D2JMFER1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

        v.                         10 Cr. 863 (AKH)

JOE FERNANDEZ,

          Defendant.

------------------------------x

                             New York, N.Y.
                             February 19, 2013
                             10:00 a.m.


Before:

               HON. ALVIN K. HELLERSTEIN,

                             District Judge


                    APPEARANCES

PREET BHARARA
    United States Attorney for the
    Southern District of New York
TODD BLANCHE
RUSSELL CAPONE
JOHN P. CRONAN
    Assistant United States Attorneys

MURRAY RICHMAN
BRIAN PAKETT
    Attorneys for Defendant


ALSO PRESENT:  SHAWN MacDONALD, DEA
                 VANESSA QUINONES, Paralegal
                 DON TAYLOR, Paralegal

D2JMFER1

1              (Trial commenced)

2              THE COURT:  Objection by the government.

3              MR. BLANCHE:  Your Honor, Todd Blanche, Russell

4     Capone, John Cronan for the government, and we are also joined

5     at counsel table by DEA Special Agent Sean MacDonald and

6     paralegal Vanessa Quinones.

7              THE COURT:  Give me a list of everyone at the table.

8              MR. BLANCHE:  Yes, your Honor.

9              THE COURT:  Murray Richman and Brian Pakett.

10             MR. RICHMAN:  Good morning, your Honor.

11             THE COURT:  To your right, Mr. Pakett?

12             MR. PAKETT:  Mr. Fernandez.  And to Mr. Fernandez's

13    right is Don Taylor, our paralegal.

14             THE COURT:  Go ahead, Mr. Blanche.

15             MR. BLANCHE:  Your Honor, just a brief issue, since we

16    have some time before the jury comes up, the panel comes up.

17             Our second cooperating witness is Patrick Darge.  You

18    may recall Mr. Darge had another case before your Honor, by

19    happenstance, several years ago, and he was a cooperating

20    witness for the government several years ago.

21             And as part of this 3500 material the government

22    produced turned and turned over his prior sentencing proceeding

23    before your Honor.  We asked defense counsel whether they

24    intended to elicit any statements made during that sentencing

25    by people other than the Patrick Darge, the witness.  That

D2JMFER1

1    would include statements by the Assistant U.S. Attorney, by

2    your Honor, and by Mr. Darge's attorney.

3            The government believes any statements by your Honor

4    or by the Assistant U.S. Attorney or by his attorney is

5    inadmissible hearsay, and we are not aware of any exceptions.

6    Certainly, they can elicit from Mr. Darge what he said at the

7    sentencing but not, for example, what your Honor said at the

8    sentencing.  It's a statement that was out of court and it's

9    not being stated in this trial.

10           THE COURT:  It's in court.  I catch your point.

11           Mr. Richman.

12           MR. BLANCHE:  It's in this courtroom, but it's not

13   being stated during this proceeding.  I am not even sure --

14           THE COURT:  I got you, Mr. Blanche.  I got the point.

15           Mr. Richman.

16           MR. RICHMAN:  Your Honor, would that not show Mr.

17   Darge's state of mind?  He stood before your Honor being

18   sentenced.

19           THE COURT:  I need to see the entire set of remarks

20   that need to be discussed.

21           MR. RICHMAN:  I have them right here.

22           THE COURT:  Hand them up, Mr. Richman.

23           MR. RICHMAN:  He is before you being sentenced --

24           THE COURT:  I would rather see remarks than hear the

25   rhetoric.

D2JMFER1

1          MR. RICHMAN:  The rhetoric is good, though.

2          THE COURT:  What do you want to introduce, Mr.

3    Richman?

4          MR. RICHMAN:  Your Honor, the point I'm making is, Mr.

5    Darge is so confident in his ability --

6          THE COURT:  Mr. Richman, please.  What line, what

7    page?

8          MR. RICHMAN:  Right there, your Honor, just where he

9    folded.

10          THE COURT:  Where the fold is.

11          MR. RICHMAN:  Where the U.S. Attorney speaks.

12          THE COURT:  We are turning to page 27 of the

13    transcript of March 8, 2004.  And what on that page?

14          MR. RICHMAN:  The portion thereof where Mr. Miller,

15    the U.S. Attorney, speaks on behalf of Mr. Darge, saying how

16    good an informant and how good he was doing and how truthful

17    and how exceptional he was as a human being.  And your Honor

18    should reduce the sentence you imposed.

19          THE COURT:  How do you want to use this?

20          MR. RICHMAN:  I want to show that Mr. Darge was so

21    confident in manipulating the system that he was able to do so

22    again after misleading the Court at that time, failing to tell

23    the truth, failing to come forth pursuant to the agreement,

24    getting the benefit of the agreement, and going on living his

25    life in complete --

D2JMFER1

1          THE COURT:  At the present moment I can't see the

2     relevance, so the government's objection is granted.  I will

3     review this in the context when, again, if ever you want to use

4     it.

5          MR. RICHMAN:  Thank you, your Honor.

6          THE COURT:  I'll give you back the transcript.

7          You want to raise another question?

8          MR. BLANCHE:  No, your Honor.  The government doesn't

9     have anything that needs to be raised.

10          THE COURT:  Are all persons attending fan clubs of

11     either the government or the defense?

12          MR. BLANCHE:  They are not from the government, your

13     Honor.

14          THE COURT:  Can I see counsel at the side bar.

15          (At the side bar)

16          THE COURT:  How many jurors are we going to get?

17          THE DEPUTY CLERK:  Probably around 60.  I told them

18     they have to move already.

19          THE COURT:  Which is a very delicate operation in

20     terms of defendant's rights.

21          MR. RICHMAN:  Your Honor, most respectfully, with

22     relation to my client's presence at the bar, I want to waive

23     his presence up here and I will clear it with him.

24          THE COURT:  Thank you.  I was going to ask that next.

25          MR. RICHMAN:  I can speak with the people.

D2JMFER1

1          THE COURT:  Before you wave, you can talk to him.  I

2    don't need his declaration.  Let him know, if he wishes to come

3    up, he can, but the marshals will come with him.  Let me know

4    after discussion with him it's his decision not to come up.

5          MR. RICHMAN:  I know the difficulty it places you in

6    here.  Of course, the person is out of the courtroom during the

7    proceedings.  Is there no way we can push them off to the side?

8          THE DEPUTY CLERK:  I told them we have to stand in the

9    corner until we seat the jury in the jury box.

10          THE COURT:  There is a lots of people.  Can we reduce

11    the number, Mr. Richman?

12          MR. PAKETT:  I have advised them there was a

13    probability that they would not be able to be in court today.

14          THE COURT:  I am not worried about your advice.  I'm

15    worried about the defendant's rights.  He's entitled to a fair

16    amount of family support, but he doesn't need that number.

17    It's not comfortable for the people to be standing that long

18    and it's not comfortable for the jurors to see that happen.

19          MR. RICHMAN:  I am going to have a portion wait

20    outside until we have a jury and then they will come back in.

21    I will work that out.

22          THE COURT:  The jury is going to be up within the next

23    10, 15 minutes.

24          MR. RICHMAN:  I'll talk to them right away.

25          THE COURT:  Thank you, Mr. Richman.  If there is a

D2JMFER1

1    problem, let me know.

2            THE DEPUTY CLERK:  Is his parents here?  Maybe they

3    can stay.  I have three chairs.

4            MR. RICHMAN:  There are other people there that have

5    nothing to do --

6            THE COURT:  Work it out with Brigitte.

7            MR. BLANCHE:  Just to be clear, though, under the very

8    recent Second Circuit case, as long as they understand that if

9    they want to be here or if your client wants to be here --

10           THE COURT:  Mr. Blanche, leave it to me.

11           MR. RICHMAN:  I was aware of what the Court was

12   telling me.  I understood that.

13           THE COURT:  I don't give any unwritten messages or

14   unspoken messages, Mr. Richman.  Mr. Richman and I understand

15   each other perfectly.  Thank you.

16           (In open court)

17           THE COURT:  Mr. Fernandez, one of the things we said

18   at the side bar is you have a right to be present at every

19   stage of the proceedings.  And from time to time we may have

20   side bars.  You have a right to come up at the side bars.  But

21   you also have a right to decide not to.  One of the problems

22   is, that if you come up, the marshals will come up.  And you

23   have to decide what you want.  Discuss it with Mr. Richman and

24   Mr. Richman will then tell me what you want.

25           MR. RICHMAN:  My client has informed me that he will

D2JMFER1

1    waive his right to approach the bench.

2              THE COURT:  Thank you, Mr. Richman.  Thank you,

3    Mr. Fernandez.

4              MR. RICHMAN:  May I use this time briefly for a small

5    issue?

6              THE COURT:  Yes, sure.

7              MR. RICHMAN:  We were served by the prosecution 3500

8    material today, a diagram of the hallway in which the homicides

9    occurred.  And as part of that exhibit we were given a fact

10   that latent fingerprints were removed from the scene, the first

11   knowledge that we had obtained of that information.

12             I just want to be assured, since it comes literally on

13   the eve of trial, that there is no attempt of linking these

14   latent prints to my client and if we have any information as to

15   whom they might belong.

16             MR. BLANCHE:  The government can give that assurance,

17   meaning, we have no information that the prints are linked to

18   Mr. Fernandez or to anybody involved in this case.  As I told

19   Mr. Richman a few minutes ago, we are getting whatever results

20   came back from the fingerprint lab, but we've spoken with

21   people during our investigation and we know -- this is the

22   lobby of an apartment building.  Based on we know so far, they

23   are not connected to anybody in this case.  I don't believe

24   that opinion is going to change, and certainly we have no

25   information to suggest that the prints will come back to

D2JMFER1

1    Mr. Fernandez.

2                THE COURT:  Thank you.

3                MR. RICHMAN:  Sufficient.

4                (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D2j0fer2                              Trial

                              AFTERNOON SESSION

1                                   2:45 p.m.

2          THE COURT:  All rise.  Be seated.

3          MR. BLANCHE:  After opening statements, we have the

4   first responder, NYPD officer.  He is not too long, about half

5   hour, maybe a little bit longer.  And then we have on our first

6   cooperating witness, have him ready to go.

7          I don't know if you want to start a cooperating

8   witness at the end of the day today, or just do the first

9   witness.

10         THE COURT:  Why?  Why not?  Go to 5:00.

11         MR. BLANCHE:  Yes, your Honor.

12         THE DEPUTY CLERK:  All rise.

13         THE COURT:  Be seated, everyone.

14         Members of the jury.  I summarized this morning the

15  indictment.  In the indictment are the accusations which the

16  government has to prove beyond a reasonable doubt.

17         The indictment itself is not evidence.  Nevertheless,

18  since it's the formal accusation, you should know it.  And I

19  read it to you:

20         On or about February 22, 2000, in the Southern

21  District of New York and elsewhere, the Southern District of

22  New York is Bronx County, New York County, counties to the

23  north, and some across the river.

24         On or about February 22, 2000 in the Southern District

D2j0fer2                           Trial

and elsewhere, Joe Fernandez, the defendant, and others known

and unknown, willfully and knowingly did combine, conspire,

confederate, and agree, together and with each other, to travel

in and cause another to travel in, interstate and foreign

commerce.  And to use, and cause another to use, the mail of

any facility of interstate and foreign commerce with intent

that a murder be committed in violation of the laws of any

state, and the United States, as consideration for the receipt

of, and as consideration for, a promise and agreement to pay

anything of pecuniary value.

        To wit, Fernandez agreed with others to kill two

persons, later identified as Ildefonso Vivero Flores and Arturo

Cuellar in exchange for currency and other things of pecuniary

value.  And in the course thereof conspirators did communicate

through a facility of interstate commerce which resulted in the

murder of Flores and Cuellar in the vicinity of 3235 Parkside

Place, Bronx, New York.  This is the first count.  These are

allegations, they are not facts.  They have to be proved.  You

do not accept this as evidence.

        Count two.  On or about February 22, 2000, in the

Southern District of New York, Joe Fernandez, the defendant,

willfully and knowingly, during and in relation to, a crime of

violence for which he may be prosecuted in a court of the

United States, namely a conspiracy to commit murder for hire,

did use and carry a firearm and, in furtherance of such crime,

D2j0fer2                          Trial

1     did possess a firearm.  And did aid and abet the use, carrying,

2     and possession of a firearm.  And in the course of that crime,

3     did cause the death of two people through the use of a firearm,

4     which killing is murder as defined as Title 18 United States

5     Code Section 111(a).  To wit, Fernandez caused the death of

6     Ildefonso Vivero Flores and Flores Cuellar by discharging a

7     firearm at Flores and Cuellar, and aiding and abetting the

8     discharge of a firearm in vicinity of 3235 Parkside Place,

9     Bronx, New York.

10          Again, these are accusations or allegations, they are

11    not evidence.  And in order to constitute evidence, proof must

12    be presented, and that proof in order to convict must be beyond

13    a reasonable doubt.

14          Now, let me give you some preliminary instructions.

15          I have mentioned evidence.  So what is evidence?

16    There are two kinds, direct evidence and circumstantial

17    evidence.  Neither has magical powers.  Neither is more or less

18    persuasive than the other.  You decide, from all of the

19    evidence in the case, or the absence of evidence in the case,

20    if the government, on the basis of all of the evidence or the

21    lack of evidence, has proved the allegations I have just read

22    beyond a reasonable doubt.

23          Direct evidence is testimony by a witness about what

24    that witness personally saw or heard or did.  Or evidence in a

25    document of what happened.

D2j0fer2                         Trial

1          Circumstantial evidence is evidence that can

2   reasonably be inferred from direct evidence.

3          You may consider both direct and circumstantial

4   evidence in deciding the case.  It's up to you to decide how

5   much weight, if any, to give to any particular item of

6   evidence.  You are the sole judges of the facts.  You determine

7   which in the witnesses you believe, what portion of the

8   testimony you accept, what appears to be credible from the

9   matters they present, what is reasonably to be inferred from

10   other evidence, and so on.

11          That's the evidence.  The attorneys may or may not

12   object to various items of evidence that come in.  Their

13   objections are not evidence.  The attorneys will say one word,

14   "objection."  If I need more explanation, I'll ask for it.

15   Otherwise, I want no explanation for making an objection.

16          The attorneys will rise, make the objection, and I

17   will rule on it.

18          (Continued on next page)

19

20

21

22

23

24

25

D2JMFER3

1          THE COURT:  Objections, ladies and gentlemen, are not

2     evidence.  Whether an attorney wins or loses objections does

3     not have any meaning for you at all.  It's my business, not

4     yours.  The evidence is what the witnesses say in response to

5     questions that may be put to them and what the documents say

6     that are in evidence and what stipulations may say in evidence.

7     Objections are not evidence.  Questions that are objected to

8     are not in evidence.  The only evidence is what the witnesses

9     say in response to questions.

10          The attorneys may ask questions.  I sometimes will ask

11     questions.  My questions have no more meaning and no less

12     meaning than if the attorneys asked them themselves.  I ask

13     questions if I feel that some aspect of the record needs to be

14     illuminated, and you can suggest questions as well.

15          There are certain principles that you need to observe.

16     First, come on time.  It's very important.  We cannot start

17     unless you are all here and ready to begin.  So everybody must

18     pay attention to starting times and be here.

19          Second, don't talk to each other about the case.

20     Don't talk to anyone else about the case.  As I said before,

21     talking about the case tends to close your mind.  You must keep

22     a clear and open mind.

23          The lawyers, the witnesses, the parties, they have all

24     been instructed not to talk to you.  They are not to say good

25     morning to you or good afternoon or how are you.  They are not

D2JMFER3

to observe the pleasantries of normal conversation.  So when
they don't answer you or don't address you if they see you,
it's not their fault.  They are paying attention to my
instructions.

        Similarly, don't hang around the lawyers.  If they are
in an elevator and you get in, get out.  If you come early,
assemble in the jury room and wait there.  Don't mingle around
the corridors.  We don't want contact between the lawyers or
the parties and the jury.  If there is anything about this case
in the newspapers, don't read about it.  If you hear it on TV
or the radio, don't listen.  What's important is the evidence
that comes in and only that.  You can't be affected by stray
comments from others.  Don't allow you to be that way.  As I
said before, don't research or investigate the case yourself.
The lawyers will present you the information that you need to
make a decision.

        We are going to start with the openings.  The
government will start first and tell you what it is they
present in the case.  This is their chance to tie all their
evidence together and give you context and sequence, and that's
the purpose of the opening.  It's not to issue a persuasive
statement.  The defendant may point out various things about
the government's proof or the lack of proof.  It's not also not
intended as a summation.  It's to give you context and what to
look for.  Then the evidence will come in by the witnesses and

D2JMFER3

the documents.  At the end of that, the lawyers will sum up the case to you.  Finally, I'll give you the instructions.  Only then should you discuss the case and only then in the jury room deliberating with one another.

We will go today until 4:30 p.m. and break and we will start tomorrow promptly at 10 a.m.  Those of you who drive, those of you who use public transportation, allow for delays.  Please try to come here on time.  Ms. Jones has your number if she needs to reach you.  You keep her number if you need to reach her.  If you're held up in some unplanned way, let Ms. Jones know about it.

We have distributed notepads and pens.  Those of you who would like to take notes, take them.  Sometimes they help memory, sometimes they help you pay attention.  They are not to be used to persuade one another.  There is a record for the case.  Later on, when you need to consult the record, you can have the record reread.  Your notes are not proof for anyone else.  They are not to help anyone else recall what happened.  They are only for your private use and only during the case.  Ms. Jones will take up the notes during the lunch break, keep them for you, she will take them at the end of the day and keep them for you.  At the end of the case we take up the notes and we destroy them.  They are only aids in recollection for those who take them.  And don't feel compelled to take them.  Some people prefer not to take notes.  Some people feel they can pay

D2JMFER3

1   better attention without notes.  Your decision to take notes or

2   not is your personal decision.

3            I think that's all I have.  And now we will turn this

4   over to the lawyers, the government first.  Who is going to

5   speak?

6            MR. CAPONE:  I am, your Honor.

7            THE COURT:  What Mr. Capone says to you is not

8   evidence.  It's his construction of the case to help you

9   understand the evidence as it comes in.

10            MR. CAPONE:  On the afternoon of February 22, 2000,

11   two men waited in the lobby of an apartment building in the

12   Bronx.  They paced around anxiously.  The loaded guns they

13   concealed in their clothes were invisible to anyone who would

14   have passed them by in that moment.  You see, these two men

15   were hired hitmen and their mission was to kill two other men

16   in connection with a massive cocaine deal gone wrong.

17            A short time later the victims walked into the lobby

18   of the building.  They thought they were headed to an apartment

19   where they were about to pick up millions of dollars in drug

20   proceeds.  They waited for the elevator to come, but it never

21   did.  Right at that moment the two hired hitmen emerged from

22   the shadows, drew their guns, and fired at close range.  They

23   got off many shots, shots that left the victims on the floor,

24   slumped over each other, bleeding to death.  The hired killers

25   made off in a getaway car and soon after that were paid their

D2JMFER3                      Opening - Mr. Capone

1     bounty.

2             One of those hired killers is that man, Joe Fernandez,

3     the defendant.  That is why we are here today, ladies and

4     gentlemen, because Joe Fernandez is a murderer who took the

5     lives of two men in connection with a large drug deal and was

6     paid $40,000 to do it.

7             For that he is charged with two crimes.  First, with

8     participating in a murder for hire conspiracy and, second, with

9     using a firearm during a crime of violence with death

10    resulting.

11            Now, as Judge Hellerstein just told you, this is the

12    government's opportunity to explain to you what it expects the

13    evidence will show at this trial and also how it will prove the

14    defendant's guilt of both counts.

15            So what will the evidence show?  The evidence will

16    show that in the late 1990s, a man named Jeffrey Minaya was an

17    up-and-coming drug dealer in New York City with a crew of

18    people who worked for him.  Through his contacts, Minaya began

19    working with a Mexican drug organization that distributed large

20    quantities of cocaine from Mexico to the United States.

21            In February of 2000, that organization sent a little

22    more than 250 kilograms of cocaine to New York City for Minaya

23    to distribute.  The way the deal was supposed to work was that

24    Minaya and his crew would sell the cocaine pretty quickly, and

25    at that point they would pay the Mexican organization back what

D2JMFER3                    Opening – Mr. Capone

1     they owed for the cocaine.

2              Now, the price for the more than 250 kilograms of

3     cocaine was over $6 million.  That is, obviously, a lot of

4     money.  And so the Mexican organization sent two men, Arturo

5     Cuellar and Ildefonso Vivero-Flores, the eventual victims, to

6     New York to watch over Jeffrey Minaya and his crew and to make

7     sure they paid the money.

8              Over the course of nearly two weeks, leading up to the

9     murders, Cuellar and Vivero-Flores stayed in close and almost

10    daily contact with Minaya and members of his crew.  But at some

11    point along the way the planned changed.  You see, drug dealers

12    are in the business of making money and Minaya and his crew had

13    come into millions of dollars, much of which they were supposed

14    to pay back to those two men.  They decided that instead of

15    paying the money back they were going to keep it and have the

16    two men killed.  They felt they could get away with it because

17    aside from those two men, almost no one in the Mexican

18    organization knew who Minaya or his crew were.  They could

19    always leave town immediately after the murders and lay low

20    with their new found millions.

21             So in the days leading up to the murders, Minaya and

22    his crew, including a man who went by the nickname Gordo, began

23    planning how to carry them out.  Minaya tasked Gordo with

24    hiring a hitman and Gordo turned to his cousin, a man named

25    Patrick Darge.

1    By the way, ladies and gentlemen, I have already used

2    a lot of names this morning.  For now don't worry about

3    remembering all those names.  By the end of the trial you are

4    going to know everything you need to know about the various men

5    who participated in this crime.

6    Now, Gordo turned to Patrick Darge because Darge was

7    family with Gordo.  He could be trusted.  He was a drug dealer

8    and he was violent enough to kill, if necessary.  And so the

9    night before the murders, Gordo and a couple of other members

10   of the crew approached Darge outside of his home.  They told

11   him about the need to kill the two men and they settled on a

12   $180,000 price tag for Darge to do it.  The plan they devised

13   was for one of the crew members to drive the two men to an

14   apartment building the next day where, as I mentioned, they

15   thought they were finally going to be paid their drug money.

16   Instead, Patrick Darge would kill them upon arrival in the

17   lobby.

18   But he couldn't do it alone.  As he went over the plan

19   that night, Patrick Darge decided that he would need a getaway

20   driver and he would need a backup shooter.  And so he asked his

21   friend, Luis Rivera to be the getaway driver and he asked his

22   cousin, the defendant, Joe Fernandez, to be his backup shooter.

23   He went to the defendant's home, to his apartment

24   complex in the Bronx and met with him that night.  He told him

25   that he had been hired to kill two men, and he told them that

D2JMFER3                         Opening - Mr. Capone

1   he needed backup.  He needed somebody with a gun in case things

2   went wrong.  He offered the defendant a cut of his fee,

3   $40,000, to do it.  The defendant heard Patrick Darge out and

4   readily agreed to the plan.

5        The next day the getaway driver picked the defendant

6   and Patrick Darge up and drove them to the apartment building

7   where the murders were to take place.  They went inside the

8   building, they scoped out the scene, they loitered in the lobby

9   until they received word that the moment had finally come.  The

10  victims were on their way in.  And so the defendant and Patrick

11  Darge stationed themselves in a mailroom area just off the side

12  of the lobby.  They remained motionless until they saw three

13  men, the crew member and the two victims, enter the lobby.  The

14  crew member passed the elevator button and stepped to the side,

15  leaving the two victims in front of the elevator.

16       Right then, Patrick Darge and the defendant rushed out

17  from the mailroom area.  Darge fired the first shot, a bullet

18  that went to the head of one of the victims, one who was

19  looking the other way and never saw it coming.  But when he

20  went to fire the second shot, his gun jammed.  He couldn't get

21  it off.  And so he immediately bolted from the building.

22       The defendant, hired to handle the situation if

23  anything went wrong, then finished the job.  He fired shot

24  after shot after shot into the heads, necks, and torsos of

25  Cuellar and Vivero-Flores, leaving their mangled bodies laying

1   on the lobby floor before he, too, fled the scene.

2          That is what the evidence in this case will show,

3   ladies and gentlemen.  Now I'd like to talk for a few moments

4   about how the government will prove the defendant's guilt.

5   First, you will hear from law enforcement officers who

6   responded to the crime scene and who investigated the murder.

7   You'll see evidence from the crime scene, bullets and shell

8   casings, and you will see photographs of the murder scene.  You

9   will hear from a doctor who works for the medical examiner's

10  office.  She will tell you about the autopsies that she

11  performed on Cuellar and Vivero-Flores and the conclusions she

12  reached regarding their death.

13         You will see other physical evidence, like documents

14  from the crime scene and documents from the victim and

15  documents from the hotel where the victims were staying.  In

16  addition, you are going to get an insider's view of Jeffrey

17  Minaya's drug organization and how it planned the murders.  You

18  will hear from witnesses who were members of the organization

19  and who helped to carry out the murders.

20         You will hear directly from Jeffrey Minaya.  He will

21  tell you about how he came to make the connection with this

22  Mexican organization, about the 250 plus kilograms of cocaine

23  that he received in February of 2000, about the decision to

24  kill the two men that had come to collect the money for that

25  cocaine, and about how he and his crew hired Patrick Darge to

1    do it.

2            And you will hear from Patrick Darge himself, the

3    other shooter that night.  Patrick Darge will tell you about

4    how he was approached and how the plan was formed, but, most of

5    all, Patrick Darge will tell you about how he and his cousin,

6    the defendant, killed two men in February of 2000.  He will

7    tell you about how he approached the defendant and told him

8    about the plan.  He will tell you about the money he offered

9    the defendant.  He will tell you that he asked the defendant to

10   bring his own gun and that the defendant agreed to bring his

11   own gun.  You will learn that the defendant was only going to

12   have to shoot if it became necessary.  And Patrick Darge will

13   tell you about when his own gun jammed, as he fled that lobby,

14   he heard the defendant firing the series of shots that finished

15   the murder they had been hired to do.

16           Ladies and gentlemen, there were two shooters that

17   night, Patrick Darge will tell you that, but you will also

18   learn about that from other witnesses that you will hear from

19   during this trial and you will learn about that from the police

20   investigation.  The ballistic evidence will show that on the

21   lobby floor and in the victims' bodies were one bullet that

22   came from a certain gun and a series of bullets that came from

23   another gun.

24           Now, you will hear about the murders not only from the

25   words of Patrick Darge, you will also hear about the

1    defendant's own words, his own admission to participating in

2    the murders from another family member.  Alan Darge is

3    Patrick's brother and so he, too, is family with the defendant.

4    Alan Darge was uninvolved in the murders, but, he, too, is a

5    criminal and he is in jail for selling drugs.

6           Alan Darge will tell you that on the eve of the

7    defendant's arrest, after law enforcement had come looking for

8    the defendant, the defendant turned to Alan for advice.  Alan

9    suggested to the defendant that he should get out of town, and

10   he even gave him some money and a cell phone.  And they

11   speculated about who could have told the government about the

12   defendant's involvement.  Was the defendant sure it was Patrick

13   Darge?  And Alan told you that he asked the defendant about

14   what happened that night, and the defendant told him about how

15   he and Patrick had shot and killed two men.

16          I would like to talk for a moment about Patrick and

17   Alan Darge and Jeffrey Minaya and some of the other witnesses

18   you will hear from during this trial.  There is no two ways

19   about it, these men are criminals.  They sold drugs, they

20   participated in other crimes you'll hear about, and some of

21   them participated in the murders.  Now, they are also

22   cooperating with the government.  They are trying to help

23   themselves eventually receive a reduced sentence.

24          Patrick Darge, I expect you will learn, cooperated

25   with the government in 2002, when he was arrested for selling

D2JMFER3                      Opening - Mr. Capone

1    heroin.  At that time he was supposed to tell the government

2    about all of his past crimes, but he didn't admit to the

3    murders.  I expect you will learn that and you will learn that

4    he served a couple of years in jail as a result of his

5    cooperation.  You will learn that he was released, that he led

6    his life, he became a deacon and then a pastor at a church.

7             But by 2010, the government had caught up with him and

8    found out about his role in the murders and he was arrested

9    again, and he began cooperating with the government again, as I

10   mentioned, as are many of the other witnesses that you will

11   hear from during this trial.

12            But I ask you to keep in mind that the question is not

13   whether you like Patrick Darge or Jeffrey Minaya or any of the

14   other witnesses you hear from during the trial.  The question

15   is whether they are telling you the truth.  Of course, the

16   government would like to prove its cases exclusively with

17   law-abiding citizens, but common sense tells you that

18   oftentimes the main witnesses to a crime are those who

19   participated in it.

20            And so I ask you to listen carefully to the testimony

21   of these men.  Listen carefully to Jeffrey Minaya when he tells

22   you about the plan to kill Cuellar and Vivero-Flores.  Listen

23   carefully to Patrick Darge when he tells you how he and the

24   defendant carried out that plan.  And listen carefully to Alan

25   Darge when he tells you about how the defendant admitted to him

D2JMFER3                          Opening - Mr. Capone

 1   his role in those murders.  I invite you to scrutinize their

 2   testimony and see if it fits with the other evidence you will

 3   see and hear during this case.

 4         And I expect at the end of the trial, when you go back

 5   to the jury room to deliberate, you will conclude that these

 6   men are telling you the truth about the murders of Ildefonso

 7   Vivero-Flores and Arturo Cuellar, and Patrick Darge is telling

 8   you the truth about how he and the defendant, his family

 9   member, carried out those murders.

10         Now, before that time comes and during the trial I ask

11   you to pay careful attention to the evidence as it comes in,

12   follow the judge's instructions on the law, and, most

13   importantly, to use your common sense, the same common sense

14   that you use to make decisions in your everyday lives.  If you

15   do those three things, if you pay attention to the evidence, if

16   you follow the judge's instructions, and if you use your common

17   sense, the government will get a fair trial, the defendant will

18   get a fair trial, and your verdict will be fair and just and

19   the verdict the government will respectfully ask you to enter

20   at the conclusion of this trial, the verdict the evidence will

21   compel is that the defendant is guilty as charged.

22         THE COURT:  Thank you, Mr. Capone.

23         Mr. Richman.

24         MR. RICHMAN:  Good afternoon, ladies and gentlemen.

25         My client is charged with a very serious crime.  He is

D2JMFER3                    Opening – Mr. Richman

1   charged with murder.  The government concedes he was never

2   involved in narcotics transactions involved in this case at

3   all.  The government concedes that his alleged entry into this

4   particular case happened on that day, February 22, when the

5   shooting allegedly occurred.

6           Let me tell you what this case is really about.  It's

7   about a man who learned to manipulate, a man who learned to

8   manipulate the system, Patrick Darge.  You see, Patrick Darge

9   was arrested in the year 2003 for narcotics transactions.  He's

10  a very smooth and very capable young man and he sat down and he

11  made a deal with the government that he would inform on every

12  crime that he ever was involved in, and the government bought

13  the story.  They bought the story and they signed an agreement

14  with him that if they caught him lying all bets were off.

15          Patrick Darge gave a story in 2003 involving his whole

16  narcotics crew and many of the people who will be testifying

17  here today.  Never mentioned Mr. Fernandez, barely mentioned

18  his brother, Alan Darge, who he will be referring to as Boozer,

19  and put forth such an example of rehabilitation that they

20  reduced his sentence from a minimum of ten years to a minimum

21  of about two.  He went about his life and walked away.

22          In the year 2010, he was arrested again, this church

23  deacon, this man of integrity, who had previously signed an

24  agreement with the following words:  He shall truthfully and

25  completely disclose all information with respect to the

activities of himself and others concerning all matters about
which this office inquires of him, all crimes which he has
committed.  Any testimony that he testified about himself
before shall now be admitted against him.

        You see what he didn't tell the government was that he
had killed someone, not here in this case, not in the year
2000, but a separate and complete other murder.  He shot a man
in the eye dead.  But he had learned to work the system.  How
did he learn to work the system?  Because last time he got off
by testifying, these other guys did it.  I am really looking to
help you.  What does he do now?  I'll tell you about more
murders I was involved in.

        You see, Patrick Darge is a killer and he will admit
being a killer.  But he knows that if he involves someone else
it will lay it off.  He will get off with a lighter sentence.
You see, Patrick Darge had previously fooled the DEA, he had
previously fooled the United States Attorney's Office, and you
will see the evidence of that yourself.  And he also previously
fooled the judge.  He lied.  And this lie got him off.  And
you'll see it.  You can hold me to it.  When you learn to lie
and you learn it works, you will continue lying, it will always
work.  You know it and I know it.

        So Patrick Darge said, fine, I can't testify against
the other people who are now in jail, let me bring someone else
in.  Let me bring my cousin in.  He is not involved in any of

1  that.  He is the guy who did it with me and that's the whole

2  testimony.  That's what this case is all about, Patrick Darge,

3  and his brother Boozer.  Boozer, who you will learn is a

4  well-known shooter because he shot people before in 1998, 1999,

5  he shot a couple of people.  He is a drug dealer.  But his own

6  brother, who is making $180,000 to kill somebody, doesn't go to

7  his brother, who he doesn't testify about before, who is a

8  known shooter who has a whole bunch of guns and you will hear

9  about that, 24 guns he has, he doesn't go to his brother.  He

10 goes to cousin.  And you will learn that his cousin is married,

11 has children.  You will learn all that.  He is a working stiff.

12 But he knows he has learned the lesson.

13        Look.  It's not a personality contest.  If I'm overly

14 dramatic, please don't hold it against me.  Listen to the

15 evidence as it comes in.  Listen to the evidence and lack of

16 evidence.  You know, aside from the word of Patrick Darge, and

17 he is slick, and the so-called admission to Boozer just before

18 my client is arrested, you'll have no evidence of fiber, no

19 evidence of saliva present, no evidence of any scientific

20 nature, DNA, anything, connecting my client to this wrong, not

21 one thing.  You will have to depend upon Patrick Darge.

22        I am going to pose a question for you at the end of

23 this case.  If Patrick Darge, as slick as he is, approached you

24 to buy a watch and he would tell you it was a Rolex, would you

25 pay $25 for that Rolex?  And if your answer was no, how then

D2JMFER3                    Opening - Mr. Richman

1   can you convict another human being on such testimony as that.

2            Thank you.

3            THE COURT:  Thank you, Mr. Richman.  The government

4   will call its first witness.

5            MR. CAPONE:  Your Honor, the government calls Police

6   Officer Joseph Szaniszlo.

7    JOSEPH SZANISZLO,

8        called as a witness by the Government,

9        having been duly sworn, testified as follows:

10  DIRECT EXAMINATION

11  BY MR. CAPONE:

12  Q.  Good afternoon, Officer Szaniszlo.

13  A.  Good afternoon, counselor.

14  Q.  How are you employed?

15  A.  I'm employed with the New York City Police Department.

16  Q.  What is your title?

17  A.  My title is police officer and I'm an auditor.

18  Q.  How long have you been a police officer for the New York

19  City Police Department?

20  A.  Just over 16 and a half years.

21  Q.  And where are you currently assigned?

22  A.  Currently assigned to the data integrity unit right here in

23  police headquarters, Manhattan.

24  Q.  What is the data integrity unit?

25  A.  What we do is, we field calls from outside commands

D2JMFER3                          Szaniszlo – direct

1   throughout the city to make sure that we can accurately record

2   the crimes as they happen, and we also monitor and take random

3   samples of all complaint reports and complaint follow-up

4   reports to make sure that they include weapons, if there was

5   any statements, evidence, et cetera.

6   Q.  Were you working for the NYPD in 2000?

7   A.  I was.

8   Q.  Where did you work in 2000?

9   A.  At the time I was assigned to 52nd Precinct in the Bronx.

10  Q.  That was not the data integrity unit?

11  A.  No.  That was a prior command.

12  Q.  When you worked in the 52nd precinct in 200, what was your

13  title?

14  A.  I was police officer assigned to patrol.

15  Q.  What do you mean by patrol?

16  A.  We were just answering 911 calls in marked patrol cars.

17  Q.  What area does the 52th Precinct cover?

18  A.  It would be a north central Bronx part of the borough.

19  Q.  Now, I would like to direct your attention to February 22

20  of 2000.

21        Were you working that day?

22  A.  I was.

23  Q.  Did you participate in a homicide investigation that day?

24  A.  I did respond to one, yes.

25  Q.  How did you come to participate in that investigation?

D2JMFER3                        Szaniszlo – direct

1    A.  Well, that day was pretty typical day on patrol.  My

2    partner and I were, the first half of the day we had come

3    off --

4         THE COURT:  The question is, how did you come to

5    respond?

6         THE WITNESS:  It was a radio run of, I believe it was

7    shots fired at the address was 3235 Parkside Place.

8         THE COURT:  What's a radio run?

9         THE WITNESS:  It came over 911 and a dispatcher

10   contacted us over the air.  She was raising us.  We were sector

11   Michael.

12        THE COURT:  So dispatcher called you directly?

13        THE WITNESS:  Yes.

14        THE COURT:  Go ahead.

15   Q.  And you may have said this already, but did the dispatcher

16   tell you where the shots were reported fired?

17   A.  It came over as shots fired in the lobby of that address.

18   Q.  What was the address again?

19   A.  3235 Parkside Place.

20   Q.  Now, when you received that radio run, how far were you

21   from 3235 Parkside Place?

22   A.  Well, we had just come off our meal break, so we were about

23   four to five blocks away at the time.  We were really close to

24   the precinct.  We had just gotten in our car.

25   Q.  Were you familiar with that building?

D2JMFER3                         Szaniszlo - direct

1    A.  Yes.  I had been there in the past and in the vicinity.

2    That's the sector we patrol usually.

3             THE COURT:  What are the nearby streets?

4             THE WITNESS:  You have Webster Avenue passes by,

5    parallels with Parkside Place, 209th Street, 210th Street.

6    There is a school in the area.

7    Q.  Who, if anyone, was in the car with you that day when you

8    received the radio run?

9    A.  Yes.  That would be Officer Paul Dronzek.

10   Q.  How long did it take for you and Officer Dronzek to respond

11   to the scene?

12   A.  We were there fairly quickly.  I would say four minutes

13   about.

14   Q.  You don't have any idea about how much time had elapsed

15   between the time that crime had taken place in the lobby and

16   the time you arrived?

17   A.  If I remember correctly, it was about 2:20 when we had

18   arrived there, and I believe the radio run, we received it

19   about four minutes prior to that, about 2:16 in the afternoon,

20   and we were there fairly quickly.

21   Q.  You don't know when the crime was actually committed before

22   that?

23   A.  No.  All I can say is when we first heard it come over the

24   radio, it was about 2:16 in the afternoon.

25   Q.  Were you and Officer Dronzek the first to arrive at the

D2JMFER3                        Szaniszlo – direct

1   scene?

2   A.  Yes, we were.

3   Q.  Can you please describe how you approached the building?

4   A.  Sure.  We knew from prior patrolling in the area where the

5   building was located, and that street is a one-way facing

6   south.  And we actually came up the wrong way on the one-way.

7   We had turned our lights and sirens off so as to not alert the

8   perps that we were getting close by, if they were still there.

9   We didn't know until we would get there and find out.  We came

10  up the wrong way on a one-way street.  We stopped our patrol

11  car just to, I guess, the south, it would be, of the courtyard

12  and the entryway to the building.  And as we got out of the car

13  we were scanning, visually scanning the area.  We had our guns

14  drawn.  We had to find out was this a founded radio run or --

15  until we could confirm what it was, we had to have our guns out

16  for our safety.  It deemed it was required at least for safety

17  sake at that time.

18  Q.  So what happened next?

19  A.  As we -- as I said, we did a visual scan of the area.  We

20  made our way to the lobby.  The courtyard has a setback from

21  the sidewalk.  The entrance has an inner and outer vestibule

22  door.  And we didn't see anybody to the north of the building.

23  We didn't see anybody across the street.  We didn't see anybody

24  in the courtyard.  So we made our way to the entry at that

25  time.

1   Q.   Did you enter the building?

2   A.   Yes, we did.  We entered the outer doors and the inner

3   doors, there was glass.  We could see what appeared to be two

4   victims laying face down from the inner lobby door.

5   Q.   This is before you entered the inner doors?

6   A.   Yes.  We went through the outer doors and there was a

7   vestibule where they have the buzzers for people to buzz to get

8   in the building.

9            THE COURT:  So the victims were lying in the place

10   where the buzzers were?

11            THE WITNESS:  No, your Honor.  They would be actually,

12   we could see through the inner lobby doors to the lobby where

13   they were lying face down next to a staircase inside the lobby.

14   We were able to see that through the glass doors from the inner

15   lobby doors.

16   Q.   Did you enter the inner doors?

17   A.   Yes, we did.

18   Q.   Do you remember if they were locked or how you got in?

19   A.   I don't recall having difficulty getting in.  I don't think

20   we had to buzz, but I don't recall difficulty.  The lock may

21   have been just broken.  We just pushed the doors and they

22   opened to gain entry.

23   Q.   Describe what happened when you went inside the lobby.

24   A.   Sure.  As soon as we walked in, we both had our guns drawn,

25   as I said, and we were looking to the left and to the right.

D2JMFER3                        Szaniszlo - direct

```
 1    It was a wide lobby.  It wasn't very deep, but it was a wide
 2    lobby.  To the left and to the right there could be somebody
 3    hiding there.  We looked both to the left and to the right.  We
 4    didn't see anybody.  We saw the two victims.  We made our way
 5    over to them.  They didn't appear to be moving, but you could
 6    see there was a growing pool of blood around the victims at the
 7    foot of the stairs where they had fallen.
 8    Q.  Where in the lobby were the victims?
 9    A.  As you come in the entryway, there is an elevator door
10    that's just off center, straight on, and a staircase to the
11    left of that as you look inside.  They were at the foot of the
12    stairs to the left of the elevator door.
13    Q.  How about in relation to each other, the two bodies, were
14    they near each door, far from each other?
15    A.  They were pretty much against each other.  Their feet were
16    apart, but their upper torsos were touching.  Their feet were
17    spread apart, though.
18    Q.  Did you do anything with the bodies?
19    A.  Well, we had actually been answering the radio and coming
20    over and telling them that we had two confirmed males shot, and
21    my partner and I were asking for an ambulance, EMS to rush to
22    come to the scene.  And I remember touching the neck of one of
23    the victims to see if I could find a pulse, and there was a lot
24    of blood on their upper bodies and I didn't feel any pulse on
25    the one victim that I touched, and neither were moving.
```

D2JMFER3                          Szaniszlo - direct

1   Q.  Aside from the crime scene, do you remember what the lobby

2   looked like generally?

3   A.  Could you repeat the question?

4   Q.  Do you remember what the lobby looked like generally, where

5   things were in --

6   A.  Generally I do, yes.

7   Q.  What is that?

8   A.  They had curved corners.  It was rectangular shaped with --

9   as I said, the elevator door, as you entered, was slightly off

10  center to the left.  A staircase.  There was an alcove under

11  the staircase where there appeared to be mailboxes, I guess,

12  for the building, and there was another apartment on the

13  extreme left.  There was an alcove there with at least one

14  apartment there.  And there was an apartment on the extreme

15  right, I believe, too.

16  Q.  I am going to show you on your computer screen there, I

17  believe it will come up, what has been marked for

18  identification as Government Exhibit 20.

19          Do you recognize what's depicted in that photograph?

20  A.  Yes.  This is from the sidewalk in front of 3235 Parkside

21  Place.  This would be the courtyard looking at the entryway

22  vestibule, the outer door.

23  Q.  Do you recognize this to be a fair and accurate

24  representation of the entryway to 3235 Parkside Place as it

25  appeared on February 22, 2000?

D2JMFER3                    Szaniszlo - direct

1    A.  Yes, I would say that is true.

2              MR. CAPONE:  Your Honor, I will offer Government

3    Exhibit 20.

4              MR. RICHMAN:  No objection.

5              THE COURT:  Received.

6              (Government's Exhibit 20 received in evidence)

7              MR. CAPONE:  This can be published now for the jury.

8    Q.  So it may be obvious, Officer Szaniszlo, can you describe

9    what you see?

10   A.  As I said, this is viewed from the sidewalk just as you

11   would enter the actual courtyard to 3235 Parkside Place, and

12   those are the outer vestibule doors to the building.

13   Q.  I am going to hand you a little laser pointer that you can

14   use for future photographs.

15             Now I am going to show you what is marked for

16   identification as Government Exhibit 21.

17             Do you recognize what's depicted in this photograph?

18   A.  Yes.  This is the same location as the other picture but

19   looking to the north, north side of the sidewalk, right in

20   front of the courtyard for 3235 Parkside looking north.

21   Q.  Is that a fair and accurate representation of the view from

22   the sidewalk of the building as it appeared on February 22,

23   2000?

24   A.  Yes, it is.

25             MR. CAPONE:  We offer Exhibit 21.

D2JMFER3                          Szaniszlo – direct

1                  MR. RICHMAN:  No objection.

2                  THE COURT:  Received.

3                  (Government's Exhibit 21 received in evidence)

4                  THE COURT:  Is the building to the left?

5                  THE WITNESS:  Yes, it is.

6                  MR. CAPONE:  I ask that that photograph be published.

7                  THE COURT:  Is the building to the left, 3235?

8                  THE WITNESS:  Yes, sir, it is.

9  Q.  And Officer Szaniszlo, in what direction did you approach

10 the building?

11 A.  From -- it would be the opposite direction from where we

12 are looking.  This is looking north.  We came from the south.

13 This is what we would have saw on the way up to the building,

14 yes.

15 Q.  I am now going to show you what is marked for

16 identification as Government Exhibit 24.

17                  Do you recognize what's depicted here?

18 A.  Yes.  That would be the inside of the vestibule, and we are

19 looking at the inner doors, and through the windows of the

20 inner doors you can see the top half on the window on the

21 right.  You can see the elevator door.

22                  I'll wait for the picture to load.

23 Q.  Is that a fair and accurate representation of the inner

24 door area of 3235 Parkside Place --

25                  MR. RICHMAN:  I have no objection, your Honor.

D2JMFER3                          Szaniszlo - direct

1    A.  That is an accurate description.

2              THE COURT:  Received.

3              (Government's Exhibit 24 received in evidence)

4              THE COURT:  How many more pictures do you have?

5              MR. CAPONE:  One more, your Honor.

6              THE COURT:  Okay to receive it, Mr. Richman?

7              MR. RICHMAN:  I have seen it.

8              THE COURT:  You don't have to authenticate the

9    picture.  Just put it up.

10   Q.  Officer Szaniszlo, is this the vantage point from which you

11   first saw the bodies?

12   A.  A little bit closer, but, yes, that was what we saw when we

13   walked through the outer door.  And as we were entering those

14   doors we are looking at, then you can see, as you walk closer

15   through the glass, you can see them, yes.

16   Q.  Is that the elevator --

17   A.  That is the elevator door that's just off center to the

18   left, with the staircase also to the left of that elevator

19   door, and the victims were at the foot of the staircase to the

20   left of the elevator door.

21   Q.  Now I am going to show you and offer Government Exhibit 25.

22             MR. RICHMAN:  No objection.

23             THE COURT:  You can put it up.

24             (Government's Exhibit 25 received in evidence)

25   Q.  Do you recognize what is depicted in this photograph?

1    A.  Yes, I do.

2    Q.  What is it?

3    A.  Those -- that's what we saw.  Those are the two male

4    victims that we saw as we entered the location.

5            The cups that you see are covering ballistic evidence,

6    possibly, and that would be bullets, bullet fragments, shell

7    casings.  And you can see the mailboxes to the left of the

8    staircase, the little alcove there.

9    Q.  Can you point to that with your laser pointer?

10   A.  Yes, of course.  This would be the alcove with the

11   mailboxes to the left of the staircase, the two victims, and

12   these cups are put there by our crime scene detectives later

13   on, after the fact, for investigation.  You can see more over

14   here on the stairs.

15   Q.  To be clear, the cups were not there --

16   A.  The cups were not there, no.  That was put there later.

17   But the images and the positions that the victims were in is

18   what we saw.

19   Q.  The victims, when you first saw them, were they in that

20   position?

21   A.  Yes.  They were touching each other and their feet were

22   apart, yeah.

23   Q.  Were there any other people in the lobby when you arrived?

24   A.  When we arrived, there was someone that did come out.  I

25   believe it was somebody on the left side.  And not -- within a

D2JMFER3                      Szaniszlo - direct

1   minute I'd say of us getting there.  And once we saw that they

2   were no threat, they didn't appear to have a firearm, they

3   looked shocked and surprised, we just told them, did you see

4   anything and just stay back.  Go back inside.  We had to make

5   sure it was safe.  We didn't know if they were still up on the

6   next landing, whether somewhere in the building.  We just

7   wanted everybody out of harm's way as well.  We didn't want the

8   crime scene contaminated any further.

9   Q.  Did that person come from an apartment?

10  A.  As I said, to the left out of this picture, but over here,

11  there was another alcove similar to this with apartments, and

12  that's, I believe, where the person had come out.  But it's

13  been a while.  I believe it was to the left side.  I know

14  someone did come out and we just said, you know -- I remember

15  saying, myself and my partner saying, did you see anything?

16  Did you see what happened?  And they were just like shocked.

17  And we told them go back inside, stay inside.  Just don't come

18  out.

19  Q.  You also said that you called for an ambulance?

20  A.  Yes.

21  Q.  Did one come?

22  A.  Yes.  They were there fairly quickly, I would say within a

23  minute or two of us getting there, because they probably had

24  heard it over their radio.  They share radio bands with us.

25  And when they heard the initial shots fired, and especially

1    once we confirmed that they were probably nearby, they were

2    there fairly quickly, I would say within one or two minutes.

3    Q.  What happened when the ambulance arrived?

4    A.  They came inside and we ushered them over.  We held open

5    the lobby doors, make sure they could get in quickly, pointed

6    where they were.  And they examined the bodies, but they pretty

7    much said that they were gone, that there was nothing they

8    could do for them.

9    Q.  Did anyone else arrive at the scene?

10   A.  Yeah.  Multiple people arrived at the scene.  We had the

11   patrol supervisor, Sergeant Rosado, who was working, he

12   arrived; Lieutenant Pagano, from the precinct, he was the

13   platoon commander.  He arrived.  In no particular order, but

14   Inspector McGrath, who was the commanding officer of the 52th

15   Precinct, precinct detectives came.  Touhy was one that I

16   remember, Detective Touhy, and later on like Bronx homicide

17   detectives, I believe, came.  It got pretty crowded there in

18   like 15 minutes or so.

19   Q.  What is the role of those detectives?

20   A.  All of those detectives' roles are to canvass, I guess, the

21   apartment to see if anybody -- we did have 911 operator said

22   that there was a call from an apartment inside the building.

23   So they would be interviewing those occupants that called what

24   they heard, what they saw, knocking on other doors, if anybody

25   else saw or heard anything, trying to get a time frame or time

1    span exactly when the crime happened and, if anything, what

2    they saw.  Got a description.

3            Because we did not have a description of the perps.

4    We had been asked by our dispatcher over the radio, do you have

5    a description?  Do you have a direction of flight?  And we had

6    seen nobody when we pulled up.  They had already gone, whether

7    they had left through the front or somewhere else, but we

8    didn't have a description.

9    Q.  And did crime scene detectives arrive at the scene?

10   A.  Yes, they also did show up on the scene.  And they laid

11   these cups out later on.  They also were in charge of

12   photographing and taking samples.  There was bullet fragments

13   that were also in the walls, I believe, over here.  There were

14   bullet fragments recovered.  There may have been some here.

15   There was scattered shell casings, as I said.  You can see

16   little bits of plaster, I guess, over here.  I remember bits of

17   plaster being knocked out.  Some of it is over here as well.

18   So the crime scene detectives were going to package all of that

19   and photograph the scene.

20   Q.  How about you.  Once the other detectives arrived on the

21   scene, did you have a role going forward?

22   A.  What we basically did is we kind of stepped back into the

23   foreground and just protected the scene.  We made sure nobody

24   came in from the outside.  We made sure nobody came down the

25   stairs and walked into the middle of this.  We had just had it

D2JMFER3                        Szaniszlo - direct

protected as it was being investigated so nobody would stumble

through it.  We don't need any additional person that would

disrupt the scene.  We had to try to freeze it just as it

happened so it could be investigated later on and nothing would

contaminate the scene.

         We basically just stood in the background.  If anybody

was walking in from the outside, what apartment do you live in?

We tried to assist in the investigation and we had to stay,

obviously.  This was in the afternoon on a school day, so there

were people that tried to say, I have to go pick up my kid from

school, or they were trying to come back into the building.  We

had to keep those people from coming in and out, unfortunately.

They had to leave the building through another way, maybe a

basement or something.

Q.  Did you play any role in recovering evidence?

A.  I did.  I played a role in vouchering several -- there were

several vouchers I prepared later on in the day.

Q.  What are vouchers, by the way?

A.  Vouchers are when evidence was collected and it was handed

to me later on, we package that up and we have to type a

voucher.  It's basically a report with a victim's name, my

name, the vouchering officer, the security envelope's number is

recorded on there.  And that keeps a trail of what is listed

and it's in a clear envelope, unless it contains blood or

biohazards.  Then it goes in brown paper bags because the

D2JMFER3                        Szaniszlo - direct

1    plastic will reactivate the blood, the fluid.  And it's just

2    for investigation later that we can keep it free from getting

3    contaminated.  It can be handled and looked at through the

4    plastic, and it's kept by the property clerk for later on for

5    investigation purposes and later on for trial, if there is any.

6    Q.  Do you remember what type of evidence you vouchered that

7    day?

8    A.  Yes.  There were many items.  There was ballistic evidence,

9    bullet, bullet casings, bullet fragments.  There were -- there

10   was decedent's property from each of the victims such as

11   jewelry.  There was a watch, a ring, cell phone, credit cards,

12   hotel passkeys.  There was some currency, some U.S. currency.

13   I think I said credit cards.  Some blood, serological evidence,

14   DNA evidence to see what victim it came from.  Probably a third

15   person, that maybe one of the perpetrators left blood behind.

16   Q.  I am going to hand you what is marked as Government Exhibit

17   62.

18            Do you recognize what that is?

19   A.  I do.

20   Q.  What is it?

21   A.  This is an envelope containing ballistic evidence that was

22   recovered by crime scene detectives that day at the scene.

23   Q.  What's ballistic evidence?

24   A.  Ballistic evidence would be shell casings.  When a bullet

25   is fired from a gun, there is brass that's left.  And if it's

D2JMFER3                      Szaniszlo – direct

1    fired from either an automatic or a semiautomatic, that brass

2    is ejected.  That was what was under some of those cups that

3    you saw in the previous pictures.  So there would be bullet

4    fragments.  If it hit a wall, it didn't hit a victim, it would

5    be deformed, the led.  That was vouchered if they were able to

6    recover that, which they did.  They recovered some.  We had

7    bullet casings, bullet fragments, and that's what's basically

8    inside this envelope here.

9    Q.  How do you know that the bullets and bullet fragments and

10   shell casings in that envelope are the same ones that were

11   recovered from the scene on February 22, 2000?

12   A.  Well, this has my name, it has voucher number on here.  And

13   we had viewed this a couple of weeks prior with you and your

14   assistants in the office.

15   Q.  Did it correspond to the voucher number you filled out --

16   A.  It did, yes.

17            MR. CAPONE:  Your Honor, I'll offer Government Exhibit

18   62.

19            MR. RICHMAN:  No objection.

20            THE COURT:  Received.

21            (Government's Exhibit 62 received in evidence)

22   Q.  I am going to show you one more exhibit.  This is what has

23   been marked as Government Exhibit 68A.

24            Do you recognize that?

25   A.  I do.

D2JMFER3                          Szaniszlo - direct

1  Q.  And what is it?

2  A.  This -- well, it could be one of several things.  It's

3  marked biohazard.  It's in a brown bag, so it had blood on it.

4  That's why we separate these items.  This could be either

5  currency or the hotel passkeys because there was blood on a

6  good bit of the victim's property.  I would have to see the

7  corresponding voucher that would list what it is for 864,

8  invoice 864.

9           MR. RICHMAN:  No objection.  I have no objection.

10          THE COURT:  Received.

11          (Government's Exhibit 68A received in evidence)

12 Q.  Would something refresh your recollection as to what's

13 inside?

14 A.  Yes.  If you have voucher number 864, I believe it would.

15 It would probably describe exactly what this is.  Yes.  It

16 states that these are the hotel passkey cards in a yellow

17 envelope, which is what we have here.  And the security

18 envelope number matches.

19 Q.  Do you know who they were recovered from?

20 A.  It says here that I typed --

21          THE COURT:  No.  Do you know?

22 Q.  Do you remember where they were recovered from?

23 A.  This was on one of the victims and these were recovered by

24 the medical examiner.  The medical examiner is the one that

25 removed the decedent's property.

D2JMFER3                         Szaniszlo - direct

1    Q.  Did you play any role in identifying the victims?

2    A.  We looked through all of the property that they had,

3    wallet, and we had to get tentative identifications by the

4    names of what was in there.  I believe only one of the victims

5    had a passport on him which contains a photo.  So the second

6    victim would have been a tentative ID based on the names that

7    was there.  Not everybody carries their ID or they may have

8    someone else's ID.  So they were tentative IDs.

9    Q.  Do you remember who you identified the victims as that day?

10   A.  I remember the names that we got.

11   Q.  What were the names?

12   A.  One was Jose Gonzalez and the other one was Ildefonso

13   Vivero-Flores, I believe.

14   Q.  Do you independently have any knowledge as to whether those

15   were the individuals' real names?

16   A.  No, I don't.

17   Q.  Were the bodies at some point removed from the scene?

18   A.  Yes, they were.

19   Q.  Did you see them being removed?

20   A.  Yes.  We were there.  My partner and I were there to secure

21   the scene.  And at a later time, probably about four hours

22   later, they were removed by representatives of the medical

23   examiner's office.

24   Q.  When did your shift end that day?

25   A.  My shift ended about an hour after it happened, but I

D2JMFER3                          Szaniszlo – direct

1   stayed.  It was around the clock until about 8:00 the next

2   morning.

3   Q.  After 8:00 the next morning, did you have any further role

4   in the investigation?

5   A.  No.  I believe all we had done was all the assorted

6   paperwork and that was it.

7              MR. CAPONE:  Your Honor, if I could have one second.

8              No further questions, your Honor.

9              THE COURT:  Mr. Richman.

10  CROSS-EXAMINATION

11  BY MR. RICHMAN:

12  Q.  Good afternoon, Officer.

13  A.  Good afternoon.

14  Q.  You and I have never spoken about this case, have we, sir?

15  A.  No, we have not.

16  Q.  Now, when you first got the radio run, you said it was

17  about 2:20 in the afternoon, is that correct?

18  A.  Actually, it was about 2:16 in the afternoon.  We arrived

19  at 2:20.

20  Q.  And you said you were coming off a mid-afternoon meal, is

21  that right?

22  A.  That's correct.

23  Q.  Where was that meal at?

24  A.  That was at the 52th Precinct station house.

25  Q.  That's on Webster Avenue, is it not?

D2JMFER3                        Szaniszlo - cross

1   A.  Yes, it is.

2   Q.  That's about half a dozen blocks or so from Park Place?

3   A.  That would be fair to say, yes.

4   Q.  When you came up, you came against the traffic without your

5   sirens, just in case anybody was leaving and would not have

6   noticed or heard from the police, is that right?

7   A.  We extinguished our sirens and lights as we entered the

8   block on 3235.

9   Q.  What kind of day was it weather wise?

10   A.  It was a sunny day.

11   Q.  Who cool, cold?

12   A.  I don't remember it being particularly cold or warm.  I

13   think it was probably seasonable.

14   Q.  That was about exactly 13 years ago this very week, is that

15   right?

16   A.  Very close to it, yes.

17   Q.  Now, when you arrived, in what position in your car?  Were

18   you the driver or recorder?

19   A.  I was the recorder.

20   Q.  Can you tell the jury what it means to be a recorder?

21   A.  A recorder is -- we call it a recorder because you are

22   either driving or you're a recorder.  You're the operator or

23   the recorder.  The recorder generally answers the radio if you

24   are called or puts over anything if you are making a stop.

25   Let's say somebody runs a red light.

D2JMFER3                         Szaniszlo – cross

1            You're also responsible for taking the paperwork for

2    any of the jobs you respond to.  That was my role that day.  I

3    was the recorder.

4            (Continued on next page)

D2j0fer4                         Joseph Szaniszlo

1   Q.  And, in fact, you did take notes that day in your memo

2   book.

3   A.  I did, yes.

4   Q.  And you're required to maintain that memo book?

5   A.  Yes.

6   Q.  And you did maintain it; correct, sir?

7   A.  Yes, I did.

8   Q.  Now, once you arrived at the scene and observed what you

9   had on your hands, you were there to preserve the integrity;

10  were you not?

11  A.  Yes.

12  Q.  And you wanted to make sure that scene, that crime scene,

13  remained untouched of any evidence that would remain there?

14  A.  To the best of our abilities, yes, while still trying to

15  see if we could render any aid or help to the victims.

16  Q.  And, in fact, in government's 21 in evidence --

17              MR. RICHMAN:  Could I have that put up, too.

18  Q.  Was it you who put the yellow tape around?

19  A.  I don't believe I did, no.  We were inside the lobby trying

20  to maintain the integrity of the initial scene anywhere the

21  victims were.

22  Q.  That's the real purpose, is to maintain that nothing is

23  messed with, so to say; right?

24  A.  That would be correct, yeah.  That tape was put up by other

25  people that arrived.  As you can see up on the corner -- could

D2j0fer4                         Joseph Szaniszlo

1   I use the pointer?

2   Q.   Sure.

3   A.   As you can see, up here, that's the front of the patrol

4   car.  And these are several officers over here, in addition to

5   one over here in uniform.  And other units were probably

6   directed by the parole supervisor to put up this tape, just to

7   slow down anybody that might turn the corner, let's say by

8   accident, and walk into something like that.  This would get

9   their attention.  And, then, if they had managed to get by an

10  officer, let's say it would slow them down from coming in and

11  examining the scene.  That's why that tape was put up there, to

12  keep people out, basically.

13  Q.   Was the street blocked?

14  A.   Not when we had gotten there, no.  At a later time, it may

15  have been; yeah, I believe it was.

16  Q.   Now, you at one point made efforts to collect evidence,

17  correct?

18  A.   I did not collect evidence at the scene.  A lot of the

19  evidence that was collected was collected by crime scene

20  detectives and the medical examiner.  They, in turn, would hand

21  this to me.  They would say who was the vouchering officer,

22  that would be me.  I would raise my hand.  And they would say

23  stay close by, you know, so you wouldn't have to go look.

24  There is a lot of work here at the time.  This was a mess.

25  Q.   And vouchering officer is the first officer on scene,

D2j0fer4                         Joseph Szaniszlo

1   right?

2   A.  Not necessarily.  In this instance, I was, yeah.

3   Q.  So there was lots of things to pick up, you picked up, I

4   believe, shell casings?

5   A.  As I said, crime scene would have done that.  But that was

6   their role.  And they would have then handed it to me once it

7   was packaged.

8   Q.  And the bullets?

9   A.  That was among some of the evidence.

10  Q.  Cell phones?

11  A.  Yes, that was prisoner -- or I keep saying prisoner,

12  forgive me.  That would be decedent's property; yes.

13  Q.  And there is a lot of blood there, correct?

14  A.  On the ground and on the victims, yes.  And on some of the

15  property.

16  Q.  And did you notice any step prints, footprints in the

17  blood?

18  A.  I did not, no.  I thought we did a good job of keeping

19  people from stepping in that, yeah.

20  Q.  And there also came a time, did there not, the other

21  persons were there, like witnesses or persons were questioned.

22  A.  I did observe detectives questioning people, yeah.

23  Q.  Now, you prepared the vouchers, is that right?

24  A.  I prepared most of the vouchers.  There was -- there was an

25  additional -- there were -- Officer Dropzig, my partner, he

D2j0fer4                      Joseph Szaniszlo

1    also prepared vouchers, but I was on the majority of them.

2    Q.  And the vouchers included all of those things that were

3    recovered from the scene?

4    A.  From the scene and from the victims; yes.

5    Q.  And for the purpose of identification, would you take a

6    look at these.  And are these your vouchers, the ones that you

7    prepared?

8              MR. CAPONE:  If I could find out what the witness

9    is --

10             MR. RICHMAN:  All vouchers 3500.

11             MR. CAPONE:  -- looking at.

12   A.  These vouchers that you have handed me do contain mine and

13   Officer Dropzig's as well.

14   Q.  As part of your work, you also prepared a report; did you

15   not?

16   A.  A complaint report, yes.

17   Q.  And you make reference -- is this the complaint report you

18   prepared?

19   A.  Yes.  This is the computer-generated version of the report

20   that I prepared roughly on the scene.  This is the computer

21   generated version, uh-huh.

22   Q.  Would you take a look at that?  Makes reference to

23   perpetrator one, is that correct?

24   A.  That's what it says; yes.

25   Q.  Did you mark that in there?

D2j0fer4                    Joseph Szaniszlo

1    A.  I don't recall, but we recorded it as best we could.  And I

2    guess I very possibly did, but I don't recall actually putting

3    that one.

4    Q.  You indicated there was one perpetrator?

5    A.  That's what it says here, yes.

6    Q.  And you prepared that report, sir?

7    A.  Yes.

8            MR. RICHMAN:  May I have I moment, your Honor?

9    BY MR. RICHMAN:

10   Q.  By the way, did you notice whether or not there were any

11   cameras in the hallway?

12   A.  I did not observe any, no.

13           MR. RICHMAN:  I have no further questions, thank you.

14           THE COURT:  Redirect?

15           THE WITNESS:  Your Honor, may I add something?

16           THE COURT:  No.

17   REDIRECT EXAMINATION

18   BY MR. CAPONE:

19   Q.  Officer, you were shown a document that is labeled 3505-C;

20   do you see that?

21   A.  Could you repeat the number?

22   Q.  3505-C, in the bottom right-hand corner?

23   A.  I do see it, yes.  I have it in my hand.

24   Q.  And what is that again?

25   A.  This is a computer-generated version of what we call "the

D2j0fer4                         Szaniszlo - redirect

1   scratch." The scratch is something that we take in rough hand,

2   pen, on the scene.

3   Q.  And you see there are details that were filled out?

4   A.  The details?

5   Q.  Yeah.

6   A.  Yes.  And in that details, it does say unknown person or

7   perps.

8   Q.  Person or perps?

9   A.  Person or perps.  I put an "S" in there in the type,

10  because it was unknown how many there were.

11  Q.  Did you, that day, have any knowledge as to how many

12  shooters there were?

13  A.  No, I did not.

14  Q.  Did you play any role in the investigation after that?

15  A.  After preparing --

16  Q.  After the following morning.

17  A.  No, I did not.

18           MR. CAPONE:  I have no further questions.

19           THE COURT:  Could I see that?  I wonder, counsel, if

20  this document should not be put into evidence because of the --

21           MR. RICHMAN:  I would offer it as such, your Honor.

22           MR. CAPONE:  I mean, your Honor, I think it's hearsay.

23  He is here to testify.

24           THE COURT:  I think it explains his testimony.  There

25  is nothing that is harmful to either side by this document, and

D2j0fer4                    Szaniszlo - redirect

1   I would like the jury to see the two items that were discussed.

2           MR. CAPONE:  Your Honor, if I could just then ask a

3   couple of more questions about it, if it's gonna be in

4   evidence.

5           THE COURT:  Let's do that.

6           MR. CAPONE:  Okay.  Let's put this into evidence as

7   the next government exhibit.

8           THE COURT:  Doesn't make any difference in front of

9   the jury who offers the document, whether it is defense or

10  government.  What counts is what's inside.  3505-C.

11          MR. CAPONE:  We can call it 3505-C, if your Honor --

12          THE COURT:  Call it 3505-C.

13          And members of the jury, there is a box midway down,

14  which you can't see from there.  But it's -- just so you see

15  the document.  The whole document is a complaint report.  And

16  it says:  Total number of perpetrators.  And the next box says:

17  Wanted, one.  Arrested, zero.  And at the bottom, under

18  details, the document says: At TPO.

19          What does that mean?

20          THE WITNESS:  At the time and place of occurrence.

21  That's an abbreviation.

22          THE COURT:  Above victim was found face down in lobby,

23  DOA.  Which means?

24          THE WITNESS:  Dead on arrival.

25          Dead on arrival of apparent gunshots.  Unknown person

D2j0fer4                      Szaniszlo – redirect

(S) fled in unknown direction.  Above reporter called 9/11 from

his parents' apartment "L" inside 3235 Parkside Place.  And

then there is other information.

          Anything else that anybody else wants to add?

          MR. RICHMAN:  No, your Honor, I'm fine.

          THE COURT:  Mr. Capone?

          MR. CAPONE:  Yes, just a couple of questions.

BY MR. CAPONE:

Q.  Officer Szaniszlo, you didn't fill out this particular

version, is that right?

A.  No.  This, once this complaint report number is received at

the precinct, we can -- and the information is typed in

manually into the computer.  Then you can print out a

computer-generated copy.  And that is often preferred, because

handwriting can be so atrocious on the scenes that at least it

could be read by anybody that picks up the report.

Q.  At what point do you fill out your hand-written version?

A.  That's usually done on the scene.  We carry scratch

complaint reports, blanks.  And we fill in the required

information at the scene.  And later on, when we go back to the

precinct, we input that into the computer.  And that's where we

actually generated our report number.  And we can print out a

hard copy then of a computer-generated report.

Q.  What type of information did you have when you printed this

report out?

D2j0fer4                        Szaniszlo - redirect

1    A.  Well, I had tentative IDs of Mr. Flores which is listed

2    here.  The times in the upper portions of the report; the time

3    of the call; the date; the day of the week; and the address of

4    the occurrence, which is listed as 3235 Parkside Place.

5    Q.  Did you have any information about how many shooters there

6    were?

7    A.  We did not know at the time.

8    Q.  I'm showing you another document -- two other documents I'm

9    showing you.

10          First is 3505-D; do you see that?

11   A.  Yes, I do.

12   Q.  And what is that?

13   A.  This is an additional complaint report for the second

14   victim.

15   Q.  The first one was for one of the victims, and this one was

16   for the second?

17   A.  Yes.  Yes.  NYPD protocol dictates that each victim of a

18   homicides gets their own complaint number.  So we have 2154 and

19   2155, one for each.

20   Q.  What is 35 -- what does it say about the number of

21   perpetrators on this form?

22   A.  It also says total number of perpetrators wanted is one,

23   arrested zero.  And in the details it says:  Perp, with an "S"

24   in parentheses that I typed in, because it was unknown whether

25   there were more than one.  There was at least one, but we

D2j0fer4                         Szaniszlo - redirect

1    didn't know how many.

2              MR. CAPONE:  And, your Honor, I'll offer 3505-E as an

3    exhibit.

4              MR. RICHMAN:  No objection.

5              THE COURT:  Received.

6              (Government's Exhibit 3505-E received in evidence)

7              THE COURT:  I think we have hit this enough.

8              MR. CAPONE:  And the next document is --

9    Q.  Well, can you identify 3505-E?

10   A.  3505-E would be a photocopy of, as I described, a scratch

11   report that we filled out on the scene.

12   Q.  Did you fill that out?

13   A.  Yes.  That's my handwriting.  And I did fill this out and

14   signed it.

15   Q.  Is that what the other documents are then based on?

16   A.  Yes.

17             MR. CAPONE:  Your Honor, I would offer 3505-E.

18             MR. RICHMAN:  Objection, your Honor.

19             THE COURT:  Let me see it.

20             THE WITNESS:  3505-E.  And this is D.

21             THE COURT:  Same, isn't it?

22             MR. CAPONE:  It's what the other documents were then

23   created.  Based on, your Honor.

24             THE COURT:  Sustained.

25             MR. CAPONE:  No further questions.

D2j0fer4                          Szaniszlo - redirect

1              MR. RICHMAN:  None, your Honor.

2              THE COURT:  You're excused, Officer.

3              Thank you very much.

4              (Witness excused)

5              THE COURT:  It's 4:15.  And we're gonna break at 4:30.

6              MR. BLANCHE:  We have another witness, your Honor, if

7    we're gonna start --

8              THE COURT:  But we can't go that far.

9              MR. BLANCHE:  Sure.

10             THE COURT:  We'll take the witness --

11             MR. BLANCHE:  Your Honor, we also need to talk about

12   scheduling.

13             THE COURT:  Just a minute sir.  Sir?  Sir?

14             THE WITNESS:  I need a break for a moment, please.

15             THE COURT:  I'm going to excuse you.

16             THE WITNESS:  May I be excused for a moment, please.

17             THE COURT:  You can all be excused.

18             Need to go right now?

19             THE WITNESS:  I would like to, your Honor.

20             THE COURT:  Go.

21             MR. BLANCHE:  Your Honor?

22             THE COURT:  Is this for the record or sidebar?

23             MR. BLANCHE:  Scheduling issue.  If we could talk at

24   sidebar for one moment, your Honor.

25             THE COURT:  I'll dismiss the jury first, and then

D2j0fer4                        Szaniszlo - redirect

 1    we'll -- I need the dismiss you all at once, so we we'll --

 2             THE DEPUTY CLERK:  Are they coming?

 3             THE COURT:  I have to dismiss them all at once.  He is

 4    gonna come back.

 5             MR. BLANCHE:  Your Honor, the scheduling issue.

 6             THE COURT:  We can't do anything until there is a full

 7    jury or I dismiss the jury, so just step back.

 8             MR. BLANCHE:  Yes, your Honor.

 9             THE COURT:  Members of the jury, we are finished for

10    today.  Close up your books, give them to Ms. Jones on the way

11    out.

12             Don't discuss the testimony, keep an open mind.  See

13    you tomorrow at 10:00.

14             THE DEPUTY CLERK:  Judge?  Judge?  You may want to --

15             MR. RICHMAN:  Voir dire in morning, sir, if you

16    recall.

17             THE COURT:  I do recall, now.

18             So we should start 10:30.

19             MR. RICHMAN:  Yes, sir.

20             THE COURT:  10:30 a.m. tomorrow morning, members of

21    the jury.

22             (Jury excused)

23             THE COURT:  If this is something personal, I'll take

24    the juror alone.

25             MR. RICHMAN:  Fine.

D2j0fer4                        Szaniszlo – redirect

1              MR. BLANCHE:  Fine.

2              (Sidebar with the Court and the juror)

3              THE COURT:  Be seated.  See you tomorrow at 10:30.

4              (Adjourned until Wednesday, February 20, 2013 at 10:00

5       a.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25