D2LMFER1

```
1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4              v.                           10 Cr. 863 (AKH)

5   JOE FERNANDEZ,

6              Defendant.

7   ------------------------------x

8                                   New York, N.Y.
                                    February 21, 2013
9                                   10:30 a.m.

10
    Before:
11
                   HON. ALVIN K. HELLERSTEIN,
12
                                         District Judge
13

14                          APPEARANCES

15  PREET BHARARA
         United States Attorney for the
16       Southern District of New York
    TODD BLANCHE
17  RUSSELL CAPONE
    JOHN P. CRONAN
18       Assistant United States Attorneys

19  MURRAY RICHMAN
    BRIAN PAKETT
20       Attorneys for Defendant

21

22  ALSO PRESENT:   SHAWN MacDONALD, DEA
                    VANESSA QUINONES, Paralegal
23                  DON TAYLOR, Paralegal

24

25
```

D2LMFER1

1              (Trial resumed; jury present)

2              THE COURT:  Mr. Darge, you remain under oath.

3              Mr. Capone, please continue your direct examination.

4              MR. CAPONE:  Thank you, your Honor.

5    PATRICK DARGE, resumed.

6    DIRECT EXAMINATION (cont'd)

7    BY MR. CAPONE:

8    Q.  Good morning, Mr. Darge.

9    A.  Good morning.

10   Q.  I'd like to go over a couple of the relationships with the

11   folks we discussed yesterday.

12              MR. CAPONE:  Ms. Quinones, if you could put Exhibit 13

13   up.  You can publish it to the jury as well.

14   Q.  Who is that, Mr. Darge?

15   A.  That's Jose Rodriguez.

16   Q.  What did you call him?

17   A.  Gordo.

18   Q.  What was Gordo's role, again, in the murders?

19   A.  He was the one that called me so that I could do the job.

20   Q.  And what is your relationship to him?

21   A.  We cousins.

22   Q.  How are you cousins?  What's the relationship?

23   A.  His father and my mother, they are like stepbrothers.

24   Q.  Do you have the same grandparents?

25   A.  Well, my mother's father is his father.  They from

D2LMFER1                          Darge - direct

1   different marriages.

2             MR. CAPONE:  Ms. Quinones, if you could just show to

3   the witness Government Exhibit 1.

4   Q.  Do you recognize who is in that photograph?

5   A.  Yes.

6   Q.  Who is that?

7   A.  Joe Fernandez.

8             MR. CAPONE:  Your Honor, the government would offer

9   Exhibit 1.

10            MR. RICHMAN:  No objection.

11            THE COURT:  Received.

12            (Government's Exhibit 1 received in evidence)

13            MR. CAPONE:  You may publish that.

14  Q.  Again, what was the defendant's role in the murders?

15  A.  His role was to back me up in case that anything happens to

16  me.

17  Q.  And how are you related to the defendant?

18  A.  His grandmother and my grandmother, they sisters.

19  Q.  So are Gordo and the defendant related?

20  A.  No.

21  Q.  But they are both your cousins from different sides?

22  A.  Right.

23  Q.  Did they know each other?

24  A.  Yes.

25  Q.  Let's go back to where we left off yesterday.  I think that

D2LMFER1                         Darge - direct

1    was after you had spoken to both Joe and Luis the night before

2    the murders.  What did you do after those conversations?

3    A.  I went back home and I don't really remember exactly what I

4    was doing at home.  I was just, you know, thinking about

5    everything, and at one point I went to sleep.

6    Q.  And what happened the next morning?

7    A.  Then when I woke up I did normal things that I do in the

8    morning, wash up and things like that.

9    Q.  Let me stop you.  I apologize.  After you spoke to Joe

10   Fernandez and Luis Rivera that night, did you have any other

11   conversations with anyone else?

12   A.  Yes, I did.

13   Q.  And with who?

14   A.  With Gordo.

15   Q.  Describe that conversation and how it happened.

16   A.  After I spoke to Luis, because that was the last person I

17   spoke to, I called Gordo so that we could meet up again and

18   discuss further plans.  And I told him that I'll be home, to

19   meet me in my house.  He told me he will.  So I went home, I

20   waited for him.  When he got to my house, he called me down and

21   I went downstairs to meet him and it was him and Zac.  Zac was

22   driving and Gordo was on the passenger's side when I got

23   downstairs.  And I got inside the car, I went, I got to the

24   back seat of the car.  And I told him that I got everything I

25   needed to do the job and I'm willing to do it.

D2LMFER1                          Darge - direct

1   Q.  By the way, these conversations with Gordo and Zac, were
2   they in Spanish or English?
3   A.  We speak in both English and Spanish.
4   Q.  How about your conversations with Joe, were they in Spanish
5   or English?
6   A.  English.
7   Q.  So after you told Gordo and Zac that you were going to do
8   it, what did they say?
9   A.  Well, we started, you know, planning how we was going to do
10  the job.  We started speaking about who was going to bring the
11  connect to the stash house, where they wanted us to wait,
12  meaning Joey and whoever I called to do the job.  And so we
13  agreed that Zac would be the ones bringing the connect to the
14  stash house, I'll be there ready waiting for them, and he also
15  told me that he will give me a code.  He will say a word to let
16  me know that he's there.
17  Q.  Who would give you the word?
18  A.  I don't remember the exact word that he told me.
19  Q.  Who was going to say it?
20  A.  Zac.  And the time, too, we agreed upon the time, that it
21  was going to be early in the day.  So I told him that, okay, no
22  problem, that I'm ready, so we agreed that we was going to do
23  it earlier on that day.  Zac was going to bring the connect to
24  the building.  I'll be there waiting for him.
25             THE COURT:  When you say early that day, did you talk

D2LMFER1                          Darge - direct

 1   about a time?

 2          THE WITNESS:  Yes, we did, but I don't remember the

 3   time.

 4          THE COURT:  Early, does that mean before dawn?

 5          THE WITNESS:  Morning.

 6          THE COURT:  How early in the morning?  Without giving

 7   me a time.  Just describe how early.  Like before light time,

 8   after daybreak, when?

 9          THE WITNESS:  It was daytime already.

10          THE COURT:  After breakfast?

11          THE WITNESS:  Yes.

12          THE COURT:  After breakfast, before lunch?

13          THE WITNESS:  Correct.

14   Q.  And this stash house, did you know whose stash house it

15   was?

16   A.  Well, yes, they told me that it was Gordo's, Zac and

17   Aladino's.  That's where they stored all the things.

18   Q.  Did you first find that out that night?

19   A.  Yes.  They were the ones that told me.

20   Q.  How were you going to know where it was?

21   A.  Well, that same night, after we discussed the plan, they

22   took me to the place.  I told them I don't need to go inside

23   the building, that I just need him to point out the building

24   and show me the area.

25          THE COURT:  What do you mean by the area?  Did he pick

D2LMFER1                        Darge - direct

1   a spot in the building?

2           THE WITNESS:  The block where the building was.

3           MR. CAPONE:  It might make sense, Ms. Quinones, to put

4   up Government Exhibit 19.

5   Q.  How did you get to that area?

6   A.  Well, I -- they drove me there.

7   Q.  Who drove you?

8   A.  Zac and Gordo was in the car as well.

9   Q.  And you said you didn't go inside the building?

10  A.  No, I did not.

11  Q.  Why not?

12  A.  I didn't need to.  I just wanted to know exactly where it

13  was at so I could know the area.

14  Q.  Did you know where you were going to be waiting inside the

15  building?  How did you know how it was going to happen inside?

16  A.  They described that in the building there was an area where

17  the mailbox was, and I would be waiting around that part of the

18  lobby.

19  Q.  He told you to wait in an area where the mailbox was?

20  A.  The mailbox area, yes.

21  Q.  Now that the map is up, do you recognize what this is a map

22  of?

23  A.  Yes.

24  Q.  What is it?

25  A.  That's where the stash house is at, where the red dot is.

D2LMFER1                        Darge - direct

1    And we drove by Webster Avenue.

2              MR. CAPONE:  Ms. Quinones, maybe we can get in a

3    little closer.

4              THE COURT:  The jury has it on their screens.

5    Q.  Do you see that map?

6    A.  Yes, I see it.

7    Q.  You see you have a little pen in front of you there.

8    That's a laser clicker.  You click it and then you can point at

9    the large map.  Can you show where you drove by?

10   A.  We drove by this street right here, Webster Avenue.  When

11   we got to this point they pointed out to this building, that

12   that was where the stash house is.

13   Q.  That is not the street that the building is on?

14   A.  No.

15   Q.  How can you see it?

16   A.  Because this part right here is up on a hill, and from

17   Webster Avenue you can see it clearly.

18   Q.  Then you just kept driving on Webster?

19   A.  Exactly.  We just kept going.

20   Q.  What was supposed to happen when you went inside that

21   building?

22   A.  Once I entered the building, they told me that by my left

23   side there was going to be the mailbox area, and that's where

24   it will be a good place for me to wait, because the lobby was

25   pretty dark.  There was not too much light in the lobby.

D2LMFER1                          Darge - direct

1    Q.  Is that what they told you?

2    A.  Yes.  And when he brings the connect that he was going to

3    give me that sign, that I could be ready.  And that's all we

4    really discussed after that.

5              THE COURT:  This is all discussion held in the car?

6              THE WITNESS:  Yes.

7    Q.  It's you, Gordo, and Zac?

8    A.  Yes.  Just us three.

9    Q.  No one else?

10   A.  No one else.

11   Q.  Was Zac doing any talking?

12   A.  No.  All the talking was Gordo.

13   Q.  And you?

14   A.  And myself, yes.

15   Q.  Is there anything else you remember about your discussion

16   in the car that night?

17   A.  No, not at this moment.

18   Q.  What happened next?

19   A.  So then they dropped me off home and I went upstairs.  I

20   don't remember exactly the things that I was doing, but at one

21   point I went to sleep.  And I woke up the next day.

22   Q.  What did you do when you woke up?

23   A.  You know, normal things, washed up.  And then after I

24   was -- I cleaned up and whatnot, I called Gordo to find out if

25   everything is still in plan, and he told me yes.  So then right

D2LMFER1                          Darge - direct

1    away, after my conversation with Gordo, I called Joey Fernandez

2    and also Luis Rivera to find out if they were still in the

3    plan, and everybody says yes.  So I told Luis that we need to

4    start getting together so we could start heading to the place.

5    Q.  By the way, how many phones were you using at the time?

6    A.  I only had one phone.

7    Q.  And is that a phone that you used to call people in other

8    states as well as in New York?

9    A.  Yes.

10   Q.  So what happened after you spoke to Joe and Luis?

11   A.  After they told me that everybody is still sticking to the

12   plan, so I told Luis that he needs to start picking me and Joey

13   up so we could start heading to the stash house.  I don't

14   remember if he picked me up first or he picked up Joe first,

15   but at one point we was all together, and we went to the stash

16   house.

17   Q.  What kind of car was Luis driving?

18   A.  Ford Expedition.

19   Q.  What color was it?

20   A.  It was like greenish, like aqua green, something like that.

21   Q.  Whose car was it?

22   A.  It was Luis Rivera's.

23   Q.  Is that a car you had driven in before?

24   A.  Yes, plenty of times.

25   Q.  Is that the car you testified yesterday that had a secret

D2LMFER1                          Darge - direct

1    compartment in it?

2    A.  Yes, correct.

3    Q.  And it was installed at Live Wire?

4    A.  Yes, correct.

5    Q.  Do you remember who installed the secret compartment in

6    Luis' car?

7    A.  Yes, I remember.  Gordo, Zac, and Richard.

8              MR. CAPONE:  Ms. Quinones, if you can put up

9    Government Exhibit 10.

10   Q.  I don't think I have shown this one to you.

11             Who is that?

12   A.  That's Richard.

13   Q.  And what did he do?

14   A.  He worked for Live Wire.

15   Q.  Do you know why Luis Rivera had a secret compartment in his

16   car?

17   A.  Yes.  Because he was selling drugs and that was a

18   convenient way to transport drugs from one spot to another,

19   money as well.

20   Q.  Had you seen him put drugs in that compartment before?

21   A.  Yes.

22   Q.  And where was the secret compartment?

23             THE COURT:  Are you okay with this?

24             MR. RICHMAN:  I don't know the relevancy of this.

25             THE COURT:  Neither do I.  I'm asking if you're okay.

D2LMFER1                        Darge - direct

1   You're not objecting.

2            MR. RICHMAN:  I object, your Honor.

3            THE COURT:  You are late.  The line has come in.

4   Sustained as to this question.

5   Q.   What happened when you were in the car?

6   A.   Once we was in the car, like I said yesterday, I told Luis

7   Rivera to bring me a gun that I could use and be able to get

8   rid of it after use.  He opened up the secret compartment where

9   he had the gun, he handed me over the gun.  And we was driving,

10  I checked the gun, I took out the cartridge from the gun, took

11  out all the bullets, and started cleaning for any fingerprints

12  while we was on our way to the stash house.

13  Q.   What did you clean for fingerprints?

14  A.   The bullets, the cartridge, the gun.

15  Q.   What did you use to do that?

16  A.   I used my shirt.

17  Q.   Why did you do that?

18  A.   To remove any form of fingerprints.

19  Q.   What did the gun look like?  Do you remember?

20  A.   It was a handgun.  It was not new.  It was brownish color.

21  Q.   Do you know what kind of gun it was?

22  A.   It was a handgun.  I'm not a gunsmith, so I don't --

23  Q.   Yesterday you testified that you told the defendant he

24  would need to bring his own gun.  Did he?

25  A.   Yes, he did.

D2LMFER1                          Darge - direct

1    Q.   And did you see that gun at any point?

2    A.   Yes, I did.

3    Q.   At what point?

4    A.   When we was driving, he had his gun in a little duffle bag.

5    And while we was discussing about all the things that we are

6    going to do, where we are going to be, waiting for the connect

7    to come, and making sure that Luis understands his role, that

8    he had to keep the car on when he waits for us.  And I was just

9    explaining to both of them everything that they need to do so

10   everything could go according to plan.  And while we was

11   talking, Joey was putting together his gun.

12   Q.   What do you mean, putting together his gun?

13   A.   Yeah.  Because it was not a handgun.  It was something, you

14   know, bigger than mines.

15   Q.   Do you remember --

16            THE COURT:  What do you mean it was not a handgun?

17   What kind of gun was it?

18            THE WITNESS:  I'm not a gunsmith.

19            THE COURT:  Describe it.

20            THE WITNESS:  It was pretty big.  It was about this

21   size.

22   Q.   Indicating about two and a half to three feet, two feet?

23   A.   Yes.  I had a handgun, but he had a much bigger gun.

24            THE COURT:  He put the parts together?

25            THE WITNESS:  Yes.

D2LMFER1                              Darge - direct

1    Q.  Did the defendant also wipe his gun down?

2    A.  I didn't see all of that, no.

3    Q.  Do you know one way or the other?

4    A.  I don't know.

5    Q.  And you said you were telling the defendant and Luis what

6    they were supposed to do?

7    A.  Yes.

8    Q.  What did you tell the defendant he was supposed to do?

9    A.  Joey Fernandez, I told him that he should be on my back,

10   backing me up.  And Luis Rivera, when we get to the place, he

11   was not going to drop us off right in front of the building,

12   but we was going to go around the block.  He was going to drop

13   us off and then wait for us in the next corner where he dropped

14   us off with the car on, ready to go.

15            THE COURT:  You might want to illustrate that.

16            MR. CAPONE:  You want to pull up Exhibit 19.

17            THE COURT:  Get it closer.  Use your laser.  Show them

18   where you were supposed to be parked and you are supposed to

19   wait, Mr. Rivera was supposed to wait.

20            THE WITNESS:  This is the street where we came

21   through.  We passed right in front of the building.  And then

22   we went around this block right here.  And he dropped us off

23   right around here.

24            THE COURT:  In back of the billing?

25            THE WITNESS:  Yes.  There is other buildings there,

D2LMFER1                              Darge - direct

1    but, yes, in back of the building.

2              THE COURT:  What street is that?  Do you know?

3              THE WITNESS:  No, I don't know what street.

4              THE COURT:  Does the map indicate?

5              MR. CAPONE:  The map seems to indicate Decatur Avenue,

6    your Honor.

7              THE WITNESS:  He dropped us off right here and I told

8    him to wait for us at this corner right here.

9              THE COURT:  The corner of Decatur and --

10             THE WITNESS:  And 207.

11             THE COURT:  And 207th Street?

12             THE WITNESS:  Yes.

13             THE COURT:  In the Bronx?

14             THE WITNESS:  Yes.

15   Q.  Is that what happened?

16   A.  Yes.

17   Q.  And where did he go after he dropped you off?

18   A.  Once he dropped us off, like right around here, Joe and I

19   walked, turned the corner, came down, made a right, and went

20   inside the building.

21   Q.  By the way, do you remember what you were wearing that day?

22   A.  Yes, I remember what I was wearing.

23   Q.  What was that?

24   A.  I had black boots, black jeans, a black hoodie, and navy

25   blue jacket.  I had black gloves on, too.

D2LMFER1                          Darge - direct

1    Q.  Do you remember what the defendant was wearing?

2    A.  Joey Fernandez had a hoodie.  He had a jacket, jeans, and I

3    don't remember if he had boots or sneakers.  I'm not too clear

4    about his outfit.  But I know he had a hoodie.

5    Q.  Was he wearing anything on his hands?

6    A.  Yeah.  He had gloves, also.

7    Q.  Did you take your gloves off at any point?

8    A.  Yes.  After the murder, when we was inside the car.

9    Q.  Did you take your gloves off at any point before the

10   murders?

11   A.  No.  Because as we was driving there I was cleaning the gun

12   and I didn't want to leave any fingerprints anywhere.

13   Q.  Did you see the defendant take his gloves off at any point

14   before the murders?

15   A.  No, I did not.

16   Q.  And you also said you saw Luis take the gun out of the

17   secret compartment and give it to you?

18   A.  He opened up the secret compartment.

19   Q.  Where was that?

20   A.  That was on the arm rest.

21   Q.  Do you know how he opened it?

22   A.  Yes.  Electronically.

23            MR. RICHMAN:  Objection.

24            THE COURT:  Overruled.

25   Q.  What do you mean by that?

D2LMFER1                          Darge - direct

1    A.  He has a code and that he presses and it just opens up

2    electronically.

3              THE COURT:  So you were driving in the car, the three

4    of you?

5              THE WITNESS:  Yes.

6              THE COURT:  Who was driving?

7              THE WITNESS:  Luis Rivera.

8              THE COURT:  Who was sitting in the passenger's seat in

9    the front?

10             THE WITNESS:  Me.

11             THE COURT:  Who was sitting in the back?

12             THE WITNESS:  Joe Fernandez.

13             THE COURT:  Were you watching Mr. Fernandez?

14             THE WITNESS:  No.  At that point I'm not watching Joe

15   Fernandez.

16   Q.  Did you see him take a gun out?

17   A.  Yes.

18   Q.  When you say you are not watching him, you mean --

19   A.  When we was opening the stash I'm focusing on getting the

20   gun in the stash, so I'm looking at that.  That's what I think

21   I'm being asked.

22   Q.  Now, as you took the walk around the corner to the building

23   that you just discussed, where was your gun?

24   A.  My gun was in my hood pocket in front of me.

25   Q.  And where was the defendant's gun?

D2LMFER1                        Darge - direct

1    A.  Joe Fernandez, he strapped his on his shoulder and he

2    covered it with his jacket.

3    Q.  What happened when you got inside the building?

4    A.  As soon as we got in front of the building, we didn't have

5    to open any doors.  The doors was already open.  We just walked

6    inside the lobby.  And I told Joey to check if there is any

7    cameras inside the lobby.  And we did briefly looked around.

8    We didn't see no cameras.  And we looked around for the mailbox

9    room which it was on our left side.  We walked towards the

10   mailbox area and then we saw a door, too, that leads to an

11   alley.

12   Q.  Can you describe how generally how the lobby looked?

13   A.  The lobby, we walked in, all the doors was opened.  As soon

14   as you walk in, there is the elevator is there.  Then on my

15   right you have like a hallway with some apartments and another

16   staircase leading to other floors.  And then on my left, right

17   next to the elevator, there is like two steps and then there is

18   the main stairways to go to the next floor.  Before that, at

19   your left, you have a little hallway which leads to the mailbox

20   room.  And then from the mailbox room there is a door that

21   leads to an alley outside.

22   Q.  What did you do after you looked around the lobby?

23   A.  Once we looked around, we went to -- towards the mailbox

24   area.  We actually went out the door.  There was a black door,

25   metal door there with a glass.  And we looked through the

D2LMFER1                          Darge - direct

1    alleyway.  We got up to -- even there was a gate there that was

2    not in good condition, and we checked around, we looked around.

3    And then we started -- we talked to each another and say, man,

4    this is taking too long because we was already there for a

5    little while there.  I told him that I will call Gordo and find

6    out what's going on so he could let me know, you know, how is

7    the progress of them bringing the connect.

8    Q.  Did you call Gordo?

9    A.  Yes, I did.

10   Q.  Did you speak to him?

11   A.  Yes.

12   Q.  And what did you learn?

13   A.  I told Gordo that, you know, what's going on.  We are here,

14   we are waiting.  And he told me that Zac is on his way, that as

15   soon as Zac gets to the neighborhood, like close by, that he

16   will call me again and let me know so I can be ready.

17          THE COURT:  Who is he that will call?

18          THE WITNESS:  Zac.

19   Q.  Zac was going to call you?

20   A.  Gordo was going to call Zac to find out how far he is.  And

21   when Zac was close enough to the building that Gordo was going

22   to call me and let me know.

23   Q.  Did you talk about anything else with Gordo?

24   A.  I asked him, you know, how he will know, and he told me

25   that he is close by, that he is by a McDonald's that is on

D2LMFER1                          Darge - direct

1    Webster Avenue.

2    Q.  Did you know where that McDonald's was?

3    A.  Yes.

4    Q.  You see it on the map?

5    A.  No.

6    Q.  Can you now see it on the map?

7    A.  Yes.

8    Q.  Can you point to it.

9    A.  Right around here.

10   Q.  Indicating --

11   A.  That's Gun Hill Road and the McDonald's is right around

12   here.

13   Q.  At the intersection of Gun Hill Road and Webster Avenue?

14   A.  Yes.

15   Q.  How was Gordo going to know when Zac was about to arrive?

16   A.  This main area you can see people coming from the highway,

17   from Bronx River, from any route, and that was the route that

18   he was going to take to come inside this neighborhood.

19           THE COURT:  I don't know if that answered the

20   question.

21           How is Gordo going to know when Zac was about to

22   arrive?  How do you know that?

23           THE WITNESS:  Gordo told me that he was parked right

24   here by McDonald's.

25           THE COURT:  Near the McDonald's?

D2LMFER1                          Darge - direct

1              THE WITNESS:  Exactly.

2              THE COURT:  That's high ground.

3              THE WITNESS:  No.  It's level with Gun Hill, Webster.

4      It's not nothing blocking anything.  You can see this whole

5      area clearly.  It's not a good picture, but you can.  And Zac

6      was coming from this route.

7              THE COURT:  From the east across the bridge?

8              THE WITNESS:  Exactly.

9              THE COURT:  There is a bridge there over the Bronx

10     River Parkway.

11             THE WITNESS:  It's not a bridge, but somewhat.  He was

12     going to come this route.  He told me he was going to see him

13     when Zac passed by.

14     Q.  And you mean coming on Gun Hill Road, turning onto Webster

15     Avenue?

16             THE COURT:  Coming west on Gun Hill Road, turning

17     left.

18             THE WITNESS:  This area, this is a one-way street, so,

19     yes.

20             THE COURT:  Which is the one-way street?

21             THE WITNESS:  You have to enter through here.

22             THE COURT:  What's a one-way street?

23             THE WITNESS:  The neighborhood where the stash house

24     is.

25             THE COURT:  Parkside Terrace?

D2LMFER1                        Darge - direct

1              THE WITNESS:  Yes.

2              THE COURT:  To enter Parkside Terrace, you go first on

3    Webster Avenue?

4              THE WITNESS:  Right.

5              THE COURT:  If you're turning left or south from Gun

6    Hill Road, you still go onto Webster Avenue and then you go on

7    Parkside Terrace.  Is that it?

8              THE WITNESS:  Yes.

9              THE COURT:  Parkside Terrace is elevated over Webster?

10             THE WITNESS:  Yes.  Right here is where you enter and

11   you come in.

12             THE COURT:  Indicating the entrance of Parkside

13   Terrace on Webster Avenue going south.

14             MR. CAPONE:  Thank you, your Honor.

15   Q.  Do you know if Gordo was with anyone when you spoke to him?

16   A.  Yes.  He told me Aladino was with him.

17   Q.  What happened after you spoke to Gordo?

18   A.  We just waited.  We waited right by the mailbox room for

19   Gordo to call me.

20   Q.  Did you have any other discussion?

21   A.  No.  We was just -- we pretty much said everything we had

22   to say and we was just waiting and making sure that we are not

23   seeing -- as we was waiting, one tenant came out the building

24   that I remember and that's pretty much it.  It was no movement

25   at the time that we was there besides that tenant, so it was

D2LMFER1                          Darge - direct

1    pretty quiet.

2    Q.  And, by the way, earlier you said you had been told the

3    lobby would be dimly lit.

4    A.  The mailbox area, there was not much light there.

5    Q.  How about the regular lobby?

6    A.  It was all not too bright.

7              THE COURT:  There is a picture that you had before of

8    that area.  Put it up.

9              MR. CAPONE:  The picture?

10             THE COURT:  In evidence of that lobby.

11             MR. RICHMAN:  21, your Honor.

12             MR. CAPONE:  One second, your Honor.

13             Your Honor, the picture we have never shown the

14   witness.  It's after the murders.

15             THE COURT:  Don't talk to me yet.  If you want to

16   discuss this at side bar -- when we are talking about the

17   lobby, I thought it might be useful.

18             What do you think, Mr. Richman?

19             MR. RICHMAN:  I think it's proper.  Show him the

20   picture.  It's indicative if you show this picture before to

21   the witness --

22             THE COURT:  Enough, gentlemen.  Put up the picture and

23   see if you can identify what's there.

24             MR. RICHMAN:  It's in evidence.

25             MR. CAPONE:  That would be Government Exhibit 21.

D2LMFER1                          Darge - direct

1              It's Government Exhibit 25.

2              THE COURT:  Do you recognize that, Mr. Darge?

3              THE WITNESS:  Yes.

4    Q.  Have you ever seen this picture?

5    A.  No.

6              THE COURT:  Where were you waiting?

7              THE WITNESS:  By the mailbox area right there.

8              THE COURT:  Use the laser pointer.

9              THE WITNESS:  This area right here.

10             THE COURT:  And that red door, is that the elevator?

11             THE WITNESS:  Yes.

12             THE COURT:  When you saw the tenant come out, where

13   did the tenant come out from?

14             THE WITNESS:  He came down from this --

15             THE COURT:  Came down the stairway?

16             THE WITNESS:  Yes.

17             THE COURT:  Do you think the tenant saw you?

18             THE WITNESS:  I don't know, no.

19             THE COURT:  Excuse me?

20             THE WITNESS:  I don't know if she did or not.

21             THE COURT:  Continue, Mr. Capone.

22   Q.  Where were you when you saw the tenant?

23   A.  We was in the mailbox area.

24   Q.  And where did the tenant go?

25   A.  Out the building.

D2LMFER1                            Darge - direct

```
 1   Q.  So you said you were waiting around for Gordo to call.  Did

 2   you receive any call?

 3   A.  Yes.  Gordo called me to tell me that Zac should be pulling

 4   up any minute now.

 5   Q.  And what happened after that?

 6   A.  So I told Joey to get ready.  We had already -- we put our

 7   hoodies on, and we was just there waiting.

 8   Q.  Where were you waiting?

 9   A.  By the mailbox area.

10          THE COURT:  Both of you together?

11          THE WITNESS:  Yes.  Joey was behind me.  I was in

12   front of him.

13   Q.  Did anyone eventually come into the building?

14   A.  Yes.  Zac.

15   Q.  How long from when you were told by Gordo that he would be

16   coming was it until he actually arrived?

17   A.  It was seconds.  I can't tell you exact.

18   Q.  You say you saw Zac come in.  Did he come in with anyone

19   else?

20   A.  Yes.

21   Q.  How many more people?

22   A.  Two more people.

23   Q.  What happened at that point?

24   A.  Well, when Zac entered, I know Zac.  And I knew that it was

25   him.  And he gave me the sign.  And when I looked behind him I
```

D2LMFER1                          Darge - direct

1    saw the connect behind him, which was the two guys.

2    Q.  What did they do?

3    A.  So as soon as Zac came in, he press the button for the

4    elevator.  And if you want to --

5             MR. CAPONE:  I want to put back up Exhibit 25.

6    A.  Zac pressed the button for the elevator and then he

7    slightly went up -- he stood right by here instead of standing

8    by the elevator.

9             THE COURT:  Around that corner?

10            THE WITNESS:  Yeah, right here.  He went up the steps

11   right here.

12            THE COURT:  The steps are recessed a few feet from the

13   face where the elevator is?

14            THE WITNESS:  Right.

15            THE COURT:  And he stood in that recess, is that

16   right?

17            THE WITNESS:  Yes.  And one was facing the elevator

18   and the other one had his back towards me, which I was standing

19   by the mailbox room area.

20   Q.  One had his face directly to the elevator?

21   A.  Yes.  He was facing the elevator.

22   Q.  And the other had his back to you?

23   A.  The other one, yeah, had his back towards me.

24   Q.  So what happened next?

25   A.  As soon as they positioned themselves, the gun was already

D2LMFER1                          Darge - direct

1    loaded and ready to shoot.  I walked up to the one that was

2    facing his back towards me and I aimed to his head, right by

3    this area, and I pressed the trigger.

4    Q.  How close was the gun to his head when you pressed the

5    trigger?

6    A.  About an inch.

7    Q.  And do you recall where on his head you were aiming?

8    A.  Yes.  Back here.

9    Q.  Behind his ear?

10   A.  Yes.  On his right side.

11   Q.  And was your gun, if you recall, pointed towards the front

12   of his face or to the side of his head?

13   A.  He was pretty tall, taller than me.  And so I faced up.

14   Q.  Straight or angled?

15   A.  Up, at an angle.

16   Q.  Indicating from the right to the left?

17   A.  From the right to the left, yes.

18   Q.  Did the shot go off?

19   A.  Yes, it did.

20   Q.  Did you see what happened to him after the shoot went off?

21   A.  Yes.  He twitched.  And then when I tried to go for the

22   other guy the gun was jammed, so I tried to unjam it.  I saw I

23   wasn't getting anywhere, because the gun won't unjam.  So I put

24   it back in my hoodie and I left out the building, ran out the

25   building.

D2LMFER1                          Darge - direct

1  Q.  Now, stepping back a moment, when you first left the

2  mailroom area to head towards that man, what did the defendant

3  do?

4  A.  Joey was behind me.

5  Q.  Did he leave the mailroom area as well?

6  A.  Yes.

7  Q.  How do you know that?

8  A.  Because that was what he was supposed to do.  Once I go

9  up --

10            MR. RICHMAN:  Objection.

11            THE COURT:  Sustained.  Change the form.  Put the

12  question again.  Just change the form.

13  Q.  Did you see the defendant come out of the mailroom area --

14            THE COURT:  When you say how do you know that, is

15  there a conversation that you had that discussed what he was

16  supposed to do?

17            THE WITNESS:  Yes, your Honor.

18            THE COURT:  Who was the conversation between?

19            THE WITNESS:  Joe Fernandez and myself.

20            THE COURT:  When did it occur?

21            THE WITNESS:  Before the murder.

22            THE COURT:  When before?

23            THE WITNESS:  When I already knew that they were

24  already coming in the building.

25            THE COURT:  So you had a conversation with

D2LMFER1                          Darge - direct

1    Mr. Fernandez?

2                    THE WITNESS:  Yes.

3                    THE COURT:  What did you say to him and what did he

4    say to you?

5                    THE WITNESS:  That I was going -- as soon as they come

6    and position themselves, I was going to walk right straight to

7    the first guy and for him to be behind me watching my back.

8                    THE COURT:  What does that mean?

9                    THE WITNESS:  To be right behind me in case of

10   anything.

11                   THE COURT:  When you walked out what was he supposed

12   to do?

13                   THE WITNESS:  Be behind me.

14                   THE COURT:  Also walk out?

15                   THE WITNESS:  Yes.

16                   THE COURT:  And if there were two guys, did you

17   discuss if you or he was supposed to shoot the second fellow?

18                   THE WITNESS:  Yes, we did.

19                   THE COURT:  What did you say to him and what did he

20   say to you?

21                   THE WITNESS:  I said I was the one that was going to

22   shoot both.  All he had to do was watch my back.

23                   THE COURT:  So no one else would get to you?

24                   THE WITNESS:  Exactly.

25   Q.  Why did he need a gun?

D2LMFER1                           Darge - direct

1   A.  To defend himself.

2              MR. RICHMAN:  Objection.

3              THE COURT:  Sustained.

4   Q.  You asked him to bring a gun, is that right?

5   A.  Yes.

6   Q.  Did you tell him why he needed to bring a gun?

7              MR. RICHMAN:  Objection.

8              THE COURT:  Overruled.

9   A.  Because his job was to back me up.

10             THE COURT:  Did you say that to him?

11             THE WITNESS:  Yes.

12             THE COURT:  The question is, what did you say to him?

13  What did you say to him and when?

14             THE WITNESS:  When we spoke the first time, I told

15  him --

16             THE COURT:  First time is when, near the project?

17             THE WITNESS:  Right.

18             THE COURT:  The Roberto Clemente project?

19             THE WITNESS:  Yes.  I told him he needed to back me

20  up.  I knew he would not be able to defend me with his hands,

21  so I told him to bring a gun in case somebody try to get me and

22  shoot me.

23  Q.  By the way, the two men that came in with Zac, had you ever

24  seen them before?

25  A.  No.

D2LMFER1                           Darge - direct

1   Q.  I should say, do you know if you had ever seen them before?

2   A.  One time I was in Costco or BJ's, one of those two, I don't

3   remember exactly, and I saw Jeffrey Minaya.  As I walking out

4   the place, he was walking in and he was with two guys.  And we

5   just slightly greeted each other and we just kept walking.  I

6   don't know if these two were the same guys.

7   Q.  Why do you even bring that up?

8   A.  Because I knew that he will always be with his connect and

9   I knew that these guys were his connect.

10  Q.  I think you said that you fired one shot and then your gun

11  jammed?

12  A.  Yes.

13  Q.  And what did you do?

14  A.  I tried to unjam it and I wasn't -- I didn't get anywhere,

15  so I put it back in my hood pocket, which was in the front, and

16  I ran out the building.

17          THE COURT:  What do you do to unjam it?

18          THE WITNESS:  I was trying to unclog it because there

19  was a bullet jammed.

20          THE COURT:  You pressed the first bullet for the first

21  guy and the bullet issued?

22          THE WITNESS:  Yes, it did.

23          THE COURT:  You pressed the trigger again.

24          THE WITNESS:  And nothing happened.

25          THE COURT:  That's what a jam is.

D2LMFER1                         Darge - direct

1                   THE WITNESS:  Yes.

2                   THE COURT:  How do you try to unjam it?

3                   THE WITNESS:  I try to clock it back, but I didn't get

4      nowhere.

5      Q.  What do you mean, clock it back?

6      A.  Because it was an automatic gun, so I tried to like unjam

7      it.  Once I released the first shot, the gun cocked back and

8      then it stood like that.

9                   THE COURT:  You tried manually to do what?

10                  THE WITNESS:  To unjam it.

11                  THE COURT:  With a cock?

12                  THE WITNESS:  Yes.

13                  THE COURT:  You tried to push the cock forward?

14                  THE WITNESS:  Yes.

15                  THE COURT:  With a bullet in the chamber?

16                  THE WITNESS:  Right.

17     Q.  What happened after you couldn't get the shot off?

18     A.  I put the gun back in my hood pocket and I ran out the

19     building.

20                  THE COURT:  What did the guy you were trying to shoot

21     do?

22                  THE WITNESS:  When I took the first shot, he twitched,

23     and then right away I wanted to go for the second guy.

24                  THE COURT:  Who twitched?

25                  THE WITNESS:  The first guy, the guy that I hit in the

D2LMFER1                           Darge - direct

1    back --

2              THE COURT:  What do you mean, he twitched?

3              THE WITNESS:  Once I let go of the shot, he kind of

4    like twitched.

5              THE COURT:  His head shook?

6              THE WITNESS:  Yeah.  He went down a little bit.

7              THE COURT:  He didn't fall to the ground?

8              THE WITNESS:  No, he did not.

9              THE COURT:  What did the second guy do when your gun

10   jammed?

11             THE WITNESS:  I was too busy trying to unjam the gun,

12   so once -- he just stood there.  And once I see that I

13   couldn't, I just put the gun in my pocket and I ran out.

14   Q.  How long did you spend trying to unjam your gun?

15   A.  It was seconds.  You know, everything happened so fast.

16   Q.  Did you see where the defendant was when you ran out?

17   A.  No.  At that point I didn't see.

18   Q.  Did you see if he had left the mailroom area?

19   A.  No.  I -- once I saw the gun, I just looked to the exit and

20   I left.  I ran out.

21   Q.  Did you hear anything as you ran out?

22   A.  Yes.  I heard more shots.

23   Q.  How many?

24   A.  That I remember, two, two or three at the most.

25   Q.  Did you keep running?

D2LMFER1                          Darge - direct

1    A.  Yes, I did.

2    Q.  Where did you go?

3         MR. CAPONE:  We can put Government Exhibit 19 back up

4    and get in a little closer.

5    A.  Once I got out the building, I made a left and ran across

6    the street.

7    Q.  On 207th Street you made a left?

8    A.  On 207th Street I made a left, crossed to the other side

9    because Luis was waiting for me right there at this corner.

10   Q.  The corner of 207th Street?

11   A.  And Decatur, yes.

12   Q.  And was Luis there?

13   A.  Yes, he was.

14   Q.  Was he inside of the car?

15   A.  Yes, he was.

16   Q.  Was the car on or off?

17   A.  It was on.

18   Q.  Did you notice anything else as you were running for the

19   car?

20   A.  No.  I just ran and, you know, my adrenaline was very high.

21   Once I heard the shots and as I was running, then after a

22   while, you know, I felt like somebody was running, you know

23   behind me.

24   Q.  By the way, before you ran out of the building, did you see

25   what Zac did, if anything?

D2LMFER1                         Darge - direct

1   A.   I don't remember now.  Because he was on my left-hand side.

2   And when I was trying to unjam the gun I was facing mostly the

3   second guy.

4   Q.   What happened when you reached the car?

5   A.   Once I reached in the car, I opened the passenger's side,

6   got inside and Joey still was inside the car.  Then after a

7   while, you know, then Joey showed up.

8   Q.   After a while, meaning how long?

9   A.   I can't tell if it was two minutes, three minutes, seconds.

10  Everything happened so fast.

11          THE COURT:  You said Joey still was inside the car.

12  Is that what you meant?

13          THE WITNESS:  No.

14          THE COURT:  You said Joey was still inside the car.

15  Then after a while you know then Joey then showed up.

16          Can you clear that up.

17          THE WITNESS:  Luis Rivera was in the car.  I got

18  inside the car.  And then Joey showed up and got inside in the

19  back seat car.

20  Q.   What happened then?

21  A.   Right away I directed Luis to get us out of there as soon

22  as possible.  So I told him to go straight, down Decatur to

23  reach Gun Hill.  And I was also complaining to him that the gun

24  that he brought me, you know, jammed and I was upset.

25          MR. CAPONE:  Ms. Quinones, if we can zoom out.

D2LMFER1                        Darge - direct

1  Q.  Can you indicate using your pointer what route the car

2  took?

3          THE COURT:  North on Decatur he said.

4          THE WITNESS:  Yes.

5          THE COURT:  Is Decatur one way?

6          THE WITNESS:  I think so.  And we was in this corner

7  and we drove all the way to Gun Hill.  We hit a light.  We

8  waited to the light changes and then we made a right on Gun

9  Hill.  And we got caught up on another light.  And once the

10 light changed, we crossed over to take the Bronx River south.

11 Q.  You got on the highway?

12 A.  Yes, we did.

13 Q.  What, if anything, did you talk about while you were

14 driving away?

15 A.  Well, at that moment I was just making sure that Luis

16 stayed focused and stay on point and get us out of there.  And

17 once we hit the highway, we started really discussing about

18 everything that took place.

19 Q.  What did you discuss?

20 A.  Well, I was very angry at the fact that he brought me a gun

21 that jammed on me.  I also spoke to Joey about why he took so

22 long, because he should have been right behind me.

23          THE COURT:  Why he took so long at what point?

24          THE WITNESS:  To get inside the car, to get to the

25 car.

D2LMFER1                            Darge - direct

1   A.  What he told me was, I had to make sure they were both

2   dead.

3            And Luis Rivera had no explanation to why the gun

4   jammed or why not.

5            And I put away the gun in the stash, again.  And we

6   got caught up in a traffic jam on Bronx River.

7            Once we was in the river, we a little bit at peace

8   because we had already gotten out of the area.  What I told him

9   was to head to Joe's house so we could -- he could put away the

10  gun, his gun.

11           And as we talking and -- talking and having this

12  conversation, I might as well calling Gordo to see what

13  happened, what was going on.  And Gordo was not picking up my

14  phone calls.  So I kept trying.

15           We still driving.  We finally got out of the traffic

16  jam.  And we ended up by Joey's house.  And Joey went up to put

17  away his gun.  I told him to come back down, that I am going to

18  keep trying to get in contact with Gordo.  When he came back

19  down, he got inside the car and we took the highway, the

20  Deegan, and we went to Yonkers.

21  Q.  By the way, did you have any blood on you from the man that

22  you shot?

23  A.  No, I did not.

24  Q.  Did you yourself cut yourself at any point or bleed?

25  A.  No.

D2LMFER1                         Darge - direct

1   Q.  Did you see any blood on Joe?

2   A.  No.

3   Q.  Did either of you change your clothes while you were in the

4   car?

5   A.  No.  I took off my gloves and, you know -- no.  But I

6   didn't change.

7   Q.  Do you remember if the defendant changed?

8   A.  I don't remember.

9   Q.  What did you do in Yonkers?

10  A.  We went to a TGI Friday's on Central Avenue.

11  Q.  What did you do there?

12  A.  I ordered some food and we was just killing time waiting

13  for Gordo to get back to me or answer my calls.

14  Q.  Did he?

15  A.  He did not.  So after we ate, I told Joey and Luis that,

16  you know what, I'm going to keep trying calling him.  Let's go

17  home.  And as soon as I hear from him, I'll get back to you.

18  Q.  And did Luis drop you off?

19  A.  Yes.  He dropped Joey and myself off to our houses.  And I

20  just kept trying to get in contact with Gordo.

21  Q.  What happened next?

22  A.  When I got home, I don't know how much longer, but at one

23  point I got a call from Zac.  He told me to please come down to

24  open the door, that he's on my street.  So I said okay.  So I

25  went down --

D2LMFER1                        Darge - direct

1            THE COURT:  Where do you live?

2            THE WITNESS:  This was when I was living in Ellis and

3    Homestead in the Bronx.

4            THE COURT:  What street is that?

5            THE WITNESS:  Ellis.

6            THE COURT:  What numbered street?

7            THE WITNESS:  That's by Castle Hill and Cross Bronx.

8    A.   Once I came down and opened the door, I saw Zac walking

9    with a paper bag on his right hand, and he reached to my house.

10   I opened the gate.  He came in.  He handed me over the bag.

11   And he actually came inside the house.  I live on the second

12   floor at that time.  And we were on our way up, I was telling

13   him that why did Gordo did not answer my call.  He said,

14   listen, I can't answer that right now.  But here is the money,

15   count it.  They are in stacks of ten.  So I quickly, you know,

16   counted.  We got to my floor.  I opened the door, went inside

17   my apartment.  He came inside as well.  I put away the bag.

18   And then I dismissed him, took him downstairs, and he left.

19   Q.   You said you counted the money?

20   A.   I counted the stacks.  He told me that there were stacks of

21   ten, so I know that 18 will make 180,000.

22   Q.   Were there 18 stacks?

23   A.   Yes, there was.

24   Q.   Did you ever count the actual bills?

25   A.   Yes.

D2LMFER1                         Darge - direct

1    Q.   How much money was there?

2    A.   180,000.

3    Q.   Did you pay the defendant the money that you had promised

4    him?

5    A.   Yes, I did.

6    Q.   How much was that?

7    A.   40,000 for Joe Fernandez and 20,000 Luis Rivera.

8    Q.   Did you pay Luis Rivera his 20,000?

9    A.   Yes, I did.

10   Q.   Now, aside from that $180,000, were you ever paid any more

11   money for the murders?

12   A.   Yes.

13   Q.   How much?

14   A.   10,000.

15   Q.   How did that come to happen?

16   A.   I was shopping with my girlfriend that I was with at that

17   time in Yonkers, Cross County Mall, and while I was shopping I

18   ran into Aladino and his wife.  And he was surprised to see me

19   there.  And I was -- I approached him and we greeted each other

20   and I told him that what Gordo did was messed up.  I still

21   haven't spoken to him to this day.

22   Q.   How long after the murders was this encounter?

23   A.   It was about a week.

24   Q.   And you said what Gordo did was messed up.  What did you

25   mean by that?

D2LMFER1                          Darge – direct

1   A.   That he was not answering my calls.  He came and got me for

2   the job and then he just vanished.  He just disappeared.

3            THE COURT:  Except to pay you.

4            THE WITNESS:  Excuse me?

5            THE COURT:  Except to pay you.

6            THE WITNESS:  Yes.

7   Q.   Who paid you?

8   A.   Excuse me?

9            (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D2LUFER2                         Darge - direct

1   Q.  Who actually gave you the money?

2   A.  Zac.

3   Q.  Then what happened?

4   A.  So then like Aladino was apologizing on his behalf.  I

5   wasn't really trying to get into deep conversation because my

6   girlfriend was there, his wife was there.  So he told me,

7   listen, I got something for you.  I'm going to give you

8   $10,000, and he told me that he would call me to bring it to

9   me.

10  Q.  Did he do that?

11  A.  Yes, he did.

12  Q.  What did you do with the $190,000 that you were paid?

13  A.  I did some traveling, and I also invested in savaged cars.

14  I was trying it get into that business, repairing savaged cars.

15  Q.  What do you mean by that?

16  A.  Cars that been in wrecks and you just restore them, buy new

17  parts and resell them.

18  Q.  Where did you travel?

19  A.  Florida, Dominican Republic.

20  Q.  You said what you did with the $190,000.  Did you give some

21  of that to the defendant?

22          THE COURT:  Keep your voice up.

23  Q.  Did you give some to the defendant and to Luis Rivera?

24  A.  Yes.  40,000 to Joe Fernandez and 20,000 to Luis Rivera.

25  Q.  Did there come a time when you learned anything more about

D2LUFER2                          Darge - direct

1    the reason that Gordo had asked you to do these murders?

2              MR. RICHMAN:  Objection.

3              THE COURT:  I'm sorry.  I didn't hear the question.

4    Q.  The question is, did there come a time when you learned

5    anything more about the reason that Gordo had asked you to do

6    these murders?

7              THE COURT:  Objection sustained as to form.

8    Q.  You testified earlier that Gordo told you that the family

9    was in trouble and that was one of the reasons that he wanted

10   you to do those murders?

11             THE COURT:  Keep your voice up, Mr. Capone.

12   A.  Yes.

13   Q.  Did you ever learn whether that was true or not?

14             MR. RICHMAN:  Objection.

15             THE COURT:  Sustained.

16   Q.  What did you learn, if anything, about the murders after

17   they occurred?

18             MR. RICHMAN:  Objection.

19             THE COURT:  Sustained.

20   Q.  Did you talk to Gordo at any point after the murders?

21   A.  Yes, I did.

22   Q.  When was that?

23   A.  He called me.  It was about a month, I would say, about --

24   Gordo was kidnapped and the day that he got kidnapped, I was

25   actually on a plane to the Dominican Republic, and when I

D2LUFER2                          Darge - direct

1    arrived to the Dominican Republic, the phone was ringing in the

2    house.

3              MR. RICHMAN:  Objection.  Relevancy.  What does this

4    have to do with --

5              THE COURT:  I don't know whether it is relevant or

6    not.  Objection overruled.

7              Put the question again.

8              MR. CAPONE:  The question is when he talked to Gordo

9    after the murders and what did they discuss.

10             THE COURT:  Overruled.

11             You may answer.

12             THE WITNESS:  And his mother was telling me over the

13   phone.

14             MR. RICHMAN:  Objection.  The mother is not part of

15   this.

16             THE COURT:  Objection sustained.

17   Q.  Just what you talked to Gordo about.

18   A.  Gordo told me that he knew who kidnapped him and that --

19             THE COURT:  Hold on.

20             I will see you at the sidebar.

21

22             (Continued on next page)

23

24

25

D2LUFER2                          Darge - direct

```
 1                    (At the sidebar)

 2                    MR. RICHMAN:  What is the relevancy?

 3                    MR. CAPONE:  What this defendant was told about the

 4     family being in danger was a pretext the whole time.  He

 5     eventually finds that out after he confronts Gordo, so it is

 6     all related to the conspiracy.  That's where I am going with

 7     it.  He goes to the Dominican Republic to talk to him about it.

 8     It was actually, I believe -- conversations in the Dominican

 9     Republic --

10                    THE COURT:  Mr. Richman.

11                    MR. CAPONE:  I assume that you are going to cross him.

12                    MR. RICHMAN:  I don't see the relevancy of the whole

13     thing.

14                    THE COURT:  Neither do I.

15                    MR. CAPONE:  He is going to cross him on the reason

16     that he did the murder.

17                    THE COURT:  No.  I think it is all he may, may not.

18                    Objection sustained.

19

20                    (Continued on next page)

21

22

23

24

25
```

D2LUFER2                         Darge - direct

1              (In open court)

2              THE COURT:  Members of the jury, I sustained the

3    objection.  Do not pay attention to what was just said, an

4    issue of a kidnapping, whether or not it existed is not

5    something that we can go into -- at least not at this point --

6    so wipe it from your mind.

7    BY MR. CAPONE:

8    Q.  Yesterday we spoke briefly about your brother, is that

9    right?

10   A.  Yes.

11   Q.  What was his name?

12   A.  Allen Darge.

13   Q.  Did you ever have any conversations with your brother about

14   the murders?

15   A.  Yes.  He approached me that he have heard that I was

16   involved and that he knew who was involved.  And I just said,

17   well, you heard what you heard, at that point.

18   Q.  Did you discuss the money that you got paid?

19   A.  I didn't give him details.

20   Q.  Did he say anything to you about the money that you got

21   paid?

22   A.  No, not at that point.  It was afterwards that once I knew,

23   found out some more information about why Gordo, you know,

24   hired me and the true story, then I told him details so, just

25   in case anything happens to me, at least somebody that I trust

D2LUFER2                          Darge - direct

```
 1   will know the truth.
 2   Q.  Did your brother express any opinion about the money that
 3   you got paid?
 4            MR. RICHMAN:  Objection.
 5            THE COURT:  Sustained.
 6   Q.  Did you know if the defendant and Aladino knew each other?
 7   A.  No.
 8   Q.  No, you don't know or --
 9   A.  I don't know.
10   Q.  Do you know if the defendant and Zac knew each other?
11   A.  No, I do not know.
12   Q.  Do you know if the defendant and Jeffrey knew each other?
13   A.  No.
14   Q.  Do you know if the defendant and Gordo knew each other -- I
15   think I asked that?
16   A.  Yes.
17   Q.  Do you know where Gordo is now?
18            MR. RICHMAN:  Objection.
19            THE COURT:  Sustained.
20   Q.  Have you spoken --
21            THE COURT:  The last question, there could be a
22   possible misunderstanding; you asked two questions.  You asked,
23   did I ask you that, and the answer was yes.
24   Q.  Did Gordo and the defendant know each other?
25   A.  Yes.
```

D2LUFER2                          Darge - direct

1   Q.  Have you spoken to the defendant since he was arrested?

2   A.  Yes.  When he was in 5 North.

3   Q.  What is 5 North?

4   A.  That is the unit where I am presently.

5           THE COURT:  It is in the Metropolitan Correctional

6   Facility, right.

7           THE WITNESS:  Yes.

8           THE COURT:  The jail?

9           THE WITNESS:  Yes.

10  Q.  How did you come to speak to the defendant in the jail?

11  A.  Well, upon his arrest --

12          THE COURT:  Give a date if you can.

13          THE WITNESS:  I don't have a date.

14          THE COURT:  A month, a year.

15          THE WITNESS:  It was last year.

16          THE COURT:  2012?

17          THE WITNESS:  Yes.

18          THE COURT:  What season?  Beginning of the year, the

19  middle of the year, the end --

20          THE WITNESS:  The beginning.

21          THE COURT:  The beginning of the year?

22          THE WITNESS:  Yes.

23          THE COURT:  Somewhere between January and March 2012?

24          THE WITNESS:  Something like that.

25          THE COURT:  You were in jail?

D2LUFER2                         Darge - direct

1          THE WITNESS:  Yes, I was.

2          THE COURT:  What did you say?

3          THE WITNESS:  I live on 14, but at that present time

4    when new inmates arrive to the unit, I was on 16, and I heard

5    that some new inmates came to the unit.  So I quickly looked

6    and I saw Joey right in the main floor of the unit.  And I went

7    up the stairs and I screamed out his name.  He looked at me and

8    all he was saying was like why --

9          THE COURT:  Can you ask a question.  Do it by question

10   and answer.

11   Q.  You said Joey looked at you?

12   A.  Yes.

13   Q.  Did you go up to him?

14   A.  Yes, I did.

15   Q.  Did you have a conversation with him?

16   A.  At that time, yes.

17   Q.  What did he say?

18   A.  He was saying --

19          THE COURT:  What did you say and what did he say?

20          THE WITNESS:  When I screamed out his name, he looked

21   at me.  And I walked up to him and he kept telling me like,

22   why, why, why.

23   Q.  Did you say anything to him?

24   A.  I didn't really want to talk to him right at that moment

25   because there were other inmates around and an officer on duty

D2LUFER2                         Darge - direct

1   was there too.

2   Q.  So what did --

3   A.  So what I did was, I told the officer that there's empty

4   beds on my tier, tier 4, that they should put him in one of

5   those empty beds.

6   Q.  What happened at that point?

7   A.  He told me, all right, to direct him there because there

8   were other inmates and he was looking for beds for them.  So I

9   took him downstairs to tier 4.  I took him to the room where

10  there was an empty bed.  He dropped off some of his papers.

11  And I told him, if you want to talk, we can talk in my room.

12  Q.  The room where there was an empty bed, was there anyone

13  else living in that room?

14  A.  Yes.

15  Q.  Do you know who that was?

16  A.  Yes.  He goes by the name of Mendez.

17  Q.  I think you said that he dropped off his stuff in the room

18  that Mendez lived in?

19  A.  Yes.

20  Q.  Then what happened?

21  A.  From there we went to my room.

22  Q.  Did you have a conversation in your room?

23  A.  Yes, we did.

24  Q.  What did you say to him and what did he say to you?

25  A.  Well, he kept asking me that, why, why, why, why did I turn

D2LUFER2                         Darge - direct

1    him in.  And he -- it took a while for me to answer.  And he

2    was like, I'm going to lose my house, my family, my kids.  He

3    was expressing how he felt.  He said, I was on the run when I

4    found out that you got arrested.

5          And then at that point I was like, you know what, he

6    deserves to know the truth so I told him what I did.  I told

7    him yes, it was me that turned you in.  He said, nobody knew me

8    why did you do that?  None of them could have identified me.

9          I told him, yes, somebody could identify you.  Gordo

10   knew you.  But he said, yeah, but he is not even arrested.

11         And I said, well, I confessed to you.  I'm telling you

12   that, yes, it was me that turned you in.  I also turned in

13   Luis.  He also thought that Luis might be involved --

14              MR. RICHMAN:  Objection.

15              THE COURT:  Sustained.

16              Just say what he said.  Did he say anything about

17   Luis?

18              THE WITNESS:  Yes, he did.

19              THE COURT:  What did he say?

20              THE WITNESS:  He thought that Luis --

21              MR. RICHMAN:  Objection.

22              THE COURT:  Overruled.

23              Just what he said, not what he thought.  Did he say he

24   thought --

25              THE WITNESS:  Yes.  That's what he said, he thought

D2LUFER2                          Darge - direct

1   that Luis was even involved, that he was talking too.

2   Q.  How long was this conversation?

3   A.  20, half hour, max.

4          THE COURT:  20 minutes or a half hour max?

5          THE WITNESS:  Yes, 20 max or half hour.

6   Q.  How long was the defendant in the same unit in the jail as

7   you?

8   A.  For about two weeks.

9   Q.  Did you have any other conversations with him during that

10  time?

11  A.  Yes.  You know, a couple of times I went up to him, see if

12  he was hungry or he needed anything.  One time he was sitting

13  by the TV and I went up to him to check up on him and we

14  started discussing about things of the family, what work he was

15  doing, how was his wife how was his kids.

16          And one time we also had a conversation in the gym

17  area because there was confusion, he heard that I pleaded.

18          And I said how did you hear that?

19          And he said a letter that came to your grandmother's

20  house.

21          So I was a bit confused about how he found out that my

22  grandmother received a letter, me, that I was about to plead.

23  So I called my grandmother, and it was that I wrote to her to

24  just update her what was going on with me.

25          So it was clear to me so I went up to him while he was

D2LUFER2                        Darge - direct

1   in the gym and I said, listen, that letter that you heard

2   about, it was me that wrote to them, to my grandmother telling

3   her, updating her what's going on with me.

4           Then after that, we wasn't really talking to each

5   other.  There was a lot of avoidance.

6   Q.  Did you talk to Joe about anyone else in the family he had

7   communicated with before being arrested?

8   A.  Well, when we was in the room, that was one of the things

9   that we discussed.  He was telling me that while he was on the

10  run, he was in communication with my brother --

11          MR. RICHMAN:  Objection, your Honor.

12          THE COURT:  Sustained.

13          Members of the jury, you haven't had a break.  We can

14  go to 12:30 and have lunch then or have a break and go to 1.

15          What's your pleasure?

16          JUROR:  Whatever you want.

17          JUROR:  We are OK.

18          THE COURT:  Is everyone OK, because I need all 14 of

19  you to be OK.

20          JURORS:  We are OK.

21          THE COURT:  Keep going.

22          JURORS:  Yes.

23          THE COURT:  Go ahead.

24  Q.  Mr. Darge, without telling me what he said about any of

25  those people, did he tell you who, if anyone, he was in

D2LUFER2                           Darge - direct

1    communication before being arrested, who from the family?

2    A.  Yes.

3    Q.  Who?

4    A.  Allen my brother and Christian.

5    Q.  Who is Christian?

6    A.  He is a cousin of mine.

7    Q.  Do you know his full name?

8    A.  Christian Guzman.

9    Q.  Is he your cousin?

10   A.  Yes.

11   Q.  Is he also the defendant's cousin?

12   A.  Yes.

13   Q.  Did Christian have anything to do with the murders?

14   A.  No.

15   Q.  I am going to show you a couple of photographs.

16            THE COURT:  Any of the jurors need water or coffee?

17            JURORS:  No, thank you.

18   Q.  If we could look at Government Exhibit 15.

19            THE COURT:  Louder.

20   Q.  Do you who is depicted in Government Exhibit 15?

21   A.  Yes.  That is Mendez.

22   Q.  Who is Mendez, again?

23   A.  He was Joey Fernandez's cellmate.

24            MR. CAPONE:  I will offer Government Exhibit 15.

25            MR. RICHMAN:  No objection.

D2LUFER2                          Darge - direct

1          THE COURT:  Received.

2          (Government Exhibit 15 received in evidence)

3          MR. CAPONE:  Publish that, Ms. Quinones.

4  Q.  One more photograph to show you, taking a look at

5  Government Exhibit 14.  Do you recognize who that is?

6  A.  Yes.

7  Q.  Who is that?

8  A.  Christian Guzman.

9          MR. CAPONE:  I will offer Exhibit 14.

10         MR. RICHMAN:  No objection.

11         THE COURT:  I don't know that he has been discussed in

12  any way so far.

13  Q.  Who is Christian Guzman?

14  A.  He is my cousin.  He was one of the ones that Joey

15  Fernandez was in contact while he was on the run.

16         MR. RICHMAN:  Move to strike.

17         THE COURT:  Sustained.  Strike that.

18         MR. CAPONE:  One second.

19  Q.  Another question or two about this.  You said that this

20  happened in early 2012, these interactions with the defendant?

21         THE COURT:  January through March, he said.

22  Q.  Are you sure that was the range or are you guessing?

23  A.  No, I'm not sure.  I am --

24  Q.  Is that around when it was?

25  A.  Yes.

D2LUFER2                         Darge - direct

1          THE COURT:  What does that mean, "around"?  It could

2     have been earlier, back in 2011?

3          THE WITNESS:  I don't remember so I can't just --

4     right now at this point, I can't.

5          THE COURT:  Give me anytime.  January 2011?

6          THE WITNESS:  It was on the time of his arrest, so I

7     don't know what the date -- I can't remember.

8          THE COURT:  You don't remember the year?

9          THE WITNESS:  It was like about a year ago.

10          THE COURT:  About a year ago?

11          THE WITNESS:  Yes.

12          THE COURT:  Was it wintertime?

13          THE WITNESS:  Yes, around.

14          THE COURT:  Wintertime?

15          THE WITNESS:  Yes.

16          THE COURT:  Go ahead.

17     Q.  At any point did the government tell you to have any

18     conversations with the defendant in jail?

19     A.  No.

20     Q.  Mr. Darge, the murders that we have with been discussing

21     this morning, were they the only murders that you have ever

22     committed?

23     A.  No.

24     Q.  How many other people have you killed?

25     A.  One more.

D2LUFER2                         Darge - direct

1    Q.  Was that before or after the murders that we just

2    discussed?

3    A.  Before.

4    Q.  Do you remember when it was?

5    A.  Yes.

6    Q.  When?

7    A.  February of '98.

8    Q.  How old were you at that time?

9    A.  About 26.

10   Q.  Can you briefly describe how that murder came to happen?

11   A.  I was at my girlfriend's house when I received a call from

12   another cousin of mine's, and he told me that something came up

13   that and he needs to see me.  It is an emergency.

14   Q.  What was this cousin's name?

15   A.  Joseph Agramante.

16   Q.  Did you know him by any other names?  Did he have any

17   nicknames?

18   A.  Tilo.

19   Q.  How do you spell that?

20   A.  T-I-L-O.

21   Q.  What did Joseph Agramante tell you?

22   A.  So he told me that he needed to see me.

23        I told him where I was.  I was under 149th in the

24   Bronx.

25        And he already knew more or less where I was at so he

D2LUFER2                         Darge - direct

1   said, I am on my way.  I'll call you when I am downstairs.

2              So when he got there, he called me.  I came down, got

3   inside the van.

4              And as we were driving, he was explaining to me the

5   situation.  He told me that one of his uncle's connect did a

6   dirty business with his uncle and he needed to kidnap him and

7   he needed help.

8   Q.  Who was his uncle, do you know?

9   A.  Yes, Manuel.

10  Q.  And what did he mean by Manuel's connect did a dirty

11  business with him?

12  A.  The story that Joseph Agramante told me, that the connect

13  gave him some drugs.

14  Q.  Gave who some drugs?

15  A.  Manuel.

16             And when Manuel and his connect went to the stash

17  house, the connect did not know that the only two people that

18  knew about the stash house was Manuel and the connect.  So

19  after they put away the drugs, they left.

20             And when Manuel came back to, you know, to start

21  opening the packages and what not there were no drugs there.

22  So he already knew that it was the connect that send somebody

23  to steal the drugs from that place from the stash house.  So

24  Manuel wanted Joseph Agramante to kidnap the connect so we

25  could get back the drugs.

D2LUFER2                        Darge - direct

1   Q.  What did Joseph Agramante, if anything, ask you to do?

2   A.  He wanted me to help him to get the guy inside the van.

3   Q.  Get what guy inside the van?

4   A.  The connect.

5   Q.  And to do what?

6   A.  You know, we was going to kidnap him and take him to

7   wherever Manuel had told Joseph Agramante to take him.

8   Q.  What happened after Joseph Agramante told you this?

9   A.  So when we on our way over there --

10  Q.  Over where?

11  A.  To one of Manuel's apartments.

12          He already, you know, he had a gun with him.  And he

13  told me that the plan was that the connect was going to be in

14  the lobby waiting for Manuel, but it is just a setup so that we

15  could snatch him up from the lobby of that building where

16  Manuel had an apartment.

17          When we got there, I grabbed the gun.  I went inside

18  the lobby.

19  Q.  Did Joseph come with you inside the lobby?

20  A.  No, he did not.  He waited inside the car.

21  Q.  OK.

22  A.  He had the car on.  He was the one driving.  And when I got

23  inside the lobby, I pressed -- there was an elevator there -- I

24  pressed the button for the elevator.  And then when I turned

25  around I saw him.  He was sitting by -- there was like a little

D2LUFER2                              Darge - direct

1   garden there.  There was a rail, and he was sitting on the

2   rail.  And he had told me his name, the connect's name.

3   Q.  Do you remember the name?

4   A.  Yes.  Arturo.

5   Q.  OK.

6   A.  I said his name to make sure that he was the person, and he

7   got up.  And when I pulled out the gun, he right away jumped on

8   top of me and we were wrestling with the gun.  And it came to a

9   point where it was either him or mine, I pulled the trigger and

10  I caught him in the face.

11  Q.  Where in the face?

12  A.  Around this area.

13  Q.  Indicating --

14  A.  -- close to the eye.

15  Q.  Below your left eye?

16  A.  Yeah, around this area.

17  Q.  What happened next?

18  A.  While we wrestling, Joseph Agramante saw that I was

19  struggling, the guy was way bigger than me, and he got outside

20  the car and he went in through the first door -- there was two

21  doors to that lobby.  He went through the first door, but by

22  the time he reached the second door, I already took the shot

23  and the guy fell back and I just ran out.

24  Q.  Did you see what happened to the guy?

25  A.  Yeah.  I saw him fall down.  I saw the blood splattered on

D2LUFER2                          Darge - direct

1   the wall.

2   Q.  What happened after you ran out?

3   A.  Once we ran out, we got inside the car and we just drove

4   off.

5   Q.  Were you paid for this?

6   A.  Yes.

7   Q.  What were you paid?

8   A.  $5,000.

9   Q.  Who paid you?

10  A.  Manuel.

11  Q.  This was basically a couple of years before the February

12  2000 murders that we have been discussing?

13  A.  Yes.

14  Q.  So just to be clear, did the defendant have anything to do

15  with this murder?

16  A.  No.

17  Q.  So, essentially, Tilo had been involved in a murder with

18  you?

19  A.  Yes.

20  Q.  Did you think about asking him to help you with the

21  February 2000 murder?

22          MR. RICHMAN:  Objection.

23          THE COURT:  Sustained.

24  Q.  Mr. Darge, in between these two murders, how were you

25  making your money?

D2LUFER2                          Darge - direct

1   A.   Selling drugs.

2   Q.   Anything else?

3   A.   Yes.  I also was doing credit card frauds.

4   Q.   Let's talk a little bit about your drug dealing.  Before we

5   get there, I should show you Government Exhibit 12 -- and I

6   only have that in a hard copy.

7        Government Exhibit 16, do you recognize this person?

8   A.   Yes.

9   Q.   Who is that?

10  A.   Joseph Agramante.

11       (Discussion off the record between counsel)

12       THE COURT:  No.

13       MR. RICHMAN:  You're the boss.

14       THE COURT:  Sometimes.

15  Q.   When did you start selling drugs?

16  A.   From the age of 14.

17  Q.   What drugs did you sell when you first got started?

18  A.   I was selling crack cocaine.

19  Q.   How did you get started selling drugs?

20  A.   My aunt and my uncle, they had a friend that was dealing

21  crack cocaine and I always was around them.  And I was there

22  when they was actually, you know, preparing the crack cocaine

23  and they offered me to, if I wanted to make some money, to help

24  them to bag up the crack and I did.  And after that I told them

25  that around my neighborhood there's a lot of -- a lot of people

D2LUFER2                         Darge - direct

1   that ask for that type of drug and that I'm interesting to

2   start selling that drug in my neighborhood.  So they -- the

3   connect which was friends with my uncle's, they was willing to

4   front me some drugs, which they did, and I started selling it

5   in my block on 188 and Valentine in the Bronx.

6   Q.  What happened next with your drug dealing?

7   A.  Well, made a lot of money and I was selling crack, and then

8   from there I was also selling cocaine and also weed -- whatever

9   I could get my hands on -- and supplying whatever the customer

10  needed.

11  Q.  At this point, what kind of quantities of these drugs were

12  you selling?  Were you selling larger quantities or to users of

13  drugs?

14  A.  Excuse me?

15          THE COURT:  Keep your voice up, Mr. Capone.

16  Q.  Were you selling these drugs to people who would use them

17  or were you selling large quantities?

18  A.  People that use them.

19  Q.  At any point did you start selling any other drugs?

20  A.  Yes.

21  Q.  What was that?

22  A.  Heroin.

23  Q.  When did you start selling heroin?

24  A.  About age 17, 18, around there.

25  Q.  How did you get started selling heroin?

D2LUFER2                          Darge - direct

1   A.  Well, the same connect has a relative or one of his cousins

2   that only dealt with heroin and I was introduced to him.  And

3   he also offered to help me out if I was interested in selling

4   heroin.  And I did.  So he started giving me a couple of grams

5   to see how it goes.  And I wasn't doing too well with that.  I

6   was not experienced with that type of drug until Roman which

7   was Luis Rivera's father told me that he could help me out

8   because he was selling heroin on 184 which was two blocks away

9   from my house.

10  Q.  Luis Rivera, that's the getaway driver?

11  A.  Yes.

12  Q.  What happened when you started dealing with Roman?

13  A.  And he started teaching me how to, you know, bag up the

14  heroin and how to prepare it so it could be sellable to the

15  customer.  I learned and I still didn't do too well, so he was

16  actually getting rid of the drug for me in his block.

17  Q.  What do you mean getting rid of the drug?

18  A.  Selling it to his customers.  And it got to a point where I

19  gave up on that, you know, selling bag, you know, hand to hand.

20  About a year after or two, Carlos, which is Jeffrey Minaya's

21  cousin, was getting weight.  And I started dealing with weight

22  and selling large quantities of heroin.

23          THE COURT:  What did you call it?

24          THE WITNESS:  Weight.

25          THE COURT:  Spell it.

D2LUFER2                           Darge - direct

1                THE WITNESS:  Weight like --

2                MR. RICHMAN:  W-E-I-G-H-T, your Honor.

3                THE COURT:  Meaning?

4                THE WITNESS:  Meaning large quantities of heroin.

5   Q.  You said Carlos was Jeffrey Minaya's cousin?

6   A.  Yes.

7   Q.  Do you know his last name?

8   A.  No, I don't.

9   Q.  So what were you doing with Carlos?

10  A.  So Carlos, since he knew that I knew people that was

11  selling in the streets, he decided that we'll work together and

12  get rid of the amounts of drugs that he was receiving, and he

13  was getting at that time, 250 grams to half a kilo of heroin.

14  Q.  By the way, around that time what was the price, if you

15  remember, for a kilo of heroin?

16  A.  For a gram, at that time when I first started, it was like

17  about $115 per gram.

18  Q.  And a kilo is how many grams?

19  A.  A thousand.

20  Q.  Did you eventually have any other partner in the heroin

21  business?

22  A.  Yes.  When I decided to leave that alone, my brother took

23  over and him and Roman, they was working together.  So

24  basically I was one of the connects that was giving my brother

25  quantities, large quantities.

D2LUFER2                          Darge - direct

1   Q.  Now, you were eventually arrested selling heroin?

2   A.  Yes.

3   Q.  When was that?

4   A.  In 2002.

5   Q.  How did you come to get arrested?

6   A.  Richard Gonzalez was actually my partner at that time.  We

7   was working together and he was -- he had someone coming from

8   Ecuador with three kilos of heroin.  And he called me so that

9   we could go downtown and meet this guy and pick it up and pick

10  up the drugs.  So I picked him up and we went --

11  Q.  When you say pick what up?

12  A.  Picked up Richard Gonzalez.

13  Q.  OK.

14  A.  And we went to Manhattan, the place, it was a Days Inn on

15  49th and 8th.  When we got there, Richard Gonzalez told me that

16  since he has been talking to the guy, that just to go up to him

17  and find out how his vibe, what's was going on with him.

18  Q.  Who was he?

19  A.  He was the mule that was bringing it -- I don't remember

20  his name.

21  Q.  What do you mean by "mule"?

22  A.  The one that was transporting the drugs from Ecuador to the

23  United States.

24  Q.  So you said you arrived and Richard Gonzalez asked you to

25  talk to him?

D2LUFER2                              Darge - direct

1   A.   Yes.   Once we got to the location, Richard Gonzalez told me

2   that, that's the guy right there and to go up to him and find

3   out how -- what's going on with him, if I feel any strange vibe

4   about him.  So I got out of the car.  I approached him.  And I

5   told him, listen, your friend sent me.  I just want to know how

6   is everything with you, is everything OK?  He was a bit

7   nervous.  I said, you know, you look nervous, you look tired.

8             He said yeah, the trip wasn't easy but I'm OK so --

9             MR. RICHMAN:  What is the relevancy in all of this?

10            THE COURT:  I don't know.

11            Why haven't you objected.

12            MR. RICHMAN:  I just --

13            THE COURT:  Are you objecting?

14            MR. RICHMAN:  Yes.

15            THE COURT:  Sustained.

16            I watch you like a fox.  When you stand up and object,

17   I pay attention.

18            MR. RICHMAN:  Thank you.

19   Q.   As a result of this meeting, were you arrested?

20   A.   Yes, I was.

21   Q.   What were you arrested for?

22   A.   For heroin.

23   Q.   How much heroin was involved in the deal you were arrested

24   for?

25   A.   Three kilos.

D2LUFER2                        Darge - direct

1   Q.  Earlier you said around this time you were also -- at some

2   point you also committed credit card fraud?

3   A.  Yes.

4   Q.  Were you ever arrested for committing credit card fraud?

5   A.  Yes, in 1999.

6   Q.  Did you plead guilty to credit card fraud?

7   A.  Yes, I did.

8   Q.  Do you know the specific charge you pled guilty to?

9   A.  Grand larceny, the third degree.

10  Q.  Did you do any time in jail for that grand larceny?

11  A.  Five days in prison, and then I got sentenced to five-year

12  probation.

13  Q.  Were you arrested for a specific transaction or a larger

14  set of --

15  A.  A specific transaction.

16  Q.  Had you been doing credit card fraud beyond that?

17  A.  Yes.

18  Q.  Now, just to get back to your arrest for heroin, what

19  happened to that case?

20  A.  I got sentenced to 35 months.

21  Q.  Before you were sentenced, did you plead guilty?

22  A.  Yes, I did.

23  Q.  Did you plead guilty to pursuant to any agreement with the

24  government?

25  A.  Yes.  I took my safety valve and I was cooperating with the

D2LUFER2                       Darge - direct

1    government.

2    Q.  So did you have a cooperation agreement?

3    A.  Yes.

4            THE COURT:  What court was this, state or federal?

5            THE WITNESS:  Federal.

6            THE COURT:  So a cooperation agreement, ladies and

7    gentlemen, is an agreement between the prosecutor and the

8    defendant.  It is an exchange.  The defendant promises to

9    cooperate and give all information and to be truthful.  In

10   exchange, if, in the opinion of the prosecutor, the witness has

11   truthfully cooperated in the respects that he is supposed to,

12   the cooperator will write a letter to the sentencing judge.

13           The laws regarding sentencing require, as a compulsion

14   to the judge, that the person be sentenced to a set number of

15   years at least.  And the purpose of all of this arrangement is

16   to invoke a provision of the law that allows, in certain

17   particular situations, a defendant to be sentenced below those

18   what we call mandatory minimums.

19           And that's what is involve understand a cooperation

20   agreement -- an exchange for a letter by the prosecutor to the

21   judge, and the judge has to make various kinds of findings and

22   if the findings satisfy the law and the judge is so moved, the

23   judge can sentence below the requirements otherwise imposed by

24   the law.

25           Is that OK, Mr. Richman, that explanation?

D2LUFER2                         Darge - direct

 1              MR. RICHMAN:  I couldn't have said it better myself.

 2              THE COURT:  Maybe I should have asked you to do it.

 3              Is that all right, Mr. Capone?

 4              MR. CAPONE:  Absolutely.

 5    Q.  You also said something about safety valve?

 6              THE COURT:  Safety valve is another aspect of law.

 7    Again, in certain situations which are limited, if the

 8    defendant says everything to the government, even without a

 9    cooperation agreement, truthfully telling the government

10    everything relating to the offense and just that offense, then

11    the judge makes certain findings, and there is no need for the

12    government to do anything in this but sometimes they do.  The

13    judge is allowed to sentence below the mandatory minimum

14    otherwise required.

15              So there are three situations -- the situation where a

16    person is convicted of a narcotics crime where the law requires

17    certain mandatory minimum punishments, a safety valve where the

18    defendant truthfully tells the prosecutor everything he knows

19    about a certain offense and the judge is allowed to sentence

20    below the mandatory minimum, and a cooperation agreement where

21    the defendant fully cooperates and the judge also is allowed to

22    sentence below a certain level.

23              I don't think you need to know more about this because

24    it gets very complicated in the details.  I should tell you

25    this, that this whole line of inquiry about what Mr. Darge did

D2LUFER2                          Darge - direct

with narcotics and credit card frauds and with the additional

murder that took place in 1998.  You might ask, why are we

hearing this?  Why is it relevant to the issue of whether or

not Mr. Fernandez is proved beyond a reasonable doubt to have

committed the charges in the indictment against him?  He is not

charged from, in a 1998 murder.  There is no allegation that he

had anything to do with it.  He is not charged with credit card

fraud.  He is not charged with the narcotics activity that

Mr. Darge has been testifying about.  So it is not relevant to

the issues that you have to find, and the issue being whether

the government satisfies beyond a reasonable doubt the

accusations in the indictment.

        The information is being given to you in assessing the

credibility of what Mr. Darge has been telling you.  You have a

right to understand all that may motivate him to tell his

story, and you can take into consideration in deciding how much

you want to believe Mr. Darge about the prior murder he

committed and the prior narcotics activities he committed and

the prior credit card frauds and the aspect of the dishonesty

that goes with credit card fraud that he committed and all of

these other things.  And it is customary and quite appropriate

for both the prosecutor and defense counsel to go into these

various areas.  We call this impeachment testimony.  That kind

of testimony is there so you can get a better idea of how much

credibility to give to the witness.

D2LUFER2                          Darge - direct

1           OK.

2           MR. CAPONE:  Thank you, your Honor.

3   Q.  Mr. Darge did you have both a cooperation and safety valve

4   agreement?

5   A.  Yes.

6   Q.  By the way, who was your judge in that case?

7   A.  Judge Hellerstein.

8   Q.  Before you pled guilty in 2003 --

9           THE COURT:  It is quite coincidental.  I am not a

10  specialist in Mr. Darge.

11  Q.  Before you pled guilty --

12          THE COURT:  They should know this also.  When a case

13  comes in, how is it that a certain judge gets a certain case?

14          Well, there are a number of categories of criminal

15  cases and also a number of categories of civil cases and each

16  judge's name is in a wheel, much like this box but now it is

17  done by computer.  And when a clerk gets a new case, he puts

18  his hand inside the box and it is judge whoever it is.  I was

19  the judge who was drawn from the box for Mr. Darge before and I

20  got Mr. Fernandez this time -- I'm a very lucky man.

21  Q.  Before you pled guilty in 2003, did you meet with the

22  government?

23  A.  Yes, 2000 --

24  Q.  When did you plead?

25  A.  2003, yes.

D2LUFER2                          Darge - direct

1    Q.  Did you meet with the government before you pled?

2    A.  Yes.

3    Q.  How many times did you meet with the government?

4    A.  It was about less than 10 times.

5    Q.  Less than --

6    A.  Less than 10.

7    Q.  Who was at those meetings?

8    A.  The prosecutors, the agent, my lawyer.

9    Q.  Did you continue to meet with the government after your

10   cooperation agreement?

11   A.  Yes.

12         THE COURT:  You said the first plea.  You see that the

13   first sentence was a safety valve.  Are you asking about a

14   cooperation agreement in connection with the same offense?

15         MR. CAPONE:  Same offense, your Honor.

16         THE COURT:  And that offense was the narcotics

17   offense?

18         MR. CAPONE:  Yes.

19         THE COURT:  Distribution of cocaine?

20   Q.  What was the offense that you were charged with?

21   A.  Heroin.

22   Q.  And you had a cooperation agreement?

23   A.  Yes.

24   Q.  You said that you met with the government in trying to

25   reach that cooperation agreement?

D2LUFER2                    Darge - direct

1    A.  Yes.

2    Q.  What was your understanding of what you were required to do

3    under that cooperation agreement?

4    A.  I had to be truthful.  I had to tell them anything that I

5    have committed in the past.  Whenever they wanted to meet with

6    me, I had to attend the meetings.  Maybe I had to testify, I

7    would have to testify and not commit any other crimes.

8    Q.  You said that you had to tell them about the crimes that

9    you committed, was that only the crimes that you were charged

10   with or any crimes?

11   A.  Any crimes I committed.

12           THE COURT:  All crimes?

13           THE WITNESS:  All crimes.

14   Q.  At that time, during your 2003 cooperation, did you tell

15   the government the truth about all of your crimes?

16   A.  No.

17   Q.  What didn't you tell them, or what did you lie about?

18   A.  About the murders.  I didn't go into much details about my

19   drug history and credit card frauds.

20   Q.  Which murders didn't you tell them about?

21   A.  The '98 and the 2000.

22   Q.  And did you tell them that had you been dealing drugs for

23   sometime?

24   A.  Yes, I did.

25   Q.  So what --

D2LUFER2                         Darge - direct

1   A.   But I didn't go into full details.  I didn't mention my

2   brother or Carlos or, you know, any of the people that I am

3   mentioning today.

4   Q.   Did you get a benefit from not telling the truth?

5   A.   Yes, I did.

6   Q.   Did the government write you a letter to the judge in

7   connection with your sentencing?

8   A.   Yes, he did.

9   Q.   Did that letter say anything about the murders you had

10  committed?

11  A.   No.

12  Q.   Why not?

13  A.   Because I didn't confess to those murders.

14  Q.   Were you sentenced eventually?

15  A.   Yes, I was.

16  Q.   And what sentence did you receive?

17  A.   35 months and 5 years' probation.

18  Q.   What sentence were you facing without a cooperation

19  agreement?

20  A.   10-year minimum.

21  Q.   When you were sentenced by the judge to 35 months, did the

22  judge know that you had committed these murders?

23  A.   No, he did not know.

24  Q.   Were you interviewed by a probation officer in connection

25  with your sentencing?

D2LUFER2                        Darge - direct

1    A.  Yes.

2    Q.  Did you tell the probation officer anything about the

3    murders?

4    A.  No.

5    Q.  Did you understand you were supposed to tell all of these

6    people about any crimes you had committed?

7    A.  Yes, I understood.

8    Q.  You said that you were sentenced to 35 months.  How long

9    did you actually spend in prison?

10   A.  Two years and a couple of months.

11   Q.  When were you released?

12   A.  April of 2005.

13            THE COURT:  The law in federal courts, ladies and

14   gentlemen is this.  The sentence that is given by the judge is

15   the actual sentence that is served.  In the state court, we

16   have what is called, the judge applies it, indeterminate

17   sentence, a span of years.  Usually when a third of the

18   sentence has been satisfied, a parole authority then convenes

19   and then decides if the person should be released earlier --

20   that does not apply in the federal courts.  If I had

21   sentenced -- which was apparently the case -- Mr. Darge for 35

22   months, he served 35 months less 15 percent for good time

23   behavior.

24            In other words, the prison authorities have a need to

25   govern the prisons, want to give an incentive for a person to

D2LUFER2                              Darge - direct

behave.  It a person behaves, 15 percent of the sentence is

reduced.  There is also a provision for the last part of the

sentence to be switched from a full-time custodial arrangement

to a halfway house.  But basically speaking, if a person is

sentenced to 35 months, the person serves less 15 percent -- if

he has had a good record, has behaved properly -- and perhaps a

few months less than that so that he can go to a halfway house

and start to rehabilitate himself to lead a useful, law-abiding

life.

        Then after that, this supervised release, it is called

probation but it is not probation even though it is supervised

by probation officers.  It is supervised release.  Again, it is

a defined term.  In this case it was five years with the

obligation of the person on supervised release to observe a

number of conditions that were imposed at the time of sentence,

including reporting to the probation officer from time to time

as the probation officer requires.  And there are other

requirements as well.  So if a person violates the condition,

for example, committing another crime, not only is he eligible

for conviction on the other crime, the person has also

committed a violation of supervised release which can cause the

original sentencing judge to impose even more custodial time.

        Again, I mention this because it comes up in testimony

and you might be interested to know why it is mentioned.  It

also has to do with how much credibility you should give the

D2LUFER2                         Darge – direct

1    person who is testifying, to see if he satisfied the conditions

2    of the prior punishment.

3             MR. CAPONE:  Thank you, your Honor.

4    Q.  You heard the judge talk about getting off 15 percent for

5    good time in prison?

6    A.  Yes.

7    Q.  Did you have credit for good time?

8    A.  Yes, I did.

9    Q.  When you were released -- you were released in 2005?

10   A.  April of 2005, yes.

11   Q.  From the time that you were arrested in 2002 to today, did

12   you sell any other drugs?

13   A.  No.

14   Q.  Did you commit any other crimes?

15   A.  No.

16   Q.  You were arrested for these murders at some point?

17   A.  Yes.

18   Q.  Meaning the February 2000 murders?

19   A.  Yes.

20   Q.  When were you arrested for them?

21   A.  December 3rd of 2010.

22   Q.  So that was 10 years after the murders?

23   A.  Yes, about.

24   Q.  And 5 years after you were released from prison for drugs?

25   A.  Yes.

D2LUFER2                          Darge - direct

1    Q.  How were you arrested?

2    A.  I was actually parking my car in front of the church and

3    federal agents, you know, pulled right next to me and told me

4    to turn off my car and they apprehended me.

5    Q.  Where were you taken?

6    A.  To DA's headquarters here by the west side.

7    Q.  DA or DEA?

8    A.  DA.

9    Q.  Were you asked questions about the murders that night?

10   A.  Yes, I was.

11   Q.  Did you admit to them?

12   A.  Yes, I did.

13   Q.  Were you asked about the other people involved?

14   A.  Yes.

15   Q.  Did you admit who they were?

16   A.  Yes.

17   Q.  Did you mention the defendant?

18           MR. RICHMAN:  Objection.

19           THE COURT:  Sidebar.

20

21           (Continued on next page)

22

23

24

25

D2LUFER2                          Darge - direct

1              (At the sidebar)

2              THE COURT:  We already know that he fingered your

3    client, why the objection?

4              MR. RICHMAN:  Because he is merely bolstering the

5    previous testimony with statements that he did so --

6              THE COURT:  Mr. Capone.

7              MR. CAPONE:  The witnesses, Mr. Richman said it was

8    all about Mr. Darge's credibility, that he is a liar.  So I am

9    eliciting that he told the truth immediately.

10             THE COURT:  Objection sustained.

11

12             (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

D2LUFER2                          Darge - direct

```
1                (In open court)

2                THE COURT:  I sustained the objection.  The question

3     is not relevant, in any event.

4     BY MR. CAPONE:

5     Q.  Since you were arrested in 2010, what happened to your

6     case?

7     A.  When I was arrested when, in 2010?

8     Q.  Yes.

9     A.  I have cooperated with the government.

10    Q.  Did you plead guilty?

11    A.  Yes, I did.

12    Q.  What did you plead guilty to?

13    A.  To four counts, murder.

14

15                (Continued on next page)

16

17

18

19

20

21

22

23

24

25
```

D2LMFER3                         Darge - direct

1    Q.  What were those four counts related to?

2    A.  Murder.

3    Q.  Which murders?

4    A.  The '98 and the 2000.

5    Q.  Were you initially arrested for the '98 murder?

6    A.  No.

7    Q.  How did you come to plead guilty to it?

8    A.  Because I confessed it.

9    Q.  And when did you plead guilty?

10   A.  May -- I believe it was May of last year.

11   Q.  2012?

12   A.  2012, yes.

13   Q.  I am going to show you a document marked 3503-GG.

14           Do you recognize that document?

15   A.  Yes, I do.

16   Q.  What is it?

17   A.  It's my agreement.

18   Q.  What agreement is it?

19   A.  That I made with the government.

20   Q.  Your plea agreement?

21   A.  Yes, my plea agreement.

22   Q.  If you turn to the last page, is that your signature?

23   A.  Yes.

24   Q.  And your lawyer's signature?

25   A.  Yes.

D2LMFER3                          Darge - direct

```
 1              MR. CAPONE:  Your Honor, I'll offer 3503-GG.

 2              MR. RICHMAN:  I have no objection, your Honor.

 3              THE COURT:  Received.

 4              (Government's Exhibit 3503-GG received in evidence)

 5    Q.  Did you meet with the prosecutors before you entered this

 6    agreement?

 7    A.  Yes, I did.

 8    Q.  Approximately how many times before you entered the

 9    agreement did you meet with the prosecutors?

10    A.  About 15 times, 20 times, about.

11    Q.  Who was at those meetings?

12    A.  Prosecutor, agent, and my lawyer.

13    Q.  What topics did you discuss at those meetings?

14    A.  About the murder of 2000 and my past criminal history.

15    Q.  Did you discuss the murders in 1998 or the murder in 1998?

16    A.  Yes.

17    Q.  Did you continue to meet with the government after you

18    signed the plea agreement?

19    A.  Yes, I did.

20    Q.  About how many times?

21    A.  About ten times or probably more.

22    Q.  In these meetings have you told the government everything

23    about your prior crimes?

24    A.  Yes, I did.

25    Q.  What do you understand to be the maximum sentence you could
```

D2LMFER3                        Darge - direct

1    face on the counts that you pled guilty to?

2    A.  Life.

3    Q.  Do any of those counts carry any mandatory minimum

4    sentence?

5    A.  Yes.  Life.

6    Q.  Have you been sentenced yet?

7    A.  No.

8    Q.  Who decides your sentence?

9    A.  The judge.

10   Q.  What do you understand to be your obligations under this

11   agreement that you signed?

12   A.  That I must be truthful, I should say everything, any crime

13   I ever committed in my life, and need to -- I can't commit

14   another crime.  Also, that whenever the government had told me

15   to meet with them, to meet with them.  And if I had to testify,

16   I have to testify.

17   Q.  Does the defendant, Mr. Fernandez, have to be found guilty

18   in order for you to meet your obligations under the agreement?

19   A.  No, he does not.

20   Q.  What is your understanding of what the government will do

21   if you live up to the agreement?

22   A.  The agreement is that they will write a letter

23   recommendation, 5K1 letter.  And the letter, like the judge

24   explained to us earlier, that is basically describing my past

25   and how I cooperated with the government.  That's it.

D2LMFER3                              Darge - direct

1   Q.  What do you understand to be the most amount of time that
2   you could get, even if the government sends this letter to the
3   judge?
4   A.  Life.
5   Q.  Now, if the government sends the letter, can you get less
6   than the mandatory minimum of life?
7          MR. RICHMAN:  Objection.
8          THE COURT:  Overruled.
9   Q.  You can answer.
10  A.  Could you repeat that again, please.
11         THE COURT:  If the government sends the letter, can
12  you still get less than the mandatory minimum of life?
13         THE WITNESS:  Yes, I could.
14  Q.  If there is no letter, could you get less than the
15  mandatory minimum?
16         THE COURT:  According to your understanding.
17  A.  No.
18  Q.  Are you hoping to receive a lower sentence as a result of
19  that letter?
20  A.  Yes.
21  Q.  What sentence are you hoping to receive?
22         MR. RICHMAN:  Objection.
23         THE COURT:  He can say.
24  A.  I don't have a specific amount of time.
25  Q.  Are you hoping to receive less than life?

D2LMFER3                         Darge - direct

1    A.   Yes.

2    Q.   What's your understanding of how you can violate the

3    agreement and not get a letter?

4    A.   By not being truthful and committing another crime.

5    Q.   If the defendant is found not guilty but you told the truth

6    here today, will you get a 5K letter?

7              THE COURT:   Sustained.

8    Q.   Regardless of what happens here today, if it turns out if

9    the government finds out that you lied, will you get a 5K

10   letter?

11             MR. RICHMAN:   Objection.

12   Q.   What is your understanding of whether you would get a 5K

13   letter?

14             THE COURT:   Overruled.

15   A.   Could you --

16   Q.   Regardless of the outcome of this trial, if the government

17   later finds out that you lied, what is your understanding of

18   whether you will get a 5K letter?

19   A.   I will not get a 5K1 letter, and I will be charged with a

20   new charge.

21   Q.   What do you mean by that?

22   A.   For perjury.  I will be charged.

23   Q.   Besides writing a 5K letter to the judge, if you hold up

24   your end of the cooperation agreement, has the government made

25   any other promises to you?

D2LMFER3                         Darge - direct

1   A.  No.

2               MR. CAPONE:  Your Honor, if I could have one second.

3               Your Honor, I'm basically done.  Just a couple more

4   questions.  I don't know if you want to stop.

5               THE COURT:  I was hoping you had been done.  I was

6   keeping the session going.

7               MR. CAPONE:  I have one more question, your Honor.

8   Actually it's not even a question, your Honor.  The witness has

9   already identified Exhibit 16.  We offer Exhibit 16.

10              MR. RICHMAN:  No objection.

11              THE COURT:  Received.

12              (Government's Exhibit 16 received in evidence)

13              MR. CAPONE:  With that, we have no further questions.

14              THE COURT:  It's about 20 to 1.  Let's come back at

15  2:00, give you an extra five minutes as a reward for being so

16  patient and attentive.

17              Close up your books and give them to Ms. Jones on your

18  way out.  Don't discuss the case.

19              (Jury not present)

20              THE COURT:  The jury has asked for the schedule of

21  next two weeks.  I'll tell the jury Monday and Tuesday of next

22  week, then we recess until the following Monday.  And I don't

23  know now whether we will work four days or five days.  I think

24  there is a fair likelihood that the government's case, I think

25  it's probable the government's case will finish and maybe both

D2LMFER3                         Darge - direct

1    sides will finish.  I won't say anything about that to the

2    jury.

3              MR. CAPONE:  Your Honor, we think the government is

4    probably going to conclude the case Monday, March 4; at the

5    latest, Tuesday March 5.

6              THE COURT:  Let's wait while Mr. Fernandez is excused.

7              We are recessed.

8              (Luncheon recess).

9              (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D2LMFER3                         Darge - direct

1                        AFTERNOON SESSION

2                            2:10 p.m.

3            (Jury present).

4            THE COURT:  Mr. Darge, you remain under oath.

5     Cross-examination.

6     CROSS-EXAMINATION

7     BY MR. RICHMAN:

8     Q.  Good afternoon, Mr. Darge.

9     A.  Good afternoon.

10    Q.  Mr. Darge, we closed this morning with Mr. Capone asking

11    you about your plea agreement.  Is that understood?

12    A.  Yes.

13    Q.  And you understood that plea agreement is an agreement by

14    you with the government to testify in a particular case,

15    correct?

16    A.  Yes.

17    Q.  And, in fact, you understood, also, what it would mean if

18    you were to lie?

19    A.  Yes.

20    Q.  And you also understood that you were hoping to receive

21    some benefit from whatever your testimony would be in this

22    particular case, isn't that correct?

23    A.  I don't understand by benefits.

24    Q.  You hope to get a lesser sentence, correct?

25    A.  Yes.

D2LMFER3                        Darge - cross

1    Q.   That's the benefit, correct?

2    A.   Yes.

3    Q.   And now, you're faced, as a person charged with murder,

4    with life imprisonment, isn't that correct?

5    A.   Yes, I'm facing life, yes.

6    Q.   And the only ones to judge or determine whether or not you

7    are telling the truth is the government, is that right?

8    A.   Can you rephrase that.

9            MR. RICHMAN:   May it be read back, your Honor.

10           THE COURT:   Yes.

11           (Record read)

12   A.   Yes.

13   Q.   But you signed an agreement with exactly the same terms on

14   a prior occasion, didn't you?

15   A.   In 2002, yes.

16   Q.   If I would suggest to you March 27 of 2003, would that

17   refresh your recollection?

18   A.   Yes.

19   Q.   And you were represented by an attorney Ben Heinrich, is

20   that right?

21   A.   Yes.

22   Q.   And you were represented by the same lawyer this time,

23   correct?

24   A.   Correct.

25   Q.   You understood then that you were to tell the truth?

D2LMFER3                        Darge - cross

1   A.  Right.

2   Q.  You understood then that you were to tell the complete and

3   whole truth about all your criminal conduct?

4   A.  Correct.

5   Q.  And you were to tell the whole truth about all those

6   persons that you were associated with, right?

7   A.  I understood that, but I didn't --

8   Q.  You understood that.  No buts.  You understood that, right?

9   A.  I understood that I had to say the whole truth.

10  Q.  But you didn't, did you?

11  A.  But I did not.  Yes.

12  Q.  You lied?

13  A.  Yes.

14  Q.  You got over on the government, right?

15  A.  When I lied, yes.

16  Q.  You lied to the government?

17  A.  Yes.

18  Q.  You lied to the agents, you lied to the judge, isn't that

19  correct?

20  A.  Yes.

21  Q.  And those lies worked?

22  A.  Yes.  I got benefit out of them.

23  Q.  Those lies worked and they reduced the sentence and you

24  were faced with a minimum of 151 months, which is 12 and a half

25  years, right?

D2LMFER3                           Darge - cross

1   A.   Yes.

2   Q.   And based upon the statements which you were lying about,

3   it was reduced, you did only two years, is that right?

4   A.   Yes.

5   Q.   So you knew how to play the system, didn't you?

6   A.   Well, I lied.  I didn't know how to play the system.  What

7   you mean by that?

8   Q.   What you've been doing all along, your whole life.

9            THE COURT:  The government is entitled to object, you

10  know, Mr. Capone.

11           MR. CAPONE:  Objection, your Honor.

12           THE COURT:  Sustained.  Be alert.

13  Q.   You know how the system works, don't you?

14           THE COURT:  Same objection.  Sustained.

15           Mr. Capone, when you object, stand up and you object.

16  This is not a time to relax.

17           MR. CAPONE:  Understood, your Honor.

18  Q.   Do you know how the criminal justice system works in terms

19  of cooperation?

20  A.   Today, yes, I do.

21  Q.   And did you know it then, back in 2003?

22  A.   Yes.

23  Q.   And in fact --

24           MR. CAPONE:  Objection, your Honor.

25  Q.   Referring to 3503-QQ, is this your signature on the

D2LMFER3                          Darge - cross

1   agreement?

2              THE COURT:  Wait.

3   Q.  Is this your signature on an agreement?

4   A.  Yes, it is.

5   Q.  In which you swore to tell the truth, the whole truth?

6   A.  Yes.

7   Q.  And you lied?

8   A.  Yes.

9              MR. RICHMAN:  I offer this in evidence, your Honor.

10             MR. CAPONE:  No objection.

11             THE COURT:  Can I see it.

12             Received.

13             (Government's Exhibit 3503-QQ received in evidence)

14  Q.  Pursuant to that agreement you would tell the government

15  everything you knew about every crime?

16  A.  Every crime I committed, yes.

17  Q.  Or that you knew was being committed that you were involved

18  in, directly or indirectly, correct?

19  A.  Crimes I committed, yes.

20  Q.  But you didn't say anything about murders?

21  A.  No, I did not.

22  Q.  You also didn't tell us about or you didn't tell the

23  government about your brother Boozer, right?

24  A.  Nope.

25  Q.  You left him out, too, correct?

D2LMFER3                      Darge - cross

1    A.  Yes, correct.

2    Q.  Because he's family, right?

3    A.  He's my brother, yes.

4    Q.  He's your brother and you were living with him at the time,

5    were you not?

6    A.  No.

7    Q.  Is it not a fact that in 2003 you were living with your

8    brother?

9    A.  No.

10   Q.  When did you cease living with your brother?

11   A.  I was living with my brother in '98.

12   Q.  Did you live with him in 2000 as well?

13   A.  No.

14   Q.  Where were you living in 2000?

15   A.  I was living in my grandmother's house.

16   Q.  Where was your brother living?

17   A.  He was with his wife.

18   Q.  Where was that?

19   A.  A block away, Tiebout.

20   Q.  So you were very close with your brother, right?

21   A.  I loved him.  We didn't see eye to eye, but he's my

22   brother.

23   Q.  And you did business with him, right?

24   A.  Yes.

25   Q.  You were in the drug business with your brother, right?

D2LMFER3                         Darge - cross

1    A.  Correct.

2    Q.  Did you ever buy guns with your brother?

3    A.  No.

4    Q.  Did you have guns?

5    A.  I had guns, yes.

6    Q.  How many guns did you have?

7    A.  I had one.

8    Q.  Where did you buy that gun?

9    A.  Excuse me?

10   Q.  Where did you buy the gun?

11   A.  I got that gun from one of my cousins.

12   Q.  Who?

13   A.  Joseph.

14   Q.  Joseph who?

15   A.  Agramante.

16   Q.  Joseph Agramante, also known as?

17   A.  Tilo.

18   Q.  Tilo?

19   A.  Correct.

20   Q.  The one you performed the first murder with, correct?

21   A.  Yes.

22   Q.  Your brother Boozer had guns, did he not?

23   A.  Yes, he did.

24   Q.  He had a thing for guns, right?

25   A.  I don't know what you mean by, he had a things for guns.

D2LMFER3                          Darge - cross

1    Q.  He bought a substantial number of guns, in excess of 10,

2    correct?

3    A.  No, that's not correct.

4    Q.  Did he not have 25 guns at one point?

5    A.  No, that's not correct.

6    Q.  How much guns did he have, the most he had at one point, if

7    you know?

8    A.  I have no idea.

9    Q.  But you knew he had guns, didn't you?

10   A.  Yes.

11   Q.  More than one, correct?

12   A.  Yes.

13   Q.  And he had various types of guns, right?

14   A.  I don't know what you're getting at.

15   Q.  You trusted Boozer, right?

16   A.  Somewhat.

17   Q.  You trusted him to watch your back?

18   A.  Who, my brother?

19   Q.  Yeah.

20   A.  No.  We never had a situation that he had to watch my back.

21   Q.  Wasn't he selling drugs for you on the avenue?

22   A.  He wasn't selling drugs for me.  I was supplying drugs to

23   him.

24   Q.  Forgive me.  You were supplying your brother with drugs?

25   A.  Yes.

D2LMFER3                          Darge - cross

1    Q.  So that he could sell them for you?

2    A.  Well, he was the one running that block, so I was just

3    being his connect.

4    Q.  What block was that?

5    A.  188 and Valentine.

6    Q.  By the way, you told me you were involved with a church.

7    The block went from 188th to 189th.  Where was the church?

8    A.  189th, between Hughes and Belmont.

9    Q.  You mean Hughes Avenue and Belmont, not huge.

10   A.  Yeah, Hughes.

11           THE COURT:  Let's not have a competition on

12   pronunciation.

13   Q.  Your church was in the general vicinity of the

14   neighborhood, correct?

15   A.  No.  It has a distance.  From 188 and Valentine.

16   Q.  Now, when did your brother stop selling drugs?

17   A.  When he got arrested.

18   Q.  When did he get arrested?

19   A.  About six, seven months ago.

20   Q.  Not as a result of your testimony to the agents, is that

21   correct?

22   A.  No.

23   Q.  In fact, even when you were cooperating in this particular

24   case, you didn't give your brother up, did you?

25   A.  No.  I spoke about him, but I didn't give him up.

D2LMFER3                          Darge - cross

1    Q.  You didn't give him up, did you?

2    A.  I don't understand what you are saying by that.

3    Q.  You know what I'm saying.  You know exactly what I'm

4    saying.

5                THE COURT:  Can we not have these kinds of questions.

6    The idea of testimony is to have a clear question and a clear

7    answer.

8    Q.  Your brother was arrested six or seven months ago, correct?

9    A.  Yes, about.

10   Q.  In a separate investigation completely, to your knowledge?

11               MR. CAPONE:  Objection.  Foundation.

12               THE COURT:  Overruled.

13   A.  Yes.

14   Q.  And you've been cooperating with the government for how

15   long?

16   A.  Since the day of my arrest.

17   Q.  That's two and a half years ago?

18   A.  27 months, about.

19   Q.  And you were telling them stuff truthfully?

20   A.  Yes, I am.

21   Q.  But you didn't talk too much about Boozer, correct?

22               THE COURT:  What time are we talking about, Mr.

23   Richman?

24               MR. RICHMAN:  When he was arrested, December of 2000.

25               THE COURT:  Were you involved with crimes with

D2LMFER3                           Darge - cross

1    Mr. Boozer?

2              THE WITNESS:  Yes.  I sold drugs with him.

3              THE COURT:  Mr. Richman is asking whether in

4    connection with the crimes that you were committing, among

5    others, with your brother, whether you told the government

6    about that.

7              THE WITNESS:  Yes.  I told them about all the drug

8    deals that we had done and things like that.

9    Q.  When did you first tell them about that?

10   A.  When I started cooperating.

11   Q.  By the way, Benjamin Heinrich was your attorney the first

12   time around, correct?

13   A.  Yes, he was.

14   Q.  You paid him, did you not?

15             MR. CAPONE:  Objection.

16             THE COURT:  Sustained.

17             MR. RICHMAN:  May I be heard?

18             THE COURT:  No.

19   Q.  When you were arrested the second time around in the

20   federal court, did you pay him?

21             MR. CAPONE:  Objection.

22             THE COURT:  Sustained.

23   Q.  Did someone pay him for you?

24             MR. CAPONE:  Objection.

25             THE COURT:  Sustained.

D2LMFER3                         Darge - cross

1   Q.  Let's go back a little longer than that.  You said you were

2   arrested for credit card fraud?

3   A.  Yes.

4   Q.  You took a plea to grand larceny, correct?

5   A.  Yes.

6   Q.  That's stealing, isn't that right?

7   A.  Yes.

8   Q.  Now, you took a plea in February of 1998.

9            Do you recall that?

10  A.  That I took a what?

11           THE COURT:  A plea in 1998.

12  A.  Yes.

13  Q.  When did you take a plea?

14  A.  I don't remember.  I know it was around '99 that I got

15  arrested for that case.

16           THE COURT:  So you couldn't have taken a plea in 1998?

17           THE WITNESS:  No.

18           THE COURT:  When did you take a plea?

19           THE WITNESS:  It was some time in '99.

20           THE COURT:  After your arrest?

21           THE WITNESS:  Yes.

22  Q.  And do you know when you were sentenced?

23  A.  I don't quite remember now.

24  Q.  You don't remember?

25  A.  It was probably around that time.

D2LMFER3                     Darge - cross

1   Q.   About what time is that?

2   A.   In '99.

3   Q.   If I were to suggest to you it was September 18 in the year

4   2000, would that refresh your recollection?

5            MR. CAPONE:  Objection.

6            THE COURT:  Overruled.

7   A.   No.

8   Q.   Now, from the time of your arrest in 1999 to the time of

9   your sentence in the year 2000 on the credit card fraud case,

10  were you cooperating with the state?

11  A.   No, I was not.

12  Q.   In fact, you received a sentence of five days?

13  A.   I didn't get a sentence of five days.  I was -- when I got

14  incarcerated in the county jail I was there for five days.  I

15  got sentenced to five years' probation.

16  Q.   And you were working with a guy named Joey at that time, is

17  that correct?

18  A.   That's a name I made up.

19  Q.   You made up and you lied to the government about that then?

20  A.   To the agent, the officer that were arresting me.

21  Q.   And the reason you lied about that?

22  A.   Because I didn't want to cooperate with them.

23  Q.   So you lied about what you said was the truth, but it

24  really wasn't the truth?

25            MR. CAPONE:  Objection.

D2LMFER3                          Darge - cross

1           THE COURT:  Overruled.

2   Q.  Correct?

3   A.  Could you rephrase that again.

4           MR. RICHMAN:  I would rather have him answer it the

5   way it was posed.

6           THE COURT:  What you said was the truth, but it really

7   it wasn't the truth.

8           THE WITNESS:  No, it was not the truth.  I made it up.

9   Q.  So you lied the time you got arrested for credit cards in

10  order to get some kind of consideration, you lied to the

11  Federal Government when you got arrested for narcotics to get

12  some consideration, is that right?

13          MR. CAPONE:  Objection.

14          THE COURT:  Sustained.

15  Q.  Did you identify that person Joey as a person named Jose

16  Torres?

17  A.  Yes.

18  Q.  Was there such a person?

19  A.  No.

20  Q.  You made him up?

21  A.  Yes, I did.

22  Q.  Mr. Darge, why would you believe that someone would come to

23  you and kill someone?

24          THE COURT:  I am not sure that sentence makes sense.

25  Can you rephrase it.

D2LMFER3                          Darge - cross

1    Q.  Why do you think Minaya came to you to arrange a killing?

2              MR. CAPONE:  Objection.  It assumes facts.

3              THE COURT:  You've got too much compounded in a

4    sentence.

5              Did Minaya come to you to arrange a killing?

6              THE WITNESS:  No.

7    Q.  Gordo came, correct?

8    A.  Yes.

9    Q.  And Gordo was your cousin?

10   A.  Yes, he was.

11   Q.  And Gordo was a liar, correct?

12   A.  Gordo is known to lie, yes.

13   Q.  But you are not known to lie, are you?

14   A.  I can't answer that question.

15             THE COURT:  You know what your reputation is about

16   lying?

17             THE WITNESS:  No, I don't.  I cannot answer that.

18             THE COURT:  He can't answer that.

19   Q.  Now, why would Gordo come to you to arrange a killing?

20             MR. CAPONE:  Objection.

21             THE COURT:  Sustained.

22   Q.  Did Gordo know that you had killed other persons?

23             MR. CAPONE:  Objection.

24             THE COURT:  Sustained.

25   Q.  But there came a point that Gordo came to you, isn't that

D2LMFER3                          Darge - cross

```
 1   right?
 2   A.  Yes.
 3   Q.  I believe you said on direct testimony the reason he came
 4   was because you were that kind of a dude?
 5   A.  I did not say that I'm that kind of a dude.
 6   Q.  If you know, how is it that Gordo came to you for the
 7   purposes of arranging this killing?
 8           MR. CAPONE:  Objection.
 9           THE COURT:  You can answer, if you know.
10           Do you remember the question?  If you know, how is it
11   that Gordo came to you for the purposes of arranging this
12   killing?
13           THE WITNESS:  I don't understand that question.
14           THE COURT:  Rephrase it.
15   Q.  Gordo came to you, right?
16   A.  Yes.
17           THE COURT:  You already established that.
18   Q.  Why?
19           MR. CAPONE:  Objection.
20           THE COURT:  Sustained.
21           MR. RICHMAN:  I'm sorry?
22           THE COURT:  The objection is sustained.
23   Q.  Is your testimony that he came to you the night before the
24   killing was to take place?
25   A.  Yes.
```

D2LMFER3                         Darge - cross

1   Q.   He came to you, you said, because the family was in

2   trouble?

3   A.   Correct.

4   Q.   Who in the family was in trouble?

5   A.   His mother.

6   Q.   His mother?

7   A.   Yes.

8   Q.   But you did not believe him, correct?

9   A.   I was skeptical about his story.

10  Q.   You were so -- what was the word you used?

11          THE COURT:  Skeptical.

12  Q.   So skeptical about his story that you charged him a

13  $140,000 fee, is that right?

14  A.   Was not 140,000 and I did not charge him.  He offered.

15  Q.   You said that you were only concerned about family

16  importance and that's why you heard him out, is that correct?

17  A.   That was most of the reason why.

18  Q.   And $140,000 had no motivation?

19          THE COURT:  I think he is challenging the amount.

20  A.   It was not 140.

21  Q.   How much was it?

22  A.   First he offered was 150.

23  Q.   Then he raised it to 180, right?

24  A.   Correct.

25  Q.   So you knew it was not all about family; you knew it was

D2LMFER3                          Darge - cross

1   about business, right?

2   A.  To them, they really wanted this to be done.

3   Q.  Had you ever done that before?

4   A.  Done what before?

5   Q.  Planned killing.

6           THE COURT:  Have you done a planned killing before?

7           THE WITNESS:  No.

8   Q.  But they came to you that night within hours of when the

9   killing was to take place?

10  A.  Correct.

11  Q.  And what time did they come to you?

12  A.  I don't remember what time it was.  It was dark.

13  Q.  And where did you meet?

14  A.  In front of my house.

15  Q.  Out in the street?

16  A.  Right in front of my house.

17  Q.  How long were you out there?

18  A.  For about, at most, half hour.

19  Q.  And in a half hour you understood what they wanted you to

20  do and you heard it all out?

21  A.  Well, he shared his story, and I was all about, to me, to

22  think about it and tell him if I am going to do it or not.

23  Q.  What was the weather like that day?

24  A.  It was mild.  It was not cold.

25  Q.  And what were you wearing when you went down?

D2LMFER3                          Darge - cross

1    A.  I don't remember what I was wearing.

2    Q.  Now, you have sat down with the government with relation to

3    what you've testified today on many occasions, have you not?

4    A.  Yes, I did.

5    Q.  Before you even signed the cooperation agreement, you met

6    with them for ten different times, correct, or more?

7    A.  About, yes.

8    Q.  You sat literally for hours going over and over what you

9    say occurred?

10   A.  Yes.

11   Q.  And when you signed the agreement you met with them an

12   additional 10 plus times, isn't that correct?

13   A.  Yes, more or less.

14   Q.  And that time you spent many hours with them as well?

15   A.  Yes.

16   Q.  And you sat down with Mr. Capone going over questions and

17   answers, isn't that correct?

18   A.  Well, things that he would ask me, yes.

19   Q.  In fact, you went over the pictures as well, correct?

20   A.  Some pictures.

21   Q.  And you went over the picture of the map scene?

22   A.  Yes.  That I did see.

23   Q.  You literally rehearsed your testimony, is that right?

24              MR. CAPONE:  Objection.

25              THE COURT:  Did you rehearse the testimony that you

D2LMFER3                         Darge - cross

1    were going to give?

2              THE WITNESS:  No.  What do you mean by rehearsing?

3    Q.  You went over it and over it and over it again?

4    A.  Yes.

5    Q.  Did you go to a courtroom and practice in a courtroom?

6    A.  No.

7    Q.  Where did you do this?

8    A.  I don't know what to call it.  It's one of the offices

9    where they brief you at.

10   Q.  They kept you there for hours and they fed you there, also,

11   correct?

12             THE COURT:  Let's break it up into two questions.

13   Q.  They kept you there for hours going over and over your

14   testimony?

15   A.  About, yeah, close to two hours.

16   Q.  And each time, correct.  Not?

17   A.  Not all the time.

18   Q.  And they would order lunch for you?

19   A.  Sometimes, yes.

20   Q.  Did you ever go to the scene in the last 13 years?

21   A.  No.

22   Q.  Did you ever get into a car and drive there?

23   A.  No.

24   Q.  So you went over the scene on the map with them?

25   A.  Correct.

D2LMFER3                          Darge - cross

1   Q.  Now, that building where you went to on Parkside, had you

2   ever been there before?

3   A.  Never been to that building.

4   Q.  Did you remember the number?

5   A.  No, I don't.

6   Q.  Do you remember the street?

7   A.  Yes.

8   Q.  Was your memory refreshed when they told you where it was?

9             MR. CAPONE:  Objection.

10            THE COURT:  Sustained.

11  Q.  13 years have gone by since this event, is that right?

12  A.  Yes, about.

13  Q.  You know how many years have gone by since the date of

14  Joseph Fernandez's arrest?

15            MR. CAPONE:  Objection.

16            THE COURT:  Overruled.

17            Do you know when he was arrested?

18            THE WITNESS:  No, I don't.

19            THE COURT:  Do you know approximately when?

20            THE WITNESS:  Yeah, probably, about a year.

21  Q.  About a year.

22            When did you start cooperating in this particular

23  case?

24  A.  From the time I was arrested.

25  Q.  And do you remember the month he was arrested, Joseph?

D2LMFER3                          Darge - cross

1  A.  Joseph or Joey?

2  Q.  Joseph Fernandez, do you know the month he was arrested?

3  A.  No, I don't remember.

4  Q.  You were not required to remember that by the prosecution,

5  were you?

6              MR. CAPONE:  Objection.

7              THE COURT:  Sustained.

8  Q.  Would it be fair to say that from the time of 14 years of

9  age until the present, until you were arrested, you lived the

10 life essentially of crime?

11 A.  Yes.

12 Q.  By the way, we talked about Boozer before.  Did you tell

13 the government about Boozer's shooting people?

14 A.  No, I never told him about shooting people.

15 Q.  But you knew that Boozer had shot a gun, didn't you?

16 A.  Yes, I did.

17 Q.  You didn't tell the government even now?

18 A.  Yes, correct.

19 Q.  And you were just told just moments ago that you had to

20 tell everything to the government, correct?

21 A.  Yes, correct.

22 Q.  And you knew that your brother was a shooter, correct?

23 A.  I knew that he was involved in something like that.

24 Q.  You started out as a small-time drug dealer, isn't that

25 right?

D2LMFER3                              Darge - cross

1   A.  Yes.

2   Q.  And you moved up the ladder by selling larger and larger

3   amounts, correct?

4   A.  Correct.

5   Q.  And you eventually were selling pounds, is that right?

6   A.  Pounds?

7   Q.  Keys?

8   A.  Yes, half a key.

9   Q.  Half a key is over a pound, isn't it?

10          THE COURT:  Is a key a kilo?

11          THE WITNESS:  Yes.

12  Q.  1.1 pounds is half a key, correct?

13  A.  Correct.

14  Q.  That was coke, crack?

15  A.  It was heroin.

16  Q.  Heroin?

17  A.  Um-hum.

18  Q.  And heroin is a very addicting drug, is it not?

19  A.  Crack is worse.

20  Q.  You sold both.  It didn't matter.

21  A.  Well, at the beginning I sold crack and then I sold heroin.

22  Q.  Now, you also had guns to protect your business, right?

23  A.  I didn't need a gun to protect my business.

24  Q.  Why, because you are a tough guy?

25  A.  No.

D2LMFER3                         Darge - cross

1    Q.  Nobody will bother me?

2    A.  If I'm dealing with my brother, people that I know, I

3    didn't have to protect myself from it.

4    Q.  You and your brother were like a team?

5    A.  I don't know what you mean by that, a team.

6    Q.  You worked closely together?

7    A.  If you put it that way, yes.

8    Q.  Now, when they came to you to kill these persons -- by the

9    way, the first person you called was named Arturo, correct?

10   A.  Correct.

11             THE COURT:  Did you know that then?

12             MR. RICHMAN:  I believe he testified to that, your

13   Honor.

14             THE COURT:  Did you know one of the guys you were

15   supposed to kill was named Arturo?

16             THE WITNESS:  No, I did not.

17   Q.  I'm talking about the first person you killed in 1998.  Did

18   you kill a guy named Arturo?

19   A.  Yes.

20   Q.  In the year 2000, did you kill a guy again named Arturo?

21   A.  One of them, yes, his name is Arturo.

22             THE COURT:  Same guy?

23             THE WITNESS:  No.

24             MR. RICHMAN:  Your Honor, that's a question of fact --

25             THE COURT:  I couldn't resist.

D2LMFER3                          Darge - cross

1    Q.   The first guy was dead, right?

2    A.   Excuse me?

3    Q.   The first guy you killed was dead?

4    A.   Yes, he died.

5    Q.   You shot him in the face, right?

6    A.   Correct.

7    Q.   You were helped out by Joey, correct?

8    A.   Wrong.

9    Q.   Joey Agramante, Tilo.

10   A.   Joseph Agramante helped.  I don't now what you mean by

11   that.  I need to hear that again.

12   Q.   In the first murder?

13   A.   Yes.

14   Q.   Joseph Agramante is your cousin, is he not?

15   A.   Yes, he is.

16   Q.   His name is Tilo?

17   A.   Yes.

18   Q.   He helped you in that murder, correct?

19   A.   Which way you mean that he helped me?

20          THE COURT:  He was supposed to help you, right?

21          THE WITNESS:  He was actually supposed to be in the

22   car while I bring Arturo inside the car.

23   Q.   In fact, you had gone to Arturo to help Joey.  You were

24   going to kidnap the guy, right?

25   A.   To help Joey.  I don't understand why you keep saying Joey.

D2LMFER3                         Darge - cross

1   There is no Joey.

2   Q.   Joseph Agramante.

3   A.   Yes.

4   Q.   You call him Tilo?

5   A.   Yes.

6   Q.   His name is Joseph Agramante, correct?

7   A.   Correct.

8           THE COURT:  How about calling him Mr. Agramante.

9           MR. RICHMAN:  I would rather not call him

10  Mr. Anything.

11          THE COURT:  Deal with misters.

12  Q.   This Tilo, he was going to assist you in a kidnapping,

13  right?

14  A.   Yes.

15  Q.   You were going to kidnap somebody, right?

16  A.   Yes, that's what I was going to do.

17  Q.   But the guy resisted, so you killed him?

18  A.   He actually jumped on me, so it was either him --

19  Q.   Self-defense, right?

20          MR. CAPONE:  Objection.

21          THE COURT:  Overruled.  I don't know that we are going

22  anywhere, Mr. Richman.  I think the jury understands what

23  happened or was supposed to happen and what did happen.

24  Whatever point you want to make, you have it.  Let's move on.

25          MR. RICHMAN:  Very good, sir.  I'll move on.

D2LMFER3                          Darge - cross

```
 1              THE COURT:  Thanks.
 2   Q.  By the way, what was the night that you met with Gordo and
 3   Zac?
 4   A.  The night before the murder.
 5   Q.  That day was?  What was that date?
 6   A.  I don't remember the date.  I know it was in February 2000.
 7   Q.  Do you remember the date because you were told that that
 8   was the date that the two bodies were found?
 9              MR. CAPONE:  Objection.
10   A.  No.
11              THE COURT:  Overruled.
12   Q.  So you don't remember the time they came to you?
13              THE COURT:  Who is they?
14              MR. RICHMAN:  Zac and Gordo.
15              THE COURT:  When?  Try to make a more specific
16   question.
17   Q.  The night before the homicide you met with Zac and Gordo,
18   right?
19   A.  And Aladino.
20   Q.  And Aladino?
21   A.  Yes.
22   Q.  Aladino was another cousin of yours, right?
23   A.  He was not another cousin of mines.
24   Q.  Who was Aladino?
25   A.  He is the brother-in-law of Jeffrey Minaya.
```

D2LMFER3                        Darge - cross

1   Q.   You met with them when you were making the offer to killing

2   somebody.  You knew it was not family because Zac and Aladino

3   are not your family, correct?

4           THE COURT:  Mr. Richman, do it as a question.  That's

5   about four questions in there.

6   Q.   Is Zac a member of your family?

7   A.   No.

8   Q.   Aladino a member of your family?

9   A.   No.

10  Q.   They came there with the desire to have you kill someone,

11  correct?

12  A.   Gordo was the one that called me it's not done.  But since

13  they worked together they were there with him.

14  Q.   And they were kicking in their money to motivate you, is

15  that correct?

16  A.   Well, they agreed to all chip in to pay me because they all

17  worked together.

18  Q.   Then you said you might do it or you might not, correct?

19  A.   I did not say might do.  I just say I need to think about

20  it and I'll get back to you.

21  Q.   But you knew in your head you wanted to do it, right?

22  A.   At that point I did not make that decision.

23  Q.   How much time elapsed before you made the decision to go

24  ahead with it?

25  A.   Once I made my phone calls and I knew that I had the help

D2LMFER3                          Darge - cross

 1    that I needed, and I spoke to them, then after, I made up my

 2    mind to do it.

 3    Q.  How much time?

 4              THE COURT:  Between when and when?

 5              MR. RICHMAN:  From the time he heard the offer until

 6    he made the decision to do it.

 7    A.  Hours.

 8    Q.  Would it be fair to say that late that night you made the

 9    decision to kill someone the next morning?

10    A.  Yes.

11    Q.  You say you decided to call your cousin Joseph or Joey

12    Fernandez, right?

13    A.  Yes.

14    Q.  What was the last time before that date had you seen Joseph

15    Fernandez?

16    A.  I don't remember.

17    Q.  In fact, would it be fair to say in the past 10 years, 13

18    years, you may have seen him twice?

19              MR. CAPONE:  Objection.

20              THE COURT:  Overruled.  Don't speak.

21    A.  Could you repeat that again, please.

22              THE COURT:  Have you seen him more than twice in the

23    10 years before 2000?  That's then 1990 and 2000.

24    A.  1990 and 2000, if I seen him only twice.

25              THE COURT:  Is that your question, Mr. Richman?

D2LMFER3                         Darge - cross

1              MR. RICHMAN:  No.

2              THE COURT:  That's withdrawn.

3    Q.  Would it be fair to say that in the year 2000 to 2013, you

4    might have seen your cousin Joey Fernandez on two occasions?

5              THE COURT:  Objection sustained.

6    Q.  How many occasions did you see Joey Fernandez in the past

7    13 years?

8              THE COURT:  Between when and when?

9              MR. RICHMAN:  Between the beginning of 2000 and

10   present.

11   A.  I was incarcerated.  I came out in 2005.  So it has to be

12   from 2005 to 2010.  We didn't see each other much.

13   Q.  When you say much, how many times?

14   A.  I can't say a number, but he didn't live around the

15   neighborhood.  He had moved out.

16             THE COURT:  Where did he move out to?

17             THE WITNESS:  Upstate.

18             THE COURT:  Where upstate?

19             THE WITNESS:  I think Poughkeepsie, somewhere near

20   Poughkeepsie or Newburgh, somewhere around there.

21   Q.  So you didn't really see him very often at all?

22   A.  I saw him a couple of times that he came to visit his

23   mother and grandmother.

24   Q.  That's the person you decided would be the person you

25   wanted to do the killing with, correct?

D2LMFER3                          Darge - cross

1    A.  At that time I had seen them more than that.

2    Q.  How many times did you see him at that time in that

3    vicinity, in the year 1998 to February 2000?

4    A.  I can't really say a number.  Occasionally, I used to see

5    him.

6    Q.  Occasionally?

7    A.  Yes.

8    Q.  Immediately prior to this homicide that you admitted doing,

9    you may have seen Joey Fernandez occasionally, right?

10   A.  Yes.

11   Q.  You saw your brother every day, right?

12   A.  Not every day.

13   Q.  Almost every day, right?

14   A.  Yes.

15   Q.  And you knew he was a responsible shooter, right?

16   A.  I am not answering that.

17          THE COURT:  Because why?

18          THE WITNESS:  Responsible shooter?  I don't know what

19   you mean by that.

20          THE COURT:  Rephrase the question.

21   Q.  The person you can count on shooting people.

22   A.  I wouldn't even think about that.

23   Q.  You made several references that while you were in jail

24   that Joey Fernandez was on the run, correct?

25   A.  Yes.

D2LMFER3                          Darge – cross

1   Q.   When you were in jail, how would you know that?

2   A.   He told me when we saw each other on 5 north.

3   Q.   Were you aware --

4            THE COURT:  Come up, please, side bar.

5            (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D2LMFER3                        Darge - cross

1              (At the side bar)

2              THE COURT:  When Mr. Capone asked that question you

3    objected.  Why should it be relevant now if you objected then?

4              MR. RICHMAN:  He got it out four separate times that

5    Joey was on the run.

6              THE COURT:  Everybody time you objected I sustained

7    the objection.

8              MR. RICHMAN:  I beg to differ.  I'm not arguing that.

9    I admitted the last time when he emphasized the point --

10             THE COURT:  Every time you objected, Mr. Richman, I

11   sustained the objection.  The objection is now sustained.

12             MR. RICHMAN:  May I just complete the record, sir?

13             THE COURT:  No.

14             (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

D2LMFER3                          Darge - cross

 1              (In open court)

 2              THE COURT:  I sustained the objection.

 3              Thank you, Mr. Richman.  I'm sorry.  Please go ahead.

 4   Q.  While you were in MCC, that's the Metropolitan Correctional

 5   Center at 150 Park Row.  That's the jail, right?

 6   A.  Yes.

 7   Q.  Did you see Richard Correa there?

 8   A.  Yes, one time.

 9   Q.  And did you speak to Richard Correa?

10   A.  We greeted each other.

11   Q.  Did you see Mendez there?

12   A.  Yes.

13   Q.  Were you working in the church at MCC?

14   A.  Yes.

15   Q.  Would you see many of your friends when they came to church

16   there?

17   A.  What do you mean, friends?

18   Q.  Your associates in business.

19   A.  The only person I seen was Richard, one time that he came

20   down.

21   Q.  After the murder -- we are going to get back to the murder

22   itself -- after the murder you went down to the Dominican

23   Republic with your brother Boozer, is that correct?

24   A.  Yes.

25   Q.  Joe Fernandez did not go, did he?

D2LMFER3                        Darge - cross

1                MR. CAPONE:  Objection.

2                THE COURT:  Sustained.  I didn't go, either.

3                MR. RICHMAN:  You weren't involved.

4                THE COURT:  I'm sorry.  That's my fault.

5    Q.  You had never been to Parkside Place before the morning

6    that you decided to do the killing, is that right?

7    A.  The night before I drove by there, but I didn't actually go

8    inside the building.

9    Q.  What time did you drive by?

10   A.  I don't remember the time.  It was night.

11   Q.  It had to have been dark?

12   A.  Yes, it was.  It was dark.

13   Q.  It had to have been late at night, correct?

14   A.  Yes.

15   Q.  And you were able to drive by.  In fact, you didn't go by

16   Parkside; you went up, was it Webster?

17   A.  Webster Avenue, yes.

18   Q.  And you went up Webster Avenue?

19   A.  That's correct.

20   Q.  You were going north on Webster?

21   A.  North, yes.

22                MR. RICHMAN:  May I have that chart displayed, the

23   photograph.

24                MR. CAPONE:  Government Exhibit 19.

25   Q.  Now, you were going north on Webster, which is the large

D2LMFER3                           Darge - cross

1    street adjoining the park, is that right?

2    A.  Yes, Webster Avenue.

3    Q.  And you were going, would you say, 30 miles an hour or

4    thereabouts?

5    A.  I don't remember how many miles I was going.

6    Q.  You looked over your shoulder through traffic up the hill

7    and you were able to observe the building in question, correct?

8    A.  There wasn't too much traffic on that street.

9    Q.  You just drove by --

10   A.  We drove by and they pointed where the building is located.

11   Q.  And you were able to see the courtyard and the entrance

12   into the building?

13   A.  No, you cannot see the courtyard.  You could just see more

14   or less where the building is.

15   Q.  You didn't see the entrance or the hallway itself?

16   A.  No, I did not.

17   Q.  That's all you needed for the planning of a murder, is that

18   right?

19   A.  I just needed to know the location so I know where to

20   position myself and see what route I could take to get out.

21   Q.  Had you that much experience in doing murders that that's

22   all you needed to do for an observation?

23           MR. CAPONE:  Objection.

24           THE COURT:  Overruled.  You can answer.

25   A.  That's all I needed to know, the area, and that's it.

D2LMFER3                        Darge - cross

1          THE COURT:  How from Webster Avenue could you tell how

2     you would get there, how you would get out of there, how you

3     position yourself, so on.

4          THE WITNESS:  I've been living in the Bronx for over

5     30 years and I pretty much know that whole area.

6          THE COURT:  You know Parkside Place?

7          THE WITNESS:  Yes, I know that street.  I know Gun

8     Hill.  I've taken that road so many times.  I take Bronx River.

9          THE COURT:  Decatur Avenue?

10         THE WITNESS:  Decatur Avenue.  My cousin, Joseph

11    Agramante, lives close to Decatur.

12         THE COURT:  Where on Decatur does he live?

13         THE WITNESS:  He lives in Maran, actually, 194.

14    That's the street before Decatur.

15         THE COURT:  That's far away from Decatur and 206th

16    Street.

17         THE WITNESS:  Yes.

18         THE COURT:  What is it that makes you so familiar with

19    the way Decatur Avenue is?  Is it one way north, one way south,

20    two ways?  What is it?

21         THE WITNESS:  Decatur is actually one way and to a

22    certain point going north.

23         THE COURT:  At the particular point where you were,

24    was it going one way or two ways or which way?

25         THE WITNESS:  I believe it was two ways, around that

D2LMFER3                          Darge - cross

1     area.

2              THE COURT:  Would that be relevant to how you can get

3     in and get out?

4              THE WITNESS:  Yes.  I wanted to really know if there

5     was main streets like Gun Hill, if it was close to a highway.

6     Q.  Who took you there?

7     A.  Gordo and Zac.

8     Q.  Gordo and Zac?

9     A.  Yes.

10    Q.  If you knew where the building was or you knew that street,

11    why did anybody have to take you there?

12    A.  I didn't know where was the building.  They had to show me.

13    Q.  Where were you seated in the car when they drove by?

14    A.  The back seat.

15    Q.  I'm sorry?

16    A.  The back seat.

17    Q.  So you looked out of the back window and made all of your

18    observations?

19    A.  Correct.

20    Q.  You had your own gun at that time, right?

21    A.  No, I did not.

22    Q.  Your brother had guns, right?

23    A.  Yes.

24    Q.  And it's your statement that you would have to go to Luis

25    Rivera or Reyes to get a gun?

D2LMFER3                         Darge - cross

1    A.  I told Luis to bring a gun.

2    Q.  You were familiar with guns, were you not?

3    A.  What you mean by familiar with guns?

4    Q.  You've shot them?

5    A.  Yes.  In '98, I shot a gun.

6    Q.  Is that the only time you've ever shot a gun?

7    A.  Yes.

8    Q.  You shot a gun just one time and here you are ready to kill

9    two people?

10   A.  It doesn't take much to press the trigger.

11                  (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D2LUFER4                          Darge - cross

1    Q.  I guess not.

2          Now, you said that the reason you went with Joe

3    Fernandez is because no one knew of him or would know of him,

4    correct?

5    A.  Right.  That was one of the reasons, yes.

6    Q.  But you went to Luis Reyes who everybody knew?

7          MR. CAPONE:  Objection just to the name, your Honor.

8    Q.  Luis Rivera, isn't that correct?

9          THE COURT:  You didn't have a question.

10   Q.  You went to Luis Rivera to be your driver, correct?

11   A.  Correct.

12   Q.  Everybody knew him from the block?

13         THE COURT:  Which block?

14         MR. RICHMAN:  The neighborhood where he was selling

15   the drugs.

16         THE WITNESS:  On 188, yes.

17         THE COURT:  188 and where?

18         THE WITNESS:  Valentine.

19         THE COURT:  Don't mix up neighborhoods Mr. Richman,

20   please.

21   Q.  You also knew him from Live Wire?

22   A.  What do you mean by knew him from Live Wire?

23   Q.  You were the owner of Live Wire, were you not?

24   A.  Yes, I was.

25   Q.  And Live Wire was the company that did the business of

D2LUFER4                         Darge - cross

1   making traps or places to secret drugs and guns?

2   A.  That's correct.

3   Q.  And you knew that Luis had a car in which you had put a

4   trap in, correct?

5   A.  Yes, correct.

6   Q.  Everybody knew Luis, correct?

7   A.  What do you mean by everybody knew?

8   Q.  The guys you hung out with?

9   A.  Some of the guys, yes.

10  Q.  What time that morning did you arrange to have Luis pick

11  you up?

12  A.  I don't remember the time.

13  Q.  You don't remember the time?

14  A.  No, I don't.

15  Q.  Who was picked up first, you or Joe?

16  A.  I don't remember.

17  Q.  How early in the morning was it, if you recall?

18  A.  It was after breakfast, before noon.

19  Q.  How long did you wait before you shot the guys?

20  A.  Excuse me?

21  Q.  How long were you waiting there before you killed them?

22          THE COURT:  When you got to the location and you had

23  to wait, how long was it?

24          THE WITNESS:  I can't really recall how long I stood

25  there.

D2LUFER4                          Darge - cross

1    Q.  Half hour, 20 minutes?

2    A.  It was not more than an hour.

3    Q.  Not more than an hour?

4    A.  No.

5    Q.  And that's when the entire thing occurred, the murder

6    occurred, right?

7    A.  Yes, around that time.

8    Q.  That's your best recollection?

9    A.  Yes.

10   Q.  And that's the recollection you have after going over this

11   with the government over 20 times?

12   A.  Correct.

13   Q.  So it was before noon?

14           MR. CAPONE:  Objection.

15           THE COURT:  Hold on.

16           MR. RICHMAN:  Can the question be read back?

17           THE COURT:  "And that's the recollection you have

18   after going over this with the government over 20 times?"

19           And the answer was "correct."

20           The question:  "So it was before noon?"

21           Make it a better question.

22           MR. RICHMAN:  Sorry?

23           THE COURT:  Make it a better question.

24   Q.  So the event occurred prior to 12 o'clock noon?

25           MR. CAPONE:  Objection.

D2LUFER4                          Darge - cross

```
 1              THE COURT:  Overruled.
 2  A.  Like I said, I don't remember the exact time.
 3              THE COURT:  When you finished whatever you were doing
 4  and you started to go away, did you have an idea of what time
 5  it was?
 6              THE WITNESS:  Yeah, it was probably after noon.
 7              THE COURT:  Like what?
 8              THE WITNESS:  I can't remember -- I don't remember the
 9  time.
10              THE COURT:  Did you look at a watch?
11              THE WITNESS:  No, I did not.
12              THE COURT:  You testified that you ended up in some
13  restaurant on Central Avenue in Yonkers?
14              THE WITNESS:  In Yonkers, yes.
15              THE COURT:  About what time did you get to the
16  restaurant?
17              THE WITNESS:  Probably like an hour, hour or so.
18              THE COURT:  What time was it, 2 o'clock, 3 o'clock?
19              THE WITNESS:  After the murder.
20              THE COURT:  About 2 o'clock, 3 o'clock, 4 o'clock?
21              THE WITNESS:  I don't remember the time.
22              THE COURT:  Mr. Richman, he doesn't remember.
23  Q.  What kind of gun did you use.
24  A.  I had a handgun.
25  Q.  And what kind of gun was it?
```

D2LUFER4                     Darge - cross

```
 1    A.  I'm not a gunsmith, so I can't really describe the gun that
 2    I had.
 3              THE COURT:  Was there a label on the gun?
 4              THE WITNESS:  No label on the gun, probably something
 5    encrypted.
 6              THE COURT:  You examined the gun to make sure that all
 7    fingerprints were off?
 8              THE WITNESS:  Correct.
 9              THE COURT:  Did you see a manufacturer's name?
10              THE WITNESS:  No, I didn't.  I didn't pay attention to
11    that.
12    Q.  Sir, didn't you tell your lawyer in February 2011 that the
13    gun was a .380?
14    A.  I thought it was a .380.
15    Q.  You know guns?
16              THE COURT:  Let him finish the answer.
17              Finish the answer.  You said you thought it was a
18    .380?
19              THE WITNESS:  Exactly, but then again I could be
20    wrong.
21              THE COURT:  What is a .380?
22              MR. RICHMAN:  This is a caliber --
23              THE COURT:  Not you.
24              What is a .380?
25              THE WITNESS:  That's why I said, I don't know.
```

D2LUFER4                    Darge - cross

1          THE COURT:  Why did you call it a.380?

2          THE WITNESS:  Because Luis Rivera, that's what he told

3     me it was.

4     Q.  So Luis Rivera told you it was a .380?

5     A.  Correct.

6     Q.  Isn't it a fact that you had previously told the government

7     that it was a 9 millimeter?

8     A.  I don't remember saying that.

9     Q.  February 7, 2011 in a meeting with the government and your

10    lawyer being present, did you not tell the government that

11    initially you believed it to be a 9 millimeter?

12    A.  I believe I said it was a .380.

13    Q.  Did you previous to that day, on or about December of the

14    year 2010 and other meetings before February 7 of 2011, say

15    that it was a 9 millimeter gun?

16    A.  I don't recall.

17    Q.  You know what a 9 millimeter is?

18    A.  Yes, I do.

19    Q.  Tell the judge, the jury what a 9 millimeter is.

20    A.  It is just a caliber of bullet.

21    Q.  Are you familiar with 9 millimeters?

22    A.  I had one before.

23    Q.  In fact you used that one in the first murder, a 9

24    millimeter?

25    A.  I believe so, yes.

D2LUFER4                          Darge - cross

1   Q.  So you know about guns?

2   A.  I don't really know about guns.

3   Q.  What did you do with the gun afterwards?

4   A.  Told Luis to get rid of it, so when I got inside the car, I

5   put it back inside the stash.

6   Q.  You knew where he got rid of it?

7   A.  No, I don't know.

8   Q.  By the way, you said that you shot the man in the head,

9   correct?

10  A.  In 2000?

11  Q.  Yes.

12  A.  Yes.

13  Q.  Do you remember which gun at this time it was, a .380 or a

14  9 millimeter?

15  A.  Like I said, to my knowledge, it was a .380.

16  Q.  But you don't know whether it was a .380, correct?

17  A.  You got that, yes.

18  Q.  What?

19  A.  Correct.

20  Q.  You said that you ran out, right?

21  A.  I didn't ran out, it jammed.

22  Q.  I know, but you ran out.  You turned and ran out of the

23  place?

24  A.  Yes.

25  Q.  And you didn't see what happened after that, right?

D2LUFER4                        Darge - cross

1    A.  No, I did not.

2    Q.  Zac was still in the place, correct?

3    A.  Yes.  He was in the lobby.

4    Q.  Zac was one of the guys who wanted those two guys dead,

5    right?

6    A.  Correct.

7    Q.  Do you know whether Zac had a gun in his possession at that

8    time?

9    A.  No, I did not know.

10   Q.  Do you know if Zac did the killing himself after you left?

11   A.  No, I do not know.

12   Q.  When you went up to TGIF -- that was the place you went to

13   after the murders, right?

14   A.  Yes.

15   Q.  Was Joseph Fernandez with you?

16   A.  Yes, he was.

17   Q.  Did you drink?

18   A.  No, we did not drink.

19   Q.  What did you do?

20   A.  We ordered food.

21   Q.  Who was there?

22   A.  Luis Rivera, Joe Fernandez and myself.

23   Q.  How long did you spend there?

24   A.  About an hour.

25   Q.  What did you have?

D2LUFER4                          Darge - cross

1    A.  I don't remember what I ate.

2    Q.  You know Joseph Fernandez's family, do you not?

3    A.  Yes, I do.

4    Q.  Do you recognize any of them in court today?

5    A.  Yes.

6    Q.  Do you see his wife?

7    A.  Yes.

8    Q.  You know his wife, right?

9    A.  Yes, I do.

10   Q.  How many times have you met her?

11   A.  A couple of times.

12   Q.  In fact, that's the same wife that he had back 13 years

13   ago, right?

14   A.  Yes, correct.

15   Q.  Do you know his children as well?

16   A.  I don't know them that well, no.

17   Q.  You don't know them well.  Do you know how many children he

18   has?

19   A.  He has about two, but I know she had also children.

20   Q.  And you know what she does for a living?

21   A.  Yes, I know.

22   Q.  What is that?

23   A.  She's a nurse.

24   Q.  Do you know what Joseph does for a living?

25   A.  At that time he was -- I believe he was working for BJ's or

D2LUFER4                         Darge - cross

1   something like that.

2   Q.  He was working?

3   A.  Yeah.

4   Q.  You weren't working at that time, were you?

5   A.  No.

6   Q.  When you were at MCC, you were cooperating with the

7   government already when you saw Joseph Fernandez, correct?

8   A.  Yes.

9   Q.  You were looking to make points with the government, is

10  that fair to say?

11  A.  I don't understand what you are saying by points.

12  Q.  You were seeking to obtain information that would benefit

13  you when you spoke with the government, is that correct, while

14  you were at MCC?

15  A.  Yeah.  I made an agreement to cooperate.

16  Q.  So when you saw that your cousin Joey had come in and he

17  shook his head at you, you came over to talk to him, correct?

18  A.  Correct.

19  Q.  To involve him in a conversation that you were going to

20  tell the government about, is that what you are telling us?

21  A.  Involve him in a conversation?

22  Q.  Yes.

23  A.  No, that is not correct.

24  Q.  Would it be fair to say that you had an interest in gaining

25  as much information as you possibly could to benefit yourself?

D2LUFER4                              Darge - cross

1    Would that be fair to say?

2    A.  I was not obtaining information from him.

3    Q.  Do you remember this question being posed to you and this

4    answer being given to you in the proceedings yesterday?

5              MR. CAPONE:  Objection.

6              THE COURT:  Sustained.

7              MR. CAPONE:  Your Honor, could we have a very brief

8    sidebar?

9              THE COURT:  No.

10             Do you want a break, members of the jury?

11             Yes.

12             Let's close up your books.  Leave them on your chairs.

13             We will break for 10 minutes and come back at 25 after

14   3.

15             Don't discuss the case.

16

17             (Continued on next page)

18

19

20

21

22

23

24

25

D2LUFER4                         Darge - cross

```
1              (Jury not present)
2              MR. CAPONE:  Your Honor, can we raise a quick issue?
3              THE COURT:  Wait.
4              Do it now.  Mr. Fernandez has to be in here.
5              MR. CAPONE:  Your Honor, the issue that I wanted to
6    raise is that Juror Number 7 is continuing --
7              THE COURT:  One minute.
8              Juror Number 7 is what?
9              MR. CAPONE:  Is continuing to sleep through most of
10   the proceedings.  He was audibly snoring --
11             THE COURT:  What do you want me to do?
12             MR. CAPONE:  I just wanted to make sure the defense
13   was aware of it and wanted to do anything about it.
14             THE COURT:  Why don't you talk to Mr. Richman.
15             Do you want to do anything?
16             MR. RICHMAN:  No, I don't, your Honor.
17             THE COURT:  I don't see him sleeping.
18             MR. CRONAN:  Your Honor, just so --
19             THE COURT:  One person.
20             MR. CRONAN:  I apologize.
21             THE COURT:  Do you have an application?
22             MR. CAPONE:  I don't have an application.
23             THE COURT:  We are in recess.
24             (Recess)
25             (Continued on next page)
```

D2LUFER4                          Darge - cross

1          (Jury present)

2          THE COURT:  You can continue your cross-examination,

3    Mr. Richman.

4          (Discussion off the record between counsel)

5          MR. RICHMAN:  May we just have a moment, your Honor?

6          (Discussion off the record between counsel)

7    BY MR. RICHMAN:

8    Q.  Mr. Darge, do you have a name on the street?

9    A.  Excuse me?

10   Q.  Do you have another name on the street?

11   A.  They usually call me Pat.

12   Q.  You have another name that you were arrested by, do you

13   not?

14   A.  At what time?

15   Q.  In the '90s?

16   A.  In the '90s?

17   Q.  Yeah.  Another name?

18          We will get back to it momentarily.

19          In December did you speak to the U.S. Attorney when

20   you first decided to cooperate this time and tell them that you

21   had destroyed the guns, that you threw it into the river?

22          THE COURT:  In December 2012?

23          MR. RICHMAN:  2010.

24   Q.  Did you say that?

25   A.  Did I say what?

D2LUFER4                    Darge - cross

```
 1              THE COURT:  That you destroyed the guns or threw them
 2    in the river?
 3              THE WITNESS:  I don't remember saying that.
 4    Q.  Do you remember talking to a United States Attorney named
 5    Brown?
 6    A.  What time did you say?
 7    Q.  December 2010?
 8    A.  December 2010?  Brown?  Agent Brown.
 9    Q.  A U.S. Attorney other than these three fellows here?
10    A.  Right.  I don't remember any Brown.
11    Q.  Do you remember telling persons who were around the table
12    that you had destroyed the guns or had thrown them in the
13    river?
14    A.  I told them that I told Luis to get rid of it.
15    Q.  Were you also known as Donald Bohus?
16    A.  Donald Bohus?
17    Q.  Yes.  B-O-H-U-S.  Were you not arrested under that name?
18    A.  Donald Bohus?
19              THE COURT:  Stick with the first question, Mr.
20    Richman.
21              Were you also known by that name?
22              THE WITNESS:  No.
23              THE COURT:  The answer is no.
24              MR. RICHMAN:  I would ask that this be marked as --
25              (Discussion off the record between counsel)
```

D2LUFER4                          Darge - cross

1          MR. RICHMAN:  Your Honor, may I approach?

2          THE COURT:  Is there a number on that?

3          MR. RICHMAN:  3503PP.

4          THE COURT:  What is the question?

5     Q.  Does that refresh your recollection that you were also

6     known as Donald Bohus?

7     A.  And when is this?  When was this arrest?

8          THE COURT:  Let me see the document.

9          MR. RICHMAN:  Here is the rest of the document, your

10    Honor.

11          (Pause)

12          THE COURT:  Look through this document and

13    particularly the name in the middle of the top page.

14          THE WITNESS:  Right here?

15          THE COURT:  Yes.  The document is as of December 2010.

16          The question is whether this refreshes your

17    recollection, whether you had other names as to which you were

18    known.

19          THE WITNESS:  No.  I never was called Donald --

20          THE COURT:  OK.  Give it back.

21    Q.  At the time of your arrest, you were fingerprinted in 2010,

22    correct?

23    A.  Yes.

24    Q.  And your record was brought forth on a computerized form,

25    is that right, if you know?

D2LUFER4                              Darge - cross

1              MR. CAPONE:  Objection.

2              THE COURT:  Sustained.

3              MR. RICHMAN:  Now, if I might have 25 shown on the

4      screen.

5  Q.  That's the hallway in which the murder took place, correct?

6  A.  Yes, correct.

7  Q.  Would it be fair to say that, that was the way it was lit

8      at the time, more or less, when you were there?

9              MR. CAPONE:  Objection.

10             THE COURT:  Overruled.

11 A.  No.  It looks brighter there in that picture.

12             THE COURT:  In that picture?

13             THE WITNESS:  Yes, in the picture.

14 Q.  Where were you standing when you fired the shot?

15 A.  Where was I standing?

16             THE COURT:  Repeat the question, please.

17 Q.  Where were you standing when you fired the shot?

18             Do you have a little marker?

19 A.  No, I don't have it.

20             Thank you.

21             Right about here.

22             THE COURT:  The record will show that it is to the

23 left of the elevator door, past the corner where the wall

24 recedes and about the plane of a person standing in front of

25 the elevator door.

D2LUFER4                          Darge - cross

1    Q.  You were wearing boots at the time, were you not?

2    A.  Yes.

3    Q.  You walked out from that alcove where the mailboxes were,

4    right?

5    A.  Yes.

6    Q.  You walked out with gun in hand, right?

7    A.  Correct.

8    Q.  You shot the man in the brown pants in the head, is that

9    right?

10   A.  Yes, the one that was facing toward -- that was giving me

11   his back, yes.

12   Q.  Did you tiptoe out or did you just walk out full stride?

13   A.  I ran out.

14   Q.  You ran out?

15   A.  Yes.

16   Q.  He didn't turn, did he?

17   A.  Excuse me?

18   Q.  He did not turn?

19   A.  Who?

20   Q.  The guy you shot in the head?

21   A.  No.  He twitched.

22   Q.  After you shot him in the head, correct?

23   A.  Yes.

24   Q.  Your gun jammed and you turned to run, is that what you are

25   saying?

D2LUFER4                          Darge - cross

1    A.   I tried to unjam it and then when I seen I couldn't do it,

2    I ran out.

3    Q.   Where did you run out, the front door or the side door?

4    A.   Through the front.

5    Q.   You ran right out the front door?

6    A.   Yes, right out through the front.

7    Q.   Just display it to the jury.

8         You ran through the courtyard of the building, right?

9    A.   Through the courtyard?

10   Q.   There was a courtyard in that building, wasn't there?

11   A.   The main entrance, I ran right out through there.  The same

12   way I came in, that's the same way I ran out.

13   Q.   You ran to the left, right, after you came out of the

14   courtyard?

15   A.   I ran out -- I don't understand by what you saying about

16   the courtyard.

17        THE COURT:  When you reached the street, when you

18   reached the sidewalk?

19        THE WITNESS:  I made a left.

20   Q.   You ran up a hill, correct?

21   A.   Well, once I got to the corner, I crossed the street and

22   ran up the hill, yes.

23        MR. RICHMAN:  Could we display the entranceway,

24   please.

25        THE COURT:  Was Parkside Place a level street or an

D2LUFER4                          Darge - cross

```
1    inclined street?
2              THE WITNESS:  Where the building is, is level.
3              THE COURT:  So when you turned left on Parkside Place,
4    you ran on level ground?
5              THE WITNESS:  Yes.
6              THE COURT:  When you reached 207th Street and made a
7    left turn, was it level or inclined?
8              THE WITNESS:  It was inclined, going up.
9              MR. RICHMAN:  20.
10   Q.  That's the entranceway?  Mr. Darge, is that the
11   entranceway?
12   A.  It don't look familiar, no.
13   Q.  It doesn't look familiar to you?
14   A.  No, because everything was open when we got there.
15             THE COURT:  What do you mean by "everything"?
16             THE WITNESS:  The doors were open.
17             THE COURT:  The doors to the building were open?
18             THE WITNESS:  Yes.
19             THE COURT:  How many sets of doors were there?
20             THE WITNESS:  Just that one that I see there, but they
21   were open.
22             THE COURT:  Was there another set of doors after that?
23             THE WITNESS:  I can't remember if there was.
24             THE COURT:  On the sides, were there fences?
25             THE WITNESS:  I can't remember.
```

D2LUFER4                          Darge - cross

1              THE COURT:  Was the entrance set back from the

2      sidewalk?

3              THE WITNESS:  To me the entrance was actually, to my

4      memory, was like right by the sidewalk.

5              THE COURT:  Right on the street?

6              THE WITNESS:  Yes.

7              THE COURT:  There was no recess, no courtyard recess?

8              THE WITNESS:  Not that I remember, no.

9              THE COURT:  You know some buildings in the Bronx are

10     recessed in a courtyard, some without a courtyard, some flush

11     to the sidewalk --

12             THE WITNESS:  Yes.

13             THE COURT:  -- which one was this?

14             THE WITNESS:  To me it was flush, they didn't have no

15     courtyard.

16             THE COURT:  That's how you remember it?

17             THE WITNESS:  Yes.  That's how I remember it.

18     Q.  When you drove by the night before, isn't this the building

19     that you saw?

20     A.  No, I did not see a building.  They just pointed at, more

21     or less, where the building was.  I didn't go inside the

22     building.  I didn't pass right by the building.  I was on

23     Webster Avenue.  You can't see it.

24             THE COURT:  From Webster Avenue looking up, you could

25     see the shape of an apartment building?

D2LUFER4                          Darge - cross

1           THE WITNESS:  Yes, I did.

2           THE COURT:  Did you see the entrance?

3           THE WITNESS:  No, you cannot see the entrance.

4           THE COURT:  You just saw from some mid floor up to the

5      roof?

6           THE WITNESS:  Yes.

7           THE COURT:  What else was on that block?

8           THE WITNESS:  There were other buildings next to it.

9           THE COURT:  Same size or larger?

10          THE WITNESS:  It varied.

11          THE COURT:  What was the variation?

12          Were there any one- or two-story buildings on the

13     block?

14          THE WITNESS:  I don't remember, but they were not all

15     the same height.

16          THE COURT:  How many stories did this building have?

17          THE WITNESS:  I can't remember.

18          THE COURT:  Five, six, less?

19          THE WITNESS:  I would say five.

20          THE COURT:  And buildings next to it, were they also

21     five or six floors?

22          THE WITNESS:  About, yes.

23          THE COURT:  So there were a couple or more apartment

24     houses on that block?

25          THE WITNESS:  Yes.

D2LUFER4                          Darge - cross

1   Q.  This picture doesn't refresh your recollection as to the
2   building in question where you murdered these people?
3   A.  It's been a long time and --
4            THE COURT:  The question is yes or no.
5            THE WITNESS:  No.
6            THE COURT:  When you were driving by Webster Avenue,
7   were you concerned that there might be some confusion as to
8   which apartment building you should go into?
9            THE WITNESS:  No.
10            THE COURT:  You knew right away what the particular
11   building was?
12            THE WITNESS:  Yes.
13            THE COURT:  Even though you couldn't see the ground
14   floor?
15            THE WITNESS:  Exactly.
16            THE COURT:  What made you so sure?
17            THE WITNESS:  When they pointed at it, they told me it
18   will be almost like by the corner of that block.
19            THE COURT:  Did they tell you it was the corner
20   building?
21            THE WITNESS:  I believe so, yes.  I'm not too sure.
22            THE COURT:  You can't recall?
23            THE WITNESS:  I can't recall.
24            THE COURT:  But you felt from their description you
25   knew exactly where to go?

D2LUFER4                          Darge - cross

```
 1              THE WITNESS:  Right.
 2   Q.  Sir, you knew it was a stash house for Zac, right?
 3   A.  Gordo, Aladino, Zac, yes.
 4   Q.  You knew that it was a place where Zac kept some drugs and
 5   money?
 6   A.  No, I did not know until when they told me that's where it
 7   was supposed to be.
 8   Q.  And Zac was the person who was supposed to be a person who
 9   pointed these people out, correct?
10   A.  Yeah.  He was the one that was supposed to bring them to
11   that stash house.
12   Q.  And he was bringing them to his own stash house, is that
13   right?
14   A.  Well, Gordo, Aladino and Zac, they worked together.
15              THE COURT:  So the apartment in that building, which
16   was their stash house?
17              THE WITNESS:  No.
18              (Discussion off the record between counsel)
19   Q.  I show you --
20              THE COURT:  Maybe you will get agreement.
21              Does it come into evidence, Mr. Capone?
22              MR. CAPONE:  Yes, your Honor.
23              THE COURT:  Just offer it into evidence.  You offer
24   it?
25              MR. RICHMAN:  I offer 22 in evidence.
```

D2LUFER4                              Darge - cross

 1              THE COURT:  No objection.

 2              Received.

 3              (Defendant Exhibit 22 received in evidence)

 4              THE COURT:  You can display it to the jury.

 5    Q.  I show you that which has been marked as number 22 in

 6    evidence.  Will you tell us, does that refresh your

 7    recollection that was the street that you ran up to get to your

 8    car?

 9              THE COURT:  Forget about the yellow tape.

10              THE WITNESS:  That I ran up?  No.  That seems to me to

11    be --

12              THE COURT:  Let me help you.

13              When you testified that you ran to the sidewalk and

14    then to the left, is that the sidewalk on which you ran, as

15    best you can tell?

16              And see if you can, in your mind's eye, take out the

17    tapes.

18              THE WITNESS:  That I ran up to get to the car or from

19    out of the building?

20              THE COURT:  When you left the building you, ran to

21    your left?

22              THE WITNESS:  Yes.

23              THE COURT:  The sidewalk on which you left on which

24    you ran?

25              THE WITNESS:  Yes.

D2LUFER4                          Darge - cross

1          THE COURT:  Is that it?

2          THE WITNESS:  Yes.

3          THE COURT:  On which you ran, is that it?

4          THE WITNESS:  Yes.

5   Q.  You had a full block to the next corner, is that right?

6   A.  A full what?

7          THE COURT:  Which block?

8   Q.  You ran to 207th Street, correct?

9   A.  Yes.

10  Q.  You got into the car that Luis was driving, right?

11  A.  Yes.  Once I got to it.

12         THE COURT:  He had to run up?

13         THE WITNESS:  I had to run up, yes.

14  Q.  How far was that from the entrance to the building?

15  A.  Well, if you could display --

16         THE COURT:  How far was it to 207th Street?

17         THE WITNESS:  It was like a block up.

18         THE COURT:  Wait a minute.

19         There's the location of the entrance.  There's the

20  corner.  And there is the corner on Decatur and 207.

21         So be precise in your question, Mr. Richman.

22  Q.  How far did you have to run to get to the car?

23         THE COURT:  From the entrance of the building?

24         THE WITNESS:  About a block up.

25  Q.  So that's your estimate?

D2LUFER4                        Darge - cross

1    A.   Excuse me?

2    Q.   Your estimate, right?

3    A.   Yes.

4              THE COURT:  Can I see counsel at the sidebar?

5

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D2LUFER4                          Darge - cross

1                    (At the sidebar)

2                    MR. RICHMAN:  Even I can't argue --

3                    THE COURT:  Juror Number 7 is having a lot of

4       difficulty staying awake.  We need full participation by the

5       jury.

6                    I could call Number 7 in and give him a talk, but I

7       don't think he is in control.

8                    Maybe we could excuse him at the end of the day?

9                    MR. RICHMAN:  I would concede that, your Honor.

10                   I want to discuss it with my client and tell him what

11      to expect, that it is the proper thing to.

12                   THE COURT:  I need to have an inquiry, but I don't

13      know that it would serve any purpose.  Maybe you would be

14      better off with 12 alert jurors than one who is sleeping.

15                   MR. RICHMAN:  I can't argue that.

16

17                   (Continued on next page)

18

19

20

21

22

23

24

25

D2LUFER4                         Darge - cross

1              (In open court)

2    BY MR. RICHMAN:

3    Q.  There came a point that you were arrested for this

4    particular case, correct?

5    A.  Yes.

6    Q.  It was about 10 years after the event, correct?

7    A.  Correct.

8    Q.  And do you know why you were arrested?

9              THE COURT:  It is not relevant, Mr. Richman.

10             MR. RICHMAN:  It might very well be.

11             THE COURT:  Ask the question.

12   Q.  Do you know why you were arrested?

13   A.  Well, after my arrest, yes, I found out.

14   Q.  When you were arrested, where were you?

15   A.  I was by my church.

16   Q.  And you say by your church, you were driving your car by

17   your church, is that right?

18   A.  Yes.

19   Q.  What kind of car was it?

20   A.  Ford Windstar minivan.

21             MR. RICHMAN:  Sorry?

22             THE COURT:  Windstar minivan.

23   Q.  What year was it?

24   A.  2000.

25   Q.  By the way, in the last five years, have you paid any

D2LUFER4                         Darge - cross

1    taxes?

2    A.  Did I pay taxes?

3    Q.  Yes.

4    A.  In the last what?

5    Q.  Five years.

6    A.  What five years?

7            THE COURT:  The last five years -- we are now 2013 --

8    from 2008 to 2013, did you file any taxes?

9            THE WITNESS:  Yes, I did.

10   Q.  When did you file taxes?

11   A.  Every year from after 2005, as soon as I started working.

12   Q.  And you just reflected your income from the church, is that

13   right?

14   A.  Yes.

15   Q.  And one of the things in the church that you were

16   responsible for was for tithes?

17   A.  Tithes, yes.

18   Q.  What are tithes?

19   A.  It is 10 percent of members, what they make.

20   Q.  In other words, you were responsible for the members of

21   your church paying 10 percent to your church, that you were

22   responsible for that money, correct?

23   A.  Yes, I was.

24   Q.  And the money was paid to you, is that right?

25   A.  Well, to the church.

D2LUFER4                       Darge - cross

1    Q.   But you were the collector?

2    A.   Well, I made sure that that money was collected, yes.

3            THE COURT:  Was it customarily paid by cash or by

4    check?

5            THE WITNESS:  Check.  And people put cash as well.

6            THE COURT:  In the basket that was passed?

7            THE WITNESS:  No, in an envelope with their

8    information, meaning address and contact number and how much to

9    put and what they actually paying, whether tithes, offering or

10   donation -- whatever the case may be.

11           THE COURT:  Who maintained the church bank account?

12           THE WITNESS:  I was one of them, and my senior pastor

13   was the other person that oversees that also.

14           THE COURT:  Who made the deposits?

15           THE WITNESS:  I made the deposits.

16           THE COURT:  Who endorsed the name of the church on the

17   back of the check?

18           THE WITNESS:  Myself and the pastor.

19           THE COURT:  Both or either one?

20           THE WITNESS:  We both could both do it or either or.

21           THE COURT:  With regard to cash, what was your

22   practice?

23           THE WITNESS:  Everything was deposited in the account.

24   Once we counted everything that came in on a Sunday, we -- I

25   had an assistant of mine's that would count it.  He would log

D2LUFER4                          Darge - cross

1   it on the book.  We had a book where we logged everything that

2   came in and we will go deposit.  And every month at the end of

3   the month, we will give a report to our senior pastor.

4              THE COURT:  Was anyone responsible for acknowledging

5   gifts, letters to the donors?

6              THE WITNESS:  What do you mean by --

7              THE COURT:  Did you write letters to people who gave

8   the church money to say thank you for the contribution?

9              THE WITNESS:  What we do is, at the end of the year,

10  if they want to get a letter from us of everything they

11  contributed for tax purposes, we will assess that and we will

12  have an account of what they have donated.

13             THE COURT:  Who writes the letters?

14             THE WITNESS:  The senior pastor.

15             THE COURT:  Do you have any responsibility in that?

16             THE WITNESS:  No, I don't.

17             THE COURT:  Any further questions along this line, Mr.

18  Richman?

19             MR. RICHMAN:  No, your Honor, not at all.

20  Q.  By the way, did you until your parishioners that you had

21  killed three people?

22             MR. CAPONE:  Objection.

23             THE COURT:  Sustained.

24  Q.  Sir, you are familiar with the Ten Commandments, are you

25  not?

D2LUFER4                          Darge – cross

1          MR. CAPONE:  Objection.

2          THE COURT:  Sustained.

3    Q.  When you shot the man you killed in the building that day,

4    in the year 2000, what was the second man doing after you shot

5    the first man?

6    A.  When I shot and I saw that the guy twitched and I looked at

7    my gun, that it didn't -- it was jammed because I was aiming at

8    the second guy, he just stood there.  And then when I was

9    looking at the gun to try to unjam it and I saw I couldn't fix

10   it, I put it in my pocket and I just ran out.  I didn't really

11   see what much that he did, that he do while all of that was

12   happening.

13

14          (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

D2LMFER5                        Darge - cross

1   Q.  Did Zac know Joe Fernandez at that time?

2              THE COURT:  If you know.

3   A.  No.  I don't know.

4   Q.  I'm sorry?

5   A.  That I know of, no.

6              MR. RICHMAN:  No further questions at this time, your

7   Honor.

8              THE COURT:  Before we have a redirect, members of the

9   jury, let me tell you, some of you have asked what our schedule

10  is.  Today we will go to approximately 4:30.  I've got another

11  matter coming after you.  And then we will be recessed until

12  Monday.  We will sit Monday and Tuesday, 10 to 5 both days.

13  And then we will recess until the following week.  I'm hopeful

14  that we will finish that following week.  If we are not

15  finished we will have to go into the following week after that.

16  But I think we will be finished and I hope that I'm not overly

17  optimistic when I say that.  Just to give you the dates, you'll

18  be working Monday and Tuesday, the 25th and the 26th, and then

19  the entire week of March 4, including, probably, that Friday if

20  we have to.  But keep Friday loose.  It depends on the

21  schedule.

22             I've got a large set of conferences that day.  If we

23  are making slow progress I will cancel them.  If we are moving

24  ahead well, I'll keep them.  And if we can finish this case by

25  that Friday, I'll cancel them.  The following week begins March

D2LMFER5                          Darge - cross

1    11, and we will certainly finish by that following week.

2              Counsel, am I misstating in any way?

3              MR. CAPONE:  No, your Honor.

4              MR. RICHMAN:  No, sir.

5              THE COURT:  Now we will have the redirect.

6              MR. CAPONE:  Thank you, your Honor.

7    REDIRECT EXAMINATION

8    BY MR. CAPONE:

9    Q.  Mr. Darge, on cross-examination you were asked about one of

10   your cousins, Joseph Agramante?

11   A.  Yes.

12   Q.  Tilo?

13   A.  Yes.

14   Q.  You were also asked about your brother Boozer?

15   A.  Yes.

16   Q.  Why did you not ask Joseph Agramante to be your backup

17   shooter?

18   A.  Because I needed somebody that would not question the plan

19   or have any input.  I just needed somebody to listen and

20   somebody that would trust my judgment as far as the plan that I

21   had.

22   Q.  Why did that mean, you couldn't choose Joseph Agramante?

23   A.  Because I know that he is a stubborn guy and I knew he was

24   not good for that, and he also knew some of the guys from the

25   shop.

D2LMFER5                        Darge - redirect

1   Q.  Why did you not choose your brother?

2   A.  My brother and I, like I said, I didn't see eye to eye.  I

3   needed somebody that could listen carefully to what I'm telling

4   him to do so there won't be no problems while I'm, you know,

5   executing the plan.

6   Q.  Are you covering up for either of those men?

7   A.  No, I'm not.

8              MR. RICHMAN:  Objection.

9              THE COURT:  Sustained.

10  Q.  You were arrested in December of 2010?

11  A.  Yes.

12  Q.  Since you've been in prison, how many times have you spoken

13  with your brother?

14  A.  The time I spoke to my brother was when my father passed

15  away.  We spoke the most probably -- I mean, three to four

16  times the most.

17  Q.  Since December of 2010?

18  A.  Yes.

19  Q.  When you began meeting with the government in December of

20  2010, did you tell them about your brother's drug dealing?

21  A.  Yes.

22  Q.  And that you dealt drugs with your brother?

23  A.  Yes.

24  Q.  Was your brother arrested yet?

25  A.  No.

D2LMFER5                          Darge - redirect

```
 1    Q.  Did you understand that you might have to testify against
 2    your brother?
 3    A.  Yes, I understand.
 4    Q.  Might you still have to testify against your brother?
 5              THE COURT:  Objection sustained.
 6    Q.  Do you know if you still might have to testify against your
 7    brother?
 8              THE COURT:  Objection sustained.
 9    Q.  As part of your cooperation agreement who are you required
10    to testify against?
11              MR. RICHMAN:  Objection.
12              THE COURT:  As you understood your cooperation
13    agreement, against whom would you have to testify?
14              THE WITNESS:  Against anyone that the government tells
15    me to.
16    Q.  Including family?
17    A.  Yes.
18              MR. RICHMAN:  Objection.
19              THE COURT:  Overruled.
20    Q.  You testified that Tito was involved in a murder with you
21    in 2008, is that right?
22    A.  In '98.
23    Q.  I'm sorry.  '98.  Is that correct?
24    A.  Correct.
25    Q.  Did you tell the government about that murder?
```

D2LMFER5                         Darge - redirect

1    A.  Yes, I did.

2    Q.  Were you initially charged with it?

3              MR. RICHMAN:  Asked and answered, your Honor.  This is

4    not part of the cross-examination.

5              THE COURT:  Overruled.

6    A.  Can you repeat that again?

7    Q.  Were you initially charged with the 1998 murder?

8    A.  Yes.

9              THE COURT:  When?

10   Q.  When you were first arrested.

11             THE COURT:  When?

12   Q.  In December of 2010, when you were arrested, were you

13   already charged with that 1998 murder?

14   A.  No, I was not charged.

15   Q.  You told the government about that murder yourself, right?

16   A.  Yes, correct.

17   Q.  Do you have any understanding about whether the government

18   even knew about the murder that you were involved in in 1998?

19             MR. RICHMAN:  Objection.

20             THE COURT:  Sustained.

21   Q.  Do you have any reason to cover up for Tito?

22             MR. RICHMAN:  Objection.

23             THE COURT:  Sustained.

24   Q.  You were shown on cross-examination some photographs.

25             Do you remember that?

D2LMFER5                          Darge – redirect

1    A.  Yes.

2    Q.  Of the building?

3    A.  Correct.

4    Q.  Where the murders took place?

5    A.  Correct.

6    Q.  Have you ever seen any of those photographs before?

7    A.  No.

8    Q.  In the meetings with the government that you described, did

9    the government show you any photographs of the building?

10            THE COURT:  Overruled.

11   A.  No.

12   Q.  Did you see any photographs of the crime scene?

13   A.  No.

14   Q.  Do you have any idea if your testimony is consistent with

15   the crime scene evidence?

16            MR. RICHMAN:  Objection.

17            THE COURT:  Sustained as to form.

18   Q.  Do you have any understanding as to what the crime scene

19   evidence showed in this case?

20            MR. RICHMAN:  Objection.

21            THE COURT:  Sustained.

22   Q.  Aside from the photographs you've seen of the various other

23   people involved in this case and the map, did the government

24   show you anything else in its meetings with you?

25            MR. RICHMAN:  Objection.

D2LMFER5                          Darge - redirect

```
 1              THE COURT:  It's too hard to answer.  Sustained.
 2   Q.  Did you see any autopsy reports?
 3              MR. RICHMAN:  Objection.
 4              THE COURT:  Overruled.
 5   A.  No.
 6   Q.  Did you see any ballistic evidence reports?
 7   A.  No.
 8   Q.  Do you have any idea about what any other people involved
 9   in this case have said about you?
10   A.  No.
11   Q.  On cross-examination you were asked about whether you got
12   over on the government in 2003.
13              Do you remember that?
14   A.  Yes.
15   Q.  And whether you benefited from that?
16   A.  Correct.
17   Q.  You did get a short-term benefit, didn't you?
18              MR. RICHMAN:  Objection.  Characterization.
19   Q.  Did you get a short-term benefit --
20              THE COURT:  Sustained.  Don't characterize.
21   Q.  What was the benefit you got?  I believe you testified you
22   got a benefit.  What was the benefit you got?
23              THE COURT:  Which conviction is this?
24              MR. CAPONE:  2003 conviction.
25              THE COURT:  For what?
```

D2LMFER5                            Darge - redirect

1             MR. CAPONE:  For heroin.

2             THE COURT:  The one in this court?

3             MR. CAPONE:  Yes, your Honor.

4             THE COURT:  Haven't we gone over that enough.

5    Q.  At the present time do you think that you got a benefit

6    from lying in 2003?

7    A.  Yes, I do.

8    Q.  Are you getting a benefit now?

9    A.  No, I'm not.

10            THE COURT:  You are if the government writes the

11   letter that say they might write, and if it works with me,

12   right?

13            THE WITNESS:  Yes.  But it is up to you.

14            THE COURT:  It's always up to me, right?

15            THE WITNESS:  Yes.

16            THE COURT:  One time I'm getting information and

17   another time I'm not getting information?

18            THE WITNESS:  Correct.

19   Q.  What is your understanding of whether when you were

20   sentenced for this case the judge will know about your lies in

21   2003?

22            MR. RICHMAN:  Objection.

23            THE COURT:  Sustained.  I don't think you have any

24   more, Mr. Capone.  Sounds like a very good idea to stop when

25   you start to going into questions that keep getting objected

463

 1    to.

 2              MR. CAPONE:  Just a few more questions, your Honor.

 3    Q.  You were asked about whether you know if Zac did the

 4    shooting.

 5              Do you recall that?

 6    A.  Yes.

 7    Q.  When you ran out of the building, where was Zac standing?

 8    Where was the last point you saw him standing?

 9    A.  The last point I saw him standing was right where I pointed

10    out, by the little two steps.

11    Q.  On that first step?

12    A.  Yes.

13    Q.  Was he in front of or behind the two men who were killed?

14    A.  The guy that was giving his back to me, he was standing at

15    his left side.

16    Q.  You were also asked about whether you had ever gone by the

17    name Donald Bohus?

18    A.  Yes.

19    Q.  When you were committing credit card fraud, what would you

20    use to commit that fraud?

21    A.  Whichever name that the card hold.

22    Q.  There were other people's names that you used?

23    A.  Yes.

24    Q.  Do you remember those names?

25    A.  No, I don't.

D2LMFER5                              Darge – redirect

1    Q.  You were asked about your knowledge of the defendant and

2    his family?

3    A.  Yes.

4    Q.  Do you want to be here testifying against your cousin?

5              MR. RICHMAN:  Objection.

6              THE COURT:  Sustained.

7              MR. CAPONE:  If I could just have one second, your

8    Honor.

9              No further questions, your Honor.

10             THE COURT:  Thank you very much.  You are excused.

11             (Witness excused)

12             THE COURT:  Why don't we start your next witness on

13   Monday morning.

14             MR. CAPONE:  That's fine, your Honor.

15             THE COURT:  Can I see counsel at side bar, please.

16             (Continued on next page)

17

18

19

20

21

22

23

24

25

D2LMFER5

1              (At the side bar)

2              THE COURT:  Did you have a chance to talk to your

3    client?

4              MR. RICHMAN:  Yes.

5              THE COURT:  What do you want to do?

6              MR. RICHMAN:  We are going to consent.

7              THE COURT:  You consent to removing him as a juror?

8              MR. RICHMAN:  Yes.

9              THE COURT:  I think the best thing is to excuse the

10   jury and ask him to come back, and I'll speak to him in the

11   robing room.

12             MR. RICHMAN:  I don't want to embarrass the guy.

13             THE COURT:  I'll try to be good at that.

14             MR. RICHMAN:  I know you'll be good to him.

15             THE COURT:  Thanks.

16             Should I excuse Mr. Fernandez for the day and we will

17   do it afterwards?

18             MR. RICHMAN:  Yes, that's fine.

19             (Continued on next page)

20

21

22

23

24

25

D2LMFER5

1              (In open court)

2              THE COURT:  Members of the jury, there is no point in

3    starting another witness now, so I'll ask you to close up your

4    books, give it to Ms. Jones on the way out.

5              You have the rest of the week off.  Don't think about

6    the case.  Everything will come quickly back to mind when we

7    start again on Monday.

8              Keep an open mind.  Enjoy the rest of the week.  I'll

9    see you Monday.  Monday at 10.

10              (Jury not present)

11              THE COURT:  Mr. Fernandez, we have some business with

12    the lawyers to do in the robing room.  You can stay and Mr.

13    Richman will then report back, or you can be excused.

14              MR. RICHMAN:  Your Honor, my client has elected to

15    return to his housing facility.

16              THE COURT:  Thank you.  Have a good rest of the week,

17    Mr. Fernandez.  See you Monday.

18              I'll see counsel in the robing room.

19              (In the robing room)

20              THE COURT:  The name is Ronnie Howard, Senior, juror

21    number 7.

22              (Juror present)

23              THE COURT:  Thank you for coming in, Mr. Howard.  Have

24    a seat.

25              Mr. Howard, I find it always hard to pay attention and

467

D2LMFER5

1     I don't know how it is with you, whether you have got some

2     medicines or some other things.  I've been noticing that you're

3     tending to nod off.  And jury service should not really be

4     hard.  And if it is, usually there is something going on that I

5     don't know about.  But I think it might be a better idea if we

6     excuse you from the jury.

7               JUROR:  I won't argue with that.

8               THE COURT:  Ms. Jones will take your book up and

9     destroy the pages.  We thank you for your service.  You'll be

10    counted as having good service here.  And just relax.  Don't

11    talk to fellow jurors.

12              JUROR:  I won't do that.

13              As of Monday what?

14              THE DEPUTY CLERK:  Just go back to work.

15              JUROR:  Thank you.

16              THE COURT:  Thank you, Mr. Howard.

17              (Juror not present)

18              THE COURT:  I am going to leave the jurors in their

19    places, so seat number 7 will be open.  I'll just tell them

20    that Mr. Number 7 can't attend anymore and we will just go on.

21              MR. RICHMAN:  Very good.  No problem.

22              (Adjourned to Monday, February 25, 2013, at 10:00

23    a.m.)

24

25

INDEX OF EXAMINATION

Examination of:                                    Page

PATRICK DARGE

Direct By Mr. Capone . . . . . . . . . . . . . 297

Cross By Mr. Richman . . . . . . . . . . . . . 384

Redirect By Mr. Capone . . . . . . . . . . . . 456

                    GOVERNMENT EXHIBITS

Exhibit No.                                    Received

 1   . . . . . . . . . . . . . . . . . . . . 298

 15   . . . . . . . . . . . . . . . . . . . . 350

 3503-GG   . . . . . . . . . . . . . . . . . . 378

 16   . . . . . . . . . . . . . . . . . . . . 382

 3503-QQ   . . . . . . . . . . . . . . . . . . 388

                    DEFENDANT EXHIBITS

Exhibit No.                                    Received

 22   . . . . . . . . . . . . . . . . . . . . 446