D2p0fer1                          Trial

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4                  v.

5   JOE FERNANDEZ,

6                  Defendant.

7   ------------------------------x

8                                        New York, N.Y.
                                         February 25, 2013
9                                        10:00 a.m.

10
    Before:
11
                     HON. ALVIN K. HELLERSTEIN,
12
                                         District Judge
13

14                            APPEARANCES

15  PREET BHARARA
         United States Attorney for the
16       Southern District of New York
    TODD BLANCHE
17  RUSSELL CAPONE
    JOHN P. CRONAN
18       Assistant United States Attorneys

19  MURRAY RICHMAN
    BRIAN PAKETT
20       Attorneys for Defendant

21

22  ALSO PRESENT:  SHAWN MacDONALD, DEA
                    VANESSA QUINONES, Paralegal
23                  DON TAYLOR, Paralegal

24

25

                  SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

D2p0fer1                              Trial

1   (Trial continuing; in open court)

2           THE COURT:  Good morning, everybody, be seated,

3   please.

4           (Jury not present)

5           (Witness takes the stand)

6           THE DEPUTY CLERK:  All rise.

7           (Jury present)

8           THE COURT:  Good morning, ladies and gentlemen, please

9   be seated.

10          I excused -- leave seat number -- yeah, okay.

11          I excused juror number seven, Howard, from further

12  service on the jury.  So we'll just keep our seats the way we

13  are, and we'll keep going.

14          Daniel Austin is our next witness, he is on the

15  witness stand.

16          Mr. Austin, please stand.

17          THE COURT:  Pay attention to the oath, please.

18   DANIEL AUSTIN,

19      called as a witness by the government,

20      having been duly sworn, testified as follows:

21          THE DEPUTY CLERK:  State your name and spell your last

22  name slowly for the record.

23  DIRECT EXAMINATION

24  BY MR. BLANCHE:

25  Q.  Good morning.

D2p0fer1                          Austin - direct

1    A.   Good morning.

2    Q.   Where do you currently work?

3    A.   Currently retired from New York City Police Department.  I

4    run several not-for-profits, one of theme being the retired

5    detectives association right here in the city.

6    Q.   When did you retire from the NYPD?

7    A.   March of 2005.

8    Q.   Prior to your retirement from the NYPD, what was your job

9    at the NYPD.

10   A.   I was a detective investigator assigned to the Crime Scene

11   Unit of the New York City Police Department.

12   Q.   How long were you assigned to the Crime Scene Unit of NYPD?

13   A.   Little over 11 years.

14   Q.   And why did you leave the NYPD?

15   A.   I had a lot of job offers that came about towards my

16   retirement, and I figured it was time for a change.

17   Q.   Now, I want to direct your attention to February 22nd,

18   2000.  Were you working that day?

19   A.   Yes.

20   Q.   What were you assigned to do that day?

21   A.   I was assigned as a forensic, or crime scene investigator

22   within the New York City Police Department.

23   Q.   Now, what if anything happened at approximately 2:15 p.m.

24   on that day?

25   A.   My office received a telephone call from Detective Fagan,

D2p0fer1                              Austin – direct

1    of the 52 precinct detective squad, that there had been a

2    shooting at a location inside of a lobby on Parkside Place up

3    in the Bronx, within the confines of the 52 Precinct.

4    Q.  What did you do after receiving that telephone call -- or

5    after that telephone call was received, rather.

6    A.  My partner and I, at the time was detective Danny McKenna.

7    We got into our car and we proceeded to head up to I believe

8    3235 Parkside Place up in the Bronx where the crime scene

9    actually was.

10   Q.  So if you could explain what happened, or what you did when

11   you arrived at the scene?

12   A.  Uh-huh.  One of the first things that I do is I look for

13   the detective that has either called in the job or is in

14   charge, or the head investigator, for the detective squad.  I

15   asked him some brief questions and proceeded to document the

16   crime scene.

17   Q.  So you just said "document" a crime scene.  Can you

18   explain, without talking specifically about this case, just

19   generally speaking, what does it mean for you, or a member of

20   the Crime Scene Unit, to document a crime scene?

21   A.  As a crime scene investigator, we like to use an acronym

22   called S-C-R-I-P-T, which is search, collect, record, identify,

23   package, and transfer or transport physical evidence that may

24   be left at the scene of a crime, or noncrime.

25   Q.  And how, generally speaking, do you go about doing that?

D2p0fer1                          Austin - direct

1      A.   One of the first things we do is what we call a

2      "walk-through."   We do a walk-through of the crime scene and

3      try to make notes, mental notes, as to what we have, whether it

4      is ballistic evidence, victims, ballistic damage, blood,

5      anything that could help the case or help solve the case.   And

6      then we proceed by taking photographs, which is followed by a

7      detailed sketch of the scene, in and of itself, which places

8      all of the evidence and all of the people, the victims.   And

9      then after that, we begin to collect the evidence, mark the

10     evidence, and decide where it has to go.

11             If it's ballistic-type evidence, it would go to the

12     firearms analysis section.   If it is blood evidence, it would

13     go to the chief medical examiner's office.   If it is latent

14     fingerprint, it would go to the latent fingerprint unit where

15     they try to attempt to make comparisons to what they have

16     within their realm.

17     Q.   Directing your attention now to when you arrived at the

18     Parkside location, what did you see?

19     A.   When I first arrived with my partner, the first thing I saw

20     was -- or was actually alerted to by one of the officers at the

21     scene -- was there was a shell casing on the sidewalk area just

22     adjacent to the entrance to the lobby area.   That was noted.

23             We proceeded into the lobby area, where there were two

24     victims up against the west stair wall inside this lobby.   They

25     had been shot multiple times.   There was multiple pieces of

D2p0fer1                          Austin - direct

1   ballistic evidence, shell casings, deformed pieces of bullet,

2   and the victims themselves, of course, within that location.

3   Q.   What is ballistics evidence?

4   A.   Ballistics evidence would be anything that can be fired or

5   shot from a weapon.  It could be a bullet, could be a shell

6   casing which would be the remnants after the weapon is fired.

7   In this situation, it would be a firearm.  Could be a

8   cartridge, the entire bullet itself.  The cartridge would

9   consist of the shell casing and the bullet.  The bullet would

10  be the tip, the casing would be the remnants that would be

11  either expelled or maintained within the firearm itself.

12  Q.   So what did you do --

13          THE COURT:  Tell us what happened when a bullet is

14  fired from a gun.  What -- do you have a -- we all picture a

15  bullet as sort of a pointy structure, pointed at one end --

16          THE WITNESS:  Right.

17          THE COURT:  -- cylindrical and flat at the other end.

18          THE WITNESS:  Yeah.  Most common lay people would

19  refer to it as a bullet.  However, that is not the correct

20  terminology.  The entire unfired bullet, so to speak, is called

21  a "cartridge" okay.  So if you bought a box of bullets, it's

22  really, say, 50 cartridges, not 50 bullets.

23          The bullet is actually the tip, which could be lead,

24  it could be lead encased with copper jacketing, could be Teflon

25  encased lead, and that's the bullet itself.

D2p0fer1                          Austin - direct

1          The part that remains in the weapon, if it's a

2     revolver, or semiautomatic pistol, or a long rifle, it would be

3     the shell casing of itself.  And that's usually what is

4     ejected, either to the right or to the left, and that's what

5     you would find at the scene.

6          THE COURT:  So when a bullet or cartridge is fired,

7     only the front end issues from the gun.

8          THE WITNESS:  Right.  That's the bullet.  The bullet

9     would be the part that is aimed at its intended target.

10          THE COURT:  And the casing stays behind.

11          THE WITNESS:  Right.  If it's a revolver, usually the

12     casing stays within the cylinder itself.  If its a

13     semiautomatic or fully automatic firearm, the shell casings

14     would be expelled through what's called an ejection point

15     either to the right or to the left and land somewhere on the

16     floor, or shelf, or on a counter, anywhere that would avail

17     itself to the landing of that discharged shell casing.

18          THE COURT:  So as an official of the crime scene unit,

19     you are trained to look for the casings?

20          THE WITNESS:  Yes, that's correct.  The bullets, the

21     casings, the cartridges, and the firearm itself, if it does

22     exist.

23          THE COURT:  The cartridges would be the unexpended

24     bullets.

25          THE WITNESS:  That's correct.

D2p0fer1                          Austin - direct

1          THE COURT:  Casings would be the used shell of the

2    bullet.

3          THE WITNESS:  That's correct.

4    BY MR. BLANCHE:

5    Q.  So --

6          THE COURT:  Would you find the first part, or does

7    that explode?

8          THE WITNESS:  Oftentimes, you find a deformed copper

9    jacketed bullet --

10         THE COURT:  Deformed what?

11         THE WITNESS:  Deformed copper jacketed lead bullet.

12         Again, if you picture a piece of lead, about size of

13   the tip of your pinky, encapsulated with a piece of copper, you

14   might find it deformed, you might find it in what appears to be

15   pristine condition.  If you think of the John F. Kennedy

16   assassination, one of the bullets was actually pretty much

17   pristine, led to a lot of conspiracies.  Depends on what it

18   hits.

19         If it hits something that's extremely hard, it will

20   fragment into pieces, recoverable pieces, some identifiable.

21   However, if it fragments into really small pieces, if it hits a

22   very hard object, it would just be recovered as such and very,

23   very seldom could a comparison be made to firearm or weapon

24   itself.

25         THE COURT:  If it hits bone in the human body, what

D2p0fer1                        Austin - direct

1    tends to happen?

2           THE WITNESS:  It would be deformed, or it could

3    deflect and have a slight deformation, and could actually stop

4    that bullet from exiting the body.  So you would actually have

5    a body that would have an incoming wound, and you might not

6    have an outcoming wound that you cannot see, would have to be

7    picked up by x-rays.  Or you could have a palpated wound, which

8    means that the bullet deflected off the hard bone, and it did

9    not exit the skin, just underneath the layers of skin.

10   BY MR. BLANCHE:

11   Q.   Did you take pictures of the crime scene that day?

12   A.   Yes.

13   Q.   I'm going to show you a series of photographs.  In

14   particular, I'm showing you government exhibits 20 through 36,

15   and 41 through 47.  All of these have been marked for

16   identification.  Government exhibits 20 through 22 are already

17   in evidence, and government exhibits 24 and 25 are already in

18   evidence.

19          But if you could take a look through those pictures

20   and tell me whether you recognize them.

21   A.   Yes, I do.

22   Q.   How do you recognize them?

23   A.   These are photographs that I took on February 22nd, of

24   2000, of the crime scene that existed on Parkside.

25   Q.   And how do you know that those are the pictures that you

D2p0fer1                        Austin - direct

1    took?

2    A.   On the back, they're all labeled in consecutive order, and

3    has my former shield number and my initials on each one.

4    Q.   Just to be clear, do those photographs fairly and

5    accurately depict the scene that you photographed at Parkside

6    on that day, February 22, 2000?

7            MR. RICHMAN:  I have no objection to them.

8            THE COURT:  You can answer the question.

9            THE WITNESS:  Yes.

10   A.   Yes, they are.

11           THE COURT:  The exhibits are received.

12           (Government's Exhibits in evidence 20-36, except those

13   previously received, received in evidence)

14           (Government's Exhibits 41-47, except those previously

15   received, received in evidence)

16           MR. BLANCHE:  Thank you, your Honor.

17           THE COURT:  Do you have the complete set, Mr. Richman?

18           MR. RICHMAN:  Yes, I do.

19   BY MR. BLANCHE:

20   Q.   So, if we could put up government exhibit 20, please.

21           Detective, I have pointer that I'm going to hand you,

22   if it helps.

23           THE COURT:  Are all of the jurors' screens working?

24   BY MR. BLANCHE:

25   Q.   So, just very briefly, what are we looking at on government

D2p0fer1                      Austin - direct

1    exhibit 20?

2    A.   Okay.  This is the entrance, the front entrance to

3    Parkside.  Behind these doors would be a small vestibule.  And

4    then a lobby area.

5    Q.   Put up government exhibit --

6    A.   And it's government exhibit number 20.

7    Q.   Twenty-one, please, what are we looking at in government

8    exhibit 21?

9    A.   If you were standing in front of those entrance doors where

10   the last photograph was taken, this is the sidewalk area

11   looking north on Parkside.

12            THE COURT:  Or left, as you exit the building.

13            THE WITNESS:  Which would be to your left if you are

14   exiting the building.  Or, if you were looking at that, it

15   would it be to your right.

16   BY MR. BLANCHE:

17   Q.   You mentioned that there was a piece of ballistics

18   recovered outside.  Do you know where that piece of ballistics

19   was recovered?  Do you have to look at your notes?

20   A.   Yes, I have to look at my notes for that.

21   Q.   I'm showing you what's been marked for identification as

22   3515B.  Take a look at that and tell me if that refreshes your

23   recollection about where that piece of ballistics were

24   recovered?

25   A.   Yes.  In photograph number P-17, it was a ballistics

D2p0fer1                          Austin - direct

1    evidence marked A-22.  A, being the first initial of my last

2    name, 22 being the 22nd piece of ballistics evidence.  And

3    that's located on the west sidewalk, which would be here at the

4    corner of 207th and Parkside Place.  We are on the west

5    sidewalk, and we're looking north.  So it is on this sidewalk,

6    approximately right up in this area here.

7                THE COURT:  At the corner.

8                THE WITNESS:  At the corner, 207th.

9    BY MR. BLANCHE:

10   Q.  Indicating basically at the top of the street, where it

11   appears to be a police car?

12   A.  That's correct.

13   Q.  Thank you.  If we can put up government exhibit 22.  And

14   what are we looking at now?

15   A.  Twenty-two is just a reverse photograph of People's

16   Exhibit 21.  This would be looking south on the west sidewalk

17   area of Parkside Place.  That entrance would be off to our

18   right.  So if you came out of the door, this would be to your

19   right.  If you were looking at the entrance from the outside,

20   this would be to your left.

21               THE COURT:  Again, is what you found at the corner of

22   207th and Parkside, was that a bullet a casing, a cartridge,

23   what?

24               THE WITNESS:  That was a discharged shell casing.

25               THE COURT:  A casing.

D2p0fer1                         Austin - direct

1          THE WITNESS:  A fired bullet, as a laymen --

2          THE COURT:  Discharged shell casing, is what?

3          THE WITNESS:  Discharged shell casing would be what is

4    left over and either ejected from a semiautomatic pistol or

5    rifle, or a fully automatic pistol or rifle, as opposed to

6    being contained within a revolver.  So this would be the part

7    that would remain and be ejected after the cartridge was fired

8    and the bullet has or has not hit its intended target.

9          THE COURT:  Is it always the case that there is such

10   an ejection only at the time of firing, or it can occur well

11   after the firing.

12         THE WITNESS:  If the gun or if the weapon is operating

13   normally, it would be instantaneously ejected.  If there is a

14   malfunction, it's highly possible that the shell casing could

15   remain in the weapon itself after the first shot is fired, or

16   might not even be able to be fired, it would jammed, making the

17   weapon temporarily or permanently unfirable or unoperable.

18   Q.  If we can put up government exhibit 23, please.

19         What are we looking at in government exhibit 23?

20   A.  This is a discharge shell casing that was --

21   Q.  Would you highlight that portion for us, please.

22   A.  And this is a -- from a -- it's .380 caliber discharge

23   shell casing.  And this was on the west sidewalk up towards the

24   corner of I believe 207th and Parkside Place.

25         THE COURT:  There are two objects there, actually

D2p0fer1                          Austin - direct

 1    three objects there.  Can you see steadily -- put your laser

 2    on.

 3                THE WITNESS:  This is the shell casing.  And what

 4    first responders do, or the uniform officers at the --

 5                THE COURT:  Don't move it around.

 6                THE WITNESS:  I'm sorry.

 7                THE COURT:  Okay.  Take it off.

 8                Go ahead.

 9                THE WITNESS:  What they'll do, is they'll place

10    objects, either plastic cups or something to that effect over

11    the evidence, so as EMS comes in, or other people come in, it

12    doesn't get trampled or kicked around.  It's what they do as a

13    temporary until I get there to officially start to mark and

14    make notations.

15                THE COURT:  So just surrounds the area.

16                THE WITNESS:  It surround it so people don't kick it,

17    and they are aware there is something there.

18    BY MR. BLANCHE:

19    Q.  Judge Hellerstein asked you how you go about when a shell

20    casing is ejected, and whether it should be ejected at the time

21    the gun is fired.  I mean do you know, or can you tell from the

22    crime scene how that shell casing ended up on the west side

23    sidewalk outside?

24    A.  Considering the fact that 99 percent of all of the

25    ballistic evidence are contained within this lobby area, this

D2p0fer1                              Austin - direct

1    could have been kicked out.  However, I don't believe it was,

2    for the mere fact that there were two sets of doors that you

3    had to exit from.

4           When you fire these shell casings, they go out and

5    they go every which way.  More than likely, this was caught in

6    one of defendant's clothing, either a neckband or somewhere --

7    in wintertime, jackets are on.  And as he or she was running

8    from the building, it fell out.  And whether they ran up

9    towards 207th Street, or could have fell out, even close to the

10   entrance and been kicked afterwards, but more than likely

11   that's how that shell casing got out there.

12          I do not believe there was one irrelevant shot taken

13   from outside and then everything else inside, I don't,

14   that's --

15   Q.  Did you find any ballistics damage outside of the building

16   in that area?

17   A.  No, none.

18   Q.  If we could put up government exhibit 24, please.  What are

19   we looking at in government exhibit 24?

20   A.  This is that small vestibule area behind the first set of

21   doors.  There is actually two sets of doors.  And in that is,

22   again, another piece of ballistics evidence right underneath

23   that cup.

24   Q.  Now, it doesn't appear to mean that you can see the -- the

25   victims through this window, but where -- can you indicate

D2p0fer1                    Austin - direct

1   where the victims are located, even if we can't see them?

2   A.  Yeah.  I'm going to refer to the sketch, if I may?

3   Q.  You said "sketch," we'll get to that in a minute.  Did you

4   sketch the scene?

5   A.  Yes.

6   Q.  We'll get to that in a minute, sure.

7   A.  The victims, as you proceed through, there is a staircase

8   just a little bit off to the left.  And both of our victims

9   were up against the staircase within that lobby area.  And that

10  would be along the west wall, because we're constantly

11  progressing westerly, as we go into the lobby area and

12  vestibule, from that westerly sidewalk.

13  Q.  Government exhibit 25, please.  So what are we looking at

14  government exhibit 25.

15  A.  Okay.  Government exhibit number 25, from those entrance

16  doors, the second set, we begin to see, off to the left is the

17  staircase.  This is the west wall of that lobby area.  There is

18  an elevator going up.  There is actually other areas that take

19  you to other apartments and other areas inside that lobby area.

20  And here are both of our victims, up against the staircase.

21  And underneath these cups, are additional pieces of ballistics

22  evidence.

23  Q.  And as you mentioned a moment ago, now we see the cups.  Do

24  you know how those cups got there?

25  A.  I didn't see who placed them there.  But, again, these are

D2p0fer1                         Austin - direct

1   the first uniform officers or sector officers who respond to

2   the scene first.

3          What they do, is they'll take cups or something that

4   they can put over the evidence, so it doesn't get kicked or

5   trampled while either the fire department or EMS gets there,

6   and doesn't move it around.

7   Q.  And just stating the obvious, but there appears to be blood

8   as well at the scene, correct?

9   A.  Yes; that's correct.

10  Q.  Now, okay, if we put up government exhibit 26, please.

11  What are we looking at in government exhibit 26?

12  A.  Government exhibit number 26 is just an additional view of

13  inside that lobby area, okay, showing or depicting more

14  evidence underneath these cups.

15  Q.  Now --

16          THE COURT:  Which way are we looking here?

17          THE WITNESS:  Government exhibit 26.

18          THE COURT:  What are we looking at, where are we

19  positioned?

20          THE WITNESS:  Okay.  I'm gonna have to go to our

21  photos.

22  BY MR. BLANCHE:

23  Q.  We'll put up government exhibit 25 and 26 together.

24          So if you look at those two pictures together, can you

25  explain to the jury what government exhibit 26, what the view

D2p0fer1                          Austin - direct

1   is of government exhibit 26.

2   A.   Right.   That is, I believe, the southerly view.   So if you

3   are looking from this direction --

4   Q.   On 25?

5   A.   On 25.

6        -- you would be looking off to your left, okay, which

7   would be depicted by the this small shelf area here.

8        THE COURT:   So 25, you even see on the left-hand side

9   of the picture, some kind of a --

10       THE WITNESS:   Yeah, I just want to --

11       THE COURT:   -- either a picture or something on the

12  wall --

13       THE WITNESS:   I just want to make sure that I'm

14  correct.

15       THE COURT:   -- is that what you're looking at?

16       THE WITNESS:   I'm sorry, that's my mistake.   That is

17  the right side.

18       So you would be looking off to the right side.   So you

19  would be looking north.   This is west.   This is the north

20  facing.   So if you are standing here taking this photograph

21  this way, you would take -- a photograph was taken to the

22  right.   So this is looking north.

23  Q.   Put up 27, next to government exhibit 26 on -- on the left.

24  That's 26?

25  A.   That's the north facing view of the lobby.

D2p0fer1                        Austin - direct

1  Q.  So now looking at 27, I think you just said it, but that's

2  the --

3  A.  South facing view, all right.  So if you were taking the

4  photograph from here back in the opposite direction, you can

5  see what appears to be some mirrors, another exit, and the

6  staircase, the two victims, and additional evidence under the

7  cups.

8  Q.  You said you -- so you're literally taking the photograph

9  one way, and turning it, and taking it the opposite way?

10 A.  Exactly.  Taking overall photographs when you first -- as

11 you progress in, then you would take one to the right and one

12 to left, one to the right one would be north, the left one

13 would be south, the one, in, would be west.

14 Q.  If we can put up government exhibit 28, please.  One more

15 photograph of the lobby.

16        Can you just tell us what we're looking at in

17 government exhibit 28, please?

18 A.  Yes, this is a -- this would be north.  This would be a

19 northwesterly view, all right, showing the -- the elevator and

20 additional evidence under the cups.

21 Q.  And then government exhibit 29.

22 A.  And this would just be an opposite -- this would be a

23 southeasterly view, again, depicting additional evidence

24 underneath the cups and, again, that other exit or entranceway

25 into that lobby area.

D2p0fer1                        Austin - direct

1    Q.  All right.  Can we pull up government exhibit 30, please.

2              All right, so what are we looking at in government

3    exhibit 30?

4    A.  This is the west wall of the lobby area.  This is the

5    staircase going up.  There is some ballistic evidence

6    underneath these cups.  This is -- I'll call him victim number

7    one and victim number and --

8              THE COURT:  That is the white shirt --

9              THE WITNESS:  Yeah, victim number 1, white shirt, blue

10   denim jeans; victim number 1.  And victim number 2, with the

11   black shirt and dark denim jeans.

12   Q.  Ms. Quinones, if you could focus in right next to the

13   stairwell, right about -- little higher than that.  Little

14   higher.  Perfect.

15             Looking at the wall, what do we see there on the wall?

16   A.  Okay.  These are ballistic impact marks, B-I-M.  This is

17   where the bullet or the fired part of the cartridge would come

18   out.  It may or may not hit the intended target.  If it does,

19   it could possibly go through and hit the wall and leave a

20   ballistic impact mark.  If its misses its target, again, it

21   would hit that wall, and fragment, or become deformed, and

22   leave what is known as a "ballistic impact mark" in the wall.

23   Q.  Put up government exhibit 31.  All right, so what are we

24   looking at in government exhibit 31.

25   A.  Government exhibit 31 is just an opposite view from the two

D2p0fer1                          Austin - direct

1    victims, victim number 1 and victim number 2, looking back

2    towards the entrance door, that second set of doors.  And then

3    behind that would be the small vestibule.  And then the other

4    doors that lead out to the west sidewalk area.

5    Q.  Now, do you know -- it appears that the one of the doors is

6    propped open; correct?

7    A.  Yes.

8    Q.  Do you know whether that door was propped open at the time

9    of the occurrence, or do you have any way of knowing that?

10   A.  No, I don't.

11   Q.  Also.  Okay, so we put up 32 and 33 at the same time.  Then

12   if you just highlight 32 first.  Thank you.

13          So now what -- now it appears there is numbers on

14   government exhibit 32.  What are we looking at there?

15   A.  Yes.  In government exhibit number 32, this is a

16   southeasterly view.  You're looking at inside the lobby area,

17   of course.  You're looking at evidence that are marked with

18   numbers.  In this case, this is ballistic evidence, shell

19   casings, and bullets, deformed bullets; of that nature.  This

20   is that -- that northwesterly view looking into that corner

21   where there is some additional ballistic-type evidence.

22   Q.  Why is there a number over each one, a separate number?

23   A.  Because each one is -- they're not fired all together.

24   They are all individual.  Whether it is a fully automatic type

25   weapon, one progresses the other.  I don't know which is the

D2p0fer1                        Austin - direct

first one.  But in order to document them and give them some
type of identification, you would have to do it one at a time.
And they would also have to be measured out each one, one at a
time.
Q.   Okay.  If we could put up, now, government exhibits 34 and
35.
          All right so, first, 34, it appears to be just like
the photo we looked at before, but now there is numbers; is
that correct?
A.   These -- exactly.  These, again, there is ballistic
evidence located right underneath each one of these placards or
adjacent to them.
Q.   And then 36, please?
A.   Yes.  That is correct.  That's correct right there.  This
is the sidewalk.  This is actually the discharge shell casing
that was recovered on the west sidewalk by the corner of 207
and Parkside Place.
Q.   This is the one outside?
A.   That is correct.
Q.   Thank you.  If we can now look at government exhibit 41,
please.
          What are we looking at government exhibit 41?
A.   This is ballistic impact mark on north wall.  This is the
north wall inside that lobby, which would be off to the right.
Strikes the wall here.  This is a concrete and plaster lathe

D2p0fer1                        Austin - direct

1    wall.  And the bullet hits this and breaks out a piece of the

2    plaster.  And that leaves an impact mark which is noted as

3    ballistic impact mark number 1, on the north wall.  Point of

4    impact, you can actually see where the bullet itself strikes or

5    where the tip of the bullet would strike, and the pressure just

6    breaks out a piece of the plaster.

7    Q.  Government exhibit 42, please.  What are we looking at in

8    government exhibit 42?

9    A.  These are additional ballistic impact marks.  And I believe

10   it goes two, three, four, five, and six.  And, again, these are

11   also points of impact where the bullet actually struck the wall

12   itself, fragmented the wall, and left the marking.  And in this

13   case, this piece right here, a bullet was actually recovered

14   from this hole that was left adjacent to the riser of the stair

15   and in the wall.  This is the west wall.  This is directly

16   behind the two victims.

17   Q.  So is that the -- now that you have marked it up, is that a

18   picture of what we blew up a few minutes ago, right on the

19   stairwell?

20   A.  Yes, that's correct.  And these measurements are all

21   heighths off of the floor, how high up and so forth.

22   Q.  And now did you -- you indicated that you actually pulled

23   something out of one of the marks there.  Is that the only one,

24   the one that you are pointing out which is in the far left-hand

25   side of government exhibit 42?

D2p0fer1                          Austin - direct

1    A.   Yes.  That's where an actual piece of the deformed bullet

2    was recovered from inside that hole right there.

3    Q.   How do you know that the other holes are ballistics damage?

4    A.   You can actually see.  A lot -- many times, you'll actually

5    see where the bullet hit.  And it will leave either a piece of

6    trace lead or trace copper jacketing.  And usually directly

7    adjacent to it, or somewhere around it, is the corresponding

8    bullet fragment, or piece of bullet or deformed copper jacketed

9    bullet, which is in one of the photos prior to this you saw the

10   markers on that little landing area of the staircase.

11   Q.   So could we put up government exhibit 43 and focus in on

12   that area.

13            Just about what you were just talking about, can you

14   elaborate a little bit more?

15   A.   Yes.  This is the west wall.  This is directly above that

16   stair landing.  This is behind victims number 1 and 2.  This is

17   ballistic impact mark number 2, all right, which is depicted by

18   this here, an arrow pointing to it.  And this is -- looks like

19   41 and a half inches above.  And this is the area, here, this

20   is the marking that the bullet --

21   Q.   Sir -- sorry.  You're circling the ballistic damage.  Can

22   you see on that picture, where the bullet entered the wall, or

23   no?

24   A.   All you can see is the damage that is left behind in this,

25   which is this whole area right here.  This is recent.  When I

D2p0fer1                          Austin - direct

1    say "recent," this was not here -- this happened in 2000,

2    February 22nd.  I can assure you this was not here in February

3    of 1999.  Could I say reasonably that this happened within an

4    hour?  Within two hours?  Within -- yes, absolutely.  Here in

5    the City of New York -- I was born and raised here.  Kids have

6    a tendency to see something like this and make it a hell of a

7    lot bigger than it really is.  This is just an opportunity-type

8    thing.  So, yes, this is very recent, within several hours.

9    The plaster is white as white can be.  There is no

10   discoloration.  Things here in City discolor all of the time.

11   People smoke in lobbies, things turn yellow.  A lot of car

12   traffic, just through modern technology and time, things tend

13   to discolor here.

14   Q.  Put up government exhibits 45 and 46.

15          Just briefly, what are we looking at in those two

16   exhibits?

17   A.  Okay.  Again, this is ballistic impact mark number 4.

18   Again, this is that west wall area.  This is number 5.  This is

19   number 6.  And these are all just measurements up and acrossed.

20   And, again, you can see the holes actually divot, call them a

21   "divot" or impact mark that is left on the wall.  And, again,

22   this is the staircase.  And this is that wall that is directly

23   behind both victims.

24   Q.  And government exhibit 47, please, the last one.  So what

25   are we looking at in government exhibit 47?

D2p0fer1                          Austin - direct

A.   This is an actual -- this is a bullet hole, an impact mark.

But, actually, a hole that found a softer area between the

riser of the stair and the plaster.  And the bullet actually

penetrated.  And I was able to recover a piece of deformed lead

bullet, which was marked A17 from that location right there.

Q.   Thank you.

          All right, so after you took photographs of the crime

scene that we just went through, what did you do next?

A.   The scene is sketched.  And within that sketch, the

evidence is measured out and placed.  Sketches can be to scale.

They are often not to scale, all right.  "To scale" just means

proportionately correct, okay.

          In this case, the sketch was provided not to scale,

just depicting the location where the evidence was recovered,

whether it was ballistic evidence.  Additional searches of the

lobby area itself, it's processed for fingerprints, looking for

possible recovery of anything that contained DNA evidence,

whether it is blood, whether it's a small article of clothing,

or button, or anything of that nature.  And that's also placed

onto that sketch, photographed, documented.  And then when

everything is all documented as to where it was placed, where

it was found, it's recovered.  Piece by piece.  Each one is

marked.  Each piece is presented to a vouchering safeguarding

officer.  And then he or she is instructed that this is where

this goes, this goes to the Latent Print Unit, this goes to

D2p0fer1                          Austin - direct

Firearms Analysis Section, this goes to the chief medical

examiner's office, where each independent laboratory can

examine each piece of evidence or each item of evidence

independently, and try to get results.  Whether it is making a

match on a fingerprint, whether it is coming up with DNA that

could be already in an existing CODIS system to help apprehend

a defendant, whether they can make a ballistic match on a

weapon that might have been used prior or after.

Q.  So after you did the sketch, did you in fact do that,

collect the ballistic evidence?

A.  Yes.

Q.  How many pieces of ballistic evidence did you collect?

A.  I believe there was 24.  And I'm just going to look

through.  Yes, there were 24 pieces of ballistic evidence that

were recovered.

Q.  So you, after you recovered it, what did you do with it?

A.  Each one was processed for latent fingerprints.  There were

negative results on those.  They were each marked individually,

A1 through A24.  Again, A being the first initial of my last

name.  And 1 through 24, depicting 24 pieces.  And then they

were packaged, given to safeguarding officer.  And I'm going to

mess his name up, Szaniszlo -- is that how I say his name?  He

was the safeguarding and vouchering officer at the scene.  And

he vouchered them and forwarded them to the Firearms Analysis

Section within the Forensic Investigations Division of the New

D2p0fer1                        Austin - direct

1   York City Police Department to be analyzed.

2   Q.  I'm showing you government exhibit 62, which is already in

3   evidence.  You take a look at that, and you can open it up if

4   you want, and tell me if you recognize what is in that.

5   A.  Yes, I do.

6   Q.  And what is -- what are we looking at in government

7   exhibit 62?

8   A.  The first small package contains discharge shell casings.

9   And one cartridge, okay.  The cartridge being the unfired.

10  That contains a bullet and the cartridge.

11         The second package contains deformed bullets.  And

12  each item is marked, whether it's inside the shell casing

13  itself, on the side, or on the base; A 1 through A 24.

14  Q.  And just so it's clear, the photographs we looked at that

15  had the numbers, if for example something is marked A12, would

16  that piece of ballistics line up with the 12 number that is on

17  the photograph?

18  A.  Yes.  That would be the corresponding piece of evidence

19  that was recovered under the number 12, the number 11, the

20  number 10, the number 21.

21  Q.  And each piece of ballistics that we're looking at in there

22  does have such a marking on it?

23  A.  Yes.

24  Q.  You mentioned, a couple of times, looking for DNA.  How do

25  you go about doing that and -- well, how do you go about doing

D2p0fer1                          Austin - direct

1    that?

2    A.  You would look for any type of biological fluid; whether it

3    be spit, semen, blood.  Even articles of clothing, whether it's

4    a hat or baseball cap or knit cap, or button, or something that

5    somebody might touch on a regular basis or contain a piece of

6    hair that could actually be sent out and try to recover the

7    DNA.

8    Q.  So did you recover any DNA from this crime scene?

9    A.  I don't know if there was DNA recovered, but there was

10   several blood samples that I recovered that was sent to the

11   chief medical examiner's office to look for DNA to try to see

12   if they could try to find somebody that they could match the

13   DNA to.

14   Q.  You indicated you also looked for fingerprints when you

15   work at a crime scene.  Did you do that in this case?

16   A.  Yes, I did.

17   Q.  So can you first explain how you go about doing that?

18   A.  Okay.  We have to understand something, that not everybody

19   leaves fingerprints.  Latent fingerprints -- there are several

20   types of fingerprints -- are what's known as a chance

21   impression.  Meaning that there is a chance you may have left

22   one, there is a chance you might not have left a fingerprint.

23          If we look at the tips of our fingers, you see lots of

24   lines, these are what's called friction ridges, allows us to

25   hold bottles and glasses and cups and prevents things from

D2p0fer1                         Austin - direct

1    literally slipping out of our hands.  Within those friction

2    ridges are little holes and openings called pores.  That is

3    what emits mostly water, some body oils, and amino acids.

4    Sweat.  My hands are a little wet right now.

5           If we touch something that's either very shiny or very

6    glossy, or even matte, there are ways to process this to try to

7    recover a chance impression or a latent fingerprint, okay.

8           If we think of a doorknob in our house, or a lever if

9    we have levers, we touch it numerous times.  Oils become

10   smudged.  You would think the obvious place to find a

11   fingerprint would be the door knob, however it is the least

12   place that you would ever think of finding a doorknob.

13          The rearview mirror in your car is probably one of the

14   best places.  Because most of us, we get in our car the day we

15   buy it, we adjust the rearview mirror.  If we touch it 6 times

16   in five years, we're lucky.  So we hope that the guy who stole

17   our car went, and the first thing he wanted to do or she wanted

18   to do was move that mirror.  So when I process it, it is a good

19   possibility I recover not only his or her fingerprint, but I

20   recover your fingerprint, as well.

21          We all live in the City.  Born and raised in the city.

22   Very transient city.  I live in an apartment building.  People

23   come and go 50, 50, 60 times a day, depending on the size of

24   the building.  Is it possible to recover latent fingerprints,

25   yes.  Is it possible to recover a latent fingerprint from

D2p0fer1                        Austin - direct

1    somebody who lives in that building?  Yes.  Somebody who

2    doesn't live in that building?  Yes.  Somebody who may or may

3    not have a criminal record who has already served his or her

4    time, yes, it's highly likely.  Is it possible to recover no

5    latent fingerprints, yes.  If you are in area that's highly

6    transient, coming and going, coming and going, those overlays,

7    as we call them, if I keep touching this, and I touch it, and I

8    touch it, I have a big mish-mash of oil.

9            THE COURT:  So if you have an elevator, what?

10           THE WITNESS:  Like a doorknob.  How many times, how

11   many people push that elevator button, 50 times a day, you

12   know.  So there are things that will avail themselves, however,

13   we don't rule out processing that elevator button or that

14   doorknob, because there is always that remote possibility that

15   that chance impression is left there.  Because maybe the

16   cleaning lady or cleaning man came that day and wiped the

17   doorknob off.  That is not impossible, either.  It does happen.

18   People do do that.  That's what we look for in a case of a

19   latent fingerprint.  And we process these, search for these,

20   with contrasting powders.  If it's a light surface, we'll use a

21   black powder.  If it's a dark surface, we'll use a white

22   powder.  And if it's there, it will show us it's there.  We can

23   actually recover it, pick it up.  We can use glue.  There is a

24   lot of ways to do it.  And then that will be packaged up and

25   that will be sent to the Latent Fingerprint Unit, where they

D2p0fer1                     Austin - direct

1     have access to millions of fingerprint records around the

2     country, and see if they can make a match to what's recovered.

3                 THE COURT:  Can fingerprints come through gloves?

4                 THE WITNESS:  Highly unlikely.  I will never say

5     never.  Because if there is a hole in the tip of that glove, it

6     is possible that you could have just a little fraction,

7     infinitesimal.  But there are points that a latent print expert

8     will tell you that he or she needs in order to make a match.

9     So if you have a couple of lines, more than likely not much

10    they are going to be able to do with it, so you do need -- I

11    don't want to say significant, but you need to give something

12    more than an infinitesimal amount of a fingerprint to make a

13    match.

14    Q.  And at the risk of saying the obvious, you obviously have

15    to touch something to leave have a fingerprint, correct?

16    A.  That's correct.

17    Q.  As opposed to blood dropping on the floor or something like

18    this?

19    A.  That's correct.

20    Q.  So with that -- well, one more question.  You know a lot

21    about collecting fingerprints.  Are you a fingerprint

22    comparison expert?

23    A.  I don't do the comparisons.  I was trained by the FBI and

24    Department of Justice and a lot of other agencies throughout

25    the country, how to recover fingerprints, whether they were

D2p0fer1                          Austin - direct

1   latent, what we're looking for in this case, patent, plastic

2   fingerprints, things of that nature.

3           Again, I don't have access to millions of fingerprints

4   that are out there throughout the nation.  I could, if I wanted

5   to, but I think I had my hands full enough with just what's

6   here.  And that's what people sit in little cubicles for hours

7   after hours after hours, looking for minutia to try and match

8   up, or DNA to try and match up.  That's their job.  My job is

9   to make sure I get it to them, I get it to them the right way.

10  I get it through the chain of evidence and accurately, where

11  they can actually have something substantial to work with.

12  That's my job.

13  Q.  So the crime scene we have been talking about before, the

14  lobby, were you successful in your efforts to collect any

15  prints?

16  A.  Yes, there were several latent fingerprint recovered.

17  Q.  How many, in total?

18  A.  I'll look at my notes.  There were five latent fingerprints

19  recovered total.

20  Q.  Just were they -- were any of them recovered -- I think you

21  already said this, but were any of them recovered from the

22  ballistics?

23  A.  No.  None from ballistic evidence.

24  Q.  Where were they recovered?

25  A.  These were, all five latent fingerprints were recovered

D2p0fer1                          Austin - direct

1   from inside that lobby area.

2   Q.  So after you recovered the --

3             THE COURT:  Which part of the lobby area?

4             THE WITNESS:  The first and second latent fingerprints

5   was from the south wall of the side lobby entrance door.

6             THE COURT:  If you're facing the elevator, south is to

7   the right or left?

8             THE WITNESS:  To the left.  North would be to the

9   right.  South would be to the left.  And that was the interior

10  lobby, facing the glass panel.  The third latent fingerprint

11  was recovered from the south lobby wall.  And that was a glass

12  mirror that was adjacent to where the victims were.  And that

13  was also processed with the white fingerprint powder.  And then

14  the last two, four and five, that was recovered from the

15  secondary set of lobby entrance doors.  And we had to progress

16  through the exterior, and the little vestibule in the second

17  set.  That was facing the interior lobby.  So if you were in

18  that lobby, you would be looking at the second set of doors, so

19  it was the interior facing sides, the side that probably

20  everybody and their brother pushes out to get out those doors.

21  And that was from the window glass itself.  If you remember,

22  those doors, only about half of it was glass that you could see

23  through.  The rest of it was some kind of non translucent

24  panel.

25  Q.  So after you collected the five prints, what did you do

D2p0fer1                         Austin - direct

1   with them?

2   A.  They were recorded.  And they are sent to the latent print

3   unit at One Police Plaza.

4   Q.  Just to summarize the evidence you collected, from the

5   photographs you just looked at, do you know where the

6   ballistics evidence is sent to?

7   A.  Yes.  Ballistic evidence goes to the firearms analysis

8   section, which is at the New York City Police Department crime

9   lab.  The latent fingerprints go to the Latent Fingerprint

10  Unit, which is located on Police Plaza.

11  Q.  Do you know, as the crime scene investigator, do you know

12  whether, for example, the ballistic matched to any particular

13  gun?

14  A.  No, I don't.

15  Q.  Same thing with the DNA that was recovered.  Do you know

16  whether it was matched to a person?

17  A.  No, I don't.

18  Q.  And now with the fingerprints, do you know whether the five

19  prints were matched to anybody?

20  A.  No.

21  Q.  Now, just one moment.  Now, I think you testified that you

22  were called, or you were told to go to the crime scene around

23  2:15 p.m.  Correct?

24  A.  That's correct.

25  Q.  All this stuff you have been talking about doing, all of

D2p0fer1                          Austin - direct

1   the work that you did, about how long did that take?

2   A.  It takes -- it's a very long process.  It took roughly

3   about eight hours to process this whole crime scene.  And

4   that's documentation of the victims, the victim's wounds,

5   recovery of ballistic evidence, the search for other evidence,

6   the recovery of the blood evidence, the recovery of the latent

7   fingerprints and all of that.

8   Q.  Aside from your work on that day, February 22, 2000, and

9   your testimony here today, have you had any other role in the

10  investigation of the murders, or of what happened at that

11  location?

12  A.  No.

13              MR. BLANCHE:  No further questions, your Honor.

14              THE COURT:  Cross-examination.

15              MR. RICHMAN:  Briefly, your Honor.

16  CROSS-EXAMINATION

17  BY MR. RICHMAN:

18  Q.  Detective Austin, good morning, sir.

19  A.  Good morning.

20  Q.  You and have I have not had the opportunity to speak about

21  this case?

22  A.  No.

23  Q.  Could you put picture 22 back up, please.

24              I show you that which has previously been marked as

25  government exhibit 22 in evidence.  And that is the area on

D2p0fer1                      Austin - cross

1    Parkside Place, is it not?

2    A.  Yes, that's the west sidewalk, correct.

3    Q.  And you remember it from having been there on that one

4    occasion, correct?

5    A.  Yes.

6    Q.  And that's the portion looking down toward the entranceway

7    of the building, right?

8    A.  Well, the entrance would be off to your right.  So if you

9    came out, this would be to the right of the entrance.  And the

10   opposite way would be to the left.  This would be south

11   looking, this the other way would be north.

12   Q.  That's south looking?

13   A.  Southward looking, correct.

14   Q.  And there is a group of officers down there, is that the

15   entranceway?

16          THE COURT:  Group of what?

17          MR. RICHMAN:  Looks like officers, people.

18          THE COURT:  People.

19          THE WITNESS:  This is the 22.  I'll have to look at

20   the photograph, and I'll tell you exactly what I'm looking at.

21          THE COURT:  Look at your screen here.  You can see

22   better on your screen.  See these people beyond the yellow

23   strip?

24          THE WITNESS:  You know what?  Let me just look at

25   these photographs this way.  No.  The entrance is actually

D2p0fer1                        Austin - cross

1   where these, we'll call them "indentations" are.  So this is

2   taken from directly in front of that entrance, just looking

3   south, the previous photo which was my P-2, which is --

4           MR. BLANCHE:  Government exhibit 21.

5           THE WITNESS:  P21.  Just an opposite view.  So in

6   other words, standing from directly in front of that entrance,

7   I took a photograph north, which is People's 21.  And I took a

8   photograph south, which is that one, correct.

9           THE COURT:  Government exhibit.

10          THE WITNESS:  Government exhibit.

11  A.   This is looking north.  This, again, is the entrance to

12  that lobby area.  Again, this is the opposite stepped wall.  So

13  where those officers were, that would was outside of the crime

14  scene.  If you look at the tape, they're on the other side of

15  the tape.

16  Q.   Is that street flat or slightly elevated?

17  A.   This is a bit of an incline or decline, however you want to

18  say it, it's a graduating slope.  You can see here, if you are

19  looking to the northerly direction, this is actually sloping

20  from the north down to the south.

21  BY MR. RICHMAN:

22  Q.   Would it be fair to say that leaving the building and

23  turning to your left, you would have to run up an incline?

24  A.   You would have to run up somewhat of an incline, correct.

25  Q.   Now, sir, when you got to the scene, do you know what time

D2p0fer1                    Austin - cross

1   you got to the scene?

2   A.  It was somewhere around 3:30ish, I want to say; 3:35.

3   Q.  And you got there by yourself, or with a brother officer?

4   A.  No, I was there with Detective Danny McKenna, who was my

5   partner at the time.

6   Q.  Where did you come from?

7   A.  We came from, I believe at the time we were in Jamaica,

8   Queens.

9   Q.  When you parked your car out front, and you entered the

10  premises, correct?

11  A.  That's correct.

12  Q.  And you did your SCRIPT.

13  A.  That's correct.

14  Q.  Did you search the area?

15  A.  Yes.

16  Q.  And collected evidence and reported where the evidence was?

17  A.  That's correct.

18  Q.  Now, sir, I notice, in the picture of the --

19          MR. RICHMAN:  Can the shell casings be put up again.

20  Q.  I believe that is number 29, and number 27.  Put up

21  juxtapositioned.

22          Those cups indicate where shell casings were found; is

23  that right?

24  A.  That's correct.

25          (Continued on next page)

D2PMFER2                         Austin - cross

1    Q.  Shell casings, is that portion of the bullet or the

2    cartridge that is ejected from the gun, is it not right?

3    A.  Yes.  But that's a generic term.  Under these cups, and I

4    would have to go through each and every one, A1 through A24,

5    some were discharged shell casings.  Remember, there was one

6    cartridge that was recovered that had been unfired, and then

7    there is the deformed bullets.  Just by looking at this I

8    cannot tell you which is which.  I would have to go through my

9    notes, go to the sketch, and look at A1, A2, A3, and so forth,

10   and tell you with the corresponding photograph with those

11   little yellow placards what A1 is, what A2 is, what A3 is.

12   Q.  Generally speaking, the majority of these cups would

13   reflect the shell casings, is that correct?

14   A.  That's correct.

15   Q.  A shell casing is ejected from a weapon, correct?

16   A.  From a semiautomatic or fully automatic weapon, correct.

17   Q.  Am I not mistaken that the shell casing is generally

18   ejected upwards and to the right and back?

19   A.  Yes.  There are some weapons that will eject upwards and to

20   the left, but the majority are upwards and to the right,

21   correct.

22   Q.  If this were an ordinary state of events, this would

23   indicate that these casings were ejected upwards and out to the

24   right?

25   A.  You can generalize that and make that determination, yes.

D2PMFER2                         Austin - cross

1    Q.  And how far would they be ejected?  Would it be fair to say

2    about 12 feet?

3    A.  You know, that's always debatable, and you're aware of

4    that.  I'm aware of that.  Under ideal circumstances --

5         THE COURT:  This case is for the judge and jury, who

6    are not aware of that.

7         THE WITNESS:  That's what I'm here to explain.

8    A.  Wintertime, we have coats.  Whatever action is going on in

9    here, whether that gun is this way, this way, this way --

10        THE COURT:  Pointing different directions.

11   A.  -- ideally straight ahead.  Ideally, it's going to be up

12   and out to the right and down, within 12 feet, nine feet,

13   depends on the amount of spring pressure in the magazine,

14   amount of pressure that's on the slide when that comes back.

15   Depends on the kind of weapon, ideally.

16        If I hold that weapon sideways and now my ejection

17   comes straight up or a little kiltered to the left, not

18   straight up, but a little to the left, it goes straight up and

19   it falls almost straight down, it's going to hit the hard

20   concrete or terrazzo floor.  These are aluminum shell casings

21   or metal.  They are going to bounce around a little bit.  It

22   doesn't just hit and stop.  It's like if take a penny on the

23   sidewalk outside in front of the Grace building, where it's

24   concrete terrazzo, and I drop it, it doesn't just stop there.

25   Q.  I was getting to that, Detective.

D2PMFER2                    Austin - cross

```
 1    A.  It bounces.  I want to make it easy for the jury to
 2    understand.
 3    Q.  Now, they popped up and then they hit the floor, correct?
 4    A.  That's correct.
 5    Q.  Hitting the floor, being hollow or empty, metal, they could
 6    bounce, they could bounce as far as 20 or 30 feet?
 7    A.  They could be kicked, they could be, you know --
 8    Q.  Yes or no?
 9    A.  Yes, sure.
10    Q.  Sometimes they would bounce into the cuff or the clothes of
11    the shooter?
12    A.  Absolutely.
13    Q.  And that would explain the shell that was found outside?
14    A.  More than likely, yes.
15              THE COURT:  What happened if the gun jams?
16              THE WITNESS:  If the gun jams, again, the individual
17    who is firing that weapon may or may not have the knowledge or
18    capability to clear it, and the weapon can become or rendered
19    useless; therefore, relying on a second weapon or a second
20    individual or a second shooter or a second weapon that he or
21    she may be in his or her possession.
22              THE COURT:  So casing in a jammed gun stays in the
23    gun?
24              THE WITNESS:  Oftentimes stays in the weapon itself,
25    whether it's an unfired cartridge or just the discharged shell
```

D2PMFER2                         Austin - cross

```
 1   casing in and of itself.
 2            THE COURT:  Does time release it?
 3            THE WITNESS:  When you say time, that's a tricky word
 4   because, again, if you are trained in how to unjam a
 5   semiautomatic weapon, yes, it takes time.  If it's really
 6   wedged in there pretty good, you might not have the alternative
 7   means to unjam that weapon and, therefore, rely on either a
 8   second weapon or on somebody else who has another weapon.
 9   Q.  Sir, just stay with the issue.
10            The casing that you found on the outside was
11   definitely not from a jammed gun, is that fair to say?
12   A.  That's fair to say.
13   Q.  That was definitely from --
14            THE COURT:  Why do you say that?
15            THE WITNESS:  That's just --
16            MR. RICHMAN:  Judge, let me get there.
17            THE COURT:  Sorry, Mr. Richman.
18            MR. RICHMAN:  I'm just getting there.
19   Q.  And the reason why that it would not be from an unjammed
20   gun is because it was only the back of the cartridge and not
21   the front of the cartridge as well, correct?
22   A.  Okay.  Again, yes, it's a discharged shell casing.
23   However, you can stove pipe.  And what stove pipe means is, if
24   you can picture a semiautomatic weapon and you see that shell
25   casing stuck straight up out of it, looks like a stove pipe,
```

D2PMFER2                         Austin - cross

1    looks like the stack of a ship, it can get jammed in there,

2    oftentimes very easily cleared by just racking the slide back

3    once, it ejects that out.  You usually lose the second

4    cartridge out of it, but now the weapon is operable again.

5    It's not a telltale all that the weapon jammed or didn't jam.

6    It could have been perfectly operable or it may have jammed

7    stove pipe, cleared the problem and made the weapon capable of

8    firing again.

9    Q.  So it is quite clear that the shell casing found outside on

10   that hill was clearly not a cartridge that was in the weapon

11   and discharged from the weapon, correct, cleared from the

12   weapon?

13   A.  I don't know.  I couldn't answer that question.  However, I

14   do know at some point in time either that shell casing was

15   transported outside in somebody's clothing, or it's possible

16   that one shot was fired from outside.  It jammed, they cleared

17   the jam and went on to finish whatever they had to do.

18   Q.  That was a fired shell casing, right?

19   A.  That was -- yes, that's a shell casing, correct.

20   Q.  Inside the hallway you said that you found an undischarged

21   bullet?

22   A.  Yes.

23   Q.  And what kind of bullet was that?

24   A.  I have to look at my notes.  The one that was recovered was

25   a .380 auto.  That's manufactured as an NCCIR cartridge.

D2PMFER2                          Austin - cross

1   Q.  That would be indicative of a clearing of a chamber, would

2   that be fair to say?

3   A.  It would be indicative of the weapon jamming at some point,

4   whether or not the individual or individuals were able to clear

5   it with their assistance or on its own.  I don't think I'm that

6   far advanced to say that the weapon could unjam by itself.  But

7   I think as anybody would tell you, if it's possible, yes,

8   anything is possible, but more than likely probable it had to

9   be cleared by somebody, either racking the slide or doing

10  something, or it could have been a malfunction in the spring.

11  Q.  And once it's cleared it became operable again, if you

12  know?

13  A.  More than likely, that's exactly what happens.  Once it's

14  cleared, it becomes reoperable again.

15  Q.  Now, where, if you know, was this undischarged cartridge?

16  A.  Again, I'm going back to my notes.  A11, which is depicted,

17  is a .380 auto.  It's a white primer, white case, full copper

18  jacketed round nose cartridge.  There was a primer hit actually

19  noted.

20  Q.  Sir, please answer the question.  That's all I'm asking.

21  Where was it?

22          THE COURT:  Just a minute.

23          Mr. Austin, you don't have to think out loud.  Think

24  to yourself and then give an answer to Mr. Richman.

25          He is explaining how he is coming to his answer.

D2PMFER2                          Austin - cross

1   People sometimes do that.

2   A.   A11 is recovered inside that lobby area, just off to the

3   right of where victims number 1 and number 2 were located.

4   Q.   Now, sir --

5           THE COURT:   There is a picture that shows those.

6   A.   It would be a lot easier if the numbers were up.

7           THE COURT:   Let the jury see that.

8           MR. BLANCHE:   Government Exhibit 33, your Honor.

9           MR. RICHMAN:   I would have no objection to showing

10   that picture.

11           THE COURT:   Let the jury see it.

12   A.   There it is.

13           THE COURT:   Which one?

14           THE WITNESS:   That's A11.   That is a cartridge,

15   unfired cartridge.   This is the north wall in that lobby.   This

16   is the west wall.   The victims would be over here past this,

17   further to the left.

18           THE COURT:   To the left of the picture, outside the

19   picture?

20           THE WITNESS:   Correct.

21   Q.   That would be some distance from the victims?

22   A.   Yes.

23   Q.   Now, there is another photograph depicting the step where

24   the two victims were?

25           MR. RICHMAN:   Can that be displayed.   34.

D2PMFER2                        Austin - cross

1   Q.  I show you what has been marked 34.

2              MR. RICHMAN:  Switch it to 30, if you would.  It's

3   easier for me.

4   Q.  Show you that which has been marked as Government's Exhibit

5   30.  I note the three cups on the higher level, the step.

6   That's a step there, is that right?

7   A.  That's correct.

8   Q.  That step is indicative of three cups being placed over,

9   are they cartridges or are they the shell casings?

10  A.  I don't know what numbers they are.  If I see the numbers,

11  I'll be able to tell you exactly.  What number is this one?

12  Q.  14, 15, 16, and 17.

13  A.  Which is which?  I need that other photo with the numbers.

14             MR. BLANCHE:  That's depicted on Government Exhibit

15  34.

16             MR. RICHMAN:  34.

17  A.  14 is here, 15, 16, and 17.  A14 is a deformed copper

18  jacketed lead bullet.  A15 is one .380 auto NCCIR white primer,

19  white case discharged shell casing.  A16 is also like 15.  It's

20  one .380 auto, NCCIR white primer, white case discharged shell

21  casing.  A17, if you remember earlier, there is actually a hole

22  between where the wall meets the riser of the stairs.  That's

23  one deformed copper jacketed lead bullet embedded in the wall

24  adjacent to and above the landing located above first step at

25  the stringer riser of nosing second step tread, approximately

D2PMFER2                     Austin - cross

1    one foot, two inches above the top of the landing on the west

2    wall.

3    Q.  Is two of those items discussed copper jackets?

4    A.  Yes.  A14 and A17 are both deformed copper jacketed lead

5    bullets.

6    Q.  Are they complete copper jackets?

7    A.  When you say complete copper jacketed it says --

8    Q.  Don't tell me what it says.  Your recollection.

9    A.  It says deformed, so they are deformed.

10   Q.  Does that mean someone stepped on the copper jackets, could

11   be?

12   A.  I don't think anybody's boot or shoe is really that hard to

13   deform a bullet.  You know, really?  I'm thinking out loud and

14   I apologize, but those bullets, more than likely, either struck

15   one or both the victims and exited them and hit the wall or

16   missed them completely and hit the wall.  They are that

17   deformed.

18   Q.  Are they more than one bullet?

19   A.  No.  It says one deformed copper jacketed lead bullet, 14.

20   17 is one deformed copper jacketed lead bullet.  If it was more

21   than that, it would say two deformed copper jacketed lead

22   bullets, correct?

23           THE COURT:  I'm a little confused.  Each number has

24   one deformed bullet.

25           THE WITNESS:  Correct.  14 is one deformed copper

D2PMFER2                        Austin - cross

1   jacket lead bullet.  17 is one deformed copper jacketed lead

2   bullet.  This becomes deformed because it goes through the wall

3   riser area and that's how that bullet gets deformed.  That's

4   number 17.  15 and 16 are both discharged shell casings.

5   Q.  Discharged shell casing of .380s?

6   A.  .380s.

7   Q.  We know that at least the .380 discharged more than one

8   shell casing?

9   A.  Yes.  And more than one bullet.

10  Q.  And more than one bullet.

11          Now, you continued your survey of the area by yourself

12  or with your associates?

13  A.  With my partner, yes.

14  Q.  And you secured anything you thought would be of some use,

15  CSU use, correct?

16  A.  That's correct.

17  Q.  And you bagged it and preserved the integrity of the crime

18  scene, correct?

19  A.  That's correct.

20  Q.  That's what you do.  You preserve it so that it can be used

21  at some later date, being in a court of law in terms of

22  evidence, correct?

23  A.  That's correct.

24  Q.  You have been doing that for a number of years?

25  A.  I did it for a very long time, yes.

D2PMFER2                    Austin - cross

1   Q.  You sent it down to ballistics.  You have a ballistics

2   unit?

3   A.  Right.  What happens is, again --

4   Q.  Just answer the question.

5   A.  There is a safeguard and vouchering officer.  And not to be

6   confused, again, everything is packaged by me and given to that

7   officer and he is told or she is told where that evidence has

8   to go, and they voucher it and then it's transported by him or

9   her to either the firearms analysis section, to the latent

10  print unit, to the chief medical examiner's office, and so

11  forth.

12  Q.  The latent print unit, tell the jury, if you would, for one

13  moment, what they do with the latent print unit?

14  A.  The latent print unit actually has a wonderful computerized

15  system.  It's called AFIX.

16  Q.  What do they do?

17  A.  To understand what they do, these fingerprints are actually

18  put into this computer system.  And if there is a match within

19  that system, it will come up with a hit ratio and then you have

20  a comparison to look at.  And if you can make an identification

21  through what exists in the millions of latents of fingerprints

22  that are in that system, that's good.  If not, that doesn't

23  mean the person doesn't exist.  It just means that that

24  individual isn't on file, for whatever reason.

25  Q.  Now, do you know when that was done in this case?

D2PMFER2                           Austin - cross

1    A.  I don't know.

2    Q.  And did you ever find out the results of any of those

3    tests?

4    A.  No.  Unfortunately, counselor, one of my biggest

5    problems --

6              THE COURT:  Just yes or no.  Mr. Austin, the briefer

7    the answer, the better.

8    A.  No, I didn't.

9    Q.  Do you know if any of the scientific tests or the -- by the

10   way, you seek to collect hairs, do you not?

11   A.  I can collect hairs, fibers.

12   Q.  Fibers, glass, fractured glass, shoe and tire impressions,

13   correct?

14   A.  That's correct.

15   Q.  Body fluids, blood, saliva?

16   A.  That's correct.

17   Q.  Can you get saliva from a piece of gum or cigarette?

18   A.  It's possible, yes.

19   Q.  And skin cells touching things, correct?

20   A.  That's correct.

21   Q.  In fact, we are now working, are we not, to something

22   called trace DNA?

23   A.  That's correct.

24              MR. BLANCHE:  Objection.

25              THE COURT:  Overruled.

D2PMFER2                        Austin - cross

1   Q.  Latent fingerprints, correct?

2   A.  That's correct.

3   Q.  Gunshot residue and patina?

4   A.  That's correct.

5   Q.  All of those things you look for, correct?

6   A.  If it's available, if it's doable, yes.

7   Q.  And you found some of those things at the crime scene,

8   right?

9   A.  That's correct.

10  Q.  Do you know if any of those applied to this man here?

11  A.  No, I don't.

12          MR. RICHMAN:  Thank you, sir.  No further questions.

13          THE COURT:  Redirect.

14          MR. BLANCHE:  Briefly, your Honor.

15          THE COURT:  Then, if the jury wants, we will take a

16  little break.

17          MR. BLANCHE:  Ms. Quinones, can you put up Government

18  Exhibit 32, please.  If you could highlight the number 1,

19  Ms. Quinones.

20  REDIRECT EXAMINATION

21  BY MR. BLANCHE:

22  Q.  If you need to refer to your notes and tell us what was

23  recovered in number 1.

24  A.  A1 is a nine-millimeter A-Merc white primer brass-cased

25  discharged shell casing.

D2PMFER2                          Austin - redirect

1   Q.  When defense counsel was asking you a number of questions

2   about the ballistics that was recovered you mentioned .380.  Is

3   that different than the nine-millimeter?

4   A.  That's obviously different from the nine-millimeter.

5   Q.  How many pieces of ballistics did you recover, from what

6   you know from collecting it, that was nine-millimeter?

7   A.  Just that one.

8          MR. BLANCHE:  Now, if you could, Ms. Quinones, if you

9   could put up Government Exhibit 27, please and actually, 32 and

10  33.

11  Q.  Now, Detective, you were asked a number of questions about

12  how shell casings or how the casings are ejected from certain

13  firearms, correct?

14  A.  That's correct.

15  Q.  Do you have any idea how the various shell casings that are

16  depicted in Government Exhibits 32 and 33 ended up where they

17  are on those photographs?

18  A.  No, I don't.

19  Q.  For example, if somebody, not associated with NYPD, but one

20  of the assailants kicked something while he ran out or she ran

21  out, would that result in the ballistics being moved?

22  A.  Absolutely, yes.

23  Q.  If a bystander ran down the stairs and ran out seeing two

24  bodies and kicked it, that would result in being moved as well,

25  correct?

D2PMFER2                          Austin - redirect

1    A.  Yes.

2              MR. BLANCHE:  If you could put up Government Exhibit

3    36, please.

4    Q.  I believe you testified that Government's Exhibit 36, which

5    is number 22, A22, was recovered outside, is that correct?

6    A.  That's correct.

7    Q.  Defense counsel asked you whether the ballistics as

8    depicted in Government Exhibit 36 could have come out of the

9    gun at that location, meaning on the sidewalk.

10             Do you remember those questions?

11   A.  Yes, that's correct.

12   Q.  Again, do you have any idea how that piece of ballistics in

13   Government Exhibit 36 ended up there?

14   A.  No.

15   Q.  Just to clear up one issue with the photographs, defense

16   counsel showed you a couple of photographs of the outside.

17             MR. BLANCHE:  If we could put up Government Exhibit 21

18   and 22 right next to each other, please.

19   Q.  Can you tell us, Government Exhibit 21 and 22, just to be

20   clear, what we are looking at and where and how you took these

21   photographs, meaning how you took 21 and then how you took

22   Government Exhibit 22?

23   A.  Unfortunately, Government Exhibit 20 is not shown.

24   Q.  I can put up Government Exhibit 20.

25   A.  Here is the entrance looking west.  I'm on the west

D2PMFER2                          Austin - redirect

1    sidewalk looking west towards the entrance.  Here are those

2    stepped pillars on both sides.

3            So if we go to the next two photographs, Government 21

4    and 22, here are those two brief step-down columns on both

5    sides.

6            THE COURT:  Referring to 21 in the bottom left.

7            THE WITNESS:  Right.  If you look at the bottom left

8    of 21, I am standing directly in front of that entrance.  I am

9    looking to my left, or north, and I am taking that camera and I

10   am taking the photograph, northerly direction up to what I

11   believe is 207 and Parkside Place.  Here is Parkside.  I

12   believe that's 207.  If I just spin my body around, I don't

13   move, I just spin around, I take an opposite view in a

14   southerly direction of that same westerly sidewalk.  The

15   entrance to, I believe it's 3235 Parkside is to my right now.

16           THE COURT:  Bottom right of the picture, Exhibit 21.

17           THE WITNESS:  Where here is to my left, and I'm

18   looking in a southerly direction --

19           THE COURT:  I'm sorry.  Exhibit 22.

20           THE WITNESS:  -- down that inclined sidewalk.

21           THE COURT:  Just to make sure the record is clear,

22   Mr. Austin took both 21 and 22.  In 21 he is standing adjacent

23   to the entrance of the building, pointing his camera

24   northwards.  And on 22 he is standing adjacent to the entrance

25   to the building looking southwest.  Am I right?

D2PMFER2                         Austin – redirect

1           THE WITNESS:  That's correct.

2   Q.  Defense counsel asked you a number of questions about

3   deformed bullets and shell casings.  Of the, I believe you said

4   24 pieces of ballistics, how many were shell casings and how

5   many were bullets or deformed bullets?

6   A.  Let me look at my notes quickly.  There was one cartridge,

7   which is the unfired bullet.  There were 14 .380 auto

8   discharged shell casings, there was one nine-millimeter A-Merc

9   discharged shell casing, and eight deformed copper jacketed

10  lead bullets, for a total of 24.

11  Q.  How come there would be more shell casings recovered than

12  bullets or deformed bullets?

13  A.  Well, in this case we have two victims that were both

14  victims of multiple gunshot wounds, so many of these bullets

15  are still inside the intended victim or victims.

16  Q.  Could there have been bullets that were not recovered; for

17  example, if a bullet went flying somewhere and it wasn't found?

18  A.  If it fragmented into little itsy-bitsy tiny pieces, yes,

19  that's entirely possible.  If it got caught up and kicked out

20  somehow, caught in somebody's trousers, somebody's jacket that

21  bounced around, that's highly possible, too.

22          MR. BLANCHE:  No further questions.

23          THE COURT:  Thank you very much.

24          THE WITNESS:  You're welcome.

25          (Witness excused)

D2PMFER2

1           THE COURT:  Does the jury want a break or should we

2    get the next witness?

3           Break.  Close up your books and don't discuss the

4    evidence.  We will come back in ten minutes.  It is now half

5    past.  We will come back 20 of.

6           (Jury not present)

7           THE COURT:  We are breaking for ten minutes.

8           (Recess)

9           THE COURT:  The government's next witness is Dr. Susan

10   Ely, who will be sworn.

11    SUSAN ELY,

12        called as a witness by the Government,

13        having been duly sworn, testified as follows:

14   DIRECT EXAMINATION

15   BY MR. CAPONE:

16   Q.  Good morning, Dr. Ely.

17   A.  Good morning.

18   Q.  Where are you employed?

19   A.  At the Office of the Chief Medical Examiner of the City of

20   New York.

21   Q.  And how long have you worked at the Office of the Chief

22   Medical Examiner?

23   A.  Since July of 1997.

24   Q.  What is your title?

25   A.  I'm a senior medical examiner for the city.

D2PMFER2                        Ely - direct

1   Q.   What are your duties and responsibilities as a senior

2   medical examiner?

3   A.   The primary duties of senior medical examiners include

4   primarily investigating very specific kinds of deaths that

5   occur in the city.  They include deaths that occur in some way

6   violently, whether they would be homicides, suicides, or

7   accidents, deaths that occur in hospitals and clinics and

8   doctors offices where the death may be related to some kind of

9   therapeutic or diagnostic complications, deaths that occur

10  suddenly and unexpectedly in childhood, drug intoxications, and

11  deaths that have some kind of public health issue at the core.

12          MR. RICHMAN:  Judge, I'm having difficulty hearing the

13  doctor.

14          THE COURT:  You're better off without that.  Leave it

15  low and speak over it, but speak loudly.

16          You want it repeated, Mr. Richman?

17          MR. RICHMAN:  I got most of it.  I'm okay now.

18          THE COURT:  I'm glad to repeat.

19          Steve.

20          (Record read)

21  A.   As part of the investigation of these kinds of deaths, the

22  medical examiner often performs an autopsy.  And as a result of

23  that autopsy, and sometimes some studies that go along with

24  that autopsy, a cause of death and a manner of death is issued

25  on a death certificate.

D2PMFER2                    Ely - direct

1    Q.  Dr. Ely, can you briefly describe your educational

2    background and training?

3    A.  Yes.  I received my bachelor's degree at the University of

4    Maryland in science, my medical degree and public health

5    degrees at Tulane University.  I then went through internships

6    and residencies in child psychiatry, pediatrics, internal

7    medicine, internships, and residency and pathology, both

8    clinical pathology and surgical pathology.  I then went on to

9    further training after residency at the office where I now work

10   in forensic pathology, and that was in 1997.

11   Q.  Dr. Ely, you've used the terms pathology and forensic

12   pathology.  Can you describe for the jury what they mean?

13   A.  Pathology is a specific field within the overall field of

14   medicine.  Pathologists are medical doctors who have a specific

15   specialization analogous, for instance, to pediatricians or

16   cardiologists or surgeons.  Pathology specifically is the study

17   of disease and injury and pathologists in hospitals and in

18   private practice might diagnose things such as cancer or

19   diabetes in the laboratory by looking under the microscope or

20   doing specific laboratory tests.  A forensic pathologist goes

21   on to further training to investigate specific kinds of injury

22   patterns in the living and dead, but primarily in people who

23   have passed away under the circumstances that I previously

24   explained.

25   Q.  You also referred to autopsies.  What is an autopsy?

D2PMFER2                        Ely - direct

1    A.  An autopsy is a medical physical examination of a person

2    after they have died, and it involves examining that person

3    from the outside, an external examination where general

4    characteristics, such as height, the weight, the presence or

5    absence of tattoos or scars or moles, et cetera, are made note

6    of.  Also, as part of the external examination, any kind of

7    injury that is seen on the outside of the body is made note of

8    and typically photographed, and sometimes x-rays are also taken

9    before any incisions are made on the body.

10             After that part of the examination, an internal part

11   of the autopsy is performed where incisions are made on the

12   scalp, chest, and abdomen so that the internal tissues and

13   organs can be examined for any evidence of natural disease or

14   injury.

15   Q.  Approximately how many autopsies have you performed over

16   the course of your career?

17   A.  In excess of 2500.

18   Q.  Have you testified in the past as an expert in forensic

19   pathology?

20             MR. RICHMAN:  I will stipulate.

21             THE COURT:  Answer the question.

22   A.  Yes, I have.

23             THE COURT:  I recognize Dr. Susan Ely as an expert in

24   pathology.

25             MR. CAPONE:  Thank you, your Honor.

D2PMFER2                          Ely - direct

1   Q.   Dr. Ely, how do you actually perform the autopsy?

2   A.   There is an autopsy suite where an individual, person who

3   has died, is on an autopsy table and the external investigation

4   and the internal investigation are performed in that room, and

5   conclusions are drawn as a result of that examination.

6   Q.   Are there questions about an individual's death that you

7   can't answer by an autopsy?

8   A.   Yes.

9   Q.   Like what?

10  A.   Some of the circumstances of the death are not revealed by

11  looking at the body, per se.

12  Q.   What kind of paperwork is prepared in connection with an

13  autopsy?

14  A.   An autopsy report is generated after the medical examiner

15  performs the autopsy.  He or she dictates the findings, and

16  that comes back as a written report, which ultimately ends up

17  in a medical examiner case file along with other various kinds

18  of paperwork related to that person's death, both including

19  things like toxicology or drug testing reports, as well as

20  other kinds of informational identification sheets, and this

21  kind of thing that all relates to that person's death.

22  Q.   Directing your attention to an autopsy performed on

23  February 23 of 2000 on the body of Ildefonso Vivero-Flores, did

24  you perform that autopsy?

25  A.   I did.

D2PMFER2                          Ely - direct

1    Q.   What kind of documents or materials did you prepare in

2    regard to that autopsy?

3    A.   Basically, all the documents that I just described were

4    generated as a result of that examination and autopsy.

5    Q.   I am going to hand you what's marked for identification as

6    Government Exhibit 51.

7              Do you recognize that document?

8    A.   Yes.

9    Q.   What is it?

10   A.   This is the -- a copy of the autopsy case file with the

11   autopsy protocol and the associated paperwork for this -- for

12   Mr. Flores.

13   Q.   Were these documents prepared at or near the time the

14   autopsy was performed?

15   A.   Yes.

16   Q.   And were they made and kept in the regular course of the

17   medical examiner's business?

18   A.   Yes, they were.

19              MR. CAPONE:  Your Honor, the government offers Exhibit

20   51.

21              MR. RICHMAN:  No objection.

22              THE COURT:  Received.

23              (Government's Exhibit 51 received in evidence)

24              MR. CAPONE:  Ms. Quinones, if you can put that up.

25   Q.   Dr. Ely, can you please tell the jury, based on your

D2PMFER2                          Ely - direct

1   examination, what generally the external investigation of

2   Mr. Flores' body showed?  And if you need to refer to your

3   report, do that.

4   A.  He was an average-framed man who appeared -- he was

5   ultimately identified as a 31-year-old.  He appeared to be 31.

6   He was Hispanic.  The most notable external finding was the

7   fact that he had been shot six times.

8   Q.  Was he wearing clothes when the office received him?

9   A.  Yes, he was clothed.

10  Q.  You said he had been shot six times.  Did you analyze each

11  of those gunshot wounds?

12  A.  Yes, I did.

13  Q.  If you could turn to page 22 of your report.

14        MR. CAPONE:  Ms. Quinones, if you could please put

15  that up.

16  Q.  What is that?

17  A.  What is shown -- what is projected on the screen is a copy

18  of the autopsy notes that I took, at least one page of the

19  autopsy notes that I took during the course of his external

20  investigation and internal investigation.  There is a lot of

21  writing on the page and some letters and arrows to various

22  circles on his body that all correspond to the gunshot wounds

23  that he had sustained, both entrance wounds, exit wounds, and

24  lodgement sites of two out of the six bullets that remained in

25  his body.

D2PMFER2                          Ely - direct

1    Q.  Your notes continue on the next couple of pages with

2    similar diagrams?

3    A.  Yes.  There are a total of three diagram pages and one

4    nondiagram page of autopsy notes.

5                MR. CAPONE:  Your Honor, if the Court would allow, we

6    have blank versions of those documents.  And if Dr. Ely could

7    step off the stand to draw on them to explain the gunshot

8    wounds, if that's all right with the Court.

9                THE COURT:  It's all right with the Court.  What are

10   you doing?  You're taking a copy of the document?

11               MR. CAPONE:  Yes.

12               THE COURT:  Use it on a placard.  Okay.

13               Mr. Richman, if you would like to station yourself in

14   back of the jury --

15               MR. RICHMAN:  I can use the chart that's already in

16   evidence.

17               THE COURT:  You won't see how she is going to mark it

18   up.

19               MR. RICHMAN:  Very well, sir.

20               THE COURT:  Find a convenient place, and I'll do the

21   same.

22               Step down, Dr. Ely.

23               Why don't we mark these now for convenience,

24   Mr. Capone.

25               MR. CAPONE:  The first one that is up I would offer as

1    Government Exhibit 51C.

2              THE COURT:  You are going to write on 51C?

3              THE WITNESS:  Correct.

4    Q.  Dr. Ely, before we begin, are you able to tell what order

5    the gunshot wounds were received in, based on your examination?

6    A.  No, I'm not.

7    Q.  So you'll describe them in a random order, is that right?

8    A.  I am going to describe them and letter them as they are

9    lettered in the autopsy report and notes, which is A through F,

10   but that doesn't indicate sequence.  It's just an arbitrary

11   designation.

12   Q.  If you can first describe the gunshot wound that you

13   labeled in the report as A.

14             THE COURT:  If people in the audience want to

15   congregate on my right side of the courtroom, you can see

16   better.

17             What are you doing now, Dr. Ely?

18             THE WITNESS:  What I will do for each gunshot wound is

19   draw a circle to represent the entrance wound, where the bullet

20   first made contact and entered the body.  And then I will draw

21   either an X, if the bullet did not leave the body.  The X will

22   always designate a bullet that remained in the body, or I will

23   draw a triangle if the bullet exited the body, and the triangle

24   will represent an exit wound.  And each of those wounds will be

25   labeled with a letter so that the paired entrance and lodgement

D2PMFER2                          Ely - direct

1    or entrance and exit will go together.

2    A.  So the first -- may I describe?

3    Q.  Yes.

4    A.  The first gunshot wound entered the back of Mr. Flores'

5    right shoulder.  Just to clarify -- I'm sorry.  Left shoulder.

6    Since you are seeing a representation of the back of his body,

7    this is the left side.  The bullet entered the back of his left

8    shoulder.  It traveled through his body in a relatively

9    downward direction and moving from left to right and from back

10   to front.  And coming through his body it went through the left

11   rib cage, including some ribs.  It also went through the left

12   lung, the heart, the diaphragm and the liver.  It crossed the

13   midline from left to right side.  The liver is on the right

14   side of the body.  So it went through left lung, heart, liver,

15   and then became lodged in the tissues just outside of the right

16   rib cage a little bit further down on his body relative to

17   where the bullet had come in.

18            THE COURT:  Outside meaning what?

19            THE WITNESS:  I'm sorry.  Outside of the rib cage, but

20   still under the skin, within the body.

21   Q.  What, if anything, was the significance of this particular

22   gunshot?

23   A.  Well, this, even alone, has the potential to be a fatal

24   gunshot wound by virtue of the fact that it went through vital

25   organs, such as the lung and the heart most notably, but also

D2PMFER2                          Ely - direct

1    the liver, and it caused a significant amount of bleeding

2    internally in association with those injuries.

3    Q.  Did you remove that bullet from Mr. Flores' body?

4    A.  Yes.

5    Q.  Can you describe the bullet that was removed?

6    A.  The bullet that was removed was a slightly deformed,

7    roughly medium-caliber bullet with a copper jacket, or meaning

8    a copper coating, on the outside of the bullet, and that was

9    submitted as bullet A.

10            THE COURT:  You want to define medium caliber?

11            THE WITNESS:  Again, this is not so much a specific

12   ballistics designation because the actual exact caliber is

13   something that's determined in the ballistics lab, but as a

14   rough description of the bullet, typically, as medical

15   examiners will describe either small caliber, medium caliber or

16   large caliber, based on eyeballing it.  So this was an

17   intermediate-size bullet, one that is typically seen.

18            (Continued on next page)

19

20

21

22

23

24

25

D2P0FER3                          Ely - direct

1   Q.  Can you describe the second of the gunshot wounds?

2   A.  Yes.  Gunshot wound B consists of, also, an entrance and a

3   bullet lodged in this site.  The bullet entered -- and again

4   this is not a three-dimensional picture.  The bullet actually

5   entered the side of the left shoulder, more to the side and

6   back than I can demonstrate in the picture, and then became

7   lodged in the front of the left chest, also outside of the rib

8   cage, but under the skin within the soft tissues of the left

9   chest, just to left of the breast bone.  In travelling through

10  body, the bullet went through the tissues of the armpit, and

11  just the tissues of the -- outside of the left chest causing

12  some bleeding within those tissues but did not go through major

13  organs.

14  Q.  Did you also he remove that bullet from the body?

15  A.  Yes.  This bullet was also retrieved by me.

16  Q.  And can you describe that.

17  A.  This bullet had a, in very general terms, similar

18  appearance to the first bullet in terms of it appearing to be a

19  medium caliber and copper jacketed bullet.  This gunshot wound,

20  similar to gunshot wound A, was travelling relatively from back

21  to front, from left to right, and downward in the body.

22  Q.  How about the third gunshot wound, can you please describe

23  that?

24  A.  Gunshot C entered the back of Mr. Flores' left neck.  It

25  just went through the soft tissues of the back of his neck

D2P0FER3                          Ely - direct

1    without going through there the spinal cord or the spinal

2    column or anything particularly vital.  It just went through

3    the tissues of the back of his neck before exiting his body

4    from the right side of his neck, a little bit lower down.  So

5    the direction of this bullet was left to right and slightly

6    downward.  It neither went front to back, or back to front, it

7    just went straight across the back of his neck.

8    Q.  How about the fourth one --

9              Just to be clear, there was no bullet in the body for

10   the -- the wound you just described?

11   A.  That's correct.  So, again, to summarize, there were six

12   gunshout wounds that he had sustained.  Only two of them still

13   were associated with bullets in the body.  And I have already

14   described those two.  The remaining were perforating gunshot

15   wounds meaning the bullet entered the body and then

16   subsequently exited the body, so there are no other bullets

17   that I will have submitted after the first two for this man.

18   Q.  It's probably obvious, but you were not able to examine any

19   bullets for this victim other than the two you have already

20   described?

21   A.  That's correct.

22   Q.  Describe the fourth gunshot wound.

23             THE WITNESS:  Okay, I'm having to switch boards now.

24             THE COURT:  Identify this board, now.

25             MR. CAPONE:  Identify this as 51B.

D2P0FER3                              Ely – direct

 1              THE WITNESS:  Do you want me to put the case number on

 2    these boards?

 3              THE COURT:  No, we'll do that later.

 4              THE WITNESS:  Okay.

 5   A.  Gunshot wound D was also a perforating gunshot wound.  No

 6   bullet was retrieved from the body.  It entered the left side

 7   of Mr. Flores' face in front of his ear.  It traveled through

 8   the neck tissues, and then exited from the right side of his

 9   neck a little bit lower down.  So this was -- this bullet was

10   also travelling from left to right and downwards.

11   Q.  Is there any significance to this particular gunshot wound

12   in terms of the effect it would have had on the victim?

13   A.  Primarily went through the muscles of the neck and, you

14   know, could have caused some bleeding, but there was -- there

15   were no significant vital organs that were penetrated.

16   Q.  If you can, please then describe the next gunshot.

17   A.  Gunshot E also entered the left side of Mr. Flores' face, a

18   little bit more anterior or forward on his face, and slightly

19   lower down than gunshot D.

20              Gunshot entrance wound D, it also traveled through the

21   neck, but it went through more vital structures than had the

22   bullet associated with gunshot wound D.  It went through the

23   larynx, the voice box.  So it went through the airway in the

24   neck.  It also caused injury to the esophagus, which is very

25   close by to the larynx in the neck.  It went through a major

D2P0FER3                          Ely - direct

1    blood vessel on right side of neck, including the carotid

2    artery and jugular vein.  Both of these blood vessels are major

3    blood vessels in the body and would have caused significant

4    hemorrhage.  It then exited from the right side of Mr. Flores'

5    neck, close down to where the shoulder meets the neck, but then

6    it reentered his body a little bit further out on his shoulder,

7    and exited once again from the most lateral or outside aspect

8    of his right shoulder.  That part of the track of the bullet

9    did not create any vital injury as it had in the neck in terms

10   of vital organs or blood vessel penetration.

11   Q.  And how about --

12          THE COURT:  Before we leave there, there are term

13   thanks maybe the jury would like to know, esophagus, larynx,

14   why don't you tell the jury.

15          THE WITNESS:  Okay, your Honor.

16          The larynx is the upper part of the airway.  So from

17   your nose and mouth, when oxygen comes in the body, it goes

18   through the voice box, which is the other, you know, common

19   term for the larynx.  But it's also an airway.  Oxygen and air

20   has to pass through it to get to your lungs.  The esophagus is

21   the tube that carries food from your mouth, down to your

22   stomach.

23   BY MR. CAPONE:

24   Q.  And I may be mispronouncing it, but the carotid artery, can

25   you describe what that is?

D2P0FER3                        Ely - direct

A.   There are many arteries in the body.  The largest artery is
the aorta, it's a very large artery, the first one that comes
from the heart.  The carotid artery is another major artery,
while smaller than the aorta, it is still considered a major
artery.  You have two of them that basically bring blood from
the heart on the either side of the neck up to your brain.
Because they are an artery, they are under very high blood
pressure.  Your blood pressure is measured in the artery.  So
when they are injured, they tend to bleed profusely.

        The jugular vein is a similarly important blood vessel
in the neck.  You also have one on each side.  They don't bleed
as quickly as arteries, but they certainly are major blood
vessels.

Q.   Can you describe the next gunshot wound.

A.   Yes.

        And this one also went from left to right, and down
wards in the body.

Q.   This one being?

A.   I'm sorry D and E.

        Gunshot F, the bullet from gunshot F, entered the
upper part of the left neck near the jaw line.  And it also
went through the front part of the neck, fracturing a fairly
minor bone in the neck called the hyoid bone, and causing only
injury related to -- and hemorrhaging related to the muscles
and tissues in the neck, but nothing vital in terms of major

D2P0FER3                        Ely - direct

1     blood vessels or organs were penetrated.  The bullet then

2     exited from the right side of the neck, lower down, so it too

3     traveled from left to right, downwards in the body.

4     Q.  Where there any other gunshots on Mr. Flores?

5     A.  No.

6     Q.  Based on the six wounds that you have just described, were

7     you able to tell anything, generally, about any pattern to the

8     wounds?

9     A.  They all had a similar trajectory or pathway.

10            THE COURT:  Dr. Ely may go back to her chair.

11            MR. CAPONE:  Yes, your Honor.

12    Q.  You can go ahead.

13    A.  They all had a similar pathway, or what we call a bullet

14    track in the body.  They all traveled relatively from left, the

15    left side of his body to the right side, and downwards.  Most

16    of them traveled from back to front.  Some traveled neither

17    back to front, nor front to back, they just went straight

18    across the body.

19    Q.  I'm going to hand you what is marked for identification as

20    government exhibit 60.  And if you can, please look at the

21    envelope, as well is what is inside the envelope, and tell me

22    if you recognize it.

23    A.  The outside envelope is a police envelope from the

24    ballistic lab.  The inside envelopes, of which there are two,

25    are brown envelopes that came from the medical examiners office

D2P0FER3                         Ely - direct

1   that I -- that -- each of which has my handwriting on it.  They

2   are each labeled with the case number associated with Mr.

3   Flores' death, as well as my handwriting describing what the

4   contents of the envelopes are.  One envelope contains bullet A

5   removed from his body, and the other contains bullet B

6   associated with those wounds.

7   Q.  And do you recognize the bullets that are inside those

8   envelopes as the bullets that you removed from Mr. Flores'

9   body?

10  A.  Yes.

11  Q.  And how do you recognize them?

12  A.  Both by their appearance relative to the description, how I

13  had described them, as well as the markings that I made on the

14  base of each of them, identifying them as bullets A and B,

15  respectively.

16          MR. CAPONE:  Your Honor, I would offer government

17  exhibit 60.

18          MR. RICHMAN:  No objection.

19          THE COURT:  Received.

20          (Government's Exhibit 60 received in evidence)

21          THE COURT:  What is 60?

22          MR. CAPONE:  Sixty are the bullets that were removed

23  from Mr. Flores' body.

24  BY MR. CAPONE:

25  Q.  Was toxicology testing done on Mr. Flores?

D2P0FER3                          Ely - direct

1    A.  Yes.

2    Q.  What is toxicology testing?

3    A.  Toxicology testing is chemical testing in a laboratory on

4    various fluids and tissues in the body to detect large battery

5    of either prescription drugs, drugs of abuse, and/or alcohol.

6    Q.  What if anything did the toxicology testing on Mr. Flores

7    show?

8    A.  Nothing was found, no substances were found.

9    Q.  Did you reach a conclusion about the cause of Mr. Flores'

10   death?

11   A.  Yes.

12   Q.  What is that?

13   A.  Multiple gunshots of the head, neck and torso, with

14   perforations of heart, lung, larynx, and major blood vessels.

15   Q.  And now directing your attention to another autopsy

16   performed on February 23, 2000, this time on the body of Arturo

17   Cuellar.  Did you perform that autopsy?

18   A.  Yes, I did.

19   Q.  Did you create documents and materials in connection with

20   that autopsy?

21   A.  Yes.

22   Q.  I'm going to hand you what is marked for identification as

23   government exhibit 50.  And if you can look at that and let me

24   know if you recognize it.

25   A.  This is the autopsy report and associated paperwork for

D2P0FER3                          Ely - direct

1    Mr. Cuellar, his death.

2    Q.  Was that created around the time of the autopsy?

3    A.  Yes.

4             MR. CAPONE:  Your Honor, I would offer government

5    exhibit 50.

6             MR. RICHMAN:  No objection.

7             THE COURT:  Received.

8             (Government's Exhibit 50 received in evidence)

9    BY MR. CAPONE:

10   Q.  Can you please tell the jury, generally, what the external

11   examination of Mr. Cuellar's body showed.

12   A.  He appeared to be a middle aged man.  Ultimately he was

13   identified as being 59 years old.  He, too, was Hispanic.  He

14   had a stocky build and, similar to Mr. Flores, he -- the most

15   notable external findings and internal findings were the four

16   gunshots that he had sustained.

17   Q.  And was he wearing clothes when you received him?

18   A.  And he also was clothed when I received him, yes.

19   Q.  What was he wearing?

20   A.  He was wearing a Yankees baseball cap, a black jacket, a

21   white tee shirt, a plaid shirt, a pair of brown pants, a pair

22   of white briefs -- underwear, a black leather belt on the

23   pants, and one pair of black loafers.

24   Q.  Now, if you could turn to the second page of the report,

25   and we'll put that up.

D2P0FER3                         Ely - direct

1          Do you see under Roman numeral II, where it says

2     atherosclerotic and hypertensive cardiovascular disease?

3     A.  Yes.

4     Q.  What is that?

5     A.  The medical terminology for describing high blood pressure,

6     findings of high blood pressure and hardening of the arteries.

7     Q.  Is there any evidence, as a result of your autopsy, that

8     that contributed to Mr. Cuellar's death?

9     A.  No, it didn't.

10    Q.  And if you could, again, turn to page 11 of the record.

11    And is this, again, your notes on the path of the bullet

12    wounds, this time for Mr. Cuellar?

13    A.  Yes.

14          MR. CAPONE:  And your Honor, if we could do what we

15    did previously for this victim.

16          THE COURT:  Yes.  Number the boards as you go along.

17    BY MR. CAPONE:

18    Q.  I'm putting up for identification government exhibit 50B.

19    Dr. Ely, using the board, if you could describe the first --

20    well, first, let me ask you again, do you know what order any

21    of these gunshots, through Mr. Cuellar's body, was received in?

22    A.  No.

23    Q.  So I'll ask you to describe gunshot A.

24    A.  Gunshot A entered Mr. Cuellar's head.  It entered behind

25    his left ear.  And then it entered his skull and went through

D2P0FER3                         Ely - direct

1    his brain, through vital portions of his brain.  The entire

2    brain is vital, certain part are more critical in terms of

3    controlling breathing, heart rate.  The bullet went through

4    that area, the brain stem.  It also went through other

5    structures in the brain before exiting the skull and the head,

6    on the other side, on the right side of the head.  Also behind

7    the right ear.  And it traveled from left to right, slightly

8    from back to front.  It went slightly forward in the body, and

9    slightly upwards.

10   Q.  Is there any significance to that gunshot?

11   A.  This gunshot, alone, certainly can be a fatal gunshot.

12   Q.  Why is that?

13   A.  Because of the structures that it went through.  They were

14   vital structures.

15   Q.  If you can, please describe the second of the gunshots?

16   A.  Gunshot B entered Mr. Cuellar's back, just to the left of

17   the midline of the back, the vertical midline.  It traveled

18   upwards, just through the muscular soft tissues of the back,

19   without entering the thorax -- without entering the chest

20   cavity or any vital organs.  It just stayed superficially or

21   tangentially, but across the midline, on the right side, before

22   exiting the body further up on the body, close to where the

23   shoulder and neck meet.  At that junction spot, I put the exit

24   wound B in two places, not because there were two holes, but

25   because it was really kind of right in the center, between back

D2P0FER3                              Ely - direct

1    and front, which is difficult to draw on this diagram.  But it

2    did move relatively back to front, left to right, and upwards.

3    Q.  How about the third of the gunshot wounds?

4    A.  Gunshot C consisted of a wound where the bullet entered

5    also on the left side of the back, but much further down than

6    the other two wounds, meaning A and B.  It entered lower down

7    on the left side of the back.  And it traveled through the left

8    chest moving towards the front of the body, and went through

9    the left lung before travelling up through the left neck and

10   crossing over to the right side of the body and becoming lodged

11   close to the jaw bone on the right side.  So, this bullet also

12   traveled from back to front, from left to right, and upwards.

13   Q.  Now --

14   A.  This bullet, however, I mean this wound, however, was not

15   perforating, meaning the bullet stayed in the body, and I

16   removed that bullet from his body.

17   Q.  Can you describe the bullet that was removed?

18   A.  Yes.  The bullet that was removed was -- let me see how

19   deformed it was.  It was deformed.  It had gone through some

20   ribs as it traveled through the left side of the body, causing

21   the bullet to become somewhat deformed.  It appeared to be

22   medium caliber.  And it also had a copper coating or a copper

23   jacket.

24   Q.  How about the fourth gunshot wound?

25   A.  Probably should use -- gunshot D consists of a bullet that

D2P0FER3                          Ely - direct

1     entered the -- also, his left back.  It traveled up through the

2     tissues of the upper chest and neck.  It then exited the body,

3     close to the left collar bone.  And then it reentered the body

4     on the left side of the neck, and then came to rest or become

5     lodged not far from where gunshot C -- I'm sorry didn't become

6     lodged, it exited the body not far from where gunshot wound C

7     or bullet C had become lodged in the right jaw area.  So it

8     entered the left back.  It exited from the front of the body,

9     you know, the left collar bone.  Reentered the body and then

10    exited finally close to the right jaw.  This bullet traveled

11    back to front, left to right, and upwards.

12    Q.  Were there any other gunshots in Mr. Cuellar's body?

13    A.  No, that's it.

14         MR. CAPONE:  Okay.  You can return to your seat.

15    Thank you.

16         I offer into evidence government exhibit 51B, 51C, and

17    50D.

18         MR. RICHMAN:  No objection.

19         THE COURT:  Received.

20         (Government's Exhibits 51B, 51C, 50D received in

21    evidence)

22    BY MR. CAPONE:

23    Q.  Now, Dr. Ely, on page -- what is marked as page 4 of your

24    autopsy report on Mr. Cuellar -- and we'll pull that up.  Do

25    you see under, A, perforating gunshot wound of head, about four

D2P0FER3                         Ely - direct

 1    lines down, it says: There is also further surrounding

 2    asymmetrical dense pinpoint stippling; do you see that?

 3    A.  Yes, I do.

 4    Q.  What is stippling?

 5    A.  Stippling is a specific kind of injury to the body that can

 6    be found in association with some gunshots.  It is caused by

 7    unburned gunpowder flakes that leave the muzzle of the gun

 8    after the bullet leaves the gun following the bullet.  And if

 9    the gun -- if the muzzle of the gun, when fired, is close

10    enough to the body, typically within 24-inches of the body,

11    some of those unburned gunpowder flakes are tiny missiles,

12    travelling on their own, and can reach the body and make tiny

13    scrapes on the skin surrounding the gunshot entrance wound.

14    The entrance wound is caused by the bullet making contact with

15    the body.  The stippling, these tiny scrapes, are caused by

16    unburned gunpowder flakes.  The ammunition for the gun that has

17    come out of the gun and not efficiently burned, just followed

18    the bullet and landed on the body in such a way that it causes

19    scraping.

20         This stippling is a sign, in general terms, for the

21    range of fire when the gun was fired for that particular wound.

22    And as I stated, stippling only occurs when the muzzle of the

23    gun is 24-inches or closer to the body when the gun is fired.

24    Once it goes beyond that, those flakes don't have enough weight

25    to travel through the air and make contact with the body.

D2P0FER3                          Ely - direct

1   Q.  If there is no stippling, is that necessarily indicative of

2   a gun being further out than 24-inches?

3   A.  It is typically characteristic of that, and/or it means

4   that the gun is a particularly efficiently burning gun, meaning

5   all of the gunpowder is burned when the gun is fired, leaving

6   no flakes to come out.  That's probably more rare.  When there

7   is no stippling on exposed skin, not covered by clothing, then

8   the typical interpretation is that that means the muzzle of the

9   gun was beyond 2 feet from the body when it was fired.

10  Q.  And based on the four wounds that you just described, was

11  there a general pattern to the wounds through Mr. Cuellar's

12  body?

13           THE COURT:  Loud, please.

14  Q.  Was there a general pattern to the gunshots to

15  Mr. Cuellar's body?

16  A.  In terms of the path of the bullet, all four of the wounds

17  had a back to front, left to right, and upwards path.

18  Q.  And I would also like to direct your attention to page 6 of

19  your report.  Do you see on page 6 where it refers to a 3-inch

20  ill defined patchy contusion on the lateral left temple and

21  orbital rim and zygoma and a 1/8 inch abrasion on the bridge of

22  the nose?

23  A.  Yes.

24  Q.  Is there any significance to that?

25  A.  The significance of this pattern of injury, what basically

D2P0FER3                          Ely - direct

this describes is bruising and scraping to the left side of

Mr. Cuellar's face, particularly on the prominences of his

face; the cheekbone, the bridge of the nose, the brow.  These

are parts of the face where the bones actually stick out.

        The pattern of injury where you see scrapes and

bruising all on those prominences on one side of the face, is

most typical in forensic medicine, to what we call planar

injury.  Meaning that the face, in all likelihood, made contact

with a flat plane all at once.  We don't view them as three

separate impact sites.  Rather, they are one impact and only

the parts of your face that are sticking out make contact with

this resistant surface, like the ground, causing injury.  So my

interpretation of his injury is that his face hit the surface

of the floor, and he didn't break his fall because he was

unconscious, in all likelihood, when he went down.

Q.  I'm handing you what's been marked for identification as

government exhibit 61.  If you could look at the envelope

again, and what is inside the envelope, and let me know if you

recognize it.

A.  Yes.  This is a ballistics envelope from our office.  It

has my handwriting on it, and the associated medical examiner

case number for Mr. Cuellar.  It contains the markedly deformed

bullet that I retrieved from his body.  And it has the markings

that I made on it, consistent with that wound, and that bullet.

Q.  Do you recognize that as the bullet that you removed from

D2P0FER3                        Ely - direct

1   Mr. Cuellar's body?

2   A.  Yes.  It's consistent with it.

3            MR. CAPONE:  Your Honor, I offer exhibit 61.

4            MR. RICHMAN:  No objection, sir.

5            THE COURT:  Received.

6            (Government's Exhibit 61 received in evidence)

7   BY MR. CAPONE:

8   Q.  Was toxicology testing done on Mr. Cuellar, as well?

9   A.  Yes, it was.

10  Q.  And what if anything were the results?

11  A.  There were no substances found in his body.

12  Q.  And did you reach a conclusion with the cause of

13  Mr. Cuellar's death?

14  A.  Yes.

15  Q.  And what is that?

16  A.  Gunshot wounds of head and torso, with perforation of

17  brain, lung, and chest wall.

18  Q.  And if you can also turn to what is marked as page 27 of

19  your report.

20  A.  Twenty-seven?

21  Q.  Yes.

22            What is that?

23  A.  This is what I initially received back as the first draft

24  of the autopsy report that I dictated, and the handwriting on

25  there is my handwriting to make any typo corrections or any

D2P0FER3                          Ely - direct

1    other edits that need to be made.

2    Q.   And do you see under, or next to, the name of decedent, you

3    had Antonio Gonzales.  And Arturo Cuellar is written in?

4    A.   Yes.

5    Q.   Do you remember why that happened?

6    A.   I don't specifically remember why.  But based on the

7    paperwork, the name that this man came to our office identified

8    as, in an unverified or tentative fashion by police reports was

9    Antonio Gonzales.  So whatever name the individual comes to our

10   office with, we write down in our notes as a tentative or

11   unverified name until family members are able to come to the

12   office and make a definitive medical/legal identification --

13   typically it's visual.  And this name was, in fact, ultimately

14   shown not to be this man's name.  He was because identified as

15   Arturo Cuellar.

16   Q.   And do you know how he was identified by the medical

17   examiner's office as Arturo Cuellar?

18   A.   He was identified by his daughter on the 25th of February.

19   I autopsied him on the 23rd.

20   Q.   Now, in your reports, did you document how tall each of the

21   two victims were?

22   A.   Yes.

23   Q.   And how tall was Mr. Cuellar?

24   A.   He was 5 feet 7-inches.

25   Q.   And how about Mr. Flores?

D2P0FER3                          Ely – direct

1    A.  I believe he was 5 feet 8-inches, but I can check.

2           Yes, he was 5 feet 8-inches.

3           MR. CAPONE:  Thank you.  No further questions.

4           MR. RICHMAN:  I'll be very brief, your Honor.

5           THE COURT:  Let's do it now, and then we'll break for

6    lunch.

7           MR. RICHMAN:  Fine.

8    CROSS-EXAMINATION

9    BY MR. RICHMAN:

10   Q.  Good afternoon, Doctor?

11   A.  Good afternoon.

12   Q.  You have no knowledge about any of the facts in this case,

13   would that be fair to say, other than the two people that were

14   brought to you, dead?

15   A.  In terms of the autopsy facts?

16   Q.  Yes.

17   A.  That would be my area, of what -- of my knowledge.

18   Q.  You have no other knowledge about this case, as who may

19   have done it, or what may have been done; right?

20   A.  With the -- like who caused the death of these men?  No, I

21   don't know that.

22   Q.  Now, you make reference on page 3, to --

23   A.  I'm sorry, which report, counselor?

24   Q.  I believe Cuellar's report.

25           To There is no fouling in the --

D2P0FER3                          Ely - cross

1   A.   Page 3 is -- has no gunshot injury.  Is it page 4 -- oh, my
2   page 3, not the state.
3          THE COURT:  This is exhibit 51, is it?  Or 50 -- 50.
4   Mr. Richman?
5          MR. RICHMAN:  Yes, sir.
6          THE COURT:  Exhibit what?
7          MR. RICHMAN:  Fifty, your Honor.
8          THE WITNESS:  Okay.  And you're speaking of gunshot A.
9   BY MR. RICHMAN:
10  Q.   Yes.  Gunshot A, the last word there is "no fouling."
11  A.   Yes.
12  Q.   Would you explain to the jury what fouling means?
13  A.   So I explained to you before what stippling is.  Fouling is
14  another finding that can be found in relation to gunshot wounds
15  that can help to return range of fire when it is found.
16  Fouling is nothing more than soot or burned gunshot gunpowder
17  residue, as opposed to stippling caused by unburned gunpowder
18  flakes.  Fouling is soot, the soot that comes, the smoke that
19  comes out of the muzzle of the gun, following the bullet, and
20  it's produced by the combustion of the gun and burning of the
21  gunpowder.  Smoke is soot, fine particles.  It can travel a
22  short distance, even shorter distance than the unburned powder
23  flakes that causes stippling.  Typically, when fouling is seen,
24  which is a gray kind of soot-like residue around the entrance
25  site, it indicates that the muzzle of the gun was 6-inches or

D2P0FER3                         Ely - cross

1    less, on average, from the body when it was fired.

2    Q.  Is there any indication, on either of these two reports,

3    that either of these persons was shot in back of the head from

4    the right side?

5    A.  No.

6    Q.  Any indication of, in these reports, that the person was

7    shot in the back of the head, in an upward position, bullet

8    going upward?

9    A.  Yes.

10   Q.  Can you tell us which one?

11   A.  Well, there was only one gunshot head wound.  And that was

12   for Mr. Cuellar.  He was shot behind his left ear.  And the

13   bullet exited from the right side of his head, behind his right

14   ear.  And that gunshot traveled relatively back to front and

15   slightly upwards.

16   Q.  And that would indicate -- that was the wound that had the

17   asymmetrical dense pinpoint stippling; is that correct?

18   A.  That's correct.

19   Q.  And that went from left to right?

20   A.  That is correct.

21           MR. RICHMAN:  Thank you --

22   Q.  Oh, by the way, Doctor, you don't know if anybody at this

23   table had anything to do with any of that?

24   A.  No.

25           MR. RICHMAN:  Thank you.

D2P0FER3                          Ely - cross

1              THE COURT:  Redirect?

2              MR. CAPONE:  No, your Honor.

3              THE COURT:  Thank you very much, Doctor, you're

4    excused.

5              (Witness excused)

6              THE COURT:  Members of the jury, we'll break for lunch

7    now and resume at 2:00.  Don't discuss the case, close up your

8    books, and give them to Ms. Jones on your way out.

9              (Jury excused)

10             THE COURT:  Have a good lunch, folks.

11             (Luncheon recess)

12             (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

D2PMFER4

                        AFTERNOON SESSION

1

2                            2:05 p.m.

3            (Jury present)

4            THE COURT:  The next government witness is Richard

5    Correa and he will now be sworn.  Pay attention to the oath.

6     RICHARD JOSE CORREA,

7          called as a witness by the Government,

8          having been duly sworn, testified as follows:

9    DIRECT EXAMINATION

10   BY MR. CRONAN:

11   Q.  Good afternoon.

12   A.  Good afternoon.

13   Q.  How old are you, Mr. Correa?

14   A.  I'm 33 years old.

15   Q.  Where were you born?

16   A.  In the Dominican Republic.

17   Q.  I would just ask you to try to keep your voice up as much

18   as you can.

19   A.  All right.

20   Q.  How long did you live in the Dominican Republic after you

21   were born there?

22   A.  Nearly two years.

23   Q.  Where did you go next?

24   A.  I then went with my family, with my brother, sisters, and

25   father and mother, to Brooklyn, New York.

D2PMFER4                    Correa - direct

1          THE COURT:  Mr. Correa, that doesn't work.  Drop it to

2    the desk.  Speak loudly.

3          THE WITNESS:  I will.

4    Q.  How long did your family stay in Brooklyn, New York?

5    A.  Up until 1986.

6    Q.  And in 1986, where did you go then?

7    A.  We then moved to the Dominican Republic once again.

8    Q.  And after that, where did your family move to?

9    A.  After that, we moved to Bronx, New York.

10   Q.  How long did you stay in the Bronx?

11   A.  Nearly two more years.

12   Q.  And then, sir, where did your family move to?

13   A.  We moved to Tampa, Florida.

14   Q.  What brought you guys to Tampa?

15   A.  Better lifestyle my family was looking for their kids.

16   Q.  Did you go to school in Tampa?

17   A.  Yes, I did.

18   Q.  How far did you go in school?

19   A.  Graduated high school.

20   Q.  After you graduated high school in Florida, where did you

21   move to next?

22   A.  I moved to Bronx, New York.

23   Q.  By the way, what is your current immigration status?

24   A.  I'm a U.S. citizen.

25   Q.  When did you become a citizen?

D2PMFER4                    Correa – direct

1    A.  Around 1998.

2    Q.  Was that after or before you moved back to the Bronx?

3    A.  That was after I moved back to the Bronx.

4    Q.  Now, Mr. Correa, did you get a job in the Bronx after you

5    moved back there from Florida?

6    A.  Yes, I did.

7    Q.  Where did you work?

8    A.  I worked at an auto sound shop called Live Wire Auto Sound.

9    Q.  When you say an auto sound shop, what do you mean by that?

10   A.  It's a shop that installs car accessories in automobiles.

11   Q.  Is Live Wire still in business today?

12   A.  No, it is not.

13   Q.  Do you know when it went out of business?

14   A.  Yes.  Around 2000.

15   Q.  And when Live Wire was in business, do you know where it

16   was located?

17   A.  Yes, I do.

18   Q.  Where was that?

19   A.  It was located in the Bronx, New York, East 174th Street

20   between Clay and Topping.

21           MR. CRONAN:  Ms. Quinones, can we put up Government

22   Exhibit 13, please.

23   Q.  Do you know this person?

24   A.  Yes, I do.

25   Q.  Who is he?

D2PMFER4                         Correa – direct

1    A.   His name is Jose Rodriguez.   His nickname is Gordo.

2    Q.   How do you know Jose Rodriguez, or Gordo?

3    A.   He was my boss at Live Wire Auto Sound.

4             MR. CRONAN:   If we can now put up Exhibit 2, please.

5    Q.   Do you know this individual?

6    A.   Yes, I do.

7    Q.   Who is he?

8    A.   He was the owner of Live Wire.   His name is Patrick Darge.

9    He was the owner of Live Wire Auto Sound.

10   Q.   Previously we had a picture up of Jose Rodriguez, Gordo?

11   A.   Yes.

12   Q.   Do you know if Patrick Darge is related to Gordo?

13   A.   Yes, they are related.   They are distant cousins, I believe

14   so.

15            MR. CRONAN:   If we can put up Exhibit 8, next, please.

16   Q.   Do you recognize this individual?

17   A.   Yes, I do.

18   Q.   Who is that?

19   A.   That is my brother, Carlos Correa.

20            MR. CRONAN:   While we are looking at photos very

21   quickly, can we put up 10.

22   Q.   Do you recognize Exhibit 10?

23   A.   Yes, I do.

24   Q.   And who is that?

25   A.   That is myself.

D2PMFER4                        Correa - direct

1            MR. CRONAN:  Let's put Exhibit 13 back up on the
2      screen.
3      Q.  How did you get your job at Live Wire?
4      A.  I used to go to the shop because Gordo and my brother
5      Carlos are friends, or were friends at the time, and I used to
6      go there with my brother Carlos, and I was interested in
7      learning how to install accessories in automobiles and he saw
8      my interest in me learning.  And since the shop was open not
9      too long ago before I started going over there, he needed a
10     helper, an installer.  He saw my interest in wanting to learn,
11     so he hired me.
12     Q.  When did you start working for Gordo at Live Wire?
13     A.  In about summer of 1996.
14     Q.  What was your job there?
15     A.  An installer.  I was an installer.
16     Q.  What do you mean by that?
17     A.  I used to install car alarms, accessories like car radios,
18     speakers, amplifiers, et cetera.
19     Q.  Can you briefly describe for the jury the physical layout
20     of the business at Live Wire?
21     A.  Yeah.  There was a garage shop, which was the working area,
22     and then there was a showroom right next to it with an office.
23     The office was towards the back and the showroom was in front.
24     Q.  When a customer would come into Live Wire, where would they
25     go?

D2PMFER4                           Correa - direct

1    A.   They would enter the showroom.

2    Q.   And what was on display in the showroom?

3    A.   There were speakers, amplifiers, lighting, all different

4    types of accessories for cars.

5    Q.   And when those accessories were installed in cars, where

6    would that take place?

7    A.   That would take place in the garage, in the work area.

8    Q.   Indoor or outdoor garage?

9    A.   Indoor.

10   Q.   Now, what was Gordo's relationship to you at Live Wire?

11   A.   He was a friend and my boss.

12   Q.   What would be his role on a day-to-day basis working there?

13   A.   Give orders.

14   Q.   To you included?

15   A.   To me.

16   Q.   What type of orders would he give you?

17   A.   Anything from what were we going to do that day to what to

18   install and how to install it.

19   Q.   In addition to installing the types of accessories you

20   mentioned earlier, was any other type of work done at Live

21   Wire?

22   A.   Yes, there was.

23   Q.   What else was done there?

24   A.   What we called traps.

25   Q.   And we have already heard a bit about what traps are.  Can

D2PMFER4                       Correa - direct

 1   you briefly explain what you mean by a trap?

 2   A.   A trap is a hidden glove compartment in a vehicle and we

 3   would build in vehicles.

 4   Q.   What's the purpose of a trap?

 5   A.   The purpose of a trap is to carry anything from drugs,

 6   weapons, anything illegal to keep away from authorities.

 7   Q.   Mr. Correa, have you ever used a trap?

 8   A.   Yes, I have.

 9   Q.   What have you used a trap for?

10   A.   For carrying drugs, weapons.

11   Q.   And did you install traps while working at Live Wire?

12   A.   Yes, I did.

13   Q.   How did you learn to install traps?

14   A.   Gordo taught me.

15            MR. RICHMAN:  Most respectfully, relevance.

16            THE COURT:  We have enough context.  Let's move on.

17   Q.   When you installed a trap, did you install all components

18   of the trap?

19   A.   Not all components, but mostly all components.

20   Q.   When you say mostly components, what components did you not

21   install?

22   A.   The wiring of the traps, the combinations on how to open

23   and close.

24   Q.   Who did that?

25   A.   Jose Rodriguez, Gordo.

D2PMFER4                          Correa - direct

1              MR. CRONAN:  Ms. Quinones, can we put up Exhibit 4,

2    please.

3    Q.  Do you recognize this person, Mr. Correa?

4    A.  Yes, I do.

5    Q.  Do you know this individual's name?

6    A.  I don't know his name, but I know his nickname.

7    Q.  What nickname do you know for this person?

8    A.  They used to call him Batman.

9    Q.  Do you recall how you came to know this individual, Batman?

10   A.  Yes, I do.

11   Q.  How was that?

12             THE COURT:  Why do we need all this information?

13             MR. CRONAN:  May we approach side bar?  It's extremely

14   relevant.  I'm happy to explain.

15             THE COURT:  If it's extremely relevant, do it.

16   Q.  How did you meet this individual?

17   A.  I met him at Live Wire, while working at Live Wire.

18   Q.  Did you ever install a trap in a vehicle for this

19   individual?

20   A.  Yes, I did.

21   Q.  Do you remember approximately when that was?

22   A.  That was near the end of '99.

23   Q.  How did you come about installing a trap in a vehicle for

24   this individual?

25             MR. RICHMAN:  Objection.  Relevance, your Honor.

D2PMFER4                     Correa - direct

1          THE COURT:  I'm tempted to grant it.

2          MR. CRONAN:  Your Honor, I will be happy to explain.

3          THE COURT:  I don't want you to explain.  I want you

4    to get into the case, not the background of the case.  This is

5    now the sixth witness.  By this time we should know the

6    background.

7    Q.  How did you install a trap for this individual?

8    A.  How?

9    Q.  Yes.

10   A.  I installed it in a Ford Expedition he had bought.

11         THE COURT:  We are not really interested in how.  Move

12   on.

13         MR. CRONAN:  Your Honor, I really request two minutes.

14         THE COURT:  No.  Move on.

15   Q.  When you installed a trap in the vehicle for this

16   individual, where in the vehicle did you install it?

17   A.  In the center console.

18   Q.  And do you recall the size of the trap you installed in the

19   vehicle --

20         MR. RICHMAN:  Objection.

21         THE COURT:  Sustained.

22   Q.  Do you recall how this trap operated?

23         MR. RICHMAN:  Objection.

24         THE COURT:  Sustained.

25         MR. CRONAN:  Your Honor, may I have a moment?

D2PMFER4                        Correa - direct

 1                 THE COURT:  You can have a moment, yes.

 2                 MR. CRONAN:  Put up Exhibit 3, please.

 3     Q.  Do you recognize this individual?

 4     A.  Yes, I do.

 5     Q.  Who is this?

 6     A.  It's Jeffrey Minaya.

 7     Q.  How do you know Jeffrey Minaya?

 8     A.  Jeffrey Minaya is my cousin.

 9                 MR. CRONAN:  If we could put up Exhibit 5 as well.

10     Q.  Who was this individual?

11     A.  His name is Manuel Suero.  They call him Aladino.

12     Q.  How do you know Manuel Suero?

13     A.  He is married to Jeffrey Minaya's sister, which is my

14     cousin.

15     Q.  Do you know any nicknames of Manuel Suero went by?

16     A.  Yes.  Aladino.

17                 MR. CRONAN:  Exhibit 6, please.

18     Q.  Do you know that person?

19     A.  Yes, I do.

20     Q.  And what is his name?

21     A.  His name is Alberto Reyes.  They call him Zod.

22                 MR. CRONAN:  And Exhibit 11, please.

23     Q.  Do you know that individual?

24     A.  Yes, I do.

25     Q.  Who is he?

D2PMFER4                          Correa – direct

1   A.  He is Allen Darge.  He is Patrick Darge's brother.  They

2   call him Boozer.

3   Q.  Directing your attention to the end of '99 and early 2000,

4   how often did you see Jeffrey Minaya?

5   A.  Very often.

6   Q.  Do you know how Jeffrey Minaya made money back then?

7   A.  Yes, I do.

8   Q.  How did he make money?

9   A.  Selling cocaine.

10  Q.  Did you ever deal drugs with Jeffrey Minaya?

11  A.  Yes, I did.

12          MR. RICHMAN:  Your Honor, again, relevance.

13          THE COURT:  Overruled.

14  Q.  Did you ever deal drugs with Jeffrey Minaya?

15  A.  Yes, I did.

16  Q.  What types of drugs did Jeffrey Minaya deal in late '99,

17  early 2000?

18  A.  Cocaine.

19  Q.  Do you know where he was getting his cocaine back then?

20  A.  Yes.

21  Q.  Who were his suppliers?

22  A.  Mexican suppliers.

23  Q.  Do you know if Gordo, your boss at Live Wire, ever dealt

24  drugs with Jeffrey Minaya?

25  A.  Yes, I do.  He did deal drugs with Jeffrey.

D2PMFER4                         Correa - direct

1    Q.  And directing your attention to early 2000, do you ever

2    recall talking with Gordo about Jeffrey Minaya's cocaine

3    suppliers?

4    A.  Yes, I do.

5    Q.  Do you recall where you were at the time of that

6    conversation?

7    A.  I was at Live Wire Auto Sound.

8    Q.  What did Gordo say to you about Jeffrey Minaya's cocaine

9    suppliers?

10              MR. RICHMAN:  Objection.

11              THE COURT:  Come up, please.

12              (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

D2PMFER4                         Correa - direct

 1              (At the side bar)

 2              THE COURT:  What's the exception to hearsay?

 3              MR. CRONAN:  Your Honor, this was the subject of in

 4     limine briefing.  It's a statement against interest by an

 5     unavailable declarant.

 6              THE COURT:  Against whose interests?

 7              MR. CRONAN:  Against the declarant's interest.  The

 8     declarant is going to be Manuel Aladino Suero.

 9              THE COURT:  What is he going to say?

10              MR. CRONAN:  That something was going to go down with

11     Minaya's cocaine suppliers.  What went down is the murders that

12     are the subject of this case.  This was extensive briefing that

13     the parties did in limine regarding the specific statement and

14     some other statements.

15              THE COURT:  How is this going tie to the murders?

16              MR. CRONAN:  Your Honor, it relates to the murder

17     conspiracy and the murders of the two victims.

18              THE COURT:  How?

19              MR. CRONAN:  Because the witness' testimony will be

20     that the declarant said something was going to go down to

21     Jeffrey Minaya's cocaine suppliers.

22              THE COURT:  This is cumulative of the testimony.  The

23     prejudicial value outweighs any relevance.  Objection

24     sustained.

25              MR. CRONAN:  Your Honor, may I be heard briefly about

D2PMFER4                    Correa – direct

1    one other thing?

2                (Continued on next page)

D2PMFER4                          Correa - direct

1          (In open court)

2          THE COURT:  I sustained the objection to the question.

3   Q.  I want to direct your attention to the spring of 2000.  Do

4   you recall ever going to the apartment of an individual named

5   Topo?

6   A.  Yes, I do.

7   Q.  Briefly, who is Topo?

8   A.  Topo?  Topo was my brother Carlos' best friend, also my

9   friend.

10  Q.  Do you recall ever having any conversations with any of the

11  people we briefly talked about before at Topo's apartment?

12  A.  Yes, I do.

13  Q.  Which individual do you recall speaking with?

14  A.  With Aladino, Manuel Suero.

15  Q.  At any point did Aladino make any statements to you about

16  any place he was planning to travel to?

17          MR. RICHMAN:  Objection.

18          THE COURT:  Overruled.

19  A.  Yes, he did.

20  Q.  What did he say to you?

21  A.  He said he had to leave the Dominican Republic.

22  Q.  I'm sorry?

23  A.  He said he had to leave the Dominican Republic.  He had to

24  travel to the Dominican Republic.

25  Q.  Did Manuel Aladino Suero say why he was going to be leaving

D2PMFER4                        Correa - direct

```
 1   for the Dominican Republic?

 2                MR. RICHMAN:  Objection.

 3                THE COURT:  Sustained.

 4   Q.  Do you know where Jeffrey Minaya was around this time?

 5   A.  Yes.  He was in the Dominican Republic.

 6   Q.  How do you know that?

 7   A.  I knew because his family, his mother, which is my aunt,

 8   had told me and his immediate family around, also.

 9   Q.  Around this time frame, about the spring of 2000, did you

10   ever have any conversations with Jeffrey Minaya?

11   A.  Yes, I did.

12   Q.  How did that conversation take place?

13                MR. RICHMAN:  Objection.

14                THE COURT:  Sustained.

15   Q.  Around this time did you ever do any work for Jeffrey

16   Minaya?

17   A.  Yes, I did.

18   Q.  What did you do for Jeffrey Minaya?

19   A.  I picked up money for Jeffrey Minaya.

20   Q.  Where did you pick up that money from?

21   A.  From a car that was in a parking lot.

22   Q.  How did you know what car to pick up money from for Jeffrey

23   Minaya?

24                MR. RICHMAN:  Objection.

25                THE COURT:  What's the time and place?
```

D2PMFER4                          Correa - direct

1    Q.   Approximately when was this, sir?

2    A.   This was in spring of 2000.

3    Q.   And where was the car located --

4              THE COURT:  When was this?  What month?

5              THE WITNESS:  Around, I would say, March, if I'm not

6    mistaken, around that time.

7              THE COURT:  Objection sustained.

8              MR. CRONAN:  Your Honor, what question was sustained

9    so I know what to move on to?

10             THE COURT:  Question:  Where did you pick up the money

11   from?

12             From a car that was in a parking lot.

13             Question:  How did you know what car to pick up the

14   money from for Jeffrey Minaya?

15             Then objection was sustained.

16   Q.   What did you do with the money you picked up for Jeffrey

17   Minaya?

18             MR. RICHMAN:  Objection.

19             THE COURT:  Sustained.

20   Q.   Did there come a time when you traveled to the Dominican

21   Republic?

22   A.   Yes, there was.

23   Q.   Around when was that?

24   A.   Near the summer of 2000.

25   Q.   And what brought you to the Dominican Republic in the

D2PMFER4                          Correa - direct

1    summer of 2000?

2              MR. RICHMAN:  Objection.

3              THE COURT:  Objection sustained.

4              Did you go to meet anybody?

5              THE WITNESS:  Yes, I did.

6              THE COURT:  Who did you go to meet?

7              THE WITNESS:  I went to meet up with Jeffrey and the

8    family.

9              THE COURT:  Whose family?

10             THE WITNESS:  Our family, Jeffrey's family and my

11   family.

12             THE COURT:  Objection sustained.

13   Q.  In addition to meeting up with Jeffrey Minaya, did you meet

14   up with anyone else while you're in the Dominican Republic?

15   A.  Yes, I did.

16             MR. RICHMAN:  Objection.

17             THE COURT:  Not yet.  Overruled.

18   Q.  Who else did you meet up with?

19             MR. RICHMAN:  Objection.

20             THE COURT:  Overruled.

21   A.  With Manuel Suero and Alberto Reyes.

22   Q.  Some of the people you identified earlier?

23   A.  Yes.

24   Q.  Where did you meet up with those individuals?

25             THE COURT:  One minute.

D2PMFER4                         Correa – direct

1              Objection overruled.

2   Q.   Where did you meet up with Jeffrey Minaya, Alberto Reyes,

3   and Manuel Suero Aladino?

4   A.   At a beach in the Dominican Republic called Boca Chica.

5   Q.   When you're on that beach have any conversations with these

6   individuals?

7   A.   Yes, I did.

8   Q.   What were the general topics of discussions?

9              MR. RICHMAN:  Objection.

10             THE COURT:  Side bar, please.

11             (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D2PMFER4                        Correa - direct

1                (At the side bar)

2                THE COURT:  Where is this going?

3                MR. CRONAN:  Your Honor, this is an issue we briefed,

4        the conversations on the beach.  During this conversation

5        Manuel Aladino Suero made statements against interests.  Again,

6        he's an unavailable --

7                THE COURT:  Whose interests?

8                MR. CRONAN:  Against his interests.  He talked about

9        the murders.

10               THE COURT:  How does it connect Fernandez?

11               MR. CRONAN:  Because one of the statements includes, I

12       expect the witness will testify to, there are two shooters in

13       the murders.  Mr. Richman had made an issue in his opening

14       statement whether or not there was a second shooter.  He also

15       made that on cross-examination.

16               (Continued on next page)

17

18

19

20

21

22

23

24

25

D2PMFER4                          Correa - direct

1        (In open court)

2        THE COURT:  Members of the jury, I need to recess you

3   for about 10 to 15 minutes.  I need to go into an issue, and I

4   want to make sure that everybody gets the proper attention and

5   it's a little too hard to do it at the side bar.  We will be as

6   brief as we can.

7        Close up your books, leave them on your chairs.

8        (Jury not present)

9        THE COURT:  Connect this up with Mr. Fernandez.

10       MR. CRONAN:  Your Honor, I think we explained this a

11   bit in your pretrial briefing.

12       THE COURT:  Please don't refer to the pretrial

13   briefing.  Anything you want to bring to my attention, bring to

14   it my attention now.  Don't tell me that I read it before.

15       MR. CRONAN:  The witness will testify, I expect, that

16   at the beach in Boca Chica, Manuel Aladino Suero talked about

17   the murders.  He admitted his knowledge of details of the

18   murders and also mentioned that there was a second hitman along

19   with Patrick Darge.  That is extremely relevant because Mr.

20   Richman had made an issue in both his opening statement and in

21   cross-examination of the police officer whether or not there

22   was a second shooter.

23       THE COURT:  Why is this not hearsay?

24       MR. CRONAN:  It's not hearsay because Suero is an

25   unavailable declarant.  It comes in as a statement against

D2PMFER4                    Correa - direct

1    interests.  Suero has asserted his Fifth Amendment right, which

2    we discussed --

3            THE COURT:  How does Suero know what happened there?

4    He wasn't there.

5            MR. CRONAN:  Suero is one of the planners of the

6    murder.  There has been extensive testimony that Suero was

7    involved in plotting the murders and Suero, of course, also

8    pled guilty to the murders.

9            THE COURT:  Remind me now of what happened.  Suero and

10   Reyes was in the car with Darge?

11           MR. CRONAN:  Your Honor, I believe what initially

12   happened was Suero, Reyes, and Gordo got together with Jeffrey

13   Minaya and they discussed the plan to kill the two drug

14   dealers, and then Suero was in the car when Patrick Darge was

15   recruited to be the hitman.

16           THE COURT:  And the three of men, Darge, Suero, and

17   Reyes, drove up Webster Avenue so Darge could see the scene and

18   how he could get away.

19           MR. CRONAN:  Earlier in the night --

20           THE COURT:  The issue really here is whether Fernandez

21   killed one or both of Cuellar and Flores or not.  The plan to

22   do the murder was discussed by Darge.  And it seems to me that

23   comment, consistent with Darge's testimony by Suero,

24   corroborates a point that's not in issue.  It therefore has the

25   risk of creating prejudice.

D2PMFER4                         Correa - direct

1          MR. CRONAN:  Your Honor, the defense had made an issue

2    as to whether there was a second shooter.  They cross-examined

3    the first responder on the specific issue as to whether one or

4    two perpetrators.  In the opening Mr. Richman said --

5          THE COURT:  All that Suero can say is that the plan

6    with Darge was that Darge was going to get a second shooter,

7    but Darge did not disclose who the second shooter would be.

8          MR. CRONAN:  Your Honor, I understand what the Court

9    is saying, but the point is whether there was a second shooter.

10   The defense's argument has been that Patrick Darge had made up

11   the concept of a second shooter in order to gain favor with the

12   government.  That was argued in opening statement and that was

13   the subject of cross-examination to Officer Szaniszlo.  It

14   provides extremely strong corroboration of Patrick Darge's

15   testimony.  And on top of that, it deals with an issue that the

16   defense has put in dispute.

17         THE COURT:  How can Mr. Richman argue that his client

18   was not there if there is no evidence to say that he's not

19   there?  The evidence by Darge is he was there.  He can say

20   Darge was lying, he was puffing, he was doing all kinds of

21   things, but he can't say that his client wasn't there.

22         MR. CRONAN:  Your Honor, Mr. Richman's argument has

23   been in part at least that Mr. Darge even made up that there

24   was anyone else there.  This very strongly refutes that

25   argument.

D2PMFER4                          Correa - direct

1          THE COURT:  The evidence is that Darge shot the first
2     guy, his gun jammed, and he ran away.
3          MR. CRONAN:  Correct.
4          THE COURT:  There were two guns.  There was a nine
5     millimeter and a .380.  Someone must have killed the second
6     guy.
7          MR. CRONAN:  Your Honor, the defense hasn't conceded
8     that.  In fact, they have argued the exact opposite, that there
9     wasn't a second shooter, that Darge had made up the concept of
10     the second shooter in order to gain favor with the government
11     and be able to point his finger at someone.  That was the
12     opening statement argument, your Honor.
13          THE COURT:  What is Suero going to say?
14          MR. CRONAN:  I believe the testimony will be from
15     Mr. Correa that at the beach at Boca Chica they talked about
16     the murders, and Manuel Aladino Suero mentioned there was
17     another hitman along with Patrick Darge who was involved with
18     the murder.
19          THE COURT:  How does he know?  What's the basis of his
20     knowledge?
21          MR. CRONAN:  Your Honor, the basis of his knowledge
22     would be that he was one of the individuals involved in
23     planning the murders.
24          THE COURT:  It doesn't mean he knew.  It could be
25     completely speculative.

D2PMFER4                      Correa - direct

1            MR. CRONAN:  Your Honor, the defense, obviously, can

2    cross-examine the witness on that and make whatever arguments

3    he wishes.  I believe that goes more to weight than to

4    admissibility.

5            THE COURT:  Then the cat is out of the bag.  I think

6    this hearsay is, to me, unreliable hearsay because there is no

7    basis for what he said.  He could be speculating.  It could be

8    based on probability.  If he were to say that I was in on the

9    original planning and it was planned that there would be a

10   second shooter, I can accept that.

11           Is that part of the testimony I kept out?

12           MR. CRONAN:  Your Honor, part of the testimony you

13   kept out would have been that Aladino said that something had

14   gone down with Jeffrey Minaya's Mexican contacts and everyone

15   needed to get out of town quick.  They needed to get to the

16   Dominican Republic.  That was the testimony that was kept out.

17           THE COURT:  Objection sustained.

18           MR. CRONAN:  Your Honor, if I can be heard on one

19   other issue very briefly, and that involved the trap and the

20   car at Live Wire.

21           Just to be clear on what the relevance is, Patrick

22   Darge testified that he recruited Luis Rivera, Batman, the

23   person Richard Correa identified to be the getaway driver.  He

24   recruited him because he knew that Luis Rivera had a trap

25   installed at the center console of his Ford Expedition at Live

D2PMFER4                    Correa - direct

1    Wire.  Patrick Darge saw that happen.  Richard Correa is the

2    person who installed that trap in the exact location where

3    Patrick Darge said it was and the location where Patrick Darge

4    said Luis Rivera opened and handed him a pistol from.

5              First of all, it's very relevant to the facts of the

6    crime and, second of all, it's extremely strong corroboration

7    to Patrick Darge's testimony.  I don't think there is any

8    question that the defense's focus here is that Patrick Darge is

9    a liar.  The government has a right to corroborate testimony

10   provided by Patrick Darge, and this squarely corroborates some

11   very important testimony that he gave last week.  I would ask

12   the Court to reconsider its ruling with respect --

13             THE COURT:  Whose car is this?

14             MR. CRONAN:  It is Luis Rivera's car.  Luis Rivera,

15   who was known by Mr. Correa as Batman, which Patrick Darge also

16   said was his nickname on the street.  Luis Rivera is a person

17   that Patrick Darge called --

18             THE COURT:  I'll hear you on that, Mr. Richman.

19             MR. RICHMAN:  Your Honor, one need not necessarily

20   verify or corroborate that which is not necessarily an

21   important issue.  If we were to corroborate Mr. Darge by

22   saying, I have been arrested before and then the government

23   introduces the fact that he has been arrested before, it's not

24   relevant.  The relevancy of that particular issue is of no

25   consequence whatsoever.

D2PMFER4                        Correa – direct

1                THE COURT:  It's relevant to how Darge committed the

2       murder.  It's not relevant with regard to whether Fernandez was

3       there or not.  I am going to allow that testimony.

4                MR. RICHMAN:  Very well, your Honor.

5                THE COURT:  Sorry?

6                MR. CRONAN:  Thank you, your Honor.

7                THE COURT:  I'll allow that testimony, but not the

8       conversation in Boca Chica.

9                MR. CRONAN:  Yes, your Honor.

10               MR. RICHMAN:  May I have one moment before we go on?

11               THE COURT:  Is it an emergency?

12               MR. RICHMAN:  It is not going to last an hour.

13               THE COURT:  Anything else, Mr. Cronan?

14               MR. CRONAN:  Your Honor, there was one other objection

15      that was dealt with out explanation.  If I could just provide

16      the Court with some explanation what the relevance in the

17      government's view was.

18               Mr. Correa was going to testify that he retrieved

19      about $250,000 for Jeffrey Minaya from a Lincoln Town Car.

20      Those were drug proceeds that related to the drug deal at issue

21      here that led to the murders.  I believe Mr. Minaya also

22      testified as to that.  That was the relevance of that

23      testimony.  It was going to be simply that Mr. Correa went to a

24      parking lot in the Bronx, retrieved the money, and at Jeffrey

25      Minaya's direction sent it down to him in the Dominican

D2PMFER4                         Correa – direct

1   Republic.  As Mr. Minaya said it was less than it was supposed

2   to be.

3              THE COURT:  I'm satisfied with my ruling.

4              (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D2PMFER4                          Correa - direct

 1              (Jury present)
 2              THE COURT:  Mr. Correa, you remain under oath.
 3              MR. CRONAN:  Ms. Quinones, can we put Exhibit 4 back
 4   up.
 5   Q.  Just to refresh everyone, who is this person?
 6   A.  Batman.
 7   Q.  And I believe earlier you were testifying that there was an
 8   occasion when you installed a trap in a car for Batman?
 9   A.  Yes.
10              THE COURT:  What's Batman's name?
11              THE WITNESS:  I don't know Batman's name.  I just know
12   him by his nickname.
13   Q.  And I believe you said you met him at Live Wire, is that
14   right?
15   A.  Yes, I did.
16   Q.  How did you end up installing a trap in Batman's vehicle?
17   A.  Batman came to see Gordo because he had bought an SUV -- an
18   SUV is a sports utility vehicle -- a Ford Expedition he had
19   just bought.  And he came to the shop to see Gordo to ask him
20   if he can install a trap in that type of vehicle, in that
21   vehicle specifically.
22   Q.  How do you know that?
23   A.  I was there at the shop when he came by.
24   Q.  And did you hear Batman tell Gordo how large of a trap he
25   wanted to have installed in his Ford Expedition?

D2PMFER4                        Correa - direct

1    A.  Yes, I did.

2    Q.  How large of a trap?

3    A.  He said he wanted it to fit at least two kilograms of

4    cocaine or the size of two kilograms.  It doesn't necessarily

5    mean it has to be cocaine.  Or one kilo and a handgun.

6    Q.  Did you install a trap in this individual Batman's Ford

7    Expedition?

8    A.  Yes, I did.

9    Q.  How many traps did you install over your years at Live

10   Wire?

11           THE COURT:  Place a time on installation.

12   Q.  About when was that?

13   A.  That was late '99.

14   Q.  Over your years working at Live Wire, about how many traps

15   did you install in vehicles?

16   A.  I'd say around a hundred.  Anywhere maybe about a hundred

17   traps.

18           THE COURT:  Where was the trap you installed for

19   Batman?

20           THE WITNESS:  In the center console of the Ford

21   Expedition.

22           THE COURT:  Tell me --

23           THE WITNESS:  Center console is between both front

24   seats, where the armrest is at.

25   Q.  How do you recall installing this particular trap?

D2PMFER4                        Correa - direct

1    A.  It was the only Ford Expedition that I installed a trap in

2    the center console.

3    Q.  Do you recall how this trap operated in Batman's Ford

4    Expedition?

5    A.  Yes, I do.

6    Q.  How did it operate?

7    A.  It operated with the electrical actuator.  The actuator is

8    what lifts up the opening lid for the access area, and it

9    opened up as a briefcase.  If you guys can take a look at my

10   hand, it opened up vertically.

11             THE COURT:  What do you mean by briefcase?

12             THE WITNESS:  Like a briefcase.  If you could take a

13   look at my arm, like that.

14             THE COURT:  A briefcase with a flap, you mean?

15             THE WITNESS:  Yeah, with a flap.

16             THE COURT:  A flap turns over on itself?

17             THE WITNESS:  Well.

18             THE COURT:  You're motioning that the lid just comes

19   up, like on a lever.

20             THE WITNESS:  It comes up towards the dash.

21             THE COURT:  If you imagine your elbow as the lever and

22   your hand is stiff, the way that the lid opens is, it opens up

23   on the lever of your elbow?

24             THE WITNESS:  Correct.

25             THE COURT:  By how many degrees?

D2PMFER4                          Correa – direct

1          THE WITNESS:  About 45 degrees.

2          THE COURT:  It opens up 45 degrees.

3          Is the opening at the back or the opening at the

4   front?

5          THE WITNESS:  At the front.

6          THE COURT:  So whatever you put inside comes in from

7   the front?

8          THE WITNESS:  Correct.

9          THE COURT:  How does the electrical actuator work?

10          THE WITNESS:  The electrical actuator works with

11   12-volt electricity from the battery of the car.

12          THE COURT:  You have to start the car?

13          THE WITNESS:  You would have to start the switch in

14   order for the electrical components to switch in.

15          THE COURT:  Just turning the ignition switch to on,

16   will that do it?

17          THE WITNESS:  It would start to flow the electricity,

18   but it would have to operate with combinations of, how would I

19   say -- in order for you to open it and close it, it would have

20   to be through combinations that say --

21          THE COURT:  Who sets the combinations, you or the

22   customer?

23          THE WITNESS:  The combination is set by Gordo, not me.

24   I was not in charge of doing the wiring combination.

25          THE COURT:  Gordo, the owner.

D2PMFER4                        Correa - direct

1               THE WITNESS:  Gordo the owner, correct.

2               THE COURT:  Gordo sets the combination.

3               THE WITNESS:  That is correct.

4               THE COURT:  Did you know how the combination was set

5       in this car?

6               THE WITNESS:  I don't remember that one specifically.

7       No, I don't.

8       Q.  Can you give some examples of what some combinations have

9       been in traps you've worked on?

10      A.  Sure.

11              MR. RICHMAN:  Objection.

12              THE COURT:  Overruled.

13      A.  You would, for example, switch on the AC, the AC button

14      with the defrost button, and use, also, the power window

15      buttons to lift up -- open and close the trap as a combination.

16              THE COURT:  Some sequence of the car functions?

17              THE WITNESS:  Correct.

18              THE COURT:  We can go on to another subject.

19      Q.  Just to be clear, after you installed this trap, did you

20      measure it to confirm that it met the specifications it was

21      supposed to?

22      A.  Yes, I did.

23      Q.  What would have been able to fit in the trap?

24      A.  Two kilograms.

25      Q.  What about firearms?

D2PMFER4                      Correa - direct

1   A.  Also, one firearm and one kilogram would fit nice and easy.
2           THE COURT:  What kind of firearm?
3           THE WITNESS:  Handgun.
4   Q.  Now, you were involved in drug trafficking yourself, is
5   that right?
6   A.  Yes, I was.
7   Q.  What type of drug trafficking work did you do in your life?
8   A.  I dealt with marijuana, cocaine, a little bit of heroin.
9   Q.  When you dealt with marijuana, when was that?
10  A.  That was around -- the first time was like '97, '98.  And
11  throughout 2000 to 2006, I always dealt with marijuana.
12  Q.  What did that entail you do?
13  A.  Selling pounds of marijuana.
14  Q.  And did you also ever deal cocaine with Jeffrey Minaya?
15  A.  Yes, I did.
16  Q.  What did you do with Jeffrey Minaya?
17  A.  I picked up cocaine, sold cocaine, transported cocaine.
18  Q.  Before you mentioned an individual named Gordo from Live
19  Wire.  Did you ever deal drugs with Gordo?
20  A.  I didn't deal drugs with Gordo, but I did transport small
21  amounts of drugs with him.
22  Q.  What do you mean, you transported the drugs with him?
23  A.  I used to drive for him because he had a suspended driver's
24  license while we worked at Live Wire Auto Sound.  So it was a
25  routine for me to drive every day, whether or not he was

D2PMFER4                         Correa - direct

1   carrying drugs or not.

2   Q.  And going back to Jeffrey Minaya for a moment, did you ever

3   help Jeffrey Minaya purchase any firearms?

4   A.  Yes, I did.

5   Q.  When was that?

6   A.  That was in early 2005.

7   Q.  On how many occasions did you purchase firearms with

8   Jeffrey Minaya?

9   A.  Two occasions.

10  Q.  Can you explain the first occasion?

11  A.  The first occasion took place in the Bronx from -- we met

12  with a friend of ours, elementary school friend.  We met him in

13  the neighborhood.  We saw him in the neighborhood.  We met up

14  and he told us that he was selling brand-new firearms, that he

15  can get a hold of them if we were interested.  Jeffrey said

16  yes, he was interested in them.  Later on that week we went and

17  met with him at his apartment in the Bronx.  He showed us five

18  firearms.  And Jeffrey said, yes, he was interested.  That day

19  we did not purchase them, but I went back and purchased them

20  the next day, I believe it was, or the next few days.  I

21  purchased the firearms with Jeffrey's money.

22  Q.  What type of guns were these?

23  A.  Handguns.

24  Q.  And what was the name of this elementary school friend?

25  A.  Richa.

D2PMFER4                         Correa - direct

1            THE COURT:  Spell it.

2            THE WITNESS:  R-i-c-h-a.

3   Q.  Do you know what happened to these guns that Jeffrey Minaya

4   had purchased?

5   A.  Yes.

6   Q.  What happened to them?

7   A.  Eventually, I stood with them because we took them to our

8   apartment.  I used to live with Jeffrey Minaya at the time.  We

9   took them to our apartment.  Then Jeffrey later on, few months

10  later, left to the Dominican Republic, and I stood with the

11  firearms and I then sold them.

12  Q.  Who did you sell them to?

13  A.  I sold them to Allen Darge.  His nickname is Boozer.

14  Q.  That's the name you identified earlier?

15  A.  That is correct.

16  Q.  If you could briefly describe the second time you and

17  Jeffrey Minaya purchased firearms.

18  A.  Yes.  That was later on that year, around --

19           THE COURT:  What year?

20           THE WITNESS:  2005.  Around October, November, around

21  that time.

22           THE COURT:  Why do we need this?

23           MR. CRONAN:  Your Honor, if the defense thinks it's

24  irrelevant, I'll move on.

25           THE COURT:  Move on.

D2PMFER4                          Correa - direct

1    Q.   When were you arrested?

2    A.   My last arrest?

3    Q.   In this case.

4    A.   In this case I was arrested June 15, 2011.

5    Q.   Where were you arrested?

6    A.   At the Dominican Republic.

7    Q.   Did you agree to be extradited to the United States?

8    A.   Yes, I did.

9    Q.   After you arrived in the United States, did you plead

10   guilty?

11   A.   Yes, I did.

12   Q.   When was that?

13   A.   That was near the spring of 2012.

14   Q.   I'm sorry.  Can you repeat that?

15   A.   Spring 2012.

16   Q.   And did you plead guilty pursuant to any agreement with the

17   United States Attorney's Office?

18   A.   Yes, I did.

19   Q.   I'm showing you what had been marked 3502-D for

20   identification.

21        Do you recognize that?

22   A.   Yes, I do.

23   Q.   What is that document?

24   A.   This is a cooperation agreement.

25   Q.   You signed that document?

D2PMFER4                          Correa - direct

1    A.  Yes, I did.

2    Q.  Did your attorney as well?

3    A.  Yes, he did.

4    Q.  Did you understand all the terms of that cooperation

5    agreement before you signed it?

6    A.  Yes, I do.

7         MR. CRONAN:  The government offers 3502-D into

8    evidence, your Honor.

9         MR. RICHMAN:  I have no objection.

10        THE COURT:  Received.

11        (Government's Exhibit 3502-D received in evidence).

12   Q.  Did you meet with the government both before and after you

13   entered into that cooperation agreement?

14   A.  Yes, I did.

15   Q.  And at your first meetings with the government did you tell

16   the government about all of your crimes?

17   A.  No, I didn't.

18   Q.  What did you hold back?

19   A.  I held back the firearms.

20   Q.  Why did you hold back the firearms?

21   A.  I hold back the firearms because when I'm -- while I was in

22   prison, in jail, I heard rumors that if you had violence, and

23   firearms are considered violence, in your case, you wouldn't be

24   able to get a safety valve or cooperation agreement.

25   Q.  Have you since learned that this jailhouse advice was

D2PMFER4                          Correa – direct

1   wrong?

2   A.  Yes, correct, I did.

3   Q.  What did you understand before you pled guilty that you

4   needed to do to get a cooperation agreement with the

5   government?

6            MR. RICHMAN:  Objection.  Relevancy.

7            THE COURT:  Sustained.

8   Q.  Have you told the government about all of your crimes?

9   A.  Yes, I have.

10  Q.  Have you left anything out?

11  A.  No, I haven't.

12  Q.  What is the maximum sentence that you could face on the

13  counts that you pled guilty to committing?

14  A.  Life in prison.

15  Q.  Normally, do those crimes have a mandatory minimum

16  sentence?

17  A.  Yes, they do.

18  Q.  What is that, Mr. Correa?

19  A.  15 years mandatory minimum.

20  Q.  And you have not been sentenced yet, have you?

21  A.  I have not.

22  Q.  What do you understand to be your obligations under the

23  cooperation agreement that you entered into with the

24  government?

25  A.  I had to be truthful and render substantial information to

D2PMFER4                        Correa - direct

1    the government and not commit any crimes and admit to all the

2    crimes I have committed in the past.

3    Q.   And if you do that and if you live up to your end of the

4    cooperation agreement, what do you understand to be the

5    government's obligation?

6    A.   I will be provided with a 5K1 letter.

7    Q.   And very briefly, what do you understand a 5K1 letter to

8    do?

9    A.   It is the letter that my prosecutor writes to my judge

10   prior to sentencing with all the crimes that I have committed

11   and all the information -- all the helpful information that I

12   have provided to the government, including me testifying in

13   front of a grand jury in order for the judge to consider

14   lowering my sentence below the minimum mandatory.

15   Q.   Fair to say you're hoping to receive a lower sentence as a

16   result of your cooperation?

17   A.   Yes, that is correct.

18   Q.   What is your understanding of how you could violate the

19   cooperation agreement you entered into?

20   A.   By committing any other crimes or being untruthful.

21   Q.   And if you commit any other crimes or are untruthful, what

22   is your understanding of whether or not you will receive that

23   5K1 letter at your sentencing?

24   A.   I will not receive my 5K letter and my cooperation will be

25   torn up.

D2PMFER4                    Correa – direct

1   Q.  Will you be facing a mandatory minimum sentence?

2   A.  Yes, I would.

3   Q.  Will you be able to withdraw your guilty plea?

4   A.  No, I wouldn't.

5          MR. CRONAN:  No further questions, your Honor.

6          THE COURT:  Cross.

7          MR. RICHMAN:  Very briefly.

8   CROSS-EXAMINATION

9   BY MR. RICHMAN:

10  Q.  Mr. Correa, you and I have never met, is that correct?

11  A.  No.

12  Q.  We have never spoken?

13  A.  Never.

14  Q.  You spent your life being a drug dealer, is that correct?

15  A.  Part of my life, correct.

16          (Continued on next page)

17

18

19

20

21

22

23

24

25

D2p0fer5                              Correa - cross

1    Q.  And you hung around with Patrick Darge?

2    A.  Not much, but I did see him every now and then.

3    Q.  I'm sorry?

4    A.  Not much, but I did see him every now and then; yes.

5    Q.  And you showed us a picture of Batman; correct?

6    A.  Correct.

7    Q.  And would it be fair to say that Batman was close to

8    Patrick?

9    A.  Yes.

10   Q.  And would it be fair to say that Batman was also close to

11   Boozer?

12   A.  Yes.

13   Q.  And would it be also fair that the three of them often did

14   things together; is that right?

15   A.  I would say so, correct.

16   Q.  And sometimes worked as a team; is that right?

17   A.  I don't know, working as a team, but they would --

18   Q.  They would?

19   A.  They would be together.

20   Q.  And that was often, right?

21   A.  Pretty often.

22   Q.  And Boozer is Patrick's brother?

23   A.  Yes, that is correct.

24   Q.  And would you say that they were close?

25   A.  They didn't really demonstrate that they were that close,

D2p0fer5                          Correa - cross

1   like they had different, what do you say, they would hang in

2   different places, they wouldn't -- but they were -- they were

3   close as brothers.

4   Q.  They were close as brothers?

5   A.  Yes.

6   Q.  Did you live in the same neighborhood?

7   A.  No, not as them, no.

8            THE COURT:  Where did they live, and where did you

9   live?

10           THE WITNESS:  I lived in Pelham, which is --

11  Q.  I'm sorry, speak up?

12  A.  I lived in Pelham Place, which is at the end of East

13  Tremont.

14           THE COURT:  Pelham Place.

15           East Tremont ends in Long Island Sound, close to Ferry

16  Point Park.

17           THE WITNESS:  No, is it?  Or --

18  Q.  You were close to Burnside Avenue --

19           THE COURT:  West Bronx.

20           THE WITNESS:  Yes, West Bronx, I'm sorry.

21  Q.  You were just a few blocks from Valentine Avenue; right?

22           THE COURT:  It's more than a few blocks.

23           THE WITNESS:  It's more than a few blocks, correct.

24           MR. CAPONE:  I have no further questions of the

25  witness.

D2p0fer5                              Correa - cross

1                   THE COURT:  Excellent.  Thank you very much.

2                   MR. CAPONE:  No redirect, your Honor.

3                   THE COURT:  You're excused.

4                   (Witness excused)

5                   THE COURT:  Next witness.

6                   MR. BLANCHE:  Government calls Roberto Reyes, your

7      Honor.

8                   THE COURT:  You ladies are?

9                   THE INTERPRETER:  Official certified Spanish

10     interpreters.

11                  MR. BLANCHE:  Next witness requires a Spanish

12     interpreter.

13                  THE COURT:  Any requests that the interpreters be

14     sworn, I don't think we need, they are certified.

15                  MR. RICHMAN:  No, your Honor, no necessity.  I've

16     known them for years.

17                  MR. BLANCHE:  The witness is here, your Honor.  I

18     think he is just being brought out.  One minute.  I mean he is

19     not out here, but he is right back here.

20                  THE COURT:  I understand.  Do I look impatient?

21                  MR. BLANCHE:  No, your Honor.

22                  (Witness takes the stand)

23                  THE DEPUTY CLERK:  Raise your right hand.

24      ALBERTO REYES,

25          called as a witness by the Government,

D2p0fer5                              Correa - cross

1          having been duly sworn, testified as follows:

2                THE DEPUTY CLERK:  Be seated.  State your name spell

3     it slowly for the record.

4                THE WITNESS:  Alberto Reyes, A-L-B-E-R-T-O R-E-Y-E-S.

5                THE COURT:  I want to hear your voice.  Drop the

6     microphone, it doesn't work.  You speak loud, Mr. Reyes, okay?

7                THE WITNESS:  Yes, your Honor.

8                THE COURT:  Who is questioning, Mr. Reyes.

9                MR. BLANCHE:  I am, your Honor.

10               THE COURT:  Mr. Blanche.

11    DIRECT EXAMINATION

12    BY MR. BLANCHE:

13    Q.  Please keep your voice up, Mr. Reyes.

14    A.  Okay.

15    Q.  Do you have a nickname?

16    A.  Yes.

17    Q.  What is your nickname?

18    A.  Zac.

19    Q.  Do you know why you have that nickname?

20    A.  Because I used to do graffiti out on the street before.

21    Q.  Where were you born, Mr. Reyes?

22    A.  In the Dominican Republic.

23               THE COURT:  What does Zac have to do with graffiti.

24               THE WITNESS:  When I was young, that's what I used to

25    do, that's what I used to write when I was out on the street at

D2p0fer5                          Reyes - direct

1    first.

2              THE COURT:  So why were you given the name Zac?

3              THE WITNESS:  When I used to do graffiti, that's what

4    people called me.

5              THE COURT:  I give up.

6    BY MR. BLANCHE:

7    Q.  Mr. Reyes, you signed that name when you did graffiti.

8    A.  Yes.

9    Q.  And Judge Hellerstein said Zac, but how would you spell it?

10   A.  Oh, Z-O-D.

11   Q.  And, now, you said you were born in the Dominican Republic.

12   When did you first come to the United States?

13   A.  I don't remember the year exactly, I was very young.

14   Q.  Where did you grow up?

15   A.  In the City of New York.

16   Q.  Do you -- you're using the Spanish interpreter today,

17   correct?

18   A.  Correct.

19   Q.  Can you speak some English?

20   A.  Yes, I do speak some English.

21   Q.  Do you understand some English?

22   A.  Yes, I understand English.

23   Q.  But you're more comfortable using the Spanish interpreter

24   today?

25   A.  Yes, please.

D2p0fer5                              Reyes - direct

1   Q.   How old are you?

2   A.   Forty.

3   Q.   Are you in this country legally?

4   A.   Yes.

5   Q.   What is your legal status in the United States?

6   A.   I'm an American citizen.

7   Q.   Now, how far did you go in school?

8   A.   First semester at the university level.

9   Q.   Do you have your high school diploma?

10  A.   I have a GED.

11  Q.   Where do you currently live right now?

12  A.   At MDC Brooklyn.

13  Q.   Federal jail?

14  A.   Yes.

15  Q.   How long have you been in jail?

16  A.   Two years.

17  Q.   Do you remember the day you were arrested?

18  A.   December 2, 2010.

19  Q.   Where were you arrested?

20  A.   At the Miami airport.

21  Q.   Now, briefly, what did you do that led to your arrest and

22  imprisonment in this case?

23  A.   I had committed a crime of murder.

24  Q.   When did you commit that crime of murder?

25  A.   That was in the year 2000.

D2p0fer5                          Reyes - direct

1    Q.  Did you -- how many people died?

2    A.  Two people.

3    Q.  Did you commit the crime of murder alone, or with others?

4    A.  With others.

5    Q.  What was your role in the murder?

6    A.  My role was to go and get the two people and bring them to

7    a place so that they could get killed.

8    Q.  Who else, that you know of, was -- were involved in that

9    murders?

10   A.  The names?

11   Q.  Well, you don't have to say the names.  If you know them,

12   say the names.  But who else was involved?

13   A.  There were quite a few other people involved.

14   Q.  Tell us who they were?

15   A.  One was Shortie Aladino.  The other one was el Gordo.

16   Patrick.  Me and Jeffrey.

17   Q.  Were there anybody else?

18   A.  There was another person, but I don't remember that person.

19   Q.  What was that other person's role?

20   A.  I don't remember him.  He was one of the guys who killed

21   the Mexicans.

22   Q.  Now, do you have a family?

23   A.  Yes.

24   Q.  How many kids do you have?

25   A.  Four.

D2p0fer5                              Reyes - direct

1   Q.  Are you married?

2   A.  Engaged.

3   Q.  Now, I don't want to spend too much time on this, but when

4   did you first start committing crimes?

5   A.  Approximately when I was very young, when I was in high

6   school.

7   Q.  What were you doing when you were in high school?

8   A.  Besides graffiti, I would sell drugs marijuana.

9   Q.  Did you -- now talking about the time through high school

10  and the years after, did you have legitimate jobs, as well?

11  A.  Yes, I had legal jobs.

12  Q.  What?  Doing what?

13  A.  I worked doing mechanic work at the Sam's Club, Midas and

14  Meineke mufflers.

15  Q.  You said you worked at Sam's Club.  What did you do at

16  Sam's Club?

17  A.  I was the cake decorator.

18  Q.  When you worked at the mechanic shops for Midas and

19  Meineke, what did you do there?

20  A.  I inspected vehicles, I fixed brakes; everything in the

21  front end.

22          MR. BLANCHE:  We'll put up government exhibit 13,

23  please, Ms. Quinones.

24  Q.  Do you recognize the person in government exhibit 13?

25  A.  Yes.

D2p0fer5                          Reyes - direct

1   Q.   Who is that?

2   A.   El Gordo.

3   Q.   Did you ever work at a mechanic shop with Gordo?

4   A.   No, it was a shop where sound equipment, music equipment,

5   was installed in cars, as well as traps.

6   Q.   When did you -- did you work at that location?

7   A.   In '98, '99.

8   Q.   While you were working with Gordo at that shop, were you

9   also committing crimes?

10  A.   Yes.

11  Q.   What crimes were you committing?

12  A.   Well, besides the traps that we built, we also sold drugs.

13  Q.   When you say "the traps," you mean traps inside cars?

14  A.   Yes.   Secret compartments.

15  Q.   Now, what kind of drugs were you selling?

16  A.   Cocaine.   And heroin from time to time.

17  Q.   And now you were you selling drugs with Gordo?

18  A.   Yes.

19  Q.   Anybody else?

20  A.   Shortie.

21          MR. BLANCHE:   Can you put up, real quick, government

22  exhibit 6, please.

23  Q.   Who is that?

24  A.   Me.

25          MR. BLANCHE:   And then if you put up government

D2p0fer5                          Reyes - direct

1    exhibit 5, please.

2    Q.  Who is that?

3    A.  Shortie.

4    Q.  So you, Gordo and Shortie, were selling cocaine together?

5    A.  Yes.

6    Q.  Who was supplying you with the cocaine?

7    A.  Jeffrey.

8    Q.  Anybody else?

9    A.  Well, there were other people from time to time, but I

10   really don't remember them.  Most of it we received from

11   Jeffrey.

12          MR. BLANCHE:  Put up government exhibit 3, please,

13   Ms. Quinones.

14   Q.  Who is that?

15   A.  Jeffrey.

16   Q.  Now, aside from receiving cocaine from Jeffrey, did you

17   ever -- well, did you ever have a car with the trap in it?

18   A.  I had a Honda Civic.

19   Q.  And it had a trap in it?

20   A.  Yes.

21   Q.  Did you ever do any -- did you ever use that car with

22   Jeffrey?

23   A.  Yes, I used it once.

24   Q.  What happened then?

25   A.  He asked me as a favor to take some cocaine for him to a

D2p0fer5                         Reyes - direct

1    place.  I took it.  And then after that, he locked that Civic

2    and he exchanged it for a Lexus.

3    Q.  Now, if we could put up government exhibit 7, please.  Who

4    are we looking at in government exhibit 7?

5    A.  Sonny.

6    Q.  Now, did there ever come a time when you delivered money

7    for Jeffrey?

8    A.  Yes.

9    Q.  Do you remember what time of the year that was?

10   A.  That was in the new year.

11   Q.  What do you mean it was in the new year?

12   A.  I mean to say between December and January.

13   Q.  Where were you when you first were -- well, where did you

14   deliver the money from and where did you take it to?

15   A.  Jeffrey had given me a van that had $2,000,000 in it to

16   bring it to El Paso, Texas, into Mexico.

17   Q.  Where were you when Jeffrey gave you that van?

18   A.  At Gordo's shop.

19   Q.  Who else was there?

20   A.  It was Jeffrey, Gordo, me, and the Mexican, one of the

21   Mexicans that we killed were there.

22   Q.  Was that the -- was that time the first time that you met

23   the -- one of the Mexicans that was eventually killed?

24   A.  No, I had seen him before at a restaurant.

25   Q.  Do you know his name?

D2p0fer5                           Reyes - direct

1    A.  I don't remember.

2    Q.  At the time, did you know his name?

3    A.  The name of the place?  Or the name of the Mexican.

4    Q.  The name of the Mexican.

5    A.  No, no, no, I don't remember, I never knew it.

6    Q.  Now, were you -- were you told that you were gonna get paid

7    for taking the money from New York to Texas?

8    A.  Yes, I was told that I was going to be paid $30,000.

9    Q.  Were you eventually paid?

10   A.  Yes.

11   Q.  How were you paid?

12   A.  With a kilo.

13   Q.  Kilo of what?

14   A.  A kilo of cocaine.

15   Q.  Who gave you that kilo?

16   A.  That kilo was given to me -- well, I took it when the load

17   that Jeffrey was expecting arrived.

18   Q.  The load of what?

19   A.  The load of cocaine that he received.

20   Q.  Did you successfully take the money from New York to Texas?

21   A.  Yes, it took me three days.

22   Q.  What happened when you got to Texas -- when you got to

23   Texas with the $2,000,000?

24   A.  I met over there with Jeffrey, Sonny and a Mexican.  And I

25   turned the van over to them.

D2p0fer5                          Reyes - direct

1   Q.  How did you get back, did you come back to New York?

2   A.  Yes, I flew back.

3   Q.  So after that, did there come a time when Jeffrey got the

4   load?

5   A.  Yes.

6   Q.  Now, by the way, if we could put up government exhibit 11,

7   please.  Do you know who that is?

8   A.  That's Boozer.

9   Q.  Do you know who Boozer is?

10  A.  Patrick's brother.

11  Q.  Did you ever commit any crime with Boozer?

12  A.  Yes.

13  Q.  What crime did you commit?

14  A.  One time I bought some bundles off of him.  And on another

15  occasion, I sold him some heroin.

16  Q.  When you said you bought bundles off him, what kind of

17  drug -- is that drugs?

18  A.  Yes.  Those are small packages of heroin.

19  Q.  So how did you come about to hear that Jeffrey had received

20  a load?

21  A.  El Gordo told me about it.

22  Q.  What did Gordo tell you?

23  A.  Gordo told me that as a result of the money that he had

24  paid, Jeffrey received a -- was receiving a load.  And when he

25  did, he would give us some kilos for us to sell.

D2p0fer5                           Reyes - direct

```
 1   Q.  Gordo told you, "for us to sell," what is your

 2   understanding of who he meant?

 3   A.  To me, to Shortie, and to himself.

 4   Q.  Now, at that time, did you, Shortie, and Gordo have a place

 5   where you kept drugs that you got from Jeffrey?

 6   A.  Yes.  We had an apartment where the Mexicans were killed.

 7            THE COURT:  That was not a question, was it?

 8            MR. BLANCHE:  Pardon me, your Honor?

 9            THE COURT:  That wasn't the question, was it?

10            MR. BLANCHE:  No.

11   BY MR. BLANCHE:

12   Q.  You had an apartment where you stored the drugs?

13   A.  Yes.  We had an apartment where we stored the drugs.

14   Q.  And the location of that was, where?

15   A.  In the Bronx.

16   Q.  I think you mentioned it is the same location where the

17   murders took place; is that correct?

18            THE COURT:  Don't ask that question.

19            Where in the Bronx?

20            THE WITNESS:  I don't remember the exact street.  It

21   was near Webster.

22            THE COURT:  Did you go there?

23            THE WITNESS:  Yes.

24            THE COURT:  And how did you get there?

25            THE WITNESS:  By car.
```

D2p0fer5                          Reyes - direct

1           THE COURT:  Did you drive?

2           THE WITNESS:  Yes.

3           THE COURT:  How did you get there?

4           THE WITNESS:  On the street, on the highway.

5           THE COURT:  Go ahead, tell me.

6           THE WITNESS:  Well, to tell you the trajectory, you

7   know, the way there, I really don't remember because I have

8   been out of the City of New York for so long.

9           THE COURT:  Do you remember the name of the highway?

10          THE WITNESS:  No.

11          THE COURT:  Bronx River Parkway?

12          THE WITNESS:  I don't know.  Everything is erased from

13  my head, being here.  I have not traveled or gone around in a

14  long time.  The only highway that I remember very well is the

15  one that I used to take to go home, which is 87.  North.

16          THE COURT:  Go ahead put the question.

17          THE WITNESS:  The Degan, right?  The Degan.

18  BY MR. BLANCHE:

19  Q.  You said your home was 87 North.  You took 87 North to get

20  to your home, where were you living?

21  A.  In New Paltz.

22  Q.  How far was that from that apartment in the Bronx?

23  A.  87 miles.

24  Q.  Do you remember -- well, where in that apartment building

25  did the murders take place?

D2p0fer5                           Reyes - direct

1    A.   In the hallway, at the entrance to the building.

2    Q.   Where was your apartment inside that building?

3    A.   Fourth floor.

4    Q.   How long have you, Gordo, and Shortie had that apartment?

5    A.   A little while.

6    Q.   Little while.  A matter months or years, or how long?

7    A.   Months.

8    Q.   So what if anything happened after Gordo told you that

9    Jeffrey had gotten a load?

10   A.   Well, we were given anywhere between 50 and 75 kilos of

11   cocaine or so, around there, and we started selling them.

12            THE COURT:  Members of the jury, it's 3:30.  If you

13   want a break, you can have one.  One of the jurors has to leave

14   at 4:30, so we'll finish up today at 4:30.  Should we go

15   through, or do you want a break, what would you like?

16            Okay, stand in place and stretch a little bit

17   and during the course of the testimony, if you want to stretch

18   and move around, just do it.

19            MR. BLANCHE:  Thanks, Judge.

20   BY MR. BLANCHE:

21   Q.   So you said you got about 50 to 75 kilograms of cocaine.

22            Do you remember the exact amount that you received?

23   A.   I don't remember the exact amount, because it kept

24   changing.

25   Q.   Why did it keep changing?

D2p0fer5                              Reyes - direct

1   A.  Well, once we would go out, we would then receive it.

2   Q.  Now, can you explain to the jury how you, Gordo and Shortie

3   would make money from this cocaine deal?

4             THE INTERPRETER:  Repeat the question.

5   Q.  Sure.  Can you explain to the jury how you, Gordo and

6   Shortie would make money from this cocaine deal.

7   A.  Well, we would receive it at a certain price.  And we would

8   sell it at a different price.  For example --

9             THE COURT:  I think we get the picture.

10  Q.  When you said you had to receive it at a price, who did you

11  have to pay for kilograms that you received?

12  A.  Jeffrey.

13  Q.  And how did you, Gordo and Shortie, divide up the profits

14  among yourselves?

15  A.  Once all of the kilos were sold, well, that's where we saw

16  the profit.  Once we paid Jeffrey what had to be paid to him,

17  the rest was left for us.

18  Q.  When you were selling these drugs, during this time, where

19  did you keep the drugs before you sold it?

20  A.  We stored it in a closet.  Well, it was a trap that was

21  made in the closet.  And if there was part of it that didn't

22  fit, we would put it in the back in the bedroom.

23  Q.  Is this the bedroom in the apartment where the murders took

24  place?

25            THE COURT:  Rephrase the question.

D2p0fer5                    Reyes - direct

1    Q.  This bedroom and the trap in the closet you are talking

2    about, what apartment is that?

3    A.  The apartment where the murders occurred.

4    Q.  And when you collected money during this time, where did

5    you keep the money?

6    A.  We stored it together with the cocaine.  And that whatever

7    didn't fit, we would put it in the back, also.

8    Q.  Now, you mentioned a little bit ago, one of the Mexicans

9    who was killed, that you saw him at the shop.

10   A.  That's true.

11   Q.  Did you see them -- did you see the other Mexicans, meaning

12   the two Mexicans that were killed, at any time during this time

13   period.

14   A.  Yes.

15   Q.  When?

16   A.  When I went to get them.

17   Q.  Aside from that time, did you see them any other time?

18   A.  I don't remember that well.

19   Q.  So did there -- you just said you went to get them.  Did

20   there come a time when you heard about a plan to actually kill

21   the Mexicans?

22   A.  Yes.

23   Q.  Where were you when you heard about that plan?

24   A.  I was in the apartment where we had the kilos put away.

25   Q.  Who was there, who else was there?

D2p0fer5                           Reyes - direct

1    A.   Me, Shortie and Gordo.

2    Q.   What did you hear, and who did you hear it from?

3    A.   Well, when we were inside there, Gordo started to talk to

4    me about the fact that we should look for somebody to kill the

5    Mexicans.

6    Q.   What did you say in response, and what else did he say,

7    meaning Gordo?

8    A.   Well, I was surprised about what was going to happen.  But

9    I said, well, if he is the one who is giving the orders.

10   Q.   When you say, "He is the one who was giving the orders?"

11   A.   Well, if Jeffrey is the one who is saying they should be

12   killed, and they are his connection, what can you do?

13   Q.   Now --

14            THE COURT:  Not kill.

15            THE WITNESS:  Kill them.

16            THE COURT:  Or not kill them.

17            THE WITNESS:  Kill them.

18   Q.   Well, during that discussion, was there a discussion of

19   what your role, Shortie's role, and Gordo's' role, were

20   supposed to be?

21   A.   Yeah, that's when Shortie said let's see if we can talk to

22   Patrick to see if he will do it.

23   Q.   At that point, did you know the name Patrick?

24   A.   Yes.

25   Q.   Who's Patrick?

D2p0fer5                          Reyes - direct

1    A.  Patrick is Gordo's cousin.

2              MR. BLANCHE:  Put up government exhibit 2, please.

3    Q.  Who is that?

4    A.  That's Patrick.

5    Q.  What did you -- how did you know Patrick at that time?

6    A.  I knew him because he was Gordo's cousin.  And one time I

7    actually gave him some kilos of cocaine.

8    Q.  You gave Patrick some kilos of cocaine?

9    A.  Yes.  I had given him some kilos.

10   Q.  What if anything did you say when Gordo suggested calling

11   or reaching out to Patrick?

12   A.  I agreed.

13   Q.  Now, was there a discussion at that point about whether you

14   were gonna make any money out of this?

15   A.  Yes, we were gonna make money.

16   Q.  And when you say "we," how much were you all going to make?

17   A.  We were going to make 2.5 million.

18   Q.  Who was going to make 2.5 million?

19   A.  Shortie, Gordo and myself.

20   Q.  How much would have that meant that you, Mr. Reyes, was

21   going to make?

22   A.  $860,000.

23   Q.  Now, at that time --

24             THE COURT:  How were you going to make $860,000,

25   somebody going to pay you?

D2p0fer5                          Reyes - direct

1            THE WITNESS:  Yeah, the money from Jeffrey's drugs.

2            THE COURT:  Well --

3  Q.  At that time --

4            THE COURT:  Did Jeffrey sell the drugs yet?

5            THE WITNESS:  The majority of it.

6            THE COURT:  So instead of paying the suppliers, he

7  would pay you; is that it?

8            THE WITNESS:  Well, the point was to hold on to all of

9  the money that he had made.

10 BY MR. BLANCHE:

11 Q.  Well, at that point, had you, Gordo and Shortie sold 75 or

12 so kilograms of cocaine?

13 A.  Yeah, we had sold all of it.  But the money, that money

14 didn't all come from there.  It came from another apartment

15 that Jeffrey had, where he looked for money for us.

16 Q.  How much money, though, had you, Gordo and Shortie

17 collected at that point?

18 A.  Hundreds of thousands.  I don't have the exact amount.

19 Q.  Well, you said hundreds of thousands.  You mean hundreds of

20 thousands of dollars?

21           THE COURT:  He said hundreds of thousands, not

22 hundreds of dollars.

23 Q.  Hundreds of thousands of dollars, though, Mr. Reyes?

24 A.  Yes.  Hundreds of thousands.

25 Q.  And at that time, in early 2000, do you recall how much

D2p0fer5                          Reyes - direct

1   each kilogram of cocaine was worth on the streets?

2   A.  The kilo always fluctuated, but it went between 21,

3   $22,000.

4   Q.  Now, you when we were talking about the money you took,

5   that you drove to Texas, it was -- was it during this time that

6   you got the kilogram back that you were owed?

7   A.  Yes, it was after that.  Yes.

8   Q.  How much were you able to sell that kilogram of cocaine

9   for?

10  A.  $35,000.

11  Q.  How were you able to sell that kilogram for so much more

12  than the amount the other kilograms of cocaine were worth?

13          MR. RICHMAN:  Relevancy, your Honor.

14          THE COURT:  I'll allow it.

15  A.  Well, when you take a kilo and you break it up, and you mix

16  it with cut, you can sell it slowly and, it turns out to be

17  more money.

18  Q.  So let's go back to the planning of the murder.  Do you

19  know whether Patrick was eventually called?

20  A.  Yes, Gordo had already called Patrick.

21  Q.  What happened next?

22  A.  Well, we went to see Patrick on Valentine.

23  Q.  When you said "we," who went to see Patrick?

24  A.  It was myself, Shortie and Gordo.

25  Q.  Who was driving?

D2p0fer5                        Reyes - direct

1   A.  I was driving.

2   Q.  Whose car did you go in?

3   A.  It was Gordo's car.

4   Q.  What kind of car was it?

5   A.  A white Honda Accord.

6   Q.  So you were driving.  Who was sitting in the passenger's

7   seat?

8   A.  El Gordo.

9   Q.  And where was Shortie sitting?

10  A.  Behind me.

11  Q.  You said you went to Valentine to meet up with Patrick.  Do

12  you know why you went there?

13  A.  Yes.

14  Q.  Why?

15  A.  Well, that's where we went to speak to Patrick about the

16  job he was going to do.

17  Q.  Did that meeting take place?

18  A.  Yes, it occurred inside the car.

19  Q.  So did Patrick get in the car?

20  A.  Yes.

21  Q.  Where was he siting?

22  A.  Behind Gordo.

23  Q.  So, tell the jury what you heard being said, and who you

24  heard being -- who you heard saying it inside that car.

25  A.  Well, since Gordo was Patrick's cousin, he was the one who

D2p0fer5                              Reyes - direct

1    decided to talk.  So he talked to Patrick about the job.  He

2    said that Jeffrey had ordered the Mexicans to be killed.

3              Well, according to what I can remember, that's mainly

4    what I can remember right now.  But Patrick didn't -- he was in

5    agreement.

6    Q.  Was there a discussion about whether Patrick would be paid.

7    A.  Yes, he was going to be paid $120,000.

8    Q.  And how was that gonna be divided up, from you.

9    A.  Well, Gordo said we had to put the money in; Gordo and

10   Shortie.  So each one of us had to give $40,000, to give it to

11   Patrick.  And Patrick said, yes, but he was going to go with a

12   cousin of his.

13   Q.  Now, do you know whether anybody ever paid Patrick more

14   money?

15   A.  No, I don't know.

16   Q.  Did you eventually contribute $40,000 towards the payment

17   to Patrick?

18   A.  Yes.

19   Q.  So, do you know whether Patrick agreed to do it?

20   A.  Yes, he agreed.

21   Q.  Was there a discussion about what role, if any, you were

22   going to have?

23   A.  Yes, I said that I was the one who was going to bring the

24   Mexicans to the place.  So when I got there, I was supposed to

25   beep Patrick, giving him the hour more or less that I got

D2p0fer5                          Reyes - direct

1    there, the time that I got there.

2    Q.  And did you have a decision about what the -- the story

3    that would be told to the Mexicans about why they were coming

4    to that apartment?

5    A.  Oh, they were going to the apartment to count the money

6    from the drugs that had been sold.

7    Q.  Is that what they were told?

8    A.  Yeah, Jeffrey had looked for them so that I could take them

9    over there.

10           THE COURT:  Jeffrey what?

11           THE WITNESS:  Looked for them.

12   BY MR. BLANCHE:

13   Q.  Just to be clear was that ever going to be what actually

14   happened?

15   A.  Yes.

16   Q.  What I mean is was somebody going to go up to the apartment

17   and count the money?

18   A.  No.

19   Q.  What was really supposed to happen?

20   A.  Once they entered the building, Patrick, with his cousin,

21   were going to kill him.

22   Q.  Now, at what point did you, Gordo and Shortie, receive your

23   share, meaning the 2.5 million or, whatever you were going to

24   receive?

25           THE INTERPRETER:  Ask the witness to repeat.

1   A.  We counted that money one night before.

2   Q.  The night before the murders?

3   A.  Before the murders, correct.

4   Q.  And who counted the money?

5   A.  Well, Shortie counted it.  Gordo counted it.  I counted it.

6   Q.  Where did the three of you get the money from?

7   A.  Part of it was the -- from the money that we had sold from

8   the drugs that we had sold, and the other part was at an

9   apartment that Jeffrey told us to go to on Pelham Parkway.

10  Q.  Do you know whose apartment that was?

11  A.  No, I didn't know, but that apartment belonged to

12  Geoffrey's people.

13  Q.  Were you there when you went and picked up that money?

14  A.  Yes, it was myself, Shortie and Gordo who went.

15  Q.  So how did you go to pick up the money?

16  A.  It was in an SUV that I had, a Bravada.

17  Q.  Did you go to the apartment building?

18  A.  Yes.

19  Q.  And how did you get the money out of that apartment?

20  A.  Well, I remember that we went in.  It had underground

21  parking.  And it had an elevator.  We took the money out in

22  boxes and in suitcases.  Yeah, because there was also quite a

23  few kilos of cocaine there.

24  Q.  When did you take your share of the proceeds away.

25  A.  Well, I took my part one night before the Mexicans were

D2p0fer5                          Reyes - direct

1    murdered.

2    Q.  And where did you take --

3            THE COURT:  So I don't understand the relationship of

4    the money.  Maybe you can clear that up.

5            MR. BLANCHE:  Sure.

6            THE COURT:  Let me ask a few questions.

7            First when Jeffrey Minaya got the drugs, the cocaine,

8    from the Mexicans, did he have to pay a certain amount?

9            THE WITNESS:  Yes.

10           THE COURT:  So when you sold the drugs for Jeffrey,

11   whatever money you took in was yours except for the price you

12   had to pay; right?

13           THE WITNESS:  No.

14           THE COURT:  Explain it.

15           THE WITNESS:  Okay.

16           Jeffrey had his group, a separate group.

17           THE COURT:  Okay.

18           THE WITNESS:  Different from Gordo, Shortie and

19   myself.

20           THE COURT:  So you, Shortie, and Gordo, was one group,

21   and Jeffrey had other groups?

22           THE WITNESS:  Yes, because Gordo received the drugs

23   from Jeffrey.  And once Gordo receives it, so then we're -- the

24   three of us are in charge of those drugs.

25           THE COURT:  And what happens to the money from those

D2p0fer5                              Reyes - direct

1    drugs?

2              THE WITNESS:  According to what I heard, he had

3    received like 300, 400 kilos less, but that I don't really

4    know.

5              THE COURT:  No.  Were the drugs that you sold, you and

6    Shortie and Gordo, were the drugs you sold, where did you keep

7    the money?

8              THE WITNESS:  Well, as we were selling the drugs, part

9    of it we would give to Jeffrey.  And the other part we always

10   stashed in the trap in the closet.

11             THE COURT:  So why did you go to Geoffrey's house to

12   get more money the night before the murder.

13             THE WITNESS:  That money that we went to get, it was

14   because Jeffrey had called Gordo.  And he had told them to go

15   and pick up some money that was in an apartment on Pelham

16   Parkway, okay.  And because that was money, that was being

17   watched over by a fellow, but the police had busted in.  The

18   police had gotten them in the street and he didn't want the

19   money left in the apartment.

20             (Continued on next page)

21

22

23

24

25

1          THE COURT:  And what were you going to do with the

2    money you got from that Pelham Parkway apartment?

3          THE WITNESS:  We were going to take that money back to

4    the apartment that we had, to our trap, and that money, along

5    with the money that we had, that's how we got to that amount.

6          THE COURT:  What amount?

7          THE WITNESS:  2.5.

8          THE COURT:  $2.5 million?

9          THE WITNESS:  Yes, correct.

10          THE COURT:  What was the purpose of going to the

11    apartment, to count all this money?

12          THE WITNESS:  I remember that Gordo told us that

13    Jeffrey had said we were to take the money to our apartment.

14    Q.  Do you know how much other money Jeffrey had collected

15    besides the 2.5 million that you had?

16    A.  I don't know the exact amount.  I heard that Jeffrey had

17    taken $3 million.

18    Q.  Who did you hear that from?

19    A.  Gordo and Shorty told me that.

20    Q.  I think you had mentioned this.  Just to be clear, who was

21    responsible for paying Patrick?

22          MR. RICHMAN:  Objection.  Asked and answered.

23          THE COURT:  Overruled.

24    A.  Gordo.

25    Q.  Now, you said you took the money, your cut, the night

D2PMFER6                        Reyes – direct

1    before the murders.

2              What did you do with it?

3    A.  I took it with me and I gave it to an uncle of mine to put

4    away.

5    Q.  What's your uncle's name?

6    A.  He died already.

7    Q.  What was his name?

8    A.  Oh, Jesus.

9              THE COURT:  Is that his name?

10             THE WITNESS:  No.  Adolfo Riple.

11   Q.  Now, I want to now talk about the day of the murders, okay?

12   A.  Okay.

13   Q.  When you woke up, where had you spent the night?

14   A.  In New Paltz.

15   Q.  What happened when you woke up?

16   A.  Well, when I woke up I had breakfast over there.  I took my

17   time.  I then came into the city.  I had called up Gordo and

18   the rest of the guys to tell them that I was going to pick up

19   the Mexicans.

20   Q.  How did you know where to go to pick up the Mexicans?

21   A.  Jeffrey had given me their phone numbers for me to call

22   them, and they said that they were in the downtown area.

23   Q.  Downtown Bronx or downtown Manhattan?

24   A.  Downtown Manhattan.

25   Q.  So you called him and they told you that.  And where did

1    you go?

2    A.  He told me they were getting haircuts at a barber shop.

3    Q.  Where did you meet him?

4    A.  In front of a barber shop downtown.

5    Q.  What kind of car were you driving that day?

6    A.  An Acura Integra.

7    Q.  What color was the Acura Integra?

8    A.  Burgundy.

9    Q.  When you arrived where they were, did you go to the barber

10   shop?

11   A.  I parked in front of the barber shop, one of them wasn't

12   done, so I waited for about five minutes.

13   Q.  One of them wasn't done getting their haircut?

14   A.  Correct.

15   Q.  Do you remember whether one of them was much older looking

16   than the other?

17   A.  Yes.

18   Q.  The person who was not done, was that the older person or

19   the younger person?

20   A.  The younger one.

21   Q.  So what happened next?

22   A.  Well, they finished, they got into the car.  I told them

23   that I was going to drive them to the apartment where the money

24   was, and that Jeffrey had told me to go and pick them up.

25   Q.  While you were driving the Mexicans, did you call anybody?

D2PMFER6                      Reyes - direct

1    A.  Yes.  I had called and spoken to Gordo, Jeffrey.

2    Q.  About what time of the day was this?

3    A.  Like noon, middle of the day.

4    Q.  Now, did you take him to the apartment building?

5    A.  I took him to the building, yes.

6    Q.  Where did you park?

7    A.  I parked on the right-hand side five car lengths away from

8    the building.

9    Q.  What happened next?

10   A.  We arrived, we parked, they exited the car on the left-hand

11   side.  I exited the car on the right-hand side.  We went to the

12   building.  I opened the door.  One Mexican went in, then I went

13   in, and then the second Mexican.  We went towards the elevator.

14   Q.  So as part of the plan, at what point was the murder

15   supposed to happen?

16   A.  Repeat the question again, please.

17          THE COURT:  What was supposed to happen next?

18          THE WITNESS:  Well, the next thing that happened was I

19   pressed the elevator button.  I was standing there, I was sort

20   of nervous.  The guys came out shooting from the left-hand

21   side.  When I saw the guy who was to my right lower himself I

22   looked, I saw the two guys, but I noticed Patrick's face.  So I

23   ran up the steps.

24          MR. BLANCHE:  We can put up Government Exhibit 25,

25   please.

D2PMFER6                        Reyes - direct

1    Q.  You see Government Exhibit 25, sir?

2    A.  Yes.

3    Q.  Had you seen that before in your discovery in the case?

4    A.  Yeah, I had seen him once.

5    Q.  So you said you pressed the elevator door button.  Is that

6    the elevator door button that we are looking at right there

7    where that laser pointer is right there?

8    A.  Yes.

9    Q.  Now, you just went through what happened pretty quickly.  I

10   want you to slow down and talk about what happens from the time

11   that you are standing at the elevator door, who is where,

12   meaning which Mexican is on which side of you and what you see.

13   And if it's easier for you to stand up and act like you are

14   right there, please do so.

15   A.  Fine.

16   Q.  Go on.

17   A.  We go into the building.  This is the elevator right here

18   in front of me.  The door is in front of the elevator.  Once we

19   go in, I press the elevator.

20        THE COURT:  You said that one Mexican came in first,

21   then you came and then the other Mexican came in.  Is that how

22   you came into the building?

23        THE WITNESS:  Yes.  Because I had opened the door.

24   When the gentleman went in --

25        THE COURT:  You opened the door for one of them but

D2PMFER6                           Reyes - direct

1    not for the second one?

2              THE WITNESS:   The other one was behind me.   So when we

3    went in he was there near the door.   So when he went in I went

4    in after him, and then he went in as well.

5              THE COURT:   Go ahead.

6    A.   We were there.   Then the guys came out from the left-hand

7    side.

8    Q.   Just looking at the picture on Government Exhibit 25 and

9    also where you're standing right now, where are the two victims

10   from where you're standing right now?

11   A.   If I remember correctly, one was on this side and the other

12   one was on this side.   I was in between the two of them.

13   Q.   One was on your right, one was on your left?

14   A.   You could say that.

15   Q.   I don't want to say that.   Is that the truth?

16   A.   Yes.

17   Q.   So with them standing right there you say you see two

18   people come out.   From which side did you see them come out?

19   A.   From the left.

20   Q.   So from the left if you're facing the elevator up on

21   Government Exhibit 25?

22   A.   Yes, from the left.

23   Q.   Can you point to where you're talking about using this

24   pointer?

25   A.   From this area.

D2PMFER6                         Reyes - direct

1    Q.   Indicating the side entranceway to the left of the

2    elevator?

3    A.   Yes.

4    Q.   What do you see?

5    A.   When I heard the first shot, when I turned around I saw

6    Patrick and the other guy and I ran up the steps.

7    Q.   When you said you ran up the steps, you ran up the steps

8    that are in this picture on Government Exhibit 25?

9    A.   Yes.

10   Q.   You say that you saw Patrick and the other guy.  Who was

11   first?

12   A.   I really don't remember or I couldn't pinpoint who came out

13   first because everything was quick.  But I saw Patrick with a

14   hoodie.

15   Q.   Did you see Patrick's face?

16   A.   Yes.

17   Q.   Did you see what the second shooter was wearing?

18   A.   I don't remember that.

19   Q.   Did you see the second shooter's face?

20   A.   No.

21   Q.   Have a seat, please.

22            Do you have any doubt that there was a second shooter?

23   A.   Of course, there were.

24   Q.   Did you see anything covering the second person's head and

25   face?

D2PMFER6                          Reyes - direct

1           MR. RICHMAN:  Objection.  Leading.

2           THE COURT:  Overruled.

3    A.  I don't remember that.

4           MR. BLANCHE:  You can take that down, Ms. Quinones.

5    Thank you.

6    Q.  You said you heard one shot and ran up the stairs, correct?

7    A.  Well, I mean, I heard the first shot and, you know, there

8    were other shots as I was running, there were other shots.

9    It's just that I was going to stand there and be shot myself,

10   so I ran.

11   Q.  Where did you run to?

12   A.  I ran up the steps on the left-hand side.  I ran up.

13   Q.  How far up the stairs did you run?

14   A.  To the fourth floor.

15   Q.  Where did you go?

16   A.  When I went up, I went crazy and I ran around, and then I

17   ran down again.

18   Q.  While you were running up and running around crazy on the

19   fourth floor, what, if anything, did you hear?

20   A.  I heard the echos of the shots.

21   Q.  You said you came back down?

22   A.  Yes, I came down.

23   Q.  How did you come back down?

24   A.  I ran down or I came down the other set of steps.

25          MR. BLANCHE:  Can you put up Government Exhibit 25 one

D2PMFER6                        Reyes - direct

1    more time, please.

2    Q.  So the stairs that we are looking at in Government Exhibit

3    25, you did not come back down those stairs?

4    A.  No.  I came down on the other set of steps, which is this

5    way.

6    Q.  This way, meaning to the right of the elevator on

7    Government Exhibit 25?

8    A.  Correct.

9             THE COURT:  You ran up when you heard other shots.

10   When did you hear the other shots as you were running up?

11            THE WITNESS:  Well, primarily, I heard the shots, but

12   what you heard a lot were the echos because there was no one in

13   that building.

14            THE COURT:  Did you hear the shots before you ran up

15   or while you were running up?

16            THE WITNESS:  Before and as I was running up the

17   steps.

18   Q.  When you ran back down the other stairs, what did you see?

19   A.  When I came down I saw the two Mexicans there in blood and

20   I ran.  I ran to the car.

21   Q.  You ran out the building?

22   A.  Well, I didn't run out of building.  I walked out quickly.

23   Q.  Where did you go when you got back in your car?

24   A.  When I got into my car I turned the car on and I drove back

25   to the block to meet with Gordo and Shorty.

D2PMFER6                      Reyes - direct

1   Q.   What block was that?

2   A.   The block on Phelan.

3          MR. BLANCHE:   You can take that down, Ms. Quinones.

4   Thank you.

5   Q.   Did you meet with Gordo and Shorty when you returned to

6   that block?

7   A.   Yes.

8   Q.   What, if anything, did you say to them?

9   A.   That I saw the guys coming up from the left-hand side and

10  that they had killed the Mexicans, and that I ran up the steps

11  because I got scared because they were shooting from the

12  left-hand side and I thought that they were going to hit me as

13  well.

14  Q.   You've talked about using your cell phone to contact the

15  Mexicans on that day, correct?

16  A.   Yes, I used them to make a phone call.

17  Q.   Did you have a conversation with Gordo and Shorty about

18  your cell phone?

19  A.   Yes.

20  Q.   What did you say to them?

21  A.   That I made a mistake and that I used my own cell phone to

22  call the Mexicans.

23  Q.   Why did you say that that was a mistake?

24  A.   Because now they are dead and the last call they get is a

25  call from me and now they are going to come and investigate.

D2PMFER6                          Reyes - direct

1    Q.  By the way, you said you used your own cell phone.  Was

2    that cell phone in your name?

3    A.  No.

4    Q.  Do you know whose name it was in?

5    A.  Yes.  Gloria's name.

6    Q.  Who is Gloria?

7    A.  Gloria is Nancy, my former girlfriend.  Same name, same

8    person.

9    Q.  Her name is Gloria, but you also call her Nancy?

10   A.  Yes.

11   Q.  You remember her last name?

12   A.  Trujillo.

13   Q.  Now, the car that you drove that day, the Acura Integra,

14   the burgundy Acura Integra, whose car was that?

15   A.  Well, that was my car, but I had given it to Nancy as a

16   gift.

17   Q.  Do you know whose name it was in?

18   A.  Her name.

19   Q.  But you used it?

20   A.  Yes.

21   Q.  Do you remember whether Ms. Trujillo used it as well?

22   A.  Yes, of course.

23   Q.  By the way, do you have any children with Ms. Trujillo?

24   A.  A little girl.

25   Q.  Do you know how old she is now?

D2PMFER6                          Reyes - direct

1   A.  I really don't know.

2   Q.  What happened next after you had that discussion on the

3   block with Gordo and Shorty?  What happened next?

4   A.  Well, I was on my way upstate, but I had to call Nancy and

5   tell her to report the phone lost or stolen.  So when I saw her

6   I told her to do that and she asked me what had happened and I

7   said to her, don't ask any questions, I don't like to tell you

8   my business.

9   Q.  You said you were going back upstate.  You mean your home?

10  A.  I was going home, I was nervous, and Gordo had told me to

11  go home.

12  Q.  Where did you go next?

13  A.  After that, I left for Santo Domingo.

14  Q.  How long after the meetings did you leave for Santo

15  Domingo?

16  A.  Few days later.

17  Q.  By the way, that cell phone that was in Ms. Trujillo's

18  name, did you use that cell phone to call outside of the State

19  of New York?

20  A.  Yes, I used it to make phone calls out of state and all

21  over the place.

22  Q.  Then you went to Santo Domingo in the Dominican Republic,

23  correct?

24  A.  Yes, correct.

25  Q.  Where have you lived since the murders?

D2PMFER6                         Reyes - direct

1    A.  From the time that the murders occurred?

2    Q.  Yes.

3    A.  In the DR.

4    Q.  Pardon me?

5    A.  In the DR, Dominican Republic.  Primarily, living in the

6    Dominican Republic, but traveling to Miami and the Dominican

7    Republic.

8            THE COURT:  And not coming back to New York?

9            THE WITNESS:  I came back to New York several times,

10   but I would leave right away.

11   Q.  Did you ever learn whether the police contacted

12   Ms. Trujillo?

13   A.  Yes.

14   Q.  How did you learn that?

15           MR. RICHMAN:  Objection.

16           THE COURT:  Overruled.

17   A.  Well, I found out through her mother.

18   Q.  Now, I don't want you to go into what her mother told you

19   the police said.  Okay?

20   A.  Okay.

21   Q.  Based upon that conversation, what happened with your

22   relationship with Ms. Trujillo?

23   A.  It didn't work out.

24           MR. BLANCHE:  May I have one moment with defense

25   counsel, your Honor?

D2PMFER6                    Reyes - direct

1           THE COURT:  Yes.

2    Q.  Now, you said you primarily lived in the Dominican Republic

3    since the time of the murders, correct?

4    A.  Yes, correct.

5    Q.  Did you continue to sell drugs in the Dominican Republic?

6    A.  Yes.

7    Q.  Now, were you selling drugs that, based upon what you know,

8    were being sent to the United States, or somewhere else?

9    A.  Somewhere else.

10   Q.  Where?

11   A.  Europe.

12   Q.  What kind of drugs?

13   A.  Cocaine.

14   Q.  While you were in the Dominican Republic from 2000 until

15   you were arrested, did you own guns?

16   A.  Yes.

17   Q.  Now, did you also have legitimate jobs in the Dominican

18   Republic?

19   A.  Yes.

20   Q.  What kind of work did you do?

21           MR. RICHMAN:  Relevancy, your Honor.

22           THE COURT:  Sustained.

23           MR. BLANCHE:  I'll withdraw the question, Judge.

24           THE COURT:  Are you finished?

25           MR. BLANCHE:  Am I finished?  Not yet, your Honor.  We

D2PMFER6                        Reyes - direct

1   still have to go through his cooperation, your Honor.  I don't

2   know if you wanted to do that now.

3             THE COURT:  You have seven minutes.

4             MR. BLANCHE:  Yes, your Honor.

5   Q.  So you said you were arrested in Miami, correct?

6   A.  Correct.

7   Q.  Did you also work in Miami at times?

8   A.  Yes.

9   Q.  Now, by the way, that day of the murder, did you have a gun

10  on you?

11  A.  No.

12  Q.  During that time period, when you were working with Gordo

13  and Shorty, did you have guns on you ever?

14  A.  Yes, at the apartment.

15  Q.  The same apartment where the murders took place?

16  A.  Yes.

17  Q.  Did you ever carry that gun out of the apartment?

18  A.  No.

19  Q.  Before we get to your cooperation I just want to ask one or

20  two more questions about the murder scene.

21            I believe you testified that you heard one shot and

22  then ran.  What did you see --

23            MR. RICHMAN:  Objection.  That is not the testimony,

24  your Honor.

25            MR. BLANCHE:  I'll withdraw it and ask him what he

1   said.

2              THE COURT:  If I keep my mouth shut, I get more

3   progress than if I rule on objections.

4              MR. BLANCHE:  I'm happy to withdraw, your Honor, and

5   ask a new question.

6   Q.  How many shots did you hear before you started running?

7   A.  From the time that I heard the first one I started running.

8   As I was running up the steps I heard more.  I can't tell you

9   if I heard two or three because it was quick.

10  Q.  What did you see as far as the two victims?

11  A.  Well, with respect to the two victims, the only thing that

12  I saw were the two guys who came out from the left-hand side.

13  As I was going up, I saw Patrick's face.  The other one I don't

14  remember.

15  Q.  The two men who died, did you see whether either of them

16  fell?

17  A.  The one who was to my left was the one who fell down first.

18             THE COURT:  Where did you see him fall?

19             THE WITNESS:  He went down this way.

20             THE COURT:  Forward on his face, right?

21             THE WITNESS:  I didn't see him fall all the way down.

22  He just doubled over.  He held his hands like this.

23             THE COURT:  Like how?  He holds his hands on his belly

24  and he fell forward?

25             THE WITNESS:  Yes.

D2PMFER6                      Reyes - direct

 1              THE COURT:  And you ran up the stairs?

 2              THE WITNESS:  I went up the steps.

 3   Q.  Now, after your arrest in this case in December of 2010,

 4   did there come a time when you decided to cooperate with the

 5   government?

 6   A.  Yes.

 7   Q.  When was that?

 8   A.  After having been here for about six, seven, or eight

 9   months.

10   Q.  Now, at some point did the government agree to meet with

11   you?

12   A.  Yes.

13   Q.  And at those meetings which the jury has heard about

14   already, government lawyers were there, correct?

15   A.  Yes.

16   Q.  And your lawyer was there as well?

17   A.  Yes.

18   Q.  And federal agents?

19   A.  Yes.

20   Q.  What kind of things did you talk about at those meetings?

21   A.  I spoke about my criminal life here.  I spoke about the

22   murders.

23   Q.  After meeting with the government --

24              THE COURT:  One minute.  It's almost 4:30.  Another

25   five minutes I think Mr. Blanche will finish his examination,

D2PMFER6                          Reyes - direct

1    right?

2              MR. BLANCHE:  Yes, your Honor.

3              THE COURT:  I don't want to make anyone have

4    difficulty in keeping an appointment.  I told you we would

5    break at 4:30.  If we go another five minutes, would we be

6    okay?  May we?  Who has to leave?  If it's not okay, we will

7    stop.

8              JUROR:  It is not.

9              THE COURT:  It's not okay.  We stop right now.

10             The jury, fold up your books, give them to Ms. Jones.

11             I'll see you tomorrow at 10:00.  Don't discuss the

12   case.  Keep an open mind.

13             (Jury not present)

14             MR. BLANCHE:  Your Honor, I believe the interpreter --

15             THE COURT:  Interpreter step aside.

16             Anything for me or we just meet tomorrow at 10?

17             MR. BLANCHE:  Tomorrow at 10.

18             THE COURT:  Anything for me now?

19             MR. BLANCHE:  Your Honor, I believe the interpreter

20   wanted to put something on the record.

21             INTERPRETER ILIAKOSTAS:  Your Honor, when Mr. Blanche

22   was questioning the witness about which victim got shot first,

23   he went like this to me.  He said, right or left?  Which one is

24   my right, which one is my left?  I just wanted to put that on

25   the record.

D2PMFER6

1              THE COURT:  Thank you.

2              MR. BLANCHE:  Nothing from the government right now.

3              MR. RICHMAN:  Most respectfully, I think that should

4    be brought to the attention of the jury, since it's very

5    important in describing what occurred.

6              MR. BLANCHE:  I'll ask some questions in the morning,

7    your Honor.

8              THE COURT:  All right.  Recess.

9              (Adjourned to Tuesday, February, 26, 2013, at 10:00

10   a.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                            INDEX OF EXAMINATION
2       Examination of:                              Page
3       DANIEL AUSTIN
4       Direct By Mr. Blanche . . . . . . . . . . . 470
5       Cross By Mr. Richman . . . . . . . . . . . . 504
6       Redirect By Mr. Blanche . . . . . . . . . . 520
7       SUSAN ELY
8       Direct By Mr. Capone . . . . . . . . . . . . 525
9       Cross By Mr. Richman . . . . . . . . . . . . 554
10      RICHARD JOSE CORREA
11      Direct By Mr. Cronan . . . . . . . . . . . . 558
12      Cross By Mr. Richman . . . . . . . . . . . . 598
13      ALBERTO REYES
14      Direct By Mr. Blanche . . . . . . . . . . . 602
15                           GOVERNMENT EXHIBITS
16      Exhibit No.                              Received
17       in evidence 20-36, except those previously   478
18       41-47, except those previously    . . . . . 478
19       51    . . . . . . . . . . . . . . . . . . . 530
20       60    . . . . . . . . . . . . . . . . . . . 542
21       50    . . . . . . . . . . . . . . . . . . . 544
22       51B, 51C, 50D  . . . . . . . . . . . . . . 548
23       61    . . . . . . . . . . . . . . . . . . . 552
24       3502-D  . . . . . . . . . . . . . . . . . . 595
25
```