D2QMFER1

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                           10 Cr. 863 (AKH)

5    JOE FERNANDEZ,

6              Defendant.

7    ------------------------------x

                                           New York, N.Y.
8                                          February 26, 2013
9                                          10:00 a.m.

10

     Before:
11
                    HON. ALVIN K. HELLERSTEIN,
12
                                           District Judge
13

14                        APPEARANCES

15   PREET BHARARA
          United States Attorney for the
16        Southern District of New York
     TODD BLANCHE
17   RUSSELL CAPONE
     JOHN P. CRONAN
18        Assistant United States Attorneys

19   MURRAY RICHMAN
     BRIAN PAKETT
20        Attorneys for Defendant

21

22   ALSO PRESENT:   SHAWN MacDONALD, DEA
                     VANESSA QUINONES, Paralegal
23                   DON TAYLOR, Paralegal
                     ELIZABETH ILIAKOSTAS, Interpreter
24                   DENA MILLMAN, Interpreter

25

D2QMFER1

1              (Trial resumed; jury not present)

2              MR. RICHMAN:  If the Court pleases, just as a

3    reminder, the Court interpreter indicated --

4              THE COURT:  I remember.

5              If you want to say something, say it right away

6    interpreter

7              INTERPRETER ILIAKOSTAS:  I tried.

8              THE COURT:  No, you didn't.

9              INTERPRETER ILIAKOSTAS:  Yeah, I did.

10             THE COURT:  No, you didn't.

11             Interpreters, you can slow down the process.  You

12   don't have to interpret so quickly.

13             Do you know where in the transcript, Mr. Richman?

14             MR. RICHMAN:  That would be at the very end, sir.

15             THE COURT:  I know.  But I don't have a line number.

16             MR. RICHMAN:  I don't have the transcript.

17             THE COURT:  How about the government?

18             MR. BLANCHE:  Yes, your Honor.

19             THE COURT:  Why don't you have the daily transcript?

20             MR. RICHMAN:  We don't have the money enough to have

21   the transcript.

22             THE COURT:  You're not CJA.

23             MR. RICHMAN:  That's right.

24             MR. BLANCHE:  Your Honor, it begins on page 644, line

25   21, when the interpreter tells the Court.

D2QMFER1

1            I think I gave you a different citation, Judge.

2            THE COURT:  Mr. Richman, look at Mr. Blanche's

3    transcript and see if you can both identify the line where I

4    need to make this clearer.

5            MR. BLANCHE:  Your Honor, I believe it's page 632.

6            THE COURT:  Please work together with Mr. Richman.

7            MR. RICHMAN:  We are agreeing.

8            MR. BLANCHE:  Page 632, your Honor.  The question --

9            THE COURT:  Wait a minute.  Let me get it.  It comes

10   up a number of times.  I think it's a little later.

11           Whoever the interpreter was at that point, would you

12   go up to Mr. Richman and Mr. Blanche and see if you can

13   identify the particular item.

14           Look at 642, also, line 11.

15           Can I suggest this, gentlemen.  When the jury comes

16   in, I'll tell the jury that after they left the interpreter

17   remarked that when Mr. Reyes was asked from where the men with

18   guns came.

19           INTERPRETER ILIAKOSTAS:  That's not the question, your

20   Honor.  It's when he started explaining who got the shot first.

21           THE COURT:  That's it.  I'll say it that way.  When he

22   started to explain who was shot first and how he doubled over,

23   before he answered from the right or the left.

24           INTERPRETER ILIAKOSTAS:  He said the person to my left

25   doubled over, and then right after he said the person to my

D2QMFER1

1    left doubled over, he went like this under the table.

2              THE COURT:  You know what, Ms. Iliakostas, why don't

3    you explain it just like that.

4              MR. BLANCHE:  That's fine with the government.

5              MR. RICHMAN:  Fine with the defense.

6              THE COURT:  Let's bring in the jury.

7              (Jury present)

8              THE COURT:  We are going to go to 4:00 today, ladies

9    and gentlemen.  I have another matter that I have to get to.

10   And then we will be recessed until Monday morning.

11             Mr. Reyes is still on the witness stand.

12             You are reminded, Mr. Reyes, that you remain under

13   oath.

14             THE WITNESS:  Fine.

15    ALBERTO REYES, resumed.

16             THE COURT:  Immediately after you left, ladies and

17   gentlemen, the interpreter brought to my attention a certain

18   aspect of the interpretation that she elaborated on, and I

19   think we should hear it.  So I'll ask Ms. Iliakostas to tell

20   the jury what she told me.

21             INTERPRETER ILIAKOSTAS:  For the record, Elizabeth

22   Iliakostas, United States Certified Court Interpreter.

23             When Mr. Blanche was questioning Mr. Reyes about who

24   was the victim who was shot first, the victim who doubled over,

25   Mr. Reyes on the stand said the victim to the left and that is

D2QMFER1

1    What I interpreted.  Right after he said that, under the table,

2    Mr. Reyes said, to the left or the right.  Wait.  This is my

3    right.

4            I am not allowed to have any conversation with a

5    witness outside of the presence of the jury or outside of the

6    questioning.  It's not ethical.  So, therefore, when we

7    recessed for the day I brought it to the judge's attention.

8            THE COURT:  Mr. Reyes, you testified about the person

9    who was first shot.

10           Do you remember?

11           THE WITNESS:  Yes.

12           THE COURT:  Was that person on your left or on your

13   right or in front of you or in back of you?

14           THE WITNESS:  To my right, leaning a little bit

15   towards the back or to the right.

16           THE COURT:  So the person who was first shot was on

17   your right side?

18           THE WITNESS:  Yes, the younger man who was to my

19   right.

20           THE COURT:  And you were facing what?

21           THE WITNESS:  I was facing the elevator but towards my

22   right.

23           THE COURT:  And was the man who was shot to your right

24   on your side, a little in front of you, a little in back of

25   you?

D2QMFER1

1          THE WITNESS:  Well, he was at that point telling me

2      that he was going to get married, and he was a little bit

3      towards my back to the right and towards my back.

4          THE COURT:  Mr. Blanche, you can continue.

5          MR. BLANCHE:  Yes.  Thanks, Judge.

6          THE COURT:  Mr. Richman, is there anything that you

7      want to inquire about right now?  I'll let you do it.

8          MR. RICHMAN:  I'm okay with it.

9          THE COURT:  Good.

10     DIRECT EXAMINATION (cont'd)

11     BY MR. BLANCHE:

12     Q.  Good morning, Mr. Reyes.

13     A.  Good morning.

14     Q.  Yesterday I was asking you about your relationship with

15     Ms. Trujillo and you said you had a child with her, is that

16     correct?

17     A.  Yes.

18     Q.  You said you didn't know how old she was?

19     A.  Correct.

20     Q.  When the murders took place in 2000, was she born yet?

21         MR. RICHMAN:  Objection.

22         THE COURT:  Sustained.

23     Q.  Do you know approximately how old your child is?

24         MR. RICHMAN:  Objection.  Relevance.

25         THE COURT:  Sustained.

D2QMFER1                    Reyes - direct

1   Q.  Now, yesterday you testified that you used a phone that was

2   in Ms. Trujillo's name, correct?

3   A.  Yes.

4   Q.  Do you remember the phone number, what the digits were?

5   A.  No.

6   Q.  When did you stop using that phone?

7   A.  The day the Mexicans were killed.

8   Q.  At the end of the day yesterday we were talking about your

9   cooperation with the government.

10  A.  Yes.

11  Q.  After meeting with the government did you eventually plead

12  guilty to crimes that you had committed?

13  A.  Yes.

14  Q.  What crimes did you plead guilty to committing?

15  A.  Murder, crimes of murder.

16  Q.  What types of crimes of murder?

17  A.  That we killed two people and also drugs.

18  Q.  Have you been sentenced yet for your role in the murders?

19  A.  No.

20  Q.  What is your understanding of the maximum sentence that you

21  face based upon what you pled guilty to?

22  A.  Life.

23  Q.  What is your understanding of the minimum term of

24  imprisonment you face based upon the crimes that you pled

25  guilty to?

D2QMFER1                        Reyes - direct

1   A.  Life.

2   Q.  In connection with your guilty plea did you enter into an

3   agreement with the government?

4   A.  Yes.

5   Q.  I'm showing you what's been marked for identification as

6   3509-B.

7           Do you recognize that document?

8   A.  Yes.

9   Q.  Is your signature on the last page?

10  A.  Yes.

11  Q.  What is that?

12  A.  This is a letter about the government giving me the 5K1

13  letter.  Well, they haven't given it to me yet.  They are

14  planning on giving it to me.

15  Q.  That's your cooperation agreement?

16  A.  Yes.

17  Q.  You just said a 5K1 letter.  What's a 5K1 letter?

18  A.  It's something that the judge can take into consideration.

19  Q.  Who writes that letter?

20  A.  The government.

21  Q.  Who does the government write the letter to?

22  A.  To the judge.

23  Q.  Now, you said that the government was planning on writing

24  that letter to the judge.

25          What do you have to do to get that letter?

D2QMFER1                        Reyes – direct

1   A.  I have to tell the whole truth and I have to cooperate in

2   any respect that they ask me to.

3          MR. BLANCHE:  By the way, your Honor, the government

4   offers 3509-B into evidence.

5          MR. RICHMAN:  No objection.

6          THE COURT:  Received.

7          (Government's Exhibit 3509-B received in evidence)

8   Q.  If you violate the terms of that agreement that you have in

9   front of you, what happens?

10          MR. RICHMAN:  Objection to the form of the question.

11          THE COURT:  Overruled.

12  A.  Well, automatically the government will rip up the letter.

13  Q.  Rip up the letter.  You mean that document in front of you?

14  A.  Correct.

15  Q.  Now, what's your understanding of how you can violate the

16  terms of that agreement?

17  A.  Lying.

18  Q.  And if you lie and the government doesn't write that

19  letter, how long will you go to jail?

20  A.  The rest of my life.

21  Q.  So if the government does write that letter to the judge,

22  what is your understanding of what that allows the judge to do?

23  A.  He can reduce my sentence.

24  Q.  And is it fair to say that that's why you're testifying

25  today?

D2QMFER1                        Reyes - direct

1    A.  Yes.

2              MR. BLANCHE:  Your Honor, no further questions.

3              THE COURT:  Cross-examination, Mr. Richman.

4              MR. RICHMAN:  Yes, your Honor.

5    CROSS-EXAMINATION

6    BY MR. RICHMAN:

7    Q.  Good morning, Mr. Reyes.

8    A.  Good morning, sir.

9    Q.  You pled guilty because you were guilty, correct?

10   A.  Yes.

11   Q.  You would not plead guilty if you were not guilty?

12             MR. BLANCHE:  Objection.

13             THE COURT:  Overruled.

14   A.  Yes, that's true.

15   Q.  And you have a long history of criminal conduct, do you

16   not?

17   A.  Yes.

18   Q.  And while you were in jail you heard persons talk in jail

19   of the benefits they can get by, quote, cooperating with the

20   government, is that right?

21   A.  Yes, that's correct.

22   Q.  And would it be fair to say that many people within the

23   jail itself look for opportunities to find something to

24   cooperate with the government about, if you know?

25             MR. BLANCHE:  Objection.

1          THE COURT:  Sustained to the form.

2    Q.  Mr. Blanche asked you a question concerning what would

3    happen if you violated the agreement, correct?

4    A.  Yes.

5    Q.  And that's if they had found out, is that right?

6    A.  Yes.

7    Q.  And you had heard no doubt that Patrick violated the

8    agreement and nothing happened?

9          MR. BLANCHE:  Objection.

10         THE COURT:  Overruled.

11   A.  No.

12         THE COURT:  No, you didn't hear such a thing?

13         THE WITNESS:  No, I didn't.

14   Q.  Now, let's get back for a moment, if you would, to the time

15   that you and Gordo and who was the third person in the car.

16   A.  Shorty.

17   Q.  Shorty met with Patrick to kill these Mexicans.

18   A.  Can you repeat that question to me?

19   Q.  When did you meet with Patrick in the car for the first

20   time to kill the Mexicans?

21   A.  That was on Valentine, Valentine Street.

22   Q.  When?

23   A.  What do you want to know, the time, the year?

24   Q.  How about the time in relation to the death of the

25   individuals?

D2QMFER1                          Reyes - cross

1   A.  No.  That time I don't remember.

2   Q.  No.  You testified yesterday, sir --

3            MR. BLANCHE:  Objection.

4            THE COURT:  There is no question.

5   Q.  Sir, do you recall testifying yesterday that you were in a

6   car with two other individuals when Patrick got in the car on

7   Valentine Avenue?

8   A.  Yes, I remember.  That I remember.

9   Q.  When was that?

10  A.  That was a couple of days before the murders.

11  Q.  And when Patrick got in the car and Gordo told him that

12  Minaya wanted them killed so they can take their money, is that

13  right?

14  A.  Yes, something like that.

15  Q.  And how is it that Patrick was called?

16  A.  Gordo called him.

17  Q.  Did you know Patrick before?

18  A.  Yes.

19  Q.  Did you know Patrick to be a killer before?

20  A.  No.

21  Q.  Did you know Patrick to be an enforcer before?

22  A.  No.

23  Q.  So Patrick got in the car and how long were you in the car

24  with him when you spoke about this plan to kill the Mexicans?

25  A.  I don't really remember how much time.  All I remember is

D2QMFER1                          Reyes - cross

 1   that we went over there and we started to talk about the fact

 2   that he had said --

 3   Q.  I didn't ask that question.  When you got into the car, was

 4   it daytime or nighttime?

 5   A.  I'm not very sure.  I don't remember.

 6   Q.  But you're definitely sure that he got in the car at

 7   Valentine Avenue?

 8   A.  Yes.

 9   Q.  It wasn't Homestead Avenue where a private house was?

10   A.  Well, I don't know about that one on Homestead, but it was

11   over there on Valentine where he always hangs out.

12   Q.  And how many times did you meet with Patrick prior to the

13   homicide?

14   A.  I don't remember the other times.  I only remember this

15   time when I went with el Gordo.

16   Q.  Was there more than one time?

17   A.  I don't remember.

18   Q.  Do you remember the weather conditions that particular day?

19   A.  No, I don't remember.

20   Q.  When were you arrested on this particular case?

21   A.  December 2, 2010.

22   Q.  And when you were arrested you were sent to MCC, is that

23   right?

24   A.  It was in Miami.

25   Q.  And they brought you to New York?

D2QMFER1                     Reyes - cross

```
 1    A.  Yes.
 2    Q.  And you were lodged in MCC?
 3    A.  MDC Brooklyn.
 4    Q.  And how long were you there before you first met with the
 5    government to have a meeting with them, a proffer session?
 6    A.  Like seven, eight months.
 7    Q.  And would that put us somewhere in May of the year 2011?
 8    A.  You know, if you talk to me about months and years, I'm
 9    real stupid about things like that.
10    Q.  How many times did you meet with the government before you
11    signed the agreement, cooperation agreement?
12    A.  Very many times.
13    Q.  You say very many times.  More than ten?
14    A.  Yes.
15    Q.  And you had previously received what we call in this
16    business discovery, the issues in this case and all the stuff
17    that other people had said and pictures to prepare for trial,
18    is that correct, sir?
19              MR. BLANCHE:  Objection.
20              THE COURT:  Overruled.
21    A.  Well, I saw the discovery, but I didn't really know exactly
22    how it was handled.
23    Q.  No.  But you did see the discovery was provided to you, to
24    your lawyer by the government.  He gave you a copy?
25              THE COURT:  Why don't you restrict what discovery is,
```

D2QMFER1                              Reyes - cross

1    tell him what it is.

2              Ask him a more precise question, Mr. Richman.

3    Q.  What did you receive as discovery?

4    A.  Well, I got a CD with the deceased at the building, phone

5    calls, photos.

6    Q.  And material about the facts in the case?

7    A.  Yes.

8    Q.  And you looked at them?

9    A.  I looked at them once.

10   Q.  And then you decided some time thereafter to cooperate with

11   the government, correct?

12   A.  Well, at that point I didn't know anything about

13   cooperation.

14   Q.  And you discussed it with your attorney, did you not?

15             MR. BLANCHE:  Objection.

16             THE COURT:  Sustained.

17   Q.  You were first arrested December of 2010, right?

18   A.  December 2, 2010.

19   Q.  And you met with the government within a few months

20   thereafter, right?

21   A.  That's true.

22   Q.  And you met with the government many, many times?

23   A.  Yes.

24   Q.  And you discussed with the government what you intended to

25   say, correct?

D2QMFER1                         Reyes - cross

1    A.  The government asked me questions and I answered them

2    honestly.

3    Q.  And would it be fair to say you did not sign the full

4    cooperation agreement until May 7 of the year 2012, just about

5    eight months ago?

6    A.  I can't tell you that.

7              MR. BLANCHE:  Objection as to what the witness is

8    being shown.

9              THE COURT:  Identify it.

10             MR. RICHMAN:  3509-B.

11             MR. BLANCHE:  Thank you.

12   Q.  You have one in front of you right here.  That's the

13   agreement.  It's in evidence, is it not?

14             MR. BLANCHE:  Objection.

15             THE COURT:  The objection is sustained.

16             MR. RICHMAN:  Your Honor, most respectfully, the

17   evidence speaks for itself.

18             THE COURT:  The form of the question.

19             What do you want him to look at, Mr. Richman?

20             MR. RICHMAN:  Look at the date of the agreement that

21   he signed.

22             THE COURT:  Does that remind you, looking at the date

23   of the agreement, that you signed it on that date?

24             THE WITNESS:  Well, if it says that date on the paper,

25   that's the date, but, as I said before, I don't remember myself

D2QMFER1                        Reyes - cross

1   if it was four months, five months, seven months.

2   Q.  Would you say that the date is accurate?

3          THE COURT:  Mr. Richman, next question.  He is looking

4   at it.  He said he has no independent memory.

5   Q.  Sir, during the shooting you ran up the stairs?

6          MR. RICHMAN:  Can I have the photograph shown --

7   A.  That's true.

8          MR. RICHMAN:  -- 27.

9   Q.  I show you that which is marked as Government Exhibit 27.

10         Is that the staircase you ran up when the shooting

11  started?

12         THE COURT:  Mr. Richman is pointing to the stairway,

13  the right side of the picture.

14  A.  Yes, yes.

15  Q.  You ran up to the fourth floor?

16  A.  Correct.

17  Q.  That's where your apartment was, right?

18  A.  Yes.

19  Q.  That's the apartment where you had drugs and money stashed?

20  A.  Yes.

21  Q.  And on occasion guns, is that correct?

22  A.  Yes, there were guns.

23  Q.  And you ran up there when the shooting began?

24  A.  I didn't run to the apartment.  I ran up to the floor.

25  Q.  To the fourth floor?

D2QMFER1                          Reyes - cross

1    A.  I arrived at the fourth floor.

2    Q.  And the apartment is on the fourth floor?

3    A.  Yes.

4    Q.  Now, did you have your telephone with you?

5    A.  Well, I said later that I lost it, but I did have it on me.

6    Q.  Wasn't the phone dropped at the scene?

7    A.  I never remembered that.

8    Q.  Now, shortly thereafter you called your girlfriend, Gloria,

9    whose real name is Nancy?

10   A.  I don't remember whether I called her or I went to see her,

11   but I did speak with her after that.

12   Q.  And you told her to lie.

13   A.  I did not tell her to lie, because she doesn't know the

14   truth.

15   Q.  You told her to say that she lost her phone?

16   A.  Well, yes, that it was lost or stolen, to report it lost.

17   Q.  That was a lie.

18   A.  Well, yes.

19   Q.  How long do you stay upstairs on the fourth floor?

20   A.  Well, I didn't stay there, standing on the fourth floor.

21   It happened quickly.  I got there and I went -- then I came

22   down the other set of stairs.

23        THE COURT:  Wait until he finishes before you start

24   interpreting.

25        INTERPRETER MILLMAN:  That's what I did, your Honor.

1              THE COURT:  No.  You're cutting him short.

2    Q.  Is there another set of stairs on the other side of the

3    elevator?

4    A.  As far as I can recall, there was.

5    Q.  And that's the stairs you came down?

6    A.  Yes.

7    Q.  You came running out the front door?

8    A.  I didn't run.  I walked quickly.

9    Q.  You got into your car and left?

10   A.  Yes.

11   Q.  Shortly thereafter you went down to the Dominican Republic,

12   correct?

13   A.  Correct.

14   Q.  You stayed down there about a year?

15   A.  Yes.

16   Q.  And then you came back to New York?

17   A.  Yes.

18   Q.  Had you previously cleaned out your apartment of the drugs,

19   money, and guns?

20   A.  Well, according to what Gordo told me in Santo Domingo,

21   that was going to be cleaned up.  He was going to send somebody

22   over to take care of that.

23   Q.  When you say take care of that, it was remove the items of

24   criminal conduct, correct?

25   A.  Well, there were drugs that were still there.

D2QMFER1                        Reyes – cross

1    Q.  And drug money?

2    A.  Well, I don't know how much money was there because I took

3    my money out the day before, and they took their money out in

4    the morning.

5    Q.  There were traps in that apartment, correct?

6    A.  There was a trap in the closet.

7    Q.  Now, please explain to the jury what a trap was in your

8    house.

9    A.  In the apartment, wherever it is in the closet, in the

10   hallway, or in the kitchen, you break up the wood.  On the

11   floor there is a space between the wood and the floor.  So you

12   cut it straight, you pick up and pull out the wood that's

13   installed there.  You then put another piece of wood which is

14   equivalent to the area, something that you can open and close.

15   Q.  It's a secret compartment, right?

16          THE COURT:  Let me just clarify this.

17          What do you mean by the floor?  Is that a cement floor

18   that is built in construction?

19          THE WITNESS:  No, no, no, no.  I'm talking about a

20   wooden floor.

21          THE COURT:  So where is the trap?  Is it below the

22   wooden floor?

23          THE WITNESS:  The trap that we had was underneath the

24   wood floor inside a closet.

25          THE COURT:  And what's below the wooden floor?

D2QMFER1                           Reyes - cross

1                   THE WITNESS:  The ceiling.

2                   THE COURT:  The ceiling below?

3                   THE WITNESS:  Yes.

4                   THE COURT:  So in the space between the ceiling below

5      and the floor, you created a trap?

6                   THE WITNESS:  Yes.

7                   THE COURT:  How did you prevent someone looking at the

8      difference in wood to know there was a trap?

9                   THE WITNESS:  Carpet.

10                  THE COURT:  So if you lifted the carpet you would see

11     the trap?

12                  THE WITNESS:  Well, you are going to see a piece of

13     wood there, but what you do is, you use a piece of wood that's

14     similar to the floor.  So anyone who looks is never going to

15     know that there is a trap in there.

16                  THE COURT:  Go ahead, Mr. Richman.

17     Q.  By the way, who rented that apartment?

18     A.  We went to an agency.  I don't know how to say it, an

19     agency that rents apartments.  And el Gordo had spoken to a

20     woman there.  And through that agency and woman is how we got

21     the apartment.  I was there present.

22                  THE COURT:  Who was the tenant?

23                  THE WITNESS:  Well, no, no.  You just rent an

24     apartment in who knows what name.  When you ask that type of

25     agency for an apartment, they know what it is going to be used

D2QMFER1                         Reyes - cross

1    for, so they use whose ever name -- I don't know whose name.

2    Q.   What agency was that?

3    A.   An agency on Amsterdam and 160 something.  I don't remember

4    exactly, but it's around there.

5    Q.   Did you frequently go to that place?

6    A.   Well, I went once with Gordo, but Gordo knew the woman.

7    Q.   I'm not talking about the agency.  The apartment.  Did you

8    go to the apartment on more than one occasion?

9    A.   Well, after we rented it, it was the stash house, so of

10   course I was always there.

11   Q.   In fact, you were known to be there because you were

12   protecting your valuables, your drugs, your money and your

13   drugs?

14   A.   Of course.

15               (Continued on next page)

16

17

18

19

20

21

22

23

24

25

D2q0fer2                         Reyes - cross

1    Q.  You became a regular at that apartment?

2    A.  Well, primarily, yes.  As long as there were drugs there, I

3    was there.

4    Q.  And you stayed there virtually every day?

5    A.  Not virtually every day.

6    Q.  But that apartment, how long did you have that apartment?

7    A.  I don't remember.

8    Q.  And that's the apartment you took these two men, knowing

9    that they were gonna kill them there?

10   A.  Those were my orders, to bring them there, so they could be

11   killed there.

12   Q.  And who gave you those orders?

13   A.  Jeffrey said to bring them there.

14           THE COURT:  Jeffrey's last name, is what?

15           THE WITNESS:  Minaya.

16           MR. RICHMAN:  I have no further questions.

17           THE COURT:  Any redirect?

18           MR. BLANCHE:  Just briefly, your Honor.

19           THE COURT:  Why?

20           MR. BLANCHE:  Pardon me, your Honor?

21   REDIRECT EXAMINATION

22   BY MR. BLANCHE:

23   Q.  Defense counsel asked you about reviewing discovery in your

24   case?

25   A.  Yes, correct.

d2q0fer2                    Reyes - redirect

1   Q.  Did that discovery have lists of who was gonna be

2   testifying in this trial?

3   A.  No.  No, no, no, I don't think so.  No.

4   Q.  Do you know who else is testifying in this trial?

5   A.  I don't have the slightest idea.

6              MR. BLANCHE:  No further questions, your Honor.

7              THE COURT:  Discovery, members of the jury, in a

8   criminal case, is a limited number of essentially documents

9   that have things to do with the case.  And under the rules of

10  criminal procedure, a defendant is entitled to his lawyer to

11  see those documents.  That's what they are talking about when

12  they say discovery.

13             Okay, thank you.  You're excused, Mr. Reyes.

14             THE WITNESS:  Thank you.

15             (Witness excused)

16             THE COURT:  Thank you, ladies.

17             THE INTERPRETERS:  Thank you.

18             THE COURT:  Next witness.

19             MR. BLANCHE:  The government calls Gloria Trujillo.

20   GLORIA NANCY TRUJILLO,

21       called as a witness by the Government,

22       having been duly sworn, testified as follows:

23  DIRECT EXAMINATION

24  BY MR. BLANCHE:

25  Q.  Good morning, Ms. Trujillo?

d2q0fer2                          Trujillo - direct

1   A.  Good morning.

2   Q.  If you could just try to keep your voice up so that

3   everyone in the courtroom can hear, please.

4            THE COURT:  Don't use that mic, it doesn't work,

5   anyhow.  Just drop it down on the desk.  Speak loud, please.

6   BY MR. BLANCHE:

7   Q.  Ms. Trujillo, did you receive a subpoena to testify in this

8   case?

9   A.  Yes.

10  Q.  Do you want to be testifying?

11  A.  No.

12  Q.  Now, what city do you live in now?

13  A.  White Plains.

14  Q.  If we could put up government exhibit 6, please.

15           Ms. Trujillo if you look at the screen -- and you also

16  have one in front of you -- do you know the person who's

17  depicted on government exhibit 6?

18  A.  Yes.

19  Q.  Who is that?

20  A.  His name is Alberto Reyes.

21  Q.  And how do you know him?

22  A.  He was my boyfriend.

23  Q.  You say he "was."  When was that?

24  A.  Around 2000.

25  Q.  And from when to when was he your boyfriend?

d2q0fer2                           Trujillo - direct

1    A.  I want to go from 1994, on and off, until 2000.

2    Q.  How old were you at the time that you first -- when he

3    first started being your boyfriend?

4    A.  Nineteen.

5    Q.  Nineteen years old?

6    A.  Yes.

7    Q.  And you said on and off, but in early 2000, were you

8    still -- were you still together?

9    A.  Yes.

10   Q.  By the way, do you and Mr. Reyes have a child?

11   A.  Yes.

12   Q.  How old is that child?

13   A.  Twelve.

14           THE COURT:  Twelve, now?

15           THE WITNESS:  Yes.

16   BY MR. BLANCHE:

17   Q.  We'll you put up government exhibit 5 and 13 next to each

18   other.

19           All right, Ms. Trujillo, I'm showing you two pictures

20   on the screen, government exhibit 5 and government exhibit 13.

21           Do you recognize the faces of the men in those

22   pictures?

23   A.  Yes.

24   Q.  How do you recognize them?

25   A.  I think they were his friends.

1    Q.  When you say "his friends" you mean Mr. Reyes?

2    A.  Yes.

3    Q.  Do you know either of those names for sure?

4    A.  No.

5    Q.  Did you, over the time that you were dating Mr. Reyes, did

6    you meet other of Mr. Reyes' friends?

7    A.  No.

8    Q.  Do you know, around the 2000 time period, where Mr. Reyes

9    was living?

10   A.  In the beginning?  2000 --

11   Q.  Where was he living?

12   A.  In the Bronx --

13            THE COURT:  1994?

14            THE WITNESS:  Bronx -- 1994?

15            THE COURT:  Yes.

16            THE WITNESS:  New Palz.

17   Q.  So in '94 he was living --

18            THE WITNESS:  New Palz and Bronx.

19   Q.  Did you ever go to -- did you ever go to his house in New

20   Palz?

21   A.  Yes.

22   Q.  And did you also go to his house in the Bronx?

23   A.  Yes.

24   Q.  And back in that time, focusing on the 2000 time period,

25   where were you living?

d2q0fer2                        Trujillo - direct

1    A.  With my mom.

2    Q.  In what borough?

3    A.  Westchester.

4    Q.  Westchester.  County, sorry.

5           THE COURT:  Did you live in White Plains, throughout?

6           THE WITNESS:  Excuse me?

7           THE COURT:  Did you live in White Plains throughout?

8           THE WITNESS:  Yes.

9    Q.  In late '99, 2000, did you have any cars?

10   A.  Yes.

11   Q.  What kind of -- how many did you have?

12   A.  Two.

13   Q.  What kind of cars did you have?

14   A.  I had an Acura Integra, and a black -- I believe it was a

15   Jeep.

16   Q.  Black Jeep, like an SUV?

17   A.  An SUV.

18   Q.  I want to talk about your Acura Integra.  What color was

19   it?

20   A.  Red.

21   Q.  Did you -- were you the only person that drove that?

22   A.  No.

23   Q.  Who else drove it?

24   A.  Albert.

25   Q.  And when you say "Albert," you mean Mr. Reyes?

d2q0fer2                           Trujillo - direct

1    A.  Yes.

2    Q.  Now, do you recall when, in early 2000, Mr. Reyes left the

3    United States?

4    A.  Yes.

5    Q.  Where did he go, if you know?

6               MR. RICHMAN:  Objection.  This would be hearsay, no

7    matter what.

8               MR. BLANCHE:  Well --

9               THE COURT:  Overruled.

10   A.  Santo Domingo.

11   Q.  Is that the Dominican Republic?

12   A.  Yes.

13   Q.  By the way, since that time, in early 2000, have you

14   maintained some contact with Mr. Reyes?

15   A.  I believe to maybe 2003.

16   Q.  And since that time, have you maintained contact with him?

17   A.  No.

18              THE COURT:  You had your child in 2001?

19              THE WITNESS:  I had her in 2000.

20              THE COURT:  In 2000.

21   Q.  Now, do you remember law enforcement coming to your house

22   at some point in early 2000?

23   A.  Yes.

24   Q.  Do you know what agency they were from?

25   A.  No.

d2q0fer2                          Trujillo - direct

1    Q.   Meaning whether were they the NYPD or FBI or anything?

2    A.   No.

3    Q.   Did you speak with them?

4    A.   Yes.

5    Q.   And you spoke with them -- well, prior to speaking to them,

6    had Mr. Reyes left the country, as far as you know?

7    A.   As far as I know, yes.

8    Q.   By the way, during that time period, I'm talking about the

9    late '99 early 2000, did you have a cell phone?

10   A.   I don't remember.

11   Q.   Do you remember, as you sit here today, whether Mr. Reyes

12   had a cell phone in your name?

13   A.   I don't remember.

14   Q.   Could he have?

15   A.   Yes.

16            MR. RICHMAN:  Objection.

17            THE COURT:  Sustained.

18            MR. BLANCHE:  No further questions, your Honor.

19            THE COURT:  Cross-examination?

20            MR. RICHMAN:  I have no questions.

21            THE COURT:  Thank you.

22            No cross-examination.  Thank you.

23            You're excused, Ms. Trujillo.

24            THE WITNESS:  Okay.

25            (Witness excused)

d2q0fer2                          Trujillo - direct

1           MR. RICHMAN:  May I have a sidebar, your Honor,

2     please?

3           THE COURT:  Do you want the witness to remain?

4           MR. RICHMAN:  No, without the witness.

5           THE COURT:  The witness can be excused.

6           Why don't we have our mid-morning break now.

7           Jury, close up your books, leave them on your chair.

8     We'll take a ten-minute break.

9           (Jury excused)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

d2q0fer2                          Trujillo - direct

1              (In open court)

2              THE COURT:  Be seated, everyone.

3              MR. RICHMAN:  Could I ask your Honor that the entire

4     testimony of Ms. Trujillo be stricken.  It has nothing at all

5     to do with this case.  Not only does it have nothing at all to

6     do with the case, any question that could have been connected

7     was never asked.  So could you tell me what it's all about?

8              THE COURT:  Overruled.

9              We'll have a 10 minute break, and we'll resume.

10             Who is the next witness, Mr. Blanche?

11             MR. CAPONE:  We have a firearms expert, Sal Lacova.

12    He's almost here.  If he he doesn't get here by the end of the

13    break, then it will be another cooperating witness, Mr. Mendez,

14    and have him up here when we're ready to go.

15             But before that, the government was going to read a

16    stipulation into the record.

17             THE COURT:  All right.

18             (Recess)

19

20

21

22

23

24

25

d2q0fer2                          Trujillo - direct

1           (In open court)

2           (Jury present)

3           THE COURT:  Be seated, everyone.  We have another

4    witness.

5           MR. BLANCHE:  Your Honor, we have a stipulation first,

6    if that's --

7           THE COURT:  All right.

8           MR. BLANCHE:  I'm reading a stipulation.

9           THE COURT:  A stipulation, ladies and gentlemen, is an

10   agreement between counsel that certain evidence is essentially

11   not disputable, could come in without the need for a document

12   or a witness.  And you take it just the same as any other piece

13   of evidence.

14          Go ahead.

15          MR. BLANCHE:  Yes, your Honor, thank you.

16          I'm reading from what's been marked for identification

17   as government exhibit 131.  And it reads as follows:

18          It is hereby stipulated and agreed by and among the

19   United States of America, by Preet Bharara, United States

20   Attorney for the Southern District of New York, Todd Blanche,

21   John P. Cronan and Russell Capone, Assistant United States

22   Attorney, of Counsel, and Joe Fernandez, the defendant, by and

23   with the conset of his attorney, Murray Richman, Esquire, that:

24          Government exhibits 110 and 111 are true and accurate

25   copies of records of Bell Atlantic Mobile, now Cellco

d2q0fer2                        Trujillo - direct

1    Partnership, doing business as Verizon Wireless.

2            The original records were made at or near the time, by

3    or from the information transmitted by, a person with knowledge

4    of the matters set forth in the records.  They were kept in the

5    course of a regularly-conducted business activity.  And it was

6    the regular practice of that business activity to maintain the

7    records.

8            Government exhibit 110 is a portion of a statement for

9    telephone number (917)921-0309, account number 104131932 in the

10   name of Gloria Trujillo, reflecting telephone calls made or

11   received on February 22nd, 2000.

12           In February 2000, the Bell Atlantic Mobile network was

13   a telephone network capable of making interstate

14   communications.

15           This stipulation and government exhibits 110 and 111,

16   may be received in evidence as a government exhibit at the

17   trial of the above-referenced matter.  And then it is signed by

18   the parties, your Honor.

19           So the government offers government exhibit 131 which

20   is the stipulation.  And government exhibits 110 and 111.

21           MR. RICHMAN:  And we have so stipulated.

22           THE COURT:  Received.

23           (Government's Exhibits  131, 110, 111 received in

24   evidence)

25           MR. BLANCHE:  If we can put government exhibit 110 up

1    on the screen for one moment, just for the jury to see.

2             And Ms. Quinones, if you could highlight the top where

3    it has Ms. Trujillo's name, and highlight the name.  And then

4    the telephone number, as well.

5             Okay, thank you, your Honor.

6             THE COURT:  Are you interested in what's in any of the

7    calls?

8             MR. BLANCHE:  Pardon me?

9             THE COURT:  Do you want to draw the jury to the

10   attention of any of the calls?

11            MR. BLANCHE:  If you could put it back up for one

12   minute, Ms. Quinones, highlight the bottom where the numbers

13   start, Ms. Quinones.

14            THE COURT:  So there is marks at a certain place.  Are

15   those what the jury should pay attention to?  What do you want

16   the jury to know about this document?

17            MR. BLANCHE:  At this point the government just wanted

18   to show the jury the name at the top, and there were telephone

19   calls to and from that telephone number, but that it only

20   reflects calls made on February 22nd.  For example, the top

21   part of the document is redacted because --

22            THE COURT:  So you've given a section of the record,

23   only the section dealing with telephone calls made on

24   February 22 at various times during the day, from various

25   places to various places, as shown in the fourth column.

d2q0fer2                          Trujillo - direct

1                MR. BLANCHE:  Yes, your Honor.  Thank you.

2                THE COURT:  Okay.

3                MR. CRONAN:  The government now calls Mr. Yubel

4   Mendez-Mendez.

5                THE DEPUTY CLERK:  Raise your right hand --

6                THE COURT:  Wait, wait.  Break it up in phrases.  Can

7   you wait until the whole thing is done.

8                THE INTERPRETER:  I will not be able to remember

9   verbatim.

10               Raise your right hand, face me.

11    YUBEL MENDEZ-MENDEZ,

12        called as a witness by the Government,

13        having been duly sworn, testified as follows:

14               THE COURT:  Okay, Mr. Cronan, go ahead.

15               MR. BLANCHE:  Thank you, your Honor.

16  DIRECT EXAMINATION

17  BY MR. CRONAN:

18  Q.  Where do you currently live, Mr. Mendez.

19  A.  I'm at the MDC, Brooklyn.

20  Q.  Is that a federal jail?

21  A.  Yes, sir.

22  Q.  Why are you in jail, Mr. Mendez?

23  A.  I am under arrest for cocaine trafficking, sir.

24  Q.  Do you recall when you were arrested?

25  A.  Yes, sir.

D2q0fer2                         Mendez-Mendez - direct

1    Q.  When was that?

2    A.  December 16, 2010.

3    Q.  And have you since pled guilty to committing drug

4    trafficking crimes?

5    A.  Yes, sir.

6    Q.  Was that guilty plea pursuant to any agreement with the

7    government?

8    A.  Yes, sir.

9    Q.  What type of agreement was that?

10   A.  A cooperation agreement with the government, sir.

11   Q.  Have you been sentenced for your crimes yet?

12   A.  No, sir.

13   Q.  Now, since your arrest in December of 2010, have you been

14   in any other federal jails in New York?

15   A.  Yes, sir.

16   Q.  Where else have you been?

17   A.  At MCC Manhattan.

18   Q.  Is that another federal jail?

19   A.  Yes, sir.

20   Q.  When were you imprisoned in the MCC, Manhattan.

21   A.  Starting on December 30th, 2010, sir.

22   Q.  Until when?

23   A.  Until January 26th, of 2012, sir.

24   Q.  Now, is the MCC, or was the MCC while you were there

25   divided into different parts or units?

D2q0fer2                          Mendez-Mendez - direct

1    A.  Yes, sir.

2    Q.  What unit were you assigned to at the MCC?

3    A.  5 North, sir.

4    Q.  Where in the MCC is 5 North located?

5    A.  It's located as you come out of the elevator on your right

6    hand side, sir.

7    Q.  Do you know what floor it is on?

8    A.  Yes, sir.

9    Q.  What floor?

10   A.  On the fifth floor, sir.

11   Q.  And is there a common area in 5 North.

12   A.  Yes, sir.

13   Q.  Briefly, can you describe that common area.

14   A.  Yes, sir.  It's in the center of the area, sir.

15   Q.  And it's the center of -- what surrounds the common area?

16   A.  Around it are the tiers where we, the inmates, sleep.

17   There are television sets where we -- that we share in the

18   common area, sir.

19   Q.  How many tiers are in 5 North.

20   A.  It has six tiers, sir.

21   Q.  How many jail cells are in each tier.

22   A.  There is eight cells per tier, sir.

23   Q.  And how many beds are in each jail cell?

24   A.  Two beds, sir.  One on top and one on the bottom.

25   Q.  And when a new inmate arrives on the floor at 5 North, how

D2q0fer2                          Mendez-Mendez - direct

1    does an inmate receive his jail assignment?

2    A.  The guard on duty assigns it to him, sir.

3    Q.  Mr. Mendez, I'm going to ask you to take a look around the

4    courtroom and ask if you recognize anyone.

5    A.  Yes, sir.

6    Q.  And if you could identify that person by describing an

7    article of clothing that he or she is wearing?

8    A.  Yes, sir.

9    Q.  Please do so.

10   A.  He is wearing a blue shirt, a striped tie -- a striped tie

11   in black and blue --

12          THE COURT:  The witness has identified --

13          THE WITNESS:  -- a black suit --

14          THE COURT:  The witness identified the defendant.

15          MR. CRONAN:  Thank you, your Honor.

16   Q.  How do you know the defendant?

17   A.  I know him from the time when we shared a cell at the MCC,

18   sir.

19   Q.  Did you learn this individual's name?

20   A.  Yes, sir.

21   Q.  What is it?

22   A.  Joe.

23   Q.  And do you recall approximately when you and the defendant

24   shared a jail cell at the MCC?

25   A.  Yes, sir.

D2q0fer2                          Mendez-Mendez - direct

1    Q.  Approximately when was that?

2    A.  At the end of 2011, sir.

3    Q.  Had you pled guilty, yet, at the time that you and the

4    defendant were cellmates?

5    A.  No, sir.

6    Q.  Do you recall when you pled guilty?

7    A.  Yes, sir.

8    Q.  When was that?

9    A.  November of 2011, sir.

10   Q.  So it would be fair to say that you and the defendant were

11   cellmates before your guilty plea in November 2011?

12   A.  Yes, sir.

13   Q.  Had you ever met the defendant before the two of you shared

14   the jail cell in 5 North?

15   A.  No, sir.

16        MR. CRONAN:  Miss Quinones, can we put up government

17   exhibit 2, please.

18   Q.  Mr. Mendez, do you recognize this individual?

19   A.  Yes, sir.

20   Q.  Who is it?

21   A.  Patrick.

22   Q.  Do you know Patrick's last name?

23   A.  No, sir.

24   Q.  How do you know Patrick?

25   A.  I met him when I was assigned to 5 North, sir, at the MCC.

D2q0fer2                          Mendez-Mendez - direct

1   Q.  Was Patrick another inmate at 5 North?

2   A.  Yes, sir.

3   Q.  Did you already know Patrick at the time you and the

4   defendant started sharing a cell together?

5   A.  Yes, sir.

6   Q.  How did you get to know Patrick?

7   A.  I met him while going to church together, to Christian

8   services.

9   Q.  Put up exhibit 14 --

10          THE COURT:  When?

11          THE WITNESS:  I met him from the time that I arrived

12  at the MCC, at 5 North.

13  Q.  And I believe you said that earlier, but when did you

14  arrive at 5 North at the MCC?

15  A.  I arrived, sir, in January of 2011.

16          MR. CRONAN:  Ms. Quinones can we put up exhibit 14,

17  please -- I'm sorry take that down.  Can we put up exhibit 15,

18  I meant.  Sorry.

19  Q.  Do you recognize that person?

20  A.  Yes, sir.

21  Q.  And who is it?

22  A.  Yubel Mendez, sir.

23  Q.  You look a little different.

24  A.  Yes, sir.

25  Q.  Why is that?

D2q0fer2                         Mendez-Mendez - direct

1   A.  Because I was a lot heavier there than I am now.

2   Q.  Was this taken when you were arrested?

3   A.  When I was brought here to the MCC, sir.

4   Q.  Take down exhibit 15, please.

5        Now, do you recall the defendant arriving at 5 North?

6   A.  Yes, sir.

7   Q.  Approximately what time in the day did the defendant arrive

8   at 5 North?

9   A.  After 5:00 p.m. in the afternoon, sir.

10  Q.  Do you recall what you were doing when the defendant

11  arrived at 5 North?

12  A.  Yes, sir.

13  Q.  What were you doing, Mr. Mendez?

14  A.  I was in the common area where we watch television, sir, on

15  the side of the Spanish television.

16  Q.  Were you watching the television alone or with other

17  people?

18  A.  There were more people, sir.

19  Q.  Do you recall who else you were watching television with?

20  A.  Yes, sir.

21  Q.  Who else were you watching with?

22  A.  I remember that Patrick was there, and other Latino men

23  were there, sir.

24  Q.  And from the area where you, Patrick, and the other

25  individuals were watching television, were you able to see the

D2q0fer2                         Mendez—Mendez - direct

1    defendant arrive at 5 North?

2    A.  Yes, sir.

3    Q.  About how far away were you from the defendant when he

4    arrived?

5    A.  We were at a distance, like from here, sir, approximately

6    to where you are at, sir.

7    Q.  Would you say approximately 20 feet?

8    A.  Give or take, sir.

9    Q.  What did you observe when you the defendant arrived on the

10   floor at 5 North.

11   A.  I observed that under his arm he had a blanket, sir.

12   Q.  And did you observe anything else that occurred?

13   A.  Yes, sir.

14   Q.  What else?

15   A.  Well, I observed that Patrick went up to say hello to him.

16   Q.  And were you able to observe Patrick as he approached the

17   defendant?

18   A.  Yes, sir.

19   Q.  Where did this interaction between Patrick and the

20   defendant take place?

21   A.  It happened in the center of the common area, sir.

22   Q.  Can you please describe what you observed to be the

23   defendant's reaction when Patrick approached him?

24   A.  We were there together watching television.  And Patrick

25   went up to him to say hello.  He said:  Hi, Joe.

D2q0fer2                              Mendez-Mendez - direct

1    Q.  And, what -- were you able to observe the defendant's

2    reaction when Patrick said.  Hi, Joe?

3    A.  I observed that he didn't even speak to him, sir.

4              THE COURT:  Who is him?

5              THE WITNESS:  Joe, sir.

6              THE COURT:  So who didn't speak to whom?

7              THE WITNESS:  Joe, sir, did not speak to Patrick.

8    Q.  And were you able to observe the defendant's body

9    mannerisms at this time?

10             MR. RICHMAN:  Objection.

11             THE COURT:  Sustained.

12   Q.  Where did the defendant go next?

13   A.  He goes to the cell that he was assigned to, sir.

14   Q.  And whose cell was that?

15   A.  That's the cell where I lived, sir.

16   Q.  And what happened when the defendant came to your cell?

17             THE COURT:  Before that, had you ever met him before?

18             THE WITNESS:  No, sir.

19             THE COURT:  Go ahead, Mr. Cronan.

20   Q.  What happened when the defendant came to your cell.

21   A.  I showed him the bed that he was gonna sleep on, sir.

22   Q.  Which bed did he have?

23   A.  The bed on top, sir.

24   Q.  Did the defendant remain in your jail cell the rest of that

25   first afternoon that he arrived at 5 North?

D2q0fer2                          Mendez-Mendez - direct

1    A.  He stayed there for awhile.  And then Patrick came and

2    Patrick invited him to go to Patrick's cell for a while.

3    Q.  Did he -- in fact -- did the defendant in fact go to

4    Patrick's cell?

5    A.  Yes, sir.

6    Q.  Where was Patrick's cell in relation to your jail cell?

7    A.  On the same tier, sir, practically across the way.

8    Q.  Were you able to see Patrick and the defendant while they

9    were in Patrick's jail cell.

10   A.  Yes, sir.

11   Q.  What were you able to observe when the defendant and

12   Patrick were in Patrick's jail cell.

13   A.  I observed Patrick showing him some of Patrick's documents.

14   Q.  Were you able to hear them speak?

15   A.  No, sir.

16   Q.  Now, did you remain in your jail cell the entire time that

17   the defendant was in Patrick's cell?

18   A.  No, sir.

19   Q.  Where did you go?

20   A.  To the common area, sir.

21   Q.  Did you eventually return to your cell?

22   A.  Yes, sir.

23   Q.  Did the defendant also eventually return to your cell?

24   A.  Yes, sir.

25   Q.  Approximately how long was the defendant in Patrick's jail

D2q0fer2                              Mendez-Mendez - direct

1    cell before he came back to your jail cell?

2    A.  About 15 or 20 minutes, sir.

3    Q.  Now over the days that you and the defendant shared a jail

4    cell, did the two of you speak frequently?

5    A.  Yes, sir.

6    Q.  What -- what times during the day would the two of you

7    speak?

8    A.  We would speak in the afternoon hours during the lock-down

9    times, sir.  And also in the evenings, sir.

10   Q.  You mentioned the lock-down times, what do you mean by

11   that?

12   A.  Because there is a system over there of locking you down in

13   order for them to do a count.  So by 3:30 in the afternoon, you

14   already have to be locked down.  And then it is reopened at

15   5:00 p.m.

16   Q.  What language did you and the defendant speak to each other

17   in?

18   A.  In Spanish, sir.

19   Q.  How was the defendant's Spanish?

20   A.  It's good, sir.  I understood him well and he understood

21   me.

22   Q.  Now, let's talk about the first day that you and the

23   defendant shared a jail cell.  Do you recall what you and the

24   defendant discussed that first afternoon and that first

25   evening?

D2q0fer2                          Mendez-Mendez - direct

1    A.  Yes, sir.

2    Q.  What did you discuss?

3    A.  We spoke about getting to know each other.  We started to

4    get to know each other.  I offered him my help in any way that

5    I could because after all we're both Dominicans.  And as we

6    were talking, I remember Patrick coming into the cell, about

7    two times.  He brought him books to read.  Patrick said that we

8    were going to get along very well, that he was his cousin.  And

9    that's --

10            MR. RICHMAN:  I object to this whole line of -- about

11   Patrick.

12            THE COURT:  Overruled.

13   A.  And we chatted you know for a while.  And then later in the

14   evening hours, he told me that he was tired.

15   Q.  Now on that first night that you shared a jail cell

16   together, did the defendant say anything to you about Patrick?

17   A.  He said what is Patrick doing bringing me books and all

18   that.  I'm going to read them just to keep myself busy, but you

19   know I'm not interested in Patrick bringing me books or

20   bringing me anything.

21            And I asked him why?  Why do you say that?

22            And he said I don't want the talk about it now, I'm

23   tired.  And

24            I said to him, well, sleep, try to sleep.  And he said

25   to me, I can't -- I can't even fall asleep.

D2q0fer2                          Mendez-Mendez - direct

1    Q.  Did the defendant tell you how he knew Patrick?

2    A.  That they were cousins, and they had been brought up

3    together.

4    Q.  Now, over the next few days, did you and the defendant get

5    to know each other better?

6    A.  Yes, sir.

7    Q.  How did that happen?

8    A.  Well, since we were sharing a cell, it was best that we get

9    along well.  I offered him my friendship, just like he offered

10   me his.  We talked about personal matters, the family.  We

11   shared time and we spoke.

12   Q.  While you were sharing the cell, did you and the defendant

13   ever talk about getting released on bail?

14            MR. RICHMAN:  Objection.

15            THE WITNESS:  Yes, sir.

16            THE COURT:  Overrulled.

17   Q.  What did the defendant say to you regarding bail?

18            THE COURT:  Oh, wait a minute.

19   Q.  Sorry.

20            THE COURT:  Sidebar.

21            (Continued on next page)

22

23

24

25

D2q0fer2                              Mendez–Mendez – direct

1            (At the side bar)

2            THE COURT:  What answer do you expect?

3            MR. CRONAN:  I expect what he will say is defendant

4   said he was hoping to get released on bail, because he knew he

5   would be looking at a long time in jail and wanted to try to

6   get his family's matters in order.

7            THE COURT:  Objection sustained.

8            MR. RICHMAN:  All right.

9            THE COURT:  I sustained the objection.

10            (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D2QMFER3                          Mendez-Mendez - direct

1    Q.  Now, as the days went by at the jail, did you notice

2    whether the defendant ever spoke with Patrick?

3    A.  I did not see him speaking to him, sir.

4    Q.  Are inmates at 5 north ever able to prepare their own food

5    while in prison?

6    A.  Yes, sir.

7    Q.  Where can they do that?

8    A.  Sir, there is a kitchen.  It's located when you come

9    through the main door on your right.

10   Q.  Have any of the individuals we have talked about today

11   prepared food at the MCC?

12   A.  Yes, sir.

13   Q.  Who was that?

14   A.  Patrick prepared his own food for himself and for other

15   prisoners.  And personally I myself prepared my own food.  Joe

16   made his food.

17   Q.  Did you ever see the defendant eat any of the food prepared

18   by Patrick?

19           MR. RICHMAN:  Objection.

20           THE COURT:  Sustained.

21   Q.  Where were you arrested?

22   A.  Sir, in the Dominican Republic.

23   Q.  Did you ever mention to the defendant that you had been

24   arrested in the Dominican Republic?

25   A.  Yes, there was a time when I did tell him that, sir.

D2QMFER3                          Mendez—Mendez – direct

1    Q.   How did the defendant respond when you informed him that

2    you had been arrested in the Dominican Republic?

3    A.   Because he had told me that he wanted to go to the

4    Dominican Republic.  He wanted to run away so he wouldn't be

5    arrested.  I told him I was arrested in the Dominican Republic

6    and extradited.

7    Q.   How did the defendant respond when you told him that you

8    had been extradited from the Dominican Republic?

9            MR. RICHMAN:  May we have a side bar on this?

10           THE COURT:  Yes.  I was waiting.

11           (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (At the side bar)

2              THE COURT:  Start with the previous question.  What's

3     the relevance?

4              MR. CRONAN:  This was briefed earlier on.

5              THE COURT:  Don't tell me that, please.

6              MR. CRONAN:  I just wanted to refresh the Court's

7     memory.  The relevance is that the defendant stated that he had

8     thought about fleeing to the Dominican Republic because he

9     didn't want to get arrested.  He was going there to avoid being

10    arrested because he didn't think he could be extradited from

11    the Dominican Republic.  Mr. Mendez informed him, I had gone to

12    the Dominican Republic, I was there and arrested.  Defendant's

13    response essentially was, this wouldn't have mattered.

14             THE COURT:  Flight.

15             MR. RICHMAN:  Your Honor, the defendant surrendered

16    himself.  He was not captured.  He came in and surrendered

17    himself to the authorities.

18             THE COURT:  Mr. Cronan is correct.

19             Place a date, a time, a conversation and double back

20    and start again on the whole conversation.

21             MR. RICHMAN:  We would stipulate to the fact that he

22    surrendered himself.

23             MR. BLANCHE:  Not during our case.

24             MR. RICHMAN:  Why not?

25             THE COURT:  On cross.

1               (Continued on next page)
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

D2QMFER3                        Mendez-Mendez - direct

 1              (In open court)

 2              THE COURT:  Objection overruled.

 3              Put a time and place on the conversation and give us

 4    the entire conversation so we understand it.

 5    Q.  Mr. Mendez, you were talking about a conversation you had

 6    with the defendant regarding the Dominican Republic.

 7              Do you recall that?

 8    A.  Yes, sir.

 9    Q.  Do you recall when you had that conversation with the

10    defendant?

11    A.  Yes, sir.

12    Q.  Approximately when was that?

13    A.  It was in nighttime hours, sir, when we were in the final

14    lockdown to go to bed.

15              THE COURT:  When in relationship to when the defendant

16    came into the jail did this conversation occur?

17              THE WITNESS:  This happened around two or three days

18    after he was in the same cell, sir.

19              THE COURT:  Same cell as with you?

20              THE WITNESS:  Yes, sir.

21              THE COURT:  Who started the conversation?

22              THE WITNESS:  We were both talking.

23              THE COURT:  Go ahead, Mr. Cronan.

24    Q.  It may be obvious, but physically where were you and the

25    defendant when you had this conversation?

D2QMFER3                          Mendez-Mendez - direct

1   A.   There were times when he was sitting on his bed, and I was

2   standing below.

3   Q.   You were in your jail cell, is that right?

4   A.   Yes, sir.

5   Q.   Can you tell us what you remember regarding the

6   conversation you had this evening in the jail cell with the

7   defendant regarding the Dominican Republic?

8   A.   Yes, sir.

9   Q.   Please do.

10  A.   We were talking about the fact that I had been arrested in

11  the Dominican Republic, that I was extradited here to the

12  United States.   That's when he said to me, since he was

13  thinking of going to the Dominican Republic, even though he

14  wasn't very familiar with the place there, because he had gone

15  to the Dominican Republic once, to Santiago de los Caballeros

16  with his grandmother, and I remember he told me that one time

17  his grandmother told him that he should take a taxi.   And when

18  they got into the taxi --

19             MR. RICHMAN:   Your Honor.

20             THE COURT:   Overruled.

21             Mr. Fernandez was saying he was thinking of going to

22  the Dominican Republic, he was not familiar with the Dominican

23  Republic, and his grandmother said something about a taxicab.

24  Pick it up from there.

25  Q.   You may continue.

D2QMFER3                     Mendez-Mendez - direct

 1              THE COURT:  Translate what I said.  You were tracking

 2      what Mr. Fernandez was saying to you concerning what his

 3      grandmother had said to him about a taxicab.

 4              THE WITNESS:  Yes, sir.

 5              THE COURT:  Continue.

 6      A.  Well, when they got into the taxi, the two of them got in.

 7      Other people got in, also, and he said, grandma, why is this

 8      happening?  Because here in the United States it doesn't happen

 9      like that.  And it seemed strange to him that other people got

10      in.  But his grandmother said to him no.  In the Dominican

11      Republic that's the way it is.

12              THE COURT:  Mr. Mendez, I don't think we are

13      interested in what happens with taxicabs.  You were talking

14      about a conversation with Mr. Fernandez concerning your arrest

15      in the Dominican Republic and then he said something.  What did

16      he say?

17              THE WITNESS:  That he had thought about going to the

18      Dominican Republic running away so that he wouldn't be arrested

19      because he thought he wouldn't be extradited from there to

20      here.  That's when I told him that I was extradited from the

21      Dominican Republic.  And when the feds are looking for

22      somebody, it's an expression we have, even if you're hiding

23      under a rock they will pull you out.  And he said, oh, well,

24      then it wasn't worth it for me to go there.  They were going to

25      catch me anyway.

1    Q.  Did the defendant tell you what he did for a living before

2    he was arrested?

3    A.  Yes, sir.

4    Q.  What did he tell you he did?

5    A.  He drove a limousine.

6    Q.  Did the defendant tell you whether he was satisfied having

7    this occupation?

8            MR. RICHMAN:  Objection, your Honor, relevance.

9            THE COURT:  Overruled.

10   A.  Yes, he told me he was happy with that job.

11   Q.  Did the defendant tell you why he was happy with that job?

12           THE COURT:  Objection sustained.

13   Q.  Did the defendant tell you about any aspects of that job?

14           MR. RICHMAN:  Objection.

15           THE COURT:  Sustained.

16   Q.  Did the defendant tell you where he was living before he

17   was arrested?

18   A.  He did tell me, but I don't remember the city that he

19   mentioned, since I have very little knowledge of the United

20   States.

21           THE COURT:  I think we are probably finished with the

22   relevant testimony of this witness.

23           MR. CRONAN:  Your Honor, I could explain the relevance

24   at the side bar.

25           THE COURT:  No, I don't want to.  You feel it's

D2QMFER3                          Mendez-Mendez - direct

 1   relevant, we will listen.  But I think you get the sense that
 2   we are really going into the, let us say, margins of relevance.
 3              MR. CRONAN:  I would disagree, respectfully, your
 4   Honor.
 5              THE COURT:  Go ahead, Mr. Cronan.
 6   Q.  What did the defendant tell you about the area where he was
 7   living?
 8   A.  He said that he had moved to that area looking for a more
 9   peaceful area.
10   Q.  Did he tell you anything about why he thought it was
11   important to move to this neighborhood?
12              MR. RICHMAN:  Objection.
13              THE COURT:  Overruled.
14   A.  Yes, sir.
15   Q.  What did he tell you?
16   A.  He said that he wanted to be in an area where there were
17   less Hispanics, to virtually live in an area that was white.
18   Q.  And did the defendant tell you why he wanted to live in
19   such an area?
20              MR. RICHMAN:  Objection.
21              THE COURT:  One more question.  Let's listen to this
22   one.  Answer it.
23   A.  Yes, sir.
24   Q.  What did he tell you?
25   A.  To feel more relaxed about the fact that he felt he was

D2QMFER3                          Mendez—Mendez - direct

1   being pursued.

2            THE COURT:  Pursued by whom?  Did he say?

3            THE WITNESS:  The authorities, sir.

4   Q.  Did there ever come a point when the defendant told you why

5   he was in jail?

6   A.  The time, yes, sir.

7   Q.  Approximately how long into your period of sharing a jail

8   cell with the defendant did he tell you why he was in jail?

9   A.  We were there about two or three days together.  Either the

10  second or the third day.

11  Q.  Can you please tell us what exactly the defendant told you

12  about why he was in jail?

13  A.  He told me it was because of his participation with

14  Patrick, and Patrick was the one that brought him into it.

15  Q.  Did the defendant tell you anything else regarding what his

16  participation with Patrick entailed?

17  A.  Yes, sir.

18  Q.  Mr. Mendez, what did he tell you?

19  A.  That Patrick had called him so that they could get together

20  in a certain area, and Patrick told him to bring a weapon, sir.

21  Q.  And Mr. Mendez, when the defendant was referring to

22  Patrick, who did you understand him to be referring to?

23  A.  Joe was referring to Patrick.

24  Q.  Is that the individual you identified earlier in your

25  testimony?

D2QMFER3                        Mendez-Mendez - direct

1    A.  Yes, sir.

2    Q.  And just to be clear, when the defendant told you this, was

3    he discussing what he did or what he was accused of doing?

4    A.  That's part of what he told me, sir.

5    Q.  Let me ask that question again.

6           THE COURT:  What did the defendant say, as the best

7    you can recall, is the way you put the question, Mr. Cronan.

8           MR. CRONAN:  I'm sorry.  I didn't hear all that, your

9    Honor.

10   Q.  What exactly did the defendants say, Mr. Mendez?

11   A.  The defendant told me that he participated with Patrick and

12   that his incarceration was due to the fact that he had

13   participated with Patrick.

14   Q.  During your conversations with the defendant do you ever

15   recall him mentioning a person named Boozer?

16   A.  No, sir.

17   Q.  What about the name Allen?

18   A.  Not that I recall, sir.

19   Q.  The name Tilo?

20   A.  He did not mention that to me, sir.

21   Q.  Do you remember the defendant mentioning any other

22   relatives of Patrick?

23   A.  Not that I can recall, sir.

24   Q.  Did you and the defendant eventually stop being cell mates

25   at 5 north?

1    A.  Yes, sir.

2    Q.  When did the two of you stop sharing a cell?

3    A.  About four or five days later I moved out of the cell.

4    Q.  Why did you move out?

5    A.  I moved because there was another Dominican gentleman who I

6    had known for a while since I had arrived at the MCC, because

7    during the time that I was in that cell lots of different

8    people moved in with me.  So I wanted to be in a calm state and

9    be with one person who had been there for a while.

10   Q.  By the way, at the time you and the defendant started or

11   were sharing a jail cell, had you started to cooperate with the

12   government?

13   A.  Yes, sir.

14   Q.  And did this entail meeting with prosecutors and law

15   enforcement officers?

16   A.  Yes, sir.

17   Q.  Did any of the individuals ever tell you to speak with the

18   defendant?

19   A.  No, sir.

20   Q.  When you were having conversations with the defendant in

21   your jail cell, were you doing so so you later could give that

22   information to the government?

23   A.  No, sir.

24   Q.  Why were you having those conversations?

25   A.  They were ordinary conversations that two cell mates would

D2QMFER3                              Mendez-Mendez - direct

1   have.

2   Q.  Do you recall approximately when you first told the

3   government about the conversations you had with the defendant?

4   A.  Yes, sir.  I more or less do remember.

5   Q.  More or less, when was that?

6   A.  Before the middle of 2012, sir.

7   Q.  And do you recall who was at that first meeting when you

8   talked about the defendant?

9   A.  Yes, sir.

10  Q.  Who was there?

11  A.  You, sir, were there, and these other two prosecutors were

12  there, too, my attorney was there.  There was a government

13  agent there.

14          THE COURT:  This time, when you had this meeting and

15  you first reported the conversations you had with defendant,

16  place it in time in relation to the conversations with the

17  defendant.

18          THE WITNESS:  Can you repeat that for me again.

19          THE COURT:  I want you to tell me in time when you had

20  the conversations with defendant and when you had the

21  conversations with the various officials of the government in

22  which you reported the conversations with defendant.

23          THE WITNESS:  Okay.  The conversations with the

24  defendant occurred at the end of 2011.  Then the meeting with

25  the government was practically in the middle of 2012, sir.

1              THE COURT:  Several months later?

2              THE WITNESS:  Yes, sir.

3    Q.  Do you know how that meeting in the middle of 2012 came

4    about taking place?

5    A.  Yes, sir.

6    Q.  What do you know?

7    A.  They called me in the morning and said that I had a court

8    date.  I didn't know what it was going to be about, the meeting

9    at the court or at the prosecutor's.  Not even my lawyer knew

10   what it was about.

11   Q.  Did you do anything to initiate that meeting?

12   A.  No, sir.

13   Q.  Now, earlier you told us that you're in jail because you

14   have been involved in drug trafficking, is that right?

15   A.  Yes, sir.

16   Q.  When did you first become involved in trafficking drugs?

17   A.  In 1995, sir, at the end of 1995.

18   Q.  How long did you remain involved in the drug business?

19   A.  Until 2009, sir.

20   Q.  Were you involved in drug trafficking nonstop from '95 to

21   2009?

22   A.  There were some pauses, sir, of several months and even

23   years.

24   Q.  I am going to ask you some general questions about your

25   drug trafficking.  If defense counsel have more specific

1   questions, are you willing to answer them?

2              MR. RICHMAN:  Objection.

3              THE COURT:  Sustained.

4   Q.  Now, going back to '95, how did you first become involved

5   in drug trafficking?

6   A.  I was working legally with a man named Damian.

7   Q.  What were you doing for Damian, legally?

8   A.  Legally I was working for him driving a van transporting

9   women to a bar that he had.

10  Q.  Women who worked at that bar?

11  A.  Yes, sir, as waitresses.

12  Q.  Was Damian involved in drug trafficking?

13  A.  Yes, sir.

14  Q.  What type of drugs did Damian traffic?

15  A.  Cocaine, sir.

16  Q.  What did you do for Damian?

17  A.  There were several occasions in which I received cocaine

18  and cash, sir.

19  Q.  Did Damian pay you for working for him?

20  A.  He didn't pay me every single time I worked for him, but I

21  do remember that at the end he gave me a payment of $5,000,

22  sir.

23  Q.  Do you recall when you stopped working with Damian?

24  A.  Yes, sir.

25  Q.  When was that?

D2QMFER3                          Mendez-Mendez - direct

1    A.  In the beginning of 1996, sir.

2    Q.  Did you continue to remain involved in drug trafficking?

3    A.  Yes, sir.

4    Q.  What type of narcotics work did you do next?

5    A.  After that, I worked picking up cocaine from the beaches in

6    Puerto Rico.

7    Q.  How did the cocaine arrive at the beaches in Puerto Rico?

8    A.  They arrived in boats, sir.

9    Q.  What did you do once the cocaine arrived on boats?

10   A.  As an employee my job was to carry the cocaine from the

11   boat to a vehicle.

12   Q.  About how many shipments of cocaine did you unload from the

13   beaches in Puerto Rico?

14   A.  Approximately 10 to 12 shipments, sir.

15   Q.  How large were these shipments?

16   A.  I remember that the smallest one, sir, was 400 kilos and

17   the largest one was 1,153 kilos, sir.

18   Q.  About how much money in profits did you personally make

19   from unloading the cocaine that arrived in Puerto Rico?

20   A.  I estimate it to be about $500,000, sir.

21   Q.  Were you also involved in transporting cocaine by

22   airplanes?

23   A.  Yes, sir.

24   Q.  When did you start doing that?

25   A.  In 2000, sir.

D2QMFER3                         Mendez-Mendez - direct

1    Q.  What was your role?

2    A.  I was the broker in charge of communication between the

3    broker, the distributor, and the transporter.

4    Q.  Where was the cocaine being sent from?

5    A.  From Puerto Rico, sir, to Kennedy.

6    Q.  And how was the cocaine being sent on these flights?

7    A.  It was sent in boxes or containers together with

8    passengers' luggage, sir.

9    Q.  In total, about how much cocaine do you think you helped

10   facilitate being sent on these flights?

11   A.  Approximately 2,000 kilos, sir.

12   Q.  Did you make a profit from doing this?

13   A.  Yes, sir.

14   Q.  About how much?

15   A.  Well, I estimated it to be -- well, with the losses that we

16   incurred I can't give you an exact figure, but I estimate it to

17   be about $1.5 million.

18   Q.  Did that include the losses you suffered?

19   A.  Yes, sir.

20   Q.  Now, when did you stop sending cocaine by airplane?

21   A.  That was like in 2003, sir.

22   Q.  And after that, did you remain involved in distributing

23   cocaine?

24   A.  Yes, sir, in the Dominican Republic.

25   Q.  And in the Dominican Republic were you involved in sending

D2QMFER3                        Mendez-Mendez - direct

1   any cocaine to the United States around this time?

2   A.  No, sir.  Just on one occasion in 2004, together with some

3   associates, I tried to bring into the United States about 50 or

4   60 kilos of cocaine, sir, which never made it.  And I never

5   knew what happened to them.  And then conspiracy charges were

6   filed against me and that's why I'm here today, sir.

7   Q.  Did you also sell drugs to your own customers while you

8   were living in the Dominican Republic?

9   A.  Yes, sir.

10  Q.  Over what period of time did you do this?

11  A.  Until 2009, sir.

12  Q.  In total, about how much cocaine did you sell to your

13  customers while in the Dominican Republic?

14  A.  About 10,000 kilos, sir.

15  Q.  And about how much of profits did you personally make from

16  these sales?

17  A.  About $5 million, sir.

18  Q.  Did you also have any dealings with heroin?

19  A.  Yes, sir.

20  Q.  What did you do with heroin?

21  A.  I remember that in 2006, I stashed or kept in my possession

22  for one of the men with whom I did business between 20 and 25

23  kilos of heroin, sir.

24  Q.  Have you ever owned a gun?

25  A.  Yes, sir.

D2QMFER3                              Mendez-Mendez - direct

1    Q.  When was that?

2    A.  That was from 1997 until 2009, when I was arrested.  No.

3    Excuse me.  Until 2010.

4    Q.  And where were you living at the time?

5    A.  In the Dominican Republic, sir.

6    Q.  Did you have a license to possess that gun?

7    A.  Yes, sir.

8    Q.  Why did you have it?

9    A.  In the Dominican Republic, as a businessman, you are

10   allowed to buy a gun, and you are charged for the license and

11   for carrying it.

12   Q.  Now, after you were arrested in the Dominican Republic in

13   December of 2010 --

14          THE COURT:  How was this left?  Was there a license?

15          MR. CRONAN:  I'm sorry.

16   Q.  Did you, in fact, have a license?

17   A.  I did have one, sir.

18          THE COURT:  You had a license?

19          THE WITNESS:  I used to have one, sir.  I don't have

20   one anymore.

21          THE COURT:  And as a person who earned profits of

22   several millions of dollars in the narcotics trade, did you

23   consider yourself a businessman eligible to receive licenses to

24   carry a gun in the Dominican Republic?

25          THE WITNESS:  I had it way before I had that money.

D2QMFER3                         Mendez-Mendez - direct

1    Remember, that I told you that I had that license since 1997

2    with a license and a license to carry.

3    Q.   Mr. Mendez, other than dealing with narcotics, did you have

4    any other jobs over the past 15 years?

5    A.   Yes, sir.

6    Q.   What else did you do?

7    A.   I worked in my legal company, which was a car dealership,

8    as well as selling very large quantities of agricultural

9    products.

10   Q.   Now, after you were arrested in the Dominican Republic in

11   December of 2010, did you agree to be extradited to the United

12   States?

13   A.   Yes, sir.  I voluntarily signed off on my extradition.

14   Q.   Do you recall when you arrived in the United States?

15   A.   Yes, sir.

16   Q.   When was that?

17   A.   December 30, 2010, sir.

18   Q.   After you arrived in the United States, did there come a

19   time when you pled guilty?

20   A.   Yes, sir.

21   Q.   What crimes did you plead guilty to committing?

22   A.   I pled guilty to the sale and distribution of five or more

23   kilos of cocaine with others.  I pled guilty to attempting to

24   import into the United States five or more kilos of cocaine and

25   to attempt to bring into the United States one or more kilo or

D2QMFER3                          Mendez-Mendez - direct

```
 1   kilos of heroin, sir.

 2   Q.  When you pled guilty did you agree to turn over any

 3   property to the United States Government?

 4   A.  Yes, sir.

 5   Q.  What did you agree to turn over?

 6   A.  An agricultural or a cattle ranch of more than 2,000

 7   hectares, which is valued at about a million dollars, sir.

 8   Q.  You said hectares.  What is an hectare?

 9   A.  Over 2,000 hectares.  In the Dominican Republic one hectare

10   is about 628 square meters, sir.

11   Q.  Have you begun the process of turning over this property to

12   the United States?

13   A.  When I pled guilty, sir, right away I did all the necessary

14   paperwork and, in fact, turned over the deed as well.

15   Q.  Showing you what has been marked for identification as

16   3511-C.  Please flip through that document.

17            Do you recognize it?

18   A.  Yes, sir.

19   Q.  What is that document?

20   A.  This is the agreement by which I pled guilty, sir.

21   Q.  And on the last page do you see your signature?

22   A.  Yes, sir.

23   Q.  I believe what's in front of you is in English.  Was this

24   document read to you in Spanish before you signed it?

25   A.  Yes, sir.
```

D2QMFER3                          Mendez-Mendez - direct

1    Q.  Were you able to understand all the terms and conditions

2    contained in that agreement?

3    A.  Yes, sir.

4    Q.  And did your attorney sign it as well?

5    A.  Yes, sir.

6              MR. CRONAN:  The government offers 35011-C.

7              MR. RICHMAN:  No objection.

8              THE COURT:  Received.

9              (Government's Exhibit 3511-C received in evidence)

10   Q.  Did you meet with the prosecutors and law enforcement

11   officers in your case before you pled guilty?

12   A.  Yes, sir.

13   Q.  And did you tell those individuals about all the crimes you

14   have committed?

15   A.  Yes, sir.

16   Q.  Have you continued to meet with the government after you

17   entered into that guilty plea?

18   A.  Yes, sir.

19   Q.  In total, about how many times have you met with the

20   government?

21   A.  About 25 times, sir.

22   Q.  What have you discussed in those meetings with the

23   government?

24             MR. RICHMAN:  Objection.

25             THE COURT:  Sustained.

D2QMFER3                          Mendez-Mendez - direct

1   Q.  What do you understand to be the maximum sentence that you

2   could face for the crimes that you have pled guilty to

3   committing?

4   A.  Life, sir.

5   Q.  And what do you understand to be the mandatory minimum

6   sentence that you normally would face for the crimes you pled

7   guilty to committing?

8   A.  Ten years, sir.

9   Q.  Have you been sentenced yet?

10  A.  No, sir.

11  Q.  Who will decide what sentence you receive, as far as you

12  understand?

13  A.  The judge, sir.

14  Q.  And what do you understand that you have to do under the

15  agreement that you signed with the government?

16  A.  To cooperate with the government.

17  Q.  And what do you understand that to mean?

18  A.  To be available if the government needs me with respect to

19  testifying and to tell the whole truth.

20  Q.  And did that include testifying against people you may be

21  friends with?

22  A.  Yes, sir.

23  Q.  Mr. Mendez, as far as you understand, does anyone have to

24  be found guilty at this trial in order for you to have met your

25  obligations under that cooperation agreement?

D2QMFER3                          Mendez-Mendez - direct

```
 1   A.  No, sir.

 2   Q.  And just to be clear, what do you mean by no, sir?

 3   A.  That's not my decision, sir.

 4   Q.  What do you understand that the government will do if you

 5   live up to your end of the cooperation agreement?

 6   A.  The government will write a recommendation letter.  It's

 7   called a 5K1, sir.

 8   Q.  What do you understand will be in that 5K1 letter?

 9   A.  How I kept all the promises or all the conditions of the

10   cooperation agreement and, also, the bad things, the bad things

11   in my case for which I'm in jail.

12   Q.  And other than writing that letter, that 5K1 letter, has

13   the government made any other promises to you?

14   A.  No, sir.

15   Q.  And a few moments ago you testified that the crime you

16   committed normally has a mandatory minimum sentence of ten

17   years.

18              THE COURT:  Let's not repeat, please.

19   Q.  Do you understand that if the government sends that 5K1

20   letter you could receive less than ten years?

21   A.  Perhaps.

22   Q.  What's the most amount of time you could receive, even if

23   the government sends that letter?

24              MR. RICHMAN:  Objection.

25   A.  Life, sir.
```

1          THE COURT:  Overruled.  I think you're finished,

2      aren't you, Mr. Cronan?

3          MR. CRONAN:  Your Honor, one or two more questions and

4      I'm done.

5          THE COURT:  I think you were done a few questions ago,

6      but go ahead.

7  Q.  What is your understanding of what will happen to you after

8      you finish serving your prison sentence?

9          THE COURT:  Sustained.

10         MR. RICHMAN:  Objection.

11         THE COURT:  Sustained.  Don't answer.

12 Q.  Lastly, if you do not testify truthfully today, what is

13     your understanding of whether or not you will receive that

14     letter you talked about earlier?

15         MR. RICHMAN:  Objection.

16         THE COURT:  I'm not sure he answered that question.

17     Go ahead, you can answer it.

18 A.  Sir, I would not get that letter.

19         MR. BLANCHE:  No further questions, your Honor.

20         THE COURT:  We will do the cross—examination after

21     lunch.

22         Members of the jury, let's come back here at

23     approximately 2:15.  Close up your books, give them to

24     Ms. Jones on your way out.

25         (Jury not present)

D2QMFER3                      Mendez—Mendez – direct

1              THE COURT:  When you are ready with Mr. Fernandez, let

2     me know.

3              Recess to 2:15.

4              (Luncheon recess)

5              (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D2q0fer4                        Trial

                         AFTERNOON SESSION

                            2:15 p.m.

             THE COURT:  I have given thought to the government's

letter, and I deny the request.  I don't think it's fair to the

defendant, two different people making closing arguments, one

at the beginning, and one in rebuttal.  It becomes two

persuasive arguments against one, and it's not right, so.

D2q0fer4                          Trial

1              (In open court)

2              So members of the jury, never again in your life will

3    everybody rise to attention when you come into the room.  You

4    feel the awesome power of the jury.  Try to get your spouses to

5    do the same thing.  Be seated.

6              Mr. Mendez is on the witness stand.

7              Mr. Mendez, I remind you you are under oath.  I'll

8    introduce you to Mr. Richman, who will cross-examine you.

9    CROSS-EXAMINATION

10   BY MR. RICHMAN:

11   Q.  Good afternoon, Mr. Mendez.

12   A.  Good afternoon, sir.

13   Q.  You were arrested back in December of 2010; is that

14   correct?

15   A.  Yes, sir.

16   Q.  And you began to cooperate immediately; is that right?

17   A.  It took me about a month before I began cooperating.

18             THE COURT:  Mr. Mendez, I want you to speak loudly,

19   not to the interpreter, but to the clock.  See the clock in the

20   back of the room?

21             THE WITNESS:  Yes, sir.

22   Q.  Is it not a fact that you first met with the government,

23   after being arraigned, to meet with the government on

24   January 10, 2011?

25             THE COURT:  I don't know that he knows what

D2q0fer4                        Mendez-Mendez - cross

1   arraignment is, Mr. Richmond.

2   Q.   Would it be fair to say that you met with the government

3   for the first time on January 10th, 2011?

4   A.   More or less, sir.

5   Q.   And you continued to meet with the government numerous

6   occasions, you indicated 25 times?

7   A.   Yes, sir.

8   Q.   When, for the first time, did you ever mention Joe

9   Fernandez?

10  A.   Sir, I mentioned it when I met with the government, sir, in

11  2012.

12  Q.   And you met with them on -- with relation to Mr. Fernandez,

13  on May 10th, 2012; is that right?

14  A.   More or less.  I don't remember the exact date, but it was

15  before the middle of the year.

16  Q.   And that would be 8 months after you saw or met him in

17  jail?

18  A.   I met him at the end of 2011, sir.

19  Q.   Would it be fair to say that you met him the day he was

20  arrested and brought to the MCC?

21  A.   When he was brought to the floor, sir.

22  Q.   And would that not be in or about October 19th, in the

23  year 2011?

24  A.   I don't remember the exact date, sir, but as I said, it was

25  toward the end of the year.

D2q0fer4                       Mendez-Mendez - cross

1   Q.  Would it be fair to say, or reasonable to say at least 8

2   months elapsed before -- in the time you met him, to the time

3   you mentioned to the government?

4   A.  Yes, 8 months would be possible.

5   Q.  How is it that after that period of time you first -- the

6   government became aware that you had allegedly had a

7   conversation with Mr. Fernandez?

8             THE COURT:  Objection sustained, to form.

9   BY MR. RICHMAN:

10  Q.  Now, your narcotics history, and all of the crimes you have

11  committed, have nothing to do with anybody else in this

12  particular case is that fair to say?

13  A.  My crimes?  No, sir.

14  Q.  No, sir.  They had nothing to do?  Or no, sir -- withdrawn.

15  I guess nobody, right?

16            MR. CRONAN:  Objection.

17            THE COURT:  Sustained.

18            MR. RICHMAN:  I'm not quite sure what the answer was,

19  Judge.

20            THE COURT:  There was no answer, because it's a bad

21  question.  A good question gets a good answer.

22            MR. RICHMAN:  Okay.

23  BY MR. RICHMAN:

24  Q.  Would it be fair to say --

25            THE COURT:  I think you have already said -- you have

D2q0fer4                          Mendez-Mendez - cross

1    asked two questions, took 5 to 8 months after the witness met

2    Mr. Fernandez to identify Mr. Fernandez, and all of the crimes

3    that he committed that he regaled us with this morning.  None

4    of them have to do with any of the people in this case, all

5    right.  We have those two things.  Now we'll move on.

6              MR. RICHMAN:  That's what I wanted to make sure.  Now

7    I have lost my place.

8    Q.  You were faced with life imprisonment, is that correct?

9    A.  I was -- can you repeat that again?

10   Q.  Are you faced with life imprisonment?

11   A.  I'm facing life.

12   Q.  And you would like to get out of that limitation, you would

13   like to get out and get a lesser sentence, right?

14   A.  A minimum of 10 years.  I have a maximum of life.

15   Q.  But if you cooperate with the government, then, give them

16   information, it would be better for you, correct, you might

17   even do less than the minimum?

18   A.  Well, yes, everything is possible.

19   Q.  And in fact, your lawyer told you that, correct?

20             MR. CRONAN:  Objection, your Honor.

21             THE COURT:  Overruled.

22   A.  My lawyer and I talked.  And he said if I cooperated with

23   the government, it could go better for me.

24   Q.  And the more you give, the more you get; is that right?

25   A.  I simply have a cooperation agreement with the government.

D2q0fer4                           Mendez-Mendez - cross

1   That's what I have, a cooperation agreement.

2   Q.  Do you know when you signed that cooperation agreement?

3   A.  When I started meeting with the government.

4   Q.  That was a proffer agreement.

5           MR. CRONAN:  Objection, your Honor.

6           THE COURT:  What's the objection to?

7           MR. CRONAN:  The statement.

8           THE COURT:  That was a proffer agreement -- that's not

9   an objection.

10          MR. CRONAN:  It was a statement, not a question.

11          THE COURT:  You had a question mark at the end of it,

12  declaratory statement with a question at the end of it.  I rule

13  it as a question.

14          Was it a proffer agreement?  Do you know the

15  difference?

16          THE WITNESS:  Okay.  It's when I pled guilty.

17  BY MR. RICHMAN:

18  Q.  And when did that occur?  When did that occur, what date?

19  A.  Sir, I pled guilty in November of 2011.

20  Q.  You had met with the government numerous times before you

21  entered your plea, correct?

22  A.  Yes, sir.

23  Q.  How many times did you meet with the government prior to

24  you signing the cooperation agreement about the subject matter

25  of Joe Fernandez?

D2q0fer4                      Mendez-Mendez - cross

1   A.  Yes.  It was when I pled guilty.  When I pled guilty, I had

2   not met with the government about Joe Fernandez yet, at any

3   time.

4   Q.  So you already had the deal with the government, and you

5   were trying to sweeten the deal by giving them more

6   information; is that correct?

7              MR. CRONAN:  Objection.

8              THE COURT:  Objection sustained.

9   BY MR. RICHMAN:

10  Q.  Now, how long of a period of time did you even know Joe

11  Fernandez?

12             THE COURT:  From when to when.

13  BY MR. RICHMAN:

14  Q.  You met him when he first came into the jail on this case,

15  is that correct?

16  A.  When he was brought to MCC, to 5 North, and he shared the

17  cell with me, that's when I met him, sir.

18  Q.  How long did he share the cell with you?

19  A.  Approximately four to five days, sir.

20  Q.  Grand total of four, five days?

21  A.  Yes, sir.

22  Q.  And you never saw him again after that?  Except here?

23  A.  Well, he was on the floor for a few more days.

24  Q.  But you were never in the same cell with him or talked to

25  him at all, correct?

D2q0fer4                         Mendez-Mendez - cross

1   A.  No, I did speak with him, sir.

2   Q.  Would it be fair to say that everything you testified about

3   Joe Fernandez this morning occurred within those four or five

4   days when you first met him?

5   A.  Yes, sir.

6   Q.  Did you write anything down?

7   A.  No, sir.

8   Q.  And you were not asked about him until eight months later,

9   when the government came to see you; is that right?

10  A.  Excuse me?  Repeat that again?

11  Q.  And you -- you didn't -- may it be read back, your Honor?

12          (Read back by the Court)

13          THE COURT:  We have covered this, Mr. Richman.  Let's

14  move on to another question.

15          Objection sustained.  Go on to another question.

16          MR. RICHMAN:  Okay, yeah.

17  BY MR. RICHMAN:

18  Q.  You indicated that Mr. Fernandez spoke Spanish well, is

19  that correct?

20  A.  Yes, sir.

21  Q.  You had a meeting with the government on May 10th, 2012;

22  did you not?

23  A.  Before the middle of the year, of 2012.

24  Q.  Did you tell the government at that time that Joe spoke a

25  little broken up Spanish?

D2q0fer4                           Mendez-Mendez - cross

1    A.  No, that we understood each other perfectly.  I understood

2    him and he understood me.  For me, it was perfect.

3    Q.  You did have a meeting with Mr. Cronan and Mr. Blanche,

4    Mr. Capone, your lawyer, and several other persons; did you

5    not?

6    A.  Yes, sir.

7    Q.  You saw somebody taking notes, did you not?

8    A.  Yes, sir.

9    Q.  Did you have those notes to refresh your recollection

10   before you testified?

11   A.  I didn't see the notes, but I know that they were writing

12   them down.  And I saw that they had, in their hands, what was

13   there.

14          THE COURT:  When you gave your story to the

15   government, did you have the ability to -- withdrawn.

16          Did you read the government's notes?

17          THE WITNESS:  No, sir.

18   Q.  So if somebody wrote that down, they would have been

19   mistaken; is that correct?

20          MR. CRONAN:  Objection.

21          THE COURT:  Objection sustained.

22   BY MR. RICHMAN:

23   Q.  How long did you know Patrick Darge?

24   A.  I met Patrick from the moment I got to 5 North at the MCC.

25   Q.  And that would have been in late 2010; is that correct,

D2q0fer4                          Mendez-Mendez - cross

1    sir?

2    A.  Sir, that was the beginning of 2011.

3    Q.  You -- 2011?

4    A.  Yes, sir.  January of 2011.

5    Q.  And you spoke with Patrick Darge on more than one occasion;

6    is that right?

7    A.  We shared church activities, sir.

8    Q.  And your cells were immediately close to each other?

9    A.  Yes, sir.

10   Q.  And you go into each other's cells on occasion and talk;

11   correct?

12   A.  No, sir.

13   Q.  Did you ever speak to him about other matters other than

14   church matters?

15   A.  We talked about the crime he committed, about his case.

16   Q.  And you did talk about your -- about his case, correct?

17   A.  But not very deeply.  Just that he was in jail for the

18   crime that he had committed, that he was hoping that God would

19   help him to solve his problem, and that he would get out soon.

20   Q.  And that was long before you even met Joe Fernandez,

21   correct?

22   A.  Yes, sir.

23   Q.  And when Joe Fernandez came in -- by the way, you -- you

24   said Joe Fernandez was talking about running away, correct?

25   A.  Yes.  About leaving this country, leaving the United

D2q0fer4                        Mendez-Mendez - cross

1    States, sir.

2    Q.  Were you aware that Joe Fernandez surrendered himself to

3    the authorities?

4    A.  I did not know that, sir.

5    Q.  So would it be fair to say that you knew Patrick and

6    discussed things with Patrick for well over 10 months to a

7    year, if not more?

8    A.  Not over a year, sir.

9    Q.  Would it be fair to say that you knew Patrick's story long

10   before you met Joe Fernandez?

11          MR. CRONAN:  Objection, your Honor.

12          THE COURT:  Overruled.

13   A.  I didn't know his whole story.

14   Q.  Do you know his whole story now?

15          THE COURT:  Can we move on -- no.  No.  Objection

16   sustained.

17   Q.  You stated your first meeting with the government, that

18   over a period of days you started to develop trust for each

19   other, and you said that this morning, as well; you and

20   Mr. Fernandez, is that right?

21   A.  After which meeting?

22   Q.  On August 7th, 2012, the second meeting with the

23   government, didn't you say that you started to develop a trust

24   with each other?

25   A.  That was after practically the middle of the year in 2012.

D2q0fer4                              Mendez—Mendez - cross

1    After I knew him, right?

2    Q.  Well, you only spent four, five days with him, total; is

3    that right?

4    A.  Yes, that's correct.

5    Q.  And when did this trust start?

6    A.  During that time, first day, the second day.

7    Q.  Did he know that you were a cooperating witness at that

8    time?

9              MR. CRONAN:  Objection.

10             THE COURT:  Overruled.

11   A.  He did not know that.

12   Q.  And you didn't tell him, correct?

13   A.  For ethical reasons, I am not supposed to tell anyone that

14   I'm cooperating for the government.

15   Q.  And you're an ethical person?

16             THE COURT:  Let's --

17             MR. RICHMAN:  Withdrawn.

18             THE COURT:  -- have another question.

19             MR. RICHMAN:  Well, withdrawn.

20   Q.  There came a time that Mr. Fernandez was separated from

21   Mr. Patrick, from Patrick Darge, and moved to another place; is

22   that correct?

23   A.  Yes, sir.

24   Q.  Isn't it a fact that Patrick Darge told you:  What I did to

25   that kid?

D2q0fer4                          Mendez—Mendez – cross

1          THE COURT:  Can you change the question, unless it's a
2     quote.
3          MR. RICHMAN:  It is a quote.
4          THE COURT:  So isn't it a fact that Patrick Darge told
5     you, quote, "What I did to that kid," close quote.  Did he use
6     those exact words?
7          MR. CRONAN:  Objection.
8     A.  No.  Patrick mentioned to me, he told me that he loved that
9     young boy as a son, and that he -- he had brought him into
10    this, and that's why this had happened.  But he was sorry.
11    Unfortunately, there was nothing else he could do.
12    Q.  And you look up to Patrick?
13         THE INTERPRETER:  I can't hear you, sir.
14         THE COURT:  Do you look up to Patrick?
15         THE WITNESS:  Do I look up to him?
16         THE COURT:  Sidebar, please.
17         (Continued on next page)
18
19
20
21
22
23
24
25

D2q0fer4                        Mendez-Mendez - cross

1                (At the side bar)

2                THE COURT:  You have to do better than this.

3                Why are we playing around with these guys.  It's not

4       characteristic of you, Mr. Richman.

5                MR. RICHMAN:  I know, Judge.

6                THE COURT:  Why don't you take a few minutes break.

7                MR. RICHMAN:  By taking a break for lunch, threw the

8       whole thing off.  It's not your fault, but it's mine.  I'll be

9       fine.

10               THE COURT:  If you want, I'll give the jury a break.

11               MR. RICHMAN:  No.  No, I'm ready to go ahead.

12               THE COURT:  Are you okay?

13               MR. RICHMAN:  Yeah, sure, I'm okay.

14               THE COURT:  So get to the point, okay?

15               (Continued on next page)

16

17

18

19

20

21

22

23

24

25

D2q0fer4                          Mendez-Mendez - cross

1              (In open court)

2    BY MR. RICHMAN:

3    Q.  Mr. Mendez, did Patrick tell you he was cooperating with

4    the government?

5    A.  Patrick said that he was resolving his case.

6    Q.  Please just answer the question.

7              THE COURT:  That's what he said.

8              Next question.  That's the answer.

9    BY MR. RICHMAN:

10   Q.  You spoke to Patrick in church several times, did you not?

11   A.  We also talked outside of the church; in the tiers, there

12   are tables where you can sit down and eat.

13   Q.  Isn't it a fact that when Joe Fernandez was brought to the

14   institution --

15             THE COURT:  Could you repeat that?  I'm missing the

16   question.

17   Q.  Was it not a fact when Joe Fernandez was brought to the

18   institution, Patrick Darge suggested to the corrections officer

19   that he be housed with you?

20             THE COURT:  Any corrections officers say that to you?

21             THE WITNESS:  Did he ask me, what?

22             THE COURT:  Repeat the question.

23   Q.  Isn't it a fact that Patrick Darge suggested to the

24   correction officer that Joe Fernandez be housed with you?

25             THE COURT:  How could he know that.

1              Rephrase the question, if you want it.

2              MR. RICHMAN:  Your Honor, we have the testimony of

3     Mr. --

4              THE COURT:  Rephrase the question.

5     BY MR. RICHMAN:

6     Q.  Were you present when Joe Fernandez arrived at the

7     institution?

8     A.  When he came to the room that I was assigned to.  But he

9     was assigned by the officer.  Patrick told me it was his

10    cousin.

11             THE COURT:  Mr. Mendez, stop.  Stop.

12             THE WITNESS:  Okay.

13             THE COURT:  Did anybody tell you that Mr. Fernandez

14    was coming into the jail before he came into the jail?

15             THE WITNESS:  No, sir.

16             THE COURT:  Before you saw Mr. Fernandez, in jail, did

17    you know he was coming?

18             THE WITNESS:  No, sir.

19             THE COURT:  Did any corrections officer tell you that

20    Mr. Fernandez, when he came to the jail, would be sharing a

21    cell or being exposed to Mr. Darge?

22             THE WITNESS:  No.  No, sir.  No one told me that.

23             THE COURT:  Move on, Mr. Richman.

24    BY MR. RICHMAN:

25    Q.  Mr. Mendez, is it not a fact you were present when

D2q0fer4                          Mendez-Mendez - cross

1    Mr. Fernandez was brought to the cell and brought to the jail

2    and you were standing with Patrick Darge?  On the tier.

3    A.  We were watching television in the area where they -- they

4    put on the Spanish programs on the television set.

5    Q.  And you were --

6            THE COURT:  So, what, you were not standing, so --

7    were you or were you not standing with Patrick Darge?  Or no.

8            THE WITNESS:  Yes.  We were standing together.

9            THE COURT:  You and Darge were standing, watching the

10   Spanish TV?

11           THE WITNESS:  Yes, sir.

12           THE COURT:  And then what happened next?

13           THE WITNESS:  Well, then, when we were watching

14   television, Mr. Joe arrives.  He was accompanied by two other

15   prisoners so that they could be assigned to the cells where

16   they were going, that they were going to share.

17           THE COURT:  Accompanied by two prisoners, or

18   accompanied by corrections officers.

19           THE WITNESS:  It was with two other prisoners, and one

20   officer.  When he came out of the SHU.  Over there, they call

21   it the SHU.

22           THE COURT:  The S-H-U is Special Housing Unit.

23           THE WITNESS:  When they arrived, after having been

24   arrested, it's where they are put until they are assigned to

25   the floor where they're going to get their cell.

D2q0fer4                          Mendez-Mendez - cross

1          THE COURT:  So Mr. Joe comes with two prisoners and

2     one corrections officer.  And what happens next as between you

3     and Mr. Darge?

4          THE WITNESS:  We were watching television.  Patrick

5     went over to Joe when he saw him to say hello to him.

6          THE COURT:  And what did you do?

7          THE WITNESS:  I stayed at the same spot where I was

8     watching television.

9          THE COURT:  How far away was Darge when he said hello

10    to Joe from you?

11         THE WITNESS:  It was quite close a distance, like --

12    like between here and where the attorney is.

13         THE COURT:  About 20 feet?

14         THE WITNESS:  More or less, sir.

15         THE COURT:  Okay.  Take it from there, Mr. Richman.

16    BY MR. RICHMAN:

17    Q.  And did you hear Patrick say to the correction officer,

18    that there is an opening on his floor, meaning five tier, 5

19    North?

20    A.  No, sir.

21    Q.  Never said that?

22         MR. CRONAN:  Objection.

23         THE COURT:  Overruled.

24    Q.  You didn't hear Patrick say that?

25    A.  To hear Patrick say to the guard there is an available cell

D2q0fer4                          Mendez-Mendez - cross

1    for him?  No.

2    Q.  You indicated that you had numerous cellmates during the

3    period of time that you were there?

4    A.  Yes, sir.

5    Q.  Tell us, more or less, how many cellmates have you had in

6    that period of time?

7    A.  About six, sir.

8    Q.  And which, in the number of six cellmates you have had,

9    which number was Joe Fernandez?

10   A.  In that cell, he was the last one that I had, because I

11   myself decided to move from that cell.

12   Q.  The first time you met with the government concerning

13   mentioning Joe Fernandez's name was in May 2012, is that

14   correct?

15   A.  They were -- they mentioned his name to me.  I didn't

16   mention him to them.  I had no intention of mentioning it to

17   the government.

18                (Continued on next page)

19

20

21

22

23

24

25

D2QMFER5                    Mendez-Mendez - cross

1    Q.  And was that during the proffer session in May of 2012?

2    A.  As I said to you before, I don't have an exact date.  It

3    was midyear.

4    Q.  It was more or less middle of the year.  It was a little

5    less than middle of the year?

6    A.  Correct, sir.

7    Q.  Had you told anybody about these conversations with Joe

8    Fernandez?

9    A.  No, sir.

10   Q.  But some eight months after these conversations the

11   government shows up and asks you about these conversations, is

12   that correct?

13   A.  They asked me about that bunky that I had, and I told them

14   the conversations that we had.

15   Q.  And who called for that meeting, you or the government?

16   A.  No.  The government called for it, sir.

17   Q.  And they had called your lawyer as well?

18   A.  Yes, sir.

19   Q.  And your lawyer was present, was he not?

20   A.  Yes, sir.

21   Q.  And you felt that if you could help the government in this

22   instance it would further help yourself, is that correct?

23   A.  My understanding is that I have a cooperation agreement

24   with the government and that agreement says that I have to help

25   the government in any respect, in any way that I can, so I had

D2QMFER5                         Mendez-Mendez - cross

1    to provide help.

2    Q.  Did they ever call you down to speak to you about any of

3    your other bunkies?

4    A.  No, sir.

5    Q.  Now, you have spoken about numerous people in your own

6    cases, correct?

7    A.  Yes, sir.

8    Q.  And you readily admit that you were a long-time drug

9    dealer?

10   A.  Yes, sir.

11   Q.  You also state that you had some legitimate businesses, is

12   that right?

13   A.  Yes, sir.

14   Q.  And these legitimate businesses, were they not funded by

15   your drug activity?

16   A.  Well, I had my legal businesses which were sustained based

17   on the profits that they themselves made.

18   Q.  So you were a big-time entrepreneur selling drugs for $5

19   million, running a cattle ranch and also running an

20   agricultural feed unit, is that right?

21   A.  Well, my agricultural business started in 2001, and those

22   $5 million did not happen until the end of 2009, when I

23   retired.

24   Q.  You also had a new car business, didn't you, a dealership?

25   A.  Yes, sir.  I sold used cars.

D2QMFER5                          Mendez-Mendez - cross

1   Q.  When were you arrested?

2   A.  I was arrested in 2010, sir, on December 16, 2010.

3   Q.  After Joe Fernandez left your cell and he no longer was a

4   cellmate of yours, did you continue to see Patrick Darge?  The

5   answer is yes or no.

6   A.  It was I who stopped being his cellmate.

7   Q.  After that particular point, did you see Patrick Darge

8   again?

9   A.  Yes, sir.

10  Q.  How often?

11  A.  Every day, sir, because we were on the same floor.

12  Q.  And Patrick would talk to you, is that right?

13  A.  Yes, sir, we chatted.

14  Q.  And you have become pretty friendly with Patrick Darge,

15  have you not?

16  A.  Not pretty friendly.  We shared in different activities.

17  We went to church together.  And at the end of the year I

18  started going to English lessons together with him.  And then I

19  was transferred to another prison.

20  Q.  And would it be fair to say that Patrick Darge told you how

21  to help yourself?

22  A.  No, sir.

23  Q.  Never you spoke about how you can help yourself by

24  cooperating with the government, correct?

25  A.  No, sir.

D2QMFER5                              Mendez-Mendez – cross

1   Q.   Did Patrick ever tell you that he doesn't know how they

2   brought Joe to the same floor that you and he were living on?

3   A.   Yes, he did say that to me, sir.

4   Q.   The answer is yes.

5   A.   That they made a mistake by bringing him to the same floor,

6   that they should have never put him together with him.

7            THE COURT:  Who said that?

8            THE WITNESS:  Patrick said it to me, sir.

9   Q.   And you could see Patrick's cell from your cell, is that

10  right?

11  A.   Yes, sir, I could see the door.

12  Q.   And you were living as virtual neighbors for well over a

13  year?

14  A.   Yes, sir.

15  Q.   And you have a trust for Patrick Darge?

16  A.   No, sir, there was not that kind of trust.  We had some

17  conversations together, we chatted, we went to church together,

18  we had certain conversations because we were both Dominicans.

19  Q.   Would it be fair to say that you knew Patrick much longer

20  than you knew Joe Fernandez?

21           INTERPRETER ILIAKOSTAS:  I'm sorry, Mr. Richman.  I

22  interrupted your question.

23           THE COURT:  Would it be fair to say, Mr. Mendez, that

24  you knew Patrick Darge much longer than you knew Joe Fernandez?

25           THE WITNESS:  Yes, sir.

D2QMFER5                          Mendez-Mendez – cross

1    Q.  Isn't it fair to say that you told Patrick that you would

2    look out for his cousin?

3    A.  I said that we would be in the same cell, we would share

4    things together, and we would get along well.

5    Q.  Did you say you would look out for him?

6    A.  Not look out for him.  He's not a child.  We were going to

7    get along well.

8    Q.  When was the last time you met with the government

9    concerning your testimony in this case?

10   A.  The last time?  On Sunday, sir.

11   Q.  This past Sunday?

12   A.  Yes, sir.

13   Q.  And how about the time before that?

14   A.  I don't remember the exact days because I didn't jot them

15   down, but it was several times.

16   Q.  In preparation for your testimony in these proceedings

17   today.

18   A.  Well, we chatted about the testimony, correct.

19   Q.  They told you what they were going to ask and you told them

20   how you were going to answer, correct?

21   A.  No, sir.  We spoke about what I know to be true about what

22   the truth is and what I'm saying here today, which is the

23   truth.

24   Q.  Before I asked you a question about whether or not Patrick

25   Darge said to you, look at what I got this kid into, referring

1    to Joe.

2              THE COURT:  Did Patrick Darge say that to you?

3              THE WITNESS:  Not look what I've done to this kid, not

4    the word kid.

5              THE COURT:  So the answer to the question is, did he

6    say that to you or not?

7              THE WITNESS:  Yes, sir.

8              THE COURT:  He said that?

9              THE WITNESS:  Yes, sir.

10   Q.  You told the government that, did you not, on January 11,

11   2013, isn't that right?

12   A.  January 11?

13   Q.  Yes?

14   A.  I didn't jot down those dates.

15   Q.  It was just last month and you just didn't remember the

16   date, did you?

17   A.  Well, I don't have the exact date, but it's not that I said

18   that specific thing to them.  I said to them what I've always

19   said to them.

20   Q.  Now, sir, you entered into an agreement, this 5K1, correct?

21   A.  I signed an agreement?

22   Q.  You signed the cooperation agreement with the government,

23   right?

24   A.  Yes, sir.

25   Q.  You also signed a proffer agreement on numerous occasions

D2QMFER5                          Mendez-Mendez - cross

1   with the government, correct?

2   A.  Before I pled guilty and the day that I pled guilty.  I was

3   available to come to any meeting that the government needed to

4   have with me.

5   Q.  One of the issues is that you would tell the truth, is that

6   correct?

7   A.  Yes, sir.

8   Q.  And who is it that determines what the truth is, as you

9   understand it, in the agreement?

10  A.  Well, the truth is determined by the government, and in

11  this case it's determined by the jury and by the judge.

12  Q.  Is it not a fact that the government solely is the

13  determiner of the truth in your case?

14  A.  In my case it is, sir.

15          MR. RICHMAN:  May I have a moment, your Honor.

16          I have no further questions.

17          THE COURT:  Redirect.

18          MR. CRONAN:  Thank you, your Honor.

19  REDIRECT EXAMINATION

20  BY MR. CRONAN:

21  Q.  Mr. Mendez, had Patrick ever mentioned Joe to you before

22  Joe arrived on 5 north?

23  A.  No, sir.

24  Q.  Why did you not mention the defendant to the government

25  prior to that mid 2012 meeting?

1              MR. RICHMAN:  Objection.

2              THE COURT:  Sustained.

3              Stand up when you make an objection.

4              MR. RICHMAN:  I'm sorry.

5     Q.  Why didn't you take notes of your conversations with the

6     defendant?

7              MR. RICHMAN:  Objection.

8              THE COURT:  Sustained.

9              Mr. Cronan, there is no legal compulsion to do a

10    redirect.

11             MR. CRONAN:  Your Honor, I'm just clarifying a couple

12    of points made on cross.

13             THE COURT:  I noticed.

14    Q.  Who did you talk about with the government prior to your

15    guilty plea?

16             MR. RICHMAN:  Objection to the form of the question.

17             THE COURT:  Overruled.

18    A.  With who?

19    Q.  What individual did you tell the government about prior to

20    when you pled guilty?

21    A.  About all the people who had done -- who had worked in the

22    drug trafficking business with me, people in the military in my

23    country, and they extortioned me.  I was extortioned by them.

24    My whole story I told them, sir.

25    Q.  Are you still meeting with the government regarding those

D2QMFER5                          Mendez—Mendez – redirect

1    individuals?

2    A.   Yes, sir.

3    Q.   And as you sit here today do you know if you'll ever be

4    required to testify against any of those individuals?

5              MR. RICHMAN:  Objection.

6              THE COURT:  Overruled.

7    A.   If I have to testify, sir, I will testify.

8              THE COURT:  Side bar.

9              (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D2QMFER5                         Mendez—Mendez – redirect

1                (At the side bar)

2                THE COURT:  Explain it me how the jury is going to be

3     helped or either side is going to be hurt or helped by the

4     answer to that last question.

5                MR. CRONAN:  Sure.  I believe the suggestion was that

6     this witness needed to tell the government about Mr. Fernandez

7     in order to gain a favorable 5K1 letter.  These questions

8     confirm that the witness continues to meet about far more

9     significant individuals and he may testify.  Your Honor, that

10    is also my last question on redirect.

11               (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D2QMFER5                          Mendez–Mendez – redirect

1            THE COURT:  Mr. Cronan says that was his last

2   question.

3            Mr. Mendez, you are excused.

4            (Witness excused)

5            THE COURT:  Next witness.

6            MR. CRONAN:  Your Honor, the government calls

7   Detective Salvatore LaCova.  He is being retrieved right now.

8    SALAVATORE LaCOVA,

9        called as a witness by the Government,

10       having been duly sworn, testified as follows:

11   DIRECT EXAMINATION

12   BY MR. CRONAN:

13   Q.  Where do you work, Detective?

14   A.  I work for firearms analysis section, forensic

15   investigations division, New York City Police Department, crime

16   laboratory.

17   Q.  How long have you been with the NYPD?

18   A.  19 years.

19   Q.  And over that period how long have you been a detective?

20   A.  Since 2003.

21   Q.  How long have you worked in the firearms analysis section?

22   A.  Seven years.

23   Q.  Can you describe what type of work is performed in the

24   firearms analysis section?

25   A.  It's broken up into a number of different parts.  There is

D2QMFER5                        LaCova - direct

1    firearms operability, there is serial number restoration, and

2    microscopy.

3    Q.  Which section do you currently work in?

4              MR. RICHMAN:  If it would help, your Honor, I would

5    stipulate to Detective LaCova's expertise.

6              THE COURT:  I think we ought to know a little bit

7    about him before we concede.

8    Q.  What section of the lab do you work in right now?

9    A.  I work in the microscopy section.

10   Q.  What type of work is done in the microscopy section of your

11   lab?

12             THE COURT:  With microscopes.

13   A.  We utilize a comparison microscope, which is two compound

14   microscopes joined together with one set of oculars, and we

15   identify bullets, cartridge casings, and bullet fragments.

16   Q.  Have you also worked in other sections of your lab?

17   A.  Yeah.  I worked at the operability section, firearms

18   operability and identification.

19   Q.  Let's talk very briefly about your background in firearms

20   analysis and ballistics.

21             Have you received any training in firearms analysis?

22   A.  Yes.  When I first was assigned to the firearms analysis

23   section I received a seven-month training program, which was

24   administered by a forensic consultant hired by the New York

25   City Police Department.

1          The training program is based off of the AFTE training

2     manual.  AFTE is the Association of Firearm and Tool Mark

3     Examiners.  It is an international organization.  It's in over

4     40 countries.  It has approximately a thousand members.

5          During that course we learned the actions of many

6     different types of firearms:  Revolvers, semiautomatic pistols,

7     rifles, shotguns, machine guns, submachine guns.  We were

8     trained by firearms manufacturers themselves:  Colt,

9     Springfield, Glock, just to make a few.

10          I also received further training from Alcohol and

11     Tobacco and Firearms, ATF, in the IBIS system.  IBIS is the

12     Integrated Ballistics Identification System.

13          THE COURT:  Mr. Richman, this point might be a good

14     point --

15          MR. RICHMAN:  I stipulated before.

16          THE COURT:  Detective LaCova is accepted as an expert

17     on firearms analysis.

18          MR. RICHMAN:  Thank you.

19  Q.  Let's then move on to the components of a gun.  What is a

20     cartridge?

21  A.  A cartridge is a unit of ammunition.  It consists of four

22     parts.

23  Q.  I'm sorry, Detective.  Can you raise your voice a little

24     bit.

25  A.  A cartridge is a unit of ammunition.  It consists of four

1    parts.  It has a cartridge case; a bullet, which is seated in

2    the mouth of the cartridge case; propellant or gun powder,

3    which is inside of the cartridge case; and a primer, which is

4    seated at the base of the cartridge case with head stand

5    barrier.

6    Q.  Would anything help you demonstrate for the jury exactly

7    what is in a cartridge?

8    A.  Yes.  I brought with me for demonstration purposes a

9    cartridge.

10            MR. CRONAN:  Your Honor, with the Court's permission,

11   we request to be able to use this demonstrative.

12            THE COURT:  Unless the jury really needs this, we know

13   more than we know about this.

14            Jury want to hear this?

15            You do.  Okay.  Go ahead.

16            MR. CRONAN:  May I approach?

17            THE COURT:  Yes.

18   Q.  Is this the demonstrative you referred to a second ago?

19   A.  Yes, it is.

20   Q.  Using this demonstrative, can you point out the different

21   components that you just explained for us?

22            THE COURT:  Why don't you stand up, show it to the

23   jury.

24   A.  This part here would be the cartridge casing.

25            THE COURT:  What's the here?

D2QMFER5                         LaCova - direct

1           THE WITNESS:  From here to here, where my hands are.

2           THE COURT:  The buff brown?

3           THE WITNESS:  Yes.  The bullet would be seated in the

4   mouth of the cartridge casing.  On the back of the cartridge

5   casing there would be a primer back here.

6           THE COURT:  What's the function of the primer?

7           THE WITNESS:  Primer is a high explosive that is

8   seated into the back of the cartridge.  When it is struck by a

9   firing pin, it explodes, which ignites the gun powder inside of

10  the cartridge casing, which causes the pressure to build up

11  inside this cartridge casing.  And when pressure reaches its

12  limit, it forces the bullet off of the cartridge casing, down

13  the barrel, and out of the firearm.

14  Q.  Where are cartridges stored in a gun before the bullet is

15  fired?

16  A.  Well, if there -- if it was in a handgun, let's say, there

17  would be -- there is two main types of handguns, although there

18  are a number of different types.  But there is a revolver and a

19  semiautomatic handgun.  In a revolver there is a cylinder and

20  in the cylinder there is a number of chambers cut into the

21  cylinder.

22          THE COURT:  You have an example?

23          THE WITNESS:  I do, your Honor.

24          THE COURT:  Show it.

25  Q.  Detective, just very briefly, what did I just hand to you?

D2QMFER5                      LaCova - direct

1   A.   You handed me two inert firearms.   This one here is the

2   revolver that I was explaining.   This is the cylinder here.   It

3   has a number of chambers that are cut inside the cylinder.   A

4   shooter would have to manually load each unit of ammunition

5   into the cylinder and then close it.   For this firearm to fire,

6   if you pull the trigger, the hammer and the cylinder would

7   rotate and it would spin a fresh chamber in front of the

8   barrel.   When the hammer falls, it strikes the primer, causes

9   that explosion that ignites the gun powder in the cartridge

10  casing and then forces the bullet down and out of the barrel.

11  The cartridge cases in a weapon like this, when they are fired,

12  they remain inside of the weapon until somebody would have to

13  manually eject them.

14  Q.   Detective, can I just stop you for a moment there.   You

15  mentioned that the gun is inert.   Just to be clear, are either

16  of those two guns operable?

17  A.   No.   They have both been rendered inoperable.

18          THE COURT:   Thank you.

19  Q.   The revolver you just described, to be clear for the

20  record, what exhibit number is that?

21  A.   82.

22  Q.   And what is Exhibit 81?

23  A.   81 is rendered inoperable semiautomatic weapon that

24  utilizes a magazine --

25          THE COURT:   Or a clip?

D2QMFER5                          LaCova - direct

 1              THE WITNESS:  Okay.

 2     A.  -- in order to feed ammunition into this weapon.

 3              The magazine consists of four parties:  Magazine body,

 4     which is the silver part, a follower, which is this orange part

 5     on the top of it.  Inside of here there is a magazine spring.

 6     And a floor plate, which is the black portion on the bottom.

 7              So a shooter would have to manually load this

 8     magazine, one unit of ammunition at a time onto that follower,

 9     which would depress the spring.  And then in order to make it

10     fire the firearm, they would have to manually load that

11     magazine into the handle or the grip of the firearm.

12              THE COURT:  Does the magazine come preloaded?

13              THE WITNESS:  No, not from the factory.  Somebody

14     would have to do that, your Honor.

15              THE COURT:  But he could do it well before the need

16     for shooting?

17              THE WITNESS:  Yes.

18     A.  Once it's loaded into the firearm, a shooter would have to

19     take the top of the firearm, which is called the slide, and

20     move it rearward.  This does two things.  It opens the chamber

21     and it cocks the weapon.  And then in order to load a fresh

22     unit of ammunition from the magazine into the weapon, they

23     would have to close the slide.  And when the slide goes forward

24     it locks the chamber, it takes the top cartridge off the

25     magazine and loads it into the chamber.  Now this firearm is

D2QMFER5                          LaCova - direct

1   ready for firing.

2           When a shooter depresses the trigger, it causes the

3   hammer to go rearward and then strike a firing pin, which, and

4   similarly to what happens with the revolver, it crushes the

5   primer, which explodes and ignites the gun powder or propellant

6   in the cartridge case.  And then when the pressure is built up

7   it forces the bullet through the barrel and out of the weapon.

8           But in a case like this, the semiautomatic weapon, the

9   extra energy or inertia from that fired cartridge causes it to

10  open, extract and eject that fired cartridge on its own, cock

11  the weapon, and then load a new cartridge from the magazine

12  back into the chamber.  So this one will do it from the energy

13  of the fired cartridge.  It will do it all by itself.

14  Q.  Detective, when you say that the semiautomatic you had in

15  your hands will expel the cartridge, which part of the

16  cartridge are you referring to?

17  A.  At that point we would just be left with the metal case.

18  Q.  Is that also called a shell casing, too?

19  A.  A shell casing, yes.

20  Q.  Does a revolver also expel shell casings?

21  A.  No.  A revolver is designed to keep the shell casings

22  inside the cylinder, and then it would have to be opened and

23  manually ejected.

24  Q.  Going back to the semiautomatic gun, are you able to

25  estimate how far from the gun the shell casings are expelled

D2QMFER5                         LaCova - direct

1   when the gun is fired?

2   A.  No, we cannot give -- we cannot give a good estimate of

3   extraction and ejection from a fired cartridge casing.  There

4   has been a number of studies that have tried to simulate that,

5   but due to environmental factors, concrete or what the shooter

6   would be shooting on, it's never anything that we can nail

7   down.

8   Q.  Going back to Exhibit 81, just point out where the barrel

9   of that firearm is.

10  A.  This is the barrel.  And when the slide is closed, it's

11  hidden inside the slide here.

12  Q.  What is inside of the barrel of a gun?

13  A.  Manufacturers cut what's called rifling or spiral groove

14  into the barrel.  We call them lands and grooves, high spots

15  and low spots.  And this gives the bullet stabilization in

16  flight and accuracy.

17  Q.  When someone talks about the caliber of a firearm, what are

18  they talking about?

19  A.  The caliber is the internal measurements of a barrel and

20  measured in hundredths of an inch.

21  Q.  What is a .380 caliber bullet?

22  A.  A .380 caliber bullet, or .380 caliber ammunition, is .380

23  or .38 caliber.

24  Q.  .380 what?

25  A.  800ths of an inch.

D2QMFER5                          LaCova - direct

1   Q.  What is a nine-millimeter caliber?

2   A.  Nine-millimeter .380, .38, .38 special, .357 magnum .357

3   SIGs, are all essentially the same caliber.  They are from .353

4   to .357.  However, these particular firearms cannot shoot each

5   other's designated ammunition with some exception.  But when we

6   talk about the bullet itself, a .380 caliber bullet generally

7   weighs somewhere in the 95 grain, which is a firearms term for

8   weight, and nine-millimeter bullets are heavier.  They start

9   approximately 115 grains and go up.

10  Q.  Does a .380 caliber bullet and a nine-millimeter caliber

11  bullet have the same diameter, approximately?

12  A.  Approximately, yes.

13  Q.  What is the difference between those two types of bullets

14  other than their weight?

15  A.  Their length.

16  Q.  Can a nine-millimeter gun fire a .380 caliber bullet?

17  A.  Nine-millimeters can fire .380 caliber ammunition, which

18  would include the bullet.

19  Q.  Why is that?

20  A.  Because the chambers is larger.  A nine-millimeter bullet

21  or cartridge is measured 9 by 19, and .380 caliber ammunition

22  is 9 by 17.  So whenever we have a smaller ammunition with the

23  same diameter, which would be the bullet, we could fire that

24  out of a nine-millimeter, but we can't close a chamber on a

25  nine in a .380.

D2QMFER5                          LaCova - direct

1   Q.  So is a .380 caliber gun able to fire a nine-millimeter

2   bullet?

3   A.  Ammunition, no.

4   Q.  How large of a gun can a .380 caliber gun be?

5   A.  It can be something as small that you can hide it in your

6   hand or something quite large.

7   Q.  Does the caliber of a gun determine its overall size?

8   A.  No.

9   Q.  Are scratches left on a bullet when it is discharged

10  through the barrel of a gun?

11  A.  They are called striations, yes.

12  Q.  How are striations left on a bullet when it's shot from the

13  barrel of a gun?

14  A.  During the manufacturing process, when the manufacturer

15  cuts that rifling into the barrel, he uses a number of

16  different tools.  In the case of cut rifling, they use these --

17  they call them broaches, and they pull them through, each one

18  is bigger than the next, until they get -- until they get what

19  they are looking for as far as their individual manufacturer's

20  determination.

21       So manufacturers can use six lands end grooves, two

22  different manufacturers could use six lands end grooves, but

23  the widths between the individual manufacturers are going to be

24  different.  Each time the manufacturer uses that same tool, and

25  they may use this same tooling through hundreds of barrels,

D2QMFER5                          LaCova - direct

because the tool is softer than the metal that it's -- which

would be the firearms barrel, it changes with each pass of the

tool.  And that's what we use, those microscopic differences we

use to make our identifications.

Q.  To be clear on that, is every gun barrel unique to itself

with respect to the striations that the barrel leaves on a

bullet fired from that gun?

A.  Yes.

Q.  And are you able to conduct a microscopic examination of

bullets to determine whether they were fired from the same gun?

A.  Yes.  At the end of our training in microscopy we receive

what's called a ten-barrel test.  It's a validation study.  We

have ten barrels from Ruger and we have two bullets that were

fired through each barrel.  Those are our knowns.  And then we

have 15 unknowns.  So we don't know where these bullets were

fired from.  What we have to do is successfully match the

unknown bullets to the known bullets.

          In this particular case when we have the ten-barrel

test and ten Ruger barrels, these Ruger barrels were

consecutively made -- one after another, not exactly at the

same time, but utilizing the same materials in the factory and

the same tools.  So what we have is we have class

characteristics, we have individual characteristics.  In the

case of a ten-barrel test, the class characteristics are the

same.  They are all six right barrels.  The measurements are

1   exactly the same from land to land and groove to groove.

2   That's class.  What's different is the individual.  Each passes

3   that tool.  There is some wearing done on that tool and it's

4   going to leave different individual striations inside that

5   barrel.  When a bullet passes through the barrel, the bullets

6   start off there slightly larger than the barrel.  From the

7   force, it's pressed through the barrel.  So what happens is, we

8   pick up -- I don't know if you can see it, but there is

9   individual -- they are scratches, but they are deep scratches.

10  We call them striations.  And what we have to do is

11  successfully match these striations.

12  Q.  What device do you use when you try to successfully match

13  those striations?

14  A.  We utilize a comparison microscope.

15  Q.  And do you need the actual gun to determine whether these

16  bullets were fired from the same gun?

17  A.  No.  In absence of a gun we can determine that they were

18  fired from what we would call a common source, or one firearm.

19  Q.  Now, earlier you testified that when a semiautomatic --

20          THE COURT:  Common source meaning the same particular

21  firearm or the same class of firearms?

22          THE WITNESS:  From the same firearm, or we'd also be

23  able to determine if they were fired from different firearms.

24  So we would say -- for instance, if we had a number of fired

25  bullets at a scene, we can determine how many guns were at that

D2QMFER5                          LaCova - direct

1   scene.

2              THE COURT:  If every passing of a bullet creates a

3   different striation, how could you establish commonality?

4              THE WITNESS:  The bullets don't create the striations.

5   The striations are in the firearm.  The bullets are softer than

6   the barrel, so they pick up the internal, the striations from

7   inside the barrel.

8              THE COURT:  In using the same weapon, one of those two

9   that you showed the jury a moment ago, and you fire six bullets

10  from each or six cartridges from each, will each and every one

11  of the cartridge from the same weapon be identical?

12             THE WITNESS:  Yes.  The cartridge cases will have what

13  we call breach face impressions and firing pin impressions, and

14  the bullets would have the striations from the barrel.

15             THE COURT:  And they would be identical?

16             THE WITNESS:  Yes, sir.

17  Q.  And you just mentioned, I believe, for the first time the

18  breach face impressions.  What is a breach face?

19  A.  The breach is the back of the firearm.  In the

20  semiautomatic pistol here it's the slide.  The cartridge case

21  strikes that breach when it's leaving the firearm.  When it's

22  locked into the chamber it sits right up against -- the breach

23  is sitting right up against that -- the headstand barrier of

24  the cartridge case.  Inside the breach, there is a whole cut in

25  here called an aperture hole and that's where the firing pin

1    protrudes through after it's struck by the hammer.

2            Once that firing pin strikes the primer and that

3    explosion happens, in a case of a semiautomatic pistol it's

4    using the inertia from that fired cartridge.  The energy is

5    forcing the bullet down and out of the barrel, but it's also

6    forcing the cartridge case into the breach face and it's

7    causing this to open, extract and eject that fired cartridge,

8    cock the weapon, strip a new cartridge off the magazine, and

9    then load it again.  And from the energy of that cartridge case

10   striking that breach, during the manufacturing process there is

11   a number of tools that are utilized in the manufacturing of

12   that breach and those tool marks are impressed into the

13   headstand barrier.

14           THE COURT:  So each weapon has an insignia that is

15   unique to that particular weapon?

16           THE WITNESS:  Yes, sir.

17           THE COURT:  And your job as a ballistics expert is to

18   match and see if they come from a common source?

19           THE WITNESS:  Or a number of sources, yes.

20   Q.  Maybe using Exhibit 80, the cartridge, can you show where

21   those breach face and firing pin impressions are left?

22   A.  In the bag.  The actual breach is off of this.  It should

23   be in that bag.

24   Q.  Sorry, Detective.

25   A.  It doesn't seem to be.

| | |
|---|---|
| 1 | THE COURT:  I think we can dispense with it. |
| 2 | MR. CRONAN:  We will move on. |
| 3 | Q.  Detective, did your lab also receive physical evidence? |
| 4 | A.  Yes, we do. |
| 5 | Q.  Is that the evidence you review in the lab? |
| 6 | A.  I'm sorry? |
| 7 | Q.  Is that the evidence that you review in your lab? |
| 8 | A.  Yes. |
| 9 | Q.  Did there come a point when you were assigned a case with |
| 10 | laboratory numbers 2012-050527 and 2000-01900? |
| 11 | A.  Yes. |
| 12 | Q.  As you sit here today, do you remember offhand when those |
| 13 | cases were assigned to you? |
| 14 | A.  No, I do not. |
| 15 | Q.  Do you remember all the details of your analysis? |
| 16 | A.  No, I do not. |
| 17 | Q.  Would there be anything that would refresh your |
| 18 | recollection? |
| 19 | A.  My notes, yes, my report. |
| 20 | Q.  I'm handing you 3508-E and 3508-F. |
| 21 | Do you recognize those two documents? |
| 22 | A.  Yes, I do. |
| 23 | Q.  What are they? |
| 24 | A.  They are firearms reports that I created in our laboratory. |
| 25 | Q.  And is your handwriting on that? |

D2QMFER5                          LaCova – direct

1   A.  My signature is down at the bottom.

2   Q.  By looking at this paperwork do you remember all the

3   details of your analysis and conclusions?

4   A.  Yes, I do.

5   Q.  Would you need to actually read from that to be able to

6   testify today?

7   A.  Some of the finer points, yes.

8            MR. CRONAN:  Your Honor, I would request that the

9   witness be allowed to refer to his notes.

10           THE COURT:  Start with his recollection.  It may be

11  enough.

12           MR. CRONAN:  Excuse me?

13           THE COURT:  Start with his recollection.  It may be

14  enough.

15  Q.  When were you assigned to work on those two lab cases?

16  A.  April 2012.

17  Q.  What do the first four digits on those cases, 2012 and

18  2000, indicate?

19  A.  That would be the case number itself.

20           THE COURT:  Do you inspect various items of ballistic

21  material?

22           THE WITNESS:  Yes, I did, your Honor.

23           THE COURT:  What did you inspect.

24           THE WITNESS:  I inspected fired bullets and cartridge

25  casings, as well as one complete unit of ammunition.

1            THE COURT:  And did you inspect those from the

2     perspective of trying to find out if they came from one or

3     several weapons?

4            THE WITNESS:  Yes, sir.

5            THE COURT:  What did you find out?

6            THE WITNESS:  In this particular case we had one

7     nine-millimeter cartridge casing, one nine-millimeter bullet,

8     we had 14 .380 caliber cartridge casings, and I believe eight

9     .380 caliber class bullets, with the exception of two, being

10    they were too deformed to actually call class on the bullets.

11    And then I had three bullets that were received from the

12    morgue, two in one case and one in another case.

13    Q.  Let's start with Government Exhibit 60 which I just handed

14    you.  What is in that?

15    A.  There is two .380 caliber class deformed bullets in this

16    case.

17    Q.  Where did you obtain those two from?

18    A.  They were obtained from the medical examiner's office.

19    Q.  And were these deformed bullets?

20    A.  Yes, they were.

21    Q.  What do you mean when you say that a bullet had deformed?

22            THE COURT:  Can't we go right to the question.

23            MR. CRONAN:  Your Honor, there has been testimony

24    about deformed bullets.

25            THE COURT:  Can't we go right to the question.

D2QMFER5                        LaCova - direct

1    Q.  What does it mean for a bullet to be deformed?

2    A.  When it engages the rifling in the firearm, it changes from

3    its original state, which would be pristine, and then it picks

4    up those striations and landing groove impressions.

5    Q.  Were you able to conduct a microscopic examination of the

6    two bullets in Exhibit 60?

7    A.  Yes.

8    Q.  What did that examination allow you to determine?

9    A.  They were fired from the same firearm.

10   Q.  How did you reach that determination?

11   A.  Based on agreement of individual characteristics, both land

12   and groove impressions.

13   Q.  Let's go to Exhibit 61.  What's in Exhibit 61?

14   A.  One .380 caliber class bullet.

15   Q.  Where did you obtain that bullet from?

16   A.  That was also from the medical examiner's office.

17   Q.  Were you able to do a microscopic examination on that

18   bullet as well?

19   A.  Yes, I was.

20   Q.  And were you able to determine whether or not the bullet in

21   Exhibit 61 from the morgue was fired from the same gun as the

22   two bullets in Exhibit 60?

23   A.  All three bullets were fired from the same firearm.

24   Q.  Let's go to the third envelope, Exhibit 62.

25          What's in that envelope?

1    A.  This one contains the nine-millimeter cartridge casing, a

2    number of .380 caliber cartridge casings, one nine-millimeter

3    bullet, and two bullets that I classified to be unknown caliber

4    class, and then six that were .380 caliber class bullets.

5    Q.  Where did all that ballistic evidence come from?

6    A.  This came from the same scene.

7    Q.  I'm sorry?

8    A.  This came from the same crime scene.

9    Q.  Now, you mentioned there was a full cartridge, is that

10   right?

11   A.  Yes.

12   Q.  Were you able to determine whether this full cartridge was

13   fired from a gun?

14   A.  It was a full cartridge, so it was intact.  It had a

15   primer, the cartridge casing and the bullet seated on it.  So

16   it was not fired from the firearm.

17   Q.  And what does what you said signify to you?

18   A.  That it was not fired.

19           THE COURT:  It was not fired?

20           THE WITNESS:  It was not fired.  Was a complete unit

21   of ammunition.

22   Q.  Was that unit of ammunition in pristine condition or had it

23   been altered in any way?

24   A.  It had what we would call a light hit or some kind of

25   firing pin strike on the primer.

D2QMFER5                         LaCova - direct

1   Q.  And the fact that there was a firing pin strike, what did
2   that indicate to you?
3   A.  It could indicate -- there is a number of reasons that it
4   could be, some unexplained.  But it looks like there was an
5   attempt for somebody to fire that cartridge.
6   Q.  If that were to happen, could that cartridge then be
7   cleared from the gun?
8   A.  If it does not -- if it does not fire and it was done so by
9   utilizing -- it was in the chamber, it would have to be
10  manually cleared.
11  Q.  Maybe using Exhibit 81, can you show how that's done?
12  A.  Well, if there was a cartridge casing here and somebody
13  pulled the trigger and it went click instead of bang, you would
14  have to manually open -- pull the slide rearward and that would
15  cause the firearm to extract and eject that unfired cartridge
16  case or a dud, if you will, out of the firearm and then they
17  would have to close it and that would strip -- assuming that
18  there was more ammunition in the magazine, that would strip the
19  next cartridge off the top of the magazine and load it into the
20  chamber, and now it's ready to be fired.
21  Q.  Now I believe you said in Exhibit 62 also had some shell
22  casings, is that right?
23  A.  That is correct.
24  Q.  How many shell casings were there?
25  A.  15.

D2QMFER5                         LaCova - direct

1    Q.  Were all the shell casings from the same type of cartridge?

2    A.  There was one nine-millimeter and 14 .380 caliber class

3    cartridges.

4    Q.  Were you able to conduct a microscopic examination of those

5    15 shell casings?

6    A.  Yes, I was.

7    Q.  What did that examination allow you to determine?

8    A.  The 14 .380 auto caliber cartridge casings were fired from

9    the same firearm.  The one nine-millimeter cartridge casing was

10   fired from a different firearm than those 14.

11   Q.  Now, let's turn to the bullets that are in Exhibit 62.

12              How many bullets were recovered from the crime scene?

13   A.  I believe eight.

14   Q.  How many bullets were recovered from the morgue?

15   A.  Three.

16   Q.  In your experience, is it uncommon for there to be more

17   shell casings recovered than bullets?

18   A.  No.  It's common to have more shell casings than bullets

19   recovered.

20   Q.  Why might be more shell casings recovered from a crime

21   scene than bullets?

22   A.  Let's say if there is a back stop behind wherever the

23   shooting is, they just may go enter into a wall or wood frame

24   or something, then they are not recovered.  They can be so

25   fragmented that they just disintegrate.  Or in the case that

D2QMFER5                        LaCova - direct

1   there is not a backstop, there is no wall or there is nothing

2   to catch the bullet, it just continue on to wherever its

3   destination is.

4   Q.  Now, with respect to the eight bullets that were recovered

5   from the crime scene in Exhibit 62, were you able to conduct a

6   microscopic comparison of all eight bullets?

7   A.  Yes.

8   Q.  What did that comparison reveal to you?

9   A.  We had one nine-millimeter bullet, which was fired from a

10  firearm other than those -- than the remaining seven .380

11  caliber class bullets.  And when I say that, two of them, two

12  of those bullets during my examination, I was unable to call

13  its class because the base was so deformed that I couldn't get

14  proper measurements on there.  One of those bullets was

15  inconclusive to the remaining bullets other than the

16  nine-millimeter, which it was out to that.  And then the

17  remaining six were all fired from the same firearm.

18  Q.  When you say the one bullet was inconclusive, what do you

19  mean by that?

20  A.  I mean that it was -- although it had the same class

21  characteristics as the .380 caliber class bullets, the

22  individual -- there wasn't enough individual characteristics to

23  make a call.

24  Q.  And with respect to the six .380 caliber bullets that were

25  fired from the same gun, were you able to determine if they

D2QMFER5                         LaCova - direct

1    were fired from the same gun as the three bullets recovered

2    from the morgue?

3    A.   Yes, they were recovered from that same firearm.

4    Q.   And was the nine-millimeter bullet fired from the same

5    firearm?

6    A.   No.  From a different firearm.

7    Q.   Based on your examination of all the ballistics evidence

8    provided to you in this case, were you able to determine the

9    minimum number of firearms that were used?

10   A.   Yes.

11   Q.   What is that?

12   A.   Two.

13            MR. CRONAN:  Nothing further, your Honor.

14            THE COURT:  Cross.

15            MR. RICHMAN:  I will be very brief.

16            I have no objection to offering the reports in as

17   evidence.

18            THE COURT:  We don't need to.

19   CROSS-EXAMINATION

20   BY MR. RICHMAN:

21   Q.   Detective LaCova, you found a whole bullet, a .380, is that

22   correct, a whole cartridge?

23   A.   When you say found, I wasn't --

24   Q.   You are right.  You were given a whole cartridge, is that

25   right?

D2QMFER5                    LaCova - cross

1   A.  Yes, sir.

2   Q.  As having been found at the location?

3   A.  Correct, yes.

4   Q.  That was a .380?

5   A.  .380, yes, sir.

6   Q.  Most of the shots appeared to have come from a .380?

7   A.  Yes.

8   Q.  Do you have the ability to have a microscopic examination

9   of the shell casing?

10  A.  I do.

11  Q.  And in checking it out you were able to check the shell

12  casings, and they usually make an imprint from the firing pin,

13  is that correct?

14  A.  Yes.

15  Q.  Were you able to check the firing pin from the .380

16  cartridge, which appeared to have been cleared with the shots

17  that came from the .380?

18  A.  It was inconclusive.

19  Q.  And a .380 would be smaller or larger than a

20  nine-millimeter?

21  A.  Smaller.

22  Q.  Now, the only cartridge you found, single cartridge, was

23  from a .380?

24  A.  Yes, sir.

25  Q.  And you say that the likelihood is that it had been

1    cleared, is that right?

2    A.   That's one way it could have found its way to that scene,

3    because of the fact that it had an attempted strike on the

4    firing pin, but that's not the only way.

5    Q.   That's the most reasonable conclusion, would that be fair

6    to say?

7    A.   Yes, sir.

8               MR. RICHMAN:  I have no further questions.

9               THE COURT:  Redirect?

10              MR. CRONAN:  No, your Honor.

11              THE COURT:  Thank you, Detective.  You are excused.

12              (Witness excused)

13              THE COURT:  Side bar, please.

14              (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

D2QMFER5

1          (At the side bar)

2          THE COURT:  The conference that I was supposed to have

3     has disappeared, so I can go longer, if you want.

4          MR. BLANCHE:  We don't have any other witnesses

5     because we thought we were ending.

6          THE COURT:  What are we doing Monday?

7          MR. BLANCHE:  I think we will most certainly rest on

8     Monday.  We have two pretty quick witnesses and Allen Darge is

9     our last cooperator.

10         THE COURT:  He does not have much to say, does he?

11         MR. CAPONE:  Direct of Allen will be about 45 minutes.

12         THE COURT:  If that long.

13         I think there is a good chance you are going to rest

14    by lunch on Monday.  I'll tell the jury that.  I'll just excuse

15    them.

16         You don't know of any witnesses.

17         MR. RICHMAN:  We are not going to do anything.

18         THE COURT:  You don't know.

19         MR. RICHMAN:  I'm being honest with you.

20         THE COURT:  In all likelihood, the case will finish on

21    Monday.  We will be ready for you for a charging conference

22    Monday afternoon.  So the thought is is that we will be

23    summarizing the case on Tuesday.

24         MR. BLANCHE:  Tuesday morning, sure.

25         THE COURT:  I understand why you're writing the

D2QMFER5

1    letter.  I have concluded some years ago that allowing two

2    assistants to do a closing is unfair to the defense because the

3    rebuttal then becomes a second closing.  And with regret I deny

4    your application to have different assistants do both parts of

5    the closing, one main and the other the rebuttal.

6              MR. BLANCHE:  We hesitated to send the letter.  I

7    appreciate your reconsidering.

8              THE COURT:  I'm not offended at all by the letter.

9              MR. BLANCHE:  I know it's a new practice by your Honor

10   and I regret it as well.

11             THE COURT:  I take it --

12             MR. BLANCHE:  I'm not doing either.  Mr. Cronan will

13   be doing both, Judge.  I don't get to give the rebuttal.

14   Thanks, Judge.

15             THE COURT:  Why don't you go to your places.  I'll

16   excuse the jury.

17             (Continued on next page)

18

19

20

21

22

23

24

25

D2q0fer6                        Trial

1              THE COURT:  Members of the jury, we're going to recess

2      now.  It's 4:00.  And I know that all of you are very

3      disappointed that you can't spend another hour listening to

4      testimony, but sometimes I have to deliver unpleasant news.

5      Close up your books and give them to Ms. Jones.  I'm going to

6      see you 10:00 on Monday.

7              I think there is a pretty good chance that the

8      evidence may finish on Monday.  In any event, as soon as the

9      evidence finishes, we'll go into the closing part of the case.

10     So, we should be able to wrap this up by midweek, that's the

11     prospect.

12             Thank you all for your attention.  Keep an open mind,

13     it's very dangerous -- don't leave, not just yet, okay.  I know

14     you hang on all of my words.  It's very dangerous at this

15     point, because you think you know the case.  And so you start

16     drifting off to make conclusions.  Don't.  The case is not

17     finished.  We don't know what the witnesses are going to say on

18     the next part of the case.  You have not heard the lawyers make

19     their arguments.  You have not heard my instructions on the

20     law.  It would really be a big mistake, unfair to the parties

21     and unfair to your oaths to close your minds now.  Keep them

22     open.  Don't think about the case.  Do whatever you need to do

23     for the rest of the week.

24             I'll see you Monday.  Have a good week, and a good

25     weekend.

D2q0fer6                          Trial

1                ALL:  Thank you, your Honor.

2                (Jury excused)

D2q0fer6                          Trial

 1              (In open court)

 2              THE COURT:  Be seated.  If there is nothing for me, we

 3    can recess.

 4              MR. CAPONE:  Judge, the government will submit a

 5    proposed verdict sheet, if it's okay with the Court, later on

 6    this week after we consult with defense counsel.  If that's

 7    what the Court wants.  I don't think anybody has put one in

 8    yet, but we will.

 9              THE COURT:  Fine.  Glad to receive anything that is

10    submitted.  And we'll decide how much help it gives us.

11              Anything else?  Have a good week.  Let's wait while

12    Mr. Fernandez is escorted out, and then we'll recess.

13              (Defendant not present)

14              THE COURT:  Okay.  We'll recess.  Thank you.

15              (Adjourned until Monday, March 4, 2013 at 10:00 a.m.)

16

17

18

19

20

21

22

23

24

25

```
                        INDEX OF EXAMINATION

Examination of:                                    Page

ALBERTO REYES

Direct By Mr. Blanche . . . . . . . . . . . 652

Cross By Mr. Richman . . . . . . . . . . . . 656

Redirect By Mr. Blanche . . . . . . . . . . 669

GLORIA NANCY TRUJILLO

Direct By Mr. Blanche . . . . . . . . . . . 670

YUBEL MENDEZ-MENDEZ

Direct By Mr. Cronan . . . . . . . . . . . . 682

Cross By Mr. Richman . . . . . . . . . . . . 723

Redirect By Mr. Cronan . . . . . . . . . . . 747

SALAVATORE LaCOVA

Direct By Mr. Cronan . . . . . . . . . . . . 751

Cross By Mr. Richman . . . . . . . . . . . . 774

                       GOVERNMENT EXHIBITS

Exhibit No.                                    Received

 3509-B   . . . . . . . . . . . . . . . . . 655

s  131, 110, 111  . . . . . . . . . . . . . 680

 3511-C   . . . . . . . . . . . . . . . . . 717
```