D240fer1                          Trial

```
1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4                   v.

5    JOE FERNANDEZ,

6                   Defendant.

7    ------------------------------x

8                                       New York, N.Y.
                                         March 4, 2013
9                                        10:00 a.m.

10

     Before:
11
                        HON. ALVIN K. HELLERSTEIN,
12
                                         District Judge
13

14                         APPEARANCES

15   PREET BHARARA
          United States Attorney for the
16        Southern District of New York
     TODD BLANCHE
17   RUSSELL CAPONE
     JOHN P. CRONAN
18        Assistant United States Attorneys

19   MURRAY RICHMAN
     BRIAN PAKETT
20        Attorneys for Defendant

21

22   ALSO PRESENT:   SHAWN MacDONALD, DEA
                      VANESSA QUINONES, Paralegal
23                    DON TAYLOR, Paralegal

24

25
```

D240fer1                    Trial

 1              (Trial resumed)

 2              (In open court; jury not present)

 3              THE COURT:  Good morning.

 4              THE DEPUTY CLERK:  All rise.

 5              THE COURT:  Good morning, everyone.  What's going to

 6      happen this morning?

 7              MR. BLANCHE:  Your Honor, to start with, the

 8      government has a brief oral stipulation that the parties have

 9      agreed upon.  And then we're calling -- we have three witnesses

10      today, your Honor, with a couple stipulations in the middle:

11      Tracey Washington from DEA; and then Christian Guzman, civilian

12      witness; and then Alain -- Boozer is our last witness.  The

13      first two are pretty quick, 10, 15 minutes each.  And obviously

14      Mr. Darge is a little longer, because he is a cooperator.  And

15      then the government anticipates resting.

16              THE COURT:  Okay.  That's fine.

17              We'll check to see if everyone is here --

18              THE DEPUTY CLERK:  One more.

19              THE COURT:  Okay.

20              (Pause)

21              (Witness takes the stand)

22              THE DEPUTY CLERK:  All rise.

23              THE COURT:  Good morning, everyone.  I hope you had a

24      pleasant weekend.

25              Tracey Washington is our next witness.  And when

D240fer1                    Trial

1      you're all set we'll sit down and she'll be sworn.

2                  Thank you.

3                  Let's swear Ms. Washington.

4                  THE DEPUTY CLERK:  Raise your right hand.

5      TRACEY D. WASHINGTON,

6           called as a witness by the government,

7           having been duly sworn, testified as follows:

8                  MR. BLANCHE:  Your Honor, before I begin with

9      Ms. Washington, the parties have a stipulation that they would

10     like to read now.

11                 THE COURT:  Yes.

12                 MR. BLANCHE:  So ladies and gentlemen, with respect to

13     the testimony of Patrick Darge who testified earlier in the

14     trial, neither the government, nor the defense, asked Mr. Darge

15     how tall he was.  Both of the parties agree, however, that if

16     he would have been asked that question, Mr. Darge would have

17     testified that he is approximately 5-foot 8-inches tall.

18     DIRECT EXAMINATION

19     BY MR. BLANCHE:

20     Q.  Good morning, Ms. Washington?

21     A.  Good morning, sir.

22     Q.  Where do you work?

23     A.  New York State Police.

24     Q.  Keep your voice up a little bit, and pull the microphone

25     down, sometimes captures the voice a little better.

D240fer1                          Washington - direct

```
 1              Where do you work again?
 2   A.   I work for the New York State Police.
 3   Q.   Are you assigned to a particular unit or group within the
 4   state police?
 5   A.   Yes, I am.
 6   Q.   And where are you assigned?
 7   A.   Drug Enforcement Task Force, which is DEA.
 8   Q.   How long have you worked for the -- or been assigned to the
 9   Drug Enforcement Task Force?
10   A.   A little less than 4 years.
11   Q.   How long have you worked for the state police all together?
12   A.   21 years.
13   Q.   So prior to joining the drug enforcement task force, where
14   did you work?
15   A.   I worked for ATF as a supervisor at the Joint Firearms Task
16   Force.  Prior to that, I did polygraph for a few years.  And
17   then I worked upstate.
18   Q.   And now what is your current position or duty within the
19   Task Force?
20   A.   I'm a supervisor with the state police.  We supervise the
21   DEA agents, New York City detectives, and state police.
22   Q.   Now, I want to direct your attention to October 13th, 2011.
23              Were you working that day?
24   A.   Yes, I was.
25   Q.   What were you assigned to do that day?
```

D240fer1                    Washington – direct

1   A.  I was assigned to go to Chester, New York to pick up an

2   individual.

3   Q.  Do you remember the name of the individual?

4   A.  Joe Fernandez.

5   Q.  And now prior to your assignment on that day, had you been

6   involved in the investigation of Joe Fernandez?

7   A.  No, I was not.

8   Q.  So what was your duty on that day?  Or what were you

9   supposed to do?

10  A.  I was to go up to Chester with other individuals from the

11  Task Force, look for the individual, and arrest him.

12  Q.  Now, you're saying Chester, do you know, do you remember

13  the exact address you went to as you sit on that stand today?

14  A.  No, I do not.

15  Q.  So can you explain to the jury what happens then when you

16  go in to make an arrest, what -- first of all, what information

17  are you given?

18  A.  An OP plan is made basically with information pertaining to

19  the individual, his name, location, any criminal past, if there

20  is a weapon involved.  Basic information about the individual,

21  where they may live at, and any information pertaining to the

22  individual.

23  Q.  Now, you said there were other members of the task force

24  with you that day.  How many people, all together, were there?

25  A.  Approximately seven.

D240fer1                        Washington – direct

1   Q.   So in what approximately -- did you go to the house in

2   Chester?

3   A.   Yes, we did.

4   Q.   Approximately what time was it when you got there?

5   A.   Early morning.

6   Q.   Give or take, how early?

7   A.   Five, 5:15.

8   Q.   In the morning?

9   A.   Yes.

10  Q.   So what happened when you got there?

11  A.   When we got there, one of the detectives spoke to the --

12  the occupant of the house, which was in the front of the house.

13  He allowed us to search that portion of the house.

14  Q.   And did you find Mr. Fernandez?

15  A.   No, we did not.

16  Q.   So what happened next?

17  A.   Then we were told that the landlord lived on the side of

18  the house.  Subject went over to there, spoke to the

19  individual, and they said that Joe Fernandez was not there.

20  Q.   Now, in the conversation, without saying what was said

21  during that conversation, did you learn who that person was?

22  A.   Joe Fernandez mother-in-law.

23  Q.   And, indeed, was Joe Fernandez there; did you check?

24  A.   He was not there.  And, yes, we did check.

25  Q.   So what happened next?

D240fer1                         Washington – direct

1   A.   Then we went to another location in Woodbury.

2   Q.   About how long was the drive from the Chester area to the

3   Woodbury area?

4   A.   It's about 15 minutes.

5   Q.   What happened when you got to that location?

6   A.   When we got to that location, we contacted the police

7   department who assisted us to go to the house that we had

8   another address at.

9   Q.   Now, about what time was it when you arrived at that next

10  address?

11  A.   I'm not quite sure.

12  Q.   Well, how long after you left the Chester address did you

13  arrive at the Woodbury address?

14  A.   Probably within a half hour.

15  Q.   Okay.  So what if anything did you do when you got to the

16  Woodbury address?

17  A.   I went to the rear of the house to secure it.

18  Q.   What if anything did you see when you went to the rear of

19  the house?

20  A.   When I went to the rear of the house, I saw that the

21  kitchen light, the hood light for the vent was on.  And I --

22  looked like there had been a vehicle that was parked in the

23  driveway, because you could see like the impression where there

24  may have been a vehicle there.

25  Q.   So you see the impression, was there a vehicle there when

D240fer1                        Washington - direct

 1  you saw it when you were there, though?

 2  A.  No, there wasn't.

 3  Q.  All right.  So did you eventually gain access to the house?

 4  A.  Yes.

 5  Q.  Did -- did you have a conversation, without saying what was

 6  said, did you have a conversation with anybody, did you talk to

 7  anybody?

 8  A.  Yes.

 9  Q.  Who did you talk to?

10  A.  The woman who opened the door.

11  Q.  Did you learn who that woman was?

12  A.  Yes, I did.

13  Q.  Who?

14  A.  Joe Fernandez wife.

15  Q.  Did she allow you -- well, what happened when you spoke

16  with her?

17  A.  She was belligerent with the other officers, but she stated

18  she would allow me into the house.

19  Q.  Did you enter the house?

20  A.  Yes, I did.

21  Q.  What happened when you entered the house?

22  A.  I asked her who was in the house.  She said her children.

23  Q.  And what happened next?

24  A.  She allowed me to walk around downstairs and upstairs to

25  look for Joe Fernandez.

D240fer1                      Washington – direct

1   Q.  Did you find him?

2   A.  No, I did not.

3   Q.  Now, when you were at the Chester address, did you tell the

4   person who you spoke with, first or second, what Joe Fernandez

5   was charged with?

6   A.  No, I did not.

7   Q.  Did you hear anybody do that?

8   A.  No, I did not.

9   Q.  And how about when you went to the Woodbury address and

10  spoke with Joe Fernandez' wife, did you tell her what Joe

11  Fernandez was charged with?

12  A.  No, I did not.

13  Q.  Did you hear anybody else tell her that?

14  A.  No, I did not.

15  Q.  And just to be clear, did you find Joe Fernandez that

16  morning?

17  A.  No.

18  Q.  Now, aside from that morning, what you just testified

19  about, have you had any role in the investigation or

20  prosecution of this case?

21  A.  No, I have not.

22  Q.  Were you part of the eventual surrender of Mr. Fernandez?

23  A.  No.

24          MR. BLANCHE:  No further questions, your Honor.

25          THE COURT:  Cross.

D240fer1                              Washington - direct

1   CROSS-EXAMINATION

2   BY MR. RICHMAN:

3   Q.  Good morning, Ms. Tracey, how are you?

4   A.  Good morning, sir.

5   Q.  When you went there, did you know what you were arresting

6   Mr. Fernandez for?

7   A.  Yes.

8   Q.  Who told you that?

9   A.  It was on our OP Plan.

10  Q.  Now, when you went there, you went -- you said you went to

11  Chester; is that right?

12  A.  Yes.

13  Q.  That's where his mother-in-law lived?

14  A.  That was the address we went to.

15  Q.  Who gave you that address?

16  A.  That was on the OP Plan.

17  Q.  And do you know where that came from?

18  A.  No, I do not.

19  Q.  Would you recognize his mother-in-law again if you saw her?

20  A.  No, I would not.

21  Q.  And did you make any notes as to that day?

22  A.  No, I did not.

23  Q.  Could it have been that you went -- do you remember the

24  address that you went to?

25  A.  No, I don't.

D240fer1                         Washington - cross

1    Q.  Could it have been Monroe, not Chester?

2    A.  Monroe is right next to it.

3    Q.  So it could have been Monroe?

4    A.  Yes.

5    Q.  When you went to this house in Woodbury, did you determine

6    who the owner of the house was?

7    A.  I did not.

8    Q.  Did someone in your group determine who the house was owned

9    by?

10   A.  I'm not sure about that.

11   Q.  Did you know that it was --

12          MR. BLANCHE:  Objection.

13          THE COURT:  Overruled.

14   BY MR. RICHMAN:

15   Q.  Di you not know that it was owned by Mr. and

16   Mrs. Fernandez?

17   A.  I did not know.

18   Q.  So, you were given an address in Monroe, and you don't know

19   how you got the address in Monroe, but you didn't find him over

20   there; correct?

21   A.  Correct.

22   Q.  And when you got to his house, you -- you met his wife;

23   correct?

24   A.  Yes.

25   Q.  Would you recognize her again?

D240fer1                         Washington - cross

1    A.  No, I would not.

2    Q.  And did you make any notations of that visit?

3    A.  No.

4    Q.  Did you remember how many children he had?

5    A.  I don't know how many children, she just said that her

6    children were in the house.  Yes.

7    Q.  You were in the house, as well?

8    A.  Yes, I was.

9    Q.  And walked around the house?

10   A.  Yes, I did, sir.

11   Q.  Were you treated courteously?

12   A.  Yes, I was.

13   Q.  Did there come a time when you left?

14   A.  Yes, I did.

15   Q.  Did you ask Mrs. Fernandez where he was?

16   A.  No, I did not, sir.

17   Q.  You didn't ask him?  You are looking for him, you didn't

18   ask, gee whiz, did he go to work?

19   A.  No, I do not, sir.

20   Q.  You didn't?

21   A.  No.

22   Q.  Did you tell her anything about what you were looking for

23   him for?

24   A.  No, my concern was --

25   Q.  No, I'm not concerned with what you --

D240fer1                    Washington – cross

1    A.  I'm trying to tell you what I did.

2    Q.  I'm asking you what you did.

3         Did you ask her where he had gone?

4    A.  No, I did not.

5    Q.  By the way, do you know the day of the week October 13 was,

6    in the year 2011?

7    A.  No, I do not, sir.

8    Q.  Would it refresh your recollection to suggest to you that

9    it was a Thursday; would that assist you?

10   A.  No, it would not, sir.

11        MR. RICHMAN:  Could the Court take judicial notice of

12   the fact that October 13, 2011 was, indeed, a Thursday?

13        If you can concede that, Mr. Blanche.

14        THE COURT:  I don't know the relevance.  If you say

15   it's a Thursday, I believe everything you say, Mr. Richman.

16        MR. RICHMAN:  Thank you, sir.

17   BY MR. RICHMAN:

18   Q.  Thank you very much?

19   A.  You're welcome, sir.

20   Q.  By the way, you were not present a few days later when he

21   surrendered to the authorities; correct?

22   A.  Correct.

23   Q.  But you do know he had surrendered to the authorities?

24   A.  Yes, I do, sir.

25        MR. BLANCHE:  No redirect, your Honor.

D240fer1                          Washington - cross

1              THE COURT:  Thank you, Ms. Washington.

2              THE WITNESS:  You're welcome, sir.

3              (Witness excused)

4              MR. BLANCHE:  Parties have a stipulation to read and

5     offer now.

6              THE COURT:  Okay.

7              MR. BLANCHE:  This has been marked for identification

8     as government exhibit --

9              MR. RICHMAN:  May we have one moment?

10             THE COURT:  Sorry?

11             MR. BLANCHE:  Your Honor, reading what has been marked

12    for identification as government exhibit 133, it's a

13    stipulation.

14             It's hereby stipulated and agreed by and among the

15    United States of America by Preet Bharara, the United States

16    Attorney for the Southern District of New York, Todd Blanche,

17    John Cronan, and Russell Capone, Assistant United States

18    Attorneys of Counsel, and Joe Fernandez, the defendant, by and

19    with the consent of his attorneys Murray Richman, Esquire and

20    Brian Pakett, Esquire that:  On October 18, 2011 Joe Fernandez

21    surrendered at his attorney's office and arranged to meet law

22    enforcement authorities at his attorney's office and did so on

23    October 18, 2011.  When Joe Fernandez surrendered, the

24    complaint and arrest warrant were unsealed.  Until the

25    complaint and arrest warrant were unsealed, they could not be

D240fer1                         Washington - cross

1   viewed or otherwise accessed by members of the public,

2   including Joe Fernandez or his attorney.

3          This stipulation may be received in evidence as a

4   government exhibit at the trial of the above-referenced matter.

5          And it's signed by the parties.

6          THE COURT:  Stipulation will be received.

7          MR. BLANCHE:  Government offers government

8   exhibit 133.

9          THE COURT:  Received.

10          (Government's Exhibit 133 received in evidence)

11          MR. CRONAN:  And your Honor, the government calls

12   Christian Guzman.

13    CHRISTIAN GUZMAN,

14       called as a witness by the government,

15       having been duly sworn, testified as follows:

16          THE COURT:  All right.  Mr. Guzman, keep your voice up

17   and speak loudly.

18   DIRECT EXAMINATION

19   BY MR. CRONAN:

20   Q.  Good morning, Mr. Guzman.

21          Did you receive a subpoena to testify in this case?

22   A.  Yes.

23   Q.  Do you want to testify this morning?

24          MR. RICHMAN:  Objection.

25          THE COURT:  Overruled.

D240fer1                          Guzman – direct

```
 1              I have to have two minutes.

 2              MR. CRONAN:  Yes, your Honor.

 3              THE COURT:  Sorry.

 4              (Recess)

 5              THE COURT:  Proceed.

 6   BY MR. CRONAN:

 7   Q.  Do you want to be here today?

 8   A.  No, I don't.

 9   Q.  Are you testifying because you have to?

10   A.  Yes.

11   Q.  How old are you, sir?

12   A.  What?

13   Q.  How old are you?

14   A.  Thirty-eight.

15              THE COURT:  Keep your voice up.

16              THE WITNESS:  Okay, got you.

17   Q.  What do you do for a living?

18   A.  I'm an electrician.

19   Q.  Where are you currently working?

20   A.  Down here in Manhattan.

21   Q.  How long have you worked in this field?

22   A.  Twelve, 13 years.

23   Q.  I'm going to ask you to look around the courtroom, and let

24   us know if you see anyone that you recognize.  And, if so, who

25   that person is.
```

D240fer1                          Guzman - direct

1   A.  When you say "around the courtroom," my whole family is

2   back there.

3            THE COURT:  Do you see anybody in the second bench

4   that you recognize?

5            THE WITNESS:  Yes.

6            THE COURT:  Who do you recognize?

7            THE WITNESS:  My cousin, Joey.

8            THE COURT:  Let the record reflect that the defendant

9   has been recognized.

10  BY MR. CRONAN:

11  Q.  When was the last time you saw your cousin, Joey?

12  A.  He went to my house.

13  Q.  And do you recall approximately when that was that he came

14  to your house?

15  A.  No, I don't.

16  Q.  Do you think it was more than a year ago?

17  A.  About a year, more than a year, I'm not sure.

18  Q.  And how did you end up seeing your cousin Joey that day?

19  A.  He called me, he came over to my house.

20  Q.  Where were you living at the time?

21  A.  In the Bronx.

22  Q.  All right.  And this is an apartment, a residential house?

23  A.  Apartment.

24  Q.  What happened -- when the defendant called you, on what

25  phone did he call you on -- what was your phone number?

D240fer1                              Guzman - direct

1    A.  My phone number?

2    Q.  Yes.

3    A.  Same one I have now.

4    Q.  And what is that, sir?

5    A.  What, do you want the number?

6    Q.  Yes, please.

7    A.  (917)826-1095.

8    Q.  And what happened when the -- when the defendant came over

9    to your apartment that afternoon?

10   A.  He -- he wanted to speak to my cousin.

11   Q.  What cousin was that?

12   A.  Alain.

13   Q.  Do you know Alain's full name?

14   A.  Alain Darge.

15   Q.  Did -- did your cousin, Joey, tell you why he wanted to

16   speak with Alain Darge?

17   A.  No, not really.

18   Q.  Did he say -- did he tell you anything that he wanted to

19   talk with Alain Darge about?

20   A.  I don't really remember.  Maybe about his brother or

21   something, but I don't really remember.

22   Q.  And when you say "about his brother," did -- do you know

23   which brother that would be referring to?

24   A.  Patrick.

25   Q.  Did Alain Darge, in fact, come over to your apartment that

D240fer1                          Guzman - direct

1    afternoon?

2    A.   Yes.

3    Q.   How did Alain Darge end up coming to your apartment?

4    A.   I called him.

5    Q.   About how long after you called Alain Darge did he arrive

6    at your apartment?

7    A.   He was around -- he was shopping around where I live at, so

8    maybe 10 minutes.

9    Q.   What happened after Alain Darge came to your apartment that

10   afternoon?

11   A.   Well, when he came, I had a game to go to.  So once he came

12   to my house, I jumped in the shower.  And they talked, but they

13   was just talking.

14   Q.   And when you say "they," who are you referring to, sir?

15   A.   Alain and my cousin, Joey.

16   Q.   Where were they talking?

17   A.   In my living room.

18   Q.   And were you able to hear anything they were talking about?

19   A.   No.

20        MR. CRONAN:  No further questions, your Honor.

21        THE COURT:  Mr. Richman.

22   CROSS-EXAMINATION

23   BY MR. RICHMAN:

24   Q.   Sir, am I -- you were close to Alain Darge, were you not?

25   A.   Yes.

D240fer1                        Guzman - cross

1    Q.  And Alain Darge is the brother of Patrick Darge, right?

2    A.  Yes.

3    Q.  And they were close, correct?

4    A.  Yes.

5    Q.  And you knew that Alain Darge was at the -- Boozer was

6    Patrick's brother, right?

7    A.  Yes.

8    Q.  And that Patrick --

9          THE COURT:  You know that Alain Darge was Boozer.

10         THE WITNESS:  Yes.

11   BY MR. RICHMAN:

12   Q.  And that Patrick was in jail for at least a couple of years

13   at that time, is that right?

14   A.  Yes.

15   Q.  And you knew that Alain was not in jail during that same

16   period, is that fair to say?

17   A.  Yes.

18   Q.  Now, you say that you recognized other members of your

19   family back there, correct?

20   A.  Yes.

21   Q.  And they include Joe's wife?

22   A.  Yes.

23         MR. CRONAN:  Objection, your Honor.

24         THE COURT:  Mr. Richman, if you want to point out

25   everyone that has been attending and introduce them?  You can.

D240fer1                              Guzman - cross

```
 1              MR. RICHMAN:  I'm sorry, your Honor?

 2              THE COURT:  If you want to introduce everyone that has

 3    been attending, you can.

 4              MR. RICHMAN:  Not everyone.

 5              THE COURT:  Go ahead and do it.

 6              MR. RICHMAN:  Do you want --

 7              THE COURT:  Mr. Richman, do it.  Otherwise, it is not

 8    relevant.

 9              MR. RICHMAN:  Stand up, please.

10    BY MR. RICHMAN:

11    Q.  Is that his wife?

12              THE COURT:  Mr. Richman, do it.  Otherwise, I'm not

13    going to allow it.

14              Do it as a matter of courtesy.

15              MR. RICHMAN:  There are a lot of family members.

16              THE COURT:  Do as many as you want to.

17              MR. RICHMAN:  I'll leave well enough alone.  Thank

18    you.

19              THE COURT:  All right, thank you.

20    BY MR. RICHMAN:

21    Q.  Now, your house was raided last week by the feds; is that

22    correct?

23    A.  My what?

24    Q.  Was your home raided in the last few weeks by the feds?

25              THE COURT:  Is there an objection?
```

D240fer1                         Guzman - cross

1    A.  Raided?  No.

2              THE COURT:  Mr. Cronan?

3              MR. CRONAN:  No objection.  I think the witness can

4    answer that.

5    BY MR. RICHMAN:

6    Q.  Did they come to your home recently?

7    A.  Yes.  They came to my house to serve me a subpoena.

8              MR. RICHMAN:  I have no further questions.  Thank you

9    very much.

10             MR. CRONAN:  No redirect, your Honor.

11             THE COURT:  Thank you, you're excused.

12             (Witness excused)

13             MR. CRONAN:  Your Honor, before the government calls

14   their next witness, we would like to read another stipulation

15   into the record, please.

16             THE COURT:  All right.

17             MR. CRONAN:  It is hereby stipulated and agreed by and

18   among the United States United States of America by Preet

19   Bharara, United States Attorney for the Southern District of

20   New York, Todd Blanche, John Cronan, and Russell Capone

21   Assistant United States Attorneys of Counsel, and Joe Fernandez

22   the defendant, by and with the consent of his attorneys, Murray

23   Richman and Brian Pakett, that government exhibits 112, 112-R,

24   113, and 114 are true and accurate copies records of AT&T.  The

25   original records were made at or near the time, by or from

D240fer1                    Guzman – cross

1   information transmitted by a person with knowledge of matters

2   set forth in the records.  They were kept in the course of a

3   regularly-conducted business activity.  And it was the regular

4   practice of that business activity to maintain the records.

5           Government exhibit 112, is a document reflecting

6   subscriber information for the telephone number (917)826-1095,

7   with account number 512021819029, in the name of Christian

8   Guzman.

9           Government exhibit 112-R is a copy of exhibit 112 with

10  certain personal information for Christian Guzman redacted.

11          Government exhibit 113 is a statement from AT&T for

12  telephone number (917)826-1095, with account

13  number 812021819029, reflecting telephone calls made or

14  received in August 2011, September 2011, and October 2011.

15          Government exhibit 114, is a legend provided by AT&T

16  for government exhibit 113.

17          On or about October 13th, 2011, the defendant, Joe

18  Fernandez, utilized the cellular telephone with a call

19  number (845)492-0601.

20          This stipulation and government exhibit 112-R, 113,

21  114, may be received in evidence as a government exhibit at the

22  trial of the above-referenced matter.

23          Your Honor, the government offers the stipulation and

24  exhibits 112R, 113, and 114.

25          THE COURT:  Received.

D240fer1                        Guzman - cross

1              (Government's Exhibits 112-R, 113, 114 received in

2     evidence)

3              MR. CRONAN:  And if we could, quickly, Ms. Quinones,

4     publish on the large screen 112-R.

5              THE COURT:  What is that, the stipulation itself?

6              MR. CRONAN:  No, 112-R.  And it's one of the exhibits.

7     And focus on the top portion.

8              And, Ms. Quinones, can we now go to exhibit 113, and

9     go to the bottom of page 236 of that exhibit, please, and focus

10    on the bottom, please.

11             THE COURT:  Do you want us to remember all of these

12    numbers?

13             MR. CRONAN:  Your Honor, I anticipate in closing

14    we'll --

15             THE COURT:  We have all committed them to memory.

16             Tell the jury what you want.

17             MR. CRONAN:  Certainly, your Honor.  The stipulation

18    noted that phone number (845)492-0601 was utilized by the

19    defendant on October 13th.  These records show that on

20    October 13th, 2011, at about 12:22 p.m. a call was made from

21    the defendant's number to Christian Guzman's number, which is

22    (917)826-1095.

23             THE COURT:  What -- where do you see that?

24             MR. CRONAN:  I believe it is highlighted on the screen

25    right now, your Honor.

D240fer1                        Guzman - cross

1          THE COURT:  845 numbers are highlighted.

2          MR. CRONAN:  845 number, your Honor, in stipulation is

3   the defendant's number.  The number that that called, is Mr.

4   Guzman's number.

5          THE COURT:  917 number, you said.

6          MR. CRONAN:  Correct, your Honor.

7          THE COURT:  Below the 845 records.

8          MR. CRONAN:  The way the records work, you go from

9   left to right, starting off there is a call number 1478, the

10  date, October 13th, 2011, the time, 12:22 p.m. the first phone

11  number, the defendant's phone number, at that time called Mr.

12  Guzman's phone number.

13         THE COURT:  Any comment you want to make, Mr. Richman?

14         MR. RICHMAN:  I would just correct the time.  I

15  believe it is 12:22.

16         THE COURT:  Okay.  I think he said that.

17         All right, thank you, Mr. Cronan.

18         MR. CRONAN:  Thank you, your Honor.

19         MR. CAPONE:  Your Honor, the government next calls

20  Alain Darge.

21         THE DEPUTY CLERK:  Stand and raise your right hand.

22   ALAIN DARGE,

23      called as a witness by the government,

24      having been duly sworn, testified as follows:

25         THE DEPUTY CLERK:  Be seated.  State your name.

D240fer1                         Guzman - cross

1                THE WITNESS:  A-L-A-I-N, D-A-R-G-E.

2    DIRECT EXAMINATION

3    BY MR. CAPONE:

4    Q.  Good morning, Mr. Darge.

5    A.  Good morning.

6    Q.  How old are you?

7    A.  Thirty-seven.

8    Q.  Where were you born?

9    A.  Puerto Rico.

10   Q.  Where did you grow up?

11   A.  Bronx.

12   Q.  And how far did you go in school.

13   A.  Tenth grade.

14   Q.  Where do you currently live?

15   A.  MDC.

16   Q.  And what is that?

17   A.  Federal jail.

18   Q.  And why are you living in a federal jail?

19   A.  Conspiracy of drugs.

20   Q.  What kind of drugs?

21   A.  Heroin.

22   Q.  When were you arrested?

23   A.  August 6, 2012.

24   Q.  And since you were arrested have you pled guilty to

25   committing drug crimes?

D240fer1                        A. Darge - direct

1    A.  Yes, sir.

2    Q.  When did you plead guilty?

3    A.  November 13th.

4    Q.  Of what year?

5    A.  2012.

6    Q.  What kind of drugs have you sold?

7    A.  Crack cocaine and heroin.

8    Q.  And over what time period did you sell drugs?

9    A.  Eighty-nine to 2012.

10   Q.  And I ask you to look around the courtroom and let me know

11   if there is anyone other than the prosecutors at the front

12   table that you recognize?

13   A.  Yes.

14   Q.  And who is that?

15   A.  My cousin.

16   Q.  Can you please identify where he is sitting and something

17   he is wearing?

18   A.  Behind the defense -- behind the --

19           THE COURT:  What table first or second.

20           THE WITNESS:  Second table.

21           THE COURT:  The record will reflect the identification

22   of the defendant.

23   Q.  And what is your cousins names?

24   A.  Joe Fernandez.

25   Q.  Up until now what kind of relationship have you had with

D240fer1                           A. Darge – direct

1    your cousin?

2    A.   Okay.

3    Q.   Did you grow up with him?

4    A.   Some what.

5    Q.   And did you live near each other when you were growing up?

6    A.   Yes, sir.

7    Q.   Where did you live?

8    A.   Two floors up.

9    Q.   Did you spend time together when you were going up?

10   A.   To like 12, 13.

11   Q.   And how about when you were older did you spend a lot of

12   time together?

13   A.   No.

14   Q.   We'll return to the defendant but I would like to discuss

15   some other people now so miss Quinones can you put up

16   government exhibit 2.  Do you recognize that person?

17   A.   Yes.

18   Q.   Who is that?

19   A.   My brother.

20   Q.   And what's his name?

21   A.   Patrick Darge.

22   Q.   Do you know where Patrick Darge lives now?

23   A.   MCC.

24   Q.   Is that also a jail?

25   A.   Yes.

D240fer1                          A. Darge - direct

1   Q.  And do you know why he is in jail?

2   A.  Yes.

3   Q.  Why?

4   A.  Two murders.

5   Q.  Do you know of any other crimes that your brother has

6   committed?

7   A.  Yes.

8   Q.  And what kind of crimes?

9   A.  White collar crime, and drugs.

10  Q.  I'm going to show you, also, government exhibit 13.

11          Do you recognize that person?

12  A.  Yes.

13  Q.  Who is that?

14  A.  My cousin.

15  Q.  And what's his name?

16  A.  Jose Rodriguez.

17  Q.  And did you know Jose Rodriguez by any other name?

18  A.  Yes.

19  Q.  What?

20  A.  Gordo.

21  Q.  What did you call him?

22  A.  Gordo.

23  Q.  And do you know in the late 1990s, and around 2000, how

24  Gordo made his money?

25  A.  Yes.

D240fer1                          A. Darge - direct

1    Q.  How is that?

2    A.  He used to work in Live Wire installing systems and selling

3    cocaine.

4    Q.  And what's Live Wire?

5    A.  A shop where they -- you put systems in.  Traps.

6    Q.  What kind of systems?

7    A.  Music.

8    Q.  And do you know what else they did at Live Wire?

9    A.  Yes.  Put traps on cars.

10   Q.  And who owned Live Wire, if you know?

11   A.  My brother.

12   Q.  Which brother?

13   A.  Patrick Darge.

14   Q.  And you also said that Gordo sold cocaine.  Are we talking

15   street level quantities or larger quantities of cocaine?

16   A.  Larger quantities of cocaine.

17   Q.  Do you know if he had any partners in his cocaine business?

18   A.  Yes.

19   Q.  Who were they, if you know?

20   A.  Aladino and Zak.  And Jeffrey.

21   Q.  I'm going to ask Ms. Quinones to put up some more pictures.

22   First, government exhibit 5; do you recognize that person?

23   A.  Aladino.

24   Q.  And next to government exhibit 6.  Do you recognize that

25   person?

D240fer1                          A. Darge - direct

1    A.  Zak.

2    Q.  And, finally, government exhibit 2.

3               THE COURT:  How do you spell that name, Sal?

4               THE WITNESS:  I don't know how to spell it.

5               THE COURT:  Is there an L?  Does it sound S, A.

6               THE WITNESS:  It's S.

7               THE COURT:  Do you -- it sounds S.  And a vowel after

8    that?

9               THE WITNESS:  I think so, yes.

10              THE COURT:  What vowel would you say, in Spanish?

11              THE WITNESS:  A.

12              THE COURT:  Any other consonants or vowels in the

13   sound?

14              THE WITNESS:  Not that I know of.

15              THE COURT:  You don't know of it, okay.

16   BY MR. CAPONE:

17   Q.  We've already seen -- so I'll ask Ms. Quinones to put up

18   exhibit 3.

19              Do you remember, do you recognize that person?

20   A.  Jeffrey.

21   Q.  Now, did there come a point where you learned about a

22   murder that various people you have been talking about

23   participated in?

24   A.  Yes.

25   Q.  And when did you learn about that murder?

D240fer1                           A. Darge - direct

1    A.  Late 2000.

2    Q.  And do you remember how you first heard about it?

3    A.  Not really.  Rumors.

4    Q.  Well, did you eventually talk to anyone who played a role

5    in that murder?

6    A.  Yes.

7    Q.  Who did you talk to?

8    A.  Gordo.

9    Q.  And do you know how long after the murder you talked to

10   Gordo?

11   A.  Maybe like a year.

12   Q.  And what did Gordo tell you?

13   A.  Well, he was talking about how my brother shouldn't be

14   complaining about the money, what he got.

15            MR. RICHMAN:  Objection, your Honor.

16            THE COURT:  Sustained.

17            MR. CAPONE:  It's not offered for the truth, your

18   Honor.

19            THE COURT:  I don't know how it is offered, but the

20   objection is sustained.

21   BY MR. CAPONE:

22   Q.  Did you talk to your brother, Patrick, about the murder?

23   A.  Not really.

24   Q.  Did you ever have a conversation with the defendant about

25   the murders?

D240fer1                         A. Darge - direct

1   A.  Yes.

2   Q.  When was that?

3   A.  Right around the time when they tried to pick him up.

4   Q.  Right around the time --

5           THE COURT:  Give us a year.

6           THE WITNESS:  2011.

7   Q.  Do you remember the month?

8   A.  No.

9   Q.  You said --

10          THE COURT:  Where did you have a conversation?

11          THE WITNESS:  In my other cousin's house, Christian

12  Guzman.

13          THE COURT:  In Christian Guzman's house?

14          THE WITNESS:  Yes.

15  BY MR. CAPONE:

16  Q.  You said right around the time that they tried to pick him

17  up.  What did you mean by that?

18  A.  Well, I know by him, he told me they tried to pick him up

19  that morning, or the day before.

20  Q.  If you could just make sure to keep your voice up,

21  Mr. Darge.

22          Who told you they had tried to pick him up that

23  morning or the day before?

24  A.  Joe Fernandez.

25  Q.  And --

D240fer1                          A. Darge - direct

1                   THE COURT:  What did you understand "pick up" meant?

2                   THE WITNESS:  They went to his house with a warrant.

3                   THE COURT:  To what?

4                   THE WITNESS:  I guess to arrest him.

5                   MR. CAPONE:  Ms. Quinones, if you would put up

6      government exhibit 14.

7      Q.  Do you recognize that person?

8      A.  Yes.

9      Q.  Who is that?

10     A.  My cousin, Christian Guzman.

11     Q.  You said you talked to the defendant at this person's

12     house.  Where was he living?

13     A.  In the Bronx, Co-op City.

14     Q.  And how did you come to speak to the defendant at Christian

15     Guzman's house?

16     A.  He called me.

17     Q.  Who called you?

18     A.  Christian Guzman.

19     Q.  And what did he tell you when he called you?

20     A.  Just to go over there and speak to him.  He wanted to speak

21     to me.

22     Q.  And did you go there?

23     A.  Yes.

24     Q.  And what -- when you got there, who else was there?

25     A.  Joe Fernandez.

D240fer1                         A. Darge - direct

1   Q.  And was Christian Guzman there?

2   A.  Yes.

3   Q.  Was anyone else there?

4   A.  No.

5   Q.  What happened when you got there?

6   A.  Well, I got there, I started speaking to Joey.

7   Q.  And do you remember where, in -- well, first of all, was it

8   an apartment or a house?

9   A.  It was an apartment.

10  Q.  Do you remember where in the apartment you spoke to the

11  defendant?

12  A.  Yes.

13  Q.  Where?

14  A.  In the living room.

15  Q.  Was Christian Guzman a part of this conversation?

16  A.  No.

17  Q.  What -- what did the defendant tell you, if anything, had

18  happened that day?

19  A.  He was telling me they tried to pick him up.

20          THE COURT:  Before you get on with that, was Guzman,

21  although not a part of the conversation, present at the

22  conversation?

23          THE WITNESS:  He was -- he was present, but he was not

24  in the conversation.

25          THE COURT:  So he was right there.

D240fer1                          A. Darge - direct

1          THE WITNESS:  Not right there.  He was a few feet away

2     from us.

3          THE COURT:  Was the conversation of a nature where

4     Guzman could hear everything that was said?

5          THE WITNESS:  No.

6          THE COURT:  Meaning what, the conversation was low?

7          THE WITNESS:  Yes, sir.

8          THE COURT:  And not in his ability to hear, as far as

9     you could understand?

10          THE WITNESS:  Yes, sir.

11          THE COURT:  All right.

12    BY MR. CAPONE:

13    Q.  He -- I believe you testified that the defendant told you

14    they had gone to pick him up.  What else did you discuss with

15    the defendant?

16    A.  I was discussing how he should flee the country.

17    Q.  Who said that?

18    A.  I did.

19    Q.  Why did you say that?

20    A.  Because he was wondering -- advice.

21    Q.  He was asking for advice?

22    A.  Yes.  So I was telling him that he should leave the

23    country.

24          THE COURT:  What did he say to you, what did you say

25    to him?

D240fer1                        A. Darge - direct

1              THE WITNESS:  Well, he wanted to know what was next.

2        And I told him what he should do, he should pick up and leave.

3              THE COURT:  Let's -- let's start.  He told you -- what

4        was the first thing he told you --

5              That's what I want you to elicit, all right?  Do it.

6        BY MR. CAPONE:

7        Q.  What was the first thing that the defendant told you,

8        Mr. Darge?

9        A.  I can't quite remember, but it was -- it was to the nature

10       like he couldn't believe what was going on, that the only

11       person he thought that could tell on him was my brother.  So

12       then I was -- we was talking about that.  And I was telling him

13       that he should flee the country.

14       Q.  And when the defendant told you that the only person that

15       could have told on him was your brother, what did you say to

16       him?

17       A.  I -- I doubt it, because my brother didn't put himself in

18       that, either.  There are a lot of people know about it.

19       Q.  And what did the defendant say, if anything, in response?

20       A.  Well, he -- he still was puzzled.  And I asked him like

21       who -- who took you there.  And he told me that Zak took him.

22       And I say, you see, more people know about it.

23       Q.  Zak took them, is that what you said, is that what the

24       defendant said?

25       A.  Yes.

D240fer1                        A. Darge - direct

1   Q.  Okay.  What else did the defendant say, if you remember?

2   A.  Well, we had a -- we kept, you know, talking.  And I know I

3   gave him $200 a cell phone.  And I told him, I'm trying to get

4   him and ID.  And he was still puzzling about that he can't

5   believe what was going on.  And I'm trying to think exactly

6   now.

7          Then he told me he wouldn't tell on nobody.  And he

8   said he only took two shots and his gun got jammed and my

9   brother finished the job.

10  Q.  And what happened next between you and the defendant.

11  A.  We part his way.  He went -- he -- he went his way and I

12  went my way.

13  Q.  I believe you said you gave him money; is that right?

14  A.  I gave him $200 and a cell phone.

15  Q.  Did he take it?

16  A.  Yes.

17  Q.  What cell phone did you give him?

18  A.  Some throw-away phone that I got.

19  Q.  How many phones did you have on you at that time?

20  A.  About three.

21  Q.  What do you mean by throw-away phones?

22  A.  Well, I use phones to do my deals.

23  Q.  What do you mean "do my deals?"

24  A.  Well, I sell drugs.  So after awhile, I get rid of them.

25  Q.  Why did you give the defendant a throw-away phone?

D240fer1                          A. Darge – direct

1   A.  So I could call him.  Try to get him an ID and passport.

2   Q.  How long was this conversation?

3   A.  About 10, 15 minutes.

4   Q.  And did the defendant say where he was going when he left?

5   A.  I think to his father's house.

6   Q.  And who left first, the defendant or you?

7   A.  He did.

8   Q.  Now, I would like to switch gears and ask you some more

9   questions about your brother, Patrick.

10          THE COURT:  I would like to have a sidebar, please.

11          (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D240fer1                          A. Darge – direct

```
 1              (At the side bar)
 2              THE COURT:  What's the relevance?
 3              MR. CAPONE:  Mr. Richman, throughout the trial,
 4    suggested that Mr. Alain Darge was the second shooter, and
 5    Patrick and Alain were tight.  I'm sure he is going to explore
 6    the relationship on cross.
 7              THE COURT:  Of the conversation that just happened.
 8              MR. CAPONE:  It's an admission of the defendant;
 9    confession.
10              THE COURT:  That he was the shooter.
11              MR. CAPONE:  Yes, your Honor.
12              THE COURT:  And, therefore, contradicts the assertion
13    made by Mr. Richman that Alain Darge was the shooter, or
14    somebody else was the shooter.
15              MR. CAPONE:  Well, yes, your Honor, but I don't --
16              THE COURT:  Okay, I catch it.  Thanks.  You can
17    continue.
18              (Continued on next page)
19
20
21
22
23
24
25
```

D240fer1                          A. Darge - direct

1              (In open court)

2    BY MR. CAPONE:

3    Q.  Mr. Darge, what was your relationship like with your

4    brother in the 1990s?

5              MR. RICHMAN:  Objection.  Relevancy.

6              THE COURT:  There has been a lot of conversation on

7    this.  I'll allow it for the moment.

8    A.  It was all right.  Somewhat.

9    Q.  What do you mean, "all right, somewhat?"

10   A.  See, most of the time we not all right.

11   Q.  Can you explain what you mean by that?

12   A.  Well, we -- we fight a lot.

13   Q.  Well, did you spend a lot of time together?

14   A.  Not really.

15   Q.  Did you do drug business together?

16   A.  At one point, yes.

17   Q.  When did you first sell drugs with your brother, Patrick?

18   A.  '89.

19   Q.  And what did you do with him?

20   A.  I was his manager.

21   Q.  And what -- what did it mean for you to be his manager?

22             THE COURT:  Let's stop here.  Resume the sidebar.

23             (Continued on next page)

24

25

D240fer1                         A. Darge – direct

1              (At the side bar)

2              THE COURT:  I thought the government doesn't want to

3       go into the narcotics business?

4              MR. CAPONE:  Well, your Honor, Mr. Richman has asked

5       other witnesses if Patrick and Alain were a team selling drugs,

6       so I would like to explore that if I can.

7              Unless Mr. Richmond doesn't intend to get into it.

8              MR. RICHMAN:  I will, I'll get into it.

9              THE COURT:  Pardon?

10             MR. RICHMAN:  I'll be getting into it.

11             THE COURT:  So I should let it go ahead for a while.

12             MR. RICHMAN:  Yeah, I didn't object.

13             THE COURT:  That's all right.  I have a role, too,

14      Mr. Richman.

15             All right.  We'll continue.

16             (Continued on next page)

17

18

19

20

21

22

23

24

25

D240fer1                          A. Darge - direct

1              (In open court)

2    BY MR. CAPONE:

3    Q.  Mr. Darge, what did you mean by you were your brother's

4    manager?

5    A.  I was to give people work.

6    Q.  What kind of work?

7    A.  I used to give people his work.

8    Q.  His drugs?

9    A.  Yes.

10   Q.  And make sure to keep your voice up.

11              And how long did you do that for?

12   A.  Couple of months.

13   Q.  And why did you stop?

14   A.  He quit.

15   Q.  He quit what?

16   A.  Selling drugs.

17   Q.  How long, if you know, did he quit for?

18   A.  About 3 years.

19   Q.  And what happened after that between the two of you?

20   A.  We always had up-and-down relationship.

21   Q.  Well, did you -- did you sell drugs with him again at any

22   point?

23   A.  Yes.

24   Q.  Was it after those few years?

25   A.  Yes.

D240fer1                              A. Darge - direct

1   Q.   And what did you do?

2   A.   He got me somebody he used to make profit off, from the kid

3   that he introduced me to.

4   Q.   And who did he introduce you to?

5   A.   To this kid named Carlos.

6   Q.   And what did Patrick have to do with that?

7   A.   Well, Pat used to get a percentage.

8   Q.   And how long did that last for?

9   A.   About a year and a half.

10  Q.   And why did it stop?

11  A.   Once again, we had a fight.

12  Q.   Over what?

13  A.   Over money issue.

14  Q.   And around when was this that you stopped this

15  relationship?

16  A.   By '95.

17  Q.   And did there come a point where you again did drug

18  business with your brother?

19  A.   Yes.

20  Q.   And if you remember, around when was that?

21  A.   '98, 99.

22  Q.   What did you do together?

23  A.   Well, I used to work at his house.

24  Q.   His house?

25  A.   Or his girlfriend's house.

D240fer1                          A. Darge - direct

1   Q.  Was it a house or an apartment?

2   A.  I was a house.

3   Q.  And where was it?

4   A.  In the Bronx.

5   Q.  And what did you do there?

6   A.  I used to pack up my drugs there.

7   Q.  And what did Patrick have to do with this, if anything?

8   A.  He used to help me.

9   Q.  And did you pay him?

10  A.  Yes.

11  Q.  And how long did you do that for, with Patrick?

12  A.  Couple of months.

13  Q.  And why did that stop?

14  A.  Once again, we had a fight.  He stoled from me.

15  Q.  And what did he steal from you?

16  A.  Some bundles.

17  Q.  What's a bundle?

18  A.  It was drugs.

19  Q.  And what kind of drugs?

20  A.  Heroin.

21  Q.  And how do you know that your brother stole from you?

22  A.  Because I caught him with Louie.

23  Q.  Who is Louie?

24  A.  A manager of mine at the time.

25  Q.  A manager?

D240fer1                          A. Darge – direct

1   A.  Yes.  At the time.

2   Q.  Does that mean that Louie also moved your drugs?

3   A.  Yes, sir.

4   Q.  And how -- how did you -- elaborate.  How did you -- how

5   did you find out from Louie?

6   A.  Well, I -- I -- I had gave my brother 70 bundles.  And when

7   I did the math, it was 80 bundles in the street, so I figured

8   that he took 10 bundles.  And when I confronted Louie, he told

9   me about it, it was true.

10  Q.  And what did Louie have to do with this?

11  A.  Louie used to be the manager.  He used to move it.

12              (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

D34VFER2                         Darge - cross

1   Q.  So do you remember when this happened?

2   A.  '99, I believe.

3   Q.  Around when in 1999, if you remember?

4   A.  Late '99.

5   Q.  How do you know that?

6   A.  Because it was right around the time I got arrested.

7   Q.  And what did you get arrested for at that time?

8   A.  Visiting Louie's father in jail, and we bring him a bundle

9   of drugs in jail.

10  Q.  You were arrested for that?

11  A.  Yes, sir.

12  Q.  Do you remember the date you were arrested?

13  A.  I think it was November 16, 1999, I believe it was.

14  Q.  And this is around the time that you found out your brother

15  stole from you?

16  A.  Yes.

17  Q.  What happened to your relationship with your brother after

18  that point?

19  A.  We didn't speak.

20  Q.  For how long?

21  A.  Couple of years.

22  Q.  Did you continue to sell drugs -- or did you sell drugs

23  with him at any point after that?

24  A.  No.

25  Q.  And how about your relationship with Louie, what happened

D34VFER2                           Darge - cross

1   to him -- with that?

2   A.  We don't speak.

3   Q.  If you know, around that time, what happened to the

4   relationship between Patrick and Louie?

5   A.  Well, they became close.

6   Q.  Now, have you seen your brother since he was arrested for

7   the murders?

8   A.  No.

9   Q.  Do you know when he was arrested?

10  A.  Around 2010.

11  Q.  Have you spoken to him?

12  A.  Yes.

13  Q.  Around how many times have you spoken to him?

14  A.  About three time.

15  Q.  Did you talk about his case at any point?

16  A.  No.

17  Q.  Have you spoken to him since you were arrested?

18  A.  No.

19  Q.  You said that from '89 through 2012 you were selling crack

20  and heroin?

21  A.  Yes.

22  Q.  How much heroin were you buying and selling at a time?

23  A.  Maybe half a key, key, depends.

24  Q.  How often?

25  A.  Depends.  It goes up and down.

D34VFER2                        Darge - cross

1   Q.  Well, by "key" you meant kilogram; is that right?

2   A.  Yes, sir.

3   Q.  And you were arrested for selling heroin?

4   A.  Yes.

5   Q.  In addition to selling crack and heroin, have you committed

6   any other crimes?

7   A.  Yes.

8   Q.  What crimes?

9   A.  Shooting, assault, and robbery.

10  Q.  Well, you said shootings.  Does that mean you've had guns?

11  A.  Yes.

12  Q.  Legally or illegally?

13  A.  Illegally.

14  Q.  How many guns have you had over the years?

15  A.  About 30.

16  Q.  Why did you have that many guns?

17  A.  When I was young, I used to like them, collect them.

18  Q.  Did you use them for protection in your drug business, as

19  well?

20  A.  If I had to, yes.

21  Q.  And did you ever carry the guns on you?

22  A.  Yes.

23  Q.  Those are the guns you've used to shoot people; is that

24  right?

25  A.  Shot.

D34VFER2                         Darge - cross

1   Q.  How many shootings have you been involved in?

2   A.  About four.

3   Q.  When was the first time you shot somebody?

4   A.  Think it was '89, '90.

5   Q.  And if you can briefly explain what happened.

6   A.  This man tried to buy -- he tried to disrespect me, tell me

7   he was going to buy my bike for $2.  And I ain't want no part

8   of that.  He smacked me.  So I went home, and came back, and

9   shot him.

10  Q.  Where did you shoot him?

11  A.  In his arm and his leg.

12  Q.  What was his name?

13  A.  I think his name was Abraham.

14  Q.  And did he live?

15  A.  Yes.

16  Q.  Were you charged with that?

17  A.  Yes.

18  Q.  What happened to the case?

19  A.  It got dismissed.

20  Q.  When was the next time that you shot at somebody?

21  A.  Over the block.  I used to share a block -- I used to share

22  my block with this other drug dealer.

23  Q.  How long after the shooting of Abraham was this?

24  A.  About a year.

25  Q.  And you said you used to share your block with another drug

D34VFER2                         Darge - cross

1   dealer?

2   A.   Yes.

3   Q.   What does that mean?

4   A.   We used to sell -- he used to sell his and I used to sell

5   mines.

6   Q.   And how did that lead to a shooting?

7   A.   Well, he was trying to sell it for -- he was trying to sell

8   drugs for cheaper, and we had a disagreement.  So his friend --

9   he came with a friend, and he threatened me about a $50,000

10  contract, so I shot his friend in the leg.

11  Q.   What do you mean a $50,000 contract?

12  A.   Well, we had a argument.  He told me he was going to put a

13  $50,000 contract on me.  And I ain't take it too well, and I

14  shot him.

15  Q.   Were you charged for that shooting?

16  A.   No.

17  Q.   How about the third time that you shot at somebody, when

18  was that?

19  A.   About 1992.

20  Q.   What happened?

21  A.   Broke my cousin jaw.  This kid named Jim broke my cousin

22  jaw.  And he called me to pick him up.

23  Q.   Who called you?

24  A.   Chris, my cousin.

25  Q.   Is that Christian Guzman?

D34VFER2                          Darge - cross

1   A.  Yes, sir.

2   Q.  Keep going.

3   A.  So I picked him up to come home.  And on my way back, those

4   kids saw me, and they was going to approach me.  So, once

5   again, I took my gun out, I went in front of my building.  He

6   was talking more frivolous stuff, and I shoot a few shots in

7   the air, and he shot back.  And he got arrested, I didn't.

8   Q.  Who's "he"?

9   A.  Jimbo.

10   Q.  That's the person who broke Christian's jaw?

11   A.  Yes, sir.

12   Q.  Did you shoot at him?

13   A.  I shot at the air.

14   Q.  How about him, did he shoot at you?

15   A.  Yes.

16   Q.  Did anyone hit anyone?

17   A.  No.

18   Q.  Was anyone arrested for that?

19   A.  Yes.

20   Q.  Who?

21   A.  Jimbo.

22   Q.  Were you arrested?

23   A.  No.

24   Q.  I think you said there were four times that you shot

25   somebody.  So when was the fourth time that you shot somebody?

D34VFER2                          Darge - cross

1    A.  2006.

2    Q.  And what happened?

3    A.  I got shot in 2004, so I seen his best friend, so I chased

4    him.  I went back home.  My other cousin told me that I should

5    leave the house.  When I went downstairs -- I grabbed the gun.

6    When I went downstairs to get in my car, he came out, the kid

7    that I chased, his name is Ed-One, he came out of a dumpster

8    and shot at me.  I shot back.  Once my gun got jammed, he went

9    his way, and I went my way.

10   Q.  Just to be clear, you said you were shot in 2004?

11   A.  Yes, sir.

12   Q.  And who is the person?  Who shot at you?

13   A.  I think his name is Louis Santiago.

14   Q.  And the person that you chased and shot at, he's named

15   Ed-One, what was his relationship to Louis Santiago?

16   A.  His best friend.

17   Q.  So did you hit him?

18   A.  No.

19   Q.  Were you arrested for that?

20   A.  No.

21   Q.  Did you have any altercations with any other people

22   affiliated with Louis Santiago?

23   A.  Yes.

24   Q.  Who?

25   A.  His uncle.

D34VFER2                         Darge - cross

1    Q.  What did you do to his uncle?

2    A.  In 2005, I seen his uncle, and I hit him with a bat.

3    Q.  You hit him with a bat?

4    A.  Yes, sir.

5    Q.  Where?

6    A.  In his back.

7    Q.  Do you know what happened to him?

8    A.  No.

9    Q.  Why did you do that?

10   A.  Out of anger.

11   Q.  And were you arrested for that?

12   A.  Yes.

13   Q.  What happened to that case?

14   A.  I got a disorderly conduct charge.  It got dismissed, but I

15   couldn't get in trouble for six months.

16   Q.  And finally, you also mentioned that you were involved in

17   robberies.  What robberies were you involved in?

18   A.  Around 2006/2007, I robbed this guy for a bunch of videos.

19   He was a bootleg video man.

20   Q.  And what did you steal?

21   A.  His VCRs, 97 VCRs.

22   Q.  Anything else?

23   A.  Well, 3,000 movies.  Then I robbed his house for $10,000.

24   Q.  That's the second time?

25   A.  Yes.

D34VFER2                          Darge - cross

1   Q.  And when you robbed him the second time, did you use

2   anything?

3   A.  Well, we had a stun gun.

4   Q.  Did you use it?

5   A.  No, sir.

6   Q.  Were you arrested for either of these robberies?

7   A.  No, sir.

8   Q.  To be clear, throughout this whole time you're also selling

9   drugs?

10  A.  At that time I wasn't, but I started selling drugs again,

11  yes.

12  Q.  And you were arrested in August for selling drugs?

13  A.  Yes.

14  Q.  Of 2012?

15  A.  Yes.

16  Q.  After you were arrested for selling drugs, did there come a

17  time that you pled guilty?

18  A.  Yes.

19  Q.  What did you plead guilty to?

20  A.  To conspiracy to sell a kilo or more of heroin, and to have

21  a gun in contact with that.

22  Q.  Gun related to the heroin?

23  A.  Related to the heroin, yes.

24  Q.  Did you have any kind of agreement with the government?

25  A.  Yes.

D34VFER2                          Darge - cross

1    Q.  What kind of agreement?

2    A.  A 5K1.

3    Q.  Well, did you plead guilty pursuant to a cooperation

4    agreement?

5    A.  Yes.

6    Q.  I'm going to show you a document marked 3510-C.

7            Do you recognize that document?

8    A.  Yes.

9    Q.  What is it?

10   A.  The agreement of mine, of my situation.

11   Q.  Your plea?

12   A.  Yes.

13   Q.  And if you turn to the last page of that document, did you

14   sign it?

15   A.  Yes.

16   Q.  And did your lawyer sign it?

17   A.  Yes.

18   Q.  And did you read it before you signed it?

19   A.  Yes.

20           MR. CAPONE:  Your Honor, I'd offer Government Exhibit

21   3510-C.

22           MR. RICHMAN:  No objection.

23           THE COURT:  Received.

24           (Government's Exhibit 3510-C received in evidence)

25   Q.  Did you meet with the prosecutors in your case before you

D34VFER2                              Darge - cross

1    entered into this agreement?

2    A.  Yes.

3    Q.  Approximately how many times did you meet with the

4    prosecutors before you entered the agreement?

5    A.  I think twice.

6    Q.  And who was there when you met them?

7    A.  My lawyer, the D.A., and an officer.

8    Q.  What did you discuss at those meetings?

9    A.  My crimes.

10   Q.  And did you also discuss the conversation with --

11             MR. RICHMAN:  Objection.

12             Bolstering.

13             THE COURT:  Overruled.

14   Q.  Did you also discuss the conversation with the defendant

15   that we've talked about today?

16   A.  Yes.

17   Q.  And have you continued to meet with the government after

18   you signed that agreement?

19   A.  Yes.

20   Q.  About how many times?

21   A.  Fourteen times.  About 14.

22   Q.  Now, what do you understand to be the maximum sentence you

23   could face on the charges that you pled guilty to?

24   A.  Life.

25   Q.  And do you know if any of those charges carry a mandatory

D34VFER2                          Darge - cross

1   minimum sentence?

2   A.  Yes.

3   Q.  What, if you know, is the mandatory minimum sentence?

4   A.  Well, for the drugs, it's ten -- for the conspiracy, it's

5   ten, and for the gun it's five; so that's 15.

6   Q.  Have you been sentenced yet?

7   A.  No.

8   Q.  Who decides your sentence, if you know?

9   A.  The judge.

10  Q.  What do you understand to be your obligations under the

11  cooperation agreement?

12  A.  To meet whenever you wanted to meet, to tell the truth, to

13  testify, and to don't commit no more crimes.

14  Q.  When you said to meet, you mean to meet the prosecutors?

15  A.  Yes, sir.

16  Q.  What is your understanding of whether anyone has to be

17  found guilty at this trial for you to satisfy your obligations

18  under the agreement?

19  A.  They don't.  Don't matter.

20  Q.  And what is your understanding of what the government will

21  do if you satisfy your obligations under the agreement?

22  A.  Give me a letter.

23  Q.  What kind of letter?

24  A.  A 5Kl.

25  Q.  And what, if you know, goes into the 5Kl letter?

D34VFER2                         Darge - cross

1    A.   My past and my present.

2    Q.   And does your cooperation go into that letter, as well?

3    A.   Yes, sir.

4    Q.   And if the government sends a 5Kl letter for you, what is

5    your understanding of what happens to the mandatory minimum of

6    15 years?

7    A.   It could go lower.

8    Q.   And are you, in fact, hoping to get lower than the

9    mandatory minimum of 15 years?

10   A.   Yes, sir.

11   Q.   What is your understanding of the most amount of time the

12   judge could sentence you, even if you get a 5K letter?

13   A.   Life in jail.

14   Q.   And what is your understanding of how you could violate

15   your cooperation agreement?

16   A.   By not telling the truth, committing a crime.

17   Q.   And if you violate the cooperation agreement that you

18   signed, do you know if you will be able to withdraw your guilty

19   plea?

20   A.   No.

21            MR. CAPONE:  Can I just have one second, your Honor?

22            (Pause)

23            MR. CAPONE:  No further questions.

24            THE COURT:  Mr. Richman.

25            Do you want a break, members of the jury, or should we

D34VFER2                          Darge - cross

1     keep going?

2                  JUROR:  Break please.

3                  THE COURT:  Break.  Sure.  Okay.

4                  Close up your books, leave them on your chair, and

5     don't discuss the case.

6                  (Jury excused)

7                  THE COURT:  Okay.  We're in recess.

8                  I'm sorry, do you want to take matters up?

9                  Do you want to wait till Mr. Darge comes down?

10                 (Recess)

11                 (Jury present)

12                 THE COURT:  Mr. Darge, you remain under oath.

13                 Mr. Richman, you may proceed with cross-examination.

14    CROSS-EXAMINATION

15    BY MR. RICHMAN:

16    Q.  Good afternoon, Mr. Darge.

17    A.  Good afternoon.

18    Q.  You stated that you had two sessions with the government

19    before you started to cooperate; is that right?

20    A.  Yes, sir.

21    Q.  You signed a proffer agreement, did you not?

22    A.  Yes, sir.

23    Q.  And is it fair to say that each time you saw the

24    government, you initialed a proffer agreement, and that's

25    before you started to cooperate; is that right?

D34VFER2                          Darge - cross

1    A.  I'm not too quite sure.

2    Q.  Would it be fair to say that you had four proffer sessions,

3    not two, as you first testified?

4    A.  I had two, then I signed.

5    Q.  I would suggest to you, sir, that you had a first one on or

6    about August 27th of year 2012 with Mr. Todd Blanche present.

7    A.  Yes.

8    Q.  Do you remember that?

9    A.  Yes.

10   Q.  Another one on September 12th, with Mr. Blanche present.

11   A.  Yes.

12   Q.  Another one October 26th with Mr. Blanche present.

13   A.  Yes.

14   Q.  Another one November 12th, 2012 with Mr. Blanche present.

15   A.  Yes.

16   Q.  So it wasn't two, it was four prior to your cooperation,

17   and then you had 14 more thereafter; is that right?

18   A.  Yes, now -- yes.

19   Q.  Refresh your recollection?

20   A.  Yes.  I ain't quite understand the question, but yes.

21          THE COURT:  If you don't understand, don't answer.

22   Say you don't understand.

23          THE WITNESS:  All right.

24   Q.  Now, you say you and your brother didn't get along; is that

25   right?

D34VFER2                         Darge - cross

1    A.  Yes.

2    Q.  But you worked for him or he worked for you?

3    A.  First I worked for him.

4    Q.  And then he worked for you; is that right?

5    A.  Yes.

6    Q.  He provided drugs to you, did he not?

7    A.  At one point, yes.

8    Q.  And you cut the drugs and distributed it for him, right?

9    A.  No, he did that for me.  Well, he did -- well, yes, yes, I

10   did, '93, yes.

11   Q.  And this was over a period of many years; is that right?

12   A.  No, about a year and-a-half.

13   Q.  And you would say you were not close to your brother,

14   right?

15   A.  Yes.

16   Q.  Did your brother know about your criminal activity?

17   A.  Yes.

18   Q.  Did he know about the drugs that you sold?

19   A.  Yes.

20   Q.  Did he know about the people you beat up?

21   A.  Not too sure.

22   Q.  Did he know about the people you shot?

23   A.  I don't speak that kind of thing.  I don't speak that.

24   But, yeah, he knew like one or two.

25   Q.  He knew about at least one or two of the people you shot,

D34VFER2                          Darge - cross

1   right?

2   A.  Yes.

3   Q.  You knew that your brother was arrested in the year 2003;

4   is that right?

5   A.  Yes.

6   Q.  And you knew that your brother had cooperated in 2003, did

7   you not?

8   A.  Yes.

9   Q.  And you knew that in cooperating in 2003, he was required

10  to tell the government about all the crime that he had known

11  about, including those associated with him; correct?

12  A.  Yes.

13  Q.  Which he knew at the time your agreement, right?

14  A.  Yes.

15  Q.  But you noted that you were not arrested in 2003 after your

16  brother cooperated, right?

17  A.  Yes.

18  Q.  And you didn't get arrested for any other drug knowledge

19  that your brother had at all; is that right?

20          MR. CAPONE:  Objection.

21          THE COURT:  Overruled.

22  A.  Yes.

23  Q.  Your brother didn't give you up, right?

24          MR. CAPONE:  Objection.

25          THE COURT:  Overruled.

D34VFER2                         Darge - cross

1    A.  I don't know that.

2    Q.  But you're not close.

3    A.  No, we're not close, no.

4    Q.  And you were never arrested for the acts that you committed

5    at that time when your brother was cooperating in 2003 and

6    thereafter, right?

7    A.  Right.

8    Q.  And, in fact, when your brother got arrested in the year

9    2010, he had known about your criminal activity, and that it

10   was continuing; correct?

11   A.  Correct.

12   Q.  And he knew about your selling drugs in the neighborhood

13   and on the streets, right?

14   A.  We don't -- we don't really speak, so --

15   Q.  But he knew about your criminal activity, did he not?

16          THE COURT:  Well, let him finish, Mr. Richman.

17          MR. RICHMAN:  Sorry, your Honor.

18   A.  Like I said, me and him don't have a close relationship, so

19   he don't know what I was doing.  Because there was a period of

20   time that I wasn't selling drugs.

21   Q.  When was that period of time?

22   A.  '09 to '011.

23   Q.  '09 to '011?

24   A.  About, yes.

25   Q.  Did you sell drugs in '05, six, seven, eight?

D34VFER2                         Darge - cross

1    A.  Yes.

2    Q.  And your brother was out of jail, right?

3    A.  Yeah, but we wasn't talking.

4    Q.  And he was in your neighborhood, was he not, 189th Street

5    and Valentine, that neighborhood?

6    A.  188.  And he was there, but I wasn't there.

7    Q.  And your brother got arrested again.  He didn't tell the

8    government again about you; correct?

9    A.  I don't know.

10              MR. CAPONE:  Objection.

11   Q.  You were not arrested in this -- in any case related to

12   your brother, were you?

13   A.  No.

14   Q.  In fact, you got arrested when you sold directly to a DEA

15   agent in a separate -- entirely different matter in the year

16   2012.

17              THE COURT:  Different from what?

18              MR. RICHMAN:  Different from the case that we have

19   been spending the last two weeks about.

20              THE COURT:  Rephrase the question.

21   Q.  In fact, would it be fair to say that you were arrested in

22   a direct sale to the government, right?

23   A.  No, I wasn't selling to the government.

24   Q.  Who were you selling to?

25   A.  To nobody.

D34VFER2                         Darge – cross

1          When I was arrested, I was picking up some drugs.

2    Q.  Oh, you were picking up some drugs?

3    A.  Yes.

4    Q.  You picked it up and they caught you picking these drugs

5    up?

6    A.  Yes.

7    Q.  And this had nothing to do with Minaya or Gordo?

8    A.  No.

9    Q.  Or any of those folks; correct?

10   A.  Correct.

11   Q.  And but you knew your brother was cooperating, right?

12          THE COURT:  You already had that --

13          MR. RICHMAN:  Second time, not the first.  That was

14   the first time.

15          THE COURT:  Rephrase the question.

16   Q.  You knew your brother was cooperating again, didn't you?

17   A.  No.

18   Q.  You didn't know?

19   A.  No.

20   Q.  And you didn't get arrested; your brother never gave you up

21   at that point?

22          THE COURT:  Mr. Richman, I think we've gone over this.

23   Q.  You said you knew about this shooting because someone told

24   you.

25   A.  Correct.

D34VFER2                          Darge - cross

1   Q.  And you said that Zach drove everybody to the scene; is

2   that right?

3   A.  Correct, as I heard, yes.

4   Q.  And who did you hear that from?

5   A.  Joe Fernandez.

6   Q.  Joe Fernandez told you that Zach drove everybody to the

7   scene?

8   A.  That Zach took them to the place.

9   Q.  That Zach took them to the scene?

10  A.  Didn't drive them; he took them.

11  Q.  You remember that?

12          THE COURT:  Mr. Richman, could you let the answers be

13  finished before you start the next question.

14          MR. RICHMAN:  Sorry, your Honor.

15  Q.  You remember Joe Fernandez telling you that Zach took him

16  to the scene; correct?

17  A.  Correct.

18  Q.  And you also remember Joe Fernandez telling you that your

19  brother did the shooting, and he at least fired one shot?

20  A.  No, he fired two shots.  His gun got jammed; my brother end

21  it.

22          THE COURT:  Who is "he"?

23          THE WITNESS:  Joe Fernandez.

24          THE COURT:  No, start again.  Who fired two shots?

25          THE WITNESS:  Joe Fernandez.

D34VFER2                      Darge - cross

| | |
|---|---|
| 1 | THE COURT:  Who's the brother who finished? |
| 2 | THE WITNESS:  My brother Patrick Darge. |
| 3 | BY MR. RICHMAN: |
| 4 | Q.  And I believe you told authorities at one point that |
| 5 | Richard Correa told you that story. |
| 6 | A.  Who's Richard Correa?  Richie. |
| 7 | Q.  Richie.  Do you know who Richie is, right? |
| 8 | A.  Yes. |
| 9 | Q.  Who's Richie? |
| 10 | A.  One of the codefendants. |
| 11 | Q.  And you said that he -- did you tell the government that he |
| 12 | told you that story? |
| 13 | A.  No, I didn't. |
| 14 | Q.  Let me correct that.  Carlos Correa. |
| 15 | A.  Well, yes, he told me about -- he didn't tell me what |
| 16 | happen, but he told me who did it and how much money they got |
| 17 | paid. |
| 18 | Q.  Carlos. |
| 19 | A.  Yes. |
| 20 | Q.  By the way, sir, when you were arrested in May of the year |
| 21 | 2012 -- |
| 22 | A.  May -- August. |
| 23 | Q.  August 2012? |
| 24 | A.  Yes. |
| 25 | Q.  And how long after that did you cooperate with the |

D34VFER2                    Darge - cross

1   government?

2   A.  I don't know.  Like in the middle of August.  August 20 --

3   27, I guess, I don't know.

4   Q.  Within a day or two?

5   A.  No.

6   Q.  How long thereafter?

7   A.  Two weeks, three weeks.

8   Q.  Because you knew that you were in serious trouble; correct?

9   A.  Correct.

10  Q.  And you were going to find out how you were going to get

11  out of this trouble, right?

12  A.  It's not find out how I'm going to get out of trouble.

13  Q.  Well?

14  A.  I don't understand.

15  Q.  Isn't that the first time you ever said to the government

16  that you didn't get along with your brother, was in February of

17  this year, 2000 -- February 12th, 2013?

18  A.  Excuse me?

19  Q.  Isn't it a fact that the very first time you told the

20  government you didn't get along with your brother was in the

21  middle of this trial last week?

22  A.  No.  If they -- when I was asked -- I been up-front with my

23  answers.

24  Q.  Do you remember having a proffer -- a meeting with the

25  government on February 27th last week?

D34VFER2                          Darge - cross

 1   A.  Guess so, yes.

 2   Q.  Well, do you guess so or do you recall?

 3   A.  Yeah, I remember.  Yeah, I was --

 4   Q.  And was Mr. Blanche present?

 5   A.  Yes.

 6   Q.  Mr. Cronan present?

 7   A.  Yes.

 8   Q.  Mr. Capone present?

 9   A.  Yes.

10   Q.  And two others?

11   A.  Yes.

12   Q.  And did you at that time tell them for the first time in

13   your discussions that you didn't get along with your brother?

14   A.  No.

15           THE COURT:  Did you tell them that or was that the

16   first time?

17           THE WITNESS:  No, I been telling them that.

18           THE COURT:  You told them that before.

19           THE WITNESS:  A long time ago, yes.

20   Q.  Sir, you pled guilty to Count One of conspiracy to

21   distribute heroin; is that right?

22   A.  Yes.

23   Q.  1993 to the year May of 2012, right?

24   A.  Yes.

25   Q.  And that you used a firearm in furtherance of the drug

D34VFER2                          Darge - cross

1    trafficking, right?

2    A.   Correct.

3    Q.   You were pretty much into guns, were you not?

4    A.   Yes, sir.

5    Q.   And did you ever show those guns to your brother?

6    A.   He probably seen them, yes.

7    Q.   And you showed your brother the various type of guns.

8            By the way, you had a .380, didn't you?

9    A.   In my course of time, yes, I did.

10   Q.   And you had a nine-millimeter, didn't you?

11   A.   Yes.

12   Q.   And in pleading guilty, you pled guilty to, if I'm not

13   mistaken, a conspiracy to distribute one kilogram and more of

14   heroin.

15   A.   Yes.

16   Q.   You have actually distributed hundreds, if not thousands,

17   of kilograms over the period of time in question, right?

18   A.   Yes.

19   Q.   Was it agreed that per your cooperation, the government

20   will not prosecute you for the other conspiracies of heroin and

21   other drugs that you may have sold?

22   A.   I don't think so.  I think -- I'm not too sure.  I don't

23   know -- what -- could you rephrase that question again?

24   Q.   Is it not a fact that you agreed to be -- plead guilty to

25   that one count, and that you would be -- you would not be

D34VFER2                          Darge - cross

1    charged with the sale of the other heroin and other drugs

2    during that period of time?

3    A.  If I'm not mistaken, it goes to the judge, and the judge

4    sees my past history.  So I don't know if that takes account or

5    not.

6              THE COURT:  What did you plead guilty to?

7              THE WITNESS:  To selling -- to conspiracy of heroin.

8              THE COURT:  And did you deal other drugs?

9              THE WITNESS:  Well, yes, I did.

10             THE COURT:  Did the government tell you they would

11   prosecute you, did they tell you they would not prosecute you

12   for those other drugs?

13             THE WITNESS:  I think they were not going to prosecute

14   me with the other drugs.

15             THE COURT:  That was what Mr. Richman was asking.

16             Move on, Mr. Richman.

17   BY MR. RICHMAN:

18   Q.  Sir, the government showed you that which has been marked

19   3510-C, your cooperation agreement; is that right?

20   A.  Yes.

21   Q.  You signed that agreement, right?

22   A.  Yes.

23   Q.  Prior to you signing it, it was explained to you; correct?

24   A.  Yes.

25   Q.  And isn't it, as part of that agreement, that you would not

D34VFER2                         Darge - cross

1   be prosecuted for possession and carrying firearms in

2   furtherance of drug trafficking, you would not be prosecuted

3   for your several assaults; correct?

4   A.   Correct.

5                (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D340fer3                    Darge - cross

1  Q.  You would not be prosecuted for burglaries?

2  A.  Correct.

3  Q.  You would not be prosecuted for robberies?

4  A.  Correct.

5  Q.  You would not be prosecuted for the various firearms you

6  had in your possession, from 1991 to 2007?

7  A.  Correct.

8  Q.  You would not be prosecuted for personal use of drugs?

9  A.  Correct.

10  Q.  By the way, do you personally use drugs?

11  A.  Yes.

12  Q.  What drugs?

13  A.  Marijuana.

14  Q.  That's all?

15  A.  Well, I done ecstasies before.

16  Q.  By the way, in 1991, you mentioned the fact that you had

17  shot this guy, Coa's friend, is that right?

18  A.  Right.

19  Q.  And you know that Coa was found dead with a bullet in his

20  eye later?

21  A.  Well, that was, I believe, years later.

22  Q.  Yeah.  And, your brother, do you know your brother had shot

23  somebody in the face, or in the eye?

24  A.  No.

25  Q.  You never knew that?

D340fer3                    Darge - cross

1   A.  No, sir.

2   Q.  Let's talk about the October 13.  Do you remember that

3   date, October 13, 2012?

4   A.  Yes, sir.  Yes.

5   Q.  You remember that?

6   A.  Well, I don't know the date, but I remember -- I know what

7   you are talking about, what you are referring about.

8   Q.  What time did you meet your cousin, Joey?

9   A.  I don't know, about 2:00, 3:00.

10  Q.  Two, three in the afternoon?

11  A.  Maybe four.

12  Q.  And you have a fair recollection of the time, correct?

13  A.  Excuse me?

14  Q.  You have a clear recollection of the time, right?

15          MR. CAPONE:  Objection.

16          THE COURT:  Overruled?

17          Do you have a clear recollection?

18          THE WITNESS:  No, sir.

19  BY MR. RICHMAN:

20  Q.  Where were you when you received the telephone call?

21  A.  Somewhere in the streets.

22  Q.  Where, in the streets?

23  A.  I exactly don't know, but I was outside, hanging out.

24  Q.  And were you there in -- were you just hanging out?

25  A.  Yes.

D340fer3                           Darge - cross

1    Q.  And at that particular time, were you still selling drugs?

2    A.  Well, I was -- not really.

3    Q.  Not really?

4    A.  Yes, because it was a period of time I was -- I ain't had

5    no drugs.  But I would get like 100 grams every other month or

6    two, so.

7    Q.  You were arrested in August of the year 2012 for possession

8    of drugs, correct?

9    A.  Correct.

10   Q.  And you stated that you had were selling drugs all of the

11   time, except between the years 2009 and 2011; right?

12   A.  Well, I -- there have been periods of time that I was not

13   selling drugs, before 2009 and '11; like in '05 to '07, I

14   wasn't selling drugs.

15   Q.  What about in May of 2012?

16   A.  August of 2012?

17   Q.  May.

18   A.  May?  Yes -- 2012?  Yes, I was selling drugs.

19   Q.  So in May 2012, when you were hanging out, where were you

20   hanging out, that date?

21   A.  I don't know.  What day are you talking about, 2011 or are

22   you talking about May?

23   Q.  When did you meet Joe?

24   A.  Excuse me?

25   Q.  When did you meet Joe?

D340fer3                        Darge - cross

1   A.  Somewhere in 2011.

2   Q.  Somewhere.  What month, do you remember?

3   A.  No.

4   Q.  Do you remember the -- was it early part of the year,

5   middle part of the year, later part of the year?

6   A.  I don't -- I can't -- I don't remember, no.

7   Q.  Would it be fair to say, sir, that you want to help

8   yourself, not go to jail, right?

9   A.  I want to help myself, yes.

10  Q.  And you want to get as little time as possible; right?

11  A.  Yes.

12  Q.  And you'd do anything to get as little time as possible?

13  A.  No, not anything.

14  Q.  Well, you wouldn't do that?

15  A.  No, I wouldn't do anything.

16  Q.  You have shot people, you have sold drugs, you have robbed

17  people, you have burglarized people, but you wouldn't lie?

18  A.  No.

19          THE COURT:  No, you wouldn't, or no --

20          THE WITNESS:  No, I wouldn't lie.

21  Q.  You --

22          THE COURT:  You would not lie?

23  Q.  And is it because lying is bad?

24  A.  No.

25  Q.  By the way, you said that you had seen Joey, and Joey told

D340fer3                        Darge - cross

1   you that the police came to his house, correct.

2   A.  Correct.

3   Q.  And did you tell the police that?  Did you tell the --

4   A.  If I'm not mistaken, yes.

5   Q.  And isn't it also a fact that Joey told you that he went to

6   work?

7   A.  Yes.  He told me that they missed him because he went to

8   work early.

9   Q.  Did you know the Joey eventually surrendered in a couple of

10  days?

11  A.  Yes.

12  Q.  In fact, do you remember the date?

13  A.  No.

14  Q.  Do you remember the year?

15  A.  2011.

16  Q.  And how soon after you say you met with Joey?

17  A.  I don't know, a few days after that.

18  Q.  By the way, you have another cousin Joey, don't you,

19  Agramante?

20  A.  I know his name was Joey, yes, but --

21  Q.  They call him Tilo, right?

22  A.  Yes.

23  Q.  And Gordo is your cousin, too, isn't he?

24  A.  Yes.

25  Q.  Would it be fair to say you stopped seeing Joey on a

D340fer3                         Darge - cross

1    regular basis because he had moved out of the neighborhood at

2    the age of 12 or 13, meaning Joe Fernandez?

3    A.  Correct.

4    Q.  And would it be fair to say that your brother still stayed

5    in the neighborhood when Joey moved out of the neighborhood,

6    right?

7    A.  Yes.

8    Q.  And your brother is how much older than you?

9    A.  About three -- three years.

10   Q.  And how much older than Joe, if you know?

11   A.  I don't know, maybe three.  I'm not too sure.

12   Q.  You know Joey's married, right?

13   A.  Yes.

14   Q.  And you know Joe has four children, right?

15   A.  Yes.

16   Q.  And do you know how old they are?

17   A.  No.

18   Q.  By the way, they call you Boozer?

19   A.  Correct.

20   Q.  Why?

21   A.  It was a nickname they gave me.

22   Q.  Is it because you are a drinker?

23   A.  No.

24   Q.  Who gave you that name?

25   A.  Excuse me?

D340fer3                      Darge - cross

1   Q.  Who gave you that name?

2   A.  In the streets.

3   Q.  The streets gave you that name?

4   A.  Yes, sir.

5   Q.  Mr. Darge, you are a very violent man, are you not?

6   A.  No.

7   Q.  I mean you have beaten people up with a baseball bat?

8   A.  Correct.

9   Q.  You shot people for various reasons?

10  A.  Correct.

11  Q.  Isn't it a fact your brother came to you as the only one to

12  back him up that day?

13  A.  Back him up for -- what are you talking about?

14  Q.  About the time that you shot those two Mexicans?

15          THE COURT:  Put the question again.

16  Q.  The time you shot the two Mexicans?

17  A.  I shot?  No, sir.  You are mistaken.

18          MR. RICHMAN:  No further questions.

19          THE COURT:  Redirect.

20  REDIRECT EXAMINATION

21  BY MR. CAPONE:

22  Q.  Mr. Darge, you were asked about your brother's cooperation

23  in 2010; do you remember that?

24  A.  Yes, sir.

25  Q.  And you were asked whether any information your brother

D340fer3                          A. Darge - redirect

1   gave led to your arrest; do you remember that?

2   A.  Yes, sir.

3   Q.  Do you have any idea what your brother told the government

4   about you, if anything?

5   A.  No.

6   Q.  Do you have any idea what he told you, in 2003, what he

7   told the government in 2003, when he cooperated?

8   A.  No, sir.

9   Q.  Do you have any idea what he told the government in 2010,

10  when he cooperated?

11  A.  No, sir.

12  Q.  You pled guilty in your case?

13  A.  Yes, sir.

14  Q.  And if you didn't plead guilty, you would have had to go to

15  trial?

16  A.  Yes, sir.

17  Q.  Do you know whether your brother would have had to testify

18  at your trial?

19  A.  No.

20  Q.  No, you don't know?

21  A.  I don't know.

22  Q.  You were asked about a man named Carlos Correa, do you

23  remember that?

24  A.  Yes.

25  Q.  And you were asked if Carlos Correa told you what had

D340fer3                         A. Darge - redirect

1   happened; do you remember that?

2   A.  Yes.

3   Q.  What did Carlos tell you happened?

4   A.  Well, he just told me who was -- who was on the -- who was

5   involved in the situation, and how much the money got split.

6   Q.  Who did he say was involved?

7   A.  He said my brother, Joey, and Louis.

8   Q.  And what Joey?

9   A.  Joe Fernandez.

10  Q.  And did he tell you who fired how many shots?

11  A.  Negative.

12  Q.  You were asked about whether you've ever owned a .380?

13  A.  Yes, sir.

14  Q.  When did you own a .380?

15  A.  I can't remember.

16  Q.  You were asked about whether you owned a 9mm.

17  A.  Correct.

18  Q.  When did you own a 9mm?

19  A.  2012 -- I don't know.

20  Q.  Have you ever owned any other types of guns?

21  A.  Yes.

22  Q.  You were asked about whether you were not going to be

23  prosecuted for assaults, do you remember that?

24  A.  Yes.

25  Q.  Do you know if that is because the federal government has

D340fer3                          A. Darge - redirect

```
 1   no jurisdiction over that?
 2             MR. RICHMAN:  Objection.
 3             THE COURT:  If you know.
 4             THE WITNESS:  Yes, I do know.
 5   Q.  And what is the answer?
 6   A.  No.
 7   Q.  You were asked about whether you were going to be
 8   prosecuted for various -- possession of various guns; do you
 9   remember that?
10   A.  Correct.
11   Q.  And you were also asked about your involvement in a
12   burglary, and whether you were going to be prosecuted for your
13   involvement in a burglary; do you remember that?
14   A.  Yes.
15   Q.  What is your understanding about whether the federal
16   government has any jurisdiction over that burglary?
17   A.  I understand you don't.
18             THE COURT:  Did you have a discussion with the federal
19   people who were involved with you as to whether or not there
20   was jurisdiction?
21             THE WITNESS:  I think I overheard it.
22             THE COURT:  You overheard them taking?
23             THE WITNESS:  Yes.
24   Q.  And how about --
25             THE COURT:  Regardless of who has jurisdiction, what's
```

D340fer3                        A. Darge - redirect

1    your understanding as to whether all of these things were or

2    were not going to be brought to the attention of the judge at

3    sentencing?

4             THE WITNESS:  I know it is going to be brought to the

5    attention of the judge at my sentencing.

6             THE COURT:  Regardless of what jurisdiction?

7             THE WITNESS:  Yes.

8    Q.  Same go for your shootings?

9    A.  Yes, sir.

10   Q.  You were asked about whether you would lie do; you remember

11   that?

12   A.  Yes.

13   Q.  And you were asked if you wouldn't lie because lying is bad

14   and you said, no, that's not why?

15   A.  Yes.

16   Q.  Why are you not lying?

17   A.  Because all of this, what I'm doing, is for nothing.

18   Q.  What, if you know, what will happen if you lie today?

19   A.  Well, I get my K 1 ripped, and I have to face my music.

20   Q.  Would you get out of jail earlier than your 15 mandatory

21   minimum if you lie today, if you know?

22            MR. RICHMAN:  Objection.

23            THE COURT:  Overruled.

24            THE WITNESS:  Rephrase that?

25   Q.  Would you get out of jail earlier than your 15 year

D340fer3                           A. Darge - redirect

1    mandatory --

2    A.  No.

3    Q.  -- minimum if you lie today?

4    A.  No.

5           THE COURT:  And why is that?

6           THE WITNESS:  Because I broke the agreement.

7    Q.  And Mr. Darge, you were asked if you and your brother shot

8    two Mexicans; do you remember that?

9    A.  Yes.

10   Q.  To be clear, did you ever do that?

11   A.  No.

12          MR. CAPONE:  No further questions.

13          MR. RICHMAN:  Briefly, your Honor?

14          THE COURT:  Only on the cross, something just brought

15   up.

16          MR. RICHMAN:  Yes.

17   RECROSS EXAMINATION

18   BY MR. RICHMAN:

19   Q.  Who do you understand -- who do you understand to be the

20   sole determiner of whether you lied or not?

21   A.  Excuse me?

22          THE COURT:  Who decides if you lied or not.

23          THE WITNESS:  I don't know.

24   BY THE COURT:

25   Q.  Isn't it a fact that you agreed that the government

D340fer3                        A. Darge - recross

1   decides, only the government decides whether you lied or not,

2   by a part of your agreement?

3          THE COURT:  What's your understanding, is the

4   question.

5   A.  I don't -- I don't comprehend what -- what are you --

6          THE COURT:  According to your understanding,

7   Mr. Darge, who decides whether you lied or not; you, the

8   government, or the judge?

9          THE WITNESS:  I guess the Judge, I -- I don't know.

10          THE COURT:  You don't know.

11          THE WITNESS:  No.

12          THE COURT:  Okay.

13          MR. RICHMAN:  Well, no further questions.

14          THE COURT:  All right.  Thank you very much.

15          We'll all remain seated while Mr. Darge leaves the

16   courtroom.

17          (Witness excused)

18          THE COURT:  Next witness.

19          MR. CAPONE:  The government rests.

20          THE COURT:  That means the government has finished its

21   presentation of proofs.  I need to do a few things with the

22   lawyers, members of the jury, so I'll ask you to recess for a

23   few minutes, probably about 15.  I'll call you again.

24          Close up your books and leave them in place.  Don't

25   discuss the case, please.

D340fer3                              A. Darge – recross

1              (Jury excused)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D340fer3                        A. Darge - recross

1              (In open court)

2              THE COURT:  Be seated, please.

3              Mr. Richman, do you want to make motions?

4              MR. RICHMAN:  Yes, your Honor.

5              THE COURT:  Or do you want to reserve.

6              MR. RICHMAN:  No, I can make a motion now.

7              THE COURT:  Go ahead.

8              MR. RICHMAN:  I most respectfully move pursuant to

9      Rule 29, dismissal of counts --

10             Pursuant to Rule 29, the defendant moves for entry of

11     judgment of acquittal based upon the fact, your Honor, that the

12     whole case, this entire case, is based upon the testimony of

13     Patrick Darge.  And Patrick Darge testifies as to a

14     participation in the alleged murder.

15             It is not a murder for hire, according to Patrick

16     Darge, as he conveyed it to Joe Fernandez.  If you are to

17     believe everything that Patrick Darge says, which of course I

18     maintain is a stretch.  But nevertheless, for your purposes

19     here and now, where is there a jurisdiction.  Just moments ago

20     we heard the government elicit from the witness where these

21     counts are not governed by the government in terms of charges

22     that can be brought by the government.  Murder is one of those

23     charges, unless it is murder for hire.

24             Here, Patrick Darge maintained, clearly, that this was

25     not a murder for hire.  That he had told Joe, it's the family,

D340fer3                         A. Darge - recross

 1   somebody is out to hurt the family.  That is not a murder for

 2   hire, stretching it as far as you wish to go.  And that

 3   particular count, as a result therefrom, does not comply with

 4   the evidence that has to be elicited by the prosecution.  And

 5   as such, respectfully, I urge the Court may and must consider

 6   Rule 29, and acquittal on that particular count.

 7          THE COURT:  How do you deal with the issue of money.

 8   That there was a suggestion that it should be done for a

 9   certain price, and Mr. Darge was noncommittal, the price was

10   increased, and Mr. Darge approved, and went ahead.

11          MR. RICHMAN:  Darge.  But his conveyance --

12          THE COURT:  I'm sorry, go ahead.

13          MR. RICHMAN:  You have to have knowledge by Fernandez.

14          THE COURT:  And then Fernandez -- and then Darge gave

15   money to Fernandez, and Darge gave money to the drivers; 40,000

16   to Fernandez, and 20,000 to the drivers.

17          MR. RICHMAN:  But that was not the reason for the

18   alleged participation.  Allegedly.  According to Darge, the

19   sole purpose of Fernandez' participation was because of the

20   family.  The family was in trouble.

21          THE COURT:  Well, if Darge tells Fernandez that it's

22   family, and also tells him it is money, isn't money sufficient

23   in that context?

24          MR. RICHMAN:  I submit no, your Honor.

25          Patrick says, in the testimony:  I need someone to

D340fer3                          A. Darge - recross

1    watch my back while I was killing.  I didn't trust the whole

2    story, so while I'm killing the individuals they would come to

3    kill me.

4              THE COURT:  So how do you account for the $40,000; was

5    that a gift?

6              MR. RICHMAN:  After the fact, your Honor, most

7    respectfully.

8              THE COURT:  Well, that was negotiated before the fact,

9    as well it was offered before the fact.  Wasn't it.  Even if

10   done after the fact, wasn't suggested an inference that it was

11   intended all along.  After all, the money was not refused, it

12   was taken.

13             MR. RICHMAN:  If it was after the fact, your Honor,

14   the state of mind at the time of commission of the crime is the

15   determining factor at the alleged crime, not something that

16   happened thereafter.  And, as such, the government has failed

17   to comply with their responsibility under the law, as I

18   understand it.

19             I recognize if you believe Darge, you might have a

20   question of a murder case.  But it isn't a murder case that is

21   subject to federal jurisdiction, it's not a murder for hire.

22             THE COURT:  It makes an issue of credibility, not of

23   Rule 29.

24             MR. RICHMAN:  Well, there is not a question of

25   credibility if the only -- if the government relies entirely on

D340fer3                          A. Darge - recross

 1    that one witness.

 2              THE COURT:  There is no -- there is no requirement of

 3    corroboration, is there?

 4              MR. RICHMAN:  No, not of the money.

 5              THE COURT:  Does there have to be corroboration of the

 6    money?

 7              MR. RICHMAN:  Just the corroboration to the extent of

 8    an alleged statement.  That that should be corroboration in a

 9    criminal case in a state Court, as you well know.

10              THE COURT:  Well, we're in a federal court now, and I

11    don't think we need corroboration.  If we did, the facts

12    corroborate the sense of the $20,000 given to the driver who is

13    not a member of the family, and the overall sum that was given

14    to Patrick Darge and distributed.  And in the conversations

15    about money afterwards.

16              MR. RICHMAN:  We have no corroboration of the money

17    given to anybody, other than Darge.  There is no corroboration

18    by anybody.

19              THE COURT:  Mr. Blanche, do you want to respond?

20              MR. BLANCHE:  Yes, your Honor.

21              First of all, your Honor is correct that the testimony

22    of a single witness, under black letter Second Circuit law, is

23    enough for a conviction.

24              More significantly, your Honor, I'm quoting from

25    page 276 of the transcript, the question put to Patrick Darge

D340fer3                         A. Darge - recross

1   was:  What else did you tell him about the situation --

2            Meaning what did Patrick tell the defendant about the

3   situation.

4            The answer was that:  I was hired to murder two guys

5   and that I needed him to back me up in case of anything after

6   that.  He agreed to help me out, whatever I needed him to do.

7            The very next page, three questions later, the

8   question was:  What are the details that you provided him --

9            Meaning that Patrick Darge provided Joe Fernandez.

10           Answer:  I also told him that I am willing to pay him

11   $40,000 to assist me.  And that he needed to bring his gun.

12           I mean that wasn't after, that was before.  And that's

13   the testimony, your Honor, so --

14           THE COURT:  Page?

15           MR. BLANCHE:  That is page 276 and 277 of the

16   transcript.

17           As far as corroboration, although it is not needed on

18   the money, Alberto Reyes also talked about paying money to

19   Patrick Darge, with the understanding that the second shooter

20   who was Patrick Darge's cousin, would need to get some of that,

21   so it is corroborated.  And it is also corroborated, frankly,

22   by the defendant's own words, both to Yubel Mendez and to Alain

23   Darge, more recently.

24           So I mean, your Honor, in the government's view, the

25   Rule 29, when you look at all of the light, as you must, in

D340fer3                          A. Darge - recross

 1   favor of the government, there is way enough to go to a jury

 2   with both counts one and two.

 3           Patrick Darge testified about the murder conspiracy.

 4   He was hired to commit a murder.  And there was a payment of

 5   money.  Telephones were used.  And certainly conspiracy to

 6   commit murder for hire, Judge, we have it.  At least --

 7           THE COURT:  Another word, Mr. Richman?

 8           MR. RICHMAN:  I would rest on what we have so far.

 9           THE COURT:  Motion denied.  For the reasons that are

10   spelled out in my questions and in Mr. Blanche's response.

11           Now, the next is to ask you about your case.  But

12   before I do, I want to speak with Mr. Fernandez directly on the

13   record.

14           Mr. Fernandez, what I'm going to say to you, I say to

15   every defendant.  It's not.

16           Do you need to talk to Mr. Fernandez?  I'll wait.

17           MR. PAKETT:  I do not, your Honor.

18           THE COURT:  So sit back and relax.

19           What I am about to say to you, Mr. Fernandez, I say

20   to --

21           Mr. Cronan, can you move to your left?

22           MR. CRONAN:  Sorry.

23           THE COURT:  To your left.

24           I say to every defendant.  And I say this, not because

25   I disrespect the lawyers in the case, I don't.  But I -- I know

D340fer3                      A. Darge - recross

1    Mr. Richman for some time.  And I admire the way he works.  I

2    think he is one of the better lawyers in this Court.  So it's

3    not because I feel that he has not said this to you.  But I say

4    it anyhow.

5            A defendant has a choice, first, about his whole case.

6    And second, about himself.  About his whole case, he has a

7    choice to produce evidence, or not.

8            He has the right to say to the jury, look, it's the

9    government's burden.  The government has to prove each and

10   every element of the crimes charged beyond a reasonable doubt.

11   And if the government fails, then that's the end of it, you

12   can't convict me.  And you don't have to produce a bit of

13   evidence.  That's the government's burden.  And that's what is

14   meant by your presumed innocence.

15           So you can safely, in that sense, decide I want to

16   rest on my presumption, and it's the government's burden to

17   prove the case.

18           If you do produce evidence, the jury is entitled to

19   consider that evidence.  Not that it changes the burden in any

20   way, it doesn't.  But like all evidence, the government has

21   to -- like all the evidence, the jury has to evaluate it, and

22   consider it's probative value, and its credibility.

23           So that's your choice about putting on evidence.

24           The second aspect is you, yourself.  Like every other

25   person, the defendant has the right to testify.  And if you

D340fer3                         A. Darge - recross

1   want to testify, you may testify.  If you do, you can be

2   cross-examined.  And the government can cross-examine you the

3   way -- pretty much the way it can cross-examine any witness.

4   However, you also have a right not to testify.  You don't have

5   to testify.  And if you choose not to testify, it's your

6   Constitutional right, and no one can argue to the jury, and

7   indeed I will instruct the jury, that they cannot draw any

8   inference from the exercise of your Constitutional right not to

9   testify.

10          So those are your choices.  I hope I have been clear

11   to you.  I would like you and Mr. Richman to have a little

12   conversation -- either where you are, or if you want to go in

13   the back -- about your rights in this regard.  And I'll ask

14   Mr. Richman to tell me if the defense plans to put on any

15   witnesses or put on any case, and whether or not you wish or do

16   not wish to testify.

17          All right.  Do you have any questions of me,

18   Mr. Fernandez?

19          THE WITNESS:  No.

20          THE COURT:  You and Mr. Richman can either talk just

21   on the table -- and Mr. Richman, would you prefer to talk

22   outside --

23          MR. RICHMAN:  We can speak here, your Honor.

24          THE COURT:  -- of if your client feels more

25   comfortable going in the back.

D340fer3                          A. Darge - recross

 1              (Pause)

 2              MR. RICHMAN:  Your Honor, I have had the opportunity

 3     to speak with my client.  This is not the first time that we

 4     have discussed this issue.

 5              THE COURT:  I'm sure of that, Mr. Richman.  And I hope

 6     you forgive me in addressing your client directly.

 7              MR. RICHMAN:  Oh, no, and I recognize your concerns.

 8              I have discussed this with him at length.  He does not

 9     feel secure in terms of the ability to communicate.  And he

10     also feels insecure, he has indicated to me that he does not

11     wish to take the stand, does not wish to testify.

12              And, is that correct?

13              THE WITNESS:  That's correct.

14              MR. RICHMAN:  I have spoken to you?

15              THE WITNESS:  Yes.

16              THE COURT:  Very well.

17              Do you have any case that you want to put on --

18              MR. RICHMAN:  No, your Honor.

19              THE COURT:  -- or do you want to rest on the defense's

20     right to subject the government to the proof and rest on the

21     presumption of innocence.

22              MR. RICHMAN:  Yes, your Honor, we'll be resting.

23              THE COURT:  Okay.  So let's -- let me, if you all will

24     sit down.

25              Let me discuss my plans with you.  And I think what I

D340fer3                         A. Darge - recross

1   would like to do is to call the jury in.  I'll give you my

2   thoughts all together, and then I'll ask for comments.

3            My thought is, now, to -- my thought is to excuse the

4   jury for the rest of the day.  After lunch -- it's now 12:30,

5   we'll take an hour or so for lunch.  And at the end of that, I

6   will ask you to come back, and I'll give you the proposed jury

7   instructions.  And approximately two hours later, I'll convene

8   you again and we'll have our charging conference.

9            Tomorrow morning, we'll -- we'll sum up the case.

10           Who will do it, Mr. Blanche?

11           MR. CRONAN:  Me, your Honor.

12           THE COURT:  Mr. Cronan will do it.  Then Mr. Richman.

13   And then Mr. Cronan, short rebuttal.  We'll follow that with my

14   instructions.  And the jury will then begin to deliberate.

15           So that's my plan.  We can -- we'll have lunch at the

16   end of the summations and the instructions.  And if it's a

17   little too early for lunch, we can start the deliberations and

18   then recess.

19           Is that a good plan, Mr. Blanche?

20           MR. BLANCHE:  Yes, your Honor.

21           THE COURT:  Mr. Richman?

22           MR. RICHMAN:  May I make a suggestion, your Honor.

23           I don't know whether you have them available, but your

24   jury instructions, might it not be best to give it to us now so

25   we can utilize the time now?

D340fer3                          A. Darge - recross

1            THE COURT:  I have a draft now, Mr. Richman, but there

2      are a few things I want to discuss with my clerk.  And I'll

3      give it to you at the end of lunch.  If I had them all ready

4      now, I would do that.  But I like to wait until the case is

5      finished before I shape the instructions completely.  So I need

6      a bit of time.  But if you like, I can -- instead of coming

7      back, I can send them to you electronically.  You'll need only

8      to come back for the charging conference this afternoon.

9            MR. RICHMAN:  So we'll stay here.

10            THE COURT:  All right.  So I'll give you hard copies.

11            MR. RICHMAN:  Very well, sir.

12            THE COURT:  Is two enough, Mr. Richman; how many would

13      you like, how many copies would you like?

14            MR. RICHMAN:  Three, if you could.

15            THE COURT:  Sure.  Notwithstanding the budgetary

16      restrictions.

17            And the government, how many would you like?

18            MR. CAPONE:  We can just take one, and we can --

19      electronically, your Honor?  Or we can print it, if your Honor

20      wants to give us one, and we can make the copies downstairs.

21            THE COURT:  Is it cheaper downstairs?

22            MR. BLANCHE:  It's a little cheaper, yes.  We do

23      double-sided.

24            THE COURT:  We'll give you three copies.

25            MR. BLANCHE:  All right.  Yes, thank you, Judge.

D340fer3                          A. Darge - recross

1          THE COURT:  All right.  So we'll bring back the jury

2     and I'll recess them until tomorrow.  I'll tell them that both

3     sides rest.

4          MR. RICHMAN:  Do you want me to rest in front of the

5     jury?

6          THE COURT:  Which do you prefer; I can tell them that,

7     or you can tell them that.

8          MR. RICHMAN:  I prefer to rest in front of the jury,

9     if it's all right.

10          THE COURT:  Okay.

11          Both sides agree to the verdict sheet, right?

12          MR. RICHMAN:  Yes.

13          THE COURT:  Is that right, Mr. Blanche?

14          MR. BLANCHE:  Let me -- yes, your Honor.

15          THE COURT:  The only difference was whether the guilty

16     question should come before the not guilty question, which is

17     my style, so.

18          MR. BLANCHE:  Okay.

19          THE COURT:  So that's how it will be.  And I'll give

20     this verdict sheet to the jury.

21          THE DEPUTY CLERK:  All rise.

22

23

24

25

D340fer3                           A. Darge - recross

1          (In open court)

2          (Jury present)

3          THE COURT:  Be seated, everyone.

4          Mr. Richman.

5          MR. RICHMAN:  If the Court pleases, the defense rests.

6          THE COURT:  Both sides rest?

7          MR. RICHMAN:  Yes, sir.

8          THE COURT:  That means, in the magic words, the proofs

9     are finished.

10          But the trial is not over.  I'm gonna recess you for

11    the rest of the day.  We have got a lot of work that we have to

12    do together before we are in a position to sum up the case to

13    you.

14          So you come back 10:00 tomorrow.  And this is what's

15    gonna happen.  Mr. Cronan is gonna sum up for the government.

16    Mr. Richman will then sum up for the defense.  And then

17    Mr. Cronan will have a short opportunity for rebuttal.

18    Following that, I will deliver my instructions, which take a

19    little bit over an hour.  And then you will begin your

20    deliberations.

21          So Ms. Jones will take your lunch order today.

22          In effect, close up your books, give them to Ms. Jones

23    on the way out.  Please do not discuss the case; not amongst

24    yourselves, not with anyone else.  It's so important at this

25    point.  You have sat through a good number of days of trial.

D340fer3                          A. Darge - recross

1   All of you are ready, but you have not heard the summations.

2   And you have not heard the instructions.

3            So you may feel ready, but you're not ready.  You have

4   not heard the lawyers put the case together.  And you have not

5   heard the law, as you are to apply it.

6            To discuss the case now, would cause you to start

7   shaping your thinking and closing your minds.  And the hallmark

8   of the jury is fairness and impartiality.  It requires an open

9   mind until the point that you are ready to deliberate, and that

10  will be tomorrow.

11           Do not discuss the case amongst yourselves or with

12  anyone else.  Don't think about the case.  Don't try to form

13  opinions.  Keep an open mind.

14           See you tomorrow at 10:00.

15           (Jury excused)

16           THE COURT:  Be seated.  Anything for me?

17           MR. BLANCHE:  Not from the government.

18           THE COURT:  All right.  So Mr. Fernandez can be

19  excused.

20           MR. RICHMAN:  Will he be produced for the conference,

21  your Honor?

22           THE COURT:  Of course.  And I'll see you at 2:00.

23           (Recess)

24

25

1          THE COURT:  All right.  I've distributed to everyone

2     the proposed charge, which reviews the submissions made to me

3     and my own history of charges.  I remind you that this is a

4     draft, subject to change.  As we go along through summations, I

5     work on the charge, so there may be changes to the sections in

6     this charge.  But I will not be able to distribute any

7     subsequent draft of this one.

8          There are captions throughout; they are for your

9     guidance.  They are not going to be read.  And I watch the jury

10    as I charge.  And where I find it necessary to review and

11    extemporize, add and modify, I do so.  So in all of this

12    particular written instruction is a substantial, but not a

13    complete, guide.

14         I do not hand out my charge to the jury.  I find that

15    this empowers those who are able to read against the other

16    members of the jury; and where jurors are equal, they perform

17    better.  And my experience in 38 years of practice and as a

18    judge has taught me that what is read is not listened to; what

19    is read alone is not listened to.  The best guide to make sure

20    that jurors and witnesses understand what is told is to talk to

21    them, as I were talking in normal life.  Watch them and repeat

22    and explain and the like, and keep attention.  And my

23    experience is that juries do pay attention; and juries

24    listening to the charge pay attention throughout.

25         All right.  With that, we'll start.

1          What's the first page in which the government has a

2     comment?

3          MR. BLANCHE:  Page 9, your Honor.

4          THE COURT:  You don't have to stand.  It's easier if

5     you sit.

6          Mr. Richman, do you have a comment before 9?

7          MR. RICHMAN:  Just as a technical -- Page 3, your

8     Honor, Line 7.  The word "evidence or the lack of evidence in

9     the case," not "and the lack of evidence in the case."

10          THE COURT:  Changing "and" to "or."

11          MR. RICHMAN:  That's correct.

12          THE COURT:  I've got that change.

13          Page 9, Mr. Blanche.

14          MR. BLANCHE:  The second line, your Honor, "unlawfully

15     can be removed."  We didn't use the word "unlawfully" in the

16     indictment.  So Count One charges the defendant --

17          THE COURT:  I think it's a heightening of willfully

18     and knowingly.  It doesn't add substance, although I define it

19     separately.  We'll keep "unlawful," unless Mr. Richman objects.

20          MR. RICHMAN:  I'm satisfied.

21          THE COURT:  Next, Mr. Blanche.

22          MR. BLANCHE:  The next, your Honor, is on Page 12.

23     When we submitted our request to charge, we made a mistake.

24     There's actually a fourth element under the object of the

25     conspiracy, which is that death results.  So when your Honor --

1    three-quarters of the page, down the page, the second-to-last

2    full paragraph that begins with the word, that requirement

3    regarding the object of such a conspiracy, it requires the

4    government to prove four points, not three points.  That was

5    our mistake.

6              THE COURT:  So we'll add after the first paragraph,

7    after the words "provide anything of value," and that death is

8    caused --

9              MR. BLANCHE:  Yes, your Honor.

10             THE COURT:  -- by the defendant's acts.

11             We'll charge that anyhow.

12             MR. BLANCHE:  We charge that and death results, yes,

13   your Honor.

14             THE COURT:  And instead of three points, it's four

15   points?

16             MR. BLANCHE:  Correct.

17             And then on the next page, Page 13, obviously when

18   your Honor is describing first, second, third -- just to add a

19   fourth.

20             THE COURT:  All right.

21             MR. BLANCHE:  And then on Page 14, your Honor, the

22   second full paragraph that right now begins, The government

23   does not have to prove, because death did occur, your Honor.

24   We believe it should say for this point, the government does

25   not have to prove that a murder was committed, which your Honor

D34VFER4                          Charge Conference

 1   is correct for the second point, that's true; but then later on

 2   we're going to say that they have to find that murder did

 3   result or the death did result.

 4           MR. RICHMAN:  That whole paragraph is to be removed;

 5   is that right?

 6           THE COURT:  Give me a moment.

 7           (Pause)

 8           THE COURT:  The first count is a conspiracy count.

 9   The crime is the agreement.  The agreement is to intend to

10   commit a murder.  Why is it that death has to actually result?

11           MR. BLANCHE:  Well, your Honor --

12           THE COURT:  That's the case of the second count.

13           MR. BLANCHE:  Under 1958, your Honor, there's

14   different statutory maximums depending on whether death results

15   or whether a murder was even attempted.  And so because the

16   object of the conspiracy in this case has the three elements,

17   typically because death did result, it does have to be

18   included.

19           Your Honor is correct.  Just by joining the conspiracy

20   to commit murder for hire, a crime has been committed.  But

21   there's a separate requirement that the jury find that death

22   results as a result of this agreement, if it applies, which it

23   does here, because death did result.  And what that does is it

24   triggers for penalty purposes, your Honor, higher penalties.

25           THE COURT:  So what you're doing is telling me that

D34VFER4                    Charge Conference

1    there is an *Apprendi* issue that is involved in this case.

2            The correct way is not to change the law regarding

3    conspiracy; the correct is to ask the jury to make an

4    additional finding, did death result from that conspiracy.  And

5    that's what I think needs to be done.  I want to study it more,

6    but I think that's the resolution.  The jury will be given the

7    instruction of conspiracy in the normal way, where the

8    agreement is the essence of the crime.  If they do find that

9    the conspiracy -- do you find that death resulted from the

10   conspiracy.  If that's the case, the statute, I think, will

11   warrant an additional punishment, and that's what will be done.

12           MR. BLANCHE:  Your Honor, we just pulled from Sand's

13   the fourth point, which is that the victim died, and I have a

14   copy here.  And so what your Honor is suggesting, which is to

15   add a special interrogatory to the verdict form, I think is

16   okay, as well, your Honor, but I do think that the jury does

17   have to find that beyond a reasonable doubt, meaning they have

18   to find that death resulted.

19           THE COURT:  I agree with you, but that's an additional

20   finding.  It would say something in this case.  The government

21   alleges that the result of the conspiracy was that death was

22   caused to another individual.  The government must prove that

23   beyond a reasonable doubt.  You find that, you will make a

24   special finding.

25           MR. BLANCHE:  Judge, we talked about that.  That's

D34VFER4                        Charge Conference

```
 1   fine.  The only concern the government has with making it an
 2   interrogatory is if the jury were to find that the conspiracy
 3   existed, and that Mr. Fernandez was a member of the conspiracy,
 4   the government is not aware of any kind of theory of the case
 5   that would allow them to find death didn't result.  So the
 6   reason why the government didn't think a special interrogatory
 7   in the verdict form was necessary is because the government
 8   can't think of any reasonable view of the evidence that would
 9   allow a jury to find, yes, Mr. Fernandez was a member of the
10   conspiracy, but death didn't result.  That's why we suggested
11   just adding it to the charge.
12             THE COURT:  I understand your point of view,
13   Mr. Blanche.
14             MR. BLANCHE:  Okay.
15             THE COURT:  I think it changes the law of conspiracy,
16   and that should not be done.  I'm going to prima facie use my
17   approach, but I'll tell you before you summarize tomorrow, in
18   case you allow that to affect your summary.  I don't think it
19   should, but I'll let you know.  Remind me to do so tomorrow.
20             MR. BLANCHE:  Yes, your Honor.
21             THE COURT:  So the changes I've made so far...
22             Mr. Walker was just asking if we had to change the
23   verdict sheet.  The answer is yes.
24             MR. BLANCHE:  So your prima facie inclination is to
25   both have a paragraph in the charge about the government also
```

1   alleges death resulted, but then also have a special question

2   on the verdict form?

3          THE COURT:  Correct.

4          MR. BLANCHE:  Okay.  Thanks, Judge.

5          THE COURT:  Correct.

6          Mr. Richman, do you have any opinion on this?

7          MR. RICHMAN:  I'm concerned as to special finding.

8   I'm familiar with the *Apprendi* issue.  I'm just wondering

9   whether or not we are, in so doing it, considering form as

10  opposed to substance.

11         THE COURT:  It's possible we may, but I think it clear

12  and accurate.  I don't like the idea of giving an instruction

13  that changes the law of conspiracy.  I think the government's

14  suggestion initially would bring me to do that, and I don't

15  want to do that.  But I do understand the issue, and I think

16  I've got to take care of the issue.

17         Let me try to do it.  I'll let you see what I've done.

18         I don't think it should affect your arguments.  If you

19  think it does, let me know, because my intent is not to change

20  the nature of the arguments of either counsel.  I think the

21  same things will have to be argued, whether it's the fourth

22  point, a conspiracy point, or a separate additional criteria.

23  But I prefer to be correct.

24         All right.  So we're down to 14.

25         Next point, Mr. Blanche.

1          MR. BLANCHE:  So, your Honor, the government's next

2     change is Page 28, actually.

3          MR. RICHMAN:  Yeah.

4          THE COURT:  Anything before that, Mr. Richman?

5          MR. RICHMAN:  No.

6          THE COURT:  28.

7          MR. BLANCHE:  In the third line.

8          MR. RICHMAN:  Second line.

9          You have to remember that I define --

10          MR. BLANCHE:  Correct.

11          MR. RICHMAN:  -- dropping the word "under."

12          MR. BLANCHE:  Correct.

13          THE COURT:  Yes.

14          MR. BLANCHE:  And then get rid of "under."

15          THE COURT:  What it should say is:  You have to

16     remember that under Count One, I define murder for you

17     according to New York State law.

18          What's involved here is another issue of perhaps form

19     over substance.  There's a different definition federally than

20     there is state.  Whether that is a difference with a meaning, I

21     don't know.  But there is a different statement of the law of

22     murder and the definition of murder, and I have to pay

23     attention to it in the charge.

24          Page 30, do you have a change?  Does someone have a

25     change on 30?

D34VFER4                    Charge Conference

1            MR. BLANCHE:  No, your Honor.  The government's next

2    change is Page 37.  Second to last line on Page 37.  It just

3    says, "of the defendant you are considering."  So there's only

4    one defendant.

5            THE COURT:  Thank you.

6            MR. BLANCHE:  And then the government's next change is

7    on Page 41.

8            THE COURT:  Yes.

9            MR. BLANCHE:  And, your Honor, this is just more --

10           MR. RICHMAN:  What line?

11           MR. BLANCHE:  Not any particular line.

12           THE COURT:  He's winding up, Mr. Richman.  Give him a

13   chance.

14           MR. BLANCHE:  It's hard for me to do this sitting

15   down.

16           Yes, your Honor.

17           So the government submitted our request for accomplice

18   testimony, and your Honor captures a lot of it.

19           One thing that is not captured by the Court's witness

20   cooperating testimony charge is the paragraph -- the second

21   paragraph in the government's request which talks about

22   experience will tell you that the government frequently must

23   rely on the testimony of witnesses.

24           THE COURT:  I know.  I know.  I don't include that.

25           MR. BLANCHE:  You don't like it.  Okay.

D34VFER4                    Charge Conference

1            And then part of that, your Honor -- well, we would

2      request that, but as long as your Honor knows we want it.

3            The other part, your Honor, is it's titled

4      "Cooperating Witness Testimony and Plea Agreement."  We had

5      requested that your Honor give an instruction about the jury

6      hearing testimony about various agreements between the

7      government and the witnesses, and then cautioning them that

8      it's of no concern about the government made these agreements

9      with the witness, and that their sole concern is whether a

10     witness has given truthful testimony here in the courtroom.

11     And the reason for that in this case --

12           THE COURT:  There's a stock charge that I often give,

13     not in every case, that the methods of the prosecution are not

14     the concern of the jury.  And maybe I should give that charge

15     and add something about cooperation agreements.

16           MR. BLANCHE:  Yes, your Honor.  We were going to

17     request that, as well.  And if it can be put in that charge,

18     yes, that would be fine.

19           THE COURT:  Okay.

20           MR. RICHMAN:  Your Honor, on that issue, that we put

21     overemphasis to the agreements, we, the defense, are not in a

22     position to give agreements to people, obviously.  It enhances

23     the government's position when you refer to agreements and the

24     truthfulness of the testimony because of those agreements.

25     It's always implied therein.

1          THE COURT:  You know, Mr. Richman, there's a point to

2     what you say.  And I'm trying to balance what the government

3     does and what the defense requires.  And like every balance,

4     you have to be careful because it can teeter.

5          The issue is credibility.  And the charge of -- the

6     government can choose various methods; it's not the jury's

7     concern, because some jurors may have distaste for some of the

8     methods and take that into account in finding credibility.  And

9     so the charge tells the jury that the government chooses

10    whatever methods.  That's the government's business.

11         Your business, the jury's business, is to find what's

12    true, what's credible.  And the purpose of the charge is to

13    walk that balance.  And I think I can do that, and I think the

14    government wants something -- it is entitled to something about

15    the method of using cooperating agreements.  And you should be

16    concerned that the government doesn't get a pat on the back for

17    using cooperating agreements, that's not the intent.  It's an

18    issue of credibility the jury will have to consider, and I'll

19    make it clear that that's so.

20         MR. RICHMAN:  Well, my objection in cooperating

21    agreements is whether or not this is superfluous altogether, is

22    the bootstrapping the government uses each and every time that

23    they introduce a cooperation agreement, mainly because they

24    have the witness sign an open cooperation agreement, then they

25    necessarily imply as a result of signing that agreement they

1   are now testifying truthfully.

2          THE COURT:  I know.  That will be a big argument on

3   your part, Mr. Richman, and I'll allow you to argue that.

4   That's a fair argument.  Just because somebody says you're

5   under contract to tell the truth doesn't mean the person is

6   telling the truth.  But I don't think I need to say that.

7   That's for you to argue.

8          MR. RICHMAN:  I'll say it.

9          THE COURT:  I assume you will.

10         MR. RICHMAN:  Your Honor, also in that same page, the

11  third line down, the cooperating witness pleaded guilty to

12  other unrelated charges, in some instances, yes, some of the

13  charges are indeed related.

14         THE COURT:  I don't need "unrelated."  "Other

15  charges."

16         MR. RICHMAN:  Thank you.

17         THE COURT:  Incidentally, this reminds me, some judges

18  look scant to people who make objections during arguments.  I

19  don't.  If you have an objection to make, make it.

20         One objection that is frequently made is that you're

21  misstating the evidence.  And if you want to make it, you can

22  make it.  But the response is the jury will itself evaluate the

23  evidence and have its own recollection.  So if you want to make

24  it, you'll know that that's likely to be the response.

25         Okay.  Next.

1            MR. BLANCHE:  Your Honor, the next change from the

2    government is on Page 45, the third line down, just evaluating

3    a witness's credibility.

4            THE COURT:  Well, the jury is not going to know where

5    the apostrophe comes, Mr. Blanche.

6            MR. RICHMAN:  Your Honor, can we back up to Page 42

7    for a moment?

8            THE COURT:  Yes.

9            MR. BLANCHE:  What page?

10           MR. RICHMAN:  42.  We're speaking in terms of

11   informant's testimony before.  And let me just go on to the

12   third line in this paragraph, in the first paragraph.

13           "And you have heard testimony regarding the use of

14   informants.  There is nothing illegal with the government using

15   these techniques."

16           Next sentence, I don't see any reason why we need

17   that.  You have established that the government --

18           THE COURT:  I accept that.

19           MR. RICHMAN:  Sorry?

20           THE COURT:  I accept it.

21           MR. BLANCHE:  We like that sentence, Judge.

22           THE COURT:  I know.

23           The comments about cooperation agreements will fit

24   this paragraph, also I could build this paragraph, or I could

25   put both these thoughts into the same paragraph of government

1    techniques, which is, I think, what I'll do.

2            MR. BLANCHE:  Yes, your Honor.  Thank you.

3            THE COURT:  Next.

4            MR. BLANCHE:  Your Honor, we don't have any other

5    comments on the charge except for that request, one additional

6    charge that we had proposed, which is preparation of witnesses.

7            THE COURT:  That should go with the credibility.

8            MR. BLANCHE:  Pardon me.

9            THE COURT:  That should go with the credibility.

10           MR. BLANCHE:  Okay.

11           If we could just add that then.  I didn't see it; I

12   might have missed it.

13           THE COURT:  In the high thirties.

14           MR. BLANCHE:  Okay.

15           THE COURT:  Let me look.  Page 38.  Yeah.  If the

16   paragraph is missing, it will go in.  We'll add it at the

17   bottom of 39.

18           MR. BLANCHE:  Thank you, your Honor.

19           And then, your Honor, just to follow up on the charge

20   that you were going -- that we were just talking about, we had

21   also requested particular investigative techniques.

22           THE COURT:  That's the one I was talking about.

23           MR. BLANCHE:  Okay.  Just wanted to make sure.

24           And then as part of that is where you'll add the

25   language about the government not being on trial, which is what

1    we were just speaking about.

2              THE COURT:  I don't know if I'd give that sentence.

3    But there is a charge that I customarily use with regard to

4    particular government techniques.

5              MR. BLANCHE:  Judge, I think that's it from the

6    government.

7              THE COURT:  Anything else, Mr. Richman?

8              MR. RICHMAN:  I'm concerned about Page 47, your Honor,

9    uncalled witnesses.

10             THE COURT:  Let me look at it.  I'm not sure it

11   applies to this case.  We've had too many witnesses.

12             MR. RICHMAN:  We had too many witnesses, but we have

13   others that were not there that were not called.  Luis Rivera,

14   for instance; Aladino; Gordo.  And they were not susceptible of

15   being called by the defense.

16             MR. BLANCHE:  Or the government.

17             THE COURT:  Well, I'm not sure about that.

18             Here's what I want to give on this:

19             The first sentence as is.

20             The second sentence reads as follows:  "If a potential

21   witness could have been called by the government or by the

22   defendant, and neither called the witness, then you may draw

23   the inference that the testimony of the absent witness could

24   have been favorable or unfavorable to the party that did not

25   call him or her, or that the witness, if called, would add

1    nothing useful to the evidence before you."

2              And then go to the second paragraph.

3              MR. RICHMAN:  With all due respect, is that

4    necessarily true?

5              THE COURT:  It's not necessarily true, but it is

6    potentially true depending on what the jury believes.

7              MR. RICHMAN:  Yeah, but if there's no basis to believe

8    that, how can one draw an inference?

9              THE COURT:  What do you want me to do?

10             MR. RICHMAN:  Obviously some witnesses could not have

11   been called because there are legal reasons.

12             THE COURT:  I don't need the jury to speculate on

13   that.

14             (Pause)

15             THE COURT:  Here's what I want to charge, instead of

16   this page:

17             "The government has the burden to prove the case

18   beyond a reasonable doubt.  In the trial, the government has to

19   call sufficient witnesses to present a full and credible

20   account of the events at issue, taking care to prove each and

21   all of the elements of the crimes charged beyond a reasonable

22   doubt.  But the government does not have to call every

23   conceivable witness, for the accounts of some potential

24   witnesses might add nothing important to the testimony of those

25   you heard.  The same is true of exhibits.  Your job as jurors

1   is to ask if upon all the evidence or lack of evidence the

2   government has succeeded in proving beyond a reasonable doubt

3   each and all of the elements of the crimes charged."

4            MR. RICHMAN:  I would prefer the way it is now as

5   opposed to that.

6            THE COURT:  Then I'll give it the way it is now.

7            I actually prefer the alternative, but I'll defer to

8   you, Mr. Richman.  I'll give the charge the way it is.

9            Anything else?

10            MR. RICHMAN:  Page 50 -- your Honor, other than --

11   will you permit me to stand?  I'm just sitting too long.

12            THE COURT:  Whatever is easier.

13            MR. RICHMAN:  In the issue of flight, the government

14   did not introduce any real evidence of flight in this

15   particular case at all, aside from opening on that issue and

16   aside from the testimony of Darge, of Boozer, where Boozer

17   says --

18            THE COURT:  Boozer's testimony is not influential with

19   me because it's Boozer who says it to Fernandez, and Fernandez

20   doesn't react.  When in relationship to what Boozer said did

21   Fernandez voluntarily submit to arrest?

22            MR. RICHMAN:  In terms of time?

23            THE COURT:  Yes.

24            MR. RICHMAN:  Four days later.

25            THE COURT:  You can't say that was flight.

1          MR. RICHMAN:  It's Thursday.  The following Tuesday.

2          THE COURT:  No, you can't say that's flight.

3          What's the evidence of Fernandez being in the

4     Dominican Republic, any?

5          MR. RICHMAN:  None.

6          MR. BLANCHE:  No, your Honor.  But the evidence --

7          THE COURT:  What's the argument of flight?

8          MR. BLANCHE:  The evidence of flight is much more than

9     Mr. Darge, your Honor.

10         Mr. Darge, what you have is you have testimony today

11    of law enforcement going to the defendant's mother-in-law's

12    house, him not being there, them going directly to

13    Mr. Fernandez's house.

14         And what the testimony was is that when law

15    enforcement went up there, there was a car that appeared to

16    have just left.  So that's first thing in the morning.

17         Then the testimony of Christian Guzman is that the

18    defendant called him and said, I need to come to your house

19    because I need to speak to Boozer about something involving

20    Patrick.

21         THE COURT:  Let's suppose they came and they have that

22    conversation that was on the record, and Fernandez weighed the

23    possibility of flight and decided it's not going to do me any

24    good and didn't do it.  The four days to me is not flight.

25         MR. BLANCHE:  But, your Honor, it's not just that.

 1          THE COURT:  The problem I have, gentlemen, is this:

 2    That there was a tremendous amount of testimony, a significant

 3    amount of testimony on the issue.  And I'm giving the jury, if

 4    I don't give this charge, no understanding of the issue.

 5          MR. BLANCHE:  Your Honor, just briefly.

 6          The number of days, four or five, is absolutely

 7    evidence of flight.  I mean there's examples, as your Honor

 8    knows, of flight that only lasts 20 seconds, meaning law

 9    enforcement goes to arrest somebody, the person takes off down

10    the hallway and tries to escape, and is then apprehended.  Of

11    course that's different than a guy who runs away for five years

12    to the Dominican Republic; I agree with the Court it's not the

13    same thing.

14          But the question is whether those four or five days

15    defendant made a choice not to surrender, whether that is

16    evidence of flight as consciousness of guilt.  And the

17    government is not going to argue he went to the Dominican

18    Republic or anything like that, but he did make a choice to not

19    surrender.  He quickly changed his mind over the course of

20    three or four days.

21          But also there was the testimony of Mr. Mendez, your

22    Honor, who the defendant spoke with the day he was arrested,

23    five or six days later, where he admitted to Mr. Mendez that he

24    was thinking about fleeing, and that he wanted to go to the DR.

25    So there's significant evidence of the defendant exercising

1    consciousness of guilt, meaning knowing cops are wanting him,

2    are looking for him, and he makes a decision or at least

3    considers fleeing.  That's what consciousness of guilt is, your

4    Honor.

5              MR. RICHMAN:  Your Honor, respectfully --

6              THE COURT:  Give me a moment please.

7              (Pause)

8              THE COURT:  I could change the first paragraph in this

9    way:  Adding the words about flight after evidence in the first

10   line:

11             "You have heard evidence about flight that the

12   defendant knew that law enforcement was actively searching for

13   him in connection with the crimes for which he is now on trial,

14   and that he actively evaded being arrested, even for a few

15   days."

16             Then I'll pick up the sentence:  "If proved, the

17   flight of the defendant after he knows he is to be accused of a

18   crime may tend to prove that the defendant believed that he was

19   guilty.  It may be weighed by you in this connection, together

20   with all the other evidence.  However, flight may not always

21   reflect feelings of guilt."

22             And I could or not give the next --

23             MR. RICHMAN:  Your Honor, most respectfully, can I be

24   heard on that issue?

25             THE COURT:  And then I pick up the last paragraph.

1           Yes.

2           MR. RICHMAN:  Mr. Blanche suggests that law

3    enforcement was consciously seeking him, and he somehow knew

4    about it.  The mere fact that the law enforcement went to the

5    wrong place, they went to his mother-in-law's house, and then

6    they came to his house, remember, Boozer testified that my

7    client told him that he had gone to work, negating the issue of

8    flight entirely.  And no indication of law enforcement looking

9    for him or he had conscious knowledge thereof.  Not to suggest

10   that he was seeking flight based upon the testimony in this

11   case would be disingenuous.  It is just patently untrue.

12          And Mr. Blanche also has another knowledge which we

13   could not bring forth during the course of this trial, is that

14   an attorney called him to surrender.  And he says we do not

15   permit surrendering of persons of these charges.  This is as I

16   understand it to be.  The lawyer's name is Craig brown, your

17   Honor.

18          MR. BLANCHE:  Your Honor, that's --

19          THE COURT:  How about this:  You have heard evidence

20   about flight.  I have to say something, because both of you

21   have gone into this.

22          So you have heard evidence about flight.  The parties

23   dispute if defendant tried to evade arrest, even for a

24   relatively short period of time.  You may decide whether or not

25   defendant tried to evade arrest and, if so, whether that is

D34VFER4                    Charge Conference

1   indicative of a belief by defendant that he was guilty of the

2   crimes charged.

3          And then the last paragraph.

4          You are specifically cautioned that evidence of flight

5   of the defendant may not be used by you as a substantive proof

6   of guilt.  Flight does not create a presumption of guilt.

7   Whether or not evidence of flight does show that the defendant

8   believed that he was guilty, and the significance, if any, to

9   be given to the defendant's feeling in this matter are for you

10  to determine.

11         MR. RICHMAN:  We have a stipulation on that very

12  issue.  The stipulation is Exhibit 133.  It says:  On October

13  18, 2011, Joe Fernandez surrendered at his attorney's office

14  and arranged to meet law enforcement authorities at his

15  attorney's office, and did so.

16         That in and of itself negates the entire issue of

17  flight.  If a man seek -- would you please, Todd, sit down.

18         THE COURT:  I'm not looking at you anyhow,

19  Mr. Blanche.

20         MR. RICHMAN:  Your Honor, if a man seeks attorney's

21  advice, even if he had knowledge that people were seeking

22  him -- and we don't concede that at all -- is that flight?  Do

23  we submit like sheep or do we have a constitutional right to be

24  represented by counsel pursuant to the Sixth Amendment, which

25  is what he did; he effectuated his right.  And, therefore, that

1   becomes evidence of flight?

2           MR. BLANCHE:  Your Honor, there's no evidence of that

3   in the record.  I have no idea if that's true.  It doesn't

4   really matter.

5           What matters, your Honor -- at this point, your Honor.

6           What matters is the evidence that both parties have --

7   that have come out in the trial.  And, your Honor, the

8   government does not have an objection to your proposed --

9           THE COURT:  I'm going to read this again.

10          MR. BLANCHE:  Okay.

11          THE COURT:  You have found evidence about flight --

12  you have heard evidence about flight.  The parties dispute if

13  defendant tried to evade arrest, even for a relatively short

14  period of time.  You may decide whether or not defendant tried

15  to evade arrest, and, if so, whether that is indicative of some

16  sort of evidence of guilt.

17          You are specifically cautioned that evidence of flight

18  of the defendant may not be used by you as a substitute of

19  proof of guilt.  Flight does not create a presumption of guilt.

20  Whether or not evidence of flight does show that the defendant

21  believed that he was guilty, and the significance, if any, to

22  be given to the defendant's feelings on this matter are for you

23  to determine in connection with all the evidence and lack of

24  evidence in the case.

25          MR. BLANCHE:  Your Honor, the government -- the only

1   thing that is missing from the proposed edit is what's in the

2   original charge, which is what they are supposed to do with it

3   if they accept the government's version, which is that if

4   proved, the flight of a defendant, after he knows he is to be

5   accused of a crime, may tend to prove the defendant believed he

6   was guilty.

7         THE COURT:  I think it lowers the case too much in

8   favor of the government.  I decline to charge that way.  I will

9   charge what I've said.

10         MR. BLANCHE:  Just so I understand the first

11  paragraph, your Honor.  In the charge that you had proposed,

12  your Honor writes in the third line:  "and that he fled from

13  law enforcement; and that he considered moving to another

14  country to evade law enforcement."

15         THE COURT:  Not going to give it.  Not good enough

16  proof.

17         You can argue.

18         MR. BLANCHE:  And we will.

19         The question is, your Honor, we do think it's

20  appropriate for the Court to instruct the jury on what they are

21  supposed to do with that argument.  And I know there's a

22  dispute and you're telling them there's a dispute --

23         THE COURT:  I've heard enough argument.

24         I'm giving them sufficient guidance on this.

25         I'll think more about it as we go along, but right now

1    this is what I'm inclined to give, what I just said.

2              All right.  Anything else?

3              MR. RICHMAN:  Page 61, your Honor.  I assume -- and

4    this is the last paragraph on Page 61.  I also want to inform

5    you that after you reach a verdict, there will be few other

6    matters that will require your consideration.  Are you

7    referring to the *Apprendi* issue therein?

8              THE COURT:  No.  I think we got tired reading.  This

9    is from another charge.  It's not going to go in.

10             Anything else?

11             MR. BLANCHE:  Your Honor, does your Honor want -- does

12   your Honor send back a stripped-down exhibit list or no?  We

13   have an exhibit list that doesn't have any -- it just has what

14   the exhibits are.  Does your Honor send that back?

15             THE COURT:  I don't send any exhibit list.  The

16   exhibit list is not in evidence, and I don't -- here's what I

17   do with exhibits:  Parties will collect all the exhibits and

18   keep them.  If the jury wants them, we send them in.

19             MR. BLANCHE:  Okay.

20             THE COURT:  So they don't get a list.

21             MR. BLANCHE:  Okay.

22             THE COURT:  Okay?

23             MR. RICHMAN:  On the issue of just the mechanics, your

24   Honor.  After the conclusion of the people's summation --

25             THE COURT:  We're in the wrong court.

D34VFER4                          Charge Conference

1           MR. BLANCHE:  Wrong court.

2           MR. RICHMAN:  Wrong court.

3           It's all the same.

4           THE COURT:  No, it's not.

5           MR. RICHMAN:  You're right.

6           The government's summation, will there be a brief

7   break?  Because I want to be able to set up certain things to

8   be displayed to the jury.

9           THE COURT:  I'll give you that time.

10          MR. RICHMAN:  Wouldn't take very much.

11          THE COURT:  Here's my goal, and depends on length of

12  time and other things, as well.

13          I like all the summations to be given in a block.  But

14  if one or another is too long or I see the jury is fidgety or

15  losing attention, I'll call a recess, a short recess, even if

16  it is to stand in place.

17          So when Mr. Cronan finishes -- I don't know how long

18  he's going to be, about ten minutes, right, Mr. Cronan?

19          MR. CRONAN:  Five and-a-half.

20          MR. RICHMAN:  I will no doubt feel this forever.

21          THE COURT:  When Mr. Cronan finishes, we'll see how

22  the jury is.  Probably if I give them a break, I'll give them

23  another break, if they want one, after you finish, Mr. Richman.

24          But, in any event, you can have time to do it.  Just

25  ask me.

D34VFER4                        Charge Conference

1              If someone's got to go to the bathroom, ask me, too.

2              All right.  Thanks.

3              I'll see you tomorrow at ten.

4              MR. BLANCHE:  Thanks, Judge.

5              MR. RICHMAN:  Thank you, your Honor.

6              (Adjourned to March 5, 2013 at 10 o'clock a.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

INDEX OF EXAMINATION

Examination of:                                    Page

TRACEY D. WASHINGTON

Direct By Mr. Blanche . . . . . . . . . . . 785

Cross By Mr. Richman . . . . . . . . . . . . 792

CHRISTIAN GUZMAN

Direct By Mr. Cronan . . . . . . . . . . . . 797

Cross By Mr. Richman . . . . . . . . . . . . 801

ALAIN DARGE

Direct By Mr. Capone . . . . . . . . . . . . 808

Cross By Mr. Richman . . . . . . . . . . . . 842

Redirect By Mr. Capone . . . . . . . . . . . 862

Recross By Mr. Richman . . . . . . . . . . . 867

GOVERNMENT EXHIBITS

Exhibit No.                                  Received

 133    . . . . . . . . . . . . . . . . . . 797

 112-R, 113, 114  . . . . . . . . . . . . . 806

 3510-C   . . . . . . . . . . . . . . . . . 838