D350fer1                          Trial

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4                 v.

5    JOE FERNANDEZ,

6                      Defendant.

7    ------------------------------x

8                                         New York, N.Y.
                                          March 5, 2013
9                                         10:00 a.m.

10

     Before:
11
                        HON. ALVIN K. HELLERSTEIN,
12
                                          District Judge
13

14                          APPEARANCES

15   PREET BHARARA
          United States Attorney for the
16        Southern District of New York
     TODD BLANCHE
17   RUSSELL CAPONE
     JOHN P. CRONAN
18        Assistant United States Attorneys

19   MURRAY RICHMAN
     BRIAN PAKETT
20        Attorneys for Defendant

21

22   ALSO PRESENT:   SHAWN MacDONALD, DEA
                      VANESSA QUINONES, Paralegal
23                    DON TAYLOR, Paralegal

24

25

D350fer1                          Trial

 1              THE DEPUTY CLERK:  All rise.

 2              THE COURT:  Good morning, all.  Good morning,

 3      everyone.

 4              MR. RICHMAN:  Good morning.

 5              THE COURT:  We have circulated a verdict sheet that

 6      reflects the separate questions that we talked about yesterday.

 7      Counsel both accepted the formulation.  And we'll mark that

 8      court exhibit five and then use that for the verdict sheet for

 9      the jury.

10              All right, gentlemen?

11              MR. BLANCHE:  Yes, your Honor.  Fine with the

12      government.

13              MR. RICHMAN:  Yes, sir.

14              THE COURT:  And we have kept the conspiracy charge as

15      we discussed yesterday, and added a paragraph with a separate

16      question of the consequence of the conspiracy.

17              There is murder and the question murder, and we have

18      circulated that particular charge.  And I gather it was

19      acceptable to both sides.

20              Mr. Blanche?

21              MR. BLANCHE:  Yes, your Honor.

22              THE COURT:  Mr. Richman?

23              MR. RICHMAN:  Yes, your Honor.

24              THE COURT:  All right.  So we're going to bring in the

25      jury.  Brigitte, ready.

D350fer1                          Trial

1              THE DEPUTY CLERK:  Yes, your Honor.

2              All rise.

D350fer1                         Trial

1            (In open court)

2            (Jury present)

3            THE COURT:  Good morning, ladies and gentlemen.  Be

4    seated, please.

5            The lawyers will now give you the summations;

6    Mr. Cronan for the government, Mr. Richman for the defendant.

7    What they say is not evidence.  It's their commentary, it's

8    their respective commentary as advocates on the evidence.  They

9    have lived with the case a long time, they have strong feelings

10   about the case as they present their respective cases, but you,

11   the jury, have to listen to them and evaluate the case for

12   yourselves.  In that way, the summations help by giving you the

13   lawyer's perspective in what they believe had been proved and

14   not proved in the case.  You, ultimately, have to listen and

15   evaluate for yourselves, subject to the instructions of law

16   that I give to you immediately following the summations.

17           We'll start with Mr. Cronan.

18           THE COURT:  What's going on?

19           MR. CRONAN:  Trying to remove that little side of the

20   screen.

21           On a sunny afternoon, just over 13 years ago, the

22   quiet lobby of an apartment building in the Bronx rang out with

23   gunshots, fifteen gunshots in total, as two hired hitmen

24   brutally executed Arturo Cuellar and Ildefonso Vivero-Flores in

25   cold blood.  Fourteen of those gunshots were fired by that man,

d350fer1                          Summation - Mr. Cronan

1      the defendant, Joe Fernandez.  Nine of the defendants' bullets

2      riddled the body of Cuellar and Flores, leaving them lifeless

3      in a pool of blood on the floor of that apartment lobby.

4              The defendant fired bullets through Arturo Cuellar,

5      through his left shoulder, that pierced his lung, tore through

6      the left atrium of his heart, and lodged in his ribcage.

7              Other bullets fired by the defendant shot through

8      Flores' neck and penetrated his carotid artery and jugular

9      vein.

10             And the defendant fired multiple bullets into Arturo

11     Cuellar.  One of those bullets shot up through his chest, went

12     through his lung, and lodged near his jaw.

13             Arturo Cuellar -- or Ildefonso Vivero-Flores and

14     Arturo Cuellar thought they were being escorted by Alberto

15     Reyes to an apartment in the building where they were going to

16     receive a payment for a huge drug deal.

17             Alberto Reyes was not escorting Cuellar and Flores to

18     be paid that afternoon, he was marching them to their

19     execution.  And just moments after Cuellar and Flores entered

20     that apartment lobby, their executioners, Patrick Darge and Joe

21     Fernandez, emerged from a dark alcove off to the side,

22     approached their two victims and gunned them down.

23             Patrick Darge and Joe Fernandez shot Cuellar and

24     Flores as they were defenseless sitting ducks waiting for an

25     elevator, without even the slightest idea that two armed

d350fer1                    Summation - Mr. Cronan

1  killers were waiting for them to arrive.

2       Patrick Darge fired the first shot, but then his gun

3  jammed.

4       Joe Fernandez was there to finish the job, firing shot

5  after shot after shot, until he was sure that his two victims

6  were dead.

7       And you learned why these two men were killed on

8  February 22nd, 2000.  They were killed for money, a lot of

9  money; millions and millions of dollars of drug money.

10       And you also learned why Joe Fernandez killed these

11  men.  He also did it for money; $40,000.

12       THE COURT:  We have a technical issue.  Every time

13  that something is flashing on the screen, there has to be some

14  reference in the record, otherwise there is no record for the

15  visual input.

16       So, Mr. Cronan, either you do it now, or you keep a

17  record of it and we'll do it later, but it must be done.

18       MR. CRONAN:  Certainly, your Honor.

19       Joe Fernandez killed these men for money.  He was paid

20  $40,000 to take the lives of these two individuals.

21       THE COURT:  Exhibit?

22       MR. CRONAN:  Your Honor, would you like me to do it

23  after the closing?

24       THE COURT:  Will it be done?

25       MR. CRONAN:  Absolutely.  Absolutely, your Honor.

d350fer1                    Summation - Mr. Cronan

1        THE COURT:  Do you have a record of each one that has

2   been shown?

3        MR. CRONAN:  Yes, your Honor.  It is on Power Point,

4   and I will be able to provide that to the Court afterwards, and

5   provide a list.

6        Now, members of the jury, I'm going to talk this

7   morning about the evidence that you have heard throughout this

8   trial.  And a lot of what you learned, really, was not in

9   dispute, or at least it doesn't seem to be.

10       So what does seem to be in dispute?  The only real

11   dispute seems to be, first, whether there was a second shooter

12   on February 22, 2002, whether Joe Fernandez was that second

13   shooter.  And he was.

14       So I'm going to spend my time this morning talking to

15   you about how we know the defendant was with Patrick Darge on

16   February 22nd, 2000.  You know that in many ways.  Several

17   members of this murder for hire conspiracy told you from an

18   insider perspective all about the murders.

19       People like Jeffrey Minaya, the leader of the New York

20   crew of drug traffickers, who was receiving cocaine from Arturo

21   Cuellar and.Ildefonso Vivero-Flores, and who ordered the hit on

22   those two individuals.

23       People like Patrick Darge, the person who was hired by

24   Jeffrey Minaya's crew to kill Cuellar and Flores, and person

25   who recruited the defendant to be his second shooter.

1              Patrick Darge hired the defendant to have his back in

2       case something went wrong.  And when something did go wrong,

3       Joe Fernandez sprang into action.

4              You also saw physical evidence from the crime scene.

5       Evidence that also corroborated Patrick Darge.  We saw autopsy

6       reports of the victim that corroborated Patrick Darge's

7       explanation to you as to what happened during the murders and

8       also obviously confirmed that the two victims died.

9              But the way you know this man Joe Fernandez was the

10      second shooter, is not just from Patrick Darge, but you also

11      heard it from two people that the defendant confessed to after

12      the murders.  His former cellmate at the Metropolitan

13      Correctional Center, Yubel Mendez and his other cousin, Alain

14      Darge.

15             So what did the evidence prove?  For much of his life,

16      Jeffrey Minaya made his living trafficking cocaine.  And in

17      late 1999, an opportunity presented itself for Minaya to become

18      a much -- even bigger player.  And that was when he met a man

19      by the name of Poncho.

20             Poncho worked for an organization that was sending

21      huge quantities of cocaine to New York City by tractor

22      trailers.  And Poncho, as you now know, his real name was

23      Ildefonso Vivero-Flores.  And he is one of the other people,

24      the people, one of the two men that would be killed on

25      February 22nd, 2000.

d350fer1                        Summation - Mr. Cronan

1          Now, the time that Minaya met Poncho, Poncho was
2     arranging for a huge shipment of some 400 kilograms of cocaine
3     to come to New York City.  Jeffrey Minaya and his crew got a
4     big chunk of that cocaine, about 100 kilograms.  And they sold
5     it on the streets.  Then it was time to pay Poncho and his
6     organization.  So Jeffrey Minaya sent one of his workers, by
7     the name of Alberto Reyes down in McAllen, Texas where he paid
8     Flores' organization more than a million dollars for some of
9     the drugs.

10         Now around this time, Jeffrey Minaya also went down to
11    McAllen, Texas.  And he went down there to meet with Flores'
12    drug trafficking organization, as well.  And that is when
13    Minaya met Flores' boss, Arturo.  And you know who Arturo is,
14    now.  That's Arturo Cuellar.  And he is the second man who
15    would have been killed, that was killed, on February 22nd,
16    2000.

17         Minaya and Cuellar got together and they talked
18    business.  And it turned out to be the perfect business
19    partnership.  They have Arturo Cuellar with access to huge
20    quantities of cocaine, and you have Minaya with the ability to
21    sell the drugs in New York City.  So they decided they would
22    continue to work together.  And they started talking about
23    another shipment of cocaine that Cuellar was going to send to
24    New York City, but this one would be entirely for Jeffrey
25    Minaya and his crew.

d350fer1                    Summation - Mr. Cronan

1          In February of 2000, that second shipment of cocaine,

2     some 274 kilograms of cocaine arrived in New York City.

3     Arturo Cuellar and Ildefonso Vivero-Flores also came up to New

4     York City.  They came up to coordinate the arrival of the drugs

5     and, also, to stick around to collect payment.  And you see

6     that because this cocaine was being provided to Jeffrey Minaya

7     on what's called "consignment."

8          Minaya explained to you what this means.  Jeffrey

9     Minaya and his crew would receive the drugs.  They wouldn't pay

10    for it up front.  They would take the drugs, sell it on the

11    streets, collect money.  And from those proceeds, they would

12    then pay Cuellar and Flores some 7 to 10 days after the drugs

13    arrived.

14         So there is 274 kilograms of cocaine arrived in New

15    York City.  Minaya and a bunch of his crew people you have

16    heard about throughout this trial, Jose Rodriguez -- or Gordo,

17    Alberto Reyes, Sonny Cruz, Manuel Suero, DiFrank Medina, all of

18    these men started selling the drugs, and they started

19    collecting the payments.

20         Meanwhile, Cuellar and Flores, they also stuck around

21    New York City.  They were anxious to get paid.  Not surprising

22    why they were anxious to get paid.  Jeffrey Minaya told you

23    that at the time Cuellar's organization was charging upwards

24    ever $24,000 per kilogram of cocaine.  They had just brought

25    274 kilograms to Jeffrey Minaya.  If you do the math, that's

d350fer1                          Summation - Mr. Cronan

1     upward of $6.5 million that Minaya owed to Cuellar and Flores.

2     Of course they were going to stick around and make sure they

3     got that money.

4              So now, at this point, Jeffrey Minaya and his crew

5     were literally sitting on millions and millions of dollars in

6     cash that they owed to Cuellar and Flores.  And as they were

7     sitting on this amount -- this pot of cash, Minaya and three of

8     his criminal associates, Gordo, Manuel Suero, and Alberto Reyes

9     got together and made a fateful decision, a decision that would

10    land all of us in this courtroom.  They decided to kill Arturo

11    Cuellar and Ildefonso Vivero-Flores.

12             Now, their idea was a very simple one, but a very

13    profitable one.  Instead of paying for the drugs, instead of

14    paying Cuellar and Flores the million dollars they were owed,

15    the millions of dollars that was owed, let's just kill them and

16    keep all of the money for ourselves.

17             Now, Cuellar and Flores were Minaya's drug connect.

18    Without Minaya's relationship with them, there wouldn't have

19    been this opportunity to steal all of this money.  So Minaya

20    demanded the most.  He wanted his cut to be $3 million.  The

21    other guys, Suero, Gordo, and Reyes, they would get paid a lot

22    by any measure, a little bit less, a little less than a million

23    dollars each.

24             So now at this point, these men had agreed to commit

25    the murders and it was time to put the plan in motion.  The

d350fer1                    Summation - Mr. Cronan

plan had two parts.  First, they would hire a hitman.  And

second, they would lure the two victims, Cuellar and Flores, to

this apartment building in the Bronx, 3235 Parkside Place.  And

they would bring them there with the ruse that they would be

receiving payment for drugs in an apartment in this building.

And of course you know what the plan really was.  Once

Cuellar and Flores walked in, they would be killed.

Now, Gordo, Suero, and Reyes were tasked with hiring

the shooter.  They needed to find someone who would be willing

to kill for money.  And Gordo knew just the man for the job.

Patrick Darge.

Patrick Darge, in the year 2000, was a dangerous man.

He was a drug dealer.  He was violent.  About two years

earlier, he had killed another man with a gun.  And Gordo knew

Patrick Darge well.  They were cousins.  They grew up together.

And Gordo suspected that Patrick Darge would be willing to kill

these two victims if he was given the right reason.

So the night of February 21st, 2000, Gordo gave

Patrick Darge that reason.  Gordo called Patrick Darge and said

that he had something urgent he needed to discuss.  Alberto

Reyes then drove Gordo, along with Manuel Suero, to go meet up

with Patrick Darge.  They went to Darge's apartment building.

Darge came down and sat in the car with them.  Darge was in the

back seat.  Gordo was in the front passenger seat.  And Gordo

made the pitch to Patrick Darge to get him to join the murder

d350fer1                    Summation - Mr. Cronan

1    plot.

2          Gordo told Patrick Darge that they had a problem.

3    That that problem was that they owed money to Jeffrey Minaya's

4    drug connect -- referring to the people who were supplying

5    Jeffrey Minaya with the cocaine, and that they didn't have the

6    money to pay that debt.

7          As a result, Gordo said the family was in danger.

8    Gordo claimed that the people knew where his mother lived.  And

9    her life was at risk.  They didn't have the money to pay for

10   the drugs.  Gordo, Suero, and Reyes offered to pay Patrick

11   Darge to commit the murders, eventually offering $180,000.

12         Patrick Darge needed a little bit of time to think

13   about the proposal.  He was worried about the safety of Gordo's

14   mother, who was like a second mother to him.  But make no

15   mistake, he was very enticed by the huge payment he was being

16   offered to do the job.  After thinking about it for a bit,

17   Patrick Darge decided to commit the murders.  But before he

18   called Gordo to confirm he was in, Patrick Darge made a few

19   calls of his own.  This job was too risky for Patrick Darge to

20   do by himself.  So he needed to assemble a team of his own.

21         First, Patrick Darge needed a back-up shooter.  This

22   was a dangerous undertaking.  And Darge needed someone that he

23   knew would have his back.  And that person was the defendant,

24   Joe Fernandez.

25         Why did Patrick Darge turn to Joe Fernandez?  He was a

d350fer1                    Summation - Mr. Cronan

1    man Patrick Darge could trust.  They were cousins.  Fernandez

2    looked up to Darge.  Fernandez lived in a different area of the

3    Bronx at the time, so the others would not have suspected that

4    Darge called Joe Fernandez into the plot.

5           And there was another reason.  Patrick Darge told you

6    that Joe Fernandez had a gun.  Simply put, Patrick Darge knew

7    that the defendant was someone he could count or for this very

8    dangerous and very deadly job.

9           So the same night that Gordo reached out to Patrick

10   Darge and pitched the murder plot to him, Patrick Darge did the

11   same with Joe Fernandez.

12          Darge called the defendant, said he needed to speak

13   with him about something; went to the defendant's apartment

14   building over near the Major Degan; and the two of them met out

15   on the street.

16          And, ladies and gentlemen, that is when Joe Fernandez

17   joined the murder conspiracy.  Patrick Darge explained to Joe

18   Fernandez that he was hired to murder two guys and he needed

19   help in that if anything went wrong.  He asked the defendant to

20   back him up, and the defendant agreed.

21          Now that Joe Fernandez was on board, Patrick Darge

22   gave the defendant some more details.  Darge offered to pay the

23   defendant $40,000 to assist him.  He told the defendant that he

24   would need to bring his own gun.  And, again, Patrick Darge

25   made clear that the plan was to commit murders.

d350fer1                    Summation - Mr. Cronan

1          The defendant listened to Patrick Darge, thought about

2     it, and confirmed that he was willing to do whatever Patrick

3     Darge needed him to do.  Patrick Darge had his back-up shooter,

4     but he needed someone else.  He needed a get-away driver.  And

5     for that, he turned to Luis Rivera.  And he learned a little

6     bit about Luis Rivera.  He was a drug dealer from the

7     neighborhood.  He had committed crimes with Patrick Darge in

8     the past.  He had driven Patrick Darge around in the past when

9     Darge was committing crimes.  But not only did Patrick Darge

10    know that he could trust Luis Rivera for this job, Darge also

11    knew that Rivera had the perfect vehicle to serve as the

12    get-away car, a Ford Expedition that had a hidden trap in the

13    center console that could be used to hide their guns.

14         So now the same night that Patrick Darge reached out

15    to Joe Fernandez, he reached out to Luis Rivera.  He explained

16    to Rivera that he was gonna be killing two people, and he

17    needed a driver.  And he offered Rivera $20,000 to be that

18    driver.  And Rivera also agreed.  And Rivera agreed to play

19    another important role.  Patrick Darge did not have a gun at

20    the time.  Rivera agreed to provide Patrick Darge with a gun to

21    use at the murders.

22         So now at this point, Darge had his back-up shooter

23    and his get-away driver.  With his team assembled, Darge called

24    Gordo to meet up.  Gordo returned a second time to Patrick

25    Darge's place that night, the night before the murders.

d350fer1                    Summation - Mr. Cronan

Patrick Darge confirmed that he was in.  And they discussed the
details of the plan.  The next day, Alberto Reyes would bring
the two victims to 3235 Parkside Place in the Bronx.  Patrick
Darge and his other shooter would be waiting in the lobby of
that building.  And when the victims were brought in, Patrick
Darge and the other shooter would be armed and ready to commit
the murders.

           Now, the next morning, the morning of the murders,
Patrick Darge called Gordo to confirm that the plan was still
going forward, and it was.  Patrick Darge called the defendant
and Luis Rivera to confirm that they were still on board, and
they were.

           Meanwhile Alberto Reyes called the two murder victims,
Arturo Cuellar and Ildefonso Vivero-Flores, telling them that
he was going to be picking them up.  They expected to receive
the payment for drugs that day.  Cuellar and Flores were at a
barber shop getting their hair cut that morning.  It was
downtown.

           Reyes went down there, picked them up and drove them
to 3235 Parkside Place.  And at the same time this was
happening, Luis Rivera picked up the defendant and Patrick
Darge, and also drove them to 3235 Parkside Place.  During this
drive, Rivera opened up the secret compartment in his Ford
Expedition and handed Patrick Darge the handgun that he had
brought for him.  Darge took out the gun, removed bullets from

d350fer1                      Summation - Mr. Cronan

1    the gun, wiped down the bullets so there were no prints, and

2    put the bullets back in the gun.

3           In the back seat of the car, Joe Fernandez took out

4    his gun; it was in a duffel bag.  And assembled it.  And as

5    they drove to the murder scene, Patrick Darge once again went

6    over the plan with the defendant and Luis Rivera.

7           The defendant's job was to back up Patrick Darge

8    during the shooting.  And Luis Rivera's job was to wait around

9    the block, ready to drive away once Darge and the defendant

10   finished the job.

11          So Luis Rivera parked, went around the corner near

12   Decatur and 207th Street.  Before getting out of the car, Darge

13   again reminds Rivera to remain alert in case he needed to make

14   a quick getaway.  And at that, Patrick Darge and Joe Fernandez,

15   wearing hoodies to conceal their face, gloves to make sure they

16   didn't leave any fingerprints, and with guns concealed, walked

17   from Rivera's car to the entrance of 3235 Parkside Place, and

18   went into the lobby.

19          They entered the lobby and looked around.  They

20   checked for any security cameras.  There didn't seem to be any.

21   They looked around for any other exits.  And they waited in the

22   side mailbox area, a little bit off to the left of the

23   entrance.  At this time, Patrick Darge had his pistol concealed

24   in his jacket in his pocket, and Joe Fernandez had his gun over

25   his shoulder, concealed under the jacket he was wearing.  And

d350fer1                        Summation - Mr. Cronan

1   they waited.

2              While Darge and Fernandez waited, Darge called Gordo

3   to see where the victims were.  Gordo told Darge that Reyes was

4   driving the two victims over to the apartment building.  And

5   they were almost there.  Gordo also explained that he was

6   located at a McDonalds over near Gunhill Road and Webster

7   Avenue and, from that location, he would be able to see Reyes

8   as he drove by with the victims.  And then a little while

9   later, Gordo called Patrick Darge and said the victims would be

10  there momentarily.

11             Patrick Darge and the defendant then got ready.  Darge

12  told the defendant to get ready for this.  They pulled the

13  hoods over their heads and they waited.  Reyes parked near 3235

14  Parkside Place and walked into the apartment building with

15  Cuellar and Vivero-Flores.

16             Reyes walked up to the elevator of the apartment

17  building with Cuellar and Flores standing next to him at the

18  time.  And then Patrick Darge, with his gun in hand, emerged

19  from the mailbox area, with the defendant following right

20  behind him.  Darge walked up to the first victim, Arturo

21  Cuellar, and fired a single gunshot into Cuellar's head, right

22  behind his ear.  At this point, you learned Alberto Reyes heard

23  the gunshot and ran up the internal stairwell of the apartment

24  building.  Darge then turned to another victim, Ildefonso

25  Vivero-Flores, and tried to fire, but he didn't fire.  His gun

d350fer1                    Summation - Mr. Cronan

1    had jammed.  Darge tried to clear the jam quickly, he was not

2    able to, and he ran out of the building.

3           But, Joe Fernandez whose job it was to take care of

4    anything, take care of things if anything went wrong, did his

5    job.  Joe Fernandez had fired 14 shots, 9 of them entered the

6    bodies of Cuellar and Flores, leaving them dead in the

7    apartment lobby.

8           And as Patrick Darge was running out of the building,

9    you can still hear some of those gunshots.  Darge ran to the

10   corner of Decatur and 207th Street, where Rivera was in the

11   Ford Expedition waiting.  Patrick Darge got in the car and they

12   waited for the defendant to arrive.  And once the defendant

13   caught up with them, they drove away.

14          Now, during that drive, Patrick Darge asked the

15   defendant what took so long, why were you not right behind me.

16   And what the defendant said was he had to make sure they were

17   both dead.  And Darge also yelled at Luis Rivera for giving him

18   a gun that had jammed.

19          The police soon arrived at the scene.  Officer Joe

20   Szaniszlo told you what he saw when they got there.  Two men,

21   Cuellar and Flores, lying dead in a pool of blood.  They were

22   just to the left of the elevator.  Cuellar was lying a bit on

23   top of Flores, and there were shell casings throughout the

24   lobby.

25          Dr. Suzanne Ely, of the New York City Medical

d350fer1                    Summation - Mr. Cronan

1    Examiner's Office testified and told you about the injuries

2    that these two individuals suffered.

3              Arturo Cuellar suffered four gunshot wounds; one

4    gunshot was fired at very close range into his head and pierced

5    his brain, the other three bullets were fired into Cuellar's

6    back, and one of them lodged near his jaw.

7              And Dr. Ely also told you that Cuellar sustained

8    bruising near his cheekbone, the bridge of his nose and his

9    brow.  And what that indicated was that Cuellar fell face

10   first, after he was shot, onto the ground, and didn't brace his

11   fall.  He was likely unconscious at that point.

12             Dr. Ely told you that Ildefonso Vivero-Flores suffered

13   six gunshot wounds.  One of the bullets entered the back of

14   Flores' left shoulder.  That one traveled downward.  It pierced

15   a number of vital organs; his lung, his heart, his liver and

16   eventually lodged near his ribcage.

17             Another bullet was fired into Flores' left shoulder as

18   well.  And that one also lodged in his ribcage.  And the other

19   gunshot wounds included gunshot wounds to the left side of

20   Flores' neck and, also, the left side of his face.

21             And one of the gunshots to Flores' face pierced his

22   voicebox, his right carotid artery, which is a major artery in

23   the neck, and his jugular vein, which is a major vein in the

24   neck.

25             Dr. Ely testified that all 10 of these shots, the four

d350fer1                          Summation - Mr. Cronan

1      shots that went into Cuellar, the six shots that went into

2      Flores traveled from left to right, which means the shooter was

3      likely shooting from the left side of him, obviously.  And that

4      makes sense.  Patrick Darge explained to you, and you also

5      heard this from Alberto Reyes, that he and the defendant

6      approached their victims from the left.  And, obviously, to

7      state what I think is clear, Dr. Ely concluded that these

8      gunshot wounds were the cause of death for both Cuellar and

9      Flores.

10             Now that Patrick Darge and Joe Fernandez had done

11     their job, now that they had killed Cuellar and Flores, it was

12     time for them to get paid.  And Alberto Reyes paid Patrick

13     Darge about $180,000, the agreed-upon amount.  Reyes took that

14     money and paid Joe Fernandez $40,000 he was owed, and Luis

15     Rivera the $20,000 he was owed.  And then a little bit later,

16     Manuel Aladino Suero paid Patrick Darge another $10,000.  So,

17     in total, Patrick Darge made about $190,000.  And then Jeffrey

18     Minaya, Gordo, Suero, and Reyes, split the rest of the money,

19     and a few other people.  Minaya made a few -- he said a little

20     over a million dollars down in the Dominican Republic, he had

21     his buddy Richard Correa retrieve some of the money that he had

22     hidden in a car that he parked in the Bronx.

23             Now, like I said at the beginning of my summation, a

24     lot of the evidence in this trial does not seem to be in

25     dispute.  I don't think there is any real dispute that in the

d350fer1                    Summation – Mr. Cronan

late 90s to early 2000s Jeffrey Minaya would become a huge

cocaine trafficker.  And I don't think there is any dispute

that the two murder victims, Cuellar and Flores, worked for the

Mexican drug trafficking organization that was supplying

Minaya's crew with huge amounts of cocaine.  And, I don't think

there is any dispute that those two men were murdered on

February 22nd, 2000, or why they were murdered.  They were

murdered because they supplied Minaya with 274 grams of

cocaine, and Minaya's crew didn't want to pay the money, they

just wanted to keep it all for themselves.  There is no real

dispute, I don't think, that Patrick Darge was one of the men

hired to kill Cuellar and Flores.

          So what is in dispute.  And, really, there seems to be

two main things; first, was there a second shooter with Patrick

Darge on February 22, 2000, and second, was that second shooter

Joe Fernandez.

          So let me spend a little bit of time focusing on those

two issues.

          How do you know Patrick Darge did not act alone on

February 22nd, 2000.

          As Judge Hellerstein has told you, and I suspect he

will tell you again, the government has the burden in this case

and we welcome the burden.  The defense doesn't need to say a

word, they don't have to make any arguments.  But if, as here,

the defense does make arguments, you should scrutinize them and

d350fer1                        Summation - Mr. Cronan

1    assess them, just like you scrutinize the government's

2    arguments.

3            In his opening statement, Mr. Richman argued that

4    Patrick Darge made up the presence of a second shooter on

5    February 22nd, 2000, because Darge wanted to gain favor with

6    the government, he wanted to get a lighter sentence.

7            And then when Mr. Richman cross-examined Officer

8    Szaniszlo on the first day of the trial, he then suggested that

9    Officer Szaniszlo's report indicated there was only one

10   shooter.  Now, I don't know if the theory is going to continue

11   to be pursued by the defense, but let me be clear, the theory

12   is absolutely absurd.

13           First of all, Officer Szaniszlo's report, which I have

14   in evidence, does not state that there was just one shooter.

15   Quite the opposite.  The report makes very clear that there may

16   have been one or more perps involved in the shooting.

17           Officer Szaniszlo had no idea how many people were

18   involved in the shooting.  How could he have?  He had just

19   arrived on the crime scene.  He found two dead bodies on the

20   floor of the apartment building lobby.  His job was to secure

21   the evidence and to secure the crime scene.  He was not -- he

22   didn't see the shootings, he was not involved in the

23   investigation.

24           But, you did hear from people who saw the shootings,

25   were involved in the investigations, and even who planned the

d350fer1                      Summation - Mr. Cronan

1    murders.  And all that evidence confirms without a doubt that

2    there were two shooters on February 22nd, 2000.

3                    (Continued on next page)

D35VFER2                    Summation - Mr. Cronan

```
 1              MR. CRONAN:  For example, Patrick Darge testified not
 2     only that there was a second shooter, Joe Fernandez, but why he
 3     needed a second shooter.  He needed someone to have his back;
 4     someone he could trust in case something went wrong.
 5              Alberto Reyes testified that when he walked the
 6     victims into the lobby of the apartment building, he saw two
 7     individuals off to the left.  He said one of them was Patrick
 8     Darge; he couldn't make out who the second person was.  But
 9     Reyes told you that he saw them emerge from the mailbox area
10     towards the victims, and then he heard a gunshot, and he ran up
11     the steps.
12              Geffrey Minaya testified that he learned from Gordo,
13     whose job it was to recruit the hitman, that there would be two
14     shooters.
15              And then you have all of the ballistics evidence that
16     was recovered from the victims at the crime scene.
17              Now, you have these in evidence.  This is Exhibit 60;
18     it has two bullets that were recovered from Flores's body; 61
19     is one bullet from Cuellar's body; and 62 includes 15 shell
20     casings, eight bullets, and one full cartridge that was
21     recovered from the crime scene.
22              Detective Salvatore Lacova of the NYPD's firearm
23     section testified.  And he told you about the ballistics
24     analysis he performed on these bullets and shell casings; and
25     his conclusion, that at least two guns were used on February
```

D35VFER2                        Summation - Mr. Cronan

1    22nd, 2000.

2            Now Detective Lacova explained to you every barrel --

3    every gun has a unique barrel.  And in that barrel are unique

4    impressions that are created on bullets.  They are called

5    striations.  So you are able to tell if multiple bullets were

6    fired from the same gun based on the unique striations that are

7    found in the bullets.  And he also told you that every shell

8    casing fired from a gun is unique, as well.  When a gun is

9    fired, unique impressions -- they are called firing pin and

10   breechface impressions -- are left on the shell casings that

11   are discharged from a gun.

12           So Detective Lacova looked at the crime scene

13   evidence.

14           Let's start with the 11 bullets that were recovered,

15   the three from the victims, and the eight from the crime scene.

16   One of those bullets was too deformed to do an analysis, but

17   nine of the bullets -- all nine of the .380 caliber bullets --

18   were fired from the same gun.  One bullet, it was a

19   nine-millimeter bullet, was fired from a different gun.  And

20   then Detective Lacova looked at the shell casings found from

21   the crime scene.  Fourteen of the shell casings were fired from

22   the same gun.  They were all .380 caliber shell casings.  And

23   the other shell casings, the nine-millimeter shell casing, was

24   fired from a different gun.

25           And that's all consistent with what you also heard

D35VFER2                    Summation - Mr. Cronan

from Detective Daniel Austin.  Detective Austin told you that

recovered from the crime scene were 14 .380 caliber shell

casings, and one nine-millimeter shell casing.

          The analysis of this ballistics evidence leaves no

doubt whatsoever that at least two guns were used on February

22nd, 2000.

          There were two shooters that afternoon.  Darge was one

of them.  How do you know Joe Fernandez was the second shooter?

Again, of course, we start with Patrick Darge.

          Patrick Darge walked you through exactly what Joe

Fernandez did.  He explained to you how he recruited Joe

Fernandez the night before; he explained to you why he went to

Joe Fernandez; he explained the money he offered Joe Fernandez

to be his back-up; he told you what Joe Fernandez's role would

be, to have his back in case anything went wrong; and when

something did go wrong, Patrick Darge explained to you that he

ran out of the building and heard gunshots continued to be

fired.  And then, moments later, Patrick Darge explained to you

that Joe Fernandez told him that he stuck around in the lobby

to make sure that the two victims were dead.

          Patrick Darge's testimony about what the defendant did

was credible, coherent, and consistent with all the other

evidence you saw in this case.

          What was that other evidence?  Let me walk you through

some more.

D35VFER2                        Summation - Mr. Cronan

1          Now, you repeatedly heard that the second shooter was
2     going to be Patrick Darge's cousins; you heard that from
3     Geffrey Minaya and Alberto Reyes.  Geffrey Minaya told you that
4     right before the murders, Gordo, who was one of the people
5     responsible for hiring the hitmen, told Minaya that the other
6     shooter would be one of Patrick Darge's cousin.

7          Minaya testified also that Manuel Suero, another
8     person who's responsible for hiring the shooters, told him that
9     Patrick Darge was going to bring one of his cousins to the
10    murders.

11         And then Alberto Reyes, the third person responsible
12    for hiring the hitmen, told you that Patrick Darge told him
13    that he had recruited his cousin for the hit.

14         So the second shooter was Patrick Darge's cousin.  And
15    you've heard a mountain of evidence that the defendant and
16    Patrick Darge are cousins; their grandmothers are sisters, and
17    there really hasn't been any dispute about that.  You've heard
18    this from Patrick Darge, from Allen Darge; and the defendant
19    also told his cellmate at the MCC, Yubel Mendez, that he and
20    Patrick Darge are cousins.

21         And talking about the MCC, you have Joe Fernandez's
22    statement as to Patrick Darge the day he arrived at the jail.
23    Now, if you remember, Patrick Darge was already incarcerated at
24    the MCC the day that Joe Fernandez arrived.  When Patrick Darge
25    saw Joe Fernandez arrive on the floor, Darge approached him.

D35VFER2                    Summation - Mr. Cronan

Defendant wanted no part of Patrick Darge; just kept saying,
Why, why, why.

The defendant was then brought to his own cell.
Patrick Darge explained to you that that was a cell that the
defendant shared with an inmate named Mendez.  Patrick Darge
explained that he then went over to Mendez's cell and brought
the defendant over to his own cell where they spoke for about
20 minutes to a half hour.

And here's what Patrick Darge explained to you they
discussed in his cell:  The defendant asked Darge why he turned
him in.  Defendant said, Nobody knew me; why did you do that?
None of them could have identified me.

Darge first pointed out that other people could have
identified him, but then admitted that he was the one who
turned the defendant in.

Now, you learned about this interaction at the MCC not
just from Patrick Darge, but also from that inmate that Patrick
Darge mentioned, that inmate Mendez.  That was Yubel Mendez,
Joe Fernandez's cellmate, for a brief period of time in the
MCC.

Mendez saw the defendant arrive on 5 North, and saw
Patrick Darge approach the defendant.  And, then, after the
defendant was brought to Mendez's cell, Mendez recalls that
Patrick Darge took the defendant from his cell into Patrick
Darge's own cell where they spoke for about 20 minutes.

1          Now, let me talk a little bit more about what you

2     learned from Yubel Mendez.  Mendez's testimony was overwhelming

3     evidence of the defendant's guilt.  Make no mistake.  Mendez

4     and defendant shared a jail cell together at 5 North; they got

5     to know each other; Mendez helped the defendant out a bit; and

6     every night the two of them talked regularly.

7          What were some of the things that you learned that the

8     defendant said to Yubel Mendez?

9          For one, the defendant told Yubel Mendez that he

10    considered fleeing to the Dominican Republic to avoid arrest.

11    Mendez had mentioned to the defendant that he had been arrested

12    in the Dominican Republic.

13         And what was the defendant's response?  The defendant

14    said that he thought about running away to the Dominican

15    Republic so he wouldn't be arrested.  The defendant had assumed

16    that he couldn't have been arrested in the Dominican Republic.

17         Mendez told the defendant, Well, that's wrong; I've

18    been arrested in the Dominican Republic.  And you know what?

19    If the federal authorities are looking for you, they are going

20    to find you.

21         And what was the defendant's response to Yubel Mendez?

22    Oh, well, then it wasn't worth it for me to go there; they were

23    going to catch me anyway.

24         Now, let's think about that for a minute.  Why would

25    the defendant have been thinking about going to the Dominican

D35VFER2                     Summation – Mr. Cronan

Republic?  Why would he have been thinking about fleeing there

if not to avoid getting arrested for a crime that he had

committed?  Why would he have been concerned that the

authorities might come looking for him if not for the fact that

he realized he committed a crime and was worried it was going

to get solved?

Keep in mind, ladies and gentlemen, that at this point

the charges against the defendant were sealed.  The parties

stipulated to this.  That means until the defendant was

arrested, the defendant would not have been able to view or

access his charges.  At the time the defendant was thinking

about going to the Dominican Republic, he would have had no way

of knowing whether charges were filed against him.

But what did he know?  He knew he had committed a

serious crime with Patrick Darge many years earlier.  And he

knew there was a chance the police would eventually catch him.

That is why he wanted to go to a place like the Dominican

Republic where he thought he couldn't get arrested.

And, members of the jury, one of the most important

things that Yubel Mendez told you that defendant said to him,

Joe Fernandez told you about Mendez, why he was in prison.  He

confessed.  Now, the defendant didn't tell Mendez every single

detail about what he did, but he told him more than enough.

Fernandez explained that he was in jail because of his

participation with Patrick; that's, of course, Patrick Darge.

D35VFER2                    Summation - Mr. Cronan

 1    And that Darge brought him into it.  And the defendant

 2    explained that Patrick had called him so they could get

 3    together, and that Patrick told him to bring a weapon.

 4            And what the defendant told Mendez happened that

 5    Patrick brought him into this, and Patrick Darge told him to

 6    bring a weapon, is exactly what happened:

 7            On February 21st, 2000, the night before the murders,

 8    Patrick Darge reached out to the defendant, said I need you to

 9    help me out with this; I need you to have my back, and I need

10    you to bring your gun.

11            How would Yubel Mendez have known these details unless

12    the defendant told him?

13            You learn that Patrick Darge never told Mendez about

14    Joe Fernandez before Fernandez arrived on 5 North.  There's no

15    evidence either on direct or cross that Mendez knew any details

16    of the case.  Mendez simply told you what Joe Fernandez told

17    him.

18            And, by the way, when the defendant was telling you

19    about Mendez, why was he in jail, did he say, I'm in jail

20    because I was framed?  I'm in jail because I was set up?  No.

21    He told Mendez why he was in jail, because he committed a crime

22    with Patrick Darge.

23            And you also have Joe Fernandez's confession to Allen

24    Darge.  In no uncertain terms the defendant also confessed to

25    Allen Darge the very day that he learned the police were

D35VFER2                    Summation - Mr. Cronan

looking for him.  And you learned yesterday what happened that

day.  Law enforcement officers were looking for the defendant

the morning of October 13, 2011.  Officer Washington told you

that very early that morning, around 5 or 5:15 a.m., they went

to their first location where they thought he might be, a house

in Chester, New York.  The defendant wasn't there, but his

mother-in-law was there.  And then about 20 minutes later, the

officers went to another address in Woodbury, New York, and

Officer Washington spoke to the defendant's wife.

        Now, the defendant also wasn't there at the second

address, but Officer Washington explained that from the imprint

on the driveway, it appeared that a car had just left.  And

then, just a few hours later, Joe Fernandez called his cousin,

Christian Guzman, a gentleman who testified yesterday.  The

defendant told Guzman that he was coming over to his apartment.

He called him up.  These are the phone records for Christian

Guzman.  And see here that's his phone number:  917-826-1095.

        And these phone records, which you'll have when you

deliberate, show that at 12:22 p.m. on October 13th, 2011, the

day the police were looking for Joe Fernandez, Christian Guzman

received a call from the defendant, and they have three more

calls in the next four minutes.

        And just so we're completely clear, this number here,

917-826-1095, that's Guzman's number; he told you that and you

have the subscriber records.  That number was called by this

 1    number, 845-492-0601.  And the parties have stipulated that

 2    that number, 845-492-0601, is a number that Joe Fernandez was

 3    using on October 13, 2011.

 4         So just a few hours after the police arrived at his

 5    house, Joe Fernandez called Christian Guzman.  And like I said,

 6    you have these phone records in evidence and you should look at

 7    them.  And I expect that when you look at them, you will see

 8    that the phone records cover August to October 2011.  Over that

 9    three-month period, there are no other calls between that

10    number for Joe Fernandez and Christian Guzman other than on

11    this day.

12         Joe Fernandez was reaching out to Christian Guzman

13    because there was something urgent they needed to discuss.  And

14    you know what was so urgent.  The police were looking for him.

15    The defendant came to Guzman's house and said he needed to

16    speak to Allen Darge.  And when Guzman testified yesterday and

17    was thinking about that day, he told you the defendant may have

18    told him that it was about Allen Darge's brother Patrick.  And

19    you know that it actually was.  When the defendant came there,

20    that was what he wanted to talk to Allen Darge about.

21         Now, let me remind you again, at this point, the

22    charges against the defendant were sealed.  Again, you have

23    this stipulation.  The charges were sealed until October 18th,

24    2011.  Until that date, the charges cannot be viewed or

25    otherwise accessed by members of the public, including Joe

D35VFER2                    Summation - Mr. Cronan

1   Fernandez or his attorney.  The defendant went to Christian

2   Guzman's house five days earlier, and he needed to speak with

3   Allen Darge about Patrick Darge.  The defendant knew the police

4   were looking for him.  Police came to his house earlier that

5   day.  But the charges were sealed.  The police never told

6   Christian Guzman's family why they were looking for him.  At

7   this point, there would have been no way of knowing -- of the

8   defendant knowing why the police were looking for him; no way

9   except his own realization that they must have been looking for

10  him for the crime he committed with Patrick Darge many years

11  before.

12          So Guzman called Allen Darge -- so defendant is at

13  Christian Guzman's house.  He called Allen Darge, Guzman called

14  Allen Darge and said, Come on over.

15          Darge came over; Allen Darge came over.  Guzman, I

16  believe he testified, he jumped in the shower and started to

17  get ready.  And then the defendant and Allen Darge got together

18  on Guzman's couch in the living room and had a conversation.

19  They spoke in low voices.  Guzman couldn't hear what they were

20  talking about, but Allen Darge told you what they talked about.

21          The defendant told Allen Darge that he learned that

22  police had come to his house looking to pick him up, and he

23  knew why.  He figured that Patrick Darge had told the

24  authorities about him.  And the defendant was looking for

25  advice from Allen Darge on what he should do.

1          Now, Allen Darge tried to calm the defendant down.  He

2     told the defendant that a lot of people know about this; maybe

3     it wasn't my brother who talked to the police about you.  Allen

4     Darge asked the defendant about who else might have known about

5     his involvement in the crime.

6          The defendant mentioned that Zac was there, and he was

7     driving the day of the murders.  Zac is Alberto Reyes.  And,

8     again, that's a detail that only someone involved in the

9     murders would have known.  How was Allen Darge able to tell you

10    about that if the defendant didn't tell that to him, and the

11    defendant knew that to be true, because the defendant was

12    there.

13         And most importantly, members of the jury, that

14    afternoon in the living room of Christian Guzman's apartment,

15    the defendant confessed to Allen Darge.  Allen Darge told you

16    that the defendant said he fired his gun twice, and then his

17    gun jammed, and Patrick Darge finished the job.

18         Now, you know from the ballistics evidence and Patrick

19    Darge's testimony pretty much the opposite happened:  Darge

20    fired the first shot, and then Joe Fernandez fired the rest.

21         MR. RICHMAN:  Objection.

22         THE COURT:  Members of the jury, you'll evaluate the

23    evidence yourself.  Counsel are advocating from their

24    respective positions.

25         You'll decide what's accurate and what's not accurate

D35VFER2                    Summation - Mr. Cronan

1    and what it means.

2         Objection overruled.

3         MR. CRONAN:  Allen Darge explained that Joe Fernandez

4    said he fired two shots and his gun jammed, and Patrick Darge

5    fired the rest.  The testimony from Patrick Darge and the

6    ballistics evidence suggested the opposite happened.  Darge

7    fired the first shot, nine-millimeter, and that Joe Fernandez

8    fired the remainder.  Maybe Allen Darge remembered the details

9    a little bit wrong from that conversation, maybe Joe Fernandez

10   was trying to minimize his role, who knows.

11        What matters is that Joe Fernandez confessed to Allen

12   Darge in the living room of Christian Guzman's apartment the

13   day the police were looking for him.

14        At the end of the conversation with Allen Darge, Darge

15   gave the defendant about $200 and a throwaway phone, it was one

16   of the phones that Allen Darge had used in his drug dealing.

17   And the defendant left and said, I'm not going to tell on

18   anyone.

19        Now, members of the jury, I want to spend one more

20   minute on this incident at Christian Guzman's apartment, this

21   incident on October 13, 2011.

22        Really think carefully about what happened that day.

23   This is devastating.

24        The police first went to a house in Chester, New York

25   looking for the defendant.  He wasn't there; his mother-in-law

D35VFER2                    Summation - Mr. Cronan

was there.  They went to a second house, the defendant's house.
He had just left.  And then just a few hours later, the
defendant reached out to his cousin, Christian Guzman; goes to
Guzman's house and needed to speak with Allen Darge about
Patrick.

          Why did he do that?  Because he immediately knew not
just that the police were looking for him, but why they were
looking for him.  They were looking for him because of the
murders he committed with Patrick Darge.  The charges weren't
public yet.  The police didn't tell the defendant's family why
they were looking for him.  He wouldn't have known why they
were looking for him.  But they were looking for him because
Patrick Darge had ratted on him.  If not for the fact that he
knew he committed that crime, there was no other way for him to
know that.

          In his opening statement, Mr. Richman told you that
aside from the word of Patrick Darge and the admission of
Boozer, that's Allen Darge, there's no evidence of connecting
the defendant to this crime.  First of all, even if that were
true, that's a lot.  You got a statement, you got testimony
from the other person who was involved in the shooting with the
defendant, and you have testimony from someone the defendant
confessed to.  That's more than enough.

          But that's not all you have, and you now know that
that's the case.  You have everything I just went through:  The

D35VFER2                    Summation - Mr. Cronan

testimony that Patrick Darge and had recruited his cousin for

the hit; testimony that Patrick Darge and the defendant were

cousins; the defendant's statements to Darge at the MCC; the

confession to Yubel Mendez; the confession to Allen Darge;

Guzman's testimony that corroborated the confession to Allen

Darge.

          The evidence establishing Joe Fernandez's guilt of the

murders on February 22nd, 2000 is overwhelming.

          I want to take a few minutes to briefly shift gears

and discuss with you the crimes that you will be considering

later on today.

          In a little bit, Judge Hellerstein will instruct you

on the law.  And just to be completely clear, what the judge

tells you the law is is what controls.  I expect I know what

the judge will tell you, but if there is anything different

between what I say and what the judge tells you, listen to him.

          THE COURT:  Nobody knows what I'll say.

          MR. CRONAN:  In case I haven't been clear, he's the

boss.

          All right.  So the defendant has been charged with two

counts.

          Count One, a murder-for-hire conspiracy.  And what

does this entail?  There are two elements to the conspiracy

part:

          First, the existence of the conspiracy to commit a

D35VFER2                    Summation - Mr. Cronan

1    murder for hire.  And a conspiracy is simply an unlawful

2    agreement between two or more people to break the law.  And in

3    this case, the object of the conspiracy is to commit a murder

4    for hire.

5           Second part, Joe Fernandez knowingly joined that

6    conspiracy, was he a member of that conspiracy.

7           So this starts with the question of what constitutes a

8    murder for hire.

9           Now, here are the elements for a murder for hire:

10          The first two elements are related.  First is the

11   defendant or another member of the conspiracy --

12          THE COURT:  Talk about the evidence.  Leave the

13   instructions to me.

14          MR. CRONAN:  Certainly, your Honor.

15          One of the reasons we repeatedly ask witnesses on the

16   stand whether the cell phone you used was able to call out of

17   state -- it probably seemed like an odd out-of-the-blue

18   question that we ask -- was because one of the things you'll be

19   asked to decide is whether or not used in the commission of the

20   crime was a cell phone that was capable of making interstate

21   calls.  And you've heard repeatedly that numerous members of

22   this conspiracy had a cell phone that they used in connection

23   with the crime that was capable of making interstate calls.

24          You had Geffrey Minaya talk about the cell phone he

25   used to stay in contact with the murder victims to coordinate

D35VFER2                    Summation - Mr. Cronan

1    with Gordo and Reyes in the planning of the murder.  Patrick

2    Darge talked about him using his cell phone; he used it to

3    reach out to Joe Fernandez and Luis Rivera recruit them into

4    the plot; he used them the day of the murders to coordinate

5    with Gordo and to coordinate with Fernandez and Rivera the day

6    of the murders.

7            Another example, Alberto Reyes.  He told you that he

8    was using his girlfriend Gloria Trujillo's cell phone the day

9    of the murders.  These are records for a cell phone used by

10   Correa Trujillo, and the parties stipulated that the cell phone

11   was operated by a network capable of making interstate

12   communications.

13           And you also learned that, for purposes of the

14   murder-for-hire count, that it was a murder for hire.  Several

15   conspirators in this murder paid Patrick Darge to commit the

16   murders.  Patrick Darge paid Joe Fernandez to be his back-up;

17   paid Luis Rivera to be the getaway driver.  And Patrick Darge

18   specifically told Joe Fernandez the day he recruited him that

19   he had been hired to kill these two men.

20           It was a murder-for-hire conspiracy.  And the

21   defendant joined that conspiracy.  He knew what the purpose

22   was.  He knew the purpose was to kill two men.  He knew his

23   role was going to be the back-up in case something went wrong.

24   He agreed to that.  And when something went wrong, he killed

25   those men; he joined that conspiracy.

D35VFER2                    Summation - Mr. Cronan

1          And I also expect you'll be asked if you find that the

2     defendant joined the murder-for-hire conspiracy, whether or not

3     death resulted.  And I think that's pretty obvious.  You have

4     Dr. Ely's testimony about the reason that Arturo Cuellar and

5     Ildefonso Vivero-Flores died that day.  They died from gunshot

6     wounds inflicted by the defendant, Joe Fernandez.

7          And to be clear, although we prove that the defendant

8     fired the gunshots that killed the two victims, we're not

9     required to.  It's not required that the defendant actually

10    fire any of the gunshots.  We don't have to prove that the

11    defendant shot anyone or who he shot or if the person died from

12    the shot fired by the defendant.  We proved all that, but it's

13    not necessary.  The question is simply whether there was -- the

14    defendant was a member of a conspiracy to commit a murder for

15    hire, and whether someone's death resulted.  That's all.

16         And then the second count that the judge will tell you

17    about is using a firearm in connection with a crime of

18    violence.  And I think the proof here was pretty obvious, as

19    well.  The defendant brought his own firearm to the offense; he

20    used it in connection with a crime of violence, a

21    murder-for-hire conspiracy.  This was a murder.  The very

22    purpose of the defendant and Patrick Darge were in the lobby of

23    3235 Parkside Place was so that these two individuals would be

24    killed.  They were waiting in the dark alcove for their victims

25    to arrive.  The plan was once they arrived, to kill them.

D35VFER2                    Summation - Mr. Cronan

 1    That's exactly what happened.

 2              And again, although with respect to the second count,

 3    the use of a firearm in a crime of violence with death

 4    resulting, we prove that the defendant shot and killed Cuellar

 5    and Flores on February 22nd, 2000.

 6              But I expect that you'll learn that the defendant also

 7    can be guilty under aiding and abetting liability.  And what

 8    that means is that the defendant did not have to pull the

 9    trigger himself.  All that is necessary is that the defendant

10    willfully and knowingly associated himself in some way with the

11    crime of carrying a firearm during the murder conspiracy; and

12    that he intentionally and knowingly committed some act to help

13    cause the murders.

14              Now, again, we proved way more than that.  We proved

15    that the defendant actually pulled the trigger and killed the

16    two victims.  I just want to make clear that there was this

17    alternative way for the defendant to be guilty, as well.

18              Now, I want to take a few minutes and talk to you

19    about some of the government's witnesses in this case.

20              THE COURT:  I think you've been going over this in

21    more detail than is necessary.  When you talk too much, you

22    lose attention.

23              MR. CRONAN:  Apologize, your Honor.

24              THE COURT:  You've already been talking over an hour.

25              MR. CRONAN:  I'm sorry?

D35VFER2                      Summation - Mr. Cronan

1          THE COURT:  You've already been talking over an hour.

2     It's getting repetitive.

3          MR. CRONAN:  Your Honor, I will try to wrap it up

4     then, briefly as I can.

5          THE COURT:  That's a good idea.

6          MR. CRONAN:  Before I do that, and I believe this is a

7     separate topic, I want to talk to you about the cooperating

8     witnesses.

9          You heard from people who committed very serious

10    crimes, there's no question about that.  And you heard

11    Mr. Richman during his opening and during his cross-examination

12    of these witnesses.  He doesn't want you to believe them; he

13    doesn't want you to believe them because they are criminals.

14    Let me be clear:  No doubt they are criminals.  Each of these

15    individuals have pled guilty for crimes, and they will be

16    sentenced for them.

17         You know, instead of these six witnesses, we would

18    have loved to have called law-abiding citizens who never so

19    much as jaywalked, but it doesn't work out that way.

20    Law-abiding citizens don't import huge shipments of cocaine,

21    they don't agree to murder other drug dealers.

22         The fact of the matter is to get to the heart of a

23    criminal enterprise is often necessary to get that information

24    from someone who is involved in that crime, someone who is in

25    that organization.  And you heard from people who knew about

D35VFER2                    Summation - Mr. Cronan

1    the crimes that brought you here, people who knew those crimes

2    inside and out.

3            The question is not whether they are criminals; of

4    course they are.  The question is whether, when they took that

5    witness stand, did they tell you the truth.  And I want you to

6    consider a few things when you think about that.

7            First, what are the consequences for these witnesses

8    if they were to lie to you?  You heard about the cooperation

9    agreements they entered into; you heard all about these 5K

10   letters, the letters they'll get at sentencing.  That letter

11   will tell the sentencing judge about the assistance they

12   provided and ask the judge to consider that assistance when

13   sentencing them.  That's a huge benefit.

14           But they have far more to lose from lying.  If they

15   lie, they will not get that letter; they will be facing a

16   mandatory minimum sentence, a huge sentence for many of them,

17   for three of them, mandatory minimum sentence of life.  And

18   they won't be able to withdraw their guilty plea.

19           Read their cooperation agreements.  They are all in

20   evidence.  They have to disclose and testify -- disclose all of

21   their crimes and testify truthfully.

22           And what if they don't?  Here's language from one of

23   the agreements:  All bets are off.  They don't get that 5Kl

24   letter.  They're subject to the mandatory minimum sentence.

25   And if the government already submitted that 5Kl letter, we

D35VFER2                    Summation - Mr. Cronan

1    could withdraw it.

2              THE COURT:  That doesn't sound like wrapping up.

3              MR. CRONAN:  Your Honor, it's --

4              THE COURT:  I know.  But it doesn't sound like

5    wrapping up.

6              You can't spend six days summarizing six days.

7              MR. CRONAN:  Your Honor, I didn't think I was going on

8    for that long, but I will try to wrap up very quickly here.

9              The other way you know these individuals are telling

10   you the truth is not just from the consequences they would face

11   from lying, but because each and everything these witnesses

12   told you was corroborated by other evidence.  And I will really

13   go through this quickly; I know you've all been paying

14   attention throughout this trial.

15             First, you have the roles of Gordo and Reyes.

16   Repeatedly witnesses told you what that role was.  Patrick

17   Darge told you that Gordo recruited him to be the hitman, and

18   Reyes was the one who brought the victim to the lobby.  And you

19   heard the same thing from Geffrey Minaya, from Alberto Reyes.

20   And Alberto Reyes even told you about the car he drove, his

21   girlfriend's red Acura; even his girlfriend told you about

22   that.

23             You learned about the trap in Luis Rivera's

24   Expedition.  You learned about that not just about Patrick

25   Darge, you learned about that from the person who installed the

D35VFER2                    Summation - Mr. Cronan

1    trap, Richard Correa.

2              THE COURT:  Mr. Cronan, wrap it up please.

3              MR. CRONAN:  Members of the jury, everything you heard

4    from these cooperating witnesses, whether it be facts like

5    this, or trap in the Expedition, or whether or not the

6    defendant was a person who committed the crime, everything you

7    heard has been corroborated by other independent evidence.

8    That's how you know they were telling the truth.  Witness after

9    witness would have had to take that stand and lie to you for

10   the defendant not to be guilty.

11             At the beginning of this trial, my colleague,

12   Mr. Capone, asked you to pay close attention to the evidence

13   and to use your common sense.  Use your common sense.  Does it

14   make sense that every single witness took that stand and lied

15   to you in complete disregard for the consequence of lying.  Is

16   it a coincidence that their testimony was corroborated by other

17   evidence?  Of course it's not.

18             And when you carefully evaluate their testimony and

19   the evidence that you saw throughout this trial, there is one

20   conclusion, and there is only one conclusion that the evidence

21   and the law compel.  And that conclusion is that the defendant

22   is guilty as charged.

23             THE COURT:  Thank you, Mr. Cronan.

24             It would probably be a good idea to have a break

25   before you start, Mr. Richman.

1              Members of the jury?  Yes.  Okay.

2              Close up your books; leave them on your chair.

3              (Jury excused)

4              THE COURT:  Mr. Richman, do you need Mr. Fernandez

5    here while you take a break?

6              MR. RICHMAN:  I need a two-minute break.

7              THE COURT:  You can have more than that, but I'm

8    asking should Mr. Fernandez be brought back or stay with you?

9              MR. RICHMAN:  Stay here, if it's at all possible.

10             THE COURT:  He can stay here, then I'll stay here,

11   too.

12             The government wants a break, they can break.

13             MR. CRONAN:  Thank you.

14             (Recess)

15             (Jury present)

16             THE COURT:  We're now going to hear Mr. Richman

17   present the summation for defendant, Joe Fernandez.  And then

18   there will be a very, very, very short rebuttal, Mr. Cronan,

19   very short.  I will then give you the instructions, and then

20   we'll break for lunch.  So it may be a while before you eat.

21   It's necessary for me to deliver the instructions before we

22   break for lunch.

23             Mr. Richman, please.

24             MR. RICHMAN:  Your Honor, attorneys for the

25   prosecution, attorney for the defense, Joe Fernandez, ladies

D35VFER2                    Summation - Mr. Richman

1    and gentlemen of the jury, this will be the last time I will

2    address you.  What I say is not evidence, and what the

3    government has said is not evidence either, what they view the

4    evidence to be.

5              This was a hard-fought case, and it's not as simple as

6    it sounds.

7              Yes, we agree on a lot of things.

8              Thirteen years ago, two people were killed, two drug

9    dealers were killed in the Bronx.  We acknowledge that.  We

10   acknowledge that Patrick Darge had something to do with it.  We

11   acknowledge Geffrey Minaya is a major drug dealer.

12             Where our point of contention is is we don't know what

13   happened because we were not there, I wasn't there, you weren't

14   there, and neither was Joe Fernandez.

15             We made suppositions based upon the evidence as it

16   come forth.  They were with the witnesses for years; they had

17   25 and 50 and 30 and 10 and 16 meetings with them I did not

18   have.  And each and every single time when they had a meeting

19   and we hit a point, boy would they back off that point.

20             To start with, I want to start at the end.

21             They showed you the stipulation in which on October

22   13th they went to Joe's mother-in-law's house to look for Joe,

23   and he wasn't there.  Well, I'm not at my mother-in-law's house

24   either.  They then went to his house, and the person was

25   honest, she doesn't know where the person went, Ms. Washington,

D35VFER2                    Summation - Mr. Richman

1    but they saw an impression.  Later on they learned that he had

2    gone to work.  But they tried to make more of it and make it

3    into an issue of flight.  And I'll deal with the concept of the

4    issue of flight later on.

5          They raised the concept that how would he know that

6    they were looking for him, how.  Joe Fernandez, when he was

7    arrested, spoke to Patrick, and Patrick said he wrote a letter

8    to his grandmother, and Joe had seen the letter.  And that's

9    part of the discussion.  They made no mention of that.  They

10   made you believe that somehow he knew in his head what they

11   were looking for.  And that's not true.  They told you what

12   they wanted to tell you.

13         And just look at the evidence; it's there.  You can

14   ask it to be read back; you can ask him -- if you have

15   recollection, you can point it out in your head, because he

16   said -- Patrick said -- I wrote the letter to grandma; I had to

17   rat you out.  I had to rat you out?

18         This is a case about a very manipulative man, a

19   terrible human being, in all aspects of his humanity.  We're

20   speaking of Patrick Darge.  Patrick Darge never did a decent

21   thing in his life.  He robbed, he told you about that; he

22   stole, he murdered.  We only learned about it now.  But he made

23   a deal with the government that he wouldn't lie.  That's beyond

24   belief in and of itself.

25         The government introduced in evidence the agreement

D35VFER2                    Summation - Mr. Richman

that they had.  You saw the agreement.  And these says, by God,

if he lies, he'll pack in the whole deal.

Patrick Darge has gone through this before.  They

didn't introduce the 2003 agreement, I did.  And it's in

evidence.  And in that particular agreement, it has the same

language.  It tells you that if he's caught lying, they'll take

the deal away from him.

Here, you can take a look here.  Take a look at the

date, right in front of you.  That's the date.  March 27, 2003.

And then in that agreement it is understood that he would tell

the whole truth.  And if he didn't tell the whole truth, the

government would not give him this deal.  And they even went to

bat for him.  They went overly to bat for him.  They made

references to this wonderful human being, except that he lied.

He lied.

How do you know he lied?  He never told them about his

brother Boozer, the one that he and his brother Boozer seem to

agree that they disagree, but everybody else says they worked

as a team.  The same brother Boozer who was a witness in this

case.  He didn't tell the government about Boozer at all.  When

he was sworn to tell the truth, he didn't tell the government

about the several murders he had committed.

What did the government do?  Did they pull back the

other deal, as they said they would do with anybody who lies?

Did they do that?  They didn't do that.  They gave him another

D35VFER2                    Summation - Mr. Richman

deal.  Fool me, once shame on me; fool me twice, shame on you.

          The government bought into this.  And they bought into

this, and they put him on the stand, and they ask you to

believe him, and believe him without question.  Why?  Because

he signed an agreement.  If you believe Patrick Darge, you

believe Buffaloes have wings; and Buffaloes have wings, you

better walk around with an umbrella.

          The first witness of any significance was Geffrey

Minaya.  Geffrey Minaya was a drug dealer.  He was another

horrible human being.  I never said he lied; I just said he's a

horrible human being.

          I asked him a question:  Have you ever done anything

decent in your life?

          He said, No, I'm a crook, I'm a thug, I'm a gangster.

          I used those very words.  He said that's what he was.

          But thing he doesn't know, he doesn't know Joe

Fernandez; never had any contact with Joe Fernandez.  Joe

Fernandez never sold drugs to him.

          He knew Patrick Darge, and he knew Patrick Darge as an

enforcer.  What does enforcer mean to you?  A person who helps

you across the street?

          And we're talking $180,000 for the murder.  And this

Mr. Geffrey Minaya was going to steal three million of this

drug money.  Does he know who the shooter is?  Sure he knows.

Patrick was the shooter.  Who did he believe was the second

D35VFER2                        Summation - Mr. Richman

1   shooter?  Mrs. Minaya's own testimony, you can have it read

2   back, Allen Darge, Boozer.  And that's in the testimony.

3          So what and how does Darge protect the only person he

4   seems to have a degree of loyalty to, his brother?  Because he

5   didn't even testify against his brother the second time he

6   became the cooperator.  When he went into this agreement on the

7   tenth -- 2010, Darge, Allen Darge, had not yet been arrested in

8   2012, and he was not arrested as a result of what his brother

9   testified to, but on a separate deal entirely.  How does that

10  strike you?  Does that strike you as being truthful?

11         Geffrey also mentioned that the other shooter, if it

12  was not Darge, is his cousin, Patrick Darge's cousin.  Do you

13  know what the cousin's name is?  Tilo.  Tilo.  And that's in

14  your record.  And Tilo's name is Joe Agramante.  He had killed

15  somebody else with and for on another occasion, the man who he

16  shot in the face.  When I asked him in the eye?  No, I just

17  shot him in the face.  That was an accident.  I didn't mean to

18  shoot him in the face.

19         He minimizes Patrick Darge.  He's a manipulator and

20  he's a manipulator, and that's the whole case.

21         You know, in this particular case, when they arrested

22  Joe Fernandez or came to arrest Joe Fernandez, the only person

23  testifying in this entire case who would have been the only

24  witness as against Joe Fernandez was Allen Darge --

25  withdrawn -- Patrick Darge.  Only one.  Everything was added

D35VFER2                         Summation - Mr. Richman

1    onto later to buttress the case.  And the only thing you add

2    onto that diminishes it adding onto it, is the truth.  And that

3    is the truth.

4           He lied then and he lied now.

5           Another person who testified during the course of this

6    case was Zac, one of the planners of this murder.  And it was

7    interesting to know how Zac was woven into the testimony of

8    Boozer at the end.

9           If you recall what Boozer said, Well, Zac knew.

10          Well, the fact is Zac doesn't know my client.  Zac sat

11   on the stand.  He said on testimony that Joe Fernandez told him

12   about the fact that Zac drove him to the scene.  This was in

13   Boozer's testimony.  We know that's not true.  We know that

14   can't be true, because Zac was the person in the hallway with

15   the two Mexican drug dealers.  He says that Zac must have told

16   about Joe.  But Zac didn't know Joe.  Zac sat on the stand; he

17   sat there for half a day, looked around the courtroom, didn't

18   know Joe Fernandez.

19          So what are we back to?  We're back to Patrick Darge.

20          Patrick Darge tells you that the reason he planned the

21   way he planned it, because he's a guy who gets things done.

22   He's a dude who gets it done, his words.  And although he had

23   never planned the murder before, he didn't even have to see the

24   scene of the crime, nor did he have to do anything.  But he was

25   polishing bullets so that his fingerprints wouldn't be on them.

D35VFER2                    Summation - Mr. Richman

 1           He was saying at the initial stage that the .380 was
 2      his.  And how do we know it was his?  He says it himself.  His
 3      gun jammed, something that the prosecution left out when they
 4      talked about the ballistics person.  The gun jammed.  There's
 5      evidence of one bullet that jammed.  That discharged a live
 6      shell.  The cartridge that fell on the floor.  And was that?
 7      The .380.  And that's in the testimony.  It's there.
 8           So whose gun?  That was Patrick's gun that jammed,
 9      .380, 14 shots by him alone.
10           What are we talking -- it makes no sense.  You can't
11      twist the truth and make it something -- what it's not.
12           I'm not saying that the prosecution has any
13      bad-intended people, but they buy into their witnesses.  You
14      get attached to a witness, and then you get his story, and you
15      start building on his story; and that story becomes the real
16      story.  But that's not the real story.  And you got to see the
17      inconsistencies.  And if it's inconsistent in one, it's
18      inconsistent in all.
19           I asked you at the beginning, at the opening, if you
20      would buy a watch from a person who would lie to that extent.
21      And I'm asking you -- you don't have to shake your head or
22      anything -- but think to yourselves now, if you met Patrick
23      Darge, aside from knowing what he does and being fearful of
24      him, as you would be, would you trust him?  Would you trust his
25      word for anything in life?  And yet you're here to trust and

D35VFER2                    Summation - Mr. Richman

1    give another man's life into his hands and, thus, into yours?

2    Would you do that?  If that's what it all is about, then

3    there's no sense in jury trials and just buying whatever they

4    say.

5           We know Patrick Darge met with the government 25

6    times, at least, after he agreed to cooperate this time.  He

7    knows how it works.  He knows that he has to be believed.  He

8    knows what's important to him.

9           Another point.  After the shooting, all the persons

10   who made money on the shooting, all the persons who benefited,

11   all the persons who did everything, all went to the DR.  They

12   all did.  It's the testimony.  Boozer, who's not supposed to be

13   speaking to his brother Patrick at the time, went with Patrick

14   to the DR.  It's in the testimony.  The only person who said

15   they were not getting along was Patrick and Boozer, thereby

16   buttressing their testimony.  They went to the DR.

17          Was Joe Fernandez there?  No.  Did anybody in this

18   case, other than those -- Patrick, Boozer, who were cousins,

19   and Mendez, who was in the same cell, know Patrick -- know Joe

20   Fernandez?  No.  No mention.  Nothing.  It's like all these bad

21   characters in a bad movie pointing the finger at the only good

22   guy in the entire courtroom.  And that's insane.

23          Did I make efforts to show you that he was a good guy?

24   Yes.  I'm not going to mislead you, I did do that.  I wanted to

25   show you that 14, 13 years ago he was 24 years ago -- obviously

D35VFER2                        Summation - Mr. Richman

1    if he's 37 now, you can infer that it was 13 years ago -- that

2    he had a child, then he has four children now, and we saw his

3    wife, who's a nurse.  You saw that they have a home, and they

4    have a decent life.

5            Did I do it to get sympathy?  Quite possibly.  I'm not

6    going to lie.  But also to show the difference.  From the tree

7    you shall know the fruit.  From these bad apples, these

8    horrible human beings, you cannot get honesty out of them, you

9    cannot use their word to condemn another human being.  If you

10   do so, you do the wrong thing.

11           Patrick Darge was almost creepy in his delivery.  He

12   sat there -- and he's a preacher, too, he tells you.  He runs a

13   church in the MCC.  He's a preacher.  He's the one you turn

14   your money over to if you have tithing.  And would you put the

15   money in his hands?  He found a new scam.  Remember his brother

16   Allen said that he had white collar crime?  Yeah, it was credit

17   card fraud, and selling drugs, and murder.

18           Minaya told you that Boozer and Patrick worked

19   together "as a team."

20           (Continued on next page)

21

22

23

24

25

D350fer3                    Summation - Mr. Richman

1              MR. RICHMAN:  Whoa else is gonna back you up but your

2    team member, your brother.

3              Patrick says, I got someone who no one else would

4    know.  And then he goes out and gets a driver that everybody

5    knows.

6              And where was the driver?  Did you hear him testify?

7              The whole case is Patrick Darge, and that's all it is.

8    He is here, my client is here because he is charged with a

9    serious crime.  He is also here because he has sat in the very

10   courtroom where we are standing in, that he is not guilty, and

11   that's why we have this trial.

12             You know, you sit down and write a summation, you

13   literally write it out, you write it out from beginning to end,

14   and then you don't use it.  You don't go through it because you

15   don't know, you want to be able to finish in time, you want to

16   be able to not waste the Court's time or waste your time.  You

17   know where you're going.  But what I'm trying to do is point

18   out the indiscretions, the mistakes, the lies; just the

19   wrongdoings.

20             You know, this agreement which the government has

21   introduced on everybody else's behalf, take a look at it

22   yourself.  You can take it in and look.  But the one that I

23   introduced, also, is the government's agreement in the

24   year 2003.  And he broke every aspect of that agreement and,

25   yet, notwithstanding, the government wants you to rely upon

D350fer3                    Summation - Mr. Richman

1    this man's word.

2              One thing that Patrick did say, though, was quite

3    interesting.  He says that Joe speaks English, he doesn't speak

4    Spanish.  What was significant about that?  And that was in the

5    testimony, by the way.  And what was significant about that?

6    It was Mendez said that he spoke to him in Spanish.

7              And I asked him, didn't you tell someone at one time

8    that he didn't speak Spanish very well?  I never said that.  I

9    must have gotten it from someplace.  But the fact of the matter

10   is, you know what the story is.

11             Let's talk about Mendez for a moment.  Mendez has

12   nothing do with this drug deal at all.  He has his own drug

13   deal.  He is a different dealer, entirely.  And he is on the

14   same floor with Patrick Darge, and they're friends, and they

15   are both informants, and they both have cooperated with the

16   government.  And Patrick says to the guard, put him in his

17   cell.  Because he is the preacher, he gets along, the guard

18   doesn't care, sure, put him in Mendez' cell.  And Mendez will

19   have you believe that after four, five days, the silent one,

20   Joe Fernandez, who Patrick called him the silent one, is now

21   spilling his guts to this man.  But he never says that he shot

22   anybody.  That's also in the testimony.  He is saying oh, I was

23   going to go to the Dominican Republic.  He's never been there.

24   There is no testimony he was ever there.

25             And but you know what was so interesting that they

D350fer3                    Summation - Mr. Richman

1    didn't mention to you?  The government somehow comes to Mendez

2    8 months after Joe Fernandez was no longer his cellmate.  Now,

3    what could motivate them to come, eight months later, for a guy

4    who was in your cell for five days, who had so much to spill

5    about the guy right away.  The one connection, the singular

6    connection, Patrick Darge.

7         Patrick Darge says, look, man, you can buttress me.

8    You can reasonably infer he is saying this.  You can make me

9    look good and get some points for yourself.  You could help the

10   government in this case.  Because, let's face it, absent that,

11   absent Mendez and absent Alain Darge, there is no other case

12   but Patrick Darge.  And Patrick and Alain work as a team.  So

13   they through Mendez in to buttress the situation.  Frankly

14   speaking, that's it.  If you look at it that way, that is it.

15        You know, I can't even tell you whether Boozer is the

16   second shooter, because I don't know.  I can't tell you whether

17   Joe Agramante is the second shooter, because I don't know.  I

18   can't even tell you if Zac may have had a gun and shot one

19   person one time, and then ran up the steps to the fourth floor

20   where the trap was, where the narcotics and the money was.  I

21   can't tell you that.

22        I can tell you the one thing, though, that, you know,

23   Darge, Patrick Darge, didn't even remember the scene of where

24   he killed two people.  Remember, he got in there and said I

25   don't recognize this building.  Not only does he not recognize

D350fer3                    Summation - Mr. Richman

1    the building, it was a flat street, and here we have he is

2    running up the hill.  The picture shows the hill.  But he

3    doesn't have any recollection of that.  But everything else,

4    what he wanted to recollect, he recollects as he makes it up as

5    he goes along.

6            Even the story is beyond belief.  That he gets called

7    from Gordo in the night before to come meet him.  And one

8    person it says, Zac says they met him at Valentine Avenue,

9    Patrick Darge says Homestead Avenue in front of a one-family

10   house, rather than the apartment house.  These are two

11   different stories.  And there is no mention, at least in Zac's

12   story, about some family troubles.  Or was that Darge making

13   himself look good and buttressing himself.

14           But, you know, the government showed you telephone

15   numbers, as the persons calling other persons, to show you

16   there is a connection.  One thing they didn't show you -- in

17   fact two things they didn't show you.  In fact, I can show you

18   a lot of things they didn't show you.  But they showed you the

19   day when Christian Guzman and Joe Fernandez spoke to each

20   other.

21           Can that be put up possibly, the telephone record for

22   that day?  Christian Guzman.

23           THE COURT:  What's the exhibit number?

24           MR. RICHMAN:  Sorry?  113.

25           THE COURT:  Please put up 113.

1            MR. RICHMAN:  And highlight the four calls.  And can

2    we actually put the four calls like you displayed them before?

3            They got the telephone numbers --

4            THE COURT:  Wait a minute.

5            MR. RICHMAN:  They got the telephone numbers, right --

6            THE COURT:  No, they'll put it up for you, hold it.

7    It's on the jury screens, please.

8            Do you see the telephone numbers up there.  They

9    show -- I'm sorry -- Joe Fernandez calling Mr. Guzman.  Mr.

10   Guzman calling Joe.  Joe calling Mr. Guzman.  And Joe calling

11   Mr. Guzman.  Where do they show Mr. Guzman calling Alain Darge.

12   It's not there, is it?  Certainly not highlighted?  Certainly

13   not included.  It's not there.  Stretch it all you want, it's

14   not there.

15           They go back and show Gloria's phone.  Gloria had

16   nothing at all to do with my client; she was Zac's girlfriend.

17   There's phone numbers and calls to her from Zac.  If they could

18   do that, why didn't they go back and show why Patrick Darge

19   called Joe Fernandez, then?  Where are the records of that

20   call?  Where are they?  Where is the evidence?  Where is the --

21   any hard evidence attaching Joe Fernandez to this case.  A

22   fiber.  They got five fingerprints in this case, not any

23   belonging to Joe Fernandez.  They got no fibers, no blood

24   spattering, no anything.  Not even the telephone numbers, which

25   they made such a big deal out of.  No connection to Joe

D350fer3                    Summation - Mr. Richman

1    Fernandez.

2            But they took what he wanted, that which they thought

3    would establish guilt.  And I submit to you, it does not

4    establish guilt.

5            Reasonable people have to have a reasonable doubt.

6    And that's all there is, a reasonable doubt.  That is all what

7    our system is based on.  Absent that, absent that, we have no

8    system whatever.

9            You know, my associate brings to my attention that

10   Mr. Darge's testimony, Patrick Darge, is how he first met with

11   Gordo and Zac and Aladino.  All of these guys have guns that --

12   they are arsenals, they are walking -- even his brother,

13   Boozer, 30 guns.  But he -- he is the killer, but he doesn't

14   carry a gun.  He has to have other people bring him the guns.

15   Stretch out this imagination.  Stretch out the beliefs.  And

16   it's just not true.

17           How could you plan this murder in one day without ever

18   going to the scene?  How do you do this?  And the person who is

19   going with you has never explained anything to you.  It's your

20   brother, your brother knows what to do.

21           My mother used to tell me an expression --

22           Judge, you may remember this expression, although you

23   are not my mother.

24           THE COURT:  Judge doesn't remember any expressions.

25           MR. RICHMAN:  A half truth is a whole lie.

D350fer3                    Summation - Mr. Richman

1          THE COURT:  That's a good one, a half truth is a whole

2     lie.

3          MR. RICHMAN:  A half truth is a whole lie.  And you

4     can't build a foundation on a series of half truths.

5          THE COURT:  My mother never said that.

6          MR. RICHMAN:  I'll tell you about it later.  I bet you

7     she did.

8          THE COURT:  Usually she caught me more red-handed than

9     that.

10         MR. RICHMAN:  You know, we all got along together very

11    well; spoke nicely with the prosecution; they were respectful

12    to me.  And, it's a pleasure to work with persons who are

13    professionals.  But it's not a pleasure to work with such

14    pressure on you.  It's not a pleasure to work when you are

15    giving human beings who are sitting there -- every one of those

16    witnesses, would you just take them home?  Would you rely upon

17    them for anything in life?

18         You know, Mr. Darge, Patrick Darge, fooled the

19    government once, and he's fooling them again, and he is fooling

20    you, and he has done that before, as well.  And I speak to you

21    as individuals, but you as jurors.  We're dealing with a human

22    being here.  We are dealing with, really, serious consequences.

23    But those consequences are not yours to concern yourself, only

24    the judge.

25         But the view of the evidence, and no matter how you

D350fer3                    Summation - Mr. Richman

1    view the evidence, it comes out in one way.  You know, words

2    out of this man's mouth, Patrick Darge says:  You know how easy

3    it is to pull the trigger?

4          Do you remember those words?  And apparently it is

5    just as easy for him to lie.

6          You know, I can go on and I don't want to.  I've gone

7    on, covered the evidence as best I can.  I thought that I've

8    answered the government's queries well.

9          The scientific evidence in this case is miniscule.

10   Yes, we have a doctor to tell you what happened.  Interestingly

11   enough, we made a stipulation about the heighth of the party,

12   said the 5-foot 8.  The reason being, is the testimony of the

13   medical examiner said that the taller of the two persons who

14   died was 5-foot 8.  And Patrick Darge said, on direct

15   examination and cross-examination, that he -- he shot the

16   bigger guy in the -- the right side, indicating the right side

17   of his head.  And then Zac said that the first guy who got shot

18   doubled over -- you saw him on the stand -- doubled over,

19   holding his stomach.  And that if you recall, was the

20   testimony.

21         Zac said anything he wanted, he didn't remember.

22   Darge says anything he wanted, because he wants you to forget.

23   He wants you to follow his word.  And this is what it's all

24   about, nothing more.

25         You know, they bring Richard Correa on the stand.

D350fer3                    Summation - Mr. Richman

Richard Correa had nothing at all to do with Joe Fernandez.  He
didn't even mention a word about Joe Fernandez.  He didn't even
acknowledge that Joe Fernandez is a person he knew, was even in
the courtroom.  But, again, you keep adding to numbers.  And
when you seem to have numbers, you saw pictures of all of the
persons, and they listed all of these persons.  And half of
them didn't even know my client.  And, certainly, Zac didn't.

          And that's how Alain Darge got bollixed up.  He made
reference to the fact that Joe came to him and said to him, you
know, I'm in trouble because of your brother.  And the words he
used was:  I'm puzzled.  If you recall, have it read back.  I
am puzzled.

          And then he -- Alain Darge, defending his brother
said, no, it's probably Zac.  Because Zac said he drove you
to -- that's not true.  We mentioned that, I don't have to
repeat that.  That's the testimony they asked you to rely upon.
Because without these late add-ons, these late so-called what
they claim to be admissions, there is no case.  You wouldn't
give five minutes to the testimony of Patrick Darge without
those add-ons.

          Mendez is helping Darge, Darge is helping Mendez.
Both of whom will get credit for cooperating with the
government.  As Alain Darge would.  Alain Darge was not
involved.  He was not in jail at the time that my client went
to see him allegedly.  This is a year and a half after his

D350fer3                     Summation - Mr. Richman

brother was in the jail, when his brother supposedly had

cooperated, such a long period of time, giving up all of the

people that he had.  He had no one to give up anymore.  He had

nobody else, so he gave up Joe Fernandez.  He had to have,

because everybody else, he put in jail.  Except his brother.

        One funny exchange, just to lighten this burden up.

When  Zac said we could have killed him; you know, we could

have killed them.  And the judge leaned over and said:  Or not

kill them.  And Zac said:  No, no, kill them.

        So casual.  So kill him.  I've rambled on about

enough.  I can't go on more than this.

        Let's talk a moment about this concept of flight.

Flight, supposedly, is indicative of the consciousness of

guilt.  A man gets a visit from the police.  He gets it on

October 13th, which is a Thursday.  On the following Tuesday,

he surrenders with his lawyer to the authorities.  Is that

flight?  Anybody with any degree of intelligence knows if

somebody is looking for you, you go with your lawyer because

that would be a foolish thing not to do it.  It is not

consciousness of guilt, it is not flight.

        Now, the concept of flight does not even contemplate

what occurred in this particular case.  And to use that as a

way to buttress their position on the fact that he is somehow

guilty because of this, is really very -- well, cheesey, if you

say so.

D350fer3                     Summation – Mr. Richman

1           There is a story I like to tell, and I'll tell this in
2     termination of this little talk.
3           There is a wise man sitting at the side of a road
4     giving wisdom to the people talking to them.  And there was a
5     bully who came there.  We'll call him Patrick for a moment.
6           And Patrick walked up to this wise man and said to the
7     wise man:  Wise man --
8           Grabbing a pidgeon.
9           -- is this pidgeon alive or is he dead?
10          And he put his hands behind his back, knowing full
11    well if the wise man said alive, he will crush it and it would
12    be a dead pidgeon.
13          If he said dead, he would let the pidgeon, and let the
14    wise man look like a fool.
15          He said the only thing he could say:  My son, you have
16    a life in your hands.
17          I say that to you.
18          Thank you.
19          THE COURT:  Thank you, Mr. Richman.
20          Rebuttal, Mr. Cronan?
21          MR. CRONAN:  We agree, don't invite Patrick Darge into
22    your house.  If he comes knocking at your door, I want you to
23    close that door, dial 911, and call the police.  Because
24    Patrick Darge is in jail for murder.
25          This case is not about silly questions like that.

D350fer3                    Summation - Mr. Richman

1  Those are distractions to get you to look away from the

2  evidence.  This case is about whether Patrick Darge and the

3  other witnesses told you the truth from that witness stand.

4          Now, I know I don't have a lot of time, I apologize

5  I'm speaking fast, especially to the court reporter, but I want

6  to try to hit a bunch of points, because Mr. Richman repeatedly

7  misstated the evidence during that summation.  And I want to

8  point out a few to start.

9          First of all --

10          THE COURT:  Mr. Cronan, I'll give you the time,

11  don't --

12          MR. CRONAN:  You will?  Thank you.

13          THE COURT:  As long as you don't over do it.

14          MR. CRONAN:  I appreciate that.

15          First of all, Mr. Richman indicated that Patrick

16  Darge, somehow, the reason his client knew that there was

17  charges against him, because Patrick Darge wrote to his

18  grandmother and told his grandmother about the charges.

19          THE COURT:  Mr. Cronan, slow down.  Relax.  If you --

20  if you are speaking too rapidly, none of your points will be

21  heard.

22          MR. CRONAN:  Got it.

23          THE COURT:  Take fewer points, and make them

24  understood.

25          MR. CRONAN:  Mr. Richman suggested that Patrick Darge

D350fer3                      Summation - Mr. Richman

1   had called his grandmother -- had written to his grandmother,

2   and that is how his client found out that Patrick Darge was

3   cooperating and talking about the defendant.  That is not the

4   testimony.

5        There is absolutely no testimony, evidence whatsoever,

6   that Patrick Darge told his grandmother that he was talking

7   about Joe Fernandez.  You need to base your deliberations, your

8   decision, on what the evidence is, not on what Mr. Richman just

9   speculated the evidence was.

10       And the reason he speculated about that is pretty

11  obvious.  The fact that the charges against Joe Fernandez were

12  sealed, is devastating.  There is no way that Joe Fernandez

13  knew the police were coming after him.  He knew why they were,

14  unless he knew that he committed the crimes.

15       And I'll give you another example, very quickly, to

16  start.  Mr. Richmond claimed that there was testimony that

17  Patrick Darge said that Joe Fernandez did not speak Spanish.

18  That's just untrue.

19       How about your conversations with Joe, were they in

20  Spanish or English.  Patrick Darge said that he spoke to Joe

21  Fernandez in English.  He didn't say Joe Fernandez didn't speak

22  Spanish.  There was no testimony, at all, saying -- from

23  Patrick Darge, saying Joe Fernandez didn't speak Spanish.

24  Yubel Mendez, of course, told you that he did.

25       Now, it shouldn't be surprising that Mr. Richman spent

1     most of his summation calling Patrick Darge a liar, who got

2     away with it.  Why do I say that?  Because if you believe

3     Patrick Darge, if you credit his testimony, Mr. Richman's

4     client is guilty.  The defendant is guilty.  That's it.

5     Period.

6              So let me talk a bit about Patrick Darge.  First of

7     all, did he get away with it?  He got a light sentence last

8     time around, sure.  But did he get away with it?

9              He has pled guilty to committing three murders.  He is

10    in jail right now for those murders.  He is facing mandatory

11    life imprisonment.  The only way he does not get life

12    imprisonment is if he tells the truth.  And even then, as he

13    told you, the judge doesn't have to give him a break.  It's up

14    to the judge.  And the judge will know everything.  He will

15    know about those three murders, everything that Patrick Darge

16    did.  Is that a deal?  Come in, meet with the government, tell

17    us about all your crimes, tell us about all your murders, tell

18    us about -- plead guilty to a murder you were not even charged

19    with.  Talk about all of your family members, agree to testify

20    against your family members, testify against anyone we possibly

21    tell you, and then maybe, just maybe, you may get a break in

22    your sentence.  But you know what?  The one way you are not

23    gonna get a break, the one way you know you are going to jail

24    for the rest of your life, is if you lie.

25             Patrick Darge told you he knew nothing about the

D350fer3                    Summation - Mr. Richman

evidence in this case.  He had not seen the discovery.  He

didn't know what the other witnesses said to him.  Does it make

sense that he would just take the risk that what he told you

was consistent with the rest of the evidence?  Take the risk

that, hopefully, I got it right?  Because if I don't, I know

I'm going to jail for the rest of my life?  It doesn't.

          Throughout this trial, we've heard a lot about whether

there was a second shooter, and who it was.  Initially, there

was not a second shooter.  Now the defense believes there is.

But guess what?  It is everyone you could imagine, except for

the one person against whom there is overwhelming evidence,

except for the one person against whom the other shooter

testified against, except for the one person who confessed to

two individuals.

          First we heard about another cousin named Tilo.  And,

again, let me correct the record here.  Jeffrey Minaya never

testified that he was told Tilo was the shooter, he thought

Tilo was the shooter.  He said the opposite.  Jeffrey Minaya

didn't say that.  Did you see any evidence that Tilo was the

other shooter?  No.  None.  What you did see was that Patrick

Darge told you that he had fingered Tilo in another murder.

Darge isn't afraid to point the finger at Tilo if he is guilty,

he did it before.  He didn't do it here, because it wasn't

Tilo.  And then, briefly, you heard it may have been Alberto

Reyes.  That lasted for not very long, because it was obvious

D350fer3                    Summation - Mr. Richman

1    Alberto Reyes was not the other shooter.  And now, finally, the
2    defense found the real shooter, Alain Darge.
3           Again, there was no evidence that Alain Darge was the
4    second shooter.
5           First of all, again, I need to correct the record
6    here.  Jeffrey Minaya did not testify that he believed that
7    Alain Darge, that he thought Alain Darge was second shooter.
8    He thought about it initially.  But then it -- he was told it
9    was one of Patrick Darge's cousins.  That is the testimony.
10   That is the testimony that is before you.  Not what Mr. Richman
11   just told you.  What he just told you was not accurate.
12          So maybe -- so now the theory is Patrick Darge framed
13   his brother, Alain Darge.  And think about that theory for a
14   bit.  Maybe at first it might make sense, Alain Darge was a
15   criminal.  But does it?  So for that to be true, Joe Fernandez
16   would be the luckiest man on this planet; working stiff,
17   unlucky cousin of Patrick Darge was randomly fingered by Darge
18   as a killer to cover up his brother?  If that were true, then
19   Patrick Darge and Alain Darge had to get together at some point
20   and agree that they would frame Joey Fernandez.
21          So when did this happen?  Well, it had to happen
22   before 2010, right, because Patrick Darge told you the day he
23   was arrested.  Was it right at the murders?  Well, let's put
24   aside the fact that you heard that Patrick Darge and Alain
25   Darge were not even talking that day.  They committed the

D350fer3                        Summation - Mr. Richman

murders.  And then Patrick Darge says to Alain Darge, here's
what I would do if I ever get caught by the feds.  First time
around, I won't tell them about the murders and hope they don't
find out.  But if they do eventually catch me, I'll tell them
about the two murders, about murdering these two people.  And
I'll even tell them about another murder I committed that they
have not charged me with.  I'll tell them the truth about
everything, but you know what I'll lie to them about?  I'll lie
about your involvement.  And how about we point our finger at
cousin Joey, and I'll tell them it was him.  And then Alain
here's what you do if you ever get arrested.  What I want you
to do is tell the police that Joey confessed to you.  And,
hopefully, they'll believe you.  And, hopefully, we'll get
really lucky.  And it will just so happen that the day the
police go looking for Joey, he'll come asking to talk to you.
So then we'll have Christian Guzman to corroborate all of that.
Is Guzman in on this, too?

        The theory is absurd.  There is no evidence that Alain
Darge was the shooter.  When defense makes an argument like
that, you need to scrutinize it.  If the shooter -- if Patrick
Darge were really trying to coverup the real shooter, why in
the world would he point at another family member.

        Patrick Darge, like everyone you saw, was not happy
about testifying.  Family members in the courtroom, testifying
against another family member.  Patrick Darge told you about

D350fer3                         Summation - Mr. Richman

one person after another, after another; Gordo, Aladino,

Alberto Reyes, Tilo; a lot of other people he could have

pointed his fingers at.  Why his cousin Joey?  Because that's

who he did it, with.

          Let me briefly touch on Yubel Mendez.  Mr. Richman

doesn't want you to believe Yubel Mendez either.  Remember how

Yubel Mendez told the government about the defendant.  He

didn't know what the government was gonna ask him about.  He

came in, he didn't know what the topic was.  And at that

meeting, he told the government about the defendant.  And what

he told the government about the defendant was spot on.  He

told the government that the defendant admitted to him that he

was asked to do something with Patrick Darge and to bring a

weapon, and that's what he did.

          Is it a coincidence that Yubel Mendez was just able to

come up with that on the spot and get it completely right?  Of

course it's not.

          Mr. Richmond made a point about the size of the gun

that Patrick Darge had, whether it was a .380.  Darge said at

first he thought it was a .380.  But he told you he is not a

gunsmith, he didn't know for sure what size gun it was.  And

Detective Lacova also told you the bullets on .380 and

9-millimeter are pretty much identical; same diameter and

different slightly in length.  That's another red herring.

Another red herring you heard was lack of DNA evidence.  Not

D350fer3                        Summation - Mr. Richman

1    every crime has forensics evidence or DNA evidence, especially

2    not a crime that occurred 13 years ago.  And you heard why it

3    wouldn't be in this case.

4          Patrick Darge and Joe Fernandez had their hoodies on.

5    They were wearing gloves, preventing leaving fingerprints.

6    There was no blood left on the scene.  There would not have

7    been any DNA evidence.  There is no reason to suspect there

8    would have been.  But you did hear evidence, overwhelming

9    evidence, from Patrick Darge, from Yubel Mendez, and crime

10   scene evidence.  That is more than enough.

11         You know, the defense wants it both ways with Patrick

12   Darge.  On the one hand, they don't want you to believe him at

13   all.  He's a liar, he's a liar, talking about Joe Fernandez.

14   And they don't want you to believe him at all.  When Patrick

15   Darge took that witness stand and he told you about his crimes,

16   well, he was telling the truth then, right?  When he told you

17   about the crimes, murders he committed, then he was telling the

18   truth.  When he told you about what happened the day of the

19   murder, except when he got to the part about Joe Fernandez,

20   then he was telling the truth.  But only when it was bad for

21   the defense, only then is Patrick Darge lying.  They can't have

22   it both ways.

23         The defense went through a lot of inconsistencies,

24   supposed inconsistencies, in the testimony; stuff regarding

25   whether Patrick Darge shot the defendant upward or not, whether

D350fer3                    Summation - Mr. Richman

or not it makes sense they went to crime scene for the first
time the night before.

          First of all, is there any question that Patrick Darge
committed these murders?  I don't think there is.  But to the
extent that there is slight inconsistency in the statements
from witnesses from a crime that occurred 13 years ago, that
shouldn't be surprising.  This was an event that occurred a
long time ago.  When you try to recall an event last week, let
alone 13 years ago, you are going to remember things slightly
different.  That's the hallmark of the truth, that's proof the
witnesses didn't get together.

          Now, let me close with this.  Mr. Richman, you know,
readily admitted that he wants you have to sympathy for the
defendant.  Working guy with a family.  Family that loves him.
The government has no doubt, whatsoever, that the defendant's
family loves him.  And ladies and gentlemen, Ildefonso
Vivero-Flores had a family, too.  He had a fiance that he was
telling Alberto Reyes about the second before he was killed.
Fiance he never got to marry.

          Albert Cuellar had a family.  He had a daughter who
had to come up to New York City to the morgue to identify the
body.  Your decision cannot be based on sympathy.  This case is
too serious to base your decision on anything but the facts.

          In fact, I think it's fair to say, every federal case
is a serious case, but not every case is a close case.  This

D350fer3                    Summation - Mr. Richman

1   was not a close case.  You heard overwhelming testimony,

2   testimony from the other shooter who identified the defendant,

3   physical evidence corroborated that, confessions that were made

4   to the Yubel Mendez and Alain Darge.

5          And if you do what I expect Judge Hellerstein will

6   instruct you to do in just about 30 seconds, if you consider

7   that evidence, and if you consider that evidence without bias

8   or sympathy, there is only one conclusion that you can reach

9   that is consistent with the evidence in this case, and that

10  conclusion is that the defendant is guilty beyond a reasonable

11  doubt.

12          THE COURT:  Thank you, Mr. Cronan.

13          I'm going to take about an hour.  Might be a good idea

14  to stand stretch in place, and then I'll start my instructions.

15          So put down your books, relax a bit.  We'll go ahead.

16          If you want a break, it's okay.  Do you want a little

17  break?  Okay.  Yeah?  Well, why don't you all go out.  Close

18  your books.  Don't discuss the case.  We'll wait here.  When

19  you come back, I'll give you instructions.

20          (Jury excused)

21

22

23

24

25

D350fer3                         Summation - Mr. Richman

1              (In open court)

2              THE COURT:  My next court exhibit, Mr. Cronan and Mr.

3    Richmond, I would like to be divided into A and B, court

4    exhibit six.  A, the government showed the following exhibits

5    to the jury during it's closing; and then B will be the defense

6    do the same thing.

7              MR. RICHMAN:  Very well, sir.

8              I only showed two exhibits, your Honor.

9              THE COURT:  Okay.  You have an easy job.

10             And that will be 6A and 6B.  That's court exhibit 6A

11   and 6B will be what is shown to the jury.

12             (Recess)

13             THE DEPUTY CLERK:  Ready?

14             THE COURT:  Yes, bring in the jury.

15

16

17

18

19

20

21

22

23

24

25

D350fer3                         Summation - Mr. Richman

1            (In open court)

2            (Jury present)

3            THE COURT:  Be seated, everybody.  I would like to

4    begin by thanking you for your patience and alertness.  You

5    have paid attention to all of the evidence throughout.  I have

6    watched you.  You saw what was going on.  You watched each

7    witness.  You watched all of the documents.  I think you have

8    absorbed and taken into mind everything that has been said to

9    you.  And that's not an easy task, so thank you for doing that.

10           And having done that, you are ready to decide the

11   case.  You are ready to decide the case on the facts, and

12   according to the law that I delivered to you.  And I'll deliver

13   this law in the context of this charge.

14           I have, first, to explain the rules and procedures

15   that apply to jury trials, generally.  I then will explain the

16   rules of law applicable to the specific statutes that the

17   defendant is accused of violating.  And then I'll give you

18   rules and procedures to help you evaluate the evidence.  And,

19   finally, I'll tell you about procedures that you use during

20   deliberations.

21           As I have told you at the beginning, it is my job to

22   give you the law.  That's the job of the judge.  It's your job

23   to decide the facts according to the law.  Please do not

24   consider whether I'm saying things in a correct way or an

25   incorrect way, or whether they make good sense to you, or not,

d350fer3                    Charge

1    as long as you understand what I'm saying.

2            But it's my job to give you the law.  And it's your

3    job to accept the law as I give it to you, and then to apply it

4    to the facts.  I will have no opinion on the facts.  That's

5    your job.  And yours alone.  And in my judgment, and those of I

6    think all of my colleagues, there is nothing like a jury trial.

7            The jury rises to the highest level of intelligence of

8    any one of the jurors, applies the practical and common sense

9    that you bring to the courtroom, and almost always the verdicts

10   are just, reasonable, and proper.  And that's the secret, one

11   of the secrets, of our democracy, the participation of ordinary

12   people from all walks of life, all degrees of intelligence,

13   come together and, in a democratic way, participate in the

14   delivery of a just verdict.

15           So you are the sole and exclusive judges of the facts.

16   That's your job, not mine.  The evidence before you consists of

17   the answers given by witnesses, the testimony, that is, and the

18   exhibits that have been presented to you, and the stipulations

19   about what the lawyers agree to, or what the witnesses will

20   say.

21           Your verdict must be based solely upon the evidence

22   developed at trial, or the absence of evidence on any material

23   element.  The defendant, Joe Fernandez, is entitled to a

24   presumption of innocence.  That is to say he is presumed

25   innocent.  It's the government's job to prove guilt.  The

d350fer3                    Charge

1    government must prove each and all of the elements of the

2    crimes charged, each beyond a reasonable doubt.  The defendant

3    is not charged with proving his innocence.  Another secret of

4    our democracy, that defendants are presumed innocent.  It's the

5    government's burden to prove guilt.  And if the government

6    fails to deliver on its burden, if it fails to prove each and

7    every element of each of the crimes charged beyond a reasonable

8    doubt, you cannot convict the defendant.

9           You may not consider any answer, testimony, or exhibit

10   that I directed you to disregard, or that I directed to be

11   stricken from the record.  If an answer was stricken, it must

12   be entirely disregarded as though the words were never spoken.

13   If I granted an objection, don't speculate what you think the

14   witness my have said, that would be improper.  It's only what

15   the witness says, responsive to the questions answered, and

16   what is contained in the exhibits, and what's contained in the

17   stipulations, that constitute evidence.

18          Now, it's a style in this Court that the government is

19   the party.  The government brings a criminal case.  But just

20   because it's the government bringing a criminal case, does not

21   give it any better entitlement to anyone else.  Everyone is

22   equal in the court of law.  The government no less than the

23   defendant, and no more than the defendant.  They are equal.

24   Your job is to decide the government has proved each and all of

25   the elements beyond a reasonable doubt.

d350fer3                      Charge

1           The defendant begins trial presumed to be innocent of

2      the allegations against him.  I instruct you that the defendant

3      is to be presumed by you to be innocent throughout the trial,

4      and throughout your deliberations, until such time, if ever,

5      that each of you is satisfied that the government has proven

6      every element of the charged crimes beyond a reasonable doubt.

7           This presumption of innocence, alone, is sufficient to

8      acquit the defendant, unless you as jurors are unanimously

9      convinced, beyond a reasonable doubt, of the defendant's guilt.

10     And you come to that view after a careful and impartial

11     consideration of all of the evidence in the case.

12          The defendant has pleaded not guilty, thus the

13     government has the burden to prove the charge against the

14     defendant beyond a reasonable doubt.  The defendant begins this

15     trial with a clean slate.  This burden remains with the

16     government throughout the entire trial, and never shifts to the

17     defendant.  The law never imposes upon a defendant in a

18     criminal case the burden or duty of calling any witness, or

19     producing any evidence, or proving themselves innocent.  Under

20     our Constitution, a defendant has no obligation to testify.  It

21     is the government's burden to prove a defendant guilty beyond a

22     reasonable doubt.  A defendant does not have to clear himself.

23          So I keep on using the phrase, "beyond a reasonable

24     doubt."  What does it mean?  What is a reasonable doubt?

25          The words almost define themselves.  A reasonable

d350fer3                    Charge

1    doubt is a doubt based upon reason and common sense.  It's a

2    doubt that a reasonable person has after carefully weighing all

3    of the evidence.  It's a doubt that would cause a reasonable

4    person to hesitate to act in a matter of importance in his or

5    her personal life.  Proof beyond a reasonable doubt must

6    therefore be proof of such a convincing character that a

7    reasonable person would not hesitate to rely and act upon it in

8    the most important of his or her own affairs.

9         However, the law does not require that the government

10   prove guilt beyond all possible doubt.  A reasonable doubt is

11   not a caprice or whim.  It's not a speculation or suspicion.

12   It's not an excuse to avoid the performance of an unpleasant

13   duty.  It's not sympathy.  It's the government's burden to

14   prove each of the elements of the crimes charged beyond a

15   reasonable doubt.

16        The defendant does not have to present evidence or to

17   challenge the evidence presented by the government.  Nor do you

18   have to accept the testimony of any witness even one who has

19   not been contradicted or impeached, if you find that witness

20   not to be credible.

21        You must decide which witnesses to believe and which

22   testimony is true.  And to what extent.  To do this, you must

23   look at all of the evidence drawing upon your own common sense

24   and experience.  If after fair and impartial consideration of

25   all of the evidence, or the lack of evidence on any particular

d350fer3                    Charge

1    point, you have a reasonable doubt as to the guilt of the

2    defendant, it is your duty to acquit.

3            On the other hand, if after fair and impartial

4    consideration of all of the evidence, you are satisfied of the

5    guilt of the defendant beyond a reasonable doubt of the crime

6    charged against that defendant, then you should vote to

7    convict.

8            As I said at the beginning, the way the government

9    presents the crimes charged is by an indictment.  An indictment

10   is not evidence.  It's a formal way to bring the charges

11   against you for the government to prove, and for you to decide.

12   The indictment must be given no evidentiary value.  It is only

13   an accusation.  No weight or significance, whatever, is to be

14   given to the fact that an indictment has been brought against

15   the defendant.

16           The defendant has denied the charges contained in the

17   indictment.  That sets up the trial, that sets up the

18   requirement for the government to prove the case beyond a

19   reasonable doubt as to which defendant enjoys a presumption of

20   innocence.  And, ultimately, for you to evaluate the evidence

21   and to decide if the government has indeed satisfied its burden

22   to prove each and all of the elements of the crimes charged

23   beyond a reasonable doubt.

24           So, we start with the indictment.  These are the

25   accusations.  These are the allegations.  There are two counts:

d350fer3                    Charge

1          One, on or about February 22, 2000, in the Southern

2     District of New York and elsewhere --

3          The Southern District of New York is the geographical

4     boundaries of this Court; Manhattan, the Bronx, Westchester and

5     various other counties to the north and the west.

6          So on or about February 22nd, 2000 in the Southern

7     District of New York and elsewhere, Joe Fernandez, the

8     defendant, and others known and unknown, willfully and

9     knowingly did combine, conspire, confederate and agree together

10    and with each other, to travel in and cause another to travel

11    in interstate and foreign commerce, and to use and cause

12    another to use the mail and any facility of interstate and

13    foreign commerce with intent that a murder be committed in

14    violation of the laws of any state in the United States, as

15    consideration for the receipt of, and as consideration for a

16    promise and agreement to pay anything of pecuniary value, to

17    wit, Fernandez agreed with others to kill two persons later

18    identified as Ildefonso Vivero-Flores and Arturo Cuellar, in

19    exchange for currency and other things of pecuniary value.  And

20    in the course thereof, the conspirators did communicate through

21    a facility of interstate commerce which resulted in the murder

22    of Flores and Cuellar in the vicinity of 3235 Parkside Place,

23    Bronx, New York.  Bronx, New York, is in the Southern District

24    of New York.

25          (Continued on next page)

1          THE COURT:  Count Two.

2          On or about February 22, 2000, in the Southern

3    District of New York, Joe Fernandez, the defendant, willfully

4    and knowingly, during and in relation to a crime of violence

5    for which he may be prosecuted in a court of the United States,

6    namely, a conspiracy to commit murder for hire, did use and

7    carry a firearm; and, in furtherance of such crime, did possess

8    a firearm, and did aid and abet the use, carrying, and

9    possession of a firearm; and, in the course of that crime, did

10   cause the death of two people through the use of a firearm,

11   which killing is murder as defined in Title 18, United States

12   Code, Section 1111(a).  To wit, Fernandez caused the death of

13   Ildefonso Flores and Arturo Cuellar by discharging a firearm at

14   Flores and Cuellar, and aiding and abetting the discharge of a

15   firearm in the vicinity of 3235 Parkside Place, Bronx, New

16   York.

17          Those are the accusations.

18          And in the balance of the charge, I will break down

19   those accusations and the elements that you need to understand

20   and which the government has its burden to satisfy by proving

21   each and all beyond a reasonable doubt.

22          I'll start with the summary.  And I'll tell you at the

23   end you decide each count separately.  There's a verdict sheet

24   that I will explain to you that will help you in your

25   deliberations.  And you go throughout and you use it -- sorry.

D35VFER4                         Charge

1    Stumbling.  And you'll use it to help you evaluate the

2    evidence.  And if you come to a conclusion, to come to a

3    conclusion and note it on this verdict sheet, and I'll tell you

4    about that later.

5           Let me start with a summary.

6           Count One of the indictment charges that the

7    defendant, Joe Fernandez, unlawfully, willfully, and knowingly

8    conspired with others, known and unknown, to use and cause

9    others to use a facility in interstate and foreign commerce

10   with the intent to commit the murders of Arturo Cuellar

11   Dejerena, and Ildefonso Flores Vivero, in violation of the laws

12   of the state of New York as consideration for a promise to pay

13   a sum of money.  This conspiracy is alleged to have taken place

14   on or about the date of the alleged murders that is February

15   22, 2000.

16          The government contends that the defendant joined and

17   was a member of the alleged conspiracy.  The defendant denies

18   that he was a member of the alleged conspiracy, and denies that

19   he intended to join a conspiracy to use or cause others to use

20   a facility in interstate commerce with the intent that murder

21   be committed as consideration for a promise to pay money.

22          The crime of conspiracy to commit a murder for hire is

23   an independent offense; it is separate and distinct from the

24   actual commission of a murder for hire, which the law refers to

25   as a substantive crime.  You may find the defendant guilty of a

D35VFER4                           Charge

1    crime of conspiracy to commit a murder for hire even if the

2    substantive crime that was the object or the conspiracy was not

3    actually committed.  Conspiracy standing alone is a separate

4    crime, even if a conspiracy is not successful.

5            I will now go on to define the elements of the crime

6    of conspiracy charged in the indictment.

7            The government has to prove beyond a reasonable doubt

8    the following elements:

9            First, that the conspiracy charged in Count One of the

10   indictment existed; that is, that there was an agreement or

11   understanding among two or more persons to violate those

12   provisions of the law that make it illegal to use or cause

13   others to use a facility in interstate and foreign commerce

14   with the intent that murder be committed as consideration for a

15   promise to pay money.

16           And second, that the defendant, Joe Fernandez,

17   unlawfully, intentionally, and knowingly, became a member of

18   the conspiracy.

19           So the first element of Count One is a charge that a

20   conspiracy to commit a murder for hire existed.

21           A conspiracy is an agreement by two or more persons to

22   violate the law.  The government is not required to show that

23   two or more people sat around a table and entered into a formal

24   contract in order to establish the existence of a conspiracy.

25   It's sufficient if two or more persons in any manner, whether

D35VFER4                        Charge

they said so directly or not, came to a common understanding to

violate the law.  There's no magic language or specific words

that is required.  Did two or more people come to an agreement

or understanding to violate the law.  If, upon consideration of

all the evidence, direct and circumstantial, you find beyond a

reasonable doubt that the minds of two or more of the

conspirators met, that is, that they agreed to work together to

further the unlawful scheme alleged in the indictment, then

proof of the existence of the conspiracy is established.

        In order to find that a murder-for-hire conspiracy

existed, you must also find that the conspiracy was intended to

achieve the unlawful purpose charged in the indictment; that

is, that the object of the conspiracy was to use or cause

others to use a facility in interstate or foreign commerce with

the intent that murder be committed in consideration for a

promise to provide something of pecuniary value.

        The requirement regarding the object of a conspiracy

itself requires the government to prove three points, each

beyond a reasonable doubt:

        First, that one or more of the conspirators either

traveled in interstate or foreign commerce or used or caused

another to use a facility in interstate or foreign commerce.  A

telephone, for example, is such a facility in interstate

commerce.

        Second requirement:  That the travel or use of the

D35VFER4                        Charge

1       facility in interstate commerce was undertaken with the intent

2       that a murder be committed, in violation of the laws of any

3       state of the United States.

4              And third, that the murder was intended to be

5       committed in consideration for receiving something of pecuniary

6       value.

7              So let me double-back and go over these points.

8              The government first must prove that the object of the

9       conspiracy is that one of the conspirators, at least one,

10      traveled in interstate or foreign commerce or used a facility

11      of interstate or foreign commerce with the intent that a murder

12      for hire take place.  The government need prove only that a

13      conspirator either traveled in interstate or foreign commerce,

14      or used a facility of interstate or foreign commerce; it need

15      not prove both.

16             The crossing of a state or international border

17      constitutes traveling in interstate or foreign commerce.  A

18      facility of interstate or foreign commerce is any means of

19      transportation or communication that causes state or

20      international lines in the course of commerce.  This includes

21      the mail or telephone that is capable of making phone calls

22      across state lines or internationally, or the interstate

23      highway system.  The actual use of the interstate or foreign

24      facility need not have actually crossed state or foreign lines.

25             For example, if you find that one of the conspirators

D35VFER4                          Charge

1    or more used a telephone that was capable of making

2    out-of-state calls as part of the murder-for-hire conspiracy,

3    that's sufficient.  Or if you find that the government

4    proved -- and each of these must be the subject of proof by the

5    government beyond a reasonable doubt with inferences and

6    everything else that you use to analyze the evidence.  Or if

7    one of the conspirators traveled on an interstate highway as

8    part of the conspiracy, either the use of the telephone or use

9    of the mails or the use of an interstate highway can qualify as

10   a use of an interstate facility, even if the particular drive

11   was entirely within a state or the particular use of the phone

12   call was in a particular state.  So it's the capability that is

13   the key on this point.

14          Next, the travel across interstate or foreign lines or

15   the use of a facility in interstate or foreign commerce must

16   have been undertaken with intent that a murder be committed, in

17   violation of the laws of the state.  The intention that murder

18   be committed need not have been the only reason or even a

19   principal reason for the use of the interstate facility, as

20   long as it was one of the reasons for the use of the interstate

21   facility.

22          Under the laws of New York State, murder is committed

23   by an unlawful killing of another person purposely or

24   knowingly.  A person kills purposely when his conscious object

25   is to cause the death of another person.  A person kills

D35VFER4                          Charge

knowingly when he is aware that what he is doing will cause the

death or it's practically certain to cause the death of

another.  The government does not have to prove that a murder

was actually committed or even that it was actually attempted;

it must prove that the facility in interstate commerce was used

with the intention to further or facilitate the commission of a

murder that was intended.

          Next, the murder must have been intended as

consideration or in consideration for the receipt of anything

of value:  An exchange of a promise to commit a murder for a

promise or the actual receipt of something of value.  That

means that there was a mutual agreement or understanding or

promise that something of value would be paid or exchanged for

committing the murder.  Items of pecuniary value include money,

but are not limited to money.  It could include other things of

value, like jewelry or real estate or whatever has monetary

value.

          So to summarize, the first element of Count One is

that there was an agreement or understanding among two or more

persons to violate those provisions of the law that make it

illegal to use or cause another to use a facility in interstate

commerce with the intent that murder be committed, in violation

of the law of New York State, in consideration for a promise to

pay money or something of pecuniary value.  The government must

prove this element beyond a reasonable doubt in order for you

D35VFER4                    Charge

1     to be able to find the defendant guilty of Count One.

2              The next element is to ask if the defendant joined or

3     became a member of the conspiracy unlawfully, willfully, and

4     knowingly.  That is, did the defendant, Joe Fernandez,

5     participate in the conspiracy with knowledge of its unlawful

6     purpose, and with a specific intention of furthering its

7     objectives.

8              Knowledge is a matter of inference from facts proved.

9     One cannot enter another person's mind.  To have guilty

10    knowledge, the defendant need not know the full extent of the

11    conspiracy, nor does he have to know all the activities of the

12    conspiracy, or even all the members of the conspiracy.  A

13    conspirator's liability is not measured by the extent or

14    duration of his participation.  Indeed, each member may perform

15    separate and distinct acts, and may perform them at different

16    times.  Some conspirators may play major roles, other minor

17    roles.  Sometimes a single act may be enough to bring a

18    defendant within the membership of the conspiracy, providing

19    that the defendant was aware of the conspiracy and knowingly

20    associate himself with its criminal aims.  This aspect of

21    knowing association, being aware of a conspiracy and knowingly

22    participating in it, is the issue.  The government must prove

23    such knowing participation beyond a reasonable doubt before you

24    can find a defendant guilty of being a member of the

25    conspiracy.

D35VFER4                         Charge

 1          However, mere association with one or more members of

 2    a conspiracy or even helping another member of a conspiracy

 3    does not automatically make a defendant a member; likewise,

 4    mere knowledge or acquiescence without intentional and knowing

 5    participation in an unlawful plan is not sufficient.  What is

 6    necessary is that a defendant aid or participate in a

 7    conspiracy with knowledge of at least one of its unlawful

 8    purposes, and with intent to help accomplish that purpose.

 9    It's not necessary that a defendant receive or even anticipate

10    any financial benefit from his participation in a conspiracy,

11    as long as he knowingly aided or participated in it with the

12    intention to help the conspirators achieve their unlawful

13    purpose.

14          The government must prove beyond a reasonable doubt

15    that defendant Joe Fernandez knew of the conspiracy to use or

16    cause others to use a facility in interstate commerce with the

17    intent that murder be committed, in violation of the laws of

18    New York State, in consideration for a promise to pay money,

19    the defendant knew the conspiracy's unlawful purpose, and that

20    defendant joined in it to further its unlawful objectives.

21          I will now define for you some of the terms that I

22    have used.

23          First the term "unlawfully."  "Unlawfully" means

24    contrary to law; that is, to do something which the law

25    forbids.  It's not necessary that a defendant know that he was

D35VFER4                    Charge

1    violating any particular law.  You must be convinced beyond a

2    reasonable doubt that defendant was aware that what he was

3    doing was in some way unlawful.

4         Then the term "knowingly."  A person acts knowingly if

5    he acts purposely and deliberately, and not because of mistake

6    or accident, mere negligence, or other innocent reason.  His

7    acts must be the product of conscious intention, and not

8    because he was careless, negligent, or foolish.

9         And then I use the term "willful."  Willfulness, like

10   knowledge, exists in the mind.  In considering if willfulness

11   has been proved, you may consider that a person ordinarily

12   intends the natural and probable consequences of an act

13   knowingly done.  If it's unlawful, if he knows about it, and he

14   has an evil purpose, he's acting willfully.

15        In this context, a person cannot intentionally close

16   his eyes to the obvious.  Pretending to disregard what he knows

17   and sees and not to know what he plainly sees before him, for

18   you may infer from the willful and deliberate avoidance of

19   knowledge that the defendant actually had knowledge.  Thus, if

20   you find that a defendant knew that there was a high

21   probability that he was using or causing others to use a

22   facility in interstate commerce with the intent that murder be

23   committed, in violation of New York State law, and in

24   consideration for a payment of money, but willfully and

25   deliberately disregarded those facts, you may infer from such

D35VFER4                         Charge

1    willful and deliberate avoidance of knowledge that defendant

2    actually had knowledge, that he was, in fact, using or causing

3    others to use a facility in interstate commerce with the intent

4    that murder be committed, in violation of New York law, in

5    consideration for a promise to pay money.

6          If, however, the defendant believed that he was not

7    involved with others in the conspiracy to use or cause others

8    to use a facility in interstate commerce with the intent that's

9    required, and in consideration for the pecuniary promise, or if

10   he was merely negligent or careless with regard to what

11   knowledge he had, he lacks the requisite state of knowledge to

12   have become a conspirator.  One cannot become a member of a

13   conspiracy unless he did so knowingly, willfully, and

14   unlawfully.  And the government must prove that beyond a

15   reasonable doubt.

16         Only if the government proves beyond a reasonable

17   doubt that a conspiracy existed, and that the defendant became

18   a member of the conspiracy, may the government prove the

19   defendant acted with knowledge of the illegal objective by

20   showing that he deliberately closed his eyes.  You must judge

21   from all of the circumstances and all of the evidence if the

22   government did or did not satisfy its burden of proof beyond a

23   reasonable doubt as to the defendant's state of knowledge and

24   as to his joining the conspiracy.

25         The indictment charges that the conspiracy existed on

D35VFER4                         Charge

1    or about February 22, 2000.  The law requires only a

2    substantial similarity between the dates alleged in the

3    indictment and the dates established by the evidence.  It's

4    sufficient if you find beyond a reasonable doubt that defendant

5    became a member of the conspiracy charged in the indictment

6    during some time around the charge date of February 22, 2000.

7            If you find that the government satisfied the elements

8    in the crime by proving each of the elements beyond a

9    reasonable doubt, and if you find that there was a conspiracy

10   to commit a murder for hire, and that defendant joined it, and

11   all the aspects of using the facility of interstate commerce as

12   to which I charged you, you reached another question, and that

13   is, did death result from the murder-for-hire conspiracy.

14           You must ask yourselves if the murder-for-hire

15   conspiracy actually resulted in the death of one or more

16   persons.  This death could have been caused by any member of

17   the conspiracy and not necessarily the act of the defendant

18   himself.  As long as it was by a member of the conspiracy, you

19   need not find that it was the defendant himself who committed

20   the murders in order to find that death resulted from the

21   conspiracy.  You do not address this question if you find not

22   guilty to the crime charged in Count One; you answer the

23   question only if you find the defendant guilty.

24           So there's a one-page verdict sheet that we'll give to

25   the foreperson.  And it asks this question:  How do you find

D35VFER4                    Charge

1    Joe Fernandez with respect to Count One, conspiracy to commit

2    murder for hire.  There's two blanks:  Guilty and not guilty.

3    If you're unanimous, depending on whether you have him as for

4    guilty or for not guilty, the foreperson will check the

5    appropriate box.  So if you unanimously find that the

6    government proved beyond a reasonable doubt each and all of the

7    elements of Count One, the foreperson, after the vote, checks

8    "guilty."  If you find unanimously that the government failed

9    to satisfy its burden to prove each and all of the elements

10   beyond a reasonable doubt, and you so vote; the foreman checks

11   "not guilty."

12           If you found guilty for the first question, you'll go

13   on to Question 2:  Did the conspiracy to commit murder for hire

14   result in the death of either or both Ildefonso Vivero-Flores

15   or Arturo Cuellar.  Again, if you unanimously vote yes, the

16   foreperson checks "yes."  If you unanimously vote no, the

17   foreperson checks "no."

18           Now I'll go on to Question 3.

19           But you'll notice that I said "unanimously votes" to

20   either question.  Whether it's guilty or not guilty, your vote

21   has to be unanimous.  A verdict that is not unanimous is not a

22   verdict.  A verdict must be unanimous of all the jurors.

23           I'm going to go on now to Count Two.

24           Is there any question?  Do you want me to repeat

25   anything?

D35VFER4                          Charge

1            You're okay.  All right.

2            Count Two alleges that defendant violated -- this is a

3    little complicated, so I'm going to go through it slowly --

4    violated Section 924(j) of the federal criminal code, 18 U.S.

5    Code, Section 924(j).  Section 924(j) incorporates another

6    section of the code, Section 924(c), which makes it a crime for

7    any person during and in relation to any crime of violence to

8    use or carry a firearm, or in furtherance of any such crime, to

9    possess a firearm.  And, if so, Section 924(j) makes it a crime

10   for any person in the course of a violation of 924(c) to cause

11   the death of a person through the use of the firearm.

12           It might be helpful if I read the charge again, and

13   then go in and define all the elements for you.

14           On or about February 22, 2000 -- this is Count Two --

15   in the Southern District of New York, Joe Fernandez, the

16   defendant, willfully and knowingly, during and in relation to a

17   crime of violence, for which he may be prosecuted in a court of

18   the United States, namely, a conspiracy to commit murder for

19   hire, did use and carry a firearm.  And, in furtherance of such

20   crime, did possess a firearm, and did aid and abet the use,

21   carrying and possession of a firearm.  And in the course of

22   that crime, did cause the death of two people through the use

23   of a firearm, which killing is murder as defined by federal

24   law.  To wit, Fernandez caused the death of Ildefonso

25   Vivero-Flores and Arturo Cuellar by discharging a firearm at

D35VFER4                          Charge

1    Flores and Cuellar, and aiding and abetting the discharge of a

2    firearm in the vicinity of 3235 Parkside Place, Bronx, New

3    York.

4         To convict the defendant of Count Two, the government

5    must prove each of the following elements, each beyond a

6    reasonable doubt:

7         First, that on or about the date alleged in the

8    indictment, February 22, 2000, the defendant used, carried, or

9    possessed a firearm; second, that the defendant used or carried

10   the firearm during and in relation to a crime of violence, or

11   possessed a firearm in furtherance of such crime; third, that

12   defendant caused the death of a person through the use of a

13   firearm; fourth, that the death of that person qualifies as a

14   murder, defined by federal law; and, fifth, that the defendant

15   acted knowingly, unlawfully, and willfully.  The government

16   must prove each and all these five elements, each beyond a

17   reasonable doubt.

18        So, again, I will double-back and define everything

19   for you.

20        A firearm means any weapon which will or is designed

21   to or may readily be converted to expel a projectile by the

22   action of an explosive.  In considering the specific element of

23   whether the defendant used or carried or possessed a firearm,

24   it does not matter if the firearm was loaded or operable at the

25   time of the crime.  A gun is a firearm.

D35VFER4                          Charge

1          What is use of a firearm?

2          In order to prove that the defendant used a firearm,

3   the government must prove beyond a reasonable doubt an active

4   employment of a firearm by the defendant during and in relation

5   to the commission of the crime of violence.  This does not mean

6   that defendant must actually fire or attempt to fire the

7   weapon, although those would obviously constitute a use of the

8   weapon.

9          Brandishing, displaying, or referring to a weapon so

10  that other persons know that defendant had a firearm available,

11  if needed, all constitute use of a firearm.  The mere

12  possession of a firearm at or near the site of a crime without

13  active employment, however, is not sufficient.  So one must use

14  the firearm in connection with a crime of violence.

15         Or -- and this is the next definition -- carry a

16  firearm.  In order to prove that the defendant carried a

17  firearm, the government must prove beyond a reasonable doubt

18  that defendant had the firearm on his possession while he moved

19  from one place to another, having a degree of possession over

20  the firearm while he moved it.  He was then carrying the

21  firearm with his movement.

22         In order to carry a firearm, the defendant need not

23  have carried the firearm on his very person.  A defendant can

24  also carry a firearm if he conveys it in some vehicle which he

25  controls or there's another way of having the firearm moved so

D35VFER4                         Charge

1    that as he moves, he has it available for use.

2            Possession of a firearm means having custody or

3    control over the firearm.  The legal concept of possession may

4    differ from the everyday use of the term.  Actual possession is

5    what most of us think of as possession; that is, having

6    physical custody or control of an object.  A person, however,

7    need not have actual physical possession in order to be in

8    legal possession of it.  If he has the ability to exercise

9    substantial control over an object, even if he does not have

10   the object in his physical custody, and the person has the

11   intent to exercise control, then he's considered to have

12   possession of the article.  That term is a constructive

13   possession.

14           Control over an object may be demonstrated by the

15   existence of a working relationship between one person having

16   the power or ability to control an item, and another person who

17   has actual, physical custody.  In addition, an individual may

18   have possession of an item that is not found on his person

19   because that individual has a relationship to the location

20   where the item is maintained.  More than one person can have

21   control over the same firearm.  Since possession may be sole or

22   joint, if one person alone has actual or constructive

23   possession, possession is sole.  If more than one person has

24   possession of it, then possession can be joint.

25           Possession cannot be found solely on the ground that

D35VFER4                          Charge

1    defendant was near a gun.  However, you may consider this

2    proximity in connection with all other evidence in making your

3    decision as to whether the defendant possessed a firearm.

4             Possession of a firearm in furtherance of a crime of

5    violence requires that the defendant possess a firearm, and

6    that the possession advance or move the crime forward.  Mere

7    presence of a firearm is not enough.  Possession in furtherance

8    of a crime of violence requires that the possession be incident

9    to and an essential part of the crime.  The firearm must have

10   played some part in furthering the crime in order for this

11   element to be satisfied.

12            Next the government must prove beyond a reasonable

13   doubt that the defendant used or carried a firearm during and

14   in relation to a crime of violence or possessed a firearm in

15   furtherance of a crime of violence.  Possession in furtherance

16   of a crime of violence requires that the possession be incident

17   to and an essential part of the crime; that the firearm must

18   have played some part in furthering the crime in order for the

19   element to be satisfied.  You must find from the government's

20   proof beyond a reasonable doubt that the defendant participated

21   in the crime of violence described in the indictment.  If you

22   find that the government proved the crime of violence beyond a

23   reasonable doubt, here the crime of violence is to kill Flores

24   or Cuellar, either of them, that constitutes a murder for hire

25   as I've instructed you.

1        So the question is did the defendant use or carry or

2   possess in furtherance of the crime a weapon that is a gun.

3        The third element the government must prove beyond a

4   reasonable doubt is that defendant caused the death of another

5   person through the use of a firearm.

6        A defendant's conduct may be found to cause the death

7   of another individual if it had such an effect in producing

8   that individual's death that to lead a reasonable person to

9   regard the defendant's conduct as the cause of death.  The

10  death of a person may have one or more than one cause.  The

11  government need only prove that the conduct of the defendant

12  was a substantial factor in causing the victim's death.  You

13  need not find that the defendant himself shot the victim or

14  that he committed the final fatal act, as long as his conduct

15  was a substantial factor in causing the death of a victim.

16       The fourth element that the government must prove

17  beyond a reasonable doubt is that the death of a person

18  qualifies as a murder.  You remember I defined murder according

19  to New York State law.  The federal law is somewhat different,

20  at least in terminology.

21       Under federal law, murder is the unlawful killing of a

22  human being, with malice of forethought.  Every murder

23  perpetrated by poison, lying-in-wait, or any kind of willful,

24  deliberate, malicious, and premeditated killing, or committed

25  in the perpetration of or attempted to perpetrate certain

D35VFER4                        Charge

1   crimes, including robbery, qualifies as murder.

2          So the unlawful killing -- and I've explained

3   "unlawful" before -- of a human being with malice of

4   forethought -- which means some kind of planning, intending to

5   do the planning to facilitate the commission of a murder, of a

6   killing -- constitutes federal definition of murder.

7          And it must be done, as I said before, using or

8   carrying or possessing a firearm in furtherance of that crime,

9   and acting knowingly and willfully in doing so.  The government

10   must prove beyond a reasonable doubt that defendant had

11   knowledge that what he was carrying or using was a firearm, and

12   that he was using the firearm or carrying it or possessing it

13   to facilitate the crime of violence of killing one or two of

14   Flores or Cuellar.

15          I've already defined the terms "knowingly" and

16   "willfully" in those definitions, and I won't repeat them,

17   unless one of you wants me to.

18          Defendant can be found guilty of this crime either if

19   he does something himself or he aids or abets another.  Aiding

20   and abetting liability is a theory of criminal liability.  It

21   permits a defendant to be convicted of a specific crime if the

22   defendant, while not himself committing the crime, aids and

23   abets and assists another person or persons in committing that

24   crime.  Whoever aids, abets, counsels, commands, induces, or

25   procures the commission of offense is punishable as a

1    principal; that is, punishable as if he did it himself.  It's

2    not necessary for the government to show that the defendant

3    physically committed the crime himself in order for you to find

4    a defendant guilty.  If you do not find beyond a reasonable

5    doubt that that defendant physically committed a crime, you

6    may, under certain circumstances, still find him guilty if he

7    was an aider and abettor of another who committed the crime.  A

8    person who aids and abets another to commit an offense is just

9    as guilty for that offense as if he personally had committed it

10   himself.  You may find the defendant guilty if you find beyond

11   a reasonable doubt that the government proved that another

12   person actually committed the crime, and that the defendant

13   aided and abetted that person in committing that offense.

14       So if another person committed the crime, and if the

15   defendant aided and abetted another, that is, knowingly

16   associate himself in some way with that crime and willfully

17   associated himself in that way, that person can be an aider and

18   abettor.

19       Participation in the crime is willful if the action is

20   taken voluntarily and intentionally, with a specific intent to

21   help that crime along, with a bad purpose to disobey or to

22   disregard the law.  Mere presence at the scene of a crime is

23   not enough.  Even coupled with knowledge by the defendant that

24   a crime is being committed, or morally acquiescing in the

25   commission of a criminal act by another, there must be an

D35VFER4                        Charge

1   actual aiding and abetting, an actual assistance to further the

2   crime, adopting it as if it were his own.  You ask yourself,

3   did the defendant participate in the crime charged as something

4   he wished to bring about or associate himself with, a criminal

5   venture, knowingly and willfully, or seek by his actions to

6   make the criminal venture succeed.  If he did those things, you

7   can find the defendant guilty as an aider and abettor just the

8   same way as if he did it himself.

9            Now, the act alleged in Counts One and Two are to have

10  alleged to have occurred in the Southern District of New York,

11  which includes Manhattan, the Bronx, and Westchester County.

12  The conspirators need not all have been present in the Southern

13  District of New York, as long as an act in furtherance of the

14  conspiracy occurred there.  And that issue is found

15  sufficiently by a preponderance of the evidence, but it's not

16  under any doubt that the crime was -- if it was committed, was

17  committed in the Bronx.  And that's in the Southern District of

18  New York.  So venue really is not an issue.

19           So I've now completed the definitions of the crime

20  charged.  Let me return to the verdict sheet and familiarize

21  yourselves with Question 3.

22           Question 3 deals with Count Two.  And it asks:  How do

23  you find Joe Fernandez with respect to Count Two, murder

24  through use of a firearm?  Again, it asks guilty or not guilty.

25  And the foreperson, after the vote -- it must be unanimous --

D35VFER4                          Charge

1    will check the appropriate box, guilty or not guilty.

2              That will complete the verdict sheet.  The foreperson

3    will date it, sign it, and I'll tell you how to use it in a few

4    minutes.

5              Now I've gone through some of the basic requirements,

6    presumption of innocence, burden to prove beyond a reasonable

7    doubt, and defined the elements of the crime.  I now want to

8    talk to you about the evidence and how to deal with the

9    evidence, since your verdict must be based upon the evidence or

10   lack of evidence in the case.

11             As I said at the outset, there are two basic

12   categories of evidence:  Direct proof and circumstantial proof.

13   Each has its own values.  Each can be its own factor of

14   weakness or strength, and that's for you to evaluate it.

15             Evidence is direct when the facts are shown by

16   exhibits that are admitted into evidence or whether testimony

17   is sworn to by witnesses who have actual knowledge of facts by

18   something they have derived by the exercise of their senses

19   such as something they heard, something they saw, something

20   they smelled, something they touched, and so on.

21             Circumstantial evidence is evidence that tends to

22   prove a disputed fact by proof of other facts.  You infer on

23   the basis of reason and experience and common sense from an

24   established fact the existence or the nonexistence of some

25   other fact.

1          Circumstantial evidence is of no less value than

2     direct evidence.  As a general rule, the law makes no

3     distinction between direct and circumstantial evidence, but

4     simply requires that before convicting a defendant, the jury

5     must be satisfied of that defendant's guilt beyond a reasonable

6     doubt from all the evidence in the case or the lack of evidence

7     on any material element.

8          One form of evidence is a stipulation.  It's an

9     agreement of the parties that a witness would say such a thing

10    or that a document says such a thing, or that such a thing

11    exists.  You accept that just the same as any other element of

12    evidence, giving it whatever importance you think it deserves.

13          Any of you need a stretch a bit before I go on?

14          Another 15 minutes.

15          Keep going.  Okay.

16          I've talked about inferences, and the lawyers have

17    used the phrase "inference."  An inference is not a suspicion

18    or guess; it's a reasoned, logical decision to conclude that a

19    disputed fact exists on the basis of another fact that you know

20    exists.  There are times when different inferences may be drawn

21    from facts, whether proved by direct or circumstantial

22    evidence.  The government may ask you to draw one set of

23    inferences, while the defense may ask you to draw another.

24    It's for you and you alone to decide what inferences you will

25    draw and what strength you will give them.

D35VFER4                          Charge

1              An inference is a deduction or conclusion which you,

2      the jury, are permitted -- but not required -- to draw from the

3      facts that have been established by other direct or

4      circumstantial evidence.  In drawing inferences, you exercise

5      your common sense.  So while you're considering the evidence

6      presented to you, you're permitted to draw from the facts which

7      you find to be proven such reasonable inferences as would be

8      justified in light of your experience.

9              Again, let me remind you that whether based upon

10     direct or circumstantial evidence, whereupon the logical,

11     reasonable inferences drawn from such evidence, you must be

12     satisfied of the guilt of the defendant beyond a reasonable

13     doubt before you may convict him.

14             The credibility of witnesses, of course, is one of the

15     major things that you have to deal with in evaluating the

16     evidence.  I'm sure that it's clear to you by now that you are

17     being called upon to resolve sharply-disputed factual issues.

18     You have to decide whether or not the government has proved

19     guilt beyond a reasonable doubt by judging the credibility of

20     the witnesses that it has presented to you.

21             You've listened to the witnesses; you've observed

22     them.  You need to make judgments carefully, scrutinizing all

23     the testimony that each witness gave in relation to the

24     testimony and exhibits that other witnesses and other documents

25     made before you.  You look at the circumstances under which

D35VFER4                          Charge

1    each witness testified, and any other item in evidence which

2    may help you to decide how true the witness's testimony is, how

3    important it is, what credibility to give to that witness.

4            There's no magic formula to evaluate testimony.  You

5    bring to this courtroom all the experience and the background

6    of your lives and your everyday affairs.  You determine for

7    yourself every day and in a multitude of circumstances the

8    reliability of statements which are made to you by others.  The

9    same tests that you use in your everyday life on matters of

10   importance are the tests you use in your deliberations.

11           Your decision whether or not to believe a witness may

12   depend on how that witness impressed you.  Did the witness have

13   the capacity to see, hear, and remember?  Was the witness

14   frank, candid, and forthright?  Did the witness seem like he

15   was hiding something, being evasive, or suspect in some way?

16   How did the way in which the witness testified on direct

17   examination compare with the way in which the witness testified

18   on cross-examination?  Was the witness's testimony consistent

19   or contradictory?  Did the witness appear to know what he was

20   talking about?  Did the witness strike you as someone who was

21   trying to report his knowledge accurately?

22           How much you choose to believe a witness may be

23   influenced by the witness's bias.  Did the witness have a

24   relationship with the government that may affect how that

25   witness testified?  Did the witness have an interest in the

 1   outcome of the case, some incentive, loyalty, or motive that

 2   might cause a witness to shave the truth?  Did the witness have

 3   some bias, prejudice, or hostility that might have caused the

 4   witness consciously or not to give you something other than a

 5   completely accurate account of the facts that the witness

 6   testified about?

 7        If a witness has an interest in the outcome, that

 8   witness is not necessarily incapable of giving truthful

 9   testimony.  It's for you to decide to what extent, if at all,

10   the witness's interest has affected or colored his testimony.

11   But evidence that one witness is bias, prejudiced, or hostile

12   with respect to someone else requires you to view that

13   witness's testimony with caution, to weigh the evidence with

14   care, and subject it to careful consideration.  Again, only

15   you, the jury, could decide how to weigh testimony.  Ask

16   yourselves if the witness's recollection of the facts stands up

17   in light of all the other evidence in the case.

18        If you find that a witness has willfully testified

19   falsely as to one material fact, you have the right to reject

20   the testimony of that witness in its entirety.  On the other

21   hand, even if you find that a witness has testified falsely or

22   inaccurately about one matter, you may reject as false or

23   inaccurate that portion of the testimony, and accept as true

24   any other portion of the testimony that recommends itself to

25   your belief, or which you may find or corroborative by other

D35VFER4                         Charge

1    evidence in the case.

2              In determining the credibility of witnesses, you may

3    consider the fact that some witnesses have discussed the facts

4    of the case and their testimony with lawyers before appearing

5    in court.  That's not an unusual practice.  Lawyers prepare

6    witnesses to familiarize the witnesses with all of the details

7    so that the witness come in more efficiently and intelligently,

8    but it's something to keep in mind.  You make the decision.  If

9    the witness appears to have rehearsed testimony to satisfy

10   another, or if the witness is reporting information accurately,

11   credibly, honestly, preparation can serve good purposes, and

12   witnesses can have different kinds of motives in being

13   prepared.  You, the jury, with your common sense and

14   experience, decide what weight to give to the preparation, and

15   to decide if it has affected negatively or positively the

16   witness's ability to tell you the truth consistently without

17   the other evidence in this case.

18             In all of these things, you try to decide credibility

19   by sizing up people in light of their demeanor and the way they

20   testify, the explanations they gave, what the other evidence in

21   the case says, whether things are consistent or inconsistent,

22   and so on, the same way you do on other matters that are

23   important in your life.  You do not leave your common sense and

24   experience behind you.  They are what you bring to judge the

25   credibility of the witnesses before you, and, indeed, in

1    evaluating all the evidence in the case.

2              Now, we've heard testimony from cooperating witnesses,

3    and the lawyers have argued about this in their summations.

4              A cooperating witness is one who has made an agreement

5    with the government to cooperate with the government in giving

6    information, and presumably in telling the truth about such

7    information.  And you've heard about clauses in the cooperating

8    agreement concerning the telling of the truth.  But whether a

9    witness actually tells the truth or not is for you to decide in

10   deciding what credibility to give to the witness.

11             The law allows the use of the testimony of cooperating

12   witnesses.  That's an investigative technique.  That's a

13   technique that the government uses.  You do not judge the

14   government on the investigative techniques that it employs.

15   That's for the government to decide.  What you do decide is how

16   to evaluate the evidence.  That's your job.

17             Is the evidence sufficient?  Has the government proved

18   the case beyond a reasonable doubt?  Is the cooperating witness

19   testifying truthfully, as best you can understand it, or

20   shading the truth, the same way that I've instructed you with

21   regard to credibility generally.  The law requires that the

22   testimony of cooperating witnesses be scrutinized with care and

23   viewed with caution.

24             A witness who has pleaded guilty and entered into a

25   cooperation agreement may have an interest different from an

D35VFER4                              Charge

1    ordinary witness.  A witness who hopes that he may achieve a

2    benefit by a possibly lighter sentence from a judge, after the

3    government has written a letter describing what the witness has

4    done in his background and describing the help that the

5    witnesses gave, has a bias.

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D350fer5                         Charge

1          THE COURT:  And that should be taken into account.

2     That makes that witness different from an ordinary witness.

3     But does that mean that the witness is not telling the truth?

4     That's for you to decide, and to what extent, and to what

5     strength you give the cooperating witness' testimony.

6          Witnesses may have motives that shade the truth, and

7     to tell the truth.  And each takes an oath to give testimony

8     that is true; nothing but the truth and all together true.  The

9     truth, the whole truth, and nothing but the truth.  You decide

10    if that witness has satisfied, or not satisfied, his oath, the

11    same way you decide the credibility of all other witnesses.

12         The government has also used confidential informants.

13    And, again, that's a government investigating technique which

14    is no business of yours.  And it's not important whether you

15    consider it appropriate or not for the government to use such a

16    technique.  The government may do it, and it's your job to

17    decide the credibility of the confidential informant's

18    testimony as it comes before you, and as you judge it according

19    to the rules I give you for judging credibility.

20         You have also heard the testimony of law enforcement

21    agents.  The fact that a witness may be employed as a law

22    enforcement agent does not mean that that witness' testimony

23    deserves more or less consideration than any other witness.

24    It's legitimate for defense counsel to impeach the credibility

25    of a law enforcement witness on the ground that testimony may

D350fer5                         Charge

1   be colored by a personal or professional interest in the

2   outcome of the case, just as it's legitimate for defense

3   counsel to impeach the credibility of any other witness,

4   cooperating witness, confidential informant, or just plain

5   witness.  That is defense counsel's job.  It's your job to

6   evaluate the credibility of the witness.

7            So in general as to all of these things I have talked

8   to you about, these investigative techniques, that's the

9   government's prerogative.  Your job is to decide if, upon all

10  of the evidence, or the absence of evidence, on any particular

11  point, the government has or has not proved all of the elements

12  charged beyond a reasonable doubt.

13           Another type of evidence is an expert witness; a

14  witness who is expert on some particular subject that is

15  relevant to a case, and which is probably beyond the

16  circumstances of knowledge of the jury or of the Court or of

17  the lawyers.

18           Expert witnesses are useful because they tell you

19  about things that are relevant that they know about, because

20  they're expert.  But you don't drop your job of judging the

21  credibility of those witnesses, either.  Because those

22  witnesses can be biased.  And their evidence could be

23  misleading.  And, again, it's up to you to judge their

24  credibility, as you judge anybody else's credibility.

25           Some of the witnesses who have testified were

D350fer5                        Charge

1    impeached by prior crimes they committed.  The law considers

2    that if you have been convicted of a crime, that could be taken

3    into consideration by the jury in deciding if you are telling

4    the truth now.  But, again, it's your job to decide the

5    credibility of the witness as the witness testified before you.

6    The fact that there has been a prior conviction of a crime,

7    particularly of a crime that has something to do with truth,

8    may be taken into consideration by you.  But it's your decision

9    what consideration to give, how much consideration to give, and

10   how to judge the credibility of the witnesses.

11           Another method of impeachment is to bring out a prior

12   inconsistent statement.  At some earlier point, the witness who

13   is describing the same event, described it differently, that's

14   another thing you take into consideration.  You judge whether,

15   indeed, there was a prior inconsistency, how important it was,

16   whether it can be explained by the mere passage of time, or of

17   course some other innocent reason as to whether it indicates a

18   lack of credibility, and you judge that as well.

19           And there is another aspect of impeachment, the

20   uncalled witness; the witness who has potentially some useful

21   information to give, but who has not been called.  The

22   defendant is not under a burden to call any witnesses.  That's

23   part of his presumption of innocence, that is part of the rule

24   that requires the government to bear the sole burden of proving

25   the case beyond a reasonable doubt.

D350fer5                        Charge

1           But if there is a particular witness, and the witness

2    has particular information, either the government or the

3    defendant has the right to subpoena that witness and to bring

4    the witness before you.

5           So if there is a witness who you think might have had

6    useful and relevant information but did not appear in the case,

7    you need to decide:  Is that really so?  Did the witness really

8    have that information?  If the witness came, would it have just

9    been a waste of time?  Would the witness have said things that

10   you already knew from other people?  And is that an

11   explanation?  And there are many other explanations why some

12   people don't appear.  What you need to do is to decide, and I

13   repeat this many times because it is key to your function.

14   Look at all of the evidence and look at what is missing and

15   decide:  Did the government satisfy its burden to prove the

16   case on each and all of the elements of the crimes charged

17   beyond a reasonable doubt.

18           The defendant did not testify in this case.  That's

19   his right.  That's his Constitutional right.  It is the

20   government's job to prove guilt beyond a reasonable doubt.  You

21   may not attach any significance to the fact that the defendant

22   did not testify.  No adverse inference may be raised against

23   him, because he did not take the witness stand.  That is his

24   Constitutional right.  You may not consider his not testifying

25   against him in any way.  Put it out of your mind.  He is

1    exercising a Constitutional right of which each and all of us

2    enjoy.

3              The government claims that certain statements made by

4    the defendant constitute admissions against him.  The defendant

5    denies that.  It's for you to decide whether what the defendant

6    said or didn't say was an admission or was not an admission.

7    And, again, it's your credibility determinations that count on

8    this, and your evaluation of all of the evidence that counts

9    for this point.

10             The government has argued that defendant ran away,

11   evaded coming after him.  The defendant has denied that.  You

12   decide if the defendant was attempting to avoid arrest and, if

13   so, whether such evasion was some indication of guilt.

14             Evidence of flight may not be used by you as a

15   substitute for proof of guilt.  Flight does not create a

16   presumption of guilt.  Whether or not evidence of flight

17   exists, may indeed show some feeling of guilt and may have some

18   significance.  If you find it, it's your job to evaluate it.

19   If you find that it didn't exist, you put it out of your mind.

20             And, finally, don't ask why other persons are not on

21   trial.  Do not draw any inference, favorable or unfavorable, to

22   the government or the defendant for the fact that other persons

23   whom you think should be on trial are not on trial.  Those

24   matters are not your concern and have no bearing upon your

25   verdict as to the defendant's guilt.  And that guilt is

D350fer5                        Charge

1    determined by your evaluation of the whether the government, on

2    all of the proof, or the absence of proof on any particular

3    point, proved or didn't prove, beyond a reasonable doubt, each

4    and all of the elements of the crime charged.

5            Your recollection in doing this governs.  Only yours.

6    What the government or defense may have said in argument, does

7    not take away your own obligation to search your own minds and

8    make your own recollections.  If you are unsure of any

9    particular point, you have a right to ask for testimony to be

10   reread.  If you want testimony reread, we'll get the reporter

11   to bring up the particular pages.  The defense and government

12   will review those pages.  And we can pass to you the transcript

13   of the particular point.  But it takes time to respond to that

14   inquiry.  Meanwhile, you keep your deliberations going and

15   we'll answer the particular questions you might have.

16           Some of you took notes.  Those notes are for your own

17   personal use only.  You may not use your notes to refresh

18   someone else's recollection on some particular point.  If your

19   memory needs recollection, the way to do that is to ask for the

20   testimony to be reread, as I just mentioned.

21           Sympathy, bias, all of those other extraneous things

22   do not enter the case.  Your job, as jurors, is to evaluate the

23   evidence, not exercise sympathy, not exercise bias.  There is

24   no room for bias of any ethnic or racial or personal

25   characteristic in this courtroom.  We are all equal.  We are

D350fer5                          Charge

all the same, we are all created in the image of God.  We're
all citizens of the United States of America.  We all have our
Constitutional rights.  We're all equal.  Your job is to look
at the facts, evaluate them, and apply them, apply the rules of
law to those facts, and come to a decision.

I do not have an opinion as to the facts.  And I do
not have likings or dislikes with respect to counsel.  This
case is not to be decided whether you like a lawyer or you
don't like a lawyer; whether a lawyer has made objections or
not made objections; or whether a lawyer has prevailed on
objections, or not prevailed on objections.

The objections are not your business, they're mine.
They're a signal to me that something may have happened that
requires a ruling on my part.  And I rule.  My rulings have
nothing to do with the merits.  I have no opinions about the
merits.  I have asked questions of witnesses.  My questions are
no more or no less important than the questions of the lawyers.
The evidence is what is important, no matter who elicited it.
And you make those decisions that you have to make on the basis
of the evidence.

The question of punishment of the defendant is not
your concern, either.  I have that burden under the law.  If a
person is found guilty, and at the time of sentence, with
various other procedures that are involved.  Put those issues
out of your mind.  Your job is to weigh the evidence relative

D350fer5                          Charge

1    to the crimes charged.  And to ask yourselves if the government

2    has or has not satisfied its burden of proof with regard to

3    each and all of the elements.

4          In terms of your deliberations, your first job will be

5    to elect a foreperson.  The practice in this court is that in

6    the absence of a vote to the contrary, juror number one who is

7    Lorraine Corchado, is the foreperson.  But it's your decision.

8    You elect the foreperson; that's the first thing you do.  And

9    the first note that you will send out is that so and so is the

10   foreperson, signed by that foreperson.  And that person becomes

11   the foreperson.

12         So what is the job of the foreperson?  The foreperson

13   has no more vote than anyone else, no more entitlement than

14   anyone else.  The job of the foreperson is to preside over the

15   jury, to make sure that each juror has an equal opportunity to

16   express his or her opinion.  Jury deliberations are democratic.

17   There is no entitlement to say something that's worth more than

18   what someone else says.  Each person has an obligation to

19   listen.  Each person has an obligation to speak his or her

20   mind.  Because you have to deliberate together.  You act as

21   one.  Your consciences are separate, but when you vote, you

22   vote as a jury.  And your vote must be unanimous, either to

23   vote guilty or to vote not guilty.  And you keep on

24   deliberating until you come to a point where each of your

25   consciences allows you to vote in a certain way.  And that's

D350fer5                          Charge

1    your job.  And the job of the foreperson is to make sure that

2    no one imposes authority over anyone else.  Everyone has an

3    equal chance.  If there is a question, to write that question

4    out and to give it to me and I'll then discuss it with the

5    lawyers and we'll respond to you.

6            You commence deliberating, when all of you are

7    together in the jury room.  All 12 of you must be deliberating,

8    and cannot have separate deliberations.  You cannot have

9    groups.  You must deliberate together as a jury.

10           With regard to notes, Ms. Jones will give you -- well,

11   you'll have your notebooks.  You write out your note.  Your

12   note should not tell me about anybody who is voting or not

13   voting a certain way.  I do not want to know how you feel about

14   the merits.  But if you have questions to ask, you ask them by

15   way of your note.  The Court Security Officer will be

16   appointed, will get your note and give it to me.  We'll mark it

17   as an exhibit.  I'll read it to the lawyers.  We'll decide how

18   best to answer it.  But we will answer it.  And then we'll

19   assemble you together, I'll read the note again to you, and

20   answer your note, and ask you if you have any further questions

21   with regard to the note, and you can tell me at that time.

22           At the end of the case, with regard to exhibits, the

23   lawyers will collect the exhibits and they will be available to

24   you if you want them.  You can ask for a particular exhibit.

25   You can ask for all of the exhibits.  I suggest that you start

D350fer5                         Charge

1    your deliberations.  And if you need particular things, you can

2    ask for them.

3            When you come to a verdict, you will write me a note

4    which will say -- the foreperson will write me a note.  And it

5    will say:  The jury has come to a verdict.

6            Do not send out the verdict sheet.  Don't tell me what

7    the verdict is.  Just tell me that the jury has reached a

8    verdict.  When that happens, I'll bring all of the jury in, the

9    note, the verdict sheet, will be opened in Court.  And then it

10   will be read.  And that will be the delivery of the verdict.

11   So don't tell me about it in advance.

12           That concludes the presentation of the instructions.

13           At this point, I need to consult with the lawyers.

14   We'll go into the robing room and have a short consultation.

15   Stay in your seats, please.  This will take just a few minutes

16   and then I'll come back and finish up.

17           (Continued on next page)

18

19

20

21

22

23

24

25

D350fer5                    Charge

 1              (In the roping room)

 2              THE COURT:  Does the government have any comment?

 3              MR. BLANCHE:  No, your Honor.

 4              THE COURT:  Does defense have any comment?

 5              MR. RICHMAN:  Respectfully, your Honor, page 42, you

 6      made reference to informant.  You actually described it as

 7      confidential informant.  There were no confidential informants

 8      in this particular case.

 9              THE COURT:  Does it make a difference?

10              MR. RICHMAN:  I believe it doesn't, I just call it to

11      your attention.

12              THE COURT:  Do you want me to --

13              MR. RICHMAN:  No, leave it go.  I just wanted to call

14      it to your attention.

15              THE COURT:  Anything else, Mr. Richman?

16              MR. RICHMAN:  No.

17              THE COURT:  Okay.

18              So the next step is to excuse juror 14, Patricia

19      Doren.  The rule requires, Rule 23 requires a jury of 12.  I do

20      not generally keep the person.  I excuse -- I excuse a

21      person -- once in a blue moon a jury of 11 comes back because

22      someone is excused.  But I think it is artificial to keep that

23      person glued to this case in some fashion.  And then the jury

24      has to forget about all deliberations that it has conducted

25      until that person comes in.  So I just excuse that person.  And

D350fer5                          Charge

 1  tell them not to communicate with the jury until it's all

 2  finished, or with anyone else?  And any objections to that.

 3            MR. RICHMAN:  No.

 4            MR. BLANCHE:  Fine with the government, Judge.

 5            THE COURT:  Anything else I should consider before we

 6  go back?

 7            MR. BLANCHE:  No, your Honor.

 8            THE COURT:  I would like to compliment both sides on a

 9  good job, really well done.  There was a lot of detail in this

10  case.  I think the government did an excellent job in

11  presenting it, and explaining it.  And I think Mr. Richman did

12  an excellent job in doing what a defense counsel has to do.

13  And I personally enjoyed this trial very much.

14            MR. RICHMAN:  Thank you.  Sir, I believe you requested

15  the list of those exhibits?

16            THE COURT:  Yes.

17            MR. BLANCHE:  We have our written version, we'll give

18  it to Ms. Jones.

19            MR. RICHMAN:  I'll give it to Ms. Jones, too.

20            THE COURT:  Thanks.

21            (Continued on next page)

22

23

24

25

1          (In open court)

2          THE COURT:  There have been no objections or comments

3    to the charge as I gave it.  It is the charge that stands, and

4    it is the charge that you are to apply.

5          Rule 23 provides that a jury is a jury of 12, so now

6    you are 13.  And it's my obligation, Ms. Doren, to ask that you

7    be excused.  I want to thank you very much for your service.

8    As you have seen, we have lost one juror.  And in many trials

9    we have to lose more than one.  So the fact that you were here

10   and paying attention is critical to our ability to conduct this

11   trial.  And I thank you very much.  I want to ask you not to

12   communicate with the other jurors until the case is finished,

13   and not to talk about this case either.

14         Ms. Jones will call you when the verdict is delivered

15   and tell you what it is.  And then you are not under any

16   further obligation.

17         As I tell all of the jurors at the end of the case,

18   what you do when you deliberate is, in effect, a set of

19   confidential communications, one with the other.  You should be

20   talking candidly and honestly and receiving information

21   candidly and honestly.  And it is consistent with the whole

22   concept of jury duty, that what you exchange with each other in

23   the jury room remains in the jury room.  And it remains

24   confidential to all of you.

25         And Ms. Doren, you would be included with that, as

D350fer5                        Charge

1    well.  So thank you very much, you are excused.  Ms. Jones will

2    take your book and tear up your notes and give you

3    instructions.

4                   (Alternate juror 13 excused)

5                   THE COURT:  And now Ms. Jones will swear the Court

6    Security Officer.

7                   (Marshal sworn)

8                   THE COURT:  The jury may now retire.  And we are

9    giving juror number one, Ms. Corchado, the verdict sheet and

10   envelopes for notes.  If you write a note, put it in the

11   envelope, seal it up, and send it to us.

12                  The jury may retire and begin its deliberations.  I

13   think lunch is there; right, Brigitte?

14                  THE DEPUTY CLERK:  Yes.

15                  (Jury retires to deliberate upon its verdict)

16                  THE COURT:  Brigitte, Mr. Richman has his list of

17   pictorial exhibits.  And do you have the government's list?

18                  MR. BLANCHE:  Yes.

19                  THE COURT:  So both of you will be standing by and

20   Brigitte will have your numbers to reach you.

21                  MR. RICHMAN:  We're going to have lunch.

22                  THE COURT:  We'll break for lunch now.

23                  Why don't we sit down and let Mr. Fernandez be

24   excused.

25                  (Defendant not present)

D350fer5                           Deliberations

1                   THE COURT:  Okay, we're in recess.

2                   Mr. Richman, do you renew your motion?

3                   MR. RICHMAN:  At the end of the entire case, I move

4        for directed verdict of acquittal.

5                   THE COURT:  Right.  For the reasons expressed before.

6                   Denied.

7                   (Recess)

8                   (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    (At 3:25 p.m., a note was received from the jury)

2    THE COURT:  I have a note which was shared with you.

3    I'll read it.

4    First is a question that came out at 3:25, which we

5    marked Court Exhibit 7:

6    "Please supply jury instructions and Counts One and

7    Two."

8    My instructions to Ms. Jones wrote back:  "What part

9    of the instructions do you want?"

10   And the answer came back:  "Count One and Count Two,

11   elements pertaining to both counts."

12   So I think we need to bring the jury in, and I'll

13   repeat my instructions, or at least those parts of it that the

14   jury seemed to want.

15   Any comments?

16   MR. BLANCHE:  No, your Honor.  I think that's what

17   they are asking for.

18   THE COURT:  Okay.  Let me get my notes.

19   All right.  Bring in the jury.

20   (Jury present)

21   THE COURT:  So the first note by the jury was:

22   "Please supply jury instructions and Counts One and Two."

23   It needs to be signed by the foreperson.

24   Who is the foreperson of the jury?

25   Okay.  Ms. Corchado.  So you should sign the note as

D35VFER6                         Deliberations

1  it comes in, under line "Foreperson," and put the time and the

2  date.  You put the time down as 3:25 p.m.

3          We then asked:  "What part of the instructions do you

4  want?"

5          And the answer came back:  "Count One and Count Two,

6  elements pertaining to both counts."

7          All right.  So I can do a number of things, but let me

8  just say this first:

9          It's my practice -- not followed by all the judges --

10 not to give a written charge to the jury.  There are several

11 reasons for that.  I found through 38 years of practice and 14

12 more as a judge that people listen better than they read.  In

13 other words, if I can deliver a charge and watch all of you as

14 I deliver the charge, I find that there's better attention by

15 more people than if I gave the charges to read while I read

16 them.  That's my belief.  Others disagree.  But that's my

17 belief.

18         And I found this out when I was a practicing lawyer,

19 and I had to deal with witnesses, and sometimes gave them

20 things to read.  And I never was confident that they would be

21 able to read and retain.  And I found that I had a better

22 chance of having that degree of confidence when I told them

23 what it was, and they listened and they could pay attention and

24 answer questions.

25         The second thing is my belief in the democracy of a

1    jury.  There are people who read quicker and more effectively

2    than others.  That doesn't make them better jurors or even

3    smarter jurors.  And if I were to give out the charges, I would

4    empower some jurors to be the authority with regard to other

5    jurors, or at least so I feel.  And so since I believe very

6    much in the democracy of each juror, and, indeed, through my

7    experience as a trial lawyer and as a judge, I have found that

8    wisdom comes from unexpected places having nothing to do with

9    how much education you have, but more with the character and

10   attentiveness and interest of a particular juror.

11          So those are the two main reasons -- there are

12   others -- why I don't give out my charge.

13          Now, I could read everything back to you.  But I think

14   what I'd like to do is to give you the highlights of the

15   charge.  And then I'll look at you, you'll tell me, Yeah, I

16   want more, this and that.

17          So the first charge was a conspiracy, and there are

18   two elements to a conspiracy:

19          One, the conspiracy exists; and, second, did the

20   defendant become a member.  You need that.

21          Do you want me to read those?

22          Ms. Corchado, look around and tell me.

23          THE FOREPERSON:  No.

24          THE COURT:  No.  Okay.

25          If anybody wants me to, I'll do it.

D35VFER6                          Deliberations

1          THE COURT:  Second.  There was discussion of the

2     definition of a conspiracy.  This elaborates more on what I

3     just asked you a moment ago of an agreement of two or more

4     persons that has to have a criminal object or unlawful object

5     that this particular conspiracy needed a certain number, other

6     details.  So let me do that now.

7          There had to be three details.  First, what was the

8     object of the conspiracy; and, second, definitions about

9     interstate facilities and going across interstate facilities

10    and the like.

11         That got a little complicated.  Do you want me to read

12    that?  No.

13         JUROR:  Elaborate on it briefly?

14         THE COURT:  Okay.  Sure.

15         The first point the government must prove about the

16    object of the conspiracy is that one of the conspirators

17    traveled in interstate or foreign commerce or used a facility

18    of interstate or foreign commerce with the intent that a murder

19    for hire take place.

20         So then I discussed what an interstate facility was;

21    that you had to use an interstate highway, but you didn't

22    necessarily have to travel from one state to another, or you

23    used a phone.  And as long as the phone had the capacity to

24    call across state lines, you didn't have to prove that the

25    actual calls that were made crossed state lines, as long as you

1    use a facility that would be used in interstate phone

2    conversations.  And we know cell phones, very few of them,

3    anyhow, at least all of those that I know, and many of them,

4    all of those that I know, have capacity to call New Jersey and

5    California as easily as New York State.  So you have the

6    highway and you have the phone.

7         And then you have to have the object, was the object

8    of using the interstate highway or the interstate phone to

9    engage in a murder for hire.  And then there were those

10   definitions.

11        The travel across interstate or foreign lines or the

12   use of the interstate or foreign facility must have been

13   undertaken with intent that a murder be committed, in violation

14   of the laws of any state, here, in New York State.  And I

15   define "murder" under New York State law as an unlawful killing

16   of another person purposely or knowingly.  And we went into the

17   murder, and it had to be in consideration for the receipt of

18   something of value, pecuniary value.

19        So the government had to prove beyond a reasonable

20   doubt there was an agreement by two or more people that

21   defendant joined that agreement.  That was a conspiracy.  That

22   the purpose of the conspiracy was to commit a murder and use an

23   interstate facility to commit the murder; and that the murder

24   was in exchange for something of value.

25        Then there was the quality of the defendant's

D35VFER6                          Deliberations

1   participation in the conspiracy; that he knew about it, it

2   wasn't just an accident; that he wanted to join it; that he

3   adopted its purpose, mere association wasn't enough; that he

4   had to have conscious intent, knowingly, willfully, unlawfully,

5   to join a conspiracy that was to use interstate facilities to

6   commit a murder for hire.  And I defined all those terms.

7          Anybody want more elaboration than that?  Okay with

8   that?

9          I told you that the date was February 22, 2000.  But

10  if the proof was around that date, it was okay.

11         And then if you found a conspiracy, you found the

12  defendant joined the conspiracy.

13         There was a second question on the verdict sheet:  Did

14  death result from the actions of the conspirators?  And that

15  was it for Count One.

16         Okay with Count One?

17         Then we go to Count Two.  And that got more

18  complicated, because there was a double statute that was

19  involved.  So I need to go over that with you.

20         There are two subsections of Section 924:  (c) and

21  (j).

22         924(c) makes it a crime for any person during and in

23  relation to any crime of violence -- so a crime of violence is

24  the crime to commit a murder, that's a crime of violence.  Then

25  it goes on to say, to use or carry a firearm.  A gun is a

D35VFER6                        Deliberations

1    firearm.  To use or carry.  I defined possession of a gun and

2    the carrying of a gun, the availability of a gun to the person

3    committing the crime as he moves, or in furtherance of any such

4    crime, to possess a firearm.  So if you possess the crime -- if

5    you possess the weapon in order to help you commit the crime of

6    violence, which is the commission of a murder, that spells out

7    the crime.  And then it also makes it a crime for any person in

8    the course of a violation of what I've just read out to cause

9    the death of a person through the use of a firearm.

10           So first to find out was a gun used in relationship to

11   a crime of violence.  What is the crime of violence?  Was a gun

12   used or carried or possessed in furtherance of the crime; and,

13   if so, in the course of that crime, did death result through

14   the use of the firearm.  That's the basic definition, and

15   there's more details.

16           Are you okay with this?

17           And then I define the crime had to take place on or

18   about February 22, 2000.

19           Second.  That the proof showed beyond a reasonable

20   doubt, and every element the government must prove beyond a

21   reasonable doubt.

22           Second.  That the defendant used or carried the

23   firearm during and in relation to a crime of violence or

24   possessed a firearm in furtherance of a crime of violence.  So

25   did defendant use or carry a gun in relationship to a crime of

D35VFER6                        Deliberations

1    violence or possess it to further the crime.

2              Third.  That defendant caused the death of a person

3    through the use of a firearm, either himself or by aiding and

4    abetting another.

5              And fourth.  That the death of the person satisfied

6    the definition of murder in federal law.  And I'll read that to

7    you again in a moment.

8              So then I defined a firearm, what's meant by use,

9    what's meant by carry, what's meant by possess; that a

10   murder-for-hire conspiracy, you have to decide is that a crime

11   of violence.

12             And the definition of the federal crime of murder is

13   the unlawful killing of a human being with malice of

14   forethought.  Unlawful killing -- no justifiable reason -- of a

15   human being, with malice of forethought; meaning that you

16   thought about it before the crime, and you have the intention

17   to kill.  Those are the definitions.

18             Are you all right with this?  Do you need more?

19             JUROR:  I'm good.

20             THE COURT:  Okay.  Can I see counsel at sidebar?

21             (At the side bar)

22             THE COURT:  Comments from the government.

23             MR. BLANCHE:  Your Honor, would your Honor clarify

24   with respect to Count One, when you were talking about the

25   highway or the phone, a couple times your Honor, I believe,

```
 1    said highway and the phone, just to be clear.

 2              THE COURT:  No, it was or.

 3              MR. BLANCHE:  Correct.

 4              THE COURT:  But I'll clarify.

 5              MR. BLANCHE:  Thank you.

 6         And then the other part that I thought was a little

 7    unclear about Count One is that the defendant didn't have to be

 8    the person who used the phone, which is in your instructions,

 9    but I don't think it was said.

10              THE COURT:  I'll clarify both of those.

11              MR. BLANCHE:  And then just one more little thing,

12    Judge.

13         When your Honor talked about the object of the

14    conspiracy, if you could just use -- I think, your Honor, just

15    to clarify what the object of the conspiracy was, which is to

16    commit a murder for hire, which I don't think was actually

17    said.

18              THE COURT:  I think it was.

19              MR. BLANCHE:  Okay.

20              MR. RICHMAN:  It was said.

21              MR. BLANCHE:  I might have missed it.

22              MR. RICHMAN:  I think you said it, but clarify the

23    issue that the defendant --

24              MR. BLANCHE:  I may have missed it, Judge.  Sorry.

25              THE COURT:  Three points is?
```

D35VFER6                          Deliberations

1          MR. BLANCHE:  The first is that either highway or cell

2     phone.  It doesn't have to be "and."

3          THE COURT:  Yes.

4          MR. BLANCHE:  The second is that the defendant didn't

5     have to be the person to use the interstate facility, highway

6     or phone.

7          THE COURT:  Okay.

8          MR. BLANCHE:  And then the third one was just the

9     object of the conspiracy, which if you said it, no need to

10    re-say it.

11         The defendant's mind, the object has to be to commit a

12    murder for hire, not to use a phone obviously to commit a

13    murder for hire.

14         THE COURT:  I'm not sure about that, because I think

15    the way the instructions run is that the facilities of

16    interstate commerce have to be used for the commission of a

17    murder-for-hire, and that's the way I charged it.

18         MR. BLANCHE:  True.  To give us jurisdiction, but

19    obviously in the defendant's mind he has to think a murder for

20    hire is being committed, not that phones are going to be used.

21         THE COURT:  That gets into another issue, which we did

22    not spot, and I did not charge that way.

23         MR. BLANCHE:  Okay.

24         THE COURT:  Mr. Richman?

25         MR. RICHMAN:  Nothing.

D35VFER6                        Deliberations

1           THE COURT:  All right.  Stay here.

2           (In open court)

3           THE COURT:  All right.

4       So the lawyers think that I could just spell out one

5   or two more clarifications.  So I'll do that now.

6           I said that there had to be an intention to use an

7   interstate facility, either highway or cell phone or any kind

8   of phone.  He didn't have to use it himself, as long as someone

9   in the conspiracy was using it.  And the object had to be to

10  use it to commit a murder for hire for pecuniary value.

11          Okay guys?  Okay.

12          So you can retire again.

13          Before you go, can I ask you how long do you want to

14  work?

15          JUROR:  Another half an hour?

16          JUROR:  Can we discuss that inside?  We are making

17  progress.

18          THE COURT:  Certainly can.

19          Look, you take the time you need, when you need it.

20  We're all at your service.

21          All right.

22          So you do what you think is right.  And if you feel --

23  one thing you don't want, you don't want to just do it to

24  finish it.  Both sides need to have the confidence that you are

25  doing what you need to do.  And if you have to come in

D35VFER6                       Deliberations

1   tomorrow, you come in tomorrow.  The government has a problem

2   with money, but it's not that good.

3              JUROR:  Understood.

4              THE COURT:  All right.

5              So you tell us.

6              You can tell the court security -- just give him a

7   note.

8              JUROR:  Okay.

9              (Jury deliberations resumed; time noted:  4:15 p.m.)

10             THE COURT:  Let the record be clear that I'm giving

11  back the government pen to my law clerk.

12             All right.  Thank you.

13             MR. RICHMAN:  Your Honor, most respectfully, while

14  we're here, I have a 9 o'clock.

15             THE COURT:  Don't worry about it.  Nothing happens

16  till you get here.

17             (Recess pending verdict)

18             (At 4:40 p.m. a note was received from the jury)

19             THE COURT:  The jury's note:  "Hi.  We would like to

20  continue deliberating tomorrow.  With your permission, we would

21  like to be dismissed today by 5 p.m."

22             We'll do that.  I'll let you know at the end.

23             Let them stay another ten minutes.

24             THE MARSHAL:  Okay.

25             THE COURT:  For tomorrow, we would like, one, Patrick

D35VFER6                        Deliberations

1   Darge's testimony.  And then, colon, and four sub points.

2   Conversations with Joe about the murder plot; conversation with

3   Joe in prison; Patrick's letter to his grandmother.  Those are

4   three.  Okay.  So we can get them.

5          Second.  Geffrey Minaya's testimony:  His

6   understanding as to who the second shooter was.

7          Three:  Alain Darge's testimony when he met with Joe

8   at Christian Guzman's apartment and Joe confessed to him.

9          Thanks so much.

10          Loreinnie Corchado, March 5, 2013, 4:40 p.m.

11          All right.

12          So I think those are limited points in the transcript.

13   I would ask the government and defense to collaborate and to

14   gather the materials, and then supply them to the jury.  And I

15   think four copies would be enough.

16          MR. RICHMAN:  Your Honor, do you intend to supply them

17   to the jury or have them read back to the jury?

18          THE COURT:  Supply them to the jury.

19          MR. BLANCHE:  So your Honor, assuming --

20          THE COURT:  Any problem with that, Mr. Richman?

21          MR. RICHMAN:  Your Honor, does that not create the

22   same problem that we were concerned with by supplying them the

23   interpretation of the --

24          THE COURT:  No, there's no interpretation.  It's going

25   to be just the testimony.  They'll deliberate on what it is.

1    You know what?  Why don't you gather -- the two of you

2  gather what the jury wants, and then we'll have a discussion

3  whether I should read it to them or Martha or Denise should

4  read it to them, or just hand it to them.  You'll look at it

5  and you'll see.

6         MR. RICHMAN:  Shall I cancel my appointment for

7  tomorrow morning?

8         THE COURT:  No, you should not.  Your health is more

9  important.  You'll take that time anyhow to gather all that

10  stuff.

11         MR. RICHMAN:  Brian will be in.

12         THE COURT:  And the jury will wait a bit, that's all.

13         All right.  So I'll leave you the note.  And you work

14  on it.  And you can tell the jury that.  It's okay to tell the

15  jury.

16         MR. RICHMAN:  Yes, your Honor.

17         THE COURT:  You can tell the jury we're working on

18  their items; they should come back tomorrow at 10 o'clock and

19  deliberate.  And when we're ready, we'll call them in.

20         MR. RICHMAN:  Thank you.

21         THE COURT:  All right.

22         So Brigitte will go back with you.

23         THE MARSHAL:  Yes, sir.

24         THE COURT:  Good night, everybody.

25         MR. BLANCHE:  Good night, Judge.

D35VFER6                        Deliberations

1          MR. RICHMAN:  Good night, your Honor.

2          THE DEPUTY CLERK:  Good night, Judge.

3          (Adjourned to March 6, 2013 at 10 o'clock a.m.)