UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA                    :

    - v. -                    :

                                          S5 10 Cr, 863 (AKH)

JOE FERNANDEZ,                    :

              Defendant.                    :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## <u>SENTENCING MEMORANDUM</u>

PREET BHARARA
United States Attorney
Southern District of New York

Todd Blanche
John P. Cronan
Russell Capone
      Assistant United States Attorneys
      - Of Counsel –

# TABLE OF CONTENTS

I.    PRELIMINARY STATEMENT ...............................................................................................1

II.    FACTUAL BACKGROUND..................................................................................................2

       A.    The Evidence at Trial ..................................................................................................2

            1.    Jeffrey Minaya's Drug Trafficking Organization .............................................2

            2.    The Murder Plot ................................................................................................3

            3.    The February 22, 2000 Murders........................................................................5

            4.    Fernandez's Subsequent Admissions of Guilt...................................................6

       B.    The Jury Verdict .........................................................................................................8

       C.    The Presentence Investigative Report ........................................................................8

III.    THE COURT SHOULD IMPOSE A SENTENCE OF LIFE IMPRISONMENT ...................................10

       A.    Applicable Law .........................................................................................................10

       B.    A Sentence of Life Imprisonment is Mandatory Under 18 U.S.C. § 1958 Because
           Death Resulted .........................................................................................................11

       C.    The Statutory Sentencing Factors Under 18 U.S.C. § 3553(a) Call for Life
           Imprisonment...........................................................................................................12

            1.    The Nature and Circumstances of the Offenses ...............................................13

            2.    The History and Characteristics of the Defendant, and the Need for Deterrence
                 and Promotion of Respect for the Law.............................................................13

            3.    Imposing a Guidelines Sentence Would Advance the Goals of
                Section 3553(a) ...............................................................................................15

IV.    CONCLUSION................................................................................................................17

# TABLE OF AUTHORITIES

**Cases**

*Gall* v. *United States*, 552 U.S. 38 (2007) ........................................................................10, 11, 16

*Rita* v. *United States*, 551 U.S. 338 (2007) ...................................................................................11

*United States* v. *Booker*, 543 U.S. 220 (2005) ............................................................................10

*United States* v. *Crosby*, 397 F.3d 103 (2d Cir. 2005) ................................................................10

*United States* v. *Fernandez*, 443 F.3d 19 (2d Cir. 2006) .............................................................16

*United States* v. *Rattoballi*, 452 F.3d 127 (2d Cir. 2006) ....................................................... 15-16

*United States* v. *Rubenstein*, 403 F.3d 93 (2d Cir. 2005) ............................................................16


**Statutes**

18 U.S.C. § 924.............................................................................................................................1, 8

18 U.S.C. § 1958 ..................................................................................................... *passim*

18 U.S.C. § 3553 ..................................................................................................... *passim*

U.S.S.G. § 2A1.1 .........................................................................................................8, 9, 15

U.S.S.G. § 2E1.4 ............................................................................................................8, 15

U.S.S.G. § 3D1.2 ............................................................................................................8. 15

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA            :

    - v. -                              :

                                                   S5 10 Cr. 863 (AKH)

JOE FERNANDEZ,                      :

                Defendant.            :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## I. PRELIMINARY STATEMENT

The Government respectfully submits this memorandum in advance of the sentencing of defendant Joe Fernandez, which is scheduled for October 7, 2014.  On March 7, 2013, following a three-week trial, Fernandez was found guilty of one count of participating in a murder-for-hire conspiracy, with death resulting, in violation of Title 18, United States Code, Section 1958, and one count of using a firearm during a crime of violence, with death resulting, in violation of Title 18, United States Code, Section 924(j).  The defendant's conviction under Section 1958 requires the imposition of a sentence of life imprisonment.

Fernandez was convicted for his commission of the brutal drug-related murders of two men almost 15 years ago in the lobby of an apartment building in the Bronx.  On February 22, 2000, Fernandez, who was hired to be the backup shooter in the murders, shot and killed Arturo Cuellar ("Cueller") and Ildefonso Vivero Flores ("Flores"), as they waited by the building's elevators.  The murders were the culmination of a murder-for-hire conspiracy planned by a New York-based drug trafficking organization that sought to avoid paying its debt for a large cocaine transaction.

The defendant's conviction under Section 1958 for a murder-for-hire conspiracy where death resulted requires the imposition of a sentence of life imprisonment. But even apart from that statutory mandate, life imprisonment is the only appropriate sentence for this defendant. The defendant murdered two defenseless men in cold blood, after they were unwittingly escorted to their execution. No sentence short of permanent incapacitation is appropriate in this case.

## II. FACTUAL BACKGROUND

### A.    The Evidence at Trial

Trial in this matter began with opening statements on February 19, 2013. The Government called twelve witnesses: six cooperating witnesses: Patrick Darge, Jeffrey Minaya, Alberto Reyes, Richard Correa, Yubel Mendez, and Allan Darge; three current and former law enforcement officers with the New York City Police Department: Detective Salvatore Lacova, Detective Daniel Austin, and Officer Joseph Szaniszlo; Dr. Susan Ely of the Office of the Chief Medical Examiner; and two lay witnesses: Gloria Trujillo and Christian Guzman.

### 1.  Jeffrey Minaya's Drug Trafficking Organization

The evidence at trial established that Minaya operated a drug trafficking organization in the New York City area that, by early 2000, was receiving large quantities of cocaine from Mexican suppliers. Tr. at 568.[1] Flores and his boss, Cuellar – the two men that Fernandez murdered on February 22, 2000 – worked for that Mexican drug trafficking organization. *Id.* at 100-01.

In early 2000, Minaya and Cuellar negotiated a 274 kilogram shipment of cocaine to New York for Minaya and his crew of local drug dealers. Tr. at 130. That shipment arrived in New York City in February 2000. *Id.* at 126. Cuellar and Flores traveled to New York City to

---

[1] "Tr." refers to the trial transcript in *United States* v. *Joe Fernandez*, S5 10 Cr. 863 (AKH), and "GX" refers to Government exhibits offered at trial.

coordinate the delivery of the drugs and to collect payment for the drugs, which were being provided to Minaya on consignment. *Id.* at 126-27, 133. After receiving the drugs, Minaya's crew – which included Jose Rodriguez, Manuel Aladino Suero, Reyes, DeFrank Medina, and Sonni Cruz – sold the cocaine locally and began collecting the money. *Id.* at 133-34. Meanwhile, Cuellar and Flores remained in New York City area, waiting to receive payment for the drugs. *Id.* at 133-35. The Mexican drug trafficking organization charged Minaya about $24,000 per kilogram of cocaine, meaning that the 274 kilogram delivery resulted in Minaya owing a debt of about $6.5 million to Cuellar and Flores. *Id.* at 119.

### 2.      The Murder Plot

As Minaya and his crew were collecting millions of dollars to pay Cuellar and Flores, Minaya, Rodriguez, Suero, and Reyes decided to have Cuellar and Flores killed, rather than paying off their drug debt. Tr. at 149-54, 616. To execute their murder plan, Rodriguez, Suero, and Reyes hired a hitman – another dangerous drug dealer, Patrick Darge ("Darge"). *Id.* at 188-89, 617-18. On the evening of February 21, 2000, Reyes, Rodriguez, and Suero met with Darge outside of Darge's apartment building. *Id.* at 256-57. Rodriguez explained to Darge that they owed money to Minaya's cocaine suppliers, but they could not afford to pay off that debt and, as a result, Rodriguez's family was in danger. *Id.* at 266-67. Rodriguez, Suero, and Reyes then offered Darge $180,000 to murder the two men to whom this debt was owed (*i.e.*, Cuellar and Flores). *Id.* at 268.

After briefly considering this offer, Darge elected to commit the murders. Tr. at 269. However, because the murders would be too risky for him to commit alone, Darge decided to assemble a team for the murders and reached out to two individuals – Luis Rivera and Fernandez. *Id.* at 270.

Darge recruited Rivera, a drug dealer from the neighborhood, to act as getaway driver after the murders. Tr. at 271, 282-83. In addition to previously committing crimes with Rivera, Darge turned to Rivera because Rivera had a Ford Expedition with a hidden trap in the center console that could be used to conceal the firearms. *Id.* at 285. Darge met with Rivera that night, and explained that he (Darge) would be killing two people and needed a driver. *Id.* at 286-87. Darge offered Rivera $20,000 for the job, and Rivera agreed. *Id.* at 286. In addition to acting as the getaway driver, Rivera provided Darge with a gun to use during the murders. *Id.* at 287.

Darge recruited his cousin, Fernandez, to serve as the backup shooter during the murders. Tr. at 255-56. Darge and Fernandez were close at the time, and Darge knew that Fernandez was someone that Darge could rely on and trust in case something went wrong. *Id.* at 273. In addition, Darge knew that Fernandez owned a gun that could be used during the murders. *Id.* Darge met with Fernandez the evening of February 21, 2000 outside of Fernandez's apartment. *Id.* at 275-76. Darge explained that he had been asked to murder two individuals and asked Fernandez to back him up during the murders, and Fernandez agreed. *Id.* at 276, 281. Darge offered to pay Fernandez $40,000 for the job and told Fernandez to bring his own gun. *Id.* at 276-77, 280. After hearing these details, Fernandez again confirmed that he would participate in the murder plan. *Id.* at 277.

Darge then met again with Rodriguez later that night and finalized the plan for the next morning. Tr. at 288, 299-300. Reyes would drive Cuellar and Flores to a building where Cueller and Flores expected to receive payment for the cocaine shipment. *Id.* at 288-90, 300. Darge and his backup shooter would be waiting in the lobby of the building for the victims to arrive, armed and ready to commit the murders. *Id.* at 290-91, 302.

### 3.      The February 22, 2000 Murders

On the morning of February 22, 2000, Rivera picked up Darge and Fernandez and drove them to 3235 Parkside Place in the Bronx.  Tr. at 305.  During the drive, Rivera opened the secret compartment in the center console of his Ford Expedition and handed Darge a handgun. *Id.* at 307, 311.  Darge removed the bullets from that gun, cleaned off any prints, and re-inserted the bullets.  *Id.*  Fernandez, who was in the backseat, removed a larger gun from a duffle bag and assembled the firearm.  *Id.* at 308.  As they drove to the murder scene, Darge reviewed the plan: Fernandez's role was to back up Darge during the shootings, while Rivera was supposed to wait around the block, ready to drive them away from the area.  *Id.* at 309.

Rivera parked around the corner from 3235 Parkside Place, near Decatur and 207th Street. Tr. at 310.  Darge and Fernandez, both wearing dark hoodies to cover their faces and gloves to prevent them from leaving prints, exited Rivera's car and walked into the lobby of 3235 Parkside Place.  *Id.* at 310-13.  Darge concealed his pistol in his pocket, and Fernandez had his gun strapped over his shoulder and hidden under his jacket.  *Id.* at 312-13.  After checking the lobby for cameras and surveying the lobby and surrounding area, Darge and Fernandez waited in the dark mailbox area for their victims to arrive.  *Id.* at 313-14.

As Darge and Fernandez waited silently in the lobby, Reyes drove Cuellar and Flores to 3235 Parkside Place in the Bronx, purportedly for the two men to receive payment for the cocaine shipment.  Tr. at 623, 629-30.  Shortly before Reyes, Cueller, and Flores arrived, Rodriguez called Darge to report that Reyes would be arriving at the apartment building momentarily.  *Id.* at 320.  Darge and Fernandez then pulled their hoods over their heads, and waited for their victims to arrive.  *Id.*  Reyes parked his vehicle near 3235 Parkside Place, and

entered the apartment building with Cuellar and Flores. *Id.* at 630. Reyes walked to the elevator and pressed the elevator button, with Cuellar and Flores standing next to him. *Id.* at 321, 630-31.

As Cuellar and Flores waited with Reyes in front of the elevator, Darge, with Rivera's gun in hand, emerged from the mailbox area, with Fernandez following right behind him. Tr. at 321-23. Darge walked up behind Cuellar and shot Cuellar in the head behind his ear. *Id.* at 322. Darge then turned to shoot Flores but his gun jammed. *Id.* at 322, 326-27. After he was unable to unjam the gun, Darge ran out of the lobby. *Id.* at 326-28. Fernandez, however, remained in the lobby and proceeded to fire fourteen shots, with nine connecting into the bodies of Cuellar and Flores, leaving them dead. *Id.* at 45-49, 328; GX 51.

Darge ran to Decatur and 207th Street, where Rivera was waiting in his Ford Expedition. Tr. at 329. Fernandez arrived at the car a little after Darge, and Rivera then drove away. *Id.* at 330-31. As they fled the murder scene, Fernandez explained that he made sure that the two victims were dead before leaving the lobby for the getaway car. *Id.* at 331-32.

When the police arrived at 3235 Parkside Place, Cuellar and Flores were found dead in the lobby, in a pool of blood, just to the left of the elevator. Tr. at 35, 40-41; GX 25. Cuellar was lying on top of Flores, and shell casings and bullets were scattered throughout the lobby. Tr. at 40-41, 46-47; GX 25.

Following the murders, Reyes paid Darge $180,000, and Suero later paid Darge another $10,000. Tr. at 335. Darge, in turn, paid $40,000 to Fernandez and $20,000 to Rivera. *Id.* Minaya, Rodriguez, Suero, Reyes, and a few others split the rest of the money. *Id.* at 186-87.

### 4.    Fernandez's Subsequent Admissions of Guilt

The evidence at trial also included testimony from two individuals, to whom Fernandez had made statements revealing his guilt.

6

First, Yubel Mendez, who was cooperating with the Government in separate investigations, testified about several incriminating statements that Fernandez made to Mendez while they briefly shared a jail cell at the Metropolitan Correctional Center.  Tr. at 685.  First, Mendez testified that Fernandez said he (Fernandez) had considered fleeing to the Dominican Republic to avoid being arrested, because Fernandez understood he could not be extradited from the Dominican Republic.  *Id.* at 700-02.  Mendez testified that, after Mendez told Fernandez that he still could have been extradited from the Dominican Republic, Fernandez responded, "oh well, then it wasn't worth it for me to go there.  They were going to catch me anyway."[2]  *Id.* at 702.  In addition, Mendez testified that Fernandez said that he (Fernandez) was in prison because he participated in something with "Patrick," referring to Darge.  *Id.* at 705-06.  Mendez further testified that Fernandez admitted that "Patrick" had called Fernandez to get together and told Fernandez to bring a weapon.  *Id.* at 705.

Second, Alain Darge testified about Fernandez's admissions of guilt to him.  Alain Darge is Patrick Darge's brother and Fernandez's cousin.  Tr. at 809-10.  On the morning of October 13, 2011, law enforcement officers went an address in Woodbury, New York, in search of Fernandez, who was not there, and spoke with Fernandez's wife.  *Id.* at 789-91.  Just a few hours later, Fernandez went to the residence of his cousin, Christian Guzman, and told Guzman that he wanted to speak with Alain Darge.  *Id.* at 800.  Alain Darge then came over to Guzman's residence and spoke with Fernandez.  *Id.* at 800-01.  Fernandez told Alain Darge that the police had come to his house looking to pick him up, and that he figured that Patrick Darge had told the authorities about him.  *Id.* at 817-19.  Fernandez wanted advice from Alain Darge about what he should do.  *Id.* at 818.  Trying to calm Fernandez down, Alain Darge told Fernandez that a lot of

---

[2] This testimony was particularly relevant because the charges against Fernandez were sealed at the time Fernandez considered fleeing to the Dominican Republic.

people other than his brother knew about the shootings, to which Fernandez mentioned that

Reyes also was present that day.   *Id.* at 819.   In addition, Fernandez mentioned to Alain Darge

that he fired his gun twice, and then his gun then jammed, and Patrick Darge finished off the job.

*Id.* at 820.

**B.     The Jury Verdict**

On March 7, 2013, the jury returned a verdict finding the defendant guilty of the both

counts charged in the Indictment:  a conspiracy to commit a murder-for-hire, resulting in the

deaths of Cuellar and Flores, in violation of Title 18, United States Code, Section 1958, and the

use of a firearm in furtherance of a crime of violence, resulting in the deaths of Cuellar and

Flores, in violation of Title 18, United States Code, Section 924(j).  Tr. at 1083-84.

**C.     The Presentence Investigative Report**

On September 17, 2014, the Probation Office submitted its final Presentence

Investigative Report (the "PSR") in this case. The Probation Office arrived at a total offense

level of 45, calculated as follows: (1) Counts 1 and 2 are not grouped because the counts

involved different victims, pursuant to U.S.S.G. § 3D1.2, *see* PSR ¶ 20;[3] (2) the base offense

level for Count One[4] is 43, pursuant to U.S.S.G. §§ 2E1.4, § 2A1.1(a), as is the resulting offense

level for Count One, *see* PSR ¶¶ 21-26; (3) the base offense level for Count Two[5] is also 43,

---

[3] As noted *infra* at Part III.C.3, the Government believes that Counts One and Two should be grouped, because the two crimes involved substantially the same harm.  *See* U.S.S.G. § 3D1.2(a).  The Government has repeatedly brought its disagreement with the PSR's grouping analysis to the attention of the Probation Office.  As of the date of the filing of this brief, a revised PSR has not been issued.

[4] The PSR incorrectly identifies Count One as "Murder of Arturo Cuellar."  PSR ¶ 21. Count One was a conspiracy to commit a murder-for-hire, resulting in the deaths of Cuellar and Flores.  The Government has repeatedly brought this error to the attention of the Probation Office.  As of the date of the filing of this brief, a corrected PSR has not been issued.

[5] The PSR incorrectly identifies Count Two as "Murder of Ildefonso Vivero Flores." PSR ¶ 27.  Count Two was the use of a firearm in furtherance of a crime of violence, with death

pursuant to U.S.S.G. § 2A1.1(a), as is the resulting offense level for Count Two, *see* PSR ¶¶ 27-32; (4) the multiple count grouping analysis for Counts One and Two results in a two-level increase in the offense level and a total offense level of 45, *see* PSR ¶¶ 33-40; and (5) the defendant has four criminal history points, placing him in Criminal History Category III, *see* PSR ¶¶ 41-61.

Accordingly, with an offense level of 45[6] and a Criminal History Category of III, the resulting advisory Guidelines range is life imprisonment. *See* PSR ¶ 80.[7]  The Probation Office recommends the imposition of a sentence of life, to be followed by a five-year term of supervised release. *Id.* at p. 16.[8]

---

resulting.  The Government has repeatedly brought this error to the attention of the Probation Office.  As of the date of the filing of this brief, a corrected PSR has not been issued.

[6] Because the Government believes that Counts One and Two should be treated as a single group, the Government has calculated the defendant's total offense level to be 43.  *See infra* Part III.C.3.  The resulting Guidelines range, however, remains life imprisonment.

[7] The Government concurs that the Court should impose a life sentence.  However, as discussed *infra* at Part III.B, the imposition of a life sentence is statutorily required under Title 18, United States Code, Section 1958, which is not noted in the PSR.  The Government has repeatedly brought this omission to the attention of the Probation Office.  As of the date of the filing of this brief, a corrected PSR has not been issued.

[8] In the Addendum to the PSR, the Probation Office lists five objections by the defense, and states, "We have sought clarification from the government as we were not present during trial and the government is in a better position to address this issue.  However, to date we have not received response."  PSR at p. 15.  First, the Government provided the Probation Office with the trial transcript as well as a summary of the defendant's offense.  Second, the suggestion that the Government somehow failed to respond to an inquiry from Probation is simply inaccurate.  While the assigned Probation Officer reached out to one of the prosecutors in this case advising that she had received objections from the defense, the officer indicated that she was not going to amend the PSR and *the objections did not require a response from the Government*, because the defense's objections would more appropriately be handled by the Government at sentencing or raised in a post-sentencing proceeding.  This was correct.  The defendant's "objections" were efforts by the defense to reargue the proof at trial, as they questioned the credibility of the Government's witnesses (Objections 1, 2, and 3), argued that Fernandez's guilt was not proved beyond a reasonable doubt (Objection 4), and asserted that post-trial relief will be sought (Objection 5).  To be sure, the Government obviously disagrees with the defense's characterization of the evidence, the credibility of its witnesses, and whether the Government

### III. THE COURT SHOULD IMPOSE A SENTENCE OF LIFE IMPRISONMENT

**A.     Applicable Law**

The United States Sentencing Guidelines (the "Guidelines") still provide strong guidance to the Court in light of *United States* v. *Booker*, 543 U.S. 220 (2005) and *United States* v. *Crosby*, 397 F.3d 103 (2d Cir. 2005).  Although *Booker* held that the Guidelines are no longer mandatory, it held also that the Guidelines remain in place and that district courts must "consult" the Guidelines and "take them into account" when sentencing.  543 U.S. at 264.  "[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range" – that "should be the starting point and the initial benchmark."  *Gall* v. *United States*, 552 U.S. 38, 50 (2007).

After that calculation, a sentencing judge must consider seven factors outlined in Title 18, United States Code, Section 3553(a): "the nature and circumstances of the offense and the history and characteristics of the defendant," 18 U.S.C. § 3553(a)(1); the four legitimate purposes of sentencing, *id.* § 3553(a)(2); "the kinds of sentences available," *id.* § 3553(a)(3); the Guidelines range itself, *id.* § 3553(a)(4); any relevant policy statement by the Sentencing Commission, *id.* § 3553(a)(5); "the need to avoid unwarranted sentence disparities among defendants," *id.* § 3553(a)(6); and "the need to provide restitution to any victims," *id.* § 3553(a)(7). *See Gall*, 552 U.S. at 49-50 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

> (A)     to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense

---

satisfied the burden of proof.  Fernandez was convicted after trial of both counts of the Indictment, reflecting that the jury, after seeing the evidence, credited the Government's proof and found the defendant to be guilty beyond a reasonable doubt.

(B)     to afford adequate deterrence to criminal conduct;

(C)     to protect the public from further crimes of the defendant; and

(D)     to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

Courts may not presume that the appropriate sentence necessarily lies within Guidelines range, but "the fact that § 3553(a) explicitly directs sentencing courts to consider the Guidelines supports the premise that district courts must begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process." *Gall*, 552 U.S. at 50 n.6.  Their relevance throughout the sentencing process stems in part from the fact that, while the Guidelines are advisory, "the sentencing statutes envision both the sentencing judge and the Commission as carrying out the same basic § 3553(a) objectives," *Rita* v. *United States*, 551 U.S. 338, 348 (2007), and the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall*, 522 U.S. at 46; *see also Rita*, 551 U.S. at 349.  To the extent a sentencing court varies from the Guidelines sentence, "[it] must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *Gall*, 552 U.S. at 50.

**B.     A Sentence of Life Imprisonment is Mandatory Under 18 U.S.C. 1958 Because Death Resulted**

The jury found Fernandez guilty of Count One of the Indictment, which charged Fernandez with participating in a murder-for-hire conspiracy with death resulting, in violation of Title 18, United States Code, Section 1958(a).  That statute provides:

> Whoever travels in or causes another (including the intended victim) to travel in interstate or foreign commerce, or uses or causes another (including the intended victim) to use the mail or any facility of interstate or foreign commerce, with intent that a murder be committed in violation of the laws of any State or the United States as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value, or who conspires to do so, shall be fined under this title or imprisoned for not more than ten years, or both; and if personal injury results, shall be fined under this title or imprisoned for not more than twenty years, or both; and if death results, shall be punished by death or life imprisonment, or shall be fined not more than $250,000, or both.

18 U.S.C. § 1958(a). Thus, if a defendant participates in a murder-for-hire conspiracy, and if death resulted, Section 1958(a) requires a sentence of "death or life imprisonment." *Id.*

Here, the jury found Fernandez guilty of a murder-for-hire conspiracy, which resulted in the deaths of Cuellar and Flores:

| THE DEPUTY CLERK: | Will the foreperson please rise. How do you find Joe Fernandez with respect to Count One, conspiracy to commit murder-for-hire? |
|---|---|
| FOREPERSON: | Guilty. |
| THE DEPUTY CLERK: | Did the conspiracy to commit murder for hire result in the death of either or both Ildelfonso Vivero-Flores or Arturo Cuellar? |
| FOREPERSON: | Yes. |

Tr. at 1083-84. Accordingly, given this jury verdict that death resulted from the murder-for-hire conspiracy, a life sentence is mandatory under Section 1958(a).

## C. The Statutory Sentencing Factors Under 18 U.S.C. § 3553(a) Call for Life Imprisonment

While Fernandez is subject to a mandatory sentence of life imprisonment based upon his conviction after trial of Count One of the Indictment, the Government respectfully submits that, even if a life sentence were not statutorily required, it is the only appropriate sentence in this case. An analysis of the Section 3553(a) factors, and particularly the nature of the offenses, as

well as the history and characteristics of this defendant, the need for deterrence, and the need to promote respect for the law, makes plain the extraordinary nature of Fernandez's crimes, and counsels for nothing less than a sentence of life imprisonment.

### 1. The Nature and Circumstances of the Offenses

Murder is of course among the most serious crimes in society.  Fernandez murdered two defenseless men, in cold blood, riddling their bodies with multiple gunshots.  He and Darge hid in the shadows of the lobby of an apartment building, as their victims were marched to their deaths and stood waiting for the elevator as sitting ducks about to be executed.  Fernandez fired fourteen bullets at his helpless victims, connecting with nine of them, even stuck around to make sure that his victims were dead.  A sentence of life imprisonment is clearly just punishment for Fernandez's actions.

### 2. The History and Characteristics of the Defendant, and the Need for Deterrence and Promotion of Respect for the Law

Fernandez committed these murders for nothing other than money.  Fernandez agreed to participate in the murders for $40,000, knowing full well that the purpose was to kill his two victims.  Fernandez's decision to kill two humans for money only reinforces his deplorable character and requires maximum punishment.

Moreover, society has few interests stronger than deterring people from committing murder.  A sentence of life imprisonment is essential to achieve maximum general deterrence in society for murder and for participating in murders-for-hire.

A sentence of life imprisonment is also necessary to deter this defendant from committing further crimes and promote respect for the law.  Indeed, although only two of Fernandez's prior convictions count toward his Criminal History under the Guidelines, *see infra* Part III.C.3, this defendant has a long history of violating the law:

- In January 1995, Fernandez was convicted of attempted burglary in connection with entering a victim's apartment in the Bronx and removing property on April 9, 1994. Fernandez was adjudicated as a youthful offender and received five years' probation. *See* PSR ¶¶ 43, 44.

- In December 1996, Fernandez was convicted of criminal possession of a weapon in connection with his possession of two daggers in the Bronx. Fernandez was sentenced to time-served. *See id.* ¶¶ 45, 46.

- In February 1997, the defendant was convicted of aggravated unlicensed operation of a motor vehicle. Fernandez initially was sentenced to a conditional discharge, was required to attend an alcohol abuse program, and was imposed a $500 fine. In July 1998, Fernandez was resentenced to a conditional discharge and five days of community service. *See id.* ¶ 47.

- In October 1997, Fernandez was again convicted of aggravated unlicensed operation of a motor vehicle. According to the PSR, Fernandez had no license, thirty-four license suspensions on fourteen dates, and two revocations of his license. Fernandez was sentenced to three years' probation and was ordered to pay a $750 fine. *See id.* ¶¶ 49, 50. Fernandez was on probation for this sentence when he committed the murders that are the subject of his conviction in this case. *See id.* ¶ 51.

- In June 1999, Fernandez was convicted of criminal possession of a weapon after he was found in possession of a brown mini-slapper, also known as a blackjack. Fernandez was ordered to pay a $100 fine. *See id.* ¶¶ 52, 53.

- In March 2002, Fernandez was convicted yet again of aggravated unlicensed operation of a motor vehicle. In addition to the unlicensed operation of a vehicle, Fernandez handed the police officer a forged New York State driver's license. Fernandez initially was sentenced to five years' probation and ordered to pay a $1,500 fine. In May 2007, after Fernandez was cited as a violation of his probation, Fernandez's probation was extended by one year. *See id.* ¶¶ 54, 55, 56.

- In May 2007, Fernandez was convicted of driving while intoxicated. He was sentenced to a conditional discharge, he was ordered to pay a $500 fine, and his driver's license was revoked. *See id.* ¶ 57.

This defendant – who murdered two men in February 2000 – lacks any respect for the law and has demonstrated that his history and characteristics require maximum punishment to ensure he does not commit future crimes.

### 3. Imposing a Guidelines Sentence Would Advance the Goals of Section 3553(a)

Pursuant to Section 3553(a), the Court is to consider "the kinds of sentence and the sentencing range established [in the Sentencing Guidelines," as well as "any pertinent policy statement [issued by the Sentencing Commission]." 18 U.S.C. § 3553(a)(4), (a)(5). These statutory factors further support a sentence of life imprisonment.

The Government has calculated the advisory Guidelines range in this case as follows:

- Because Count One (murder-for-hire conspiracy) and Count Two (use of a firearm in furtherance of a crime of violence with death resulting) involved substantially the same harm, in that they involved the same victims and same act or transaction, they are treated together in a single Group, pursuant to U.S.S.G. § 3D1.2(a).

- The applicable Guideline for Count One (murder-for-hire conspiracy) is U.S.S.G. § 2E1.4. Pursuant to that Guideline, the base offense level is either 32 or the offense level for the underlying offense, whichever is higher. Here, the base offense level for the underlying offense (murder) is 43, pursuant to U.S.S.G. § 2A1.1(a).

- The applicable Guideline for Count Two (use of a firearm in furtherance of a crime of violence with death resulting) is U.S.S.G. § 2A1.1(a). Thus, the base offense level for Count Two is also 43.

- The defendant has four Criminal History points, arising from (1) a March 2002 conviction for aggravated unlicensed operation of a motor vehicle (1 point), *see* U.S.S.G. §§ 4A1.1(c), 4A1.2(e)(2); (2) a May 2007 conviction for driving while intoxicated (1 point), *see* U.S.S.G. §§ 4A1.1(c), 4A1.2(e)(2); and (3) commission of the instant offense while on probation (2 points), *see* U.S.S.G. § 4A1.1(d). Thus, the defendant's Criminal History Category is III.

Accordingly, with an offense level of 43 and a Criminal History Category of III, the resulting advisory Guidelines range is life imprisonment, with a recommended fine of $25,000 to $250,000.[9]

As the Court of Appeals has explained, "the guidelines cannot be called just another factor in the statutory list, 18 U.S.C. § 3553(a), because they are the only integration of the

---

[9] Because of Fernandez's apparent inability to pay a fine, the Government is not seeking the imposition of a fine in this case. *See* PSR ¶ 77.

multiple factors." *United States* v. *Rattoballi*, 452 F.3d 127, 131 (2d Cir. 2006) (citations and internal quotation marks omitted); *cf. United States* v. *Fernandez*, 443 F.3d 19, 28 (2d Cir. 2006) (stating that "the Guidelines range should serve as 'a benchmark or a point of reference or departure' for the review of sentences") (citations omitted) (quoting *United States* v. *Rubenstein*, 403 F.3d 93, 98-99 (2d Cir. 2005)). As the Supreme Court put it in *Gall*, "to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." 552 U.S. at 50. Indeed, it is precisely because the Guidelines function as a national "benchmark" that a Guidelines sentence here will advance another Section 3553(a) goal: "the need to avoid unwarranted sentence disparities." 18 U.S.C. § 3553(a)(6).[10]

\*   \*   \*   \*

In sum, a sentence of life imprisonment is required under 18 U.S.C. § 1958(a), because the defendant participated in a murder-for-hire conspiracy that resulted in death.  Even apart from that statutory mandate, each of the § 3553(a) factors that is relevant here cuts powerfully in favor of a life sentence.

---

[10] In light of the nature of the crimes here and the sentence that should be imposed, educational and vocational training of the defendant does not pose a particular concern in this case, nor does the defendant require special medical care or other correctional treatment.

## IV. CONCLUSION

For all of the foregoing reasons, the Government respectfully requests that the Court impose a sentence of life imprisonment.

Dated: New York, New York
       October 3, 2014

                              Respectfully submitted,

                              PREET BHARARA
                              United States Attorney


                    By:      _____/s/ John P. Cronan_____
                              Todd Blanche
                              John P. Cronan
                              Russell Capone
                              Assistant United States Attorneys
                              (914) 993-1932 (Blanche)
                              (212) 637-2779 (Cronan
                              (212) 637-2247

## AFFIRMATION OF SERVICE

JOHN P. CRONAN, pursuant to 28 U.S.C. § 1746, hereby declares under the penalty of perjury:

I am an Assistant United States Attorney in the Office of the United States Attorney for the Southern District of New York.  On October 3, 2014, I caused copies of the Government's Sentencing Memorandum to be delivered by ECF and electronic mail to the following counsel for defendant Joe Fernandez:

> Robert Ray, Esq.
> Rwray@foxrothschild.com

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Dated: New York, New York
         October 3, 2014

                                          /s/ John P. Cronan
                                          John P. Cronan
                                          Assistant United States Attorney