UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------x

UNITED STATES OF AMERICA,   :

        v.     :

JOE FERNANDEZ,       :

      Defendant.  :

--------------------------------------------------------x

No. 10 Cr. 863-5 (AKH)


## SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION FOR COMPASSIONATE RELEASE


Benjamin Gruenstein
Eric Pilch
Alexandra Mahler-Haug
CRAVATH, SWAINE & MOORE LLP
 Worldwide Plaza
  825 Eighth Avenue
   New York, NY 10019
    (212) 474-1000


*Counsel for Defendant Joe Fernandez*


February 14, 2022

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................. iii

INTRODUCTION ............................................................................................... 1

BACKGROUND .................................................................................................. 3

    I.      Arrest and Indictment ............................................................................ 3

    II.     The Trial of Joe Fernandez ................................................................... 4

          A.     Testimony of Patrick Darge ...................................................... 5

          B.     Testimony of Jeffrey Minaya ..................................................... 7

          C.     Testimony of Alberto Reyes ...................................................... 8

          D.     Testimony of Yubel Mendez ...................................................... 8

          E.     Testimony of Alain Darge ......................................................... 8

          F.     Crime Scene Evidence ............................................................... 9

          G.     Conviction .................................................................................. 10

    III.    Sentencing ............................................................................................. 10

    IV.    Appeal .................................................................................................... 10

    V.     Section 2255 Petitions ........................................................................... 11

    VI.    Mr. Fernandez Has Complied with Section 3582's Exhaustion
          Requirement ........................................................................................... 11

APPLICABLE LAW ........................................................................................... 12

DISCUSSION ...................................................................................................... 17

    I.      There Are Compelling Reasons To Question the Jury's Verdict ............. 18

          A.     The Government's Key Witness Is an Admitted Liar
                Whose Testimony Is Contradicted by Other Witnesses and
                the Physical Evidence ................................................................. 18

          B.     The Government's Charging Decision Suggests It Harbored
                Doubts About Patrick Darge's Testimony .................................. 21

    II.    The Disparity Between Mr. Fernandez's and His Alleged Co-
          Conspirators' Sentences Constitutes an Extraordinary and
          Compelling Reason for Compassionate Release ..................................... 22

    III.    Harsh Pandemic Conditions of Confinement Have Rendered
          Mr. Fernandez's Sentence More Unjust .................................................. 26

    IV.    The Way Mr. Fernandez Has Comported Himself in Custody Is an
          Extraordinary and Compelling Reason To Reduce His Sentence ............. 29

V.     The Section 3553(a) Sentencing Factors Call for a Sentence of Time Served ............................................................................................... 32

     A.     The Nature and Circumstances of the Offense .............................. 33

     B.     The History and Characteristics of the Defendant ......................... 34

     C.     The Need for the Sentence Imposed ............................................... 42

     D.     The Kinds of Sentences Available .................................................. 42

     E.     The Disparity Between Sentences and Pertinent Policy Statements ....................................................................................... 42

CONCLUSION ................................................................................................. 43

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Fernandez v. United States*, 757 Fed. App'x 52 (2d Cir. 2018) ........................................11

*Kimbrough v. United States*, 552 U.S. 85 (2007) ..............................................................33

*McCoy v. United States*, 03 Cr. 197, 2020 WL 2738225 (E.D. Va. May 26, 2020) ....................................................................................................................................13

*Rosemond v. United States*, 572 U.S. 65 (2014) ................................................................11

*United States v. Archer*, 977 F.3d 181 (2d Cir. 2020) .......................................................34

*United States v. Ballard*, 08 Cr. 62 (JSR), 2021 WL 3285009 (S.D.N.Y. Aug. 2, 2021) ...................................................................................................................14, 25

*United States v. Brooker*, 976 F.3d 228 (2d Cir. 2020) ............................................. passim

*United States v. Cabrera*, 531 F. Supp. 3d 863 (S.D.N.Y. 2021) ....................................14

*United States v. Cirilo-Munoz*, 504 F.3d 106 (1st Cir. 2007) ...............................17, 34, 36

*United States v. Clark*, 12 Cr. 104, 2021 WL 201253 (D. Conn. Jan. 20, 2021) .............................................................................................................15, 26, 43

*United States v. Davis*, 139 S. Ct. 2319 (2019) ................................................................11

*United States v. Ezell*, 518 F. Supp. 3d 851 (E.D. Pa. 2021) ...........................................13

*United States v. Fernandez*, 648 Fed. App'x 56 (2d Cir. 2016) .......................................10

*United States v. Haney*, 19 Cr. 541 (JSR), 2020 WL 1821988 (S.D.N.Y. Apr. 13, 2020) ...................................................................................................................12

*United States v. Haynes*, 456 F. Supp. 3d 496 (E.D.N.Y. 2020) ................................15, 25

*United States v. Hernandez Frometa*, 18 Cr. 660 (AKH), 2020 WL 6132296 (S.D.N.Y. Oct. 19, 2020) .............................................................................12

*United States v. Kissi*, 469 F. Supp. 3d 21 (E.D.N.Y. 2020) ......................................15, 26

*United States v. McCoy*, 981 F.3d 271 (4th Cir. 2020) ...............................................12, 13

*United States v. Panton*, 89 Cr. 346 (LAP), 2020 WL 4505915 (S.D.N.Y. Aug. 4, 2020 ................................................................................................17, 30, 31

iii

*United States v. Perez*, 2 Cr. 7 (JBA), 2021 WL 837425 (D. Conn. Mar. 4, 2021) ....................................................................................................32, 43

*United States v. Piggott*, 94 Cr. 417 (SHS), 2022 WL 118632 (S.D.N.Y. Jan. 12, 2022) ..................................................................................14, 31

*United States v. Qadar*, 00-CR-603 (ARR), 2021 WL 3087956 (E.D.N.Y. July 22, 2021) ................................................................................ passim

*United States v. Ramirez*, 98 Cr. 927 (CM), 2021 WL 5233512 (S.D.N.Y. Nov. 10, 2021) ...........................................................................30

*United States v. Ramsay*, 538 F. Supp. 3d 407 (S.D.N.Y. 2021)......................................15

*United States v. Rios*, 3:94 Cr. 112 (JBA), 2020 WL 7246440 (D. Conn. Dec. 8, 2020)..............................................................................16, 31

*United States v. Robles*, 08 Cr. 1114 (PAE), 2021 WL 3524067 (S.D.N.Y. Aug. 10, 2021) ...............................................................................15, 27

*United States v. Rodriguez*, 492 F. Supp. 3d 306 (S.D.N.Y. 2020)............................16, 27

*United States v. Sims*, 98 Cr. 45, 2021 WL 1603959 (E.D. Va. Apr. 23, 2021) .........................................................................................13

*United States v. Somerville*, 463 F. Supp. 3d 585 (W.D. Pa. 2020) ................................32

*United States v. Vargas*, 502 F. Supp. 3d 820 (S.D.N.Y. 2020)........................................14

**Statutes & Rules**

18 U.S.C. § 2 .................................................................................................4, 43

18 U.S.C. § 924(c)(3)................................................................................................11

18 U.S.C. § 924(j)(1)............................................................................................4, 10

18 U.S.C. § 1958......................................................................................... passim

18 U.S.C. § 3553(a) ..................................................................................... passim

18 U.S.C. § 3553(a)(2)...............................................................................................42

18 U.S.C. § 3553(a)(6)...............................................................................................43

18 U.S.C. § 3582(c)(1)(A) ............................................................................. passim

18 U.S.C. § 3582(c)(1)(A)(i) ................................................................................1, 3, 12

21 U.S.C. § 841................................................................................21

21 U.S.C. §§ 848(e)(1)(A) .............................................................4

28 U.S.C. § 994(t)...........................................................................16

28 U.S.C. § 2255.............................................................................11

Federal Rule of Criminal Procedure 35(b)(2)(C)........................24

N.Y. Crim. Proc. Law § 720.35 .....................................................42

U.S. Sentencing Guidelines Manual § 1B1.13(2)........................31

**Other Authorities**

BOP COVID-19 Operational Levels,
    https://www.bop.gov/coronavirus/covid19_modified_operations_guide
    .jsp#about_levels.......................................................................27, 28

BOP Modified Operations, Federal Bureau of Prisons (Updated Nov. 25,
    2020), https://www.bop.gov/coronavirus/covid19_status.jsp.......................27

COVID-19 Cases, Federal Bureau of Prisons,
    https://www.bop.gov/coronavirus/.............................................26

Federal Bureau of Prisons, COVID-19 Pandemic Response Plan: COVID-
    19 Modified Operations Matrix, Aug. 16, 2021 .........................28

PREA Audit Report of USP Canaan, at 9 (Sept. 13, 2021), accessible at
    https://www.bop.gov/locations/institutions/caa/caa_prea_091321.pdf ...............27, 28

U.S. General Accountability Office, *BOP Response to COVID-19* (July
    2021) ...........................................................................................27

United States Attorney's Manual § 9-27-400(B), available at:
    http://web.archive.org/web/
    20130115073451/http://www.justice.gov/usao/eousa/foia_reading_roo
    m/usam/title9/27mcrm.htm#9-27.400........................................22

USP Canaan, Federal Bureau of Prisons,
    https://www.bop.gov/locations/institutions/caa/
    ......................................................................26, 27, 28, 29

## **INTRODUCTION**

Joe Fernandez respectfully submits this supplemental brief in support of his motion for compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A)(i), seeking a reduction in his sentence to time served.[1]  Mr. Fernandez is currently serving a life sentence after having been convicted of conspiracy to use interstate commerce facilities in the commission of murder-for-hire, in violation of 18 U.S.C. § 1958, a crime for which he maintains his innocence.

There are at least four extraordinary and compelling reasons for a reduction in Mr. Fernandez's sentence:

*First*, there is a strong basis to question the correctness of the verdict, and to conclude that the jury may have convicted an innocent man.  The government's case rested almost entirely on the testimony of a single cooperator, Patrick Darge.  Darge was the only witness who placed Mr. Fernandez at the murder scene.  There are serious reasons to question the testimony of Darge, including the testimony of other witnesses and the physical evidence in this case, which contradict Darge's testimony in critical ways.  In fact, the government itself appeared to harbor some doubt about Darge's testimony, as it did not seek to rely on that testimony to prosecute Mr. Fernandez's co-defendant, Luis Rivera, for conspiracy to commit murder even though Darge testified that he was the getaway driver.  Instead, the government chose to plead Rivera out to narcotics trafficking, for which he was ultimately sentenced to 24 months imprisonment.

---

[1] Proceeding *pro se*, Mr. Fernandez filed a motion for a sentence reduction pursuant to 18 U.S.C. § 3582(c)(1)(A)(i) on November 30, 2021.  (10 Cr. 863-5, ECF No. 248.)  On December 6, 2021, this Court appointed undersigned counsel pursuant to the Criminal Justice Act, and entered an order allowing for the filing of supplemental briefing.

*Second*, there are significant sentencing disparities between Mr. Fernandez's life sentence and the sentences of four other participants in the murder conspiracy, including most notably Luis Rivera, who was sentenced to two years. Mr. Fernandez's other co-defendants, Patrick Darge and Alberto Reyes, orchestrated the murder plot in addition to committing the murders (Darge as one of the shooters and Reyes, who lured the victims to their death). Darge and Reyes both cooperated with the government and were sentenced to 30 and 25 years, respectively. Jeffrey Minaya, the drug kingpin who ordered the two Mexican cartel members to be killed, was sentenced to 15 years after cooperating. All of these co-conspirators received sentences that were far less than the mandatory life sentence that Mr. Fernandez received after exercising his constitutional right to trial. The dramatic disparity in sentence between Mr. Fernandez and four other men who participated in the murder conspiracy is so significant that it presents an extraordinary and compelling reason for a sentence reduction.

*Third*, Mr. Fernandez's sentence has been rendered even more harsh due to the pandemic conditions of confinement. The COVID-19 pandemic has required the Bureau of Prisons to substantially change its operations, resulting in more punitive conditions of confinement on inmates like Mr. Fernandez.

*Fourth*, while incarcerated, and despite the ongoing pandemic conditions, Mr. Fernandez has completed numerous courses; held a job that has placed him in a position of trust; organized and led his fellow inmates in physical activities and health programs; and maintained close contact with his family and friends. Accordingly, the way Mr. Fernandez has comported himself in custody is yet another extraordinary and compelling reason to reduce his sentence.

Until recently, this Court lacked the power to amend Mr. Fernandez's mandatory life sentence. Now, due to changes in the law, this Court has the power to remedy the unjust outcome in Mr. Fernandez's case. *See* 18 U.S.C. § 3582(c)(1)(A)(i); *United States v. Brooker*, 976 F.3d 228 (2d Cir. 2020). The First Step Act of 2018 provides that a district court "may reduce" a defendant's term of imprisonment if it finds that "extraordinary and compelling reasons warrant such a reduction". 18 U.S.C. § 3582(c)(1)(A)(i); *see also Brooker*, 976 F.3d at 235. The Second Circuit has recently confirmed that district courts have the authority under the First Step Act "independently to determine what reasons, for purposes of compassionate release, are 'extraordinary and compelling'". *Id.* at 234.

As Mr. Fernandez was subject to a mandatory life sentence, the Court did not previously have an opportunity to apply the Section 3553(a) factors to impose a sentence that is "sufficient, but not greater than necessary" to achieve Congress's sentencing objectives. However, once the Court considers all of the Section 3553(a) factors, including, in particular, the nature and circumstances of the offense (which Mr. Fernandez maintains he did not commit), the history and characteristics of the defendant, and the need to protect the public from further crimes (of which there is none), it is apparent that the over 10 years Mr. Fernandez has served is adequate, and he should be sentenced to time served and be reunited with his large network of extended family and friends, many of whom have submitted letters of support to the Court.

## **BACKGROUND**

### I.     **Arrest and Indictment**

On September 23, 2010, a grand jury returned an indictment charging several members of a cocaine trafficking organization—but not Mr. Fernandez—with

murder in the course of a narcotics conspiracy, in violation of 21 U.S.C. §§ 848(e)(1)(A) and 18 U.S.C. § 2; use and conspiracy to use interstate commerce facilities in the commission of murder, in violation of 18 U.S.C. §§ 1958 and 2; and use of a firearm in furtherance of a drug trafficking crime resulting in death, in violation of 18 U.S.C. §§ 924(j)(1) and 2.  (10 Cr. 863, ECF No. 1 at 1-5.)  This indictment alleged, among other things, the murder of two Mexican cartel members on February 22, 2000, over 10 years earlier.  (*Id*.)  On October 3, 2011, a year after the indictment was filed, the government filed a complaint separately charging Mr. Fernandez as well with those murders.  (10 Cr. 863-5, ECF No. 1.)  On October 18, 2011, Mr. Fernandez voluntarily surrendered to authorities.  By a superseding indictment dated February 6, 2013, Mr. Fernandez was charged with conspiring to use interstate commerce facilities in the commission of murder-for-hire, in violation of 18 U.S.C. § 1958, and using a firearm in furtherance of a violent crime resulting in death, in violation of 18 U.S.C. §§ 924(j)(1) and 2.  (10 Cr. 863, ECF No. 74.)

## II.     The Trial of Joe Fernandez

Mr. Fernandez's trial began on February 19, 2013 and lasted approximately nine days.  The evidence at trial established that in February of 2000, drug kingpin Jeffrey Minaya devised a plan to steal a 274 kilogram shipment of cocaine, worth about $6.5 million, from members of a Mexican drug cartel.  Minaya and his associates received the shipment on consignment, agreeing to pay the cartel after they had sold the drugs.  The cartel sent two men—Ildefonso Vivero Flores and Arturo Cuellar—to New York to ensure the cartel received payment in full.  Rather than pay back the Mexican cartel, Minaya and his associates devised and executed a plan to have Flores and Cuellar murdered.

The murder plot was set into motion when Minaya's associate Jose Rodriguez contacted his cousin Patrick Darge on February 21, 2000.  (Tr. 265, 304-05.)  Rodriguez visited Darge, along with Minaya associates Manuel Suero and Alberto Reyes.  (Tr. 256, 620-21.)  Rodriguez, Suero and Reyes informed Darge that they were looking for a hitman to murder some Mexican cartel members.  Rodriguez, Suero and Reyes offered Darge $180,000 to kill Flores and Cuellar. [2]  (Tr. 268, 622.)  Darge agreed to commit the murders the next day.  (Tr. 271.)  Darge testified that he enlisted the help of two men: Luis Rivera and Mr. Fernandez.  (*Id*.)

At trial, the government relied primarily on the testimony of cooperating witness Patrick Darge but also called four additional cooperating witnesses.  None of the cooperating witnesses—with the exception of Darge—testified that they had first-hand knowledge that Mr. Fernandez was a participant in the murder conspiracy.

### A.    Testimony of Patrick Darge

Darge testified that he chose Mr. Fernandez to assist with the murder of Flores and Cuellar because he "didn't speak much" and "was not living in the neighborhood".  (Tr. 273.)  He testified that he told Mr. Fernandez he "was hired to murder two guys" and "needed him to back me up in case of anything", and offered to pay him $40,000 to help him.  (Tr. 276-76.)  Darge also contacted Rivera to serve as a getaway driver as well as to "bring [Darge] a gun that [he] could use and be able to get rid of [] after use".  (Tr. 307, 286-87.)  Darge testified that he told Mr. Fernandez he had to bring his own gun.  (Tr. 277.)

---

[2] Darge was paid an additional $10,000 after the murders.  (Tr. 335-37.)  Reyes testified that the amount they offered Darge was $120,000, with Rodriguez, Reyes and Suero each paying $40,000.  (Tr. 622.)

Darge testified that on February 22, 2000, the day of the murder, he and Mr. Fernandez waited in the "mailbox area" of a residential building in the Bronx, while Rivera waited in the car. (Tr. 302, 310, 329.) Darge was carrying a "brownish" .380 handgun, and according to Darge's testimony, Mr. Fernandez was carrying a "pretty big" gun that was approximately "two and a half to three feet" long and "much bigger" than Darge's handgun. (Tr. 308.) Darge testified that Mr. Fernandez had to "put[] together his gun" because it "was not a handgun". (Tr. 307-08.)

Darge testified he saw one of Minaya's associates, Reyes, enter the building. (Tr. 300, 320.) Reyes "gave [Darge] the sign". (Tr. 320.) Darge saw the two cartel members, Flores and Cuellar, behind Reyes. (Tr. 320-21.) Reyes "pressed the button for the elevator" before moving away from the elevator area, leaving one cartel member "facing the elevator and the other one [with] his back towards [Darge]". (Tr. 321.)

Darge testified that he came up from behind one of the men, "aimed to his head" and "pressed the trigger" with the gun about an inch away from the man's head. (Tr. 322.) Next, Darge "tried to go for the other guy", but his "gun was jammed". (*Id.*) He could not unjam the gun, so he "ran out of the building". (*Id.*) He testified he neither saw what Mr. Fernandez was doing while he was trying to unjam his gun nor did he see "where [he] was". (Tr. 328.) Darge further testified he "heard more shots" as he ran from the building, "two, two or three [shots] at the most". (*Id.*) Darge testified that he and Mr. Fernandez eventually made it to the getaway car, and Rivera drove away. (Tr. 330-31.) While the three men were driving away from the crime scene, Darge testified that Mr. Fernandez said that he "had to make sure they were both dead". (Tr. 332.)

Darge testified pursuant to a cooperation agreement with the government. Significantly, this was not the first time he entered into a cooperation agreement; Darge had previously entered into a cooperation agreement in connection with a drug case in 2003. (Tr. 385.) He testified that he violated that agreement as he "lied to the government", "lied to the agents" and "lied to the judge". (Tr. 386.) Specifically, he lied about his involvement in two murders; the extent of his drug dealing history, including that his brother, Alain Darge, was involved; and his history of credit card fraud. (Tr. 369-70.)

### B.   Testimony of Jeffrey Minaya

The government also called Jeffrey Minaya, who was the kingpin of the drug trafficking enterprise that had purchased the drugs from the Mexican cartel. (Tr. 71.) Minaya, who was a cooperating witness, testified that he decided on the plan to kill the two cartel members, and oversaw the murder plot as it was executed. (Tr. 71-72, 154.) Minaya testified about other members of his drug organization, the crimes they committed and their roles in the murders of Flores and Cuellar. Minaya first met Patrick Darge when he was around 16, and knew that Patrick Darge and his brother Alain Darge, a/k/a "Boozer", sold heroin together and engaged in violence including "shootouts and stuff". (Tr. 226.) According to Minaya, Alain and Patrick "work[ed] as a team". (Tr. 229.)

Minaya did not know Mr. Fernandez. In fact, he believed that Patrick's brother "Boozer" was the second shooter until he held "a lot of meetings with" the government. (Tr. 233.) On cross examination, Minaya was asked by the Court, "[d]o you remember telling the agents at that time that you thought the shooter would be Boozer, Patrick's brother?" (Tr. 232-33.) Minaya answered, "I said I told them that I -- I

thought about it for a while, a little time. But, you know, then I learned it was not him".
(Tr. 233.)

### C.    Testimony of Alberto Reyes

The government also called cooperating witness Alberto Reyes, who testified that while Minaya decided the cartel members should be killed, he was one of the organizers of the murder plot. (Tr. 616-17.) Specifically, Reyes helped execute the scheme by recruiting and agreeing to pay Patrick Darge to kill the two Mexican cartel members. (Tr. 616-17, 620-22.) Reyes was also present at the scene of the murder, after bringing the two cartel members into the apartment lobby where they would be killed. (Tr. 630-33.) Notably, Reyes could not identify Mr. Fernandez as the second shooter even though he testified that he saw "Patrick and the other guy" at the scene. (Tr. 633.)

### D.    Testimony of Yubel Mendez

Yubel Mendez, who did not otherwise participate in the conspiracy, testified pursuant to a cooperation agreement with the government that he shared a cell with Mr. Fernandez for four to five days immediately after Mr. Fernandez's arrest in 2011. (Tr. 707, 724.) Mendez testified that Mr. Fernandez told him that he was in jail "because of his participation with Patrick, and Patrick was the one that brought him into it". (Tr. 705.) Mendez further testified that Mr. Fernandez relayed that "Patrick had called him so that they could get together in a certain area, and Patrick told him to bring a weapon". (Tr. 705.)

### E.    Testimony of Alain Darge

Near the close of its case, the government called Alain Darge to testify about a meeting he allegedly had with Mr. Fernandez shortly before Mr. Fernandez's

arrest.[3]  (Tr. 800-01.)  Alain Darge, who like his brother was a cooperating witness (Tr. 837-38), testified that in 2011, the day after the authorities attempted to arrest Mr. Fernandez, Mr. Fernandez came to him for advice.  Alain Darge testified that Mr. Fernandez told him he "couldn't believe what was going on", and said that "he wouldn't tell on nobody" and that "he only took two shots and his gun got jammed and my brother [Patrick] finished the job".  (Tr. 819-20.)  Alain Darge testified that he encouraged Mr. Fernandez to flee the country.  (Tr. 818-19.)

### F.   Crime Scene Evidence

The government did not introduce either murder weapon into evidence, but did admit the bullets and bullet casings that were retrieved from the crime scene. Salvatore LaCova, a detective in the firearms analysis section of the NYPD, testified that he examined the crime scene evidence, which included "one nine-millimeter cartridge casing", "one nine-millimeter bullet", "14 .380 caliber cartridge casings", "six .380 caliber class bullets" and two bullets that were "unknown caliber class".  (Tr. 768, 770.) Detective LaCova was asked to inspect the ballistics evidence and determine if the bullets came from the same or different weapons.  He concluded that the "one nine-millimeter cartridge casing was fired from a different firearm than" the 14 .380 caliber cartridge casings, which were all "fired from the same firearm".  (Tr. 772.)

The government called Dr. Susan Ely, a forensic pathologist, to describe the results of autopsies conducted on Flores and Cuellar.  Dr. Ely testified that Flores was shot six times, and two bullets were recovered from his body.  (Tr. 531, 542.)  Cuellar

---

[3] Evidence discovered after the trial calls into question whether this meeting took place.  As detailed in the cell phone records provided to the Court by prior counsel Robert W. Ray, Mr. Fernandez's cell phone records do not list the calls, allegedly arranging the meeting with Alain Darge, that trial witness Christian Guzman claims to have received.  (10 Cr. 863, ECF No. 160 at 16-27.)

was shot four times, and only one bullet remained in his body. (Tr. 544-48) Detective

LaCova determined that all of the bullets recovered from the victims' bodies were .380

caliber bullets that were "fired from the same firearm". (Tr. 768-69.)

### G.  Conviction

On March 7, 2013, Mr. Fernandez was convicted of both counts.

Mr. Fernandez moved to vacate the jury's verdict and for a new trial, which this Court

denied. (10 Cr. 863, ECF Nos. 151, 162.)

## III.  Sentencing

Based on his conviction on Count One for conspiracy to use interstate

commerce facilities in the commission of a murder-for-hire in violation of 18 U.S.C.

§ 1958, Mr. Fernandez was subject to a mandatory life sentence, and this Court sentenced

him to life. On Count Two, use of a firearm in furtherance of a crime of violence with

death resulting, in violation of 18 U.S.C. § 924(j)(1) and 2, the applicable range was

10 years to life. On this count, the Court sentenced Mr. Fernandez to a consecutive life

sentence. (10 Cr. 863, ECF No. 170 at 57.)

## IV.  Appeal

On November 3, 2014, Mr. Fernandez appealed his conviction to the

Second Circuit, arguing (1) the evidence at trial was insufficient to prove beyond a

reasonable doubt that he knowingly joined the conspiracy with the specific intent to

commit murder-for-hire; and (2) the district court improperly denied his motion for a new

trial based on (a) the government's failure to disclose *Brady* material and (b) newly

discovered evidence, in the form of phone records that called into question the reliability

of certain trial testimony. On May 2, 2016, the Second Circuit affirmed his conviction.

*See United States v. Fernandez*, 648 Fed. App'x 56 (2d Cir. 2016).

V.      **Section 2255 Petitions**

On June 23, 2017, Mr. Fernandez filed a habeas petition pursuant to

28 U.S.C. § 2255.  (10 Cr. 863, ECF No. 217.)  Mr. Fernandez contended that he received

ineffective assistance of appellate counsel because his attorney failed to address an

incorrect jury instruction given on aiding and abetting under *Rosemond v. United States*,

572 U.S. 65 (2014).  On November 13, 2017, the Court denied the motion, but granted a

certificate of appealability.  By summary order, the Second Circuit denied the appeal.

*See Fernandez v. United States*, 757 Fed. App'x 52 (2d Cir. 2018).

On May 5, 2020, Mr. Fernandez moved for leave from the Second Circuit

to file a successive § 2255 petition primarily based on *United States v. Davis*, 139 S. Ct.

2319 (2019).  (20-1130, ECF No. 9.)  On June 22, 2020, the Second Circuit granted

Mr. Fernandez's motion and transferred Mr. Fernandez's § 2255 petition to the District

Court.  (10 Cr. 863, ECF No. 226.)  In a November 3, 2021 Opinion and Order, the

District Court granted Mr. Fernandez's motion to vacate his conviction and sentence on

Count Two.  (10 Cr. 863, ECF No. 245.)  The Court concluded that Mr. Fernandez's

conviction on Count One for conspiracy to commit murder-for-hire no longer qualifies as

a predicate "crime of violence" under 18 U.S.C. § 924(c)(3) for Count Two.

Accordingly, Mr. Fernandez remains incarcerated on Count One, for which he is serving

a life sentence.

VI.     **Mr. Fernandez Has Complied with Section 3582's Exhaustion Requirement**

Mr. Fernandez has fulfilled the exhaustion requirement set forth in

18 U.S.C. § 3582(c)(1)(A).  He petitioned the warden for release on September 13, 2021,

and the warden denied his request later that day.  Proceeding *pro se*, he moved the Court

for compassionate release in a memorandum dated October 29, 2021.  (10 Cr. 863, ECF

No. 248 (docketed on November 30, 2021).)  As he "'wait[ed] 30 days after serving his

petition on the warden of his facility before filing a motion in court'", his motion meets

the requirements of 18 U.S.C. § 3582(c)(1)(A).  *United States v. Hernandez Frometa*, 18

Cr. 660 (AKH), 2020 WL 6132296, at \*2 (S.D.N.Y. Oct. 19, 2020) (quoting *United

States v. Haney*, 19 Cr. 541 (JSR), 2020 WL 1821988, at \*3 (S.D.N.Y. Apr. 13, 2020)).

## APPLICABLE LAW

The First Step Act provides an exception to the general rule that a court

may not modify a term of imprisonment once it has been imposed.  Under this law, a

district court "may reduce" a defendant's term of imprisonment if it finds that

"extraordinary and compelling reasons warrant such a reduction" and "that such a

reduction is consistent with applicable policy statements issued by the Sentencing

Commission".  18 U.S.C. § 3582(c)(1)(A)(i) and (ii); *see also Brooker*, 976 F.3d at 235.

The Court's discretion in ruling on a motion for compassionate release is

undoubtedly broad.  Indeed, the determination as to what constitutes extraordinary and

compelling reasons warranting a reduction is committed to the sound discretion of the

district court.  *Brooker*, 976 F.3d at 236–37.  The ability of a district court "to consider

the full slate of extraordinary and compelling reasons that an imprisoned person might

bring before them in motions for compassionate release", *id*. at 237, provides a "'safety

valve' that allows for sentence reductions when there is not a specific statute that already

affords relief but 'extraordinary and compelling reasons' nevertheless justify a

reduction".  *United States v. McCoy*, 981 F.3d 271, 287 (4th Cir. 2020).

The First Step Act allows the district court to "consider leniency" and

correct for the "injustice of [a defendant's] lengthy sentence".  *Brooker*, 976 F.3d at 230,

238; *see also McCoy*, 981 F.3d at 278 (affirming the district court's grant of compassionate release, which was based, in part, on its finding that the defendant's sentence "far exceeded that necessary to 'achieve the ends of justice'" (quoting *McCoy v. United States*, 03 Cr. 197, 2020 WL 2738225, at *5 (E.D. Va. May 26, 2020)). This is particularly important where a defendant, after exercising his right to a jury trial, is serving a mandatory life sentence. As one district court has explained:

> Mandatory minimum sentencing mandates have been criticized by judges and attorneys alike as blunt instruments that, rather than serving their original, intended purpose—"to impose harsher punishments on a select group of the most culpable defendants"—have instead resulted in unfair sentences and a severe power imbalance during plea negotiations. While presiding judges are meant to retain ultimate authority over final sentencing decisions, in practice, mandatory minimum sentence statutes prevent judges from exercising discretion. Rather than allow assessment of culpability and mitigating circumstances on a case-by-case basis, mandatory minimum penalties are triggered solely by the prosecutor's charging decisions. Compassionate release and § 3582(c) provide an appropriate method to give secondary review to these sentences and remedy any inequities. Courts considering § 3553(a) factors have found sentencing courts' concerns about mandatory minimums and sentence disproportionality support finding extraordinary and compelling reasons to reduce a sentence.

*United States v. Sims*, 98 Cr. 45, 2021 WL 1603959, at *6 (E.D. Va. Apr. 23, 2021) (granting motion for a sentence reduction by a defendant who was serving a mandatory life sentence for bank robbery and other crimes); *see also United States v. Ezell*, 518 F. Supp. 3d 851, 858 (E.D. Pa. 2021) (granting motion for compassionate release and explaining that the fundamental purpose of the compassionate release statute is to "implement[] a 'safety valve' that allows a court to reduce a sentence upon finding extraordinary and compelling reasons—often when such a reduction is not permitted by the statute under which the defendant was initially sentenced or any other law"). While a district court may be bound by a mandatory minimum at sentencing, the First Step Act

provides an important opportunity for a court to exercise its discretion to rectify an unjust sentence.

In exercising this broad discretion, courts can consider an array of factors in making fact-specific determinations as to whether defendants have shown, based on the totality of circumstances, that extraordinary and compelling reasons justify a sentence reduction. *See United States v. Piggott*, 94 Cr. 417 (SHS), 2022 WL 118632, at *2 (S.D.N.Y. Jan. 12, 2022) ("The Court need not find a single dispositive circumstance to determine that 'extraordinary and compelling reasons' exist; rather, it may consider whether 'the totality of the circumstances' justify such a finding." (citation omitted)); *United States v. Vargas*, 502 F. Supp. 3d 820, 830 (S.D.N.Y. 2020) (finding that, in combination, the defendant's harsh sentence, rehabilitation, medical issues, the pandemic and intention to care for his mother were extraordinary and compelling reasons warranting compassionate release).

For example, in considering whether there are extraordinary and compelling reasons for a sentence reduction, courts in this district have found sentencing disparities between co-defendants are significant. *See*, *e.g.*, *United States v. Ballard*, 08 Cr. 62 (JSR), 2021 WL 3285009, at *5 (S.D.N.Y. Aug. 2, 2021) (reducing sentence where, among other things, defendant's sentence was more than four times as long as his co-defendant's, stemming "in significant part from the Government's 'charge bargaining' with [the co-defendant], who ultimately pled guilty to just two counts, despite [admitting] to having committed twenty two robberies beyond those for which [defendant] was convicted"); *United States v. Cabrera*, 531 F. Supp. 3d 863, 870 (S.D.N.Y. 2021) ("[T]he extraordinary length of Cabrera's sentence relative to his offense, especially given his

negligible criminal history; the significant, unwarranted disparity between Cabrera's sentence and the sentence of his codefendants; and Cabrera's substantial evidence of rehabilitation . . . together, demonstrate extraordinary and compelling circumstances warranting a sentence reduction."); *United States v. Ramsay*, 538 F. Supp. 3d 407, 428 (S.D.N.Y. 2021) (citing, among other factors, "extreme" sentencing disparities with co-defendants as a basis for a sentence reduction).[4]

Courts have also recognized that punitive conditions of confinement, stemming from the restrictions adopted by the BOP in response to the COVID-19 pandemic, can create extraordinary and compelling reasons for a sentence reduction. *See*, *e.g.*, *United States v. Robles*, 08 Cr. 1114 (PAE), 2021 WL 3524067, at *6 (S.D.N.Y. Aug. 10, 2021) (concluding that extraordinary and compelling reasons justified an earlier release after determining, among other things, that "the pandemic has spawned conditions of confinement", such as limitations on inmates' access to visitors and to rehabilitative, therapeutic and recreational programs, that are "far more punishing than what could have been expected at the time of [the defendant's] sentencing"); *United States v. Kissi*, 469 F. Supp. 3d 21, 39 (E.D.N.Y. 2020) (noting that the pandemic created "truly extraordinary conditions" of confinement that "undoubtedly exacerbate an already unjust sentence" and merited a sentence reduction).

---

[4] In addition to courts in this district, other courts within the Second Circuit have found that significant sentencing disparities between co-defendants constitute extraordinary and compelling circumstances warranting relief. *See United States v. Clark*, 12 Cr. 104, 2021 WL 201253, at *7 (D. Conn. Jan. 20, 2021) ("[The defendant]'s high sentence compared to other defendants in this case, despite the allegedly subordinate role he played in the conspiracy, factors into my consideration of extraordinary and compelling circumstances warranting relief"); *United States v. Haynes*, 456 F. Supp. 3d 496, 514 (E.D.N.Y. 2020) (ordering compassionate release based on a number of extraordinary and compelling reasons, including the "drastic severity" of the sentence as compared to a co-defendant's sentence, and "the extent to which that brutal sentence was a penalty for [the defendant's] exercise of his constitutional right to trial").

Courts are not prohibited from granting compassionate release if the offense conduct resulted in death, as it did here.  Indeed, in the appropriate circumstances, courts have granted relief based on extraordinary and compelling reasons in murder cases resulting in life sentences.  *See*, *e.g.*, *United States v. Qadar*, 00-CR-603 (ARR), 2021 WL 3087956 (E.D.N.Y. July 22, 2021) (reducing sentence to time served where defendant was convicted of conspiracy to commit murder for hire in violation of 18 U.S.C. § 1958); *United States v. Rodriguez*, 492 F. Supp. 3d 306 (S.D.N.Y. 2020) (granting sentence reduction to defendant convicted of murdering a government informant and sentenced to life); *United States v. Rios*, 3:94 Cr. 112 (JBA), 2020 WL 7246440, at *4, 5 (D. Conn. Dec. 8, 2020) (granting compassionate release to defendant convicted of "violent crime in aid of racketeering" murder who received life sentence).

"The only statutory limit on what a court may consider to be extraordinary and compelling is that '[r]ehabilitation . . . alone shall not be considered an extraordinary and compelling reason.'"  *Brooker*, 976 F.3d at 237-38 (quoting 28 U.S.C. § 994(t)). Nevertheless, courts have found evidence of good behavior while incarcerated could, when considered together with other equitable factors, constitute extraordinary and compelling reasons for a sentence reduction.  *See*, *e.g.*, *Qadar*, 2021 WL 3087956, at *8 (concluding that the defendant's "good character, rehabilitation, and prison accolades", in combination with other factors, constituted extraordinary and compelling reasons for a sentence reduction); *Rodriguez*, 492 F. Supp. 3d at 308 (concluding that the defendant's rehabilitation, together with other pandemic-related factors, constituted extraordinary and compelling reasons justifying a sentence reduction); *see also United States v. Panton*, 89 Cr. 346 (LAP), 2020 WL 4505915 (S.D.N.Y. Aug. 4, 2020).

As a final matter, even if "extraordinary and compelling reasons warrant a reduction", the Court must also consider "the factors set forth in section 3553(a) to the extent that they are applicable" before it can reduce the defendant's sentence. 18 U.S.C. § 3582(c)(1)(A). "Even if extraordinary and compelling reasons exist, they must outweigh the 18 U.S.C. § 3553(a) factors to warrant sentence reduction." *Qadar*, 2021 WL 3087956, at *7. When evaluating the nature and circumstances of the offense, the Court may consider the quantity and quality of the evidence underlying the conviction. *See United States v. Cirilo-Munoz*, 504 F.3d 106, 123–24 (1st Cir. 2007) (Torruella, J., concurring).

## **DISCUSSION**

There are at least four extraordinary and compelling reasons for a reduction in Mr. Fernandez's sentence. *First*, there is a strong basis to question the correctness of the verdict, and to believe that an innocent man is serving a life sentence for a crime he did not commit. *Second*, there is a serious disparity between the life sentence imposed on Mr. Fernandez and the sentences received by other participants in the murder conspiracy, Patrick Darge (30 years), Alberto Reyes (25 years), Jeffrey Minaya (15 years) and Luis Rivera (2 years). *Third*, Mr. Fernandez's sentence has been rendered even more harsh due to the pandemic conditions of confinement, and these conditions have subjected inmates like Mr. Fernandez to a significantly different experience behind bars by imposing more punitive conditions of confinement. *Finally*, the way Mr. Fernandez has comported himself in custody is yet another extraordinary and compelling reason to reduce his sentence.

**I.      There Are Compelling Reasons To Question the Jury's Verdict**

In considering Mr. Fernandez's motion for compassionate release, the Court may "consider *any* extraordinary and compelling reason for release that a defendant might raise". *Brooker*, 976 F.3d at 230. This includes the fact that the government's case rested on the testimony of a witness who was a self-admitted liar, and whose testimony was contradicted by the other cooperating witnesses at trial and by the physical evidence at the murder scene. Mr. Fernandez has always maintained his innocence and the real possibility that an innocent man is serving the remainder of his life in prison surely presents a compelling and extraordinary basis to reduce his sentence.

**A.      The Government's Key Witness Is an Admitted Liar Whose Testimony Is Contradicted by Other Witnesses and the Physical Evidence**

Mr. Fernandez's conviction hinges on the testimony of the government's key cooperating witness, Patrick Darge. Darge was the only witness at trial to identify Mr. Fernandez as the second shooter. In fact, the only other trial witness who was present at the scene—Alberto Reyes—testified that he saw Darge's face but that he could not see the second shooter's face. (Tr. 633.) Without the testimony of Darge, the government would not have been able to proceed to trial against Mr. Fernandez. Yet, as discussed below, Darge's testimony was contradicted by the testimony of other witnesses and by the physical evidence at the crime scene.

Patrick Darge has a history of lying to the government and to the court. After being arrested in 2002 for heroin trafficking, Darge pleaded guilty pursuant to a cooperation agreement. (Tr. 361-64.) Before agreeing to cooperate, Darge was facing a mandatory minimum 10-year sentence. (Tr. 370.) Due to his cooperation, Darge was ultimately sentenced to 35 months in prison. (*Id.*) Darge testified on cross-examination

at this trial that he understood, at the time of his previous cooperation, that he was obligated "to tell the complete and whole truth about all [his] criminal conduct . . . and about all those persons that [he] was associated with". (Tr. 385-86). Yet, Darge admitted that he "lied to the government", "lied to the agents" and "lied to the judge". (Tr. 386.)

Darge violated his last cooperation agreement in at least four significant ways: (1) he did not tell the government about his involvement in the murder-for-hire plot that was itself the subject of this trial (Tr. 369); (2) he failed to inform the government that he had committed another drug-related murder in February 1999 (*id.*); (3) he did not provide a complete and truthful account of his other crimes, such as his "drug history and credit card frauds" (*id.*); and (4) he failed to inform the government of his brother Alain Darge's criminal activities, despite knowing that his brother was involved in selling drugs for many years (Tr. 391-92), possessed numerous guns (Tr. 390-91, 421) and committed shootings (Tr. 405).[5] Darge's failure to inform the government of his brother's criminal activity undermined the truthfulness of his testimony about his own criminal conduct, especially considering the testimony of Jeffrey Minaya that Patrick and Alain Darge "sold heroin together", "possessed guns together" and worked together "as a team". (Tr. 227, 229.)

The testimony of other witnesses and the physical evidence contradict Patrick Darge's testimony and strongly suggest that he testified falsely in ways that minimized his own role. For example, Darge testified that he fired a single shot before

---

[5] Alain Darge testified at trial that he had committed multiple shootings. In 1989-90 Alain Darge shot a man who "tried to disrespect [him], tell[ing] [Alain] he was going to buy [his] bike for $2". (Tr. 832.) About a year later, Alain Darge also shot a man in the leg during a dispute over drug territory. (Tr. 832-33.) The third time Alain Darge fired a weapon near someone, he was retaliating against a "kid" who broke his "cousin['s] jaw". (Tr. 833-34.) Alain Darge also engaged in a retaliatory shootout in 2006 when he saw the "best friend" of a man who shot at him in 2004. (Tr. 835.)

his gun jammed and that he "didn't see" where Mr. Fernandez was when he ran out.

(Tr. 327-28.)  Darge further claimed Mr. Fernandez said that "[he] had to make sure they

were both dead" and fired all of the remaining shots.  (Tr. 332.)  Darge's brother, Alain,

however, testified that he heard from Mr. Fernandez that it was *he*—Mr. Fernandez—

who had fired "two shots" before *his* gun jammed and that Patrick Darge was the one

who "end[ed] it" by finishing the two men off.[6]  (Tr. 849-50, 820.)

Likewise, the physical evidence contradicts Darge's version of events, as

it supports a finding that *he*—Darge—was the one who shot all of the bullets at the scene

except one.  Darge testified that he used a .380 caliber gun at the murder scene and that

his gun jammed after one shot. (Tr. 429.)  There was a single intact cartridge found at the

scene, which ballistics expert Detective LaCova testified was consistent with a jammed

shot, and that one intact cartridge was .380 caliber ammunition.  (Tr. 775.)  There were

also fourteen .380 cartridge casings and at least six .380 bullets recovered at the crime

scene, along with three .380 bullets that Detective LaCova received from the morgue

found at the scene.  (Tr. 768.)  So, if Darge testified truthfully that he had used a .380

caliber gun, then he shot as many as fourteen .380 bullets given the number of casings

found at the scene, not only one as he claimed.  There was also a single nine-millimeter

bullet recovered at the scene (Tr. 768, 773), which is consistent with there being a second

shooter because a .380 caliber gun is not able to fire nine-millimeter ammunition

(Tr. 761), but it was *that shooter*, and not Darge, who fired only one shot.  This physical

---

[6] In addition, Jeffrey Minaya testified that he had initially believed that Patrick's brother Alain Darge (not Mr. Fernandez, whom he did not know) was the second shooter, until he held "a lot of meetings with" the government.  (Tr. 233.)  Minaya also testified that the murder plot was arranged "three, four days before" the shooting, which contradicts Patrick Darge's testimony that his involvement only began "[t]he night before the murder".  (Tr. 189, 264.)

evidence supports a finding that Darge lied to minimize his own role in the double murder.  This calls into serious doubt Darge's credibility and raises the question of whether Darge lied about Mr. Fernandez's involvement so as to protect the real second shooter, just as he lied about his own involvement.

**B.**     **The Government's Charging Decision Suggests It Harbored Doubts About Patrick Darge's Testimony**

According to Patrick Darge, Luis Rivera and Mr. Fernandez were both participants in the conspiracy to commit murder-for-hire.  But the government proceeded to trial only against Mr. Fernandez and dropped the murder-for-hire charges against Rivera, allowing him to plead guilty to conspiring to possess and distribute heroin in violation of 21 U.S.C. § 841.  Their radically different case outcomes are the result of the government's charging decisions, and call into question the government's view as to the reliability of Darge's testimony.  As this Court explained:

> Patrick Darge's testimony inculpates Rivera, just as it inculpated [Mr. Fernandez]. . . . If Rivera could not be charged with the crimes of which [Mr. Fernandez] was found guilty, perhaps there is something to [Mr. Fernandez's] argument, that not he, but Patrick Darge's brother, Alain Darge, was the second shooter, and that Patrick Darge testified to cover that up.

(10 Cr. 863, ECF No. 245 at 5 n.4.)[7]

The U.S. Department of Justice Manual in effect during Mr. Fernandez's case instructs that once a grand jury has returned an indictment, prosecutors should not

---

[7] The Court's November 3, 2021 Opinion and Order discusses the uncalled witness jury instruction delivered at Mr. Fernandez's trial.  (10 Cr. 863, ECF No. 245 at 5 n4 ("Had I known then that Luis Rivera would not be charged at the level [Mr. Fernandez] had been charged, but for a much less serious and unconnected narcotics conspiracy that led to a sentence of two years rather than to a mandatory life sentence, I probably would not have given this charge.").)  It is difficult to imagine a scenario where the government offered a plea to a low-level drug charge to Luis Rivera if it credited Darge's testimony that Rivera was a participant in a double homicide.

"bargain[] about charges which they have determined are readily provable and reflect the seriousness of the defendant's conduct" and should "seek a plea to the most serious readily provable offense charged".[8]  The Manual further notes that,

> [s]hould a prosecutor determine in good faith after indictment that, as a result of a change in the evidence or for another reason (e.g., a need has arisen to protect the identity of a particular witness until he or she testifies against a more significant defendant), a charge is not readily provable or that an indictment exaggerates the seriousness of an offense or offenses, a plea bargain may reflect the prosecutor's reassessment. (*Id.*)

Mr. Fernandez was, of course, not privy to the plea discussions between Rivera and the government.  But the government's charging decision speaks for itself.  Because the testimony of Darge, which served as the primary basis for Mr. Fernandez's conviction equally implicated Rivera, the government's charging decision reflects, at minimum, doubt that the testimony—of a cooperating witness who admitted to lying in violation of his prior cooperation agreement—was sufficient to prove Rivera's guilt beyond a reasonable doubt.

## II.    The Disparity Between Mr. Fernandez's and His Alleged Co-Conspirators' Sentences Constitutes an Extraordinary and Compelling Reason for Compassionate Release

The stark disparity between the sentences of Mr. Fernandez and four other participants in the murder conspiracy, Patrick Darge, Alberto Reyes, Jeffrey Minaya and Luis Rivera, is another extraordinary and compelling circumstance that weighs in favor of a sentence reduction.  *See supra* at 5-8.  Mr. Fernandez, who has consistently maintained his innocence, exercised his right to a jury trial and was convicted of a charge

---

[8] United States Attorney's Manual § 9-27-400(B) (captured Jan. 15, 2013), *available at* http://web.archive.org/web/20130115073451/http://www.justice.gov/usao/eousa/foia_reading_room/usam/ti tle9/27mcrm.htm#9-27.400 (last visited Feb. 14, 2022).

carrying a mandatory life sentence. His co-conspirators received significantly less severe sentences of 30 years (Patrick Darge), 25 years (Alberto Reyes), 15 years (Jeffrey Minaya) and 2 years (Luis Rivera). For some of these men, these sentences were not just for the murders but also for their roles in large-scale drug trafficking conspiracies.

The most dramatic disparity is between Mr. Fernandez and Luis Rivera, who received a two-year sentence. Although they had different roles in the conspiracy, Rivera played a key part in its execution. Darge testified that Rivera provided him with a gun and the getaway car, which had a hiding spot to conceal contraband. (Tr. 285-87.) Darge also testified that Rivera disposed of the murder weapon after the crime. (Tr. 429.) Despite his crucial involvement with the plot, having provided the murder weapon and driving the getaway car, Rivera served less than two years in prison because of a plea deal that the government made. The discrepancy between two years and life imprisonment is truly extraordinary.

Jeffrey Minaya is the drug kingpin who spearheaded the plot to kill the two cartel members in furtherance of the drug trafficking organization he ran.[9] Even though he was the leader of the organization and ordered his lieutenants to carry out the murder plot, he received a sentence of 15 years at his initial sentencing hearing not only

---

[9] As this Court stated with respect to Minaya's role in the murder plot:

[I thought] He [] was the chief culprit. He organized a major league distribution center of narcotics that were being imported from Mexico and Minaya was the head of that gang. They determined, Minaya and others in the gang, that they would not pay the Mexicans for the drugs they imported. So they killed the Mexican curriers [sic]. Minaya arranged the killings. He did it through his lieutenants[.]

(5 Cr. 973 (AKH), ECF No. 24 at 6.)

for participating in the murder conspiracy but also for conspiracy to distribute cocaine.[10]
(5 Cr. 973, ECF No. 24.)  That sentence was further reduced in 2017 by an additional 12
months pursuant to Federal Rule of Criminal Procedure 35(b)(2)(C).  Minaya is no longer
in BOP custody.

Mr. Fernandez's sentence was also much longer than that of Alberto
Reyes, who admitted not only to being one of the organizers of the plan to kill the two
cartel members, but also to helping put the plot into action by recruiting and paying
Patrick Darge to kill the two men.  (Tr. 616-17, 620-22.)  Further, Reyes testified that he
personally led the two cartel members to the lobby where they would ultimately be
murdered.  (Tr. 605.)  Reyes cooperated with the government and received a 25-year
sentence for his involvement in the murder and for conspiring to distribute more than five
kilograms of cocaine—far below the mandatory life sentence that was imposed on
Mr. Fernandez.  (10 Cr. 863, ECF Nos. 42, 177.)

Mr. Fernandez's sentence was also significantly higher than Darge's 30-
year sentence, even though Darge was a far more instrumental player in the scheme than
Mr. Fernandez was alleged to be.  Darge initially agreed to commit the murders and
enlisted Mr. Fernandez and Rivera to assist.  (Tr. 271.)  Darge testified that he made the
bulk of the money—he was paid $190,000 for the murders and paid Mr. Fernandez
$40,000 for his assistance.  (Tr. 335.)  Darge also testified as to his extensive criminal
history, including his involvement in a prior drug-related murder, his extensive drug
dealing history and his history of credit card fraud.  (Tr. 369-70.)

---

[10] At trial, Minaya admitted to trafficking "hundreds" of kilograms of "heroin and cocaine".  (Tr.
224.)

Extreme sentencing disparities between co-defendants can contribute to a finding of extraordinary and compelling circumstances.  For instance, in *United States v. Ballard*, the court considered a motion for compassionate release from Ballard, who received a sentence four times as long as his co-defendant.  2021 WL 3285009, at *5.  As the court explained, the disparity "arose in significant part from the government's 'charge bargaining' with [Ballard's co-defendant], who ultimately pled guilty to just two counts, despite [admitting] to having committed twenty two robberies beyond those for which Ballard was convicted".  *Id.*  In contrast, because Ballard went to trial on charges which carried a mandatory minimum—related to only a subset of the robberies—the court was bound to impose a mandatory sentence of at least 600 months of imprisonment.

The court in *Ballard* recognized that Ballard and his co-defendant were not similar in every respect.  It highlighted that Ballard "had a longer criminal history than [his co-defendant]" and had "engaged in more egregious conduct during the robberies for which he was convicted".  *Id.*  Nonetheless, the court determined that "the gross disparity between Ballard's and his co-defendant's sentences" was "another reason to find that the extraordinary and compelling circumstances of this case warrant a sentence reduction", and reduced Ballard's sentence from 601 months to 301 months.  *Id.*

Here, as in *Ballard*, Mr. Fernandez was sentenced to a term of imprisonment that far exceeded those of four of his alleged co-conspirators.  And, as in *Ballard*, this discrepancy resulted from Mr. Fernandez exercising his right to a jury trial and being subjected to a mandatory minimum sentence.  *See id.*; *see also Haynes*, 456 F. Supp. 3d at 514 (granting a motion for a sentence reduction based in part on disparities in the sentences of co-defendants and "the extent to which that brutal sentence was a

penalty for [the defendant's] exercise of his constitutional right to trial"); *Clark*, 2021 WL 201253, at *7 (granting compassionate release based, in part, on the discrepancy between the defendant's 140-month sentence and his co-defendants' sentences). The dramatic disparities between Mr. Fernandez and his alleged co-conspirators constitutes an extraordinary and compelling reason favoring a sentence reduction.

### III.     Harsh Pandemic Conditions of Confinement Have Rendered Mr. Fernandez's Sentence More Unjust

Mr. Fernandez's mandatory life sentence has been rendered even more harsh due to the pandemic conditions of confinement, which constitute a third extraordinary and compelling reason for a sentence reduction.[11]

The COVID-19 pandemic has required the BOP to substantially change its operations, subjecting inmates to a far different experience behind bars by imposing more punitive conditions of confinement. As one district court has put it, the pandemic has created "truly extraordinary conditions" of confinement, which in some circumstances "undoubtedly exacerbate an already unjust sentence" and merit a sentence reduction. *Kissi*, 469 F. Supp. 3d at 39.

Courts have recognized that the restrictions imposed in response to the COVID-19 pandemic have increased the severity of custodial punishment. *See*, *e.g.*, *Robles*, 2021 WL 3524067, at *6 (determining that "the pandemic has spawned conditions of confinement", such as limitations on inmates' access to visitors and to

---

[11] Mr. Fernandez is incarcerated at USP Canaan, a high security facility with a minimum security satellite camp. *See* USP Canaan, Federal Bureau of Prisons, *accessible at* https://www.bop.gov/locations/institutions/caa/ (last visited Feb. 14, 2022). The facility houses a total of 1,228 inmates. *Id.* Since the onset of the pandemic, USP Canaan has had 399 inmates and 142 staff members test positive for and recover from COVID-19. *See* COVID-19 Cases, Federal Bureau of Prisons, https://www.bop.gov/coronavirus/ (last visited Feb. 14, 2022).

rehabilitative, therapeutic and recreational programs, that are "far more punishing than what could have been expected at the time of [the defendant's] sentencing").  Indeed, in light of the unanticipated increases in the punitive nature of incarceration, courts are increasingly reconsidering the length and appropriateness of sentences imposed before the pandemic.  For example, in *United States v. Rodriguez*, the court found that the unique hardship caused by more punitive prison conditions was an important factor in determining that there were extraordinary and compelling reasons for a reduction of the defendant's sentence.  492 F. Supp. 3d at 316.

The punitive nature of Mr. Fernandez's custodial experience has increased as the COVID-19 pandemic continues.[12]  To mitigate the spread of COVID-19, the BOP has limited inmate movement in order to "prevent congregate gathering and maximize social distancing".[13]  Mr. Fernandez's designated facility, USP Canaan, is currently operating at Level 3.[14]  This is the most restrictive level and intended "for institutions with a high level of transmission risk which requires a full pandemic response and mitigation measures involving *intense modifications* to institution operations".  *See*

---

[12] PREA Audit Report of USP Canaan, at 9 (Sept. 13, 2021), *accessible at* https://www.bop.gov/locations/institutions/caa/caa_prea_091321.pdf (last visited Feb. 14, 2022) (in the course of conducting an audit of USP Canaan, noting that "the COVID-19 pandemic has been very difficult in the prison setting"); *see generally* U.S. General Accountability Office, *BOP Response to COVID-19*, GAO-21-502, at 34 (July 2021) ("BOP's efforts to safeguard its inmates during the pandemic has changed inmates' living conditions. Specifically, BOP has limited access to programs, services, visitors, and facility spaces.").

[13] BOP Modified Operations, Federal Bureau of Prisons (Updated Nov. 25, 2020), *accessible at* https://www.bop.gov/coronavirus/covid19_status.jsp (last visited Feb. 14, 2022).

[14] USP Canaan, Federal Bureau of Prisons, https://www.bop.gov/locations/institutions/caa/ (last visited Feb. 1, 2022). Operational levels are based on COVID-19 medical isolation rate, combined percentage of staff and inmate completed vaccinations series, and their respective community transmission rate, and affect facility operations such as inmate programming and services. *See* BOP COVID-19 Operational Levels, *accessible at* https://www.bop.gov/coronavirus/covid19_modified_operations_guide.jsp#about_levels (last visited Feb. 14, 2022).

Federal Bureau of Prisons, COVID-19 Pandemic Response Plan: COVID-19 Modified Operations Matrix, Aug. 16, 2021 (emphasis added).  Even at Level 2, prison operations are modified significantly; for example, group activities (such as educational, psychological, and religious programming and services) and recreation are limited to allow for social distancing.[15]  At USP Canaan, all visitation has been suspended as of February 1, 2022 until further notice,[16] and recreation, educational and religious activities have been canceled.[17]  Volunteers have not been permitted to provide services to inmates at USP Canaan since March 2020.[18]  Inmates, including Mr. Fernandez, have been subjected to lockdowns, where they have not been allowed to leave their cells and have had no hot meals for extended periods of time.[19]  Mr. Fernandez reports that it has been difficult for him to obtain medical care.  For the majority of the pandemic, Mr. Fernandez's family has not been able to visit him in person.[20]  Due to continuing

---

[15] *See* BOP COVID-19 Operational Levels, https://www.bop.gov/coronavirus/covid19_modified_operations_guide.jsp#about_levels (last visited Feb. 14, 2022).

[16] USP Canaan, Federal Bureau of Prisons, https://www.bop.gov/locations/institutions/caa/ (last visited Feb. 14, 2022).

[17] PREA Audit Report of USP Canaan, at 9 (Sept. 13, 2021), accessible at https://www.bop.gov/locations/institutions/caa/caa_prea_091321.pdf (last visited Feb. 14, 2022) (in the course of conducting an audit of USP Canaan stating "[p]rograms and services have had to be curtailed for well over a year" and "[a]t the time of the on-site audit, there were limited education and programming opportunities due to the COVID-19 pandemic").

[18] PREA Audit Report of USP Canaan, at 34 (Sept. 13, 2021) ("Due to the COVID19 pandemic, volunteers have not been allowed to come to the facility since March 2020 to provide services to inmates.").

[19] Letter from Hector Gomez to Hon. Alvin Hellerstein (Dec. 23, 2021) ("H. Gomez Letter") at 2. Letters of support from friends and family are collected in Defendant's Exhibit C.

[20] USP Canaan resumed modified social visitation on March 26, 2021.  *See* Memorandum from Warden E. Bradley regarding USP Social Visiting, March 19, 2021. As of February 14, 2022, all visitation to USP Canaan had been suspended "until further notice".  USP Canaan, Federal Bureau of Prisons, https://www.bop.gov/locations/institutions/caa/ (last visited Feb. 14, 2022).

visitation limitations, Mr. Fernandez has not been able to see his mother since the pandemic began.  The letters from his family, discussed in more detail below, share that, due to the pandemic, they have not seen Mr. Fernandez for months at a time.

### IV.   The Way Mr. Fernandez Has Comported Himself in Custody Is an Extraordinary and Compelling Reason To Reduce His Sentence

Mr. Fernandez has comported himself in prison in a manner that will make him a more valuable member of society upon his release.  While post-conviction rehabilitation alone cannot be a basis for compassionate release, that Mr. Fernandez has used his time in prison well, together with the circumstances described above, provides an extraordinary and compelling justification for compassionate release.  *See*, *e.g.*, *Brooker*, 976 F.3d at 238.

For example, in *United States v. Qadar*, the defendant was serving a mandatory life sentence for committing and conspiring to commit murder-for-hire and moved for compassionate release.  2021 WL 3087956, at *1.  Judge Ross concluded that Qadar's "good character, rehabilitation, and prison accolades", in combination with other factors, constituted extraordinary and compelling reasons supporting a sentence reduction to time served.  *Id*. at *8.  In particular, Judge Ross noted Qadar had one disciplinary infraction, obtained several educational certificates and served the inmate community as a suicide watch companion and fitness instructor.  *Id*. at *10.  Judge Ross also found it noteworthy that fellow prisoners indicated support for his release, as well as that Qadar maintained contact with his children and continued to have a "huge impact" on their lives.  *Id*.

In *United States v. Ramirez*, the defendant was convicted of conspiring to commit murder in aid of racketeering as well as other drug offenses.  --- F. Supp. 3d ---,

98 Cr. 927 (CM), 2021 WL 5233512 (S.D.N.Y. Nov. 10, 2021). Judge McMahon granted a sentence reduction to 40 years of imprisonment after Ramirez demonstrated evidence of his "extraordinary post-conviction rehabilitation", in addition to his age at the time of his crime and [the sentencing judge's] statements about the injustice of his lengthy sentence, even though "the nature and circumstances of the offenses in this case [were] among the most serious" to have come before Judge McMahon. *Id.* at *9-10. Ramirez presented evidence of the numerous educational courses and certifications he had completed, his participation in programs to help fellow inmates and his participation in drug treatment and psychological counseling. *Id.* at *8–9.

Similarly, in *United States v. Panton*, Judge Preska granted compassionate release to a man who was sentenced to life imprisonment for his role in a heroin trafficking conspiracy. 89 Cr. 346 (LAP), 2020 WL 4505915 (S.D.N.Y. Aug. 4, 2020). Among the factors considered by Judge Preska was the significant evidence of Panton's rehabilitation and good character. During his three decades of incarceration, Panton "maintained a good disciplinary record", "t[ook] advantage of numerous courses and other opportunities to enable a law-abiding life", "evidenced a desire to help the outside community" and "maintained an exceptional degree of contact with his children". *Id.* at *7.

Mr. Fernandez is known at USP Canaan as a leader who makes "others feel uncomfortable about their criminal behavior" and is known for the "positive effect that [he] has on the people around him".[21] Mr. Fernandez has worked consistently as a

---

[21] Letter from Christian Pearson to Hon. Alvin Hellerstein (Jan. 6, 2022) (Defendant's Exhibit C). Mr. Pearson met Mr. Fernandez when they were both incarcerated. Mr. Pearson has been released from federal custody.

lieutenant orderly, a position of trust with duties that include cleaning the offices and

facilities used by the assistant warden and the lieutenant.  He has also taken the initiative

to organize and lead his fellow inmates in regular workout sessions, which he designs.[22]

In this capacity, he serves the inmate community by encouraging and motivating others to

stay healthy through physical activity and eating well. [23]  Finally, as evidenced by

numerous letters of support, described in detail below, Mr. Fernandez has maintained

close contact with, and has extraordinary support from, his wife, children, mother,

siblings, extended family and friends.  Seventeen people have submitted unusually

passionate and detailed letters expressing their support for Mr. Fernandez and describing

his positive influence on their lives, both before and during his incarceration.[24]

      Mr. Fernandez has "used his time well in completing numerous courses

during his incarceration" even though his life sentence provided "no realistic hope of

---

[22] H. Gomez Letter at 1.

[23] Mr. Fernandez's disciplinary history does not undercut the significant steps towards rehabilitation Mr. Fernandez has taken or militate against compassionate release.  *See Panton*, 2020 WL 4505915, at *7 (granting compassionate release even though defendant had six disciplinary infractions, none of which included violence); *Qadar*, 2021 WL 3087956, at *4 (granting compassionate release notwithstanding the fact that the defendant had an infraction on his record); *Rios*, 2020 WL 7246440, at *3 (granting a sentencing reduction even though the defendant had seven total infractions, one of which "involved violence"). In 2012, while in pre-trial custody, Mr. Fernandez was accused of "refusing to obey an order". *See* Inmate Discipline Data, Chronological Disciplinary Record, Joe Fernandez (Jan. 10, 2022) (Defendant's Exhibit B).  Two incidents, in 2016 and 2017, involve accusations of giving or accepting money without authorization.  In 2018, Mr. Fernandez was found in possession of a strip of paper that later tested positive for amphetamines with a NIK kit.  None of these incidents involved an accusation of violence.

[24] For this reason, a reduction in Mr. Fernandez's sentence is also consistent with the applicable policy statements of the Sentencing Commission.  Specifically, "the Court must also determine that [Mr. Fernandez] 'is not a danger to the safety of any other person or to the community'". *Piggott*, 2022 WL 118632, at *4 (quoting U.S. Sentencing Guidelines Manual § 1B1.13(2)).  Here, as in *Piggott*, "numerous letters submitted on [the defendant's] behalf indicate that he will be bolstered by the support of numerous friends and extended family members".  This support network will help ensure that Mr. Fernandez makes a successful transition, if released.  Moreover, aside from this case, Mr. Fernandez has never been accused of violence in any form.  Since Mr. Fernandez has adamantly maintained his innocence and there are serious reasons to question the correctness of the verdict, he is not a danger to the safety of anyone in the community.

release". *Id*. at *8.  Mr. Fernandez has taken at least 18 courses covering a wide range of topics, including multiple parenting classes, courses on U.S. history and business law, and classes addressing occupational training and practical skills like OSHA, leather craft, plumbing and horticulture, for which he has received certificates of completion.  *See* Defendant's Exhibit A.  The knowledge gained from these experiences would help Mr. Fernandez secure employment if he were permitted to return to the workforce and to rejoin his family.

## V.   The Section 3553(a) Sentencing Factors Call for a Sentence of Time Served

Because Mr. Fernandez's life sentence was mandatory, this compassionate release motion represents the Court's "first opportunity to functionally weigh the § 3553(a) factors in his case".  *United States v. Perez*, 2 Cr. 7 (JBA),  2021 WL 837425, at *4 (D. Conn. Mar. 4, 2021) (granting compassionate release application of an inmate sentenced to life imprisonment for a conviction pursuant to 18 U.S.C. § 1958); *see also United States v. Somerville*, 463 F. Supp. 3d 585, 588-89 (W.D. Pa. 2020) (finding that the mandatory minimum sentence imposed by the Armed Career Criminal Act precluded the court from considering the defendant's substantial mitigating circumstances, and those factors weighed in favor of compassionate release).

Section 3553(a) "contains an overarching provision instructing district courts to 'impose a sentence sufficient, but not greater than necessary,' to accomplish the goals of sentencing".  *Kimbrough v. United States*, 552 U.S. 85, 101 (2007).  The § 3553(a) sentencing factors include:  (1) "the nature and circumstances of the offense and the history and characteristics of the defendant"; (2) "the need for the sentence imposed"; (3) "the kinds of sentences available"; (4) the guidelines ranges; (5) "any pertinent policy statement"; (6) "the need to avoid unwarranted sentence disparities

among defendants with similar records"; and (7) "the need to provide restitution to any victims of the offense". 18 U.S.C. § 3553(a). Here, the § 3553(a) factors favor a sentence of time served.

### A. The Nature and Circumstances of the Offense

The seriousness of Mr. Fernandez's conviction is obvious. Nevertheless, Mr. Fernandez has consistently maintained that he is innocent of the charges against him. At sentencing, Mr. Fernandez stated:

> On March 7, 2013, I was convicted for a crime I did not commit[,] and I am not a murderer. I was framed and set up by Patrick Darge, the government, and multiple people I am supposed to call family and a person I never knew nor shared anything with. My true family, my wife, my children, and all who truly know me know that I am innocent. I pray every day for strength from my Lord to help me bear this pain of such an unjust system full of betrayal and corruption. My family and I will continue to fight to clear my name and I will keep hope and faith and I will never stop fighting [].

(10 Cr. 863, ECF No. 170 at 54.)

When evaluating the nature and circumstances of the offense, a court may consider the quantity and quality of evidence underlying the conviction. In *United States v. Cirilo-Munoz*, Judge Torruella of the First Circuit concluded that the district court's imposition of a 27-year sentence was unreasonable because, among other things, the nature and circumstances of the offense—including the weaknesses in the case against the defendant—called for a lower sentence.[25] 504 F.3d 106. The government primarily relied on the testimony of a single, unreliable witness who had previously lied to the government. Judge Torruella noted that the defendant was unaware "of the

---

[25] The short *per curiam* statement at the start of the decision explains that each judge wrote a separate opinion. *See Cirilo-Munoz*, 504 F.3d at 107. The defendant's sentence was vacated, and the case was remanded for resentencing based on the opinions of Judges Torruella and Lipez.

intended murder of [the victim, an undercover policeman] before it happened" and "could not have had more than fleeting knowledge that a crime was going to occur". *Id*. at 124. Judge Torruella emphasized that, while he believed the conviction should have been reversed, "even accepting that there was minimally sufficient evidence for a jury to find [the defendant] guilty", his "link to this crime was so attenuated" and "remote" that the district court's high sentence could not be upheld. *Id.*

    Here, in assessing the nature and circumstances of the offense, the Court should consider the quantity and quality of evidence presented by the government.  That evidence should give the Court pause because, as discussed above, it raises serious questions about the correctness of the verdict.  *See supra* section I. A.  While concerns about whether the jury got it right are generally insufficient to overturn the jury verdict, *see United States v. Archer*, 977 F.3d 181, 188–89 (2d Cir. 2020), these concerns certainly should be taken into account when considering an appropriate sentence. Unfortunately, this Court did not have the opportunity to do so previously, as Mr. Fernandez was subject to a mandatory life sentence.  Now, under the First Step Act, this Court has the authority to take all relevant § 3553(a) factors into account, and must assess the nature and circumstances of the offense—*including* whether the defendant actually committed the offense—in setting a fair and just sentence.

    **B.**  **The History and Characteristics of the Defendant**

    When Mr. Fernandez voluntarily surrendered to authorities on October 18, 2011, he was a happily married father of four living in Woodbury, New York.  The arrest came as a shock to those who knew Mr. Fernandez, a family man who was employed full time and had no contact with the criminal justice system for years.  Despite the enormous challenges Mr. Fernandez and his family have faced over the past decade, they have stuck

together.  Mr. Fernandez has never given up hope that he may one day be released and
return to being a productive member of society.  As evidenced by the letters submitted by
his family, he is a beloved husband, father, son, brother and uncle who has the full
support of his immediate and extended family.  Notwithstanding the result of
Mr. Fernandez's criminal trial, he has remained optimistic and has comported himself
well in prison.

Mr. Fernandez was born on April 18, 1976 to a working class family in the
Bronx.  He is the second of three children born to Jose Fernandez and Maxmina
Fernandez.  Jose worked at a small grocery store; Maxmina was a matron on a school
bus.  Jose abandoned Maxmina when Mr. Fernandez was approximately five years old.
He formed a second family in Queens and lived with them full time.  Although Jose
would try to visit on the weekends, Mr. Fernandez reports that his father was largely
absent.  Mr. Fernandez's younger brother Kevin explains that Mr. Fernandez "was that
father figure I needed growing up", and he was "always there . . . in good and bad times
especially when I was dealing with my Crohn's disease".[26]  One of Mr. Fernandez's
friends, Hector Gomez, explains that he was committed to breaking the cycle of paternal
absenteeism:  "The last thing [Mr. Fernandez] ever wanted was for his kids, is to
experience life without a father at home and this has really become his worst nightmare,
not being able to be present for his children".[27]

When Mr. Fernandez was 20, he met the woman who would become his
wife, Dalila Perez.  Dalila describes Mr. Fernandez as her "best friend", "soul mate", her

---

[26] Letter from Kevin Fernandez to Hon. Alvin K. Hellerstein (Dec. 22, 2021) ("K. Fernandez Letter")
(Defendant's Exhibit C).

[27] H. Gomez Letter at 1.

"rock" and the father to her four children.[28]  The couple has been married for 18 years, and Dalila has stood by Joe during his more than 10 years of incarceration.  In her letter to the Court, Dalila explains that Mr. Fernandez "would always put me, his children and family first".[29]  He "worked hard . . . to provide for his family".[30]  Dalila wanted to pursue a career in nursing after her third daughter was born, and Mr. Fernandez took on a disproportionate share of the child-rearing responsibilities while Dalila was studying. She now works as a nurse educator, teaching young nurses who will work in pediatric home care settings.  Dalila has been devastated by the events of the past decade, but she has not given up hope.  As she writes, "I hope to one day feel my husband, hug him and have him by my side once again.  He has a dedicated support system and lots of love waiting for him.  I plead for your compassion and mercy in the review of this case".[31]

Mr. Fernandez has an extraordinarily strong bond with his children and has maintained relationships with them even while incarcerated.  For example, although Gabriella Nazar is not Mr. Fernandez's biological child, he raised Gabriella as his own daughter starting when she was one.  Gabriella writes that "Joe Fernandez is an amazing dad, role model, husband, son, and friend".[32]  Gabriella is engaged to be married, but has "pushed aside the thought of even planning my wedding because it is just something I

---

[28] Letter from Dalila Perez to Hon. Alvin K. Hellerstein ("D. Perez Letter") (Defendant's Exhibit C).

[29] D. Perez Letter at 1.

[30] *Id.*

[31] *Id.* at 2.

[32] Letter from Gabriella Nazar to Hon. Alvin K. Hellerstein ("Nazar Letter") (Defendant's Exhibit C). Ms. Nazar is now 26. She received her bachelor's degree in behavioral health from Mercy College, is pursuing a second degree and works in an assisted living facility.  As evidenced by Ms. Nazar's letter, Mr. Fernandez is still a frequent presence in her life and the life of her infant daughter and fiancé.

couldn't imagine my dad missing".[33]  Mr. Fernandez's second daughter, Abigail

Fernandez, was 12 when her father was sentenced.  She writes:

> My father was present in my life from the day I was born, he would take
> me and my sisters to the park and construct obstacle courses, or convince
> us to play new games he would create[.]  Once I was able to start
> preschool, he became a stay-at-home dad to me and my sisters and worked
> late nights while my mom decided to go back to school to become a
> registered nurse. . . . My dad is hardworking, creative, loyal, and my
> protector. [H]e was always there when I needed absolutely anything[.][34]

Abigail speaks to Mr. Fernandez whenever possible.  She writes, "Regardless of the

distance or the obstacles we faced, any chance my dad gets he uses to check in and

reaches out to me and my siblings, as we do the same".[35]  Mr. Fernandez's youngest

daughter, Bianca Fernandez, has similarly fond memories of her father:

> [M]y dad was taken out of my life in 2011, I was 9.  My dad watched
> cartoons with me, he would sit with me at my princess table while we
> tested his newest snack ideas, he would get me ready for school and do my
> hair; I grew up knowing my dad, I knew who he was, his likes his dislikes,
> what made him laugh, what made him smile and everyone whom he cared
> for.[36]

All of Mr. Fernandez's daughters have suffered immensely since his

arrest.  Gabriella Nazar writes:

> My dad has been in prison for the last 10 years of my life, and this has
> affected me in more ways than any person can understand.  When my
> father got arrested in 2011 my whole world literally flipped upside down,
> my mother had given up and me being the oldest of 4 kids I had to step up
> and become "mom".  My mother was mentally destroyed by this and it

---

[33] Nazar Letter at 1.

[34] Letter from Abigail Fernandez to Hon. Alvin K. Hellerstein ("A. Fernandez Letter") (Defendant's Exhibit C). Abigail is now 22. She is pursuing a degree in exercise therapy at Mercy College while working full-time as a nanny.

[35] A. Fernandez Letter 1-2.

[36] Letter from Bianca Fernandez to Hon. Alvin K. Hellerstein ("B. Fernandez Letter") (Defendant's Exhibit C).  As a result of her family's experiences, Bianca is studying criminology at Berkeley College, with an expected graduation in 2023.

tore our whole family apart.  Not only did we have to move out of our home that my dad contributed all his hard work to but, I had to financially contribute and work to help support my family.[37]

Bianca Fernandez also describes this incredibly difficult period in their lives:

> [I]n 2011, my father stopped coming home; there was no explanation, no warning, no signs, and then no hope.  My world was completely shattered as if someone stole and broke the rose-colored lenses that I once saw the world through; I was so lost and alone.  Me, my mom, brother, and sisters all shared the same sadness and fear. . . . We struggled constantly, in more ways than one; life was no longer enjoyable, nothing was easy anymore. For 10 years since that day, every day I would sit at my school desk fantasizing that my dad would walk through the doors and surprise me; every day I was disappointed. Every holiday, birthday, graduation this fantasy arose again, and year after year I was forced to pray and hope next year would be the year my father would be home.  My dad missed 10 of my birthdays, 3 of my graduations, and the 1,000 times that I have cried for him.[38]

Mr. Fernandez has been absent from virtually all of his son Joseph's life, and Joseph has "no memory of [his] dad being home".[39]

The letters from family and friends describe how Mr. Fernandez treated people before his incarceration.  For example, Christina Quinones, the sister of Mr. Fernandez's wife Dalila Perez, wrote about her experience living with her sister and Mr. Fernandez as a child after her parents had to return to Ecuador.  Mr. Fernandez opened up his home to her:  "He protected and cared for me during a period [that] was very difficult as I struggled with being away from my parents.  He went above and

---

[37] Nazar Letter at 1.

[38] B. Fernandez Letter at 1.

[39] Letter from Joseph Fernandez to Hon. Alvin K. Hellerstein ("J. Fernandez Letter") (Defendant's Exhibit C).

beyond for me, he made sure that I didn't feel abandoned and alone".[40]  Ms. Quinones

also describes the close bond Mr. Fernandez shared with his father-in-law:

> Later in life my father became very ill due to complications from lifelong
> diabetes, which resulted in him being legally blind, wheelchair bound, and
> requiring hemodialysis due to kidney failure. My father had to go to
> dialysis three times per week and was unable to drive due to being legally
> blind. Joe would drive my dad to dialysis, help bathe him, prepare meals,
> and many other things that my dad needed. Even though Joe had many
> other responsibilities such as work and caring for his wife and children, he
> always found a way to help the family care for my father.

Mr. Fernandez's longtime friend, Hector Gomez, writes about the man he has known

since the 1980s:

> Joe has always had my back and I will always have his.
> Joe helped me land my first job in the demolition world.
> I learned what it is to work hard for your money from him during our
> demolition workdays.
> Joe, taught me how to drive a car and a truck. . . .
> He taught me how to manage money, get to work on time and behave like
> a young and responsible adult at the workplace.
> All I have are good memories with this man
> Not a day we ever argued or disrespected one another.
> Never seen him fight, always cool tempered, drives with no road rage.
> I watched him be a dad and take his kids trick or treating fully dressed up
> or tubing down a hill when it snowed.
> I watched him set up a trampoline in the backyard and admire his children
> jumping around.
> He showed me how much he supported his marriage by being a stay at
> home dad while his wife went to Nursing School to better herself.[41]

Mr. Fernandez's brother, Kevin Fernandez, writes to the Court:

> I admire my brother so much because he is such a hard worker, always
> gets along with everyone no matter if you are a stranger, and everyone
> loves him for the person that he is.  He adores his family unconditionally

---

[40] Letter from Christina Quinones to Hon. Alvin K. Hellerstein ("C. Quinones Letter") (Defendant's Exhibit C).

[41] H. Gomez Letter at 1.

and it breaks my heart that he is not able to see his kid's achievements with school, work, or life experiences that his kids are having.[42]

Michael Caraballo, Mr. Fernandez's brother-in-law, writes that after he survived a massive heart attack, Mr. Fernandez supported him: "Joe was there for me, although sentenced, sending me positive messages".[43]  Mr. Caraballo adds:

> This just goes to show how no matter where [Mr. Fernandez] is, he will spread and share his positivity to keep his family, and everyone close to him, strong and hopeful. And that's what we did, and that's who we are. We are strong and hopeful because Joe keeps us strong and hopeful. I hope that soon I can hug my brother for life, and he can come home to our family.[44]

Mr. Fernandez's niece, Amanda Caraballo, writes that Mr. Fernandez has "the biggest heart", "lights up every room he walks into" and "never fails to put a smile on my face".[45]  Mr. Fernandez's sister, Doris Caraballo, writes that Mr. Fernandez "puts his family over everything and there are so many people who love him and are missing him, praying he comes home soon".[46]

Mr. Fernandez is Catholic and has strong faith in God.  He reads the Bible and prays every night.  Prior to his incarceration, Mr. Fernandez attended Sacred Heart Church on Sundays with his wife and children.  Although his faith has been shaken at times during his incarceration, Mr. Fernandez credits his family and faith with allowing

---

[42] K. Fernandez Letter at 1.

[43] Letter from Michael Caraballo to Hon. Alvin K. Hellerstein (Dec. 23, 2021) ("M. Caraballo Letter") (Defendant's Exhibit C).

[44] M. Carabello Letter at 1.

[45] Letter from Amanda Caraballo to Hon. Alvin Hellerstein (Dec. 23, 2021) ("A. Caraballo Letter") (Defendant's Exhibit C).

[46] Letter from Doris Caraballo to Hon. Alvin Hellerstein (Dec. 23, 2021) ("D. Caraballo Letter") (Defendant's Exhibit C).

him to remain strong.  During his incarceration, Mr. Fernandez has attended a wide variety of religious services for their uplifting messages.

Prior to his incarceration, Mr. Fernandez worked hard to support his family.  From January 2010 until his arrest in October 2011, he was working at All Points Limousine as a full-time driver.  (10 Cr. 863, Presentence Investigation Report of Joe Fernandez ("PSR") ¶ 73.)  Previously, Mr. Fernandez held a full-time job at Countryside Stoves and Fireplaces installing fireplaces.  (PSR ¶ 74.)  When his children were young and Dalila was in nursing school, Mr. Fernandez worked at BJ's Wholesale Club while taking on much of the child-rearing responsibilities.  He eventually reached the position of full-time manager at BJ's.  (PSR ¶ 75.)  Mr. Fernandez also worked at Sorrento Lactalis as a machine operator and at Weather Seal as an installer.  (PSR ¶¶ 76-77.)  When he was a young man, Mr. Fernandez did physically demanding work as a demolition laborer with his friend Hector Gomez[47] and worked as a security guard in buildings throughout New York City.

Although Mr. Fernandez has had prior contact with the criminal justice system, his criminal history is largely confined to his youth.  The most serious prior charge is a 1994 Attempted Burglary when Mr. Fernandez was 17.  That case involved no accusation of violence and resulted in a youthful offender disposition, which is not a crime under New York state law.  *See* N.Y. Crim. Proc. Law § 720.35.  The remainder of Mr. Fernandez's contacts with the criminal justice system also do not involve crimes of violence, and none of his offenses resulted in jail time.  (PSR ¶¶ 44-58.)

---

[47] H. Gomez Letter at 1.

### C.     The Need for the Sentence Imposed

Mr. Fernandez has been incarcerated for over a decade.  This sentence for a crime he maintains he did not commit and for which there is ample evidence that he did not commit has been more than sufficient to "promote respect for the law", "provide just punishment" and "afford adequate deterrence" as required by 18 U.S.C. § 3553(a)(2). There is no further need to keep Mr. Fernandez in jail to "protect the public from further crimes".  *Id.*

### D.     The Kinds of Sentences Available

At the time of Mr. Fernandez's original sentencing proceeding, the Court was required to impose a life sentence.  However, as a result of the First Step Act, the Court may impose any sentence, including time served.  *Brooker*, 976 F.3d at 230.  Such a reduction would be consistent with the extraordinary and compelling reasons presented and would not be unprecedented for § 1958 convictions, as evidenced by recent sentences that defendants received after courts granted their motions for compassionate release. *See, e.g., Perez*, 2021 WL 837425, at *4 (reducing the defendant's life sentence to time served); *Qadar*, 2021 WL 3087956, at *12 (E.D.N.Y. July 22, 2021) (same).

### E.     The Disparity Between Sentences and Pertinent Policy Statements

The disparity between Mr. Fernandez's sentence and the sentences of his alleged co-conspirators, and in particular his co-defendant Luis Rivera, counsels for a reduced sentence under § 3553(a).  *See supra* section II.  Section 3553(a)(6) instructs that one of the goals of sentencing is "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct". 18 U.S.C. § 3553(a)(6).  Reducing Mr. Fernandez's greater sentence than any of his co-defendants is consistent with the goals of § 3553(a)(6).  *See Clark*, 2021 WL 201253, at

*8 ("[R]educing [the defendant's] sentence at this point would not undermine the goals of promoting just sentencing or create unwarranted sentencing disparities between similarly situated defendants, especially in light of the fact that every other defendant in this case received a lower sentence.").

## <u>CONCLUSION</u>

The First Step Act has produced "monumental" changes to the federal criminal justice system and has resulted in the release of thousands of imprisoned people who were subject to excessive sentences.  *Brooker*, 976 F.3d at 230.  It has given this Court the power to rectify Mr. Fernandez's unjust sentence based on the extraordinary and compelling reasons presented and to reduce Mr. Fernandez's sentence.  For the foregoing reasons, this Court should grant Mr. Fernandez's motion for compassionate release and reduce his sentence to time served.

Dated:  February 14, 2022          Respectfully submitted,


/s/ Benjamin Gruenstein
Benjamin Gruenstein

Benjamin Gruenstein (3897758)
Eric Pilch (5652979)
Alexandra Mahler-Haug (5769849)
CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
  825 Eighth Avenue
    New York, NY 10019
      Telephone:  (212) 474-1000
        Facsimile:  (212) 474-3700
          bgruenstein@cravath.com
           epilch@cravath.com
            amahlerhaug@cravath.com

*Attorneys for Defendant*

## CERTIFICATE OF SERVICE

I certify that on February 14, 2022, I caused a true and correct copy of the

foregoing to be electronically filed with the Clerk of the Court using the CM/ECF

system.  Notice of this filing will be sent to counsel of record by operation of the Court's

electronic filing system.

/s/ Benjamin Gruenstein
Benjamin Gruenstein