UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

- v. -

JOE FERNANDEZ,

              Defendant.

10 Cr. 863 (AKH)

**GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION FOR IMMEDIATE
RELEASE UNDER 18 U.S.C. SECTION 3582(C)**

DAMIAN WILLIAMS
United States Attorney
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007

Christopher Brumwell
Assistant United States Attorney
-Of Counsel

**TABLE OF CONTENTS**

I.     BACKGROUND ........................................................................................... 1

    A.    Charges Against Fernandez ................................................................. 1

    B.    Trial Evidence ..................................................................................... 2

    C.    Fernandez's Post-Trial Motions.......................................................... 8

    D.    Sentencing .......................................................................................... 9

    E.    Fernandez's Direct Appeal ............................................................... 10

    F.    Previous Collateral Challenges to Fernandez's Conviction............... 10

         1.    Fernandez's First 2255 Petition ............................................ 10

         2.    Fernandez's Second 2255 Petition.......................................... 11

    G.    The Instant Petition .......................................................................... 11

II.    APPLICABLE LAW ................................................................................. 12

III.   DISCUSSION ........................................................................................... 12

    A.    There are No Extraordinary and Compelling Reasons to Reduce the
         Defendant's Sentence........................................................................ 13

         1.    The Evidence at Trial Established Joe Fernandez's Guilt Beyond a
             Reasonable Doubt ................................................................ 13

         2.    There Is No Unwarranted Disparity Between the Defendant's
             Sentence and His Co-Conspirators' Sentences ......................... 19

         3.    The Defendant Does Not Have Health Conditions that Place Him
             at Heightened Risk from COVID-19 ....................................... 22

         4.    The Defendant's Efforts at Rehabilitation are Not Extraordinary
             and Compelling Reasons to Release Him from Custody........................... 23

    B.    The 3553(a) Factors Weigh Heavily Against Granting the Motion ..................... 24

IV.   CONCLUSION........................................................................................... 26

The Government respectfully submits this memorandum of law in opposition to the defendant's motion for immediate release under 18 U.S.C. § 3582(c). The Court should deny the petition because the defendant has not, and cannot, demonstrate that there are "extraordinary and compelling" reasons to reduce the mandatory minimum sentence of life imprisonment that the Court previously imposed for being one of two shooters in a double murder-for-hire, and because the Section 3553(a) factors weigh against his release from custody.

## I.    BACKGROUND

### A.    Charges Against Fernandez

Arturo Cuellar and Idelfonso Vivero Flores were waiting in the lobby of an apartment building in the Bronx on February 22, 2000. The two men were working with a Mexican drug trafficking organization, and expecting to meet someone and receive approximately $6.5 million as payment for cocaine that had been delivered to a New York-based narcotics business. Instead, Cuellar and Flores were met by Joe Fernandez and Patrick Darge. While Cuellar and Flores waited defenseless in the lobby, Darge walked up behind Cuellar and shot him in the head. Darge's gun jammed after the initial shot and he fled the lobby. But Fernandez remained behind and opened fire. Fernandez fired fourteen times and connected with nine of them, killing Flores and leaving no doubt that Cuellar was dead too. Fernandez was paid $40,000 for the cold-blooded murder.

Fernandez's crime went undetected at the time, but he was arrested eleven years later and charged with murder-for-hire and using a firearm in furtherance of a crime of violence. Fernandez proceeded to trial on indictment S5 10 Cr. 863 (AKH), which was filed on February 6, 2013, and contained two counts. Count One charged Fernandez with conspiracy to commit a murder-for-hire, in violation of Title 18, United States Code, Section 1958. Count Two charged Fernan-

dez with using a firearm to commit murder during and in relation to the murder-for-hire conspiracy, in violation of Title 18, United States Code, Sections 924(j)(1) and 2. Fernandez's trial began on February 19, 2013, and concluded on March 7, 2013, when the jury found Fernandez guilty on both counts.

### B. Trial Evidence

At trial, the Government called thirteen witnesses, consisting of six cooperating witnesses: Patrick Darge ("Darge"), Jeffrey Minaya ("Minaya"), Alberto Reyes ("Reyes"), Richard Correa ("Correa"), Yubel Mendez ("Mendez"), and Alain Darge; four current and former law enforcement officers including a ballistics expert with the New York City Police Department; a doctor with the Office of the Chief Medical Examiner; and two lay witnesses. The Government also presented physical evidence recovered from the crime scene, as well as numerous photographs of relevant locations and individuals.

This evidence established, *inter alia*, the existence of a New York-based drug trafficking organization ("DTO") that was receiving hundreds of kilograms of cocaine from a Mexico-based supplier in early 2000; the plan devised by members of the DTO to murder two representatives of that Mexican cocaine supplier rather than settle a multi-million dollar debt; the DTO's recruitment and hiring of Patrick Darge, a local, violent drug dealer, to commit the murders; Darge's recruitment and hiring of his cousin, Fernandez, to participate in the murders; and Darge and Fernandez's commission of the murders in cold blood, including Fernandez's firing of at least nine shots into his victims' bodies. The Government additionally presented testimony of incriminating admissions that Fernandez made to both a family member and another inmate in jail.

This evidence indisputably showed that Fernandez conspired to participate in a murder-for-hire and used a firearm during that conspiracy, resulting in the deaths of Arturo Cuellar and Idelfonso Flores.

1.  <u>Jeffrey Minaya's Drug Trafficking Organization</u>

Minaya was the leader of the DTO and, by early 2000, was receiving massive quantities of cocaine from a Mexico-based source of supply. (Tr. at 98-128, 568).[1] After receiving the drugs from the Mexican distributors, Minaya and his criminal associates would sell the cocaine to customers in the New York City area. (*Id.* at 119). Flores and his boss, Cuellar—the two men that Fernandez murdered on February 22, 2000—worked for that Mexican drug trafficking organization. (*Id.* at 100-01).

In early 2000, Minaya and Cuellar negotiated a 274 kilogram shipment of cocaine to New York to be received by Minaya and his crew of local drug dealers. (Tr. at 130). In February 2000, Cuellar and Flores traveled to New York City to coordinate the delivery of the drugs, which were being provided to Minaya on consignment. (*Id.* at 126-28, 133). After receiving the drugs, Minaya's crew—which included Jose Rodriguez-Mora ("Rodriguez"), Manuel Aladino Suero ("Suero"), and Reyes—sold the cocaine locally and began collecting the money. (*Id.* at 133-34). Meanwhile, Cuellar and Flores remained in the New York City area, waiting to collect payment for the drugs. (*Id.* at 133-35). The Mexican cocaine suppliers charged Minaya about $24,000 per kilogram of cocaine, meaning that the 274 kilogram shipment of cocaine translated into a $6.5 million debt owed by Minaya's DTO to Cuellar and Flores. (*Id.* at 119).

2.  <u>The Murder Plot</u>

As Minaya and his crew were collecting millions of dollars in proceeds from cocaine sales to pay Cuellar and Flores, Minaya, Rodriguez, Suero, and Reyes made the tragic decision to have Cuellar and Flores killed, rather than paying off their drug debt. (Tr. at 149-54, 616). To

---

[1] "Tr." refers to the transcript of the trial in *United States* v. *Joe Fernandez*, S5 10 Cr. 863 (AKH) (S.D.N.Y.); "GX" refers to a Government exhibit admitted at that trial.

execute their murder plan, Rodriguez, Suero, and Reyes hired a hitman: another dangerous drug dealer, Patrick Darge. (*Id.* at 188-89, 617-18). On the evening of February 21, 2000, Reyes, Rodriguez, and Suero met with Darge outside of Darge's apartment building. (*Id.* at 256-57). Rodriguez explained to Darge that they were unable to pay off a monetary debt owed to Minaya's cocaine suppliers and, as a result, Rodriguez's family was in danger. (*Id.* at 266-67). Rodriguez, Suero, and Reyes then offered Darge $180,000 to murder the two men to whom this debt was owed (*i.e.*, Cuellar and Flores). (*Id.* at 268).

After briefly considering this offer, Darge agreed to commit the murders. (Tr. at 269). However, because he viewed the murders as too risky for him to commit alone, Darge decided to assemble a team for the murders and reached out to two individuals: Luis Rivera ("Rivera") and Fernandez. (*Id.* at 270).

Darge recruited Rivera, a drug dealer from the neighborhood, to serve as the driver for the murders. (Tr. at 271, 282-83). In addition to previously committing crimes with Rivera, Darge turned to Rivera because Rivera drove a Ford Expedition with a hidden trap in the center console that could be used to conceal the firearms to be used in the murders. (*Id.* at 285). Darge met with Rivera the night of February 21, 2000; Darge offered Rivera $20,000 for the job, and Rivera agreed.  (*Id.* at 286-87). In addition to acting as the getaway driver, Rivera agreed to provide Darge with a gun to use during the murders. (*Id.* at 287).

Darge recruited his cousin, Fernandez, to serve as the backup shooter during the murders. (Tr. at 255-56). Darge and Fernandez were close at the time, and Darge knew that Fernandez was someone that Darge could rely on and trust in case something went wrong. (*Id.* at 273). In addition, Darge knew that Fernandez owned a gun that could be used during the murders. (*Id.*). Darge met with Fernandez the evening of February 21, 2000 outside of Fernandez's apartment. (*Id.* at

275-76). Darge explained to Fernandez that he (Darge) had been asked to murder two individuals and asked Fernandez to back him up during the murders. (*Id*. at 276-281). Fernandez agreed. (*Id.* at 281). Darge offered to pay Fernandez $40,000 for the job and told Fernandez to bring his own gun. (*Id*. at 276-77, 280). After hearing these details, Fernandez again confirmed that he would participate in the planned murders. (*Id*. at 277).

Darge met again with Rodriguez later that night and finalized the plan for the next morning. (Tr. at 288, 299-300). Reyes would drive Cuellar and Flores to a building where Cuellar and Flores expected to receive payment for the cocaine shipment. (*Id*. at 288-90, 300). Darge and his backup shooter (*i.e.*, Fernandez) would be waiting in the lobby of the building for the victims to arrive, armed and ready to commit the murders. (*Id*. at 290-91, 302).

### 3.   The February 22, 2000 Murders

On the morning of February 22, 2000, Rivera picked up Darge and Fernandez and drove them to 3235 Parkside Place, the location where they were to meet Cuellar and Flores. (Tr. at 305). During the drive, Rivera opened the secret compartment in the center console of his Ford Expedition and handed a gun to Darge. (*Id*. at 307, 311). Darge removed the bullets from that gun, cleaned off any fingerprints, and re-inserted the bullets. (*Id*.). Fernandez, who was in the backseat, removed a larger gun from a duffle bag and assembled that firearm. (*Id*. at 308). As they drove to the apartment building, Darge reviewed the plan: Fernandez's role was to back up Darge during the shootings, while Rivera was supposed to wait around the block, ready to drive them away from the area. (*Id*. at 309).

Rivera parked around the corner from 3235 Parkside Place, near Decatur and 207th Street. (Tr. at 310). Darge and Fernandez, both wearing dark hoodies to cover their faces and gloves to prevent them from leaving fingerprints, exited Rivera's car and walked into the lobby

of 3235 Parkside Place. (*Id*. at 310-13). Darge concealed his pistol in his pocket, and Fernandez had his gun strapped over his shoulder and hidden under his jacket. (*Id*. at 312-13). After checking the lobby for cameras and surveying the lobby and surrounding area, Darge and Fernandez lurked in the dark mailbox area, waiting for their victims to arrive. (*Id*. at 313-14).

As Darge and Fernandez waited silently in the lobby, Reyes drove Cuellar and Flores to 3235 Parkside Place, purportedly for the two men to receive payment for the cocaine shipment. (Tr. at 623, 629-30). Shortly before Reyes, Cuellar, and Flores arrived at the apartment building, Rodriguez called Darge to alert that Reyes would be arriving momentarily. (*Id*. at 320). Darge and Fernandez then pulled their hoods over their heads, in anticipation of their victims' imminent arrival. (*Id*.). Reyes parked his vehicle near 3235 Parkside Place, entered the apartment building with Cuellar and Flores, walked to the elevator, and pressed the elevator button, with Cuellar and Flores standing next to him. (*Id*. at 321, 630-31).

As Cuellar and Flores waited with Reyes in front of the elevator, Darge, with Rivera's gun in hand, emerged from the mailbox area, with Fernandez following right behind him. (Tr. at 321-23). Darge walked up behind Cuellar and shot Cuellar in the head behind his ear. (*Id*. at 322). Darge then turned to shoot Flores, but his gun jammed. (*Id*. at 322, 326-27). After he was unable to unjam the gun, Darge ran out of the lobby. (*Id*. at 326-28). Fernandez, however, remained in the lobby and fired fourteen shots, with nine connecting into the bodies of Cuellar and Flores, leaving them dead. (*Id*. at 45-49, 328; GX 51).

Darge ran to Decatur and 207th Street, where Rivera was waiting in his Ford Expedition. (Tr. at 329). Fernandez arrived at the car "a while" after Darge, and Rivera then drove away. (*Id*. at 330-31). As they fled the murder scene, Fernandez explained that it took so long to arrive at

the getaway car because he was making sure that the two victims were dead before leaving the lobby. (*Id*. at 331-32).

When the police arrived at 3235 Parkside Place, Cuellar and Flores were found dead in the lobby, in a pool of blood, just to the left of the elevator. (Tr. at 35, 40-41; GX 25). Cuellar was lying on top of Flores, with shell casings and bullets scattered throughout the lobby. (Tr. at 40-41, 46-47; GX 25).

Following the murders, Reyes paid Darge $180,000, and Suero later paid Darge another $10,000. (Tr. at 335). Darge, in turn, paid $40,000 to Fernandez and $20,000 to Rivera. (*Id*.). Minaya, Rodriguez, Suero, Reyes, and a few others split the rest of the money. (*Id*. at 186-87).

### 4.  Fernandez's Subsequent Admissions of Guilt

The evidence at trial also included testimony from two individuals to whom Fernandez made incriminating statements revealing his guilt.

A cooperating witness, Alain Darge, testified about Fernandez's admissions of guilt to him. Alain Darge, who is Patrick Darge's brother and Fernandez's cousin, had been arrested and pleaded guilty on separate narcotics charges. (Tr. at 808-10). On the morning of October 13, 2011, law enforcement officers went to an address in Woodbury, New York, in search of Fernandez, who was not there, and spoke with Fernandez's wife. (*Id.* at 789-91). Just a few hours later, Fernandez went to the residence of his cousin, Christian Guzman, who testified at trial pursuant to a subpoena. (*Id.* at 798). Guzman testified at trial that Fernandez called him prior to coming to his residence. (*Id.* at 799). The Government offered into evidence at trial, via stipulation, records from AT&T, which showed that Fernandez had called Guzman on October 13, 2011, at approximately 12:22 p.m. (*Id.* at 804-07; GX 112-R; GX 113; GX 114).

Guzman testified that, after Fernandez arrived at his residence, Fernandez told Guzman that he (Fernandez) wanted to speak with Alain Darge. (*Id*. at 800). Alain Darge then came over to Guzman's residence and spoke with Fernandez. (*Id*. at 800-01). Fernandez told Alain Darge that the police had come to his house looking to arrest him, and that he figured that Patrick Darge had told the authorities about him. (*Id*. at 817-19). Fernandez wanted advice from Alain Darge about what he should do. (*Id*. at 818). Trying to calm Fernandez down, Alain Darge told Fernandez that a lot of people other than his brother knew about the shootings, to which Fernandez mentioned that Reyes also was present that day. (*Id*. at 819). Alain Darge further recalled Fernandez acknowledging that he (Fernandez) fired his gun twice, his gun then jammed, and Darge finished off the job. (*Id*. at 820).

In addition, Yubel Mendez, who was cooperating with the Government in separate investigations, testified about several incriminating statements that Fernandez made while they briefly shared a jail cell at the Metropolitan Correctional Center shortly after Fernandez's arrest. (Tr. at 685). First, Fernandez told Mendez that he (Fernandez) had considered fleeing to the Dominican Republic to avoid being arrested, because Fernandez understood he could not be extradited from that country. (*Id*. at 700-02). After Mendez told Fernandez that he still could have been extradited from the Dominican Republic, Fernandez responded, "oh well, then it wasn't worth it for me to go there. They were going to catch me anyway." (*Id*. at 702). In addition, Fernandez informed Mendez that he (Fernandez) was in prison because he participated in something with "Patrick," referring to Darge. (*Id*. at 705-06). Mendez further admitted to Mendez that "Patrick" had called Fernandez to get together and told Fernandez to bring a weapon. (*Id*. at 705).

### C.    Fernandez's Post-Trial Motions

Following trial, Fernandez filed numerous motions seeking to overturn the jury's verdict: (1) a Rule 29 motion for an acquittal, (2) a Rule 33 motion for a new trial, (3) a separate motion

for a new trial based on the Government's alleged failure to turn over *Brady* material, (4) another motion to vacate the jury verdict, and (5) a motion seeking grand jury minutes. These motions asserted several theories of relief, but each one alleged supposed deficiencies in Patrick Darge's trial testimony. The Court denied the motions and explained, twice, that "Fernandez's attacks on Darge's credibility are not a basis for setting aside the jury verdict." Dkt. No. 145 at 2 (order denying motion to vacate jury verdict); *see also* Dkt. No. 115 ("Fernandez argues that the testimony of the critical witness against him, his cousin Patrick Darge, was so rife with holes and inconsistencies as to be incredible as a matter of law. I disagree."). Rejecting Fernandez's attacks on Darge's credibility, the Court noted that "Darge's testimony was generally consistent with the forensic evidence in this case, as a police ballistics expert testified that two different weapons were fired at the scene of the crime." Id.

### D. Sentencing

At sentencing, Fernandez again asserted that Darge lied in his trial testimony, and complained, among other things, that the Government offered Luis Rivera a narcotics disposition even though Darge implicated him in the murder for hire plot. Dkt. No. 170, Sentencing Transcript, at 49, 53-54. In imposing sentence, the Court again explained that the jury had found the defendant guilty, and that there was no legal flaw in the jury's verdict:

> In sentencing you . . . I assume that the verdict was correct. . . . The standard is beyond a reasonable doubt. In my opinion, given the record, and that's all I know is the record, the jury's verdict was beyond a reasonable doubt. And there is no reason in law, in my opinion, for me to . . . change it.

The Court therefore imposed a sentence of life imprisonment, "to recognize that two people's lives who deserve to live were killed in what was found to be in cold blood." Dkt. No. 170, Sentencing Transcript, at 57-58.

### E.      Fernandez's Direct Appeal

Fernandez filed a timely appeal of his conviction, challenging, among other things the sufficiency of the evidence at trial based on purported deficiencies in Darge's testimony. The Second Circuit rejected Fernandez's challenge, noting that "[i]nsofar as Fernandez's sufficiency challenge is based on Darge's alleged lack of credibility, his testimony was not incredible on its face and, therefore, we must defer to the jury's assessment of his credibility."  *United States v. Fernandez*, 14-4158, Summary Order dated May 2, 2016, at *5 (2nd Cir.).

### F.      Previous Collateral Challenges to Fernandez's Conviction

####       1.      Fernandez's First 2255 Petition

Fernandez filed his first collateral challenge to his conviction on June 28, 2017, asserting principally that there were errors in the Court's jury instructions under the Supreme Court's decision in *Rosemond v. United States*, 134 S.Ct. 1240 (2014). The Court rejected Fernandez's arguments as procedurally defaulted. In doing so, the Court rejected Fernandez's actual innocence claim, observing that the "evidence introduced at trial established petitioner's guilt beyond a reasonable doubt . . . This is not an 'extraordinary case' that warrants application of the actual innocence doctrine." *Fernandez v. United States*, 17-cv-4806 (AKH), Dkt. No. 6, at 7 (quoting *House v. Bell*, 547 U.S. 518, 536 (2006)). The Second Circuit affirmed the Court's ruling, and in doing so, dismissed Fernandez's argument that purported deficiencies in Darge's testimony could form the basis for an actual innocence claim, holding as follows:

> "That argument is plainly meritless. His only argument in support of this claim of innocence is that the witnesses who testified against him were not credible, because their testimony was inconsistent and they all stood to benefit from blaming Fernandez for the crime.  He does not support this argument with evidence sufficient to demonstrate that 'it is more likely than not that no reasonable juror would have convicted him.' *Bousley*, 523 U.S. at 523. The jury was entitled to credit the witnesses who testified that Fernandez committed the crimes with which he was charged."

*Fernandez v. United States*, 18-6, Summary Order dated December 4, 2018, at 5 (2nd Cir.).

Thus, for the fourth time—the post-trial motions, direct appeal, the Court's ruling on Fernandez's 2255 petition, and the Second Circuit's affirmance—a Court declined to overrule the jury's role in weighing the witness's credibility and finding the defendant guilty.

2.    <u>Fernandez's Second 2255 Petition</u>

On July 29, 2020, Fernandez filed another collateral challenge to his conviction, this time claiming that his conviction on Count Two was invalid under the Supreme Court's decision in *United States v. Davis*, 139 S.Ct. 2319 (2019) because conspiracy to commit murder for hire is not a crime of violence under 18 U.S.C. § 924(c)(3). The Court granted the motion, finding that conspiracy to commit murder for hire did not qualify as a crime of violence under *Davis*. Dkt. No. 245 at 10. Although Fernandez procedurally defaulted on this claim by not raising this challenge on direct appeal, the Court found that the procedural default was excused under the cause and actual prejudice standard. Dkt. No. 245 at 7. The Court noted that Fernandez asserted his actual innocence as an alternative ground for excusing the procedural default, but the Court did not consider the claim. <u>Id.</u> at 9 n.6.

**G.     The Instant Petition**

On November 23, 2021, Fernandez filed his first motion for release under 18 U.S.C. § 3582(c). Fernandez's principal argument repeats his prior arguments that he should be released because Darge's trial testimony was not credible. Fernandez also sought relief based on the conditions of confinement necessitated by the COVID-19 pandemic. The Court appointed counsel to assist Fernandez with his petition, and on February 14, 2022, Fernandez filed a supplemental memorandum (the "Petition"), seeking a reduction in sentence based on (1) Darge's purported incredibility, (2) alleged sentencing disparities between Fernandez and his co-conspirators, (3) the COVID-19 pandemic, and (4) Fernandez's efforts at rehabilitation while in custody.

## II.    APPLICABLE LAW

"'A judgment of conviction that includes a sentence of imprisonment constitutes a final judgment' and may not be modified by a district court except in limited circumstances." *Dillon v. United States*, 560 U.S. 817, 824 (2010) (quoting 18 U.S.C. § 3582(b)). One such circumstance, commonly referred to as the "compassionate release" provision, permits a court to "reduce [a] term of imprisonment . . . after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that . . . extraordinary and compelling reasons warrant such a reduction." 18 U.S.C. § 3582(c)(1)(A)(i).

Where, as here, a motion for compassionate release is brought by the defendant, the district court is free "to consider the full slate of extraordinary and compelling reasons that an imprisoned person might bring before them in motions for compassionate release." *United States v. Brooker*, 976 F.3d 228, 237 (2d Cir. 2020). Although a district court has broad discretion when considering a motion under Section 3582(c), a sentence reduction is only warranted if it "would not simply constitute second-guessing of the sentence previously imposed." *United States v. Keitt*, 21 F.4th 67, 71 (2d Cir. 2021).

Extraordinary and compelling reasons are "necessary—but not sufficient—for a defendant to obtain relief under § 3582(c)(1)(A)." *United States v. Jones*, 17 F.4th 371, 374 (2d Cir. 2021). Even where extraordinary and compelling reasons exist, "the court must also consider 'the factors set forth in section 3553(a) to the extent that they are applicable' before it can reduce the defendant's sentence." *Id.* (quoting 18 U.S.C. § 3582(c)(1)(A)).

## III.   DISCUSSION

At its core, the Petition asks this Court to question the jury's verdict based on *no new evidence* beyond what was presented at trial, and then use 18 U.S.C. § 3582(c) as a back door to im-

pose a sentence below the mandatory minimum called for by the murder-for-hire statute. *See* Petition at 34. That request is unjustified and contrary to law. Section 3582(c) allows a sentence to be reduced below a mandatory minimum, but despite the Petition's invitations to the contrary, the statute does not permit mere "second guessing of the sentence previously imposed." *Keitt*, 21 F.4th at 71. As this Court and the Second Circuit have explained repeatedly, there is no legal basis to question the jury's verdict in this case, and no reason to doubt that it was just and reasonable to sentence Fernandez to the mandatory minimum of life imprisonment for his role in the cold-blooded murder of two people.

### A.   There are No Extraordinary and Compelling Reasons to Reduce the Defendant's Sentence

#### 1.   <u>The Evidence at Trial Established Joe Fernandez's Guilt Beyond a Reasonable Doubt</u>

The defendant's principal argument is that he should be released from custody because Patrick Darge's trial testimony was not reliable. This is the same argument that Fernandez has been making, and this Court and the Second Circuit have been rejecting, for years. The reason for the rejection is straightforward: it is the role of the jury, not the court, to determine Darge's credibility, and based on the jury's verdict Darge's testimony was credible and sufficient to prove Fernandez guilty beyond a reasonable doubt. Indeed, as set forth below, this Court and the Second Circuit have articulated this rationale at least six times since Fernandez was convicted:

- <u>Order Denying Motions for Acquittal and A New Trial</u>: "It was for the jury to determine whether Darge's testimony was credible, and having found him to be so, I will not disturb that finding. Darge's testimony, in combination with the other evidence presented in the case, was sufficient to convict Fernandez of the two charges against him." Dkt. No. 115 at 2.

- Order Denying Motion to Vacate Jury Verdict: "Fernandez's attacks on Darge's credibility are not a basis for setting aside the jury verdict. . . . Courts cannot reassess the credibility of witnesses and must assume that Darge's testimony was credible." Dkt. No. 145 at 2.

- Sentencing: "In my opinion . . . the jury's verdict was beyond a reasonable doubt. . . . I have to assume that what the jury found is what existed and, therefore, what existed were murders of two people." Dkt. No. 170 at 57.

- Opinion and Order Denying Petition for a Writ of Habeas Corpus: "The evidence introduced at trial established petitioner's guilt beyond a reasonable doubt . . . . This is not an 'extraordinary case' that warrants application of the actual innocence doctrine." *Fernandez v. United States*, 17-cv-4806 (AKH), Dkt. No. 6, at 7 (quoting *House v. Bell*, 547 U.S. 518, 536 (2006)).

- Summary Order on Direct Appeal: "Insofar as Fernandez's sufficiency challenge is based on Darge's alleged lack of credibility, his testimony was not incredible on its face and, therefore, we must defer to the jury's assessment of his credibility." *United States v. Fernandez*, 14-4158, Summary Order dated May 2, 2016, at *5 (2nd Cir.).

- Summary Order on Collateral Appeal: "The jury was entitled to credit the witnesses who testified that Fernandez committed the crimes with which he was charged." *Fernandez v. United States*, 18-6, Summary Order dated December 4, 2018, at 5 (2nd Cir.).

Nothing in Fernandez's initial or supplemental petition alleges that any new evidence has come to light regarding Darge's credibility, and therefore, there is no reason for this Court (or the Second Circuit) to reverse course and now find that Darge's testimony was somehow insufficient to prove that Fernandez is guilty of murder-for-hire.

While Fernandez's previous challenges to Darge's credibility were made in other procedural postures, they are equally meritless in the context of a motion under 18 U.S.C. § 3582(c). While Courts, under *Brooker*, have discretion to consider a wide range of factors in adjudicating a motion under Section 3582(c), nothing in the text or the history of the statute suggests that it is meant to alter the fundamental principle that a jury's credibility determination should not be second-guessed by courts. But Fernandez is asking the Court to do just that—reassess Darge's credibility, find it wanting, and reduce his sentence on that basis. The Court has repeatedly declined to second-guess the jury's verdict in this way, and the Court should decline again and deny the Petition.

Tellingly, the Petition fails to cite any case where a Court has reduced a sentence under Section 3582(c) based on second-guessing the jury's assessment of the credibility of the witnesses at trial. The Petition's failure to find any such case is unsurprising, because Section 3582(c) does not allow a sentence reduction when it would "simply constitute second-guessing of the sentence previously imposed." *Id.*; *see also United States v. Hunter*, 12 F. 4th 555, 562 (6th Cir. 2021) ("[F]acts that existed when the defendant was sentenced cannot later be construed as 'extraordinary and compelling' justifications for a sentence reduction.").

In addition to reasserting his challenge to Darge's credibility, Fernandez attempts to reframe his old, previously rejected arguments by claiming that the Government itself harbored doubts about Darge's testimony. Fernandez speculates that because Luis Rivera, who Darge identified as the driver in the murder plot, was given a plea offer to narcotics charges without any charges for the homicide, the Government must not believe Darge because if it did, the Government would not have offered Rivera a plea that did not require him to admit responsibility for his

role in the homicide. This argument is rank speculation, and completely misguided. The Government called Darge as a witness because it credits his testimony. That was true during Fernandez's trial in 2013, and it is still true today. Fernandez has pointed to no evidence sufficient to justify the argument that the Government disbelieves the testimony of its own witness, and therefore, the Court should reject this argument as wholly unsupported by any evidence.

Furthermore, Fernandez's argument is simply illogical because it jumps to the conclusion that the only explanation for the Government's plea offer to Rivera must have been clandestine doubts about Darge's testimony, and in doing so, the argument ignores important differences between the evidence against Fernandez and Rivera. While Darge's testimony incriminates both Fernandez and Rivera, the Government had additional evidence proving Fernandez's role in the murder. Crucially, the Government presented ballistics evidence corroborating Darge's testimony that there were two shooters, and indeed, the Court has already noted that the ballistics evidence was significant corroboration for Darge, observing that, "Darge's testimony was generally consistent with the forensic evidence in this case, as a police ballistics expert testified that two different weapons were fired at the scene of the crime." Dkt. No. 115 at 2. Additionally, the Government presented testimony from multiple witnesses who testified regarding inculpatory admissions that Fernandez made regarding his role in the murders. These admissions further corroborated Darge's testimony regarding Fernandez's role in the murder-for-hire plot. While the forensic evidence and admissions were powerful evidence against Fernandez, their probative force is diminished against Rivera because they do not relate to the identity of the getaway driver. Moreover, while Fernandez's statements were plainly admissible at his own trial, these out-of-court statements by Fernandez would have been potentially inadmissible against Rivera under the rules against hearsay. *See* Fed. R. Evid. 801(d)(2)(A); 802. While a wide range of factors inform plea

negotiations, and the Government does not believe Fernandez's arguments place upon it the burden of justifying its plea offer to Rivera, the Government submits that these differences between the evidence against Fernandez and Rivera more than adequately explain the Government's offer to Rivera. *See Bordenkircher v. Hayes*, 434 U.S. 357, 363 (1978) (noting broad prosecutorial discretion in reaching plea agreements and explaining that "[p]lea bargaining flows from the 'mutuality of advantage' to defendants and prosecutors, each with his own reasons for wanting to avoid trial.") (quoting *Brady v. United States*, 397 U.S. 742, 752 (1970)); *United States v. Torres-Echavarria*, 129 F.3d 692, 695 (2d Cir. 1997) ("[T]he plea bargain is an indispensable tool for the administration of the criminal law.").[2]

Additionally, while Fernandez has only now asserted that the Government actually does not believe Darge, it is worth noting that Fernandez has already argued to the Court that the Government's plea offer to Rivera somehow constitutes grounds to question the jury's verdict, and the Court rejected that argument. On March 15, 2013, Fernandez filed a letter seeking to set aside the jury's verdict and made the following argument regarding Rivera's plea offer:

> It is noteworthy to mention the Government did not offer ***any*** testimony from Luis Rivera – the alleged "driver" and only other eyewitness – that Joe Fernandez was the second shooter. If Darge's testimony is to be believed, viz.that Rivera both brought Patrick Darge a .380 caliber weapon and was paid $20,000 for his services, then Luis Rivera should also have been prosecuted for his direct involvement in the murder-for-hire conspiracy. The fact that he was not prosecuted, or presented as a cooperating witness in this case, establishes either he was not involved at all, or that the Government did not have sufficient evidence to connect Rivera to the murder-for-hire conspiracy.

---

[2] To be clear, the undersigned AUSA did not handle Fernandez's or Rivera's initial case, and is not seeking to make representations about what was in the mind of the relevant AUSAs at the time. That internal deliberative process evidence would be entirely irrelevant where the Government has broad discretion regarding plea dispositions and nothing about Rivera's disposition is germane to Fernandez's conviction.

Dkt. No. 81 at 2. The Court denied this motion, and thereby rejected this argument. Thus, in rais-ing the Government's plea offer to Rivera, Fernandez is again merely repackaging the same ar-guments already heard and rejected by this Court.

Finally, while the Government sought, and the Court gave, an uncalled witness jury in-struction at Fernandez's trial, nothing about the plea offer given to Rivera made that instruction unwarranted. Before Fernandez's trial, the defense was aware that Rivera was a potential witness in this case, and was also aware that plea negotiations were taking place between Rivera and the Government. Dkt. No. 170 at 22:13 – 22. Defense counsel stated that he believed the plea deal was reached prior to trial, and in fact, it was—Rivera's guilty plea was entered on May 10, 2012 and the Court sentenced him to two years' imprisonment on September 7, 2012, months before trial commenced in February 2013. Therefore, Rivera's status as a potential witness in this case, as well as the plea offer given to Rivera and his resulting sentence, were known to Fernandez well before his trial. To the extent the defense believed that the Government's plea offer tended to show that exculpatory testimony could have been elicited from Rivera, Fernandez could have sought to call him as a witness at trial, or otherwise sought to introduce evidence of the plea at trial. Of course, as the Court emphasized in a post-trial ruling, "[Rivera] was not a witness at trial, nor could he be without waiving his Fifth Amendment rights," Dkt. No. 162 at 2 – 3, but even though Rivera likely would not have testified during trial, the defense still could have sought him as a witness. Thus, because Rivera was known to both the Government and the de-fense before trial, and his guilty plea and sentencing took place months before trial began, the uncalled witness instruction was wholly appropriate in this case. *United States v. Lita*, 800 Fed. Appx. 8, 13 (2d Cir. 2020) ("Where a witness is equally available to both sides, the district court has 'discretion to (1) give no instruction and leave the entire subject to summations, (2) instruct

the jury that no unfavorable inference may be drawn against either side, or (3) instruct the jury that an adverse inference may be drawn against either or both sides.'") (quoting *United States v. Caccia*, 122 F.3d 136, 139 (2d Cir. 1997)).

In sum, the Petition offers no new evidence or arguments challenging Darge's credibility—improper in a 3582(c) petition in any event—but simply recycles the same contentions that this Court has been rejecting for years because the jury found Darge to be credible at trial. There is nothing extraordinary or compelling about Fernandez's challenges to Darge's credibility, and nothing in 18 U.S.C. § 3582(c) suggests that the Court should now credit these arguments and effectively overturn the jury's verdict and the mandatory sentence imposed by Congress by reducing the mandatory life sentence that was imposed.

> 2.    There Is No Unwarranted Disparity Between the Defendant's
>        Sentence and His Co-Conspirators' Sentences

Fernandez also seeks a sentence reduction because he is serving a longer sentence than other convicted participants in the murder for hire plot—Darge, Minaya, and Reyes—but in making this argument, he ignores the elephant in the room: Darge, Minaya, and Reyes cooperated with the Government and accepted responsibility for their actions. In fact, all three men testified in Fernandez's trial. There is nothing unusual about cooperating witnesses receiving relatively lower sentences than their former co-conspirators who are unwilling or unable to cooperate. Indeed, lower sentences for cooperating witnesses are contemplated by 18 U.S.C. § 3553(e) and the Sentencing Guidelines, and many participants in criminal activity agree to cooperate with the Government in the hope of receiving a reduced sentence. Therefore, differences between the sentences given to cooperators and non-cooperators is expressly contemplated by the law and the Guidelines, and the fact that Fernandez is serving a longer sentence than cooperating witnesses Darge, Minaya, and Reyes is far from extraordinary. *See United States v. Willis*, *abrogated on*

*other grounds by Kimbrough v. United States*, 552 U.S. 85 (2007) 476 F.3d 103, 109 (2d Cir.

2007) (defendant who declines to cooperate is not similarly situated at sentencing with cooperat-

ing defendant); *United States v. Cabot*, 755 Fed. App. 75, 81 (2d Cir. 2018); *United States v.*

*Cain*, 487 F.3d 1108 (8th Cir.2007) (292 month to 24 month sentencing disparity justified by co-

operation).

      If anything, granting Fernandez's motion would create unjustified disparities by giving

Fernandez—who was a shooter in the double murder—a lower sentence than his co-conspirators

even though Fernandez did not cooperate with the Government and has never accepted responsi-

bility for his crimes. Moreover, accepting the premise of Fernandez's argument that he is entitled

to a lower sentence based on his co-defendants' cooperation would actually create broader un-

warranted sentencing disparities because it would result in relatively higher sentences for other-

wise similarly situated defendants. As Judge Easterbrook explained the point, "why should one

culprit receive a lower sentence than some otherwise-similar offender, just because the first is

'lucky' enough to have a confederate turn state's evidence? Yet that is [defendant's] position,

which has neither law nor logic to commend it." *United States v. Boscarino*, 437 F.3d 634, 638

(7th Cir. 2006).

      Fernandez fails to point the Court to any authority that grants a sentencing reduction be-

cause a trial defendant received a higher sentence than a cooperating witness. *See United States*

*v. Ballard*, 552 F. Supp. 3d 461, 468 (S.D.N.Y. 2021) (sentencing difference resulted from multi-

ple consecutive mandatory minimum sentences, not cooperation); *United States v. Cabrera*, 531

F. Supp. 3d 863, 866-867 (S.D.N.Y. 2021) (sentencing difference resulted from change in sen-

tencing Guidelines and stipulation between the parties regarding drug weight, not cooperation).

Fernandez also argues that an unwarranted disparity exists between himself and Luis Rivera because this Court only sentenced Rivera to 24 months' imprisonment after Rivera pleaded guilty to a narcotics charge. Again, however, Fernandez's argument ignores the most important factor distinguishing his sentence from Rivera's sentence—Fernandez was convicted of murder-for-hire, and Rivera was not. Section 3553(a) only counsels against sentencing disparities "among defendants with similar records *who have been found guilty of similar conduct*," but Rivera's narcotics conviction was, by any measure, less serious than Fernandez's conviction for double murder-for-hire. 18 U.S.C. § 3553(a)(6) (emphasis added). Consequently, their different sentences are nothing unusual.

Despite the difference between their convictions, Fernandez's argument appears to be that his sentence should be comparable to Rivera's because, even though Rivera was never convicted for his role in the murder-for-hire plot, Rivera was in fact the getaway driver and therefore has culpability comparable to Fernandez's. In making this argument, Fernandez appears to be crediting Darge's testimony that Rivera was the driver, which is a stunning position for him to take. Fernandez cannot have it both ways. Fernandez cannot credibly adopt the argument that there is an unwarranted disparity between his sentence and Rivera's while also maintaining his innocence and his claim that Darge is a complete liar, and the Court should reject the argument for this reason alone.

Regardless of the apparent inconsistency in Fernandez's position, the Government does credit Darge's trial testimony, but even if Rivera was the getaway driver for the murder-for-hire plot, he was never convicted of that crime. Unfortunately, the Government cannot always obtain convictions against all participants in the criminal activity it investigates, but sentencing dispari-

ties do not exist merely because the Government is unable to obtain convictions for each partici-

pant in a serious crime. Here, as noted above, the Government had important admissions and fo-

rensic evidence that it used alongside Darge's testimony to secure Fernandez's conviction, but it

is unclear whether that evidence would have been sufficient to convict Rivera, or whether it

would have even been admissible. Rivera may well have known that in negotiating a narcotics-

offense disposition with the Government. The fact that the Government was unable to obtain cor-

roborating evidence against Rivera akin to what it obtained against Fernandez does not, in any

way, make Fernandez less culpable for his role in the double murder, and it is not a reason to re-

duce Fernandez's sentence.

> 3.   The Defendant Does Not Have Health Conditions that Place Him
> at Heightened Risk from COVID-19

Fernandez also claims that the COVID-19 pandemic, as well as the BOP's restrictions

imposed to slow the spread of COVID-19 within its facilities, provides a basis to reduce his life

sentence, but this argument fails because Fernandez has received a COVID-19 vaccine and has

no health conditions that place him at heightened risk for complications from the virus. Indeed,

Fernandez had an asymptomatic case of COVID-19 in January 2021, and fully recovered.

Where, as here, a petitioner has received a COVID-19 vaccine and has no risk factors for compli-

cations from COVID-19, courts have consistently found that Section 3582(c)'s "extraordinary

and compelling" standard is not met, particularly where a defendant has recovered from a case of

COVID-19 and received a vaccination. *See*, e.g., *United States v. Vasquez*, 2022 WL 269149 at

*4 (S.D.N.Y. January 27, 2022) ("[T]he risks posed by the pandemic alone do not constitute ex-

traordinary and compelling reasons for release, absent additional factors such as advanced age or

serious underlying health conditions that place a defendant at greater risk of negative complica-

tions from the disease.") (collecting cases); *see also United States v. Diaz*, 2022 WL 19760 at *3

(S.D.N.Y. January 3, 2022) (vaccine and recovery from positive case weigh against relief based on COVID-19 pandemic). Particularly in light of Fernandez's murder conviction, the presence of COVID-19, a virus we have been living with for over two years, does not warrant a reduction in sentence.

        4.      <u>The Defendant's Efforts at Rehabilitation are Not Extraordinary</u>
                <u>and Compelling Reasons to Release Him from Custody</u>

Fernandez also points to his service in prison and classroom work as evidence that his rehabilitation weighs in favor of reducing his sentence, but Fernandez's claim of rehabilitation is belied by his continued failure to accept responsibility for his crime. Fernandez was a willing participant in a double murder. Fernandez took another man's life for his own financial gain. Rather than making peace with his past crimes and moving on with his life, he continues to dwell on his claim that Darge is a liar, even though a jury credited Darge's testimony and the Government corroborated Darge's testimony with forensic evidence and other witnesses.

Moreover, while Fernandez's studies and work in prison are certainly commendable, they do not show any unusually extraordinary rehabilitation. Indeed, by working and completing classroom courses, Fernandez—serving a life sentence—has merely taken advantage of the programs that the BOP offers to its inmates. Even where, as here, an inmate shows a commendable record of rehabilitation, courts regularly find that the "extraordinary and compelling reasons" standard is not met. *See*, e.g., *United States v. Nwankwo*, 2020 WL 7335287, at * 3 (S.D.N.Y. December 14, 2020); *United States v. Saleh*, 2020 WL 3839626, at *4 (S.D.N.Y. July 8, 2020); *United States v. Pena*, 2020 WL 7408992, at *7 (S.D.N.Y. December 17, 2020). Furthermore, Fernandez has advanced no other cogent reasons to reduce his sentence, and Congress has expressly instructed that "[r]ehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason." 28 U.S.C. § 944(t).

Additionally, Fernandez has received three disciplinary infractions since 2016: two for the unauthorized giving or receiving of money, and one for possessing paper that tested positive for amphetamines. Of course, these few disciplinary infractions do not wholly vitiate the positive steps Fernandez has taken while in custody, but these infractions—particularly the infraction for possessing amphetamines—show that Fernandez is still capable of flouting lawful authority, which cuts against his claim of rehabilitation. *See United States v. Fuller*, 2020 WL 5849442, at *2 (S.D.N.Y. October 1, 2020) ("Defendant's disciplinary record—which includes two tickets in 2019, one for smuggling Suboxone into the prison and the other for disruptive conduct—does not inspire confidence.").

## B.     The 3553(a) Factors Weigh Heavily Against Granting the Motion

The Court should also deny the Petition because the Section 3553(a) factors weigh heavily against his release from custody. First and foremost, Fernandez seeks his immediate release from custody after serving just over ten years of his sentence, but a sentence of ten years' imprisonment is not nearly commensurate with the gravity of Fernandez's offense. Fernandez is a hired killer. His crime extinguished the lives of two human beings. Fernandez decided to participate in the murder plot with plenty of time for reflection, and he decided to willingly kill for money, personally firing the shot that killed at least one of the two victims. This crime is so serious that Congress imposed a mandatory minimum sentence of life imprisonment. Therefore, reducing Fernandez's sentence to a mere ten years' imprisonment is squarely contrary to the need to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense. 18 U.S.C. § 3553(a)(2)(A).

Second, reducing Fernandez's sentence, based on the risks of COVID-19 without any other factor, would run contrary to the compelling need to deter the recent rise in violent crime, especially violent gun crime, plaguing our local and national communities. To quell or at least

counter this rising violence, sentencing decisions by federal courts should send a message to would-be criminals that gun violence will lead to serious jail time. Reducing Fernandez's sentence based on previously rejected arguments and minimal COVID-19 risk would send the opposite message and run contrary to the rule of law. Indeed, it would cast doubt on whether even the most serious crimes—including a crime with a mandatory minimum sentence of life imprisonment—will result in serious punishment from federal courts. Thus, the compelling need to promote general deterrence of violent crime weighs against any reduction of Fernandez's sentence for shooting and killing a man for his own selfish profit.

Third, there is a compelling need to protect the public from further violence from the defendant. Through his crime, Fernandez demonstrated that he is willing to kill for profit. In doing so, he revealed that he has an exceptional capacity for violence and a disturbing lack of compassion for his fellow human beings. Since his motive for violence was simply to make money, if released, that motive will still exist, which means that Fernandez may decide to prey upon the community again through further violent crimes. Indeed, prior to his conviction in this case, Fernandez had seven prior convictions and committed this offense while on probation, showing a pattern of lack of respect for the law and lawful authority. PSR ¶¶ 42 – 57. Given Fernandez's lack of respect for the law, demonstrated capacity for serious violence, and complete failure to accept responsibility for his crimes, the Court has every reason to believe that Fernandez would continue to be a danger to the community if he were released.

Fernandez's Petition fails to explain how the 3553(a) factors weigh in favor of reducing his sentence, but instead, advances the fallacious argument that a lower sentence is justified because he believes the jury's verdict is incorrect. Fernandez offers no explanation for how a lower

sentence could be sufficient to protect the public or provide just punishment given that Fernandez took away the lives of two other human beings for his own selfish gain. As the jury found, he is a cold-blooded killer, and nothing in the defense submission explains how his immediate release after serving only a decade in prison is consistent with the 3553(a) factors.

## IV.    CONCLUSION

For the reasons set forth above, the Court should deny Fernandez's petition to for a reduction in sentence pursuant to 18 U.S.C. § 3582(c).

Dated:  New York, New York
        April 11, 2022

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By:    _____
        Christopher Brumwell
        Assistant United States Attorney
        (212) 637-2477